# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

American Association for Colleges for Teacher Education, *et al.*,

*Plaintiffs-Appellees*,

v.

U.S. Department of Education, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Maryland

## TIME SENSITIVE MOTION FOR STAY PENDING APPEAL

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

KELLY O. HAYES
  *United States Attorney*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
BENJAMIN C. WEI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7215*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, D.C. 20530*
  *(202) 514-1838*
  *daniel.tenny@usdoj.gov*

## INTRODUCTION

Defendants-appellants respectfully seek a stay pending appeal of the district court's preliminary injunction that prevents the Department of Education ("Department") from properly executing its mission to, among other things, "eliminate discrimination in all forms of education."  App. 66. At issue is the Department's broad authority to terminate grants that the Department no longer believes serve the Department's mission and the American people.  This Court has recently stayed pending appeal a separate district-court order that precluded a wide set of federal agencies from carrying out the President's directive to stop funding, to the extent consistent with applicable law, programs promoting diversity, equity, and inclusion ("DEI").  *See* Order, *National Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. Mar. 14, 2025).  The interference with the Executive Branch's funding priorities is no more warranted in this case than in that one.  We request a stay pending appeal.

There is no dispute here that the Department had authority to terminate a funding agreement that "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4).  The district court erroneously concluded that an alleged violation of that condition, which

was incorporated into the written funding agreements, was properly

adjudicated in district court rather than in the Court of Federal Claims,

which has exclusive jurisdiction over the contract claims at issue here.

App. 111-18.

Compounding that error, the district court concluded that the

Department's discretionary decision regarding which programs should be

funded to best achieve its goals was subject to review under the

Administrative Procedure Act ("APA"), and the court second-guessed the

Department's determinations on that score.  App. 95.  The court further

made the remarkable suggestion that the Department had to first engage in

notice-and-comment rulemaking to amend a regulation that provided a

menu of general considerations that could be considered in future grant

allocation decisions before conducting the case-by-case determinations of

which programs should be funded.  App. 92-94.

Finally, the district court granted relief to entities that had not been

identified in this lawsuit on the ground that they were members of one of

the plaintiff organizations.  App. 106.  In so doing, the court provided

multiple bites at the apple for individual funding recipients, and premised

relief for unnamed entities on irreparable harm ostensibly established by others.

The district court's order contemplates the immediate outlay of federal funds in a manner contrary to the policy interests of the Executive Branch. In light of these exigencies, the government requests a ruling by April 7, 2025. Plaintiffs oppose this motion.

## STATEMENT

1. This case involves three grant programs implemented by the Department of Education pursuant to broad grants of statutory authority to prepare and develop educators. The first, known as the Teacher Quality Partnership ("TQP"), provides that "the Secretary is authorized to award grants, on a competitive basis, to eligible partnerships, to enable the eligible partnerships to carry out" certain activities, including "a program for the preparation of teachers," a "teaching residency program," and "a leadership development program." 20 U.S.C. § 1022a(a), (c). The second, known as the Supporting Effective Educator Development ("SEED"), generally directs the Secretary to "award grants, on a competitive basis, to eligible entities for" five specified "purposes," such as "providing evidence-based professional development activities" and "making freely

available services and learning opportunity to local education agencies."
20 U.S.C. § 6672(a).  Finally, the Teacher and School Leader Incentive
Program ("TSL"), provides grants to "develop, implement, improve, or
expand performance-based compensation systems or human capital
management systems, in schools."  20 U.S.C. § 6631(a).  Plaintiffs in this
case—or plaintiffs' members—were selected to receive multiyear TQP
grants that began in FY 2020, 2022, and 2024, multiyear SEED grants that
began in FY 2022, and multiyear TSL grants that began in FY 2023.  App.
63.

On February 5, 2025, the Acting Secretary of Education issued a
Directive on Department Grant Priorities, which contemplated an internal
review to ensure that grants do not fund "discriminatory practices—
including in the form of DEI—that are either contrary to law or to the
Department's policy objectives, as well as to ensure that all grants are free
from fraud, abuse, and duplication."  App. 66.  The Department then
individually reviewed all awarded grants—including all TQP, SEED, and
TSL grants—by consulting each grant document and available information
about the funded program.  The Department concluded that the majority,
but not all, of TQP, SEED, and TSL grants should be terminated.  App. 67.

For each terminated grant, the Department issued a letter stating that the funded programs "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic;" "violate either the letter or purpose of Federal civil rights law;" "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education;" "are not free from fraud, abuse, or duplication;" or "otherwise fail to serve the best interests of the United States." App. 67-68. Citing both "the termination provisions in" the grants and the Department's authority under "2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253," the letters terminated recipients' grants. *Id.*

2. On March 3, 2025, plaintiffs filed this suit. Later that day, plaintiffs moved for immediate injunctive relief to remedy what they complained was the "unlawful termination of plaintiffs' members' grants." Defendants submitted their response on March 11, 2025, and the district court set a hearing for March 13, 2025. On March 17, 2025, the court granted in part and denied in part plaintiffs' motion.

Although the district court denied plaintiffs' constitutional claim based on the supposed vagueness of an Executive Order, the court

concluded that plaintiffs were likely to show the grant terminations violated the APA, 5 U.S.C. §§ 551–559, in three ways.  First, the court concluded that the grant terminations improperly relied upon 2 C.F.R. § 200.340(a)(4), which provides that any grant "may be terminated in part or its entirety . . . if [it] no longer effectuates the program goals or agency priorities," because the referenced "program goals or agency priorities" could only be modified by notice-and-comment rulemaking.  App. 92-93. According to the court, a provision of the General Education Provisions Act, 20 U.S.C. § 1232(d), that carves out certain education-related regulations from the APA's blanket exception to notice-and-comment rulemaking for grants, 5 U.S.C. § 553(a)(2), requires the Department to engage in rulemaking to change its "agency priorities" before terminating grants pursuant to 2 C.F.R. § 200.340(a)(4).  App. 92-93.

Second, the district court concluded that the grant terminations violated 2 C.F.R. § 200.341, which requires that any "notice of termination should include the reasons for termination," on the ground that the grantees had not been notified of specific policy violations.  App. 95.

Finally, the district court concluded that the "Department did not provide the 'reasonable explanation' of its final agency action the APA

requires," because the termination letters it sent failed to articulate "any workable, sensible, or meaningful reasons for the basis for the termination." App. 96. In particular, the court concluded that the termination letters were "so broad and vague as to be limitless," failed to mention any data or information considered, and did not reflect any individualized consideration. App. 96-97.

Regarding the remaining elements for a preliminary injunction, the district court found that plaintiffs' member organization would suffer irreparable harm because some members would have to close their programs while others would be forced to lay off staff. App. 100. The court also found the balance of the equities and the public interest favor a preliminary injunction because the effect of such an injunction would be to restore the *status quo* prior to the grant terminations that the court viewed as likely violating the APA. App. 102.

The district court entered a preliminary injunction that: (1) ordered the Department to reinstate the terminated TQP, SEED, and TSL grants that had been awarded to institutions that were members of the plaintiff organizations and (2) enjoined the Department from terminating any TQP, SEED, or TSL grant that had been awarded to institutions that were

members of the plaintiff organizations.  App. 106-07.

The following day, defendants filed an Emergency Motion for Reconsideration that argued the district court lacked jurisdiction because the Tucker Act, 28 U.S.C. § 1491, vested exclusive jurisdiction with the Court of Federal Claims and because the Department's decision to terminate grants is outside of APA review because it is "committed to agency discretion by law," 5 U.S.C. § 702(a)(2).  The court rejected both arguments on March 19, 2025.

Specifically, the district court reasoned that the Tucker Act was inapplicable because plaintiffs are "seeking redress for alleged statutory and regulatory violations," not "money damages for past wrongs," and plaintiffs seek "forward-looking equitable relief."  App. 116.  The court concluded that the determinations were not committed to agency discretion by law in light of its conclusion that notice-and-comment rulemaking was required.

On March 20, 2025, the defendants filed a motion to stay and suspend the preliminary injunction pending appeal.  The district court denied the motion the following day, primarily on the basis that it believed its previous opinions were correct.  App. 123-27.

# ARGUMENT

A stay pending appeal is warranted. The government is likely to succeed on the merits of its appeal, the government will face irreparable injury absent a stay, and the balance of equities and public interest support a stay. *See Nken v. Holder*, 556 U.S. 418, 426 (2009).

## A. The Government Is Likely to Prevail on the Merits

The district court's conclusion that the Department's decision to terminate the majority, but not all, of the TQP, SEED, and TSL grants awarded to members of plaintiffs violated the APA is contrary to established law.

> 1. *The district court's conclusion that it had jurisdiction notwithstanding the express mandate of the Tucker Act was incorrect.*

The federal government is generally "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). The APA provides only "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *id.*, that does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of*

*Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.*

When, as relevant to this case, a party seeks to access funding that it believes the government is obligated to pay under a contract or certain grants, the proper remedy is suit under the Tucker Act in the Court of Federal Claims, not under the APA in district court. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a). As the D.C. Circuit has explained, "the Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Employee Benefits of the Federal Reserve Employee Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This prohibition extends to claims founded on grants, such as those at issue here, that are implemented by "employ[ing] contracts to set the terms of and receive commitments from recipients." *Boaz Housing Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021). The proper recourse for asserted violations

of those grant terms is a "suit in the Claims Court for damages relating to an alleged breach." *Id.*

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also, e.g.*, *United States v. J&E Salvage Co.*, 55 F.3d 985, 987-88 (4th Cir. 1995) (applying *Megapulse*).

Here, although plaintiffs cite various statutory and regulatory provisions, none of them, even on plaintiffs' telling, compels the government to make payments to plaintiffs. The only conceivable source of that right is the funding agreements themselves. Indeed, the core regulation authorizing the terminations, 2 C.F.R. § 200.304, is expressly incorporated into the grant agreements. App. 90 n.13. Those agreements are thus "the source of the rights" on which plaintiffs' claims are based. Similarly, the relief sought is continued compliance with the government's obligations to make payments under the funding agreement—the "classic contractual remedy of specific performance." *U.S. Conference of Catholic*

*Bishops v. U.S. Dep't of State*, 1:25-cv-465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) (quotation omitted).

The district court acknowledged the relevant legal standard, but cited five reasons why it believed the Tucker Act did not apply. Each reduces to an effort to sidestep the fact that plaintiffs are, at bottom, seeking to enforce a contractual agreement with the government.

First, although the district court alluded to "alleged statutory and regulatory violations," App. 116, as noted, the cited statutes and regulations do not independently require the government to make payments to plaintiffs or their members but rather are relevant only insofar as they might lend credence to plaintiffs' argument that the government must continue to make payments pursuant to a contractual agreement. Indeed, compliance with the contractual agreements, and not with the relevant statutes and regulations, is what the court ultimately ordered. *See* App. 106-07 (requiring the Department to reinstate the TQP, SEED, and TSL grants "in accordance with the Grant Award Notification terms and conditions in place immediately prior to issuance of Termination Letters by the Department").

Second, third, and fourth, the district court viewed the remedies that plaintiffs seek as "forward-looking equitable relief" to "prevent the Defendants from terminating other Grant Program awards" and to eliminate certain conditions on drawing down funds, which were "beyond the narrow circumstances in which the Court of Federal Claims may issue injunctive relief per the Tucker Act." App. 116. Any breach-of-contract claim could be similarly recast as a requirement to continue complying with the terms of the contract. The court's reliance on *Maine Community Health Options v. United States*, 590 U.S. 296 (2020), and *Bowen v. Massachusetts*, 487 U.S. 879 (1988), which did not involve contracts with the government at all, highlights the absence of any precedent for an APA lawsuit contending that the government has failed to properly terminate a contract. And the Court of Federal Claims can rarely provide equitable relief, but that merely reflects the fact that specific performance is generally unavailable in contract claims against the government, rather than providing a basis for circumventing the exclusive jurisdictional provisions of the Tucker Act. *See Albrecht*, 357 F.3d at 68 ("We have held that the Tucker Act impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also

injunctive relief, which the Claims Court may not." (quotation marks omitted)).

Finally, the district court concluded that the fact that it had to examine "the parties' relationship pursuant to a constellation of sources," including statutes and regulations, weighed in favor of this being a proper APA suit. App. 117. But the relevant part of this observation was that the parties' relationship, at its core, comes down to a contractual agreement. The possibility that the contractual arrangement might have incorporated various statutory or regulatory provisions, as was the case here, App. 90 n.13, does not change the fundamental nature of the dispute. In *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), for example, the plaintiff alleged that the government had violated the Debt Collection Act, but the court concluded that the claim was impliedly precluded by the Tucker Act because the plaintiff sought payments and "[t]he right to these payments is created in the first instance by the contract, not by the Debt Collection Act." *Id.* at 894. The same analysis applies here.

> *2. The Department's grant-termination decisions need not be predicated on notice-and-comment rulemaking and instead are committed to agency discretion by law.*

Although the Tucker Act's preclusion of review is itself dispositive, the district court further erred in adopting an improperly narrow view of the circumstances in which the Department could terminate a grant that "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4). This well-established provision provides broad—indeed, largely unreviewable—authority for various Executive Branch agencies to terminate funding agreements that no longer serve the government's interests. The court's suggestion that it could second-guess these conclusions, or that some notice-and-comment rulemaking was required before the government could exercise this authority, was mistaken.

**a.** The Supreme Court made clear in *Lincoln v. Vigil*, 508 U.S. 182 (1993), that agency decisions like this—to discontinue a previously funded program to reallocate those funds to more productive uses—is committed by law to agency discretion and not reviewable under the APA. 5 U.S.C. § 701(a)(2).

In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead

reallocate those funds to other programs was committed to agency

discretion by law and thus not reviewable under the APA's reasoned-

decision-making standards.  *See id.* at 185-88.  The Court explained that the

"allocation of funds from a lump-sum appropriation is" an "administrative

decision traditionally regarded as committed to agency discretion,"

because the "very point of a lump-sum appropriation is to give an agency

the capacity to adapt to changing circumstances and meet its statutory

responsibilities in what it sees as the most effective or desirable way."  *Id.* at

192.

Thus, "an agency's allocation of funds from a lump-sum

appropriation requires 'a complicated balancing of a number of factors

which are peculiarly within its expertise': whether its 'resources are best

spent' on one program or another; whether it 'is likely to succeed' in

fulfilling its statutory mandate; whether a particular program 'best fits the

agency's overall policies'; and, 'indeed, whether the agency has enough

resources' to fund a program 'at all.'"  *Id.* at 193 (quoting *Heckler v. Chaney*,

470 U.S. 821, 831 (1985)).

"Of course," the Court went on, this discretion is not unbounded

because "an agency is not free simply to disregard statutory

responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." 508 U.S. at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.*

Although *Lincoln* addressed lump-sum appropriations, courts have made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly requir[e] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted); *see also Policy & Research, LLC v. U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018).

The programs at issue here are just such programs: they provide significant discretion in determining how best to allocate appropriated funds across grant applicants. The statute governing TQP grants provides simply that "the Secretary is authorized to award grants, on a competitive

17

basis, to eligible partnerships, to enable the eligible partnerships to carry out" certain activities, including "a program for the preparation of teachers," a "teaching residency program," and "a leadership development program." 20 U.S.C. § 1022a(a), (c). Similarly, the SEED grant statute generally directs the Secretary to "award grants, on a competitive basis, to eligible entities for" five specified "purposes," such as "providing evidence-based professional development activities" and "making freely available services and learning opportunity to local educational agencies." *Id.* § 6672(a). The TSL grant statute follows this pattern, and also generally directs the Secretary to "award grants, on a competitive basis, to eligible entities to enable the eligible entities to develop, implement, improve, or expand performance-based compensation systems or human capital management systems." *Id.* § 6632(a).

None of these statutes constrains the Department's discretion to determine how best to allocate the funding for each program among many different potential grant recipients. As a result, there is no meaningful standard for a court to apply in reviewing the Department's exercise of its broad discretion within the outer bounds of those "permissible statutory objectives." *Lincoln*, 508 U.S. at 193. Thus, the Department's decision to

award or terminate a grant is reviewable—at most, and in an appropriate forum—only for compliance with the terms of the governing statutes, regulations, and funding instruments.

**b.** The district court's contrary conclusion was premised on a provision that limits the circumstances in which the Department of Education can forgo notice-and-comment procedures when promulgating regulations relating to grants. *See* App. 92-03 (citing 20 U.S.C. § 1232(d)). That provision has no evident relevance here. The Department neither promulgated a new regulation—with or without notice and comment—nor accused grant recipients of failing to comply with a new policy with the force of law that would need to be codified in a regulation. Instead, it relied upon an existing regulation that gave it broad authority to terminate grants that it no longer considers certain funding agreements to be effective in carrying out the Department's broader goals. *See* 2 C.F.R. § 3474.1 (adopting 2 C.F.R. § 200.340).

The regulation the district court viewed as restricting the Department's discretion was one that set forth a list of priorities and definitions that "may be used across the [Department's] discretionary grant programs to further the Department's mission." 86 Fed. Reg. 70612, 70612

(Dec. 10, 2021). In a given grant program, "[t]he Secretary may choose to use an entire priority . . . or use one or more of the priority's subparts." *Id.* This lays out a permissible set of criteria that can be used to allocate resources going forward, but does not purport to limit the Department's discretion in terminating grants. Much less do the regulations purport to provide an exhaustive list of considerations that might come into play in determining whether a particular funding agreement is ineffectual or counterproductive.

One would expect a much clearer indication than the shared use of the broad term "priorities" to convert a Department of Education regulation that, on its face, represents a broad menu of priorities upon which future grant programs might be premised into a limitation on the Department's ability to exercise its separate authority, arising from Executive Branch-wide regulations, to terminate a funding agreement when it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). In addition, the Department's view that certain types of programs do not "effectuat[e] the program goals," *id.*, because they are ineffective or counterproductive has little to do with the announced priorities. In short, the regulations allow the Department to terminate

funding agreements to maintain flexibility in spending taxpayer dollars in

the way the Executive Branch sees fit, and do not require compliance with a

separate set of broad principles from which the agency may select in

creating future grant programs.  85 Fed. Reg. 49506, 49508 (Aug. 13, 2020)

(rejecting requests to limit Section 200.340(a)(4) to terminations "for cause,"

and explaining the provision was intended to allow termination where it

"may be in the interest of the government to terminate the Federal award").

> ### 3. *In any event, the grant terminations did not violate the arbitrary-and-capricious standard.*

Even if the Department's discretionary decisions were subject to

review, they would be upheld under the arbitrary-and-capricious standard,

which "requires that agency action be reasonable and reasonably

explained."  *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

"Judicial review under that standard is deferential, and a court may not

substitute its own policy judgment for that of the agency." *Id.*

As explained, those terminations came after the Department

conducted an individualized review pursuant to the Acting Secretary's

directive to identify grants that fund programs that are contrary to the

Department's policy priorities.  App. 97-99.  The Department confirmed

that the grants at issue here in fact funded such programs and terminated those grants on that basis.  App. 98-99.  This decision-making process was both reasonable and reasonably explained, particularly in this context of discretionary grants where the Department is vested with substantial discretion.

The district court purported to identify a lack of clarity in the termination letters, but each identified "DEI initiatives" that conflict with the Department's current policies as the root cause of the termination.  *See* App. 89.  The possibility that individual programs might be unlawful, violate the purpose of federal law, suffer other policy defects, or some combination does not obscure the clear thrust of the letter as targeted at DEI programs that the Department did not wish to continue funding.  No further explanation is required.

The district court further faulted the Department for sending template letters and for not engaging in any "individualized analysis." App. 97.  But the Department in fact engaged in individualized review, a fact the court summarily dismissed as a "post-hoc rationalization," App. 98—even though that review occurred before the grants were terminated— apparently because the Department's description of that process was

contained in a declaration filed in litigation challenging the terminations. *But see Roe v. Department of Def.*, 947 F.3d 207, 221 (4th Cir. 2020) (allowing *post-hoc* declarations that are "merely explanatory of the original record and contain no new rationalizations" (quotation and alteration omitted)); *Lana, Inc. v. United States*, 925 F.3d 521, 524 (D.C. Cir. 2019) (explaining that courts may consider such post hoc declarations when they "accurately reflect[] the contemporaneous reasoning of the" agency). The court also glossed over the fact the Department did not terminate all grants held by members of plaintiffs' organizations, confirming that review was individualized. App. 67. And because the Department identified grants with a common characteristic (funding DEI) and terminated the grants on that basis, the Department reasonably provided a common explanation to grantees. Indeed, treating similarly situated grants equally honors the APA, for "[r]easoned decisionmaking requires treating like cases alike." *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989).

### B. The Equitable Factors Favor a Stay Pending Appeal

The balance of equities and the public interest favor a stay pending appeal. *See Nken*, 556 U.S. at 435 (noting that these factors merge in cases involving the government). In particular, the district court's order will

cause significant and irreparable harm to the government. Beyond the obvious harms to the President's ability to execute core Executive Branch policies, the order irreparably harms the public fisc. The order requires the Department to reinstate access of grantees to TQP, SEED, and TSL funds, and enjoins the Department from re-terminating the grants or even imposing any additional payment protections, such as requiring pre-approval for grant payments. App. 106. Thus, the challenged order will result in the immediate outflow of significant amounts of money from the federal fisc with minimal oversight. And once that horse has left the barn, the government has a limited ability to recoup those dollars, even if it is later determined that the grant terminations were lawful and the barn doors are closed in the future. Indeed, the grant recipients here claim they will immediately spend any grant money they receive on operational costs, App. 100, which makes the prospect of the government ever recovering any improperly disbursed funds even more remote.

In contrast, the gravamen of plaintiffs' claim is monetary and, if they prevail, they will receive funds to the extent required by law. *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (the "possibility that adequate compensatory or other corrective relief will be

available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm") (citation omitted), *cert. denied*, 569 U.S. 994 (2013).  Plaintiffs have no cognizable interest in receiving federal funds to which they are not legally entitled or on a timeline that is not legally compelled.

### C. The District Court's Order Is Overbroad

Even accepting the district court's conclusions, the court's order is overbroad because it extends to all "TQP, SEED, and TSL Grant Awards of Plaintiff NCTR and Plaintiffs' Grant Recipient members."  App. 106.  In so doing, the order is not limited to the specific grants and grant recipients identified in the Complaint.  App. 20-33.  That order leads to a fundamentally inequitable situation in which unidentified members of the organization can obtain relief if plaintiffs prevail but may not be precluded from obtaining relief separately if the government prevails.  *Cf. Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (explaining the equitable and historical problems with "asymmetric" suits).  These concerns are heightened in this case, where there is a separate set of ostensibly representative plaintiffs seeking overlapping remedies in another case.

*State of California, et al. v. U.S. Department of Education, et al.*, No. 25-10548-MJJ (D. Mass.).

Finally, there is no basis to conclude that irreparable harm, a necessary predicate for a preliminary injunction, would be suffered by unnamed grant recipients. Here, the district court relied upon individual declarations by grant recipients that they would suffer "programmatic closures" and "staff terminations" as a basis for its finding of irreparable harm. App. 99. There is obviously no such evidence concerning unnamed grant recipients, even if they are members of the Plaintiff organizations. As such, there is no basis to conclude a preliminary injunction is appropriate for those unnamed grant recipients. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S.7, 22 (1980) (A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." (emphasis in original)).

## CONCLUSION

For the foregoing reasons, the Court should grant a stay pending appeal or, at a minimum, limit the district court's relief.

Respectfully submitted,

YAAKOV M. ROTH
   *Acting Assistant Attorney General*

KELLY O. HAYES
   *United States Attorney*

ERIC D. McARTHUR
   *Deputy Assistant Attorney General*

MARK R. FREEMAN

 */s/ Daniel Tenny*
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
BENJAMIN C. WEI
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7215*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, D.C. 20530*
   *(202) 514-1838*
   *daniel.tenny@usdoj.gov*

MARCH 2025

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 5,022 words. The motion complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5) and (6) because it has been prepared using Microsoft Word 2016 in proportionally spaced 14-point Book Antiqua typeface.

*/s/ Daniel Tenny*
DANIEL TENNY

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2025, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Daniel Tenny*
DANIEL TENNY

# APPENDIX

# Table Of Contents

Complaint for Declaratory and Injunctive Relief (Dkt. No. 1)_____ App. 1

Plaintiffs' Reply in Further Support of their
Motion for a Temporary Restraining Order
/Preliminary Injunction (Dkt. No. 25) _____ App. 40

District Court Opinion (Dkt. No. 32) _____ App. 58

District Court Order (Dkt. No. 33) _____App. 106

District Court Opinion and Order
on Reconsideration (Dkt. No. 42) _____App. 108

District Court Opinion and Order
on Say Pending Appeal (Dkt. No. 45) _____App. 121

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

---

| | |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, 1307 New York Ave NW #300, Washington, DC 20005, | :   :   :   :   : |
| | : |
| NATIONAL CENTER FOR TEACHER RESIDENCIES, 1332 N. Halsted Street, Suite 304 Chicago, IL 60642. | :   :   :   :   : |
| and, | : |
| THE MARYLAND ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, 304 Hawkins Hall Towson University, Towson, MD. 21252 | :   :   :   :   :   :   :   : |
| *Plaintiffs,* | : |
| v. | :   : |
| DENISE CARTER, in her official capacity as Acting Secretary of Education 400 Maryland Avenue, SW Washington, DC 20202, | :   :   :   : |
| | : |
| U.S. DEPARTMENT OF EDUCATION, 400 Maryland Avenue, SW Washington, DC 20202, | :   :   : |
| and, | : |
| DONALD J. TRUMP, in his official capacity as President of the United States, c/o Attorney General of the United States U.S. Department of Justice 950 Pennsylvania Avenue, NW Washington, DC 20530-0001 | :   :   :   :   :   :   : |
| *Defendants.* | : |

Case No.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the American Association of Colleges for Teacher Education ("AACTE"), the National Center for Teacher Residencies ("NCTR"), and the Maryland Association of Colleges for Teacher Education ("MACTE") (collectively, "Plaintiffs") file this action against Defendants Denise Carter, in her official capacity as Acting Secretary of Education, the United States Department of Education (the "Department"), and Donald Trump, in his official capacity as President of the United States (collectively, "Defendants"), for declaratory and injunctive relief.

AACTE's, NCTR's, and MACTE's members together comprise hundreds of teacher preparation programs throughout the United States. Many of Plaintiffs' members received grants from the Department through the Teacher Quality Partnership Program ("TQP"), the Supporting Effective Educator Development Program ("SEED"), and the Teacher and School Leader Incentive Program ("TSL"), which were used to fund programs to prepare and develop educators. Without prior warning, and in reliance on the President's recent Executive Order regarding DEI initiatives, the Department of Education recently summarily terminated many of Plaintiffs' members' TQP, SEED, and TSL grants. Not only were those terminations unlawful in reliance on Executive Order 14151, the Department also failed to follow statute and Federal regulations in terminating the grants, making the terminations unlawful under the Administrative Procedures Act too.

In the years that the Department of Education held competitions to award TQP, SEED, and TSL grants, the Department selected Priorities for applicants from a set of allowable agency Priorities enacted through a rulemaking process required by statute. These Priorities were used in the competitions to award TQP, SEED, and TSL grants to AACTE's and MACTE's member organizations and to NCTR and its member organizations. Pursuant to statute and Department

APPENDIX Page 2

regulation, Priorities for any competitive grant program must generally be set by Congress or through notice and comment rulemaking by the Department.[1] Only then can the final published agency Priorities apply to the competitive grant programs for selection of grantees in a particular fiscal year.

In compliance with statute and its regulation, the Department followed the notice and comment rulemaking process and established several Priorities that were allowable at the time the TQP, SEED, and TSL grants' Notices for Inviting Applications at issue in this case were published in the *Federal Register* in 2020, 2022, 2023, and 2024. The Department then awarded AACTE's and MACTE's member organizations and NCTR and its member organizations up to five-year TQP grants, up to three-year SEED grants, and/or up to three-year TSL grants that remained active through early to mid-February 2025.

But in February 2025, the Department summarily terminated grants awarded under TQP, SEED, and TSL. The purported basis provided by the Department for termination was that the grants are "inconsistent with, and no longer effectuate[], Department priorities." In form letters sent along with the official termination notifications, the Department explained that:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race,

---

[1] While there are limited exceptions to this general rule, none of those exceptions are applicable here.

color, religion, sex, national origin, or another protected
characteristic; that violate either the letter or purpose of Federal civil
rights law; that conflict with the Department's policy of prioritizing
merit, fairness, and excellence in education; that are not free from
fraud, abuse, or duplication; or that otherwise fail to serve the best
interests of the United States. The grant is therefore inconsistent
with, and no longer effectuates, Department priorities.

After terminating AACTE's and MATCE's member organizations' and NCTR's and its

member organizations' TQP and SEED grants, the Department issued a press release titled "U.S.

Department of Education Cuts $600 Million in Grants Used to Train Teachers and Education

Agencies on Divisive Ideologies." *See* https://www.ed.gov/about/news/press-release/us-

department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

Neither the Department's "official" reason for terminating the grants, as articulated in the

Grant Award Notifications regarding Department Priorities, nor its actual, publicly-articulated

reason for termination regarding DEI initiatives, were lawful. The "official" justification is

unlawful because the federal government has published a regulation governing the termination of

grants that the Department did not follow here. The Department's publicly articulated reason for

terminating the grants was unlawful because it was predicated on portions of an Executive Order

that has been enjoined by this Court.

The Department's stated reason relied, erroneously, on an implied change in "Department

priorities." Department Priorities," however, is a term of art; they are not subject to whim or fiat

and, by statute, must instead be established through notice and comment rulemaking. The

Department Priorities applicable to Plaintiffs' members' TQP, SEED, and TSL grants are the same

today as they were when the grants were awarded because (a) no subsequent rulemaking has taken

place; and (b) the statutes that established Priorities allowable for TQP, SEED, and TSL have not

been repealed or amended. Given that the Department Priorities have not changed, and the grants

4

were determined to meet the still-current Priorities during the competition process, it would be arbitrary *per se* for the Department to conclude that these grants are not consistent with or do not effectuate those same "Department Priorities" now.

As a result of the Department's improper early terminations, the Grant Recipients have been and will continue to be deprived of essential funding required to continue their teacher preparation programs and the continuation of the Department's unlawful terminations will irreparably harm Plaintiffs and their members. As such, Plaintiffs respectfully request that this Court award relief to address the irreparable harm that continues to result from Defendants' unlawful actions.

In support of their claims, Plaintiffs further aver as follows:

1.  The Supporting Effective Educator Development Program, authorized by Congress under section 2242 of the Elementary and Secondary Education Act of 1965, as amended (20 U.S.C. § 6672), provides funding to increase the number of highly effective educators in the United States by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of educators. SEED was authorized in statute to support educators' development across the continuum of their careers and requires the Secretary of the Department of Education to award grants to eligible entities for the purpose of:

> (1) providing teachers, principals, or other school leaders from nontraditional preparation and certification routes or pathways to serve in traditionally underserved local educational agencies;
>
> (2) providing evidence-based professional development activities that address literacy, numeracy, remedial, or other needs of local educational agencies and the students the agencies serve;
>
> (3) providing teachers, principals, or other school leaders with professional development activities that enhance or enable the provision of postsecondary coursework through dual or concurrent enrollment programs and early college high school settings across a local educational agency;

5

(4) making freely available services and learning opportunities to local educational agencies, through partnerships and cooperative agreements or by making the services or opportunities publicly accessible through electronic means; or

(5) providing teachers, principals, or other school leaders with evidence-based professional enhancement activities, which may include activities that lead to an advanced credential.

20 U.S.C. § 6672(a).

2.      The Teacher Quality Partnership Grant Program, authorized by section 202 of the Higher Education Act of 1965, as amended (20 U.S.C. § 1022), provides funding to eligible partnerships to improve student achievement; improve the quality of prospective and new teachers by improving the preparation of prospective teachers and enhancing professional development activities for new teachers; hold teacher preparation programs at institutions of higher education accountable for preparing teachers who meet applicable State certification and licensure requirements; and recruit highly qualified individuals, including individuals of color and individuals from other occupations, into the teaching force. TQP funds teacher preparation programs at the pre-baccalaureate or "fifth-year" level, and teaching residency programs for individuals new to teaching, or mid-career professionals from outside the field of education, with strong academic and professional backgrounds.

3.      The Teacher and School Leader Incentive Program, authorized by section 2212 of the Elementary and Secondary Education Act of 1965, as amended (20 U.S.C. § 6632), serves educators in high-need schools who raise student academic achievement and close the achievement gap between high- and low-performing students. TSL helps develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders.

4.     Plaintiff AACTE's and MACTE's member organizations and Plaintiff NCTR and its member organizations (the "Grant Recipients") receive TQP, SEED, and/or TSL funding through grants awarded by the Department of Education. Specifically, the Grant Recipients were awarded up to five-year TQP grants through the FY 2020 TQP competition, FY 2022 TQP competition, and FY 2024 TQP competition, up to three-year SEED grants through the FY 2022 SEED competition, and up to three-year TSL grants though the FY 2023 TSL competition.

5.     In February 2025, the majority of the Grant Recipients received updated Grant Award Notifications and form letters from the Department ("Termination Letters") terminating their TQP, SEED, and TSL grants.[2] True and correct representative copies of the Grant Award Notifications are attached as **Exhibit A**. True and correct representative copies of the Termination Letters are attached as **Exhibit B**.

6.     All of the Grant Recipients are similarly situated because the substance of each Termination Letter and added terms and conditions in the Grant Award Notifications from the Department are identical, indicating the same reasons with the same terminology for the grant terminations. *See* Exhibits A, B.

7.     In terminating the Grant Recipients' TQP, SEED, and TSL grants in their entirety, effective the same day as the termination letters were sent/dated, the updated Grant Award Notifications provided the following reason for termination: "The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities." (Exhibit A at pages 4, 10, 16, 22, 28, 34, 40). The Termination Letter articulated the same reason along with additional language regarding DEI initiatives:

> The grant specified above provides funding for programs that promote or
> take part in DEI initiatives or other initiatives that unlawfully discriminate

---

[2] While the Department terminated the majority of the Grant Recipients' grants, some of Plaintiffs' member organizations did not have their TQP grants terminated yet.

on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. **The grant is therefore inconsistent with, and no longer effectuates, Department priorities**. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [] in its entirety effective 2/[]/25.

Exhibit B at pages 1, 3, 5, 7, 9, 11, 13 (emphasis added).

8.    The Department's articulated basis for terminating the grants and denying access to the funds is contrary to statute and regulations, and the immediate termination constitutes final agency action that is arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act ("APA").

9.    The Grant Recipients offer programs to provide supports to improve the quality of teaching and school leadership. The unlawful termination of the TQP, SEED, and TSL grants will force the immediate closure of many of these programs and irreparably harm the Grant Recipients and the educators, students, and communities they serve. Plaintiffs thus bring this action to enjoin Defendants from terminating the TQP, SEED, and TSL grants.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action because the claims arise under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because Defendants are United States officials, *see* 28 U.S.C. § 1346(a)(2). This Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), (e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official

capacity, and a substantial part of the events or omissions giving rise to the claims occurred in this District, and Plaintiff MACTE resides in this district.

## PARTIES

12.    Plaintiff American Association of Colleges for Teacher Education is a nonprofit association of educator preparation programs, comprised of hundreds of public and private colleges and universities and nonprofit organizations.[3] AACTE's member organizations prepare professional educators across the United States and its territories, encompassing teachers, counselors, PK-12 administrators, and college faculty. AACTE's mission is to elevate education and educator preparation through research, professional practice, advocacy, and collaboration. The termination of the TQP, SEED, and TSL grants directly threatens this mission. These grants fund initiatives that benefit PK-12 students and schools nationwide by supporting innovative approaches to educator preparation and professional development. Through their work, grantees produce evidence-based practices that lead to the preparation of highly qualified teachers, principals, and school-based educators. As the nation's largest organization dedicated to educator preparation, AACTE prioritizes ensuring that every child has access to credentialed, well-prepared educators. These grants are vital to that goal. AACTE plays a crucial role in amplifying their impact by sharing grantees' research, policy insights, and best practices with the broader education community through publications, convenings, annual meetings, and other resources. Preserving these funding sources is essential to sustaining and advancing the quality of educator preparation and, ultimately, student success. AACTE's principal place of business is 1602 L St., NW, Suite 601, Washington, DC 20036.

---

[3] AACTE's member organizations can be found at https://aacte.org/membership/our-members/.

13.    Plaintiff The National Center for Teacher Residencies supports the design of new teacher residency programs and provides consulting to strengthen existing programs across the United States. NCTR is comprised of dozens of network members, including colleges, universities, and nonprofit teaching organizations.[4] NCTR's mission is to transform educator preparation by advancing the teacher residency movement to prepare, support, and retain more effective educators who represent and value the communities they serve. The termination of the TQP, SEED, and TSL grants implicates NCTR's core mission because it removes the financial supports needed to reduce tuition costs for aspiring teachers called teacher residents, pay host K-12 teachers for the work they are doing to support the aspiring teachers, offset the cost for licensure examinations and test prep workshops, and provide a stipend or pay for work the teacher residents are completing through their internships. Without these necessary supports, teacher residencies will be unable to continue to lower the financial barrier to becoming a teacher and ensure the necessary comprehensive preparation is provided to prepare future teachers. NCTR's principal place of business is 1332 N. Halsted Street, Suite 304 Chicago, IL 60642.

14.    Plaintiff the Maryland Association of Colleges for Teacher Education is a membership organization with a mission to serve as a distinct statewide voice on matters of importance to educator preparation programs at Maryland's colleges and universities. AACTE and MACTE collaborate to strengthen their advocacy efforts, share experience and expertise, and expand their members' professional development opportunities. MACTE's members include regionally accredited colleges and universities engaged in the preparation of professional school personnel with state program approval. In addition to hosting regular professional learning activities, MACTE serves on the Council of Educational, Administrative and Supervisory

---

[4] NCTR's member organizations can be found at https://nctresidencies.org/nctr-network/members/.

Organizations of Maryland Leadership Team, nominates three representatives to serve on the Professional Standards and Teacher Education Board, and represents Maryland preparation programs at AACTE. The termination of the TQP and SEED grants implicates MACTE's core mission. MACTE serves the institutions of higher education in Maryland for both the recruitment and retention of future teachers as well as the support and advancement of current classroom teachers. Both the TQP and SEED grants were focused on recruitment, retention of future teachers as well as the support of practicing teachers in Maryland. MACTE's principal place of business is 304 Hawkins Hall, Townson University, Townson, MD 21252.

15.     Defendant Denise Carter is the Acting Secretary of Education and is sued in her official capacity.

16.     Defendant the United States Department of Education is an agency of the United States.

17.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

## FACTUAL AND LEGAL BACKGROUND

### I.     Overview of Agency Priorities.

18.     In 2008, Congress authorized TQP to support high-quality teacher preparation and professional development for prospective teachers and school leaders. In 2015, Congress authorized SEED to increase the number of highly effective educators by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of teachers, principals, or other school leaders. Also in 2015, Congress authorized TSL to assist local educational agencies and nonprofit organizations to develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems

11

for teachers, principals, or other school leaders, especially for teachers, principals, or other school

leaders in high-need schools who raise student growth and academic achievement and close the

achievement gap between high- and low-performing students.

19.    Congress directed the Secretary of the Department of Education to award grants,

on a competitive basis, to eligible entities to provide funding consistent with the goals of TQP (20

U.S.C. § 1022a(a)), SEED (20 U.S.C. § 6672(a)), and TSL (20 U.S.C. § 6632(a)).

20.    Federal regulations govern the procedures and the basis by which a Federal agency,

such as the Department of Education, may terminate a Federal award. *See* 85 F.R. 49506-49582.

A Federal award may be terminated by the Federal agency or pass-through entity if an award no

longer effectuates the program goals or agency priorities. *See* 2 C.F.R. § 200.340(a)(2) (2020); *see*

*also* 2 C.F.R. § 200.340(a)(4) (2024).

21.    The Secretary of Education (the "Secretary") is required to publish agency

Priorities in the *Federal Register*, which must be used to select the Priorities for a competition and

must have gone through public comment, unless one of the following exceptions apply:

> (i) The final annual priorities will be implemented only by inviting applications that meet the priorities;
>
> (ii) The final annual priorities are chosen from a list of priorities already established in the program's regulations;
>
> (iii) Publishing proposed annual priorities would seriously interfere with an orderly, responsible grant award process or would otherwise be impracticable, unnecessary, or contrary to the public interest;
>
> (iv) The program statute requires or authorizes the Secretary to establish specified priorities; or
>
> (v) The annual priorities are chosen from allowable activities specified in the program statute.

34 C.F.R. § 75.105(b)(2); 20 USC § 1232(d).

22.     The Secretary is likewise required to establish the specific Priorities that are included in the application for each competitive federal grant program, such as TQP, SEED, and TSL, by publishing the Priorities in the Notice Inviting Applications for the grant in the *Federal Register*. (34 C.F.R. § 75.105(b)(1)).

23.     As a federal agency, the Department is unique in the statutory requirement it has to follow for setting agency Priorities for discretionary grants. While the APA (5 U.S.C. § 553) exempts grants from the rulemaking process, the General Education Provisions Act (20 U.S.C. § 1232(d)) ("GEPA") states that, for the Department of Education, the grants exemption for rulemaking only applies to regulations (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines rulemaking will cause extreme hardship to the intended beneficiaries of the program.

24.     In other words, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process, unless one of the above exceptions apply.

II.    **Department of Education Priorities Applicable to the Now-Terminated TQP, SEED, and TSL Grants.**

25.     After going through the proper notice and comment rulemaking process, the Department published a Notice of Final Priority for discretionary grant programs in the *Federal Register* on November 27, 2019. (84 F.R. 65300-65303).[5] Also after following the required notice and comment rulemaking process, the Department published a Notice of Final Priorities for all discretionary grant programs in the *Federal Register* on March 9, 2020.[6] (85 F.R. 13640-13644).

---

[5] The Department of Education published a Notice of Proposed Priorities for public comment on July 29, 2019. (84 F.R. 36504-36507).

[6] The Department of Education published a Notice of Proposed Priorities for public comment on November 29, 2019. (84 F.R. 65734-65739).

26.    Then, after going through the proper notice and comment rulemaking process, the Department published its Notice of Final Priorities for TQP, SEED, and TSL grant competitions in the *Federal Register* on July 9, 2021.[7] The final Priorities consisted of: Priority 1—Supporting Educators and Their Professional Growth; and Priority 2—Increasing Educator Diversity. (86 F.R. 36217-36220).

27.    On July 9, 2021, after going through the proper notice and comment rulemaking process, the Department published a Notice of Final Priority for TSL.[8] The Priority was for "High-Need Schools." (86 F.R. 36220-36222).

28.    After following the required notice and comment rulemaking process, the Department of Education published a Notice of Final Priorities for the Secretary's Supplemental Priorities for all discretionary grant programs in the *Federal Register* on December 10, 2021.[9] The final supplemental Priorities consisted of the following: Priority 1—Addressing the Impact of COVID-19 on Students, Educators, and Faculty; Priority 2—Promoting Equity in Student Access to Educational Resources and Opportunities; Priority 3—Supporting a Diverse Educator Workforce and Professional Growth To Strengthen Student Learning; Priority 4—Meeting Student Social, Emotional, and Academic Needs; Priority 5—Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success; and Priority 6—Strengthening Cross-Agency Coordination and Community Engagement To Advance Systemic Change. (86 F.R. 70612-70641).

---

[7] The Department of Education published a Notice of Proposed Priorities for public comment on April 20, 2021. (86 F.R. 20471-20475).

[8] The Department of Education published a Notice of Proposed Priority for public comment on April 9, 2021. (86 F.R. 18519-18523).

[9] The Department of Education published a Notice of Proposed Priorities for public comment on June 30, 2021. (86 F.R. 34664-34674).

III.    **Notice Inviting Applications for FY 2020, FY 2022, and FY 2024 TQP Grants.**

29.    On May 18, 2020, the Department published a Notice Inviting Applications for the FY 2020 TQP competition inviting applicants to apply for the grant funds. (85 F.R. 29691-29704). In addition, on February 25, 2022, the Department published a Notice Inviting Applications for the FY 2022 TQP competition inviting applicants to apply for the grant funds. (87 F.R. 10906-10923). The Department similarly published a Notice Inviting Applications for the FY 2024 TQP competition on April 4, 2024. (89 F.R. 23573-23592).

30.    The project period for the FY 2020, FY 2022, and FY 2024 TQP competitions (the maximum amount of time for which the grants can be awarded) was up to five years. (85 F.R. 29699, 87 F.R. 10918, 89 F.R. 23587).

31.    All three TQP grant competitions included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TQP's authorizing statute (20 U.S.C. § 1022).

32.    Grant Recipients were selected to receive funding from the FY 2020 TQP competition for up to a five-year period.

33.    Grant Recipients were selected to receive funding from the FY 2022 TQP competition for up to a five-year period.

34.    Grant Recipients were selected to receive funding from the FY 2024 TQP competition for up to a five-year period.

IV.    **Notice Inviting Applications for FY 2022 SEED Grants.**

35.    On April 4, 2022, the Department published a Notice Inviting Applications for the FY 2022 SEED competition, inviting applicants to apply for the grant funds. (87 F.R. 19487-19496).

36.     The project period for the FY 2022 SEED competition was up to three years. (87 F.R. 19492).

37.     The SEED grant competition included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in SEED's authorizing statute (20 U.S.C. § 6672).

38.     Grant Recipients were selected to receive funding from the FY 2022 SEED competition for up to a three-year period.

**V.     Notice Inviting Applications for FY 2023 TSL Grants.**

39.      On May 24, 2023, the Department published a Notice Inviting Applications for the FY 2023 TSL competition, inviting applicants to apply for the grant funds. (88 F.R. 33592-33601).

40.     The project period for the FY 2023 TSL competition was up to three years. (88 F.R. 33598).

41.     The TSL grant competition included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TSL's authorizing statute (20 U.S.C. § 6632).

42.     Grant Recipients were selected to receive funding from the FY 2023 TSL competition for up to a three-year period.

**VI.     The Department's Decision to Terminate the TQP, SEED, and TSL Grants.**

43.     In February 2025, the Department sent Termination Letters and updated Grant Award Notifications to Grant Recipients, informing them that their TQP, SEED, and TSL grants were terminated. The termination of the grants was effective "in [their] entirety" immediately. *See* Exhibits A, B.

44.     The only stated reason for the termination of the grants was that they are "inconsistent with, and no longer effectuate[], the Department priorities." *See id*.

16

**VII.    The Preliminary Injunction Granted in *NADOHE et al. v. Trump et al.* Prohibits the Department from Enforcing the Termination of the Grants.**

45.    On February 21, 2025, this Court granted a preliminary injunction blocking the President's administration from enforcing certain provisions of Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive Order of January 20, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) (the "J20 Order"), and Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("J21 Order"). *National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) (the "NADOHE Order"). A true and correct copy of the NADOHE Order is attached as **Exhibit C**.

46.    In relevant part, the NADOHE Order enjoins the President's administration from enforcing a provision in Executive Order 14151 requiring "[e]ach agency, department, . . . [to] take the following actions within sixty days of this order: (i) terminate, to the maximum extent allowed by law, . . . all . . . 'equity-related' grants or contracts" (the "Termination Provision").

47.    In granting the preliminary injunction, the Court held that the plaintiffs showed a likelihood of success on their claim that the Termination Provision is void for vagueness under the Fifth Amendment.

48.    While the Grant Award Notification and Termination Letters did not reference Executive Order 14151 as the reason for terminating the grants, the Department released a press release on February 17, 2025 that makes clear that the grant terminations at issue in this lawsuit were pursuant to the Termination Provision in Executive Order 14151 requiring the Department to terminate "equity-related" grants or contracts. A true and correct copy of the press release is

attached as **Exhibit D**.[10] The press release explains that the grants were terminated because they were using taxpayer funds to train teachers and education agencies on divisive ideologies, such as "Diversity, Equity, and Inclusion" and "equity training"– the same directive of the Termination Provision. *See id*.

49.    The Termination Letters likewise reference the Department's position to "ensure[] that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives[.]" (Exhibit B at pages 1, 3, 5, 7, 9, 11, 13).

50.    While the Grant Award Notifications and Termination Letters state that the grants were terminated because they were "inconsistent with, and no longer effectuate[], Department priorities," it is clear from the Government's conduct that the grants were terminated pursuant to the now-enjoined Termination Provision.

51.    The NADOHE Order benefits not just the named plaintiffs in that action, but all contractors and grantees who were subjected to the Termination Provision. *NADOHE v. Trump,* No. 1:25-CV-00333-ABA, 2025 WL 573764 at *28-29.

52.    As such, this Court's NADOHE Order covers, and forbids, the continued enforcement of the termination of the grants at issue in this lawsuit. Plaintiffs seek relief directing the Department to return the Grant Awardees to the *status quo ante* with respect to Executive Order 14151 and rescind the termination of their TQP, SEED, and TSL grants.

---

[10]   *See*   https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

**VIII.    The Department's Termination of the Grants also Violates the Administrative Procedures Act ("APA").**

53.    Even if the Department's termination of the grants at issue in this lawsuit were not governed by the NADOHE Order, the terminations were unlawful because they constituted an unlawful, arbitrary, and capricious action that violates the APA.

54.    Statute and regulation require the Secretary to publish Department Priorities for program grants in the *Federal Register*, subject to a notice and comment period. (20 U.S.C. § 1232(d), 34 C.F.R. § 75.105(b)(2)). The Secretary then selects allowable Priorities to include in the applications which are published in the *Federal Register*. (34 C.F.R. § 75.105(c)).

55.    The proffered reason by the Department for the termination of the grants because they "are inconsistent with, and no longer effectuates, Department priorities," is contrary to statute and regulation and arbitrary and capricious.

56.    The Department cannot, by law, determine that with a change in administration, specific Department Priorities for grant programs are no longer allowable unless and until the Department engages in rulemaking to propose and issue new Final Priorities. The present administration has not done that, so the current Priorities remain Department Priorities.

57.    The Department Priorities for the grants that were awarded from the respective competitions were lawfully selected for, and articulated in, the published Notices Inviting Applications in 2020, 2022, 2023 and 2024 pursuant to program statutes or after the proper notice and comment rulemaking process.

58.    As a result, and contrary to the Department's official reasons, the grants at issue are consistent with the current Department Priorities. If the Department wishes to establish new Department Priorities, it may do so only through the means established by statute and regulation, not through whim or fiat.

IX.    **Effect of Termination on Plaintiffs and Their Member Organizations.**

59.    As of the date of the Termination Letters, all funding from the grants has been halted and the Grant Recipients are no longer receiving any funds from the Department under the grants they were awarded under TQP, SEED, and TSL.

60.    Without the TQP, SEED, and TSL grants, Grant Recipients are unable to continue funding their work.

61.    The loss of funding is an economic harm so great that it threatens the very existence of Plaintiffs' members' teacher preparation programs.

62.    The TQP, SEED, and TSL grants together fund hundreds of teacher preparation programs in the United States, and the termination *en masse* of these grants threatens the system that prepares our nation's teaching workforce.

63.    The harm to Plaintiffs and their member organizations from the terminations has been severe, and a continuation of the harm is certain and irreparable.

64.    The following represent just a few of many examples of the harm to Plaintiffs and their member organizations caused by the Department's termination of the Grant Recipients' TQP, SEED, and TSL grants:

### *A. Plaintiff NCTR*

65.    Plaintiff NCTR has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. Plaintiff NCTR was awarded a three-year SEED grant in 2022.

66.    NCTR's SEED grant funded thirteen teacher residency programs spanning five states. The teacher residency programs consist of partnerships between higher education

institutions and K-12 school districts in traditional public and charter schools located in rural, suburban, and urban areas.

67.     The teacher residency programs provide financial support to their participants in the following ways: tuition support, living expense stipends, tutoring in licensing examinations, and emergency funds. The programs also provide mentorship, intensive training and professional development, and summer institutes for mentor teachers.

68.     Plaintiff NCTR's SEED grant is also used to fund a cross-organizational (twelve residency programs) collaborative effort to create and field-test a coherent and aligned vision of mentoring excellence and collective responsibility. One of the goals of the grant funds was to complete a study of attainable metrics to evaluate mentor teacher impacts on resident learning.

69.     Plaintiff NCTR's SEED grant was terminated in its third year.

70.     The termination of the SEED grant will result in a $1,188,070 overall loss, including a $332,000 direct loss to the grant winning organization, as well as a loss of $360,000 in expenses to contractors and a $495,000 loss in subgrants to the thirteen teacher residency programs.

71.     This $495,000 loss in subgrants will have an adverse impact on the thirteen teacher residency programs, and will directly lead to staff cuts at a number of those institutions. In addition, the grant termination directly affects the 128 teacher residents currently enrolled in the thirteen programs as part of the 2024-25 school year and will also impact the ability of those thirteen programs to enroll the projected 190 teacher residents who plan to begin their residency year this summer 2025. With the termination of the grant, some of the thirteen teacher residency programs will be forced to close.

72.    Programs intended to use subgrant funds to provide tuition relief and stipends for both groups of teacher residents, which would total over 300 teacher residents. This will no longer be possible with the termination of the grant.

73.    The termination of the grant will also directly affect at least 7,500 K-12 students across the five states.

74.    In addition, with the grant's termination, the study of the mentor teacher impact and teacher resident learning will not be completed, depriving Plaintiff NCTR of its capacity to engage in core mission-driven activities, such as publishing about the most promising practices for developing skilled, experienced teachers into impactful mentors of new teacher residents.

75.    Furthermore, without its ability to continue these thirteen teacher residency programs due to the loss of grant funding, Plaintiff NCTR is deprived of its ability to serve the K-12 school districts where there is high turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages.

76.    These harms prevent NCTR from engaging in the core activities compelled by its mission and reason for existence.

### B. AACTE Member Organization - American University

77.    American University ("AU") is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. AU is in the second year of a five-year TQP grant.

78.    AU's TQP grant funds a teacher preparation program for special education (learning disabilities) and early childhood education, the Residency for Excellence in Teaching and Learning ("RETL").

79.     RETL is a partnership between AU's School of Education and its charter network, Washington D.C. Friendship Public Charter Schools, consisting of five charter campuses. The purpose of the partnership is to provide a pathway for educator development to address critical areas of need, including early childhood education and special education,[11] and recruit highly motivated preservice teacher candidates who are committed to teaching in diverse early childhood and special education settings (pre-K through grade five).

80.     The partnership enables participants to complete a residency-based master's degree with an initial teaching license in Early Childhood Education or Special Education - Learning Disabilities. In addition to earning their Masters of Arts in Teaching degree, program participants receive comprehensive coaching, professional development, and ongoing support during the entirety of the three-year program -the residency year (the first year) and the induction years (the second and third year).

81.     RETL supports pathways in high-need teaching areas of early childhood education and special education, specifically targeting urban and underserved geographic areas with their partner charter network. RETL services five Friendship Public Charter campuses.

82.     RETL provides a living stipend to participants and reduced tuition (by roughly 35% of the AU graduate tuition rate) to one of two AU's School of Education's Master of Arts in Teaching degrees, Special Education in Learning Disabilities and Early Childhood Education.

83.     AU was in its second year of RETL when the Department terminated the grant, with eight students who are expected to graduate from AU in December 2025. With the funding from the TQP grant, AU planned to recruit an additional forty participants. As a result of the loss

---

[11] Washington D.C. is in need of educators for special education to serve students with disabilities. *See* https://specialedcoop.org/news-articles/the-state-of-special-education-in-the-district-of-columbia/, https://www.washingtonpost.com/opinions/2022/10/27/dc-students-disabilities-urgent-reform/.

of funding from the terminated TQP grant, AU will no longer be able to recruit future cohorts. As a result, forty-eight future RETL participants who would have had the opportunity to earn a Master of Arts in Teaching degree and deepen their expertise and longevity as teachers in Washington D.C. will no longer have that opportunity.

84.     The termination of the TQP grant will halt AU's efforts to remedy dramatic teacher shortages and improve outcomes for early childhood and special education students in Washington D.C. Up to 1,500 Washington D.C. students will be impacted by the termination of the grant, in addition to the educators at the charter school partners.

85.     In addition, AU planned to expand to at least two additional charter schools in the remaining years of the TQP grant. As a result of the Department's termination of AU's grant, there is no opportunity for additional students and educators to be served.

86.     The termination of the TQP grant will also result in AU terminating the employment of its full-time coach/program director.

87.     If funding through the TQP grant is not reinstated, the RETL program will be forced to close.

88.     These harms prevent AU/RETL from engaging in the core activities compelled by their missions and reason for existence.

### C.  AACTE Member Organization – University of St. Thomas

89.     The University of St. Thomas ("UST") is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. UST is in the second year of a three-year SEED grant and the fifth year of a five-year TQP grant.

24

90.     The UST SEED grant funds three pathway models to a career in education: (1) a residency program for graduate students in partnership with St. Paul Public Schools, Minneapolis Public Schools, and a consortium of charter schools; (2) a "work and learn" program for graduate students in partnership with schools throughout the state of Minnesota where paraprofessionals and teachers are employed while completing their teacher preparation program; and (3) an undergraduate program which prepares undergraduate students for educational careers in their junior and senior years at UST.

91.     The SEED grant provides funds of up to $20,000 per year for graduate students and up to $40,000 per year to undergraduate students who are pursuing teacher licensure in special education and elementary education.

92.     UST is currently in year two of the three year SEED grant. In year two, the grant was set to fund over 300 scholarships to future educators over the three year grant period, most of whom were preparing to be special education teachers, for approximately $2,000,000. Scholarships for fall and spring semester were disbursed to students prior to the grant termination. However, without access to the SEED grant funds, UST can no longer provide summer funding to the majority of these future educators. As a result, many of the future educators may not be able to afford the schooling required to continue their path to becoming teachers.

93.     Year three of the SEED grant was set to fund scholarships in the amount of $2,200,000; termination of the grants will result in a loss of all of these scholarships. In addition, termination of the SEED grants will result in a loss of funding for mentor teachers for professional development.

94.     To date, nearly 80 communities across the state of Minnesota have been taught by teachers who received SEED scholarship funds, including schools in rural, urban, suburban, and

exurban communities. Without continued SEED funding, the teacher pipeline program at UST will graduate fewer students capable of serving in high-needs areas such as special education, which will have widespread negative impacts on the many communities, teachers and students these teacher pipeline programs benefit.

95.    UST's TQP grant removes financial barriers to careers in education by providing funding for UST to partner with charter schools to provide living wage stipends to student teaching residents preparing to become licensed educators. UST is in year five of this TQP grant, and at present, 21 student teaching residents are in the middle of their second semester of student teaching. Collectively, the student teaching residents were set to receive $819,000 for stipends (the first half of which has already been paid), however, the termination of the TQP grant will put the living-expense stipends for these students at risk.

96.    These harms interfere with UST's ability to serve its students, and through them, to serve the community and fulfill its mission to advance the common good.

### D.  NCTR and AACTE Member Organization – Alder Graduate School of Education

97.    Alder Graduate School of Education ("Alder GSE") is a member organization of Plaintiff NCTR and Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. Alder GSE was awarded a five-year TQP grant in 2020, as well as a five-year TQP grant in 2022.

98.    Both of Alder GSE's TQP grants fund teacher residency programs.

99.    The teacher residency programs consist of partnerships between Alder GSE and partner K-12 school systems, including public school districts and a Special Education Planning Area, to operate community-based workforce development pathways for aspiring teachers.

100.    Alder GSE and its partner K-12 school systems recruit and prepare community members through a one-year teacher residency program, where candidates co-teach with a highly qualified mentor teacher while earning their Master's degree and teaching credential. They are often hired immediately upon completion of the program, most often by the school systems where they trained.

101.    The 2020 TQP grant's goals are: (i) launch and scale a new and sustainable residency program with three partner local education agency that meets local human capital needs; (ii) train, support and retain effective new teachers in schools with high concentrations of high need students; and (iii) demonstrate the capacity of partners to scale, sustain, and replicate teacher residency and development model. The 2022 TQP grant's goals are: (i) build a pipeline of high-quality and diverse teachers in partnership with high-need local education agencies that effectively meets their human capital needs and certification shortage areas; (ii) promote equity, strengthen student learning, and meet the social, emotional, and academic needs of students by modeling for and by building the capacity of mentors and residents to use evidence based practices and to create positive and inclusive learning environments; and (iii) increase impact by building capacity, sustainability and scale of the partnership and high-leverage strategies.

102.    The termination of the grants has had and will continue to have immense impacts on the aspiring teacher candidates, mentor teachers, the partner K-12 school systems, and Alder GSE.

103.    For the 2024-2025 academic year, the teacher residency programs have 83 aspiring teacher candidates who were receiving a living stipend supplemented by the funds from the TQP grants. The teaching candidates depend on these stipends to live, eat, and support their families – for most they are their only source of income. The teaching candidates signed Letters of

Commitment before June 2024, with the expectation of a level of stipend for the entirety of the school year. The teacher residency programs also presently have 83 mentor teachers who receive a stipend funded by grant funds for their work in support of their efforts to train and develop new teachers. With the termination of the grants, the 83 aspiring teacher candidates and 83 mentor teachers will no longer receive the level of stipends they were promised.

104.    Alder GSE has already recruited 40 new teacher candidates for the 2025-2026 academic year and K-12 school systems had planned to provide the living stipends – the majority of which were planned to be supplemented with TQP grant funds. Alder GSE recruited the majority of these residents with the expectation of a level of funding for their living stipend that was supplemented by the grant funding. The majority of these residents are enrolled, have signed letters of commitment, or are in final rounds of interviews/admissions. The financial impact of the grants' termination will affect many of their decisions to become teachers. Similarly, the grants' termination affects the stipend funding levels for mentors, which will have an impact on their decision to continue with the role.

105.    Alder GSE similarly planned to recruit 40 new teacher candidates and 40 new mentors for the 2026-2027 academic year, however, with the loss in grant funds, it will be more difficult for Alder GSE to recruit and prepare these future prospective candidates.

106.    The termination of the 2020 and 2022 TQP grants has caused and will continue to cause harm to the partner K-12 school systems as well. They are at risk of losing the teacher candidates who taught in their schools, which will have a negative impact on the school and its community. Alder GSE expects about $2.1 million of lost funding for their partner K-12 school systems.

107.    There were also a number of programmatic roles at Alder GSE that were partially supported by these TQP grants. These roles were supporting operation of these partnerships and these residency programs - including recruitment, admissions, enrollment, student services, financial support, data and impact, academic programs, and clinical programs. Alder GSE expects about $2.2 million of lost funding supporting Alder GSE costs to support these partnerships and residency programs.

108.    Additionally, the terminations will cause Alder GSE to lose approximately $600,000 in funding for evaluation contracts. Alder GSE's evaluation partner was providing an important source of formative feedback and evidence of program effectiveness. The evaluation from TQP 2020 has a retention study in progress that is six months to completion, but will likely not be completed as a result of the termination of the grant. The evaluation for TQP 2022 still had 2.5 more years of data collection that has been terminated mid-cycle.

109.    In addition to the dollars lost, the time and resource demands to meet this sudden news has been extraordinary. There have been countless hours of work to communicate clearly to all affected parties and to work with Alder GSE's Board and team on determining ways to mitigate these significant and completely unexpected losses.

110.    These harms prevent Alder GSE from engaging in the core activities compelled by its mission and reason for existence.

### E.  AACTE Member Organization – Teaching Lab

111.    Teaching Lab is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. In 2023, Teaching Lab was awarded a three-year TSL grant.

29

112.    Teaching Lab's TSL grant funds Project Refine, Innovate, Share, and Elevate ("Project RISE"). Project RISE involves the following: (i) implementation of Teaching Lab's teacher leadership and coaching model for public K-12 school systems located in Milwaukee, Wisconsin, Kemper, Mississippi, El Paso, Texas, and Osceola, Arkansas (the "Public School Beneficiaries"); (ii) development of human capital management systems in the foregoing districts; and (iii) a rigorous, randomized controlled trial on Teaching Lab's teacher development and coaching model, to be conducted in partnership with the American Institutes for Research, focused on the work in Milwaukee.

113.    Across all of the Public School Beneficiaries, Teaching Lab's programs through the TSL grant impact more than 40 schools and more than 150 teachers, whose instruction in turn reaches well over 6,000 K-12 students.

114.    Teaching Lab's TSL grant was terminated by the Department, resulting in great uncertainty regarding the future of Project Rise. Absent the grant funding, Teaching Lab will no longer be able to provide the curriculum-based professional learning and coaching services through Project RISE to the Public School Beneficiaries. At this time, Teaching Lab does not have an alternate source of funding. The Public School Beneficiaries do not have room in their budget to unexpectedly pay for the services.

115.    Teaching Lab has hired more than two dozen employees and contractors to support Project RISE. If the TSL grant funding is suspended for any amount of time, Teaching Lab will likely have to furlough or layoff many or all of these workers.

116.    The termination of the grant also puts the American Institutes for Research study evaluating how school districts can best spend their limited funds and limited teacher development time and resources at risk. Teaching Lab is not able to fund the study without the TSL grant funds.

117.    In addition to the loss of the study, the Public School Beneficiaries and the public will be significantly harmed by the termination of the grant, as one or more of the Public School Beneficiaries is likely to lose the benefit of Teaching Lab's services. Specifically, the Public School Beneficiaries stand to lose value of up to roughly $7 million in services if the termination moves forward.

118.    These harms prevent Project RISE from engaging in the core activities compelled by its mission and reason for existence.

### F.  AACTE Member Organization – University A[12]

119.    University A is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. In 2022, University A was awarded a five-year TQP grant.

120.    University A's TQP grant funds Program A, a program that supports talented rural individuals to receive an undergraduate degree and license without leaving their hometown. Candidates can receive a Bachelor of Arts degree and a teaching license in early childhood education, elementary education, special education, middle school math education, and secondary science education. University A partners with rural community colleges employing many rural educators.

121.    Program A was created to address the extreme teacher shortage in rural State A. Pre-K through year 12 students can go years without a qualified teacher, forcing rural districts to hire people without degrees or experience and negatively impacting rural students' learning.

---

[12] University A is an AACTE member organization that is fearful of retaliation, and therefore, did not wish to disclose its name in this Complaint or provide a Declaration that identified it by name. However, it wanted to share the severe and devastating impact the Department's termination of its TQP grant has caused and will continue to cause, absent Court intervention. This Complaint refers to the member organization as "University A" in State A, and its teacher preparation program as "Program A."

122.    Program A's TQP grant has an immensely positive economic impact on rural communities in State A. Specifically, the program funded by the grant serves 57 rural State A school districts in partnership with four rural community colleges. These districts stretch across State A representing some of the most financially impoverished communities in State A, and have some of the highest teacher shortage areas in the state. Program A was able to provide teachers for more than 2,500 students in pre-K through year 12 each year.

123.    Program A graduated 49 teachers who are presently teaching in State A rural schools. Currently, there are 77 students supported through the grant, as well as eight recent graduates supported within required induction supports.

124.    The termination of the grant forced University A to terminate the employment of the instructors who teach the courses, and eliminated the infrastructure and human resources that support Program A. University A anticipated preparing 146 teachers by the end of the five-year grant in 2027 and anticipated supporting these new teachers in their beginning years of teaching. The termination of the grant will result in a loss of 69 new teachers for these hard-hit rural areas.

125.    Furthermore, there was a total of 11 full-time equivalent positions in both rural communities and in State A's major city funded through the grant, however with the grant's termination, the money supporting rural grant employee salaries was lost immediately; State A's community college partners are uncertain about the ability to utilize emergency institutional funds to continue them, even short term. University A is using emergency funding to support State A grant employees until the end of the Spring 2025 semester, however, after the end of the semester, all of the rural grant employees will be forced to be let go.

126.    With the grant's termination, Program A will no longer be able to continue, which will have significant consequences on University A and its community as well as the rural communities it serves.

127.    These harms prevent Program A from engaging in the core activities compelled by its mission and reason for existence.

## X.    Defendants' Actions Will Cause Plaintiffs and Their Member Organizations Immediate and Irreparable Harm.

128.    Defendants' actions have harmed Plaintiffs and their member organizations by unlawfully depriving them of funding, which without Court intervention, will continue to cause immediate and irreparable harm.

129.    The funding was also used towards tuition support for enrollment at many of the colleges and universities. Without this ability of the Grant Recipients to address significant financial barriers for students, many will no longer be able to afford to continue to pursue a career in teaching and the programs' attendance will plummet.

130.    Due to the lack of funding for these programs, the Grant Recipients presently have, and will continue to have, a more difficult time recruiting new students. The tuition and other financial supports provided by the grants was used as a recruitment tool by the Grant Recipients. Without these tools to make it more affordable for cohorts of future teachers to pursue education careers, enrollment will decline, and significant structural changes will have to be made to address that decline, including changes that it may take years to repair, such as loss of staff and infrastructure that cannot be easily re-scaled.

131.    The termination of grants will jeopardize the pipeline of high-quality educators entering into schools nationwide. The forced closure of the teacher preparation programs as a result

of the lack of funding results in losing talented candidates who are ready and eager to serve students, particularly in high-need areas like special education.

132.    The loss of funding will not only significantly reduce the Grant Recipients' ability to address the ongoing teacher shortage, but also exacerbate the teacher shortages, especially in rural and urban communities, across the country.

133.    Without the grant funding, the Grant Recipients will no longer be able to provide targeted resources and training, peer support networks, professional development, and mentorship that are critical to teachers' success in the classroom.

134.    The termination of the grants is also resulting in, and will continue to result in, loss of employment for the dedicated staff members and grant managers who worked to make the teacher preparation programs run.

135.    The harm suffered by Plaintiffs is actual, not theoretical, as the funding was terminated in February 2025, immediately resulting in the Grant Recipients' inability to continue their programs, particularly given that the terminations occurred in the middle of the academic year.

136.    The loss of the funding will frustrate the Grant Recipients' abilities to fulfil their mission of providing programs to offer supports to improve the quality of teaching and school leadership.

137.    The Termination Letters provide that the Grant Recipients may challenge the termination decision by submitting information documenting their position in writing to the Department within thirty days of the termination. *See* Exhibit B at pages 2, 4, 6, 8, 10, 12, 14.

34

138.    However, any appeal to the Department does not alter the fact that the termination of funding was effective on the date of notification in February 2025. There is no funding provided starting the date of termination pending any appeals.

139.    There is no timeframe by which the Department is obliged to make a determination regarding an appeal. Therefore, even if the Grant Recipients appeal the termination decision, the timeframe in which a determination would be made is unknown. While any appeals are pending, the Grant Recipients will continue to be deprived of funding.

140.    Absent Court intervention, regardless of whether the Grant Recipients submit an appeal to the Department, many Grant Recipients will be forced to shut down their programs as a result of Defendants' unlawful actions, resulting in great harm.

## XI.    Plaintiffs were Further Harmed by Defendants' Unlawfully Imposed Grant Conditions.

141.    Generally, unless a grantee poses a specific risk, they can draw down funds from their grant award based on the allowable, allocable and reasonable costs approved in their grant budget without prior approval.

142.    In addition to the unlawful actions concerning terminating the grants discussed above, the Department also added a special condition to impacted grants after they were terminated requiring prior approval for them to draw down funds. This special condition is referred to as "route pay."

143.    The grantees are eligible for costs that were properly incurred before their termination date and costs that would not have occurred if the grant was not terminated. They have 120 days to draw down the funds after the termination date. (2 C.F.R. §§ 200.343, 200.472, 200.344(b)).

35

144.    The regulations that govern federal grants set the reasons that the Department can put conditions on grants and the requirements for notice prior to doing so. Imposing a special condition, such as establishing additional prior approvals, on a grant can only be done if the grantee is determined to pose a risk. Factors that may be considered are financial stability, quality of management systems and standards, history of performance, audit reports and filings, ability to effectively implement requirements, history of compliance with conditions of a federal award, or a responsibility determination. (2 C.F.R. § 200.208).

145.    The rule also states that before conditions are put in place, the agency has to notify the grantee as to: (1) The nature of the additional requirements; (2) The reason why the additional requirements are being imposed; (3) The nature of the action needed to remove the additional requirement, if applicable; (4) The time allowed for completing the actions if applicable; and (5) The method for requesting reconsideration of the additional requirements imposed. (*Id.*).

146.    Without notice or any finding of individual grantee risk, the Department put a blanket condition on the terminated grants to require prior approval for all drawdowns.

147.    This new, unlawfully-imposed condition will cause delays in the Grant Recipients receiving their grant funds and add potential subjectivity to already approved costs.

148.    Therefore, placing the grants on route pay was unlawful.

## FIRST CAUSE OF ACTION

## (Fifth Amendment Due Process (Vagueness))

149.    All preceding paragraphs of this Complaint are incorporated as if fully set forth herein.

150.    Under the Fifth Amendment to the United States Constitution, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of

36

ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

151.    The Termination Provision of Executive Order 14151 "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

152.    Executive Order 14151 does not define key terms, including "DEI," "DEIA," "equity" or "equity-related" and fails to satisfy the constitutional minimum.

153.    This Court previously granted a preliminary injunction enjoining the President's administration from terminating any awards on the basis of the Termination Provision in the NADOHE Order.

154.    The NADOHE Order applies to not just the named plaintiffs in that action, but to *all* contractors and grantees who were subjected to the Termination Provision.

155.    Plaintiffs and their member organizations were subjected to the Termination Provision when the Department terminated the grants at issue in this lawsuit under the instructions provided in Executive Order 14151.

156.    It follows, therefore, that Plaintiffs should also be returned to the *status quo ante* – their status prior to the Department subjecting them to the unlawful Termination Provision when it terminated their grants – just as the NADOHE Order intended.

**SECOND CAUSE OF ACTION**

**(Violation of APA – Arbitrary and Capricious Decision)**

157.    All preceding paragraphs of this Complaint are incorporated as if fully set forth herein.

158.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or are made] without observance of procedure required by law[.]" (5 U.S.C. § 706(2)).

159.    Defendants' termination of the Grant Recipients' grants constitutes final agency action under the APA. The Termination Letters provide that the "Department hereby terminates grant No. [] in its entirety effective 2/[]/25," marking it the consummation of the Department's decision-making process and demanding immediate compliance with the announced position. As of the date of the Termination Letters, the Department stopped providing all funding approved by the grants, thereby having a direct and immediate effect on Plaintiffs and their member organizations.

160.    Defendants' decision to terminate the grants is unlawful, arbitrary, and capricious for the reasons set forth above.

WHEREFORE, Plaintiffs pray that this Court:

(A)    Declare Defendants' termination of the TQP, SEED, and TSL grants unlawful;

(B)    Declare Defendants' actions placing TQP, SEED, and TSL grants on route pay unlawful;

(C)    Enter a preliminary injunction or temporary restraining order (a) enjoining Defendants' enforcement of the termination of the TQP, SEED, and TSL grants; (b) ordering such grant funding reinstated forthwith; (c) ordering Defendants to provide the Grant Recipients reimbursement for all otherwise allowable expenditures incurred between the date of termination and the Court's order; (d) enjoining Defendants' termination of any additional TQP, SEED, and TSL grants if such termination would be inconsistent with the Court's order; and (e) removing the route pay grant conditions from TQP, SEED, and TSL grants;

(D)    Issue a permanent injunction providing the same relief;

(E)    Award Plaintiffs their costs and reasonable attorneys' fees; and

(F)    Grant such other relief as this Court may deem just and proper.

Dated: March 3, 2025                          Respectfully Submitted,

                                              */s/ Daniel M. Moore*
                                              Daniel M. Moore (Bar No. 21834)
                                              SAUL EWING LLP
                                              1001 Fleet Street, Ninth Floor
                                              Baltimore, Maryland 21202-4359
                                              Telephone: (410) 332-8734
                                              Facsimile: (410) 332-8862
                                              daniel.moore@saul.com

                                              Joshua W.B. Richards (*Pro Hac Vice Forthcoming*)
                                              Carolyn M. Toll (*Pro Hac Vice Forthcoming*)
                                              SAUL EWING LLP
                                              1500 Market Street, 38th Floor
                                              Philadelphia, Pennsylvania 19102
                                              Tel: (215) 972-7737
                                              joshua.richards@saul.com
                                              carolyn.toll@saul.com

                                              *Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.,*<br><br>            *Plaintiffs*,<br>     v.<br><br>LINDA MCMAHON,<br>AS SECRETARY OF EDUCATION, *et al.,*<br><br>            *Defendants*. | Civil Action No.  1:25-cv-00702-JRR |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR A**
**TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................................................1

II.  ARGUMENT ..................................................................................................................**1**

    A.   Venue is Proper in The State of Maryland.....................................................1

    B.   MACTE has Established Standing..................................................................4

    C.   Plaintiffs Are Likely To Succeed On The Merits. .........................................7

        1. This Court's NADOHE Order Applies to Plaintiffs in this Action and the Department should be Enjoined from Enforcing the Termination of the TQP, SEED, and TSL Grants............................................................................................. 7

        2. The Department's Termination of the TQP, SEED, and TSL Grants Violates the Administrative Procedures Act.................................................................. 9

    D.   Government's Argument with Respect to the Scope of Relief. ................13

    E.   Plaintiffs' Request for Removing the Route Pay Condition is Clear.........14

III. CONCLUSION ............................................................................................................**14**

i

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290 (N.D. Ala. 2003) .........................................2

*Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183 (4th Cir. 2018)....................................................4

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .................................................................4

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ...............................................................5, 6

*Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) ...............................................................................5

*Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019) ......................................8

*Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*,
    No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) ...........................5, 6, 7

*People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*,
    843 F. App'x 493 (4th Cir. 2021) ...............................................................................................5

*Republican Nat'l Comm. v. North Carolina State Board of Elections*, 120 F.4th 390
    (4th Cir. 2024)..............................................................................................................................5

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) ...................................................................................................5, 6

*Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336 (6th Cir. 2005)...............................................2

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................................................4

**FEDERAL STATUTES**

2 C.F.R. § 200.340 ...............................................................................................9, 10, 11, 12

20 U.S.C. § 1232.............................................................................................................10, 11

28 U.S.C. § 1391 ..........................................................................................................................2

U.S. Const. Amendment V ...........................................................................................................1

## I.    INTRODUCTION

Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims and that an injunction is both in the public interest and in the interest of the equities at play here. The Government does not dispute that in the absence of an injunction, Plaintiffs will suffer irreparable harm. ECF No. 24 ("Def. Br.") at 13. The Government also does not dispute that the termination of the TQP, SEED, and TSL grants constituted final agency action, or that the terminations, if undertaken today, would violate the NADOHE order. *See generally* Def. Br.

As a result, the remaining live issues are: (1) whether Plaintiffs are properly before this Court; (2) whether continued enforcement of terminations that would be unlawful if taken today is permissible because it preceded a court order; and (3) whether "agency Priorities" as used in Section 200.340(a)(4) provides for essentially limitless discretion in terminating grants, as the Government argues. As shown below, Plaintiffs have established both standing and venue in this action; the Department's continued enforcement of the terminations violates the Fifth Amendment to the Constitution via the NADOHE order; and the Government's interpretation of "agency priorities" is completely unsupported by the text and a common-sense read of the law at issue. The Court should enter a preliminary injunction ordering the Department to vacate the grant terminations for Plaintiffs and their members on both Fifth Amendment and APA grounds.

## II.    ARGUMENT

### A.    <u>Venue is Proper in The State of Maryland.</u>

Plaintiffs have invoked venue pursuant to § 1391(b)(2) and (e)(1), ECF No. 1 at ¶ 11, and venue is proper in this District under both provisions. Section 1391(e) establishes venue in this district because Plaintiff MACTE resides in this District, a proposition the Government neither challenges nor addresses in its brief. This is really the end of the inquiry, but since the Government challenges venue under (b)(2) as well, Plaintiffs will address it as well.

Where, as here, a defendant is an officer or employee of the United States acting in her official capacity (Defendant McMahon), or an agency of the United States (Defendant Department of Education), the action may be brought in a judicial district where "the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1)(C). Federal courts applying this venue provision have concluded that only a single plaintiff need reside in the district to establish venue. *See A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1301 (N.D. Ala. 2003) (collecting cases and remarking that "[f]or over thirty years federal courts have conclusively and consistently held that the statutory language in 28 U.S.C. § 1391(e)(3)[1] regarding the residency of 'the plaintiff' should be interpreted to mean ***any*** plaintiff rather than ***all*** plaintiffs.") (emphasis in original); *see also id.* at 1302 ("This court concludes that under 28 U.S.C. § 1391(e)(3), a suit can be brought in any district in which a single plaintiff resides."); *Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336, 345-46 (6th Cir. 2005) ("[T]he case law and legislative history compel this Court to hold that the residency requirement of 28 U.S.C. § 1391(e)(3) is satisfied if at least one plaintiff resides in the district in which the action has been brought."). This action names as defendants an executive branch official sued in her official capacity and an agency of the United States. ECF No. 1 at ¶ 15-16. MACTE is a resident of Maryland with its principal place of business located at 304 Hawkins Hall, Towson University, Towson, Maryland 21252. ECF No. 1 at ¶ 14. Venue is, therefore, plainly proper pursuant to § 1391(e)(1)(C).

And as noted, although Plaintiffs need not satisfy two different bases for venue, they do. Venue is also proper in this District because a substantial part of the events giving rise to the claim occurred in Maryland. As a threshold matter, MACTE is a member organization—not a "Maryland

---

[1] 28 U.S.C. § 1391(e) was restyled in 2011 to remove the numeric list—e.g., (1), (2), (3)—and insert the letters (A), (B), and (C).

chapter" of a national organization. ECF No. 1 at ¶ 14 (describing MACTE as "membership organization" that includes "regionally accredited colleges and universities engaged in the preparation of professional school personnel with state program approval"); ECF No. 24 at 15.

More specifically, three of MACTE's member organizations—Towson University, the University of Maryland, and Frostburg State University—suffered termination of SEED and/or TQP grants. Supplemental Declaration of Laurie Mullen ("Supp. Mullen Decl.") at ¶ 4. Towson University's TQP grant was terminated in February 2025 by the Department. The TQP grant was approved on September 4, 2024, for a period of one year (October 1, 2024 to September 30, 2025), in the amount of $849,659. Future budget periods were outlined as follows: budget period 2 (10/1/2025-9/30/2026) - $811,249; budget period 3 (10/1/2026-9/30/2027) - $1,099,920; budget period 4 (10/1/2027-9/30/2028) - $1,240,123; budget period 5 (10/1/2028-9/30/2029) - $1,152,933. Supp. Mullen Decl. at ¶ 6. The University of Maryland's SEED grant was terminated in February 2025 by the Department. The terminated SEED grant was approved to begin on October 1, 2022, for a period of three years, in the amount of $4,808,683. Supp. Mullen Decl. at ¶ 7. Frostburg State University's TQP grant was also terminated in February 2025. Supp. Mullen Decl. at ¶ 8.

The Government represents that the grant terminations described in the Complaint "occurred in eight states but not in Maryland," ECF No. 24 at 13, a perplexing assertion not just because the Plaintiffs attached a declaration to their motion making clear that Maryland programs were impacted by the grant termination (ECF No. 5-5 (stating the grant terminations "result[ed] in a substantial loss of funds for teacher preparation programs in Maryland")), but because the Government cites, and is thus presumably familiar with, litigation proceeding as *California v. U.S. Dep't of Educ.*, 1:25-cv-10548-MJJ, in the District of Massachusetts. ECF No. 24 at 11-12, 17

(recognizing that "Maryland grants were terminated"), in which multiple declarations and the Court's opinion entering a TRO confirmed that Maryland-based grants were terminated. Specifically, the Department terminated MACTE member Towson University's TQP grant funding, which effectively terminated Towson's Preparing and Retaining Inclusive Maryland Educators ("PRIME") project. A true and accurate copy of the Towson declaration filed in that case is attached as Exhibit A to the Declaration of Joshua W.B. Richards ("Richards Decl."). Another declaration in that case detailed resultant harm of SEED grant termination in Maryland for another MACTE member, the University of Maryland. *California v. U.S. Dep't of Educ.*, 1:25-cv-10548-MJJ, ECF No. 8-15. A true and accurate copy of that declaration is attached as Exhibit B to the Richards Declaration. Not only that, but it is a matter of public record, of which this Court may take judicial notice, that Maryland grants were awarded, including those to Towson, Frostburg State, and the University of Maryland: https://www.ed.gov/grants-and-programs/teacher-prep/teacher-quality-partnership-program#awards, https://www.ed.gov/grants-and-programs/teacher-prep/supporting-effective-educator-development-grant-program#awards; It is also not in matter of reasonable dispute that the Government has terminated all teaching grants. *See* Richards Decl. Ex. C. Accordingly, a substantial portion of events took place in Maryland and venue in this District is proper pursuant to § 1391(b)(2) as well.

      **B.**    **MACTE has Established Standing.**

      To demonstrate standing, a plaintiff must show "(i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024); *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 187 (4th Cir. 2018). "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent,

not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up).

An organization can establish standing in one of two ways: either "in its own right to seek judicial relief for injury to itself," or "as a representative of its members who have been harmed." *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 495 (4th Cir. 2021) (citation omitted). An organization must only "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (emphasis omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)); *see also Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *9 (D. Md. Feb. 21, 2025) ("When an organization is alleging harm, it may establish standing based on its own injury or based on its members' injuries, the latter of which is called representational or associational standing.") (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)).

Moreover, "[a]n organization may have standing to sue on its own behalf for injuries it sustains as a result of a defendant's actions." *Republican Nat'l Comm. v. North Carolina State Board of Elections*, 120 F.4th 390, 395 (4th Cir. 2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). "[T]he organization must make the necessary showing to demonstrate Article III standing—an injury-in-fact, caused by the defendant, that can be redressed by a favorable decision from the court." *Id.* (quoting *Hippocratic Medicine*, 602 U.S. at 393–94); *see also Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) (recognizing that an organization must show it has suffered an "injury in fact," in that defendant's "actions impede its efforts to carry out its mission." (citation omitted); *Havens Realty*, 455 U.S. at 379 (observing that an organization

has standing to sue in its own right if the organization has suffered a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources— constitut[ing] . . . more than simply a setback to the organization's abstract social interests").

MACTE has done more than show an "intense interest" or "strong opposition" to the challenged conduct. ECF No. 24 at 16. It has demonstrated that numerous of its members suffered actual harm. ECF No. 1 at ¶ 14. If there were any doubt, the Supplemental Mullen Declaration, attached hereto, makes the point abundantly clear. Defendants terminated grant funding for three Maryland educational institutions, each of which are MACTE members: Towson University, Supp. Mullen Decl. at ¶ 6; the University of Maryland, Supp. Mullen Decl. at ¶ 7; and Frostburg State University, Supp. Mullen Decl. at ¶ 8. Because MACTE's member organizations suffered an injury in fact—*i.e.*, termination of grant funding—MACTE has standing to pursue this action. *See S. Walk*, 713 F.3d at 184.

To be sure, the termination of its member organizations' SEED and/or TQP grants also significantly impairs MACTE's core mission. ECF No. 1 at 14. This is a "concrete and demonstrable injury" to MACTE that drains its resources. *Havens Realty*, 455 U.S. at 379.

Finally, Plaintiffs alleged that all of the grant recipients are similarly situated. ECF No. 1 at ¶ 6 ("All of the Grant Recipients are similarly situated because the substance of each Termination Letter and added terms and conditions in the Grant Award Notifications from the Department are identical, indicating the same reasons with the same terminology for the grant terminations."). MACTE has, therefore, established organization standing.

APPENDIX Page 48

**C.**    **Plaintiffs Are Likely To Succeed On The Merits.**

    *1.*    ***This Court's NADOHE Order Applies to Plaintiffs in this Action and the Department should be Enjoined from Enforcing the Termination of the TQP, SEED, and TSL Grants.***

The heart of the Government's argument with respect to the NADOHE order[2] is that, yes, the Department terminated the grants at issue here because of DEI, which flowed from the J20 order, *see* ECF No. 24 at 8 (citing Department directives, including one that "Diversity, Equity, and Inclusion initiatives unlawfully discriminate on the basis of race, color, religion, sex, national origin, or other protected characteristic") (cleaned up), but, the Government argues, because the Department terminated the grants *before* the NADOHE order was issued, neither the order nor the reasoning supporting it apply. The Government is wrong.

*First*, and as set forth in Plaintiff's brief, the Government's argument turns the principles underlying the NADOHE order on their head. The J20 order was unconstitutionally vague because it did not sufficiently define what kind of conduct was unlawful, and therefore deprived courts of the ability to test its lawfulness and deprived grant recipients (and others) of the opportunity to seek to conform their conduct to the law *before* being deprived of rights. *See Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *19-20 (D. Md. Feb. 21, 2025).

The fact that Plaintiffs here had no opportunity to even attempt to conform their conduct because the Government acted pursuant to an unlawful order before Plaintiffs sought relief does

---

[2] The Court issued a Clarified Preliminary Injunction on March 10, 2025 in *National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA. The Clarified Preliminary Injunction redefines "Enjoined Parties" to include: "Defendants other than the President, as well as all other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions directed pursuant to the J20 and J21 Orders[.]" It does not modify the Court's prior Order issued on February 21, 2025 in any substantive way relevant to this action.

not make the J20 order less unconstitutionally vague or, critically, the continued enforcement of deprivations that flowed from the order less unlawful. *See Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019) (observing that the purpose of the fair notice requirement is to provide an opportunity for individuals to "conform their conduct to the proscriptions of the law") (citation omitted); *see also id.* at 278 (condemning unconstitutionally vague statutory language that invited arbitrary enforcement). To conclude otherwise would create incredible perverse incentives for government officials to shoot first and answer questions later, which is in fact what seems to have happened here. Plaintiffs' deprivation was compounded by the lack of any real opportunity for a post-deprivation challenge to the termination decisions because the form termination letters failed to provide any specificity about the reason that the Department found any individual grant allegedly "inconsistent with. . . Department priorities." The form termination letters instead merely list, disjunctively, five vague ways in which the specific grant at issue might be "inconsistent" with purported agency priorities.

Second, the Government argues at page 20 of its brief that the "documentary record indicates agency review;" this is presumably meant to be contrasted with generalized and unreasoned terminations based on the vague and undefined concepts in the J20 Order. The Government provides no citation to support its assertion of "agency review," which is, in fact, belied by the record before the Court. The termination letters and Grant Award Notifications ("GANs") filed with the Court, which Plaintiffs have alleged are essentially identical across all their members' terminations, *see* ECF 1 at ¶¶ 5-6, demonstrate that no independent agency review of individual grants, underscoring the fears that accompany a vague order like J20.

No exemplar grant termination presented by the Government lists any actual reason that any individual grant violates any term or condition of the award, to say nothing of how it might

violate the J20 Order (even if that order were not unlawful). None of the termination letters presented by Plaintiffs do either. *See* ECF No. 1-1 at 4, 10, 16, 22, 28, 34, 40; ECF No. 1-2 at 1, 3, 5, 7, 9, 11, 13; *see also* Richards Decl. Ex. A at 68, 72, Ex. B at 68. To the contrary, the Department undertook no individualized inquiry into specific grants, instead sending a form letter and a form basis in each GAN terminating the grants, and then issued a press release.

The Government mounts no serious challenge to the proposition that its terminations of Plaintiffs' members grants would be unlawful under the NADOHE order if undertaken today. Its argument that continued enforcement of those terminations is somehow insulated from scrutiny under the same standard lacks any justification and should be rejected by the Court.

### 2. The Department's Termination of the TQP, SEED, and TSL Grants Violates the Administrative Procedures Act.

The Government does not dispute that the grant terminations at issue here constitute final agency action under the APA.

In attempting to justify the terminations, the Government begins by conceding that Federal regulations allow agencies to terminate grants for "no other reason" apart from when "an award no longer effectuates . . . agency priorities." ECF No. 24 at 25 (citing 2 C.F.R. § 200.340).[3] As an initial matter, the Government points to no explanation as to *how* the individual terminated awards, or even the awards writ large, failed to effectuate those priorities, or what the priorities are, or by what process the priorities were "issued," beyond arguing that there are "big picture" priorities that every administration may have and that the grants here were terminated for that reason. The closest the Government comes to articulating a reason is a hedged denial that it was because of

---

[3] While it is true that the failure to effectuate agency priorities is the only ground for termination at issue here, there are actually four reasons a federal award could be terminated, all enumerated in Section 200.340(a).

DEI. *See* Def. Br. at 20 ("Although Plaintiffs assume DOE terminated their grants because of the J20 Executive Order that NADOHE enjoined, DOE does not concede this and the documentary record indicates independent agency review.") The Government's arguments here are neither developed nor persuasive.

First, the Government argues that the provision in the Uniform Guidance, 2 CFR Part 200 – the federal government rules for grants – stating that the Federal agency can terminate an award if it no longer "effectuates the program goals or agency priorities," 2 C.F.R. § 200.340, confusingly does not actually refer to agency grant Priorities at all. The Government acknowledges that if that were the case, the Priorities would need to be set through notice and comment rulemaking. *See* ECF No. 24 at 24. The Government's reading, divorcing the term "agency priorities" from the context of grants in which it appears, requires a willful disregard for the provisions that surround the use of the term. Section 200.340 is about termination of grants and 2 C.F.R. Part 200, in which it appears, is devoted entirely to the administration of federal awards. Section 200.340(a)(1) states that the terms and conditions of the grant must be followed, and 200.340(a)(4) refers to the goals of the grant program or agency priorities. A plain reading of 200.340(a)(4) makes it clear that throughout the subclause, the regulation speaks to different aspects of *grants* – namely, grant program goals and grant Priorities, the very Priorities that were set when the grant was awarded and which can only be reset through rulemaking.

As explained in Plaintiffs' brief in support of their motion, the statute governing how the Education Department specifically must set Priorities for grants is GEPA, 20 U.S.C. § 1232(d). The Department of Education is unique in being obliged by a specific statute to use notice and comment rulemaking for grants. GEPA instructs clearly that the ordinary and general APA exemption for rulemaking for grants does not apply to the Education Department (except in limited

circumstances, not relevant here). 20 U.S.C. § 1232(d). This matters because the Government argues as a policy matter, and erroneously, that if the rule is interpreted to mean what it says, every federal agency would be powerless to shift its activities with new Presidential administrations absent a lengthy public rulemaking process. But in fact, only the Education Department is subject to GEPA, and Congress stated that decision unambiguously, so the Government's argument in that regard holds no water.

The parties agree that agency Priorities do and must reflect each Administration's specific missions and agenda. Even so, Congress specifically passed a law stating that for the Department of Education, agency Priorities for grants must go through rulemaking. This Department has not done so, it cannot utilize new, un-set "Priorities" to determine what has or has not been effectuated.

But even if the Department's attenuated position that the words "agency priorities" for grants in the termination regulation did not refer to the same "priorities" explicitly required elsewhere in Department grant regulations, it would not change the fact that Defendants *still* did not follow the proper procedure in terminating the TQP, SEED, and TSL grants in February 2025. The Government's deflection on agency priorities just opens the door to greater problems.

The Department's articulated reason for the grant terminations in the GANs and termination letters, which Defendants repeat in their Opposition, is that the grants were terminated because they are "inconsistent with,[4] and no longer effectuate[], Department priorities," citing to 2 C.F.R. § 200.340(a)(4). But Section 200.340(a)(4) actually provides that a federal award may be terminated "[b]y the Federal agency or pass-through entity *pursuant to the terms and conditions of the Federal award,* including*, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." (emphasis added). The word "including," in this instance,

---

[4] The phrase "inconsistent with" does not appear in the termination regulation. *See* 2 C.F.R. § 200.340(a)(4).

must be read to bring everything that follows it within the scope of the phrase that immediately precedes it, to wit: "pursuant to the terms and conditions of the grant award." Section 200.340(b) goes on to provide that "[t]he Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."

In other words, all reasons that the Federal agency may terminate the grant *must* be "clearly and unambiguously" specified in the terms and conditions of that particular grant, and *only if* the terms and conditions specify that the Federal agency may terminate for "no longer effectuat[ing] [] agency priorities" in a clear and unambiguous way is the Federal agency permitted to do so. This raises a number of obvious problems for the Government's proposed alternative reading of (a)(4), because the terms and conditions of the Federal awards here contain just one line that states that "2 CFR PART 200." *See* Supplemental Declaration of Kathlene Campbell on behalf of NCTR Ex. A at 4; Richards Decl. Ex. A at 15; Richards Decl. Ex. B at 14.

The Government points to nowhere in the Federal awards at issue where the terms and conditions specifically state that a grant may be terminated for no longer effectuating actual agency priorities, let alone a tortured reading of "agency priorities" so far divorced from the rest of the statutory and regulatory scheme so as to provide for limitless flexibility. It goes without saying, then, that the terms and conditions do not state in a "clear and unambiguous" manner that the Department may terminate awards on the basis of a change in what the Government somewhat mushily calls "big-picture Department priorities," which require no notice, no reasoned basis, and appear to be the definition of the arbitrariness the APA was intended to avoid.

It bears emphasis that agency priorities are not subject to whim. In pointing out the error of the Government's argument on this point, and the implications of their argument, Plaintiffs are

not inviting the Court to rule on matters beyond the scope of those necessary to resolve the claims at issue; this motion can and should be resolved by ruling that "agency priorities" do not change without rulemaking, and the Department has neither engaged in rulemaking nor explained how any of the terminated grants have ceased to effectuate priorities they met when they were awarded. But in the event the Court finds it necessary to test the Government's contrary argument, the Government fails in its task because nothing approaching the level of discretion to unilaterally terminate appeared alongside "2 CFR PART 200" in Plaintiffs' notices of award, so regardless of what "agency priorities" in the termination provision refers to, the Department failed to follow its regulations.

### D.    <u>Government's Argument with Respect to the Scope of Relief.</u>

The Government argues that if relief is granted, it should be limited in two ways. First, the Government argues that if granted, a preliminary injunction should be limited in scope to include only the terminated grants of those member organizations which were specifically identified by name in Plaintiffs' Complaint. However, the Government fails to acknowledge that Plaintiffs alleged that all of the grant recipients are similarly situated. ECF No. 1 at ¶ 6 ("All of the Grant Recipients are similarly situated because the substance of each Termination Letter and added terms and conditions in the Grant Award Notifications from the Department are identical, indicating the same reasons with the same terminology for the grant terminations."). Simply providing relief to the member organizations which submitted Declarations in conjunction with the Complaint would deprive all of the similarly situated member organizations the relief to which they are similarly entitled and subject them to harm that the Government has already conceded is irreparable. *See also* Richards Decl. Ex. C (email from the Department on February 21, 2025 confirming that "[a]ll the grants have been terminated[.]"). Accordingly, it would be inequitable for relief to be limited in the manner suggested by the Government.

13

Second, while it is unclear if the Government is asking for the Court to remand the matter to the Department to provide an explanation for each grant termination in the absence of a preliminary injunction, or to limit an injunction to such relief, in any event, such a remand would likewise perpetuate irreparable harm and is accordingly inequitable and not in the public interest as a remedy.

### E.   Plaintiffs' Request for Removing the Route Pay Condition is Clear.

While the Government attempts to sidestep responding to Plaintiffs' allegations with respect to route pay by briefly arguing that Plaintiffs' reference to route pay is unclear, that is simply not the case. Not only does Plaintiffs' brief devote an entire section to detail how the imposition of the route pay condition is unlawful (ECF No. 5-1 at 33-34), but Plaintiffs' Motion expressly requests relief in the form of ordering Defendants to "[r]emoving the route pay grant conditions from TQP, SEED, and TSL grants." ECF No. 5 at 2. Plaintiffs' request is clear, as is its right to relief, and so Plaintiffs continue to request that its right to preliminary relief sought in its motion not be impaired by the Department unlawfully placing further roadblocks in the way of their continued access to grant funding.

### III.   CONCLUSION

For the foregoing reasons, and the reasons set forth in Plaintiffs' Memorandum of Law in Support of Their Motion for Temporary Restraining Order/Preliminary Injunction, Plaintiffs respectfully request that the Court enter a preliminary injunction consistent with its request.

Dated: March 12, 2025                    Respectfully Submitted,

                                         */s/ Joshua W.B. Richards*
                                         Joshua W.B. Richards (*Admitted Pro Hac Vice*)
                                         Carolyn M. Toll (*Admitted Pro Hac Vice*)
                                         SAUL EWING LLP
                                         1500 Market Street, 38th Floor
                                         Philadelphia, Pennsylvania 19102
                                         Tel: (215) 972-7737
                                         joshua.richards@saul.com
                                         carolyn.toll@saul.com

                                         Daniel M. Moore (Bar No. 21834)
                                         SAUL EWING LLP
                                         1001 Fleet Street, Ninth Floor
                                         Baltimore, Maryland 21202-4359
                                         Telephone: (410) 332-8734
                                         Facsimile: (410) 332-8862
                                         daniel.moore@saul.com

                                         *Counsel for Plaintiffs*

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION,** *et al.***,** | |
| ***Plaintiffs***, | |
| **v.** | **Civil No.: 1:25-cv-00702-JRR** |
| **LINDA MCMAHON, in her official capacity as Secretary of Education,** *et al.***,** | |
| ***Defendants***. | |

<u>**MEMORANDUM OPINION**</u>

This matter comes before the court on Plaintiffs American Association of Colleges for Teacher Education, National Center for Teacher Residencies, and the Maryland Association of Colleges for Teacher Education's Motion for Temporary Restraining Order/Preliminary Injunction. (ECF No. 5; the "Motion.") Following expedited briefing by the parties, the court convened a hearing on the Motion on March 13, 2025. For the reasons that follow, by accompanying order, Plaintiffs' Motion will be granted in part and denied in part.

**I.    <u>BACKGROUND</u>**

Plaintiffs American Association of Colleges for Teacher Education ("AACTE"), National Center for Teacher Residencies ("NCTR"), and the Maryland Association of Colleges for Teacher Education ("MACTE") initiated this action on March 5, 2025. (ECF No. 1; the "Complaint.") Plaintiffs' claims arise from the Department of Education's (the "Department") termination of grants awarded through its Teacher Quality Partnership Program ("TQP"), Supporting Effective Educator Development Program ("SEED"), and the Teacher and School Leader Incentive Program ("TSL") (collectively, the "Grant Programs").

### A. Plaintiffs

Plaintiffs AACTE, NCTR, and MACTE are composed of members that provide teacher preparation programs throughout the United States.  (ECF No. 1 at p. 2.)

Plaintiff AACTE is the largest membership organization dedicated to educator preparation in the United States.  (ECF No. 1 ¶ 12.)  Its hundreds of members include public and private colleges and universities, as well as nonprofit organizations.  *Id.*  AACTE members work with teachers, counselors, pre-Kindergarten through grade 12 administrators, and college faculty.  *Id.*  AACTE shares its membership organization's research, policy insights, and best practices with professional educators to further its mission of "elevat[ing] education and educator preparation through research, professional practice, advocacy, and collaboration."  *Id.*  Fifty-four AACTE members, including five located in Maryland, were awarded TQP, SEED, and TSL grants.  (ECF No. 5-3 ¶¶ 5, 6.)

NCTR's members include colleges, universities, and nonprofit teaching organizations across the United States.  (ECF No. 1 ¶ 13.)  Its mission is "to transform educator preparation by advancing the teacher residency movement to prepare, support, and retain more effective educators who represent and value the communities they serve."  *Id.*   NCTR "supports the design of new teacher residency programs and provides consulting to strengthen existing programs across the United States."  *Id.*  NCTR's members use grant money, including from the Grant Programs, to "reduce tuition costs for aspiring teachers called teacher residents, pay host K-12 teachers for the work they are doing to support the aspiring teachers, offset the cost for licensure examinations and test prep workshops, and provide a stipend or pay for work the teacher residents are completing through their internships."  *Id.*  Twenty-five NCTR members received SEED, TQP, and/or TSL

grant awards; and in 2022, the Department awarded NCTR a three-year SEED grant. (NCTR Decl., ECF No. 5-4 ¶¶ 5–6.)

MACTE is a membership organization with a mission "to serve as a distinct statewide voice on matters of importance to educator preparation programs at Maryland's colleges and universities." (ECF No. 1 ¶ 14.) MACTE's members are "college and universities engaged in the preparation of professional school personnel with state program approval." *Id.* All of MACTE's members are located in Maryland. (ECF No. 5-3 ¶ 6.) Three of MACTE's 10 members received TQP and SEED grants. *Id.* ¶ 7. These TQP and SEED grant recipients use their grant awards to recruit, retain, and support teachers in Maryland. *Id.* ¶ 5.

## B. The Grant Programs

The Grant Programs' authorizing statutes reserve funds for the Secretary of the Department (the "Secretary") to award grants on a competitive basis to provide funding for specified purposes. According to the statute, TQP grant funds shall be used for "carry[ing] out a program for the preparation of teachers . . ., a teaching residency . . ., or a combination of such programs" that include certain requirements specified in 20 U.S.C. § 1022a(d) and (e). 20 U.S.C. § 1022a(c)(1).

SEED provides grants for the purposes of:

> (1) providing teachers, principals, or other school leaders from nontraditional preparation and certification routes or pathways to serve in traditionally underserved local educational agencies;
> (2) providing evidence-based professional development activities that address literacy, numeracy, remedial, or other needs of local educational agencies and the students the agencies serve;
> (3) providing teachers, principals, or other school leaders with professional development activities that enhance or enable the provision of postsecondary coursework through dual or concurrent enrollment programs and early college high school settings across a local educational agency;
> (4) making freely available services and learning opportunities to local educational agencies, through partnerships and cooperative

> agreements or by making the services or opportunities publicly accessible through electronic means; or
> (5) providing teachers, principals, or other school leaders with evidence-based professional enhancement activities, which may include activities that lead to an advanced credential.

20 U.S.C. § 6672(a).

TSL provides grants to "eligible entities to develop, implement, improve, or expand performance-based compensation systems or human capital management systems, in schools served by the eligible entity." 20 U.S.C. § 6631(a). TSL's authorizing statute describes its purposes as follows:

> (1) to assist States, local educational agencies, and nonprofit organizations to develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders (especially for teachers, principals, or other school leaders in high-need schools) who raise student academic achievement and close the achievement gap between high- and low-performing students; and
> (2) to study and review performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders to evaluate the effectiveness, fairness, quality, consistency, and reliability of the systems.

*Id.* § 6631.

Per their authorizing statutes, SEED and TSL awards provide grants for periods of "not more than 3 years." 20 U.S.C. §§ 6672(b)(1), 6632(b)(1). TQP awards provide grants for periods up to five years. (ECF No. 1 ¶ 4.)

## C. The Application Process

The Grant Programs' authorizing statutes set forth grant application procedures. 20 U.S.C. §§ 1022a(b), 6672(d), 6632(c). The statutory application process for the Grant Programs (set forth in Title 20 of the United States Code, titled "Education") is implemented in accordance with the Code of Federal Regulations, Title 34, which governs the Department specifically. According to

the regulations adopted to implement the statutory application process for the Grant Programs, the Secretary is required to publish proposed and final "Annual absolute, competitive preference, and invitational priorities" in the Federal Register. 34 C.F.R. § 75.105. The applicable regulations also require that the Secretary's proposed priorities go through public comment rule making except in the following circumstances:

> (i) The final annual priorities will be implemented only by inviting applications that meet the priorities;
> (ii) The final annual priorities are chosen from a list of priorities already established in the program's regulations;
> (iii) Publishing proposed annual priorities would seriously interfere with an orderly, responsible grant award process or would otherwise be impracticable, unnecessary, or contrary to the public interest;
> (iv) The program statute requires or authorizes the Secretary to establish specified priorities; or
> (v) The annual priorities are chosen from allowable activities specified in the program statute.

34 C.F.R. § 75.105(b)(2). Once the priorities are established through notice and comment, they must then be published in a notice in the Federal Register, usually in the Notice Inviting Applications seeking grant applicants. *Id*. § 75.105(a).

The Department is subject to additional rule making requirements under the General Education Provisions Act ("GEPA") at 20 U.S.C. § 1232. Important here, GEPA carves out Department priority notice and comment rule making, including as applied to the Grant Programs statutory application process, from the Administrative Procedure Act's ("APA") more generalized exemption of grant-related matters from public notice and comment rule making requirements. 5 U.S.C. § 553(a)(2). Under GEPA,

> The exemption for . . . grants and benefits in section 553(a)(2) of Title 5 [of the APA] shall apply only to regulations--
> (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or

(2) where the Secretary determines that the requirements of this subsection will cause extreme hardship to the intended beneficiaries of the program affected by such regulations.

20 U.S.C. § 1232(d).

For purposes of § 1232(d), a "regulation" is "any generally applicable rule, regulation, guideline, interpretation, or other requirement that (1) is prescribed by the Secretary or the Department; and (2) has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program." 20 U.S.C. § 1232(a). "Applicable program" means "any program for which the Secretary or the Department has administrative responsibility as provided by law or by delegation of authority pursuant to law." *Id.* § 1221(c)(1).

Here, Plaintiffs' members that received (now terminated) TQP, TSL, and SEED grants ("Grant Recipients")[1] were selected to receive funding ("Grant Awards") from FY 2020, 2022, and 2024 TQP Grants; FY 2022 SEED Grants; and FY 2023 TSL Grants. (ECF No. 1 ¶¶ 32–34, 38, 42.) All Grant Recipients applied for Grant Program awards pursuant to a Notice Inviting Application published in the Federal Register. For TQP Grant Program awards, Notices Inviting Applications appeared at 85 Fed. Reg. 29691–29704; 87 Fed. Reg. 10906–10923; and 89 Fed. Reg. 23573–23592. For SEED Grant Program awards, Notices Inviting Applications appeared at 87 Fed. Reg. 19487–19496. For TSL Grant Program awards, Notices Inviting Applications appeared at 88 Fed. Reg. 33592–33601. The Notices Inviting Application set forth the Department priorities established through the § 75.105 public notice and comment rule making process, to include the following priorities: "supporting educators and their professional growth," "increasing educator diversity," "high-need schools," "addressing the impact of COVID-19 on Students, Educators, and Faculty," "[p]romoting equity in student access to educational resources and

---

[1] The term "Grant Recipients" includes Plaintiff NCTR. (*See* ECF No. 5-4 ¶ 6.)

opportunities," "supporting a diverse educators workforce and professional growth to strengthen student learning," "meeting student social, emotional, and academic needs," "increasing postsecondary education access, affordability, completion, and post-enrollment success," and "strengthening cross-agency coordination and community engagement to advance systemic change." 85 Fed. Reg. 29691–29704; 87 Fed. Reg. 10906–10923; 89 Fed. Reg 23573–23592; 87 Fed. Reg 19487–19496; 88 Fed. Reg. 33592–33601; *see also* ECF No. 1 ¶¶ 29, 31, 35, 37, 39, 41.

### D. Change of Administration

On January 20, 2025, President Trump was sworn in, for the second time, as President of the United States. That same day, he signed Executive Order 14151 titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025). The "Purpose and Policy" portion of Executive Order 14151 provides:

> The Biden Administration forced illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military. This was a concerted effort stemming from President Biden's first day in office, when he issued Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government."

> Pursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted "Equity Action Plans" to detail the ways that they have furthered DEIs infiltration of the Federal Government. The public release of these plans demonstrated immense public waste and shameful discrimination. That ends today. Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great.

*Id.* § 1, *Purpose and Policy*.

Of import here, Executive Order 14151 mandates the termination of, *inter alia,* certain grants and programs as follows:

> (b) Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:
>
> > (i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

*Id.* § 2(b)(1), *Implementation.*[2]

On February 3, 2025, three membership associations (none a plaintiff here) and the City of Baltimore filed action in this court against President Trump, the Acting Secretary of the Department, and the Acting Secretaries of the Departments of Health and Human Services, Labor, Commerce, Agriculture, and Energy, and the Secretary of the Department of the Interior. *Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA (D. Md. Feb. 3, 2025) (the "*NADOHE*" case). The *NADOHE* plaintiffs claim, *inter alia,* that the Termination Provision violates the Fifth Amendment to the United States Constitution, as well as the Spending Clause at Article I. Following briefing and oral argument on the *NADOHE* plaintiffs' motion for preliminary injunction, the presiding judge issued a preliminary injunction enjoining the defendants from "paus[ing], freez[ing], imped[ing], block[ing], cancel[ing], or terminat[ing] any awards, contracts or obligations ("Current Obligations") or chang[ing] the terms of any Current Obligation, on the basis of the Termination Provision." *Ass'n of Diversity Officers in Higher Educ. v. Trump*, No.

---

[2] Other courts have referred to this as the "Termination Provision." For continuity, so too shall this court.

1:25-CV-00333-ABA, 2025 WL 573764, *31 (D. Md. Feb. 21, 2025), *opinion clarified,* No. 25-CV-0333-ABA, 2025 WL 750690, *5 (D. Md. Mar. 10, 2025)

Following Executive Order 14151, but before the *NADOHE* preliminary injunction, the Department's Office of Planning, Evaluation and Policy Development issued an internal directive (the "Directive") titled "Eliminating Discrimination and Fraud in Department Grant Awards."[3] (ECF No. 24-2.)  The Directive, dated February 5, 2025, was signed by Acting Secretary of the Department Denise L. Carter.  *Id.*  The Directive begins:

> From the Supreme Court's 1954 landmark opinion in *Brown v. Board of Education* to its 2023 decision in *Students for Fair Admissions, Inc. v. Fellows of Harvard College,* education has played a central role in this Nation's fight against discrimination. It remains a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. This includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

*Id.*

Through the Directive, the Department instructed its personnel as follows:

> For these reasons, pursuant to, among other authorities, 20 U.S.C. § 3411 and 2 C.F.R. § 200.339–341, the Secretary of Education hereby directs as follows:

---

[3] The Directive was offered by Defendants as an exhibit to their opposition to the Motion and was referenced by defense counsel at the hearing over no objection.  At the hearing, defense counsel explained, over no objection by opposing counsel, that the Directive was made public by way of a social media post that was not at the direction, or with the permission, of Acting Secretary Carter. In other words, it was leaked.  Plaintiffs offer no challenge to its authenticity.  (ECF No. 24 at p. 8; ECF No. 24-2.)

> Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication.

*Id.  See also* Oglesby Decl., Hearing Ex. No. 2 ¶ 5.  The Directive makes no mention of President Trump, Executive Order 14151, or any other Executive Order.

### E. February 2025 Termination

In early February 2025, the majority of Grant Recipients received a letter from the Department, which reads:

> This letter provides notice that the United States Department of Education is terminating your federal award, [Grant Award number]. *See* 2 C.F.R. § 200.340–43; *see also* 34 C.F.R. § 75.523.
>
> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict

with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339–43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [___] in its entirety effective [February ___, 2025].

(ECF No. 1-2; the "Termination Letter.")

In addition to the Termination Letter, Grant Recipients received updated Grant Award Notifications ("GANs"). (ECF No. 1 ¶ 5.) The GANs contained information regarding the Grant Recipient, Grant Project award information, project staff and title, key personnel, award periods, authorized periods, authorized funding, administrative information, legislative and fiscal data, and terms and conditions. (ECF No. 1-1.) The updated GANs read: "[t]his grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253." *Id.*

Since the Termination Letters were issued, Plaintiffs and their member organizations have stopped receiving their Grant Award funds. (ECF No. 5-1 at p. 11.) As a result, Plaintiffs' member organizations are unable to continue their work, which directly effects thousands of students and educators, and threatens the existence of Grant Recipients' programs. *Id.*; *see, e.g.* ECF No. 5-6 Declaration of Carolyn Parker, Ph.D., of AACTE member American University ("AU") (attesting to deleterious impact of TQP grant termination); ECF No. 5-7, Declaration of Amy Smith, Ph.D., of AACTE member University of St. Thomas ("UST") (same); ECF No. 5-8, Declaration of Heather Kirkpatrick, Ph.D., of NCTR and AACTE member Alder Graduate School of Education (same); ECF No. 5-9, Declaration of Dr. Sarah Johnson, of AACTE member Teaching Lab (same *re* TSL grant termination); ECF No. 5-4, Declaration of Kathlene Campbell, Ph. D., Chief

Executive Officer of Plaintiff NCTR (same *re* SEED grant termination); and ECF No. 5-5, Declaration of Laurie Mullen, Ph.D., President of Plaintiff MACTE (same *re* termination of MACTE members' TQP and SEED grants).

Following issuance of the Termination Letters, on February 17, 2025, the Department issued a press release titled "U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants."[4] (February 2025 Press Release, ECF No. 1-4.) In full, the February 2025 Press Release reads:

> The U.S. Department of Education today announced it has terminated over $600 million in grants to institutions and nonprofits that were using taxpayer funds to train teachers and education agencies on divisive ideologies. Training materials included inappropriate and unnecessary topics such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; "anti-racism"; and instruction on white privilege and white supremacy. Additionally, many of these grants included teacher and staff recruiting strategies implicitly and explicitly based on race.
>
> The grants are awarded to teacher preparation programs that train future classroom teachers. Examples from the grant applications included:
> - Requiring practitioners to take personal and institutional responsibility for systemic inequities (e.g., racism) and critically reassess their own practices;
> - Receiving professional development workshops and equity training on topics such as "Building Cultural Competence," "Dismantling Racial Bias" and "Centering Equity in the Classroom";
> - Acknowledging and responding to systemic forms of oppression and inequity, including racism, ableism, "gender-based" discrimination, homophobia, and ageism;
> - Providing "targeted practices in culturally relevant and responsive teaching abolitionist pedagogies and issues of diversity in classroom management"; and
> - Providing spaces for critical reflection to help educators confront biases and have transformative conversations about equity.

---

[4] The February 2025 Press Release is available on the Department's website at https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants (last visited Mar. 17, 2025).

*Id.*

### F.  Resulting Litigation

Following issuance of the Termination Letters, at least two lawsuits were filed to challenge the Department's termination of the Grant Awards.  On March 3, 2025, Plaintiffs filed the instant action asserting that the Department's termination of their members' TQP, SEED, and TSL Grant Awards violates the Due Process Clause of the Fifth Amendment (Count I) and the APA (Count II).[5]  (ECF No. 1.)  That same day, Plaintiffs filed the Motion for temporary restraining order and preliminary injunction to reinstate the terminated Grant Awards and to enjoin Defendants from terminating other Grant Awards under the same rationale.  (ECF No. 5.)  On March 5, 2025, the court convened a status conference with the parties.  The parties agreed to treat the Motion as one for preliminary injunction only (in lieu of first addressing the motion for temporary restraining order) and, with the parties' consent, the court set an expedited briefing schedule and scheduled a hearing.  (ECF No. 18.)  On March 13, 2025, the parties appeared for a hearing on the Motion.

After the instant case was filed, but before the hearing on the Motion, the states of California, Maryland, New Jersey, Colorado, Illinois, New York, Wisconsin, and the Commonwealth of Massachusetts joined as plaintiffs to file suit in the United States District Court for the District of Massachusetts (Civil Case No. 1:25-cv-10548-MJJ; the "*California* case").  The *California* plaintiffs allege the Department, Secretary McMahon, and former Acting Secretary Carter violated the APA by terminating TQP and SEED Grant Awards.  On March 10, 2025, the presiding judge, the Honorable Myong J. Joun, entered a temporary restraining order as follows:

> 1. Defendants shall immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded TQP or SEED grants for recipients in Plaintiff States;

[5] Plaintiff NCTR seeks redress of termination of its own grant, as well as of those of its members.  (ECF No. 1 ¶¶ 65–76.)

2. Defendants are temporarily enjoined from implementing, giving effect to, maintaining, or reinstating under a different name the termination of any previously awarded TQP or SEED grants for recipients in Plaintiff States, including but not limited to through the Termination Letter, Termination GAN, and any other agency actions implementing such terminations, such as suspension or withholding of any funds approved and obligated for the grants;

3. Defendants are temporarily enjoined from terminating any individual TQP and SEED grant for recipients in Plaintiff States, except to the extent the final agency action is consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's Order;

4. Within 24 hours of entry of this Order, Defendants shall provide notice of the TRO to their employees and anyone acting in concert with them, and to all TQP and SEED grantees in Plaintiff States;

5. Defendants shall file a status report with the Court, within 24 hours of entry of this Order, confirming their compliance with the Court's TRO;

6. This TRO shall become effective immediately upon entry by this Court. The TRO shall remain in effect for 14 days; and

7. By March 11, 2025 at 5 P.M., the parties shall jointly propose a briefing schedule regarding Plaintiff States' request for preliminary injunction.

*California v. U.S. Dep't of Educ.*, — F. Supp. 3d. — , No. CV 25-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025). The *California* defendants filed a notice of appeal of the temporary restraining order the following day.

## II. <u>LEGAL STANDARD</u>

Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. "A preliminary injunction is 'an extraordinary remedy' that 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Pierce v. N. Carolina State Bd. of Elections*,

97 F.4th 194, 209 (4th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (noting that "a preliminary injunction is 'an extraordinary remedy never awarded as of right'").  As such, preliminary injunctive relief is to be "granted only sparingly and in limited circumstances."  *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 351 (D. Md. 2021), *aff'd,* No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd,* No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)).

A plaintiff seeking preliminary injunctive relief "must establish that 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm absent preliminary relief; 3) the balance of the equities favors the requested injunctive relief; and 4) that relief is in the public interest."  *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (citing *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170–71 (4th Cir. 2019)). These factors were established by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).   "[P]laintiff bears the burden of establishing that each of these factors supports granting the injunction."[6]  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citing cases); *see St. Michael's Media, Inc.*, 566 F. Supp. 3d at 351 (same).

---

[6] "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 352 (D. Md. 2021), *aff'd,* No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd,* No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016)).

III.    <u>ANALYSIS</u>

### A. Jurisdictional Matters

#### 1. *Standing*

The Constitution extends the judicial power of Article III courts to "cases" or "controversies." U.S. CONST. ART. III, § 2, cl. 1. The doctrine of standing, among others, "implements" this limit. *Carney v. Adams*, 592 U.S. 53, 58 (2020). Accordingly, as a threshold matter, the court must determine whether Plaintiffs have standing to bring this action. To establish standing:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dep't. of Educ v. Brown*, 600 U.S. 551, 561 (2023) (citations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In *TransUnion LLC v. Ramirez*, the Supreme Court explained that when determining if a plaintiff meets the concrete-harm requirement, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." 594 U.S. 413, 424 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Traditional tangible harms include physical and monetary harms or losses. *Id*. at 425.

Membership organizations, like Plaintiffs, may establish standing based on their own injury or based on their members' injuries; the latter standing basis is known as representational

or associational standing.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

As referenced in Section I.E., above, Plaintiffs allege the following facts in their Complaint and through affidavits (or declarations) of relevant persons with knowledge:

In 2022, Plaintiff NCTR received a three-year SEED grant.  (ECF No. 1 ¶¶ 65–76; NCTR Decl., ECF No. 5-4 ¶ 6.)  On February 10, 2025, NCTR received a Termination Letter from the Department informing it that its SEED grant was terminated for no longer effectuating Department priorities.  (ECF No. 1 ¶¶ 6–7; NCTR Decl., ECF No. 5-4 ¶¶ 10, 11.)  That same day, the Department stopped funding NCTR's grant. (NCTR Decl., ECF No. 5-4 ¶ 14, pp. 14–15.)  Without the SEED grant funding, NCTR will be unable to engage in its core activities, including operating teacher residency programs and conducting research regarding best practices for teacher training.  (ECF No. 1 ¶¶ 65–71; NCTR Decl., ECF No. 5-4 ¶¶ 12, 17–19.)  Accordingly, as a direct result of the Department's termination decision, NCTR suffered monetary harm, and a decision in Plaintiffs' favor, finding the Department's termination illegal and reinstating NCTR's SEED grant would remedy NCTR's alleged harm.  Plaintiff NCTR has sufficiently demonstrated standing to bring this action.

Plaintiffs AACTE and MACTE assert representational standing through their members.  (ECF No. 1 ¶ 4.)[7]   AACTE and MACTE's members "together comprise hundreds of teacher preparation programs throughout the United States."  *Id.* at p. 2.  Their members received TQP, SEED, and TSL grants from the Department that remained active until the February 2025 Termination Letters.  *Id.* at pp. 6–7.  To establish representational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the

---

[7] Plaintiff NCTR also seeks relief for its members, including without limitation NCTR member and (now terminated) TQP Grant Recipient Alder Graduate School of Education.  (ECF No. 1 ¶ 14; ECF No. 5-8.)

interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions*, 600 U.S. at 181. (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).   An organization need only "make specific allegations establishing that at least one identified member had suffered or would suffer harm."  *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (emphasis omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

AACTE member organizations received TQP, SEED, and TSL grants.  (ECF No. 1 at p. 2; *see supra re* Declarations at ECF Nos. 5-6, 5-7, 5-8, and 5-9).   AACTE's members' grants remained active through early to mid-February 2025 until receipt of the Termination Letter.  *Id.* at pp. 3–4.  Among those grants terminated was AU's TQP grant.  *Id.* ¶ 77; *see also* Section I.E., *supra*.  As a result of the termination and corresponding loss of funding, AU is no longer able to recruit participants to its teacher-training residency program and, if the funding is not reinstated, AU will shut down the program.  *Id*. ¶¶ 83–86.  Accordingly, at least one AACTE member has standing to bring this action in its own right.

AACTE's mission is "to elevate education and educator preparation through research, professional practice, advocacy, and collaboration."  (ECF No. 1 ¶ 12.)   The Department's termination of the Grant Awards "directly threatens this mission," as "[t]hese grants fund initiatives that benefit PK-12 students and schools nationwide by supporting innovative approaches to educator preparation and professional development."  *Id*.  AACTE, therefore, satisfies the second prong of representational standing.  Finally, the claims presented and relief requested here concern the legality of the Department's termination decision and do not require this court to consider "the individual circumstances of any aggrieved" Plaintiff member

organization.  *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. V. Brock*, 477 U.S. 274, 287 (1986).

According to the Complaint, Plaintiff MACTE's member organizations also received Grant Program awards and Termination Letters.  (ECF No. 1 at pp. 2–4.)  Further, according to the record before the court, the Department terminated grants awarded to MACTE members Towson University, University of Maryland, and Frostburg State University, causing "a substantial loss of funds for teacher preparation programs in Maryland."  (ECF No. 25-1 ¶¶ 5–9.)  Defendants contend that Plaintiffs fail adequately to allege MACTE's standing in the Complaint and may not salvage such defect through supplemental declarations or its reply in support of the Motion.  The court is satisfied that Plaintiffs sufficiently allege MACTE's standing in the Complaint, and reiterate MACTE's standing in the Motion.

Specifically, the Complaint (ECF No. 1) at page 2 avers that MACTE members received Grant Awards; at pages 3 and 4, the Complaint alleges that these grants remained active through mid-February 2025 until they were terminated by the Department through the Termination Letters; the Complaint at paragraph 4 defines "Grant Recipients" to include MACTE members; and the Complaint at paragraph 14 alleges that the Department's grant terminations impact MACTE's core mission, and that TQP and SEED Grant Awards support teachers in Maryland.  These allegations are supported by MACTE President Dr. Laurie Mullen's attestation that three of MACTE's 10 members received TQP and SEED grants; the Department terminated the grants; and the grant terminations caused a substantial loss of funds for teacher preparation programs in Maryland.  (MACTE Decl., ECF No. 5-5 ¶¶ 6–7.)  Further, Plaintiffs allege that the Department's Grant Program terminations "implicated MACTE's core mission," as MACTE "serves the institutions of higher education in Maryland for both the recruitment and retention of future teachers as well as

the support and advancement of current classroom teachers." (ECF No. 1 ¶ 14.) Finally, for the same reasons identified in relation to AACTE, the court discerns no cause for it to consider the individual circumstances of MACTE's members. Accordingly, MACTE satisfies all the requirements of organizational standing.

As a separate but related issue, Defendants also argue Plaintiff MACTE lacks standing because Judge Joun's temporary restraining order in the *California* case (issued March 10, 2025, seven days after the instant action was filed) ordered the Department to restore terminated TQP and SEED grants to recipients in Maryland, which effectively covers MACTE's allegedly aggrieved members. *California v. U.S. Dep't of Educ.*, No. CV 25-10548, — F. Supp. 3d. — , 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025). This is wrong-headed. Standing "is concerned with the presence of injury, causation, and redressability at the time a complaint is filed," whereas mootness "scrutinizes the presence of these elements after filing—*i.e.*, at the time of a court's decision." *Garcia v. U.S. Citizenship & Immgr. Servs.*, 168 F. Supp. 3d 50, 65 (D.D.C. 2016). As mentioned, the Complaint here was filed March 3, 2025, a week before the *California* case TRO. (ECF No. 1.) Judge Joun's order does not impair MACTE's standing here.

Moreover, the *California* TRO does not render MACTE's (or any Plaintiff's) claims moot. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.,* 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)). A "case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Id*. (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009)). This is not the situation at hand.

Temporary restraining orders exist to prevent immediate and irreparable injury, loss, or damage by preserving the *status quo* until the court considers whether to order preliminary injunctive relief (or terminate the TRO). FED. R. CIV. P. 65(b)(1)(A). As its name suggests, a temporary restraining order is temporary; unless extended, the order expires within 14 days of entry. FED. R. CIV. P. 65(b)(2). Rule 65 contemplates the importance of proceeding expeditiously from entry of a TRO to a preliminary injunction hearing. FED. R. CIV. P. 65(b)(3). Indeed, courts are instructed to prioritize a preliminary injunction hearing following a TRO granted without notice above all other matters. *Id*. A preliminary injunction provides more lasting relief than a TRO; it serves to prevent irreparable harm during the pendency of litigation, and to preserve the court's ability to render meaningful judgment and relief on the merits. *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003). While Plaintiffs here, and those in the *California* case, pursued emergency relief, Judge Joun's TRO does not, indeed cannot, resolve the parties' disputes. Against this backdrop, the question of the legality of the Department's termination of MACTE members' TQP and SEED grants remains very much alive and appropriate for this court to consider pursuant to Article III.

### 2. *Judicial Review*

The APA waives the federal government's sovereign immunity to permit judicial review of agency action in limited circumstances. 5 U.S.C. § 705. Such review is available in suits brought by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" who seeks "relief other than money damages." *Id*. Importantly, judicial review is limited to "final agency action for which there is no other adequate remedy in a court." *Id*. § 704. "Because 'sovereign immunity is jurisdictional in nature,' finality under the APA is a jurisdictional requirement." *Jake's Fireworks Inc. v. United States Consumer Prod.*

*Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (quoting *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019)).

Agency action is "final" when two conditions are met: (1) "the action must mark the 'consummation' of the agency's decision making process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)); *see Biden v. Texas*, 597 U.S. 785, 808 (2022) (quoting *Bennett*, 520 U.S. at 178).

The parties agree, as does the court, that the Department's termination of the subject TQP, SEED, and TSL Grant Awards constituted final agency action. Each Termination Letter represented that the Department had concluded its review of the grant in question. (ECF No. 1-2). The Department's Termination Letters immediately produced legal consequences for the Grant Recipients; the Grant Recipients could no longer access the funds allotted to them by the Grant Awards. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), — F. Supp. 3d — , 2025 WL 368852, at *10 (D.D.C. Feb. 3, 2025) (finding Office of Management and Budget memorandum directing federal agencies to temporarily pause disbursement of federal financial assistance and to freeze all such funds "immediately produced legal consequences across the entire federal funding system").

### B. Venue

Where, as here, a defendant is an officer or employee of the United States, a plaintiff may bring its claims in any judicial district in which:

(A) a defendant in the action resides,

(B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or

(C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1).

Although they need only establish one of the above recited circumstances, Plaintiffs aver venue is proper in this district because "a substantial part of the events or omissions giving rise to the claims occurred in the District of Maryland, and Plaintiff MACTE resides in this district." (ECF No. 1 ¶ 11.)  Further, under § 1391(e)(1)(C), venue in the District of Maryland is proper because no real property is involved, Plaintiff MACTE resides in this district, and Defendant McMahon, as the Department Secretary, is an officer of the United States.

Even if Defendant MACTE lacked standing or was not a party to this action, per § 1391(e)(1)(B), Plaintiffs ably demonstrate that "a substantial part of the events . . . giving rise to the claim occurred" in Maryland.  "[I]t is possible for venue to be proper in more than one judicial district;" the question for the court under § 1391(e)(1)(B) is not whether a given district is the best venue, but whether the events or omissions that occurred there are "sufficiently substantial." *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004).  In considering "whether events or omissions are sufficiently substantial to support venue . . . , a court should not focus only on those matters that are in dispute or that directly led to the filing of the action." *Id*. at 406 (citation omitted).  Instead, the court "should review 'the entire sequence of events underlying the claim.'" *Id*.; *accord Brito v. Major Energy Elec. Servs., LLC,* 526 F. Supp. 3d 95, 109 (D. Md. 2021) (same); *Taylor v. Shreeji Swami*, PWG-16-3787, 2017 WL 1832206, at *1 (D. Md. May 8, 2017) (same); *Convergence Mgmt. Assocs., Inc. v. Callender*, TDC-15-4015, 2016 WL 6662253, at *2 (D. Md. Nov. 10, 2016) (same).  A substantial part of the events "does not mean 'a majority of the events.'"

*Coastal Lab's, Inc. v. Jolly,* 502 F. Supp. 3d 1003, 1023 (D. Md. 2020) (quoting *Seidel v. Kirby*, 296 F. Supp. 3d 745, 751–52 (D. Md. 2017)).

Here, the facts alleged make clear there is more than one relevant "event that occurred in Maryland;" further, the Maryland events do not "appear[] to be unsubstantial." *Tusha v. Greenfield*, No. CV GLR-20-2143, 2021 WL 1530211, at *5 (D. Md. Apr. 19, 2021). Many AACTE members applied for, received, and utilized grants in Maryland. (ECF No. 5-3 ¶ 6.) The terminations, it is competently alleged, will produce a substantial loss of funds and related programming for teacher preparation programs in Maryland. *Id*.

## C. Request for Preliminary Injunction

### 1. *Likelihood of Success on the Merits*

"A plaintiff seeking a preliminary injunction must make a clear showing that he is likely to succeed at trial and to suffer irreparable harm in the absence of preliminary relief." *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)). Plaintiffs contend they are likely to succeed on the merits of both their Fifth Amendment and APA claims. The court addresses each in turn.

### a. Fifth Amendment Due Process Claim – Vagueness

Among its many protections, the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V. The requirement of clarity is "essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly

defined."[8] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Where a law is impermissibly vague, it must be invalidated. *Fox Television*, 567 U.S. at 253.

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 588 U.S. 445, 447 (2019). As the Supreme Court has explained:

> Our doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers. . . . Vague laws contravene the "first essential of due process of law" that statutes must give people "of common intelligence" fair notice of what the law demands of them. . . . Vague laws also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect.

*Id.* at 451 (first citing *Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring in part and concurring in judgment); then quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926); then citing *Collins v. Kentucky*, 234 U.S. 634, 638 (1914)). The void-for-vagueness doctrine thus addresses these "two connected but discrete due process concerns"—that "regulated parties should know what is required of them so they may act accordingly," and that "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at 253; *see Just Puppies, Inc. v. Frosh*, 565 F. Supp. 3d 665, 734 (D. Md. 2021), *aff'd sub nom.* 123 F.4th 652 (4th Cir. 2024) (same).

"Fair notice of the law's demands . . . is 'the first essential of due process.'" *Dimaya*, 584 U.S. at 183 (Gorsuch, J., concurring in part and concurring in judgment) (quoting *Connally*, 269 U.S. at 391). It is a "fundamental principle in our legal system . . . that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox Television*, 567 U.S.

---

[8] As Plaintiffs assert, and this court has previously explained, while challenges to vagueness are often analyzed in the statutory context, the same principles guide consideration of executive orders. *See, e.g., Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, — F. Supp. 3d — , No. 1:25-CV-00333-ABA, 2025 WL 573764, at *19 (D. Md. Feb. 21, 2025) (discussing principles of statutory vagueness in analyzing a vagueness challenge to an executive order); *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146–47 (9th Cir. 2009) (same); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 536 (N.D. Cal. 2017) (same).

at 253; *see Edgar v. Haines*, 2 F.4th 298, 316 (4th Cir. 2021) (same).  "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."  *Grayned*, 408 U.S. at 108.  "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Id.* at 108–109.

While "perfect clarity and precise guidance have never been required," *see United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)), "a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement."  *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272–73 (4th Cir. 2019); *see Fox Television*, 567 U.S. at 253 (same).

Plaintiffs' Fifth Amendment claim rests on allegations that the Termination Provision of Executive Order 14151 is unconstitutionally vague.[9]  In order to show they are likely to succeed on their Fifth Amendment claim, Plaintiffs concede that they must produce evidence that the Department terminated their members' Grant Awards pursuant to the Termination Provision of Executive Order 14151.  As will be explained below, Plaintiffs fail to adduce, at this stage, sufficient evidence in support of same; as such, they have not met their burden to show a clear likelihood of success on the merits of their Fifth Amendment claim.  The court, therefore, does not reach the question of unconstitutional vagueness.

---

[9] Plaintiffs ask the court to extend to them the benefit of the *NADOHE* preliminary injunction through retroactive application.  (ECF No. 5-1 at pp. 17–18; *see* ECF No. 1 ¶¶ 45-52.)  Their arguments are unavailing for the reasons set forth in this opinion and because they fail to overcome the material procedural and substantive differences between the case at bar and *NADOHE*.  Further, on March 14, 2025, the Fourth Circuit granted the *NADOHE* defendants' request to stay the preliminary injunction pending appeal.

Plaintiffs allege: "Plaintiffs and their member organizations were subjected to the Termination Provision when the Department terminated the grants at issue in this lawsuit under the instructions provided in Executive Order 14151." (ECF No. 1 ¶ 155.) Plaintiffs acknowledge that the Termination Letters did not expressly reference or mention Executive Order 14151, and argue that "the Department's publicly-articulated reason for termination," as described in the February 17, 2025 Press Release, offers competent circumstantial evidence to support the conclusion that the Department terminated the Grant Awards in obeyance of Executive Order 14151. (ECF No. 5-1 at pp. 15, 17–18 .)

As discussed *supra*, the full February 2025 Press Release reads:

> The U.S. Department of Education today announced it has terminated over $600 million in grants to institutions and nonprofits that were using taxpayer funds to train teachers and education agencies on divisive ideologies. Training materials included inappropriate and unnecessary topics such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; "anti-racism"; and instruction on white privilege and white supremacy. Additionally, many of these grants included teacher and staff recruiting strategies implicitly and explicitly based on race.
>
> The grants are awarded to teacher preparation programs that train future classroom teachers. Examples from the grant applications included:
> - Requiring practitioners to take personal and institutional responsibility for systemic inequities (e.g., racism) and critically reassess their own practices;
> - Receiving professional development workshops and equity training on topics such as "Building Cultural Competence," "Dismantling Racial Bias" and "Centering Equity in the Classroom";
> - Acknowledging and responding to systemic forms of oppression and inequity, including racism, ableism, "gender-based" discrimination, homophobia, and ageism;
> - Providing "targeted practices in culturally relevant and responsive teaching abolitionist pedagogies and issues of diversity in classroom management"; and

- Providing spaces for critical reflection to help educators confront biases and have transformative conversations about equity.

(ECF No. 1-4.)

For comparison, the Termination Provision of Executive Order 14151 provides:

> Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:
>
> (i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).

Beyond referencing "DEI," the court does not discern substantially similar language, which is to say, it is not in fact "clear," as Plaintiffs allege, that the Department terminated the Grant Awards at issue pursuant to the Termination Provision of Executive Order 14151. (ECF No. 1 ¶ 48.) Plaintiffs' papers otherwise offer no other argument or evidence in support of its allegation. At the hearing, Plaintiffs confirmed that the circumstantial evidence upon which they rely in support of this allegation is that of timing and presidential authority—the Termination Letters were issued within the required timeframe under the Termination Provision (60 days) ordered by President Trump.

Defendants also argue that the record before the court demonstrates that the Department did not terminate the Grant Awards as a means to comply with Executive Order 14151, or, alternatively, the record sufficiently undermines Plaintiffs' theory and conclusion that Executive

Order 14141 and the Termination Letters (and the February 2025 Press Release) are plainly and obviously connected.  The court agrees with Defendants on this point.  The Department's Directive cites as authority 28 U.S.C. § 3411 and 2 C.F.R. §§ 200.339–341, and directs Department personnel to "conduct an internal review of all . . . grants" to "ensur[e] that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication."  (February 2025 Directive, ECF No. 24-2.)  The Directive, as Defendants note, makes no reference to Executive Order 14151 or President Trump.  Further, importantly, the Directive preceded the *NADOHE* preliminary injunction enjoining enforcement of the Termination Provision, which is to say, at the time of the Directive, the Department had no incentive or motive to omit reference to Executive Order 14151, because the Termination Provision had not yet been enjoined in *NADOHE*.  *See NADOHE*, 2025 WL 573764, *supra*.[10]

The circumstantial evidence offered by Plaintiffs does not demonstrate a clear likelihood of success on their Fifth Amendment claim where that claim necessarily requires that the Termination Provision was the source of the Grant Award terminations.  Said another way, the record before the court at this time fails to demonstrate that the Department likely terminated the Grant Awards at the directive of Executive Order 14151.  The evidence Plaintiffs rely upon to rest that conclusion is simply too tenuous to serve as the cornerstone for the extraordinary relief of a

---

[10] Defendants also point to correspondence offered in the *NADOHE* case from the FCC Chair stating that the FCC was ending the FCC's "promotion" of DEI pursuant to the policies expressed in President Trump's Executive Order. *NADOHE*, 2025 WL 573764, at *7.

preliminary injunction.[11]    As such, Plaintiffs fail to meet their burden to show they are likely to succeed on their Fifth Amendment challenge.[12]

      b.  <u>Administrative Procedure Act Claim</u>

The APA instructs a reviewing court to hold unlawful and set aside final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "A disputed action also may be set aside as arbitrary and capricious if the agency has acted 'without observance of procedure required by law.'"  *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017) (first quoting 5 U.S.C. § 706(2)(D); then citing *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (noting that "even in cases arising under § 706(2)(D), the arbitrary-and-capricious standard frequently governs.")); *see also Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 557 (D. Md. 2020) (same).  As discussed above, judicial review is appropriate here, as the parties agree, as does the court, that the Termination Letters constituted final agency action.

In deciding whether a final agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the reviewing court determines "only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'"  5 U.S.C. §

---

[11] Further, as the court expressed at the hearing on the Motion, Plaintiffs neglect to consider that Acting Secretary Carter and Secretary McMahon may well share President Trump's views and opinions regarding DEI and equity-based programs and grants as expressed in Executive Order 14151.  Indeed, one might expect that to be the case.  That Executive Order 14151 may have, by its terms mandated precisely the action taken by the Department in terminating the Grant Awards does not mean the Department terminated the Grant Awards because it was ordered to do so – as opposed to because the Department head devised her own action items for the Department going forward; or based on some combination of same.

[12] Because the court concludes Plaintiffs fail to demonstrate a clear showing of likelihood of success on the merits on their Fifth Amendment claim for failure to relate adequately the Termination Letters to the Termination Provision of Executive Order 14151, it does not address Defendants' arguments related to the principle that "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement— depends in part on the nature of the enactment."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).

706(2)(A); *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). The court may not substitute its own policy judgment for that of the agency. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

An agency action qualifies as "arbitrary" or "capricious" if it is not "reasonable and reasonably explained." *Id.* "Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43).

"Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* (quoting *Michigan v. EPA*, 576 U. S. 743, 758 (2015)); *see also State Farm*, 463 U.S. at 50 (noting "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself").

To remind the reader, the Termination Letters state as follows:

> This letter provides notice that the United States Department of Education is terminating your federal award, [Grant Award number]. *See* 2 C.F.R. § 200.340–43; *see also* 34 C.F.R. § 75.523.
>
> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law

of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339–43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [___] in its entirety effective [February ___, 2025].

(ECF No. 1-2.)

       i.   Rule Making Requirements

The Department primarily relies upon two sections of the Code of Federal Regulations: § 200.340 and § 75.253.  Sections 200.339 and 341–43, also cited, provide additional notification requirements for terminations described in § 200.340.  At oral argument, Plaintiffs stated, and the Defendants did not dispute, that § 75.253 has no application here, because § 75.253 prescribes the procedure for "Continuation of a Multiyear Project after the First Budget Period" – and no Grant Recipient was in such a position relative to the Termination Letter.

Section 200.340 provides:

> (a) The Federal award may be terminated in part or its entirety as follows:
>
> > (1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;
> >
> > (2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;
> >
> > (3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or
> >
> > (4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.
>
> (b) The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.

2 C.F.R. § 200.340(a)–(b) (2025).

The Grant Recipients' GANs incorporate § 200.340 in their terms and conditions.[13]  (ECF No. 25-2.)   Accordingly, in compliance with § 200.340(b), the Department included the

---

[13] In relevant part, the GANs read: "2 CFR Part 200 as adopted at 2 CFR 3474." (ECF No. 25-2 at pp. 17, 91.) Section 3474.1 is titled "Adoption of 2 CFR part 200" and reads: "(a) The Department of Education adopts the Office of Management and Budget (OMB) Guidance in 2 CFR part 200, except for 200.102(a) and 2 CFR 200.207(a).  Thus, this part gives regulatory effect to the OMB guidance and supplements the guidance as needed for the Department. (b) The authority for all of the provisions in 2 CFR part 200 as adopted in this part is listed as follows. (Authority: 20 U.S.C. 1221e-3, 3474, and 2 CFR part 200)."  2 C.F.R. § 3474.1.

termination provisions set forth in § 200.340(a) in the GANs provided to the Grant Recipients. The parties' dispute, therefore, concerns whether the February 2025 Grant Terminations complied with § 200.340(a)(4).

Plaintiffs argue that "agency priorities" as used in § 200.340(a)(4) and the Termination Letters is a term of art. (ECF No. 5-1 at p. 5.)[14] As relates to the Department, Plaintiffs insist, "agency priorities" cannot be changed without going through public notice and comment rule making. *Id.* at p. 10. Defendants dispute this contention and instead suggest "agency priorities" refers to broader ("big-picture") agency policy aims, set by each administration or Secretary, and are not required to go through public notice and comment processes. (ECF No. 24 at pp. 24–25.) Defendants may be correct as it relates to other agencies, but, as discussed below, Plaintiffs persuade the court for purposes of the Motion that Department "agency priorities" may change only pursuant to APA notice and comment processes.

In 2020, § 200.340 was amended to allow, for the first time, an agency to terminate a federal award for failure to "effectuate agency priorities." Previously, a federal agency was entitled to terminate a federal award for the reasons currently listed at § 200.340(a)(1)–(3) or for cause. 2 C.F.R. 200.399 (2019). The comments to this change acknowledge:

> The intent of this change is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals. For instance, following the issuance of a Federal award, if additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award.

Guidance for Grants and Agreements, Published Doc. No. 2020-17468, 85 FR 49506 (Aug. 13, 2020). In at least two other instances since President Trump's 2025 inauguration, courts addressed

---

[14] Plaintiffs assert "program goals" are also a term of art and refer to program goals established by Congress. At the hearing, Defendants agreed that "program goals" are not relevant or at issue here.

terminations of federal awards by the United States Department of State pursuant to § 200.340(a)(4).  *See Aids Vaccine Advoc. Coal. V. United States Dep't of State*, No. CV 25-00400 (AHA), — F. Supp. 3d — , 2025 WL 752378, at *12, n.10 (D.D.C. Mar. 10, 2025) (describing "waves of suspension and termination notices with boilerplate language" advising programs were suspended "because the award 'no longer effectuates agency priorities and is terminated in accordance with the U.S. Department of State Standard Terms and Conditions and 2 C.F.R. 200.340'");  *United States Conf. of Catholic Bishops v. U.S. Dept. of State,* No.1:25-CV-00465 (TNM), — F. Supp. 3d — , 2025 WL 763738, at *3 (D.D.C. Mar. 11, 2025) (noting "the justification behind the termination was simple: the agreements 'no longer effectuate[d] agency priorities.' [] PRM thus terminated the awards 'in accordance with the U.S. Department of State Standard Terms and Conditions, 2 C.F.R. 200.340'").  No party cites, and the court is unaware of, another instance of the Department terminating federal awards under § 200.340(a)(4).  *See* ECF No. 24 at p. 26 (noting the "relatively untested" nature of and "paucity of caselaw interpreting" § 200.340).

Under § 200.340(a)(4), an award termination for failure to effectuate (program goals or) agency priorities is limited to "the extent authorized by law."  With important exceptions the court will shortly address, the APA's rule making requirements do not apply to "a matter relating to . . . grants."  5 U.S.C. 553(a)(2).  Critically, this exemption does not apply to the Department.

The General Education Provisions Act ("GEPA")—(applicable to the Department under Title 20 of the United States Code)—provides:

> The exemption for . . . grants . . . in section 553(a)(2) of Title 5 shall apply only to regulations—
>
> (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or

(2) where the Secretary determines that the requirements of this subsection will cause extreme hardship to the intended beneficiaries of the program affected by such regulations.

20 U.S.C. § 1232(d).  Neither of these exceptions is present here.

A "regulation," as used in the above section, is "any generally applicable rule, regulation, guideline, interpretation, or other requirement that – (1) is prescribed by the Secretary or the Department; and (2) has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program."  20 U.S.C. 1232(a).  GEPA thereby limits the APA's rule making exemption for grants to two circumstances—neither of which applies to the Grant Recipients' awards     .  All other Department regulations, including its "agency priorities," are subject to 5 U.S.C. § 553 notice and comment rule making.[15]

Defendants' argument that "Plaintiff's interpretation of federal regulation renders every federal agency powerless to shift its activities with new Presidential administrations absent a lengthy public rulemaking process" ignores GEPA's specific application to the Department's purported change of "priorities" at issue here.  (ECF No. 24 at p. 26.)  Defendants' assertion that the "priorities" referred to in the Termination Letters are "general and issued at the discretion of the Agency or the Administration" and "can be changed at any time without a vote or notice and comment from the public" is utterly at odds with GEPA.  (ECF No. 24 at p. 26.)  Under GEPA,

---

[15] Plaintiffs persuasively explain: "[i]n sum, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process;" "while there are limited exceptions to this rule, none of the exceptions are applicable to the analysis here."  (ECF No. 5-1 at p. 5 (citing 20 U.S.C. § 1232(d) and 34 C.F.R. § 75.105(b)(2)); *see* ECF No. 1 ¶ 24 ("In other words, the Priorities for grant programs administered by the Department must go through notice and comment rulemaking process, unless one of the [§ 1232(d)] exceptions applies.") Defendants do not argue that any exception to the APA rule making process applies here; instead, they argue generally that neither cited authority applies.  (ECF No. 24 at p. 25 ("These provisions do not support Plaintiffs' argument. § 1232(d) governs regulations and § 75.105(b)(2) governs annual priorities.")) Section 75.105 provides instruction for priorities used in the selection of grant recipients; it falls under subparts "How To Apply for a Grant" and "The Application Notice."  Section 1232(d) applies to "regulations," but Defendants offer no argument why § 200.340(a)(4) "agency priorities" are not "regulations" as defined in § 1232(a).

'department priorities' are established by the Secretary or Department and grant recipients must abide them to avoid award cancellation – which is to say, they are legally binding on the federal award recipient. As a matter of law, therefore, such "priorities" – including those on which the Termination Letters were based – must go through public notice and comment rule making.

The Grant Recipients' Grant Awards were terminated upon the Department's supposed finding that "[t]he grant is . . . inconsistent with, and no longer effectuates, Department priorities." (ECF No. 1-2.) Nothing in the administrative record before the court supports, or tends to support, this conclusion or the veracity of the statement itself – which is to say, nothing in the record supports, or tends to support, a conclusion that, in fact, any Grant Program award was inconsistent with, or no longer effectuated, Department priorities as had been previously established through the statutorily mandated public notice and comment rule making process. Nothing before the court supports, or tends to support, a conclusion that in fact the Department reviewed the grant award of each Grant Recipient and, on such review, in fact, found it to run afoul of previously lawfully established "agency priorities." Defendants present no evidence of public notice and comment rule making through which its priorities (on which the Grant Recipients received their Grant Awards) underwent amendment or change. (*See* ECF No. 1 ¶¶ 25–28 and Federal Register authorities cited therein regarding Notices of Final Priorities establishing agency priorities used in selection of the Grant Recipients.) Instead, Defendants urge that the Department, embarking on a new presidential administration, is entitled to make "big-picture" priority changes free from the constraints of GEPA and the APA, and was therefore free to terminate the Grant Recipients' awards on the basis that the Department essentially changed its mind.

Plaintiffs have made a clear showing that the Department's termination of the Grant Recipients' Grant Program awards violates the APA. Specifically, Plaintiffs make a clear showing

that the Department did not change, modify, or alter the agency priorities (which are regulatory in nature and effect) on which the Department based the Grant Recipients' Grant Awards.  Plaintiffs also make a clear showing that the Department did not notify Grant Recipients that their programs were inconsistent with, or violated, agency policies, as required by 2 C.F.R. § 200.341, and which the Department cites in the Termination Letter.  (*See, e.g.*, MACTE Decl., ECF No. 25-2, attesting that prior to the Termination Letter, no MACTE Grant Recipient had received "notice, written or otherwise, that the grant administered by [the Grant Recipient] engaged in any of the activities described in the termination letter.")  Defendants do not assert that, prior to issuance of the Termination Letters, any Grant Recipient was notified of such policy violation or non-compliance (despite the Termination Letter's citation to C.F.R. § 200.341 as supportive authority for its action).

For these reasons, the court concludes that Plaintiffs have made a clear showing of likelihood of success on the merits of their APA claim.  Specifically, the court finds that the Department's Termination Letter, and the Department's termination of the Grant Recipients' Grant Awards are likely to be proven arbitrary and capricious, because the Department's action was unreasonable, not reasonably explained, based on factors Congress had not intended the Department to consider (*i.e.*, not agency priorities), and otherwise not in accordance with law.[16] 5 U.S.C. § 706(2)(A); *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018).

---

[16] The record before the court also supports a finding of likelihood of success on the basis that the Department's action was "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

ii. Termination Letter Grounds

Even crediting Defendants' assertions that the "agency priorities" referenced in the Termination Letters are not subject to notice and comment rule making, and that the Department followed procedure required by law in issuing the Termination Letters, Plaintiffs still make a clear showing of likelihood of success on their APA claim because the Termination Letters fail to provide Grant Recipients any workable, sensible, or meaningful reason or basis for the termination of their awards. Plaintiffs correctly observe: "the form letters failed to provide basic notice by omitting any specificity about the reason that the Department found any individual grant 'inconsistent with . . . Department priorities.' The letters merely list, disjunctively, five vague ways in which the specific grants at issue might be 'inconsistent.'"[17]  (ECF No. 5-1 n.10.)  The court agrees.

The Department has not provided the "reasonable explanation" of its final agency action the APA requires. *Prometheus*, 592 U.S. at 423. The Termination Letter's list of ways in which a Grant Recipient's program is "inconsistent" with Department priorities is so broad and vague as to be limitless; devoid of import, even. Coupled with the disjunctive nature of the list (". . . or that otherwise fail to serve the best interests of the United States"), the Termination Letter effectively and practically renders meaningless the right to appeal, which, as described in the Termination Letter, requires a written appeal to be submitted within 30 days containing a "brief statement of your argument and the disputed factual, legal, or other issues." (ECF No. 1-2.) Inasmuch as the Termination Letter at once accuses a Grant Recipient of nothing and everything, it is utterly unclear

---

[17] The Termination Letters provide in pertinent part: "The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States." (ECF No. 1-2.)

to the court how a terminated Grant Recipient might mount such an appeal.  How does one draft a "brief statement" of a "disputed" fact when one has no earthly idea what has been asserted, if anything?

A reasonable explanation considers relevant data and articulates a satisfactory explanation for the agency's decision, "including a rational connection between the facts found and the choice made." *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43).  The Department has not provided a satisfactory explanation of the facts found or the choice made, much less a rational connection between the two.  The Termination Letter fails to mention or refer to data or information the Department considered, if any, in deciding that the Grant Programs no longer effectuate Department priorities.  Further, the Department's use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiffs' argument that the Department did not consider individual, or any, data or information.  *California v. U.S. Dep't of Educ.*, — F. Supp. 3d. — , No. CV 25-10548-MJJ, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025) (finding the same Termination Letter "does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all").

### iii.  Oglesby *California* Case Declaration

On the eve of the hearing, Defendants, with Plaintiffs' consent, offered for the court's consideration a declaration of Rachel Oglesby, Chief of Staff of the Department, which bears the caption of, and was offered in, the *California* case.  (Hearing Ex. No. 2.)  In the declaration, Ms. Oglesby attests to the Department's "individualized review process" of "every grant issued under the [TQP] Program and the [SEED] Program."  *Id*. ¶¶ 6, 7.  At the hearing here, Defendants did not rely on Ms. Oglesby's declaration to oppose Plaintiffs' arbitrary and capricious argument.  Nonetheless, inasmuch as the declaration is before the court, the court addresses its significance.

In reviewing a final agency action, the court "'consider[s] the record made before the agency at the time the agency acted,' so 'post-hoc rationalizations . . . have traditionally been found to be an inadequate basis for review.'" *Roe v. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020) (quoting *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467–68 (4th Cir. 2013)). Courts may consider "affidavits not contained in the agency record . . . where 'there was such failure to explain administrative action as to frustrate effective judicial review.'" *Dow AgroSciences*, 707 F.3d at 468 (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)). Such post-hoc materials, however, must only provide "background information or evidence of whether all relevant factors were examined by an agency," or be "merely explanatory of the original record and . . . contain no new rationalizations." *AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (citations omitted).

Even if credited as "background information" or "merely explanatory of the original record," Ms. Oglesby's declaration, regarding plaintiffs in another case, fails to rescue Defendants from the unavoidable conclusion that Plaintiffs are likely to succeed on the merits of their APA claim. Ms. Oglesby's declaration fails to remedy that the Termination Letter evinces no individualized consideration of Grant Recipient awards and does not shed light on which of the possible grounds for termination set forth in the disjunctive list applies to a Termination Letter recipient. Further, nothing in Ms. Oglesby's declaration suggests that any of the unnamed grants Ms. Oglesby describes are at issue in this action. *See* Hearing Ex. No. 2 ¶¶ 11–16 (offering reasons why five unnamed grants were terminated); *id.* ¶ 24 ("The [Termination] letters reasoned that the funded programs 'promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; . . . violate either the letter or purpose of Federal civil rights law; that conflict with

the Department's policy of prioritizing merit, fairness, and excellence in education; . . . are not free from fraud, abuse, or duplication; or … otherwise fail to serve the best interest of the United States." (ellipses in original)).

### 2. *Irreparable Harm*

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (citing cases). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Irreparable harm is harm that "cannot be fully rectified by the final judgment after trial." *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

While "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough," *see Roe v. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)), "irreparable harm may still occur in extraordinary circumstances, such as when monetary damages are unavailable or unquantifiable." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263 (4th Cir. 2017). For instance, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). Similarly, harm that "threaten[s] a party's very existence" can qualify as irreparable. *Mountain Valley Pipeline*, 915 F.3d at 218.

Plaintiffs contend they will suffer irreparable harm in the absence of a preliminary injunction because Grant Recipients are – in this moment – deprived of "essential funding required to continue their teacher preparation programs and the deprivation "complete eviscerates[] Plaintiffs' missions."[18] (ECF No. 5-1 at pp. 25–28.)  For purposes of the Motion, Defendants do not dispute Plaintiffs will suffer irreparable harm in the absence of an injunction.  (ECF No. 24 at p. 27.)

Plaintiffs have made a clear showing that their members will suffer irreparable harm in the absence of an injunction.  According to the supporting declarations, the loss of funding will cause some Grant Recipients to shutter their programs entirely.  (NCTR Decl., ECF No. 5-4 ¶ 14; AU Decl., ECF No. 5-6 ¶ 13.)  Others will be forced to terminate staff that work on teacher preparation programs and will be unable to provide funding to teachers set to start in their respective training programs—teachers who often rely on such funding for their livelihoods.  (NCTR Decl., ECF No. 5-4 ¶¶ 14–15; AU Decl., ECF No. 5-6 ¶ 13; UST Decl., ECF No. 5-7 ¶¶ 13–14; Alder GSE Decl., ECF No. 5-8 ¶ 13; Teaching Lab Decl., ECF No. 5-9 ¶ 19.)  Plaintiffs ably demonstrate that they will suffer irreparable harm that is both actual and imminent absent a preliminary injunction—harm that will affect the existence of Grant Recipients' programs as well as the livelihoods of individuals within the affected teacher preparation programs.

---

[18]  As to Plaintiffs' claims regarding the impact on their missions, the Fourth Circuit has indicated that where an organizational plaintiff's standing is based on a representation theory (as is the case with respect to AACTE and MACTE, but not as to NCTR), district courts should look at the irreparable harm to its members.  *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 n.9 (4th Cir. 2020).

Plaintiffs also assert irreparable harm in the form of a likely constitutional violation, *see* ECF No. 5-1 at p. 24; this argument is unavailing in view of the court's conclusion that Plaintiffs have not made a clear showing that they are likely to succeed on the merits of their Fifth Amendment claim.

### 3. *Balance of Equities and the Public Interest*

Finally, "Plaintiffs must show 'that the balance of equities tips in [their] favor' and 'that an injunction is in the public interest.'" *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When, as here, the Government is the party opposing a motion for preliminary injunction, the balance of equities and public interest factors merge. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," with "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)); *see Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 397 (D. Md. 2022) (same). The court considers "the 'harm to the plaintiff if the injunction is erroneously denied versus harm to the defendant if the injunction is erroneously granted.'" *Students for Fair Admissions v. United States Naval Acad.*, 707 F. Supp. 3d 486, 509 (D. Md. 2023) (quoting *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019)).

Plaintiffs argue that the balance of equities favors them – where a preliminary injunction would restore "the *status quo* . . . had the Department not unlawfully terminated" the Grant Awards. (ECF No. 5-1 at p. 30.) Absent an injunction, Plaintiffs assert, the Grant Recipients' teaching preparation programs risk closure. *Id.* at pp. 30–31. Defendants, in turn, argue that "several compelling interests" weigh against an injunction, referring to the Government's and some citizens' interest in "ending discrimination" in the form of DEI policies, a cornerstone of President Trump's reelection. (ECF No. 24 at pp. 27–29.)

Defendants' arguments miss the mark insofar as the *Winter* factors are concerned. The inquiry the court is obliged to undertake requires the balancing of harm if the injunction is erroneously granted as opposed to denied. *See Students for Fair Admissions*, 707 F. Supp. 3d at 509, *supra*. In that vein, a member of the public who is opposed to government funding of Grant Programs that relate to DEI does not outweigh the asserted concrete, irreparable harm in the form of programmatic closures, staff terminations, and loss of funding of teacher preparation programs Plaintiffs and Plaintiffs' members will experience should the injunction not issue.[19] The harms Plaintiffs identify also implicate grave effect on the public: fewer teachers for students in high-need neighborhoods, early childhood education, and special education programs. (AU Decl., ECF No. 5-6 ¶ 13; UST Decl., ECF No. 5-7 ¶¶ 6, 14–15.) Moreover, even to the extent Defendants assert such an interest in ending DEI-based programs, they have sought to effect change by means the court finds likely violate the law. "[T]he public 'undoubtedly has an interest in seeing its governmental institutions follow the law.'" *Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (quoting *Roe*, 947 F.3d at 230–31).

The balance of equities and public interest favor issuance of a preliminary injunction.

### D. Appropriate Scope of the Preliminary Injunction

Having determined that Plaintiffs are entitled to a preliminary injunction, the court turns now to the proper scope of the injunction.[20] "Crafting a preliminary injunction is an exercise of

---

[19] At the hearing, Defendants asserted that individual participants in these teacher preparation programs may be harmed by "believing their success . . . [to be] unearned." *See* ECF No. 24 at p. 28 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 275–76 (2023) (Thomas, J., concurring)). Inasmuch as individuals are free to participate in such programs, or not, this is unpersuasive with respect to the Motion.

[20] Defendants request that, if the court is inclined to grant a preliminary injunction, it should instead remand the matter to the Department, so that it may provide a more detailed explanation for the terminations on an expedited schedule. (ECF No. 24 at p. 29.) In the time since Defendants' filing, there have been significant reductions in force at the Department, which defense counsel acknowledged at the hearing consistent with her duties of candor to the court. In accordance with her duties as an officer of the court, defense counsel expressed that she did not know whether expedited review remained possible. Regardless, Defendants' request for remand is not compelling here, where they

discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). Federal district courts possess "wide discretion to fashion appropriate injunctive relief in a particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992)). At the same time, courts also "must ensure that 'a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe*, 947 F.3d at 231). The court "may issue a nationwide injunction so long as [it] 'mold[s] its decree to meet the exigencies of the particular case.'" *Id.* (quoting *Roe*, 947 F.3d at 231). "[A] nationwide injunction may be appropriate when the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs." *Id.* (quoting *Roe*, 947 F.3d at 232–33).

With the aforementioned principles in mind, the court concludes the following scope is no more burdensome than necessary to provide complete relief to Plaintiffs and those similarly situated, and subject to the Termination Letter, or substantially the same Grant Program termination letters, pursuant to the Department's apparent categorical policy. *See HIAS*, 985 F.3d at 326, *supra*. By separate order, issued herewith, Defendants are ordered to reinstate the Grant Awards for Plaintiffs' members who are Grant Recipients (including NCTR), in accordance with the GAN Terms and Conditions in place immediately prior to the Termination Letters. The court will further order that Defendants shall not undertake to terminate, or terminate, any TQP, SEED, and TSL awards in a manner this court has determined is likely unlawful as violative of the APA as described herein.

---

fail to state or to propose a time frame within which Plaintiffs' members complaints addressed herein could be evaluated.

### E. Security

Pursuant to Federal Rule of Civil Procedure 65(c), this court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). "This rule is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (citing *District 17, UMWA v. A & M Trucking, Inc.,* 991 F.2d 108, 110 (4th Cir. 1993)).

In determining the amount of an injunction bond, courts "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order"; the inquiry thus "ordinarily depends on the gravity of the potential harm to the enjoined party." *Hoechst Diafoil*, 174 F.3d at 421 n.3. While bond is mandatory, the court has discretion "to set the bond amount 'in such sum as the court deems proper,'" including a bond in a nominal amount or in the amount of zero. *See id.* at 421 n.3 (citations omitted) (discussing a nominal bond); *Maryland Dep't of Hum. Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (discussing a nominal bond amount of zero). Indeed, a nominal bond approach "has long been followed in public-interest litigation cases." *State of Maryland, et al., v. U.S. Dep't of Agriculture, et al.*, — F. Supp. 3d — , No. CV JKB-25-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) (citing cases).

Plaintiffs here request that no bond, or alternatively a nominal bond, be required. (ECF No. 5-1 at p. 31.) At the hearing on the Motion, defense counsel stated that Defendants did not oppose Plaintiffs' request for no bond. Defendants subsequently filed a notice advising of their change of position and requesting bond amount "equal to the Federal Government's potential costs

and damages from a wrongly issued injunction," per President Trump's March 11, 2025 Executive Order titled "Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)."  (ECF Nos. 30, 30-1.)  Defendants now seek a bond, because injunctive relief "would potentially mandate that the Executive spend money that may not be recouped once distributed."  (ECF No. 30.)  Defendants do not request a specific amount in bond; and this and other courts have imposed a nominal bond upon such unsupported speculations.  *See, e.g.*, *PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 685124, at *32 (D. Md. Mar. 4, 2025); *Washington v. Trump*, No. 2:25-CV-00244-LK, 2025 WL 659057, at *28 n.29 (W.D. Wash. Feb. 28, 2025).  *Cf. Hoechst Diafoil Co.*, 174 F.3d at 421 n.3 (explaining that where the risk of harm to an enjoined party is "remote," "a nominal bond may suffice").

In view of the facts here, and where Defendants present no non-speculative assertion of potential costs and damages, the court finds a nominal bond is appropriate.  As far as the court can discern, and Defendants do not argue to the contrary, any financial cost Defendants may incur existed prior to terminations of Grant Program awards at issue here.  The court will, therefore, set a nominal bond in the amount of $100.00.

## IV.    CONCLUSION

For the reasons set forth herein, the Motion (ECF No. 5) shall be granted in part and denied in part.


March 17, 2025                                        /S/
                                             _____
                                             Julie R. Rubin
                                             United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION,** *et al.*,

      *Plaintiffs*,

      **v.**

**LINDA MCMAHON, in her official capacity as Secretary of Education,** *et al.*,

      *Defendants*.

Civil No.: 1:25-cv-00702-JRR

## <u>ORDER</u>

The court has before it Plaintiffs American Association of Colleges for Teacher Education, National Center for Teacher Residencies, and Maryland Association of Colleges for Teacher Education's Motion for Preliminary Injunction. (ECF No. 5; the "Motion.") The court has considered the parties' motions papers, as well as arguments made and exhibits offered at oral argument held March 13, 2025. For the reasons set forth in the accompanying memorandum opinion[1] and in accordance with Federal Rule of Civil Procedure 65, it is this 17th day of March 2025:

**ORDERED** that Plaintiffs' Motion shall be, and is hereby, **GRANTED IN PART AND DENIED IN PART** as follows:

It is **ORDERED** that Defendants United States Department of Education and Linda McMahon, in her official capacity as Secretary of Education, **SHALL**, within five (5) business days of entry of this order, **REINSTATE** the TQP, SEED, and TSL Grant Awards of Plaintiff NCTR and Plaintiffs' Grant Recipient members in accordance with the Grant Award Notification

---

[1] All terms defined in the court's accompanying memorandum opinion shall have the same meanings here.

terms and conditions in place immediately prior to issuance of Termination Letters by the Department; and further it is

**ORDERED** that Defendants United States Department of Education and Linda McMahon, in her official capacity as Secretary of Education, **SHALL NOT TERMINATE**, and are **ENJOINED** from terminating, any TQP, SEED, or TSL Grant Program award in a manner this court has determined is likely unlawful as violative of the Administrative Procedure Act as described in the accompanying memorandum opinion; and further it is

**ORDERED** that the Motion shall be, and is hereby, **DENIED** in all other respects; and further it is

**ORDERED** that Plaintiffs shall, within two (2) business days of entry of this order, provide Defendants a list to include Plaintiff NCTR and Plaintiffs' Grant Recipient members whose TQP, SEED, and TSL Grant Awards were terminated by the Department Termination Letter; and further it is

**ORDERED** that the parties shall file a joint status report within seven (7) business days of entry of this order, apprising the court of the status of the parties' compliance with this order; and further it is

**ORDERED** that this preliminary injunction shall remain in effect subject to further order of court; and further it is

**ORDERED**, pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs collectively **SHALL POST A BOND** of **ONE HUNDRED DOLLARS ($100.00)** with the Clerk of Court within three (3) business days of entry of this order.

/S/

_____

Julie R. Rubin
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION,** *et al.*, | | |
| *Plaintiffs*, | | |
| **v.** | | Civil No.: 1:25-cv-00702-JRR |
| **LINDA MCMAHON, in her official capacity as Secretary of Education,** *et al.*, | | |
| *Defendants*. | | |

## MEMORANDUM OPINION AND ORDER[1]

This matter comes before the court on Defendants Linda McMahon, in her official capacity as Secretary of Education, U.S. Department of Education, and Donald J. Trump's, in his official capacity as President of the United States, Emergency Motion for Reconsideration. (ECF No. 36; the "Motion.") The court has reviewed all papers. No hearing is necessary and none has been requested. Local Rule 105.6 (D. Md. 2023).

## I.    BACKGROUND

As discussed at length in its memorandum opinion issued Monday, March 17, 2025, Plaintiffs AACTE, NCTR, and MACTE initiated this action on March 5, 2025, asserting two claims: violation of the Due Process Clause of the Fifth Amendment (Count I) and violation of the APA (Count II). (ECF No. 1.) Plaintiffs' claims arise from the Department's termination of grants awarded through the TQP, SEED, and TSL Grant Programs. Following briefing and a hearing on Plaintiffs' motion for preliminary injunction, the court granted in part and denied in part Plaintiffs' motion. (ECF Nos. 32, 33.) Specifically, the court held that Plaintiffs demonstrated a clear

---

[1] All terms defined in the court's memorandum opinion at ECF No. 32 shall have the same meanings here.

likelihood of success on the APA claim and issued a preliminary injunction that, *inter alia*, requires Defendants to reinstate TQP, SEED, and TSL Grant Awards of Plaintiff NCTR and Plaintiffs' members, and enjoins Defendants from terminating TQP, SEED, or TSL awards in a manner the court found likely in violation of the APA. *Id.*   Defendants are required to reinstate the aforementioned TQP, SEED, and TSL awards within five business days of the court's order. (ECF No. 33.)

At 7:53 p.m. on March 18, 2025, Defendants filed their emergency Motion, requesting the court rule on the Motion within 24 hours. (ECF No. 36.)  That same evening, the court ordered Plaintiff to respond by 12:00 p.m. today, March 19, 2025. (ECF No. 37.)  Plaintiffs met that deadline with 8 minutes to spare (ECF No. 38), following which Defendants filed a reply at 2:11 p.m. today (ECF No. 40).

## II.   LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 54(b)

Defendants bring this Motion pursuant to Federal Rule of Civil Procedure 54(b). (ECF No. 26-1 at p. 2.)  Rule 54(b) "governs reconsideration of orders that do not constitute final judgments in a case (*i.e.,* interlocutory orders)." *Carrero v. Farrelly*, 310 F. Supp. 3d 581, 583–84 (D. Md. 2018).  Rule 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims." FED. R. CIV. P. 54(b).  "Compared to motions to reconsider *final* judgments pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Rule 54(b)'s approach involves broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops and new facts or arguments come to light." *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 257 (4th Cir. 2018) (emphasis in original) (citing *Carlson v. Boston Sci. Corp.*, 856

F.3d 320, 325 (4th Cir. 2017)). Resolution of a motion for reconsideration of an interlocutory order "is committed to the discretion of the district court." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003). Importantly, "the discretion afforded by Rule 54(b) is not limitless;" the Fourth Circuit has "cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case." *U.S. Tobacco Coop. Inc.*, 899 F.3d at 256–57. Accordingly, a court may revise an interlocutory order to account for "(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." *Id.* at 257 (quoting *Carlson*, 856 F.3d at 325).

### B. Federal Rule of Civil Procedure 12(b)(1)[2]

"Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016). "The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 162, 176 (D. Md. 2019) (citing *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999)). "In determining whether jurisdiction exists, 'the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue.'" *Id.* at 176 (quoting *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003)).

Subject matter jurisdiction challenges may proceed in two ways: "either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). Defendants here mount

---

[2] Defendants at once title their Motion as one "for Reconsideration" per Federal Rule of Civil Procedure 54(b) and seek dismissal of the Complaint per Rule 12(b)(1).

a facial challenge to this court's exercise of jurisdiction.  In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction."  *Kerns*, 585 F.3d at 192; *see Ministry of Defence of State of Kuwait v. Naffa*, 105 F.4th 154, 159 (4th Cir. 2024) (same).

Inasmuch as subject matter jurisdiction is unwaivable and may be raised at any time by any party, including by the court *sua sponte*, the court dispenses with discussion of Rule 54 and moves to the heart of the matter.

## III.    ANALYSIS

Defendants now advance two arguments, both jurisdictional in nature, and neither of which was raised in their briefing or oral argument on Plaintiffs' motion for preliminary injunction.

First, Defendants argue the court lacks subject matter jurisdiction because the United States Court of Federal Claims has exclusive jurisdiction over this action in accordance with the Tucker Act.  Second, Defendants contend that Plaintiffs' challenge to the Department's final agency action—termination of the Grant Program Awards by the Termination Letter—was a matter committed to agency discretion and, as such, is beyond the grasp of judicial review.

### A.  Tucker Act – 28 U.S.C. § 1491

"The Tucker Act grants jurisdiction to the United States Court of Federal Claims 'to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort.'"  *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) (quoting 28 U.S.C. § 1491).  "Jurisdiction is exclusive in the Court of Federal Claims for claims over $10,000, while district courts have concurrent jurisdiction with the Court of Federal Claims

for claims at or under $10,000." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert. denied,* 144 S. Ct. 818 (2024) (citing *Randall*, 95 F.3d at 347).

While not novel, *Massachusetts v. Nat'l Institutes of Health*, 25-cv-10338, 2025 WL 702163, at *5 (D. Mass. Mar. 5, 2025), "[t]he interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction." *Randall*, 95 F.3d at 346. "The APA allows private parties to sue the federal government in district court over final agency actions, so long as they seek relief other than monetary damages 'for which there is no other adequate remedy in a court.'" *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346). "Claims for money, by contrast, proceed under the Tucker Act and in the Court of Federal Claims." *Williams v. Roth*, No. 8:21-CV-02135-PX, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022) (citing 28 U.S.C. §§ 1346(a)(2), 1491). To that end, "where 'a plaintiff has an adequate remedy by suit under the Tucker Act,' they are precluded from review under the APA." *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346); *see also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (noting the flip side of the same coin: "[t]he Tucker Act yields when the . . . Administrative Procedure Act [] provides an avenue for relief").

"There is a 'distinction between an action at law for damages,' which provides monetary compensation, and 'an equitable action for specific relief,' which might nonetheless require monetary relief." *Massachusetts,* 2025 WL 702163, at *7 (first quoting *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); and then citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (explaining "whether [restitution] is legal or equitable depends 'on the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought" (citations omitted)). "To determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over his claim, courts must look to the 'essence' of the complaint and whether

the relief requested is 'not . . . an incident of, or collateral to, a monetary award.'" *Coleman*, 74 F.4th at 615–16 (quoting *Randall*, 95 F.3d at 346).

"The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). "Courts must read the Complaint with an eye toward 'the true nature of the action' to ascertain whether it is, in fact, seeking money damages or some other relief." *Williams v. Roth*, No. 8:21-CV-02135-PX, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022) (quoting *James v. Caldera*, 159 F.3d 573, 579 (Fed. Cir. 1998)). Importantly, "a suit which does not seek monetary damages does not arise under the Tucker Act simply because the plaintiff's success will result in eventual monetary gain from the government." *Harrison v. Kendall*, 670 F. Supp. 3d 280, 297 (E.D. Va. 2023) (quoting *Powe v. Sec'y of Navy*, 35 F.3d 556, at *2 (4th Cir. 1994) (unpublished table decision)); *see Roetenberg v. Sec'y of Air Force*, 73 F. Supp. 2d 631, 636 (E.D. Va. 1999) (explaining that "[i]t is settled that where . . . the essence of a claim is the equitable relief sought, and any financial ramifications of a favorable decision are subordinate to the equitable relief, the Court of Federal Claims does *not* have exclusive jurisdiction over that claim" (emphasis in original)). "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893.

"A hallmark of such equitable actions is the existence of prospective relief in ongoing relationships." *Massachusetts*, 2025 WL 702163, at *7 (citing *Bowen*, 487 U.S. at 905). "An adjudication of the lawfulness of [an agency's] regulatory interpretation will have future impact on the ongoing relationship between the parties. The Court of Federal Claims cannot provide this relief." *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994). In contrast, a suit properly proceeds

in the Court of Federal Claims under the Tucker Act where plaintiffs "seek not prospective, nonmonetary relief to clarify future obligations but specific sums already calculated, past due, and designed to compensate for completed labors." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020). Indeed, it is generally understood that the Court of Federal Claims "has no power to grant equitable relief." *Richardson v. Morris*, 409 U.S. 464, 465 (1973). The Tucker Act, however, allows for narrow exception to empower the Court of Federal Claims to provide injunctive relief only when such relief is necessary to provide an entire remedy and when the injunction is "an incident of and collateral to" an award of monetary relief. 28 U.S.C. § 1491(a)(2).

In *Bowen*, the Supreme Court considered whether a district court had subject matter jurisdiction over the Commonwealth of Massachusetts' request for judicial review of the Secretary of Health and Human Services' Medicaid disallowance decision; and to order the Secretary to pay the state the monies it asserted had been wrongfully disallowed (not reimbursed). *Bowen v. Massachusetts,* 487 U.S. at 882. The Court concluded: "since the orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id*. at 910.

*Bowen* sets forth a thorough explication – relying with favor on Judge Bork's analysis in *Maryland Dept. of Health Resources v. Dept. of Health and Human Svc.,* 763 F.2d 1441 (D.C. Cir. 1985) – of the critical distinction between "money damages" and "monetary relief." 487 U.S. at 894–96. In sum, the Court explains that while money damages is always a form of monetary relief, not all monetary relief is money damages. And an action to enforce a statute (there, the Medicaid Act), "which happens to be one for the payment of money" does not render it subject to the Tucker Act. *Bowen*, 487 U.S. at 900. "The fact that the mandate is one for the payment of money must

not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief." *Id.* at 900-901.

In *California v. U.S. Department of Education*, Judge Joun concluded in favor of the district court's subject matter jurisdiction on a Tucker Act challenge. He concluded that the plaintiffs (several states) "seek equitable relief in the form of reinstatement of the TQP and SEED grants. Plaintiff States also seek to enjoin Defendants from implementing, giving effect to, maintaining or reinstating under a different name the termination of any previous awarded TQP and SEED grants. In other words, Plaintiff States seek to preserve the previous status quo to alleviate corresponding harm; they are not alleging claims for past pecuniary harms." *California v. U.S. Dep't of Educ.*, — F. Supp. 3d. — , No. CV 25-10548-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025) (citing *Massachusetts*, 2025 WL 702163, where Judge Angel Kelley found the essence of the plaintiffs' claims was not contractual in nature because "Plaintiffs do not bring claims for past pecuniary harms. Rather, like petitioners in *Bowen*, their claims are to preserve their ongoing and prospective agreements with [the agency]")); *see also Aids Vaccine Advoc. Coal. v. United States Dep't of State*, — F. Supp. 3d. — , No. CV 25-00400 (AHA), 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025) (finding that "Plaintiffs do not seek money damages and, . . . do not seek the contractual remedy of 'money in compensation for [their losses], whatever they may be,' in relation to any breach of their agreements . . . . Indeed, it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach").

On review of the caselaw, controlling and persuasive alike, whether the Tucker Act controls (*i.e.*, divests a district court of jurisdiction) is fact-specific and requires analysis tailored

to the particular facets of the claims before the court. The court must consider: 1) the beating heart of the plaintiff's complaint; and 2) what relief will render the plaintiff whole if the complaint has merit.

Here, the court concludes that the Tucker Act does not apply and this court has subject matter jurisdiction over Plaintiffs' claims for the following chief reasons:

1.     Plaintiffs do not seek money damages for past wrongs. Plaintiffs come to court seeking redress for alleged statutory and regulatory violations that, if left unchecked, will have immediate, lasting and irreparable harm of an existential nature to their programs, and resultant grave harm to the communities they serve. Plaintiffs' seek reinstatement of their status as Grant Program awardees so they can resume and sustain the capacity to run their education-related programming across the nation; that the court's order for reinstatement effects the Department's purse does not render this a contract claim for money damages. That is not its essence;

2.     In addition to reinstatement, Plaintiffs seek forward-looking equitable relief to prevent Defendants from terminating other Grant Program awards in the manner about which they complain and for which they requested preliminary injunctive relief. The Court of Federal Claims lacks the authority to afford the complete equitable relief Plaintiffs seek;

3.     The narrow circumstances in which the Court of Federal Claims may issue injunctive relief per the Tucker Act do not exist here, which is to say, equitable relief is not incident of, or collateral to, an award of money damages. 28 U.S.C. § 1491(a)(2);

4.     In addition to restoration of their Grant Program status, Plaintiffs demand the court order Defendants to remove "route pay grant conditions" (requiring pre-approval to access grant funds), which Plaintiffs allege Defendants unlawfully put in place. Here, again, Plaintiffs seek

forward-looking equitable relief to remove what they allege are unlawful roadblocks to their programming.  The Court of Federal Claims lacks the authority to provide this relief; and

5.      Plaintiffs' Complaint requires the court to review and make findings regarding the parties' relationship pursuant to a constellation of sources: the Grant Programs' respective authorizing statutes, the Departments regulations to implement those statutes; and GEPA.  This, alone, removes this action from the Tucker Act's grant of exclusive jurisdiction to the Court of Federal Claims.

The cases Defendants cite in their reply are unavailing.  *Spectrum Leasing Corp. v. United States*, for example, involves a private government contractor who contracted to provide data processing services and equipment to the General Services Administration.  764 F.2d 891 (1985). When the plaintiff failed to provide deliverables, GSA invoked the liquidated damages provision of the contract and withheld payment on outstanding invoices.  The contractor sued, claiming GSA violated the Debt Collection Act (31 U.S.C. §§ 3701, *et seq.*); the district court dismissed the action on the basis that (per the Tucker Act), it lacked subject matter jurisdiction, and the Court of Federal Claims had exclusive jurisdiction.  *Id.*  Nothing about that case resembles the instant action.

In *Thermalon Indus. v. United States*, 34 Fed. Cl. 411 (1995), the plaintiff sued the United States in the Court of Federal Claims for breach of contract claiming the government (the National Science Foundation) wrongfully withheld payment for work done under a research grant.  The government argued the district court had exclusive jurisdiction because the grant was "an agreement intended to effectuate the sovereign obligations of the United States and that all such agreements necessarily fall outside the scope of . . . the Tucker Act."  *Id.* at 413.  The Court of Federal Claims rejected that argument because the authorizing statute (the National Science Foundation Act of 1950, 42 U.S.C. §§ 1861, *et seq.*) specifically empowered the National Science

Foundation to enter "contracts or other arrangements" to promote the sciences.  There, the plaintiff sought money damages for unpaid invoices for work completed per the grant contract.  Nothing about that the court's determination, as Defendants note in their reply, that a grant can fill the essential elements of a contract is remarkable; nor is the court's ruling that Thermalon brought a standard issue breach of contract action against the United States for non-payment of services. Again, as said above, Plaintiffs here do not seek an award of money damages for work performed or to compensate for a wrong.

### B.  Judicial Review

Defendants also seek reconsideration of the court's preliminary injunction on the basis that the challenged agency action at issue here—termination of the Grant Awards on the basis of agency priorities—is "committed to agency discretion by law" and falls outside the scope of permissible judicial review under the APA.  (ECF No. 36-2 at p. 7.)  *See* 5 U.S.C. § 702(a)(2).

The APA provides "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  "That language sets up a 'basic presumption of judicial review' of agency action."  *Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282, 287 (4th Cir. 2022) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)).  The text carves out two exceptions to that "basic principle."  *Id.*  First, where "statutes preclude judicial review" per § 701(a)(1); and second, where "agency action is committed to agency discretion by law" per § 701(a)(2). *Holbrook,* 48 F.4th at 287. With regard to the second, "[a]gency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'"  *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (quoting *Heckler v.*

*Chaney*, 470 U.S. 821, 830–31 (1985)).  Of import here, the APA's prohibition of judicial review of actions committed to agency discretion by law, and a defect related thereto, "goes to subject matter jurisdiction."  *Id.* (citing *Angelex Ltd. v. United States*, 723 F.3d 500, 505–506 (4th Cir. 2013)).

Defendants' argument relies exclusively on the Supreme Court's opinion in *Lincoln v. Vigil*, 508 U.S. 182 (1993).  (ECF No. 36-1 at p. 7–8.)  *Lincoln* is materially distinguishable from the facts here.  In *Lincoln,* the Court's decision concerned the Indian Health Service's decision to reallocate resources from the Indian Children's Program to a "nationwide effort to assist" children previously served by the Indian Children's Program.  508 U.S. at 184.  The Court held that the Indian Health Service's "decision to discontinue the Program was 'committed to agency discretion by law' and therefore not subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2), and that the Service's exercise of that discretion was not subject to the notice-and-comment rulemaking requirements imposed by § 553."  *Id.*

Relevant here, the Indian Health Service, per the Snyder Act, 25 U.S.C. § 13, and the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601, *et seq.*, received an annual appropriation from Congress.  Neither the Snyder Act nor the Indian Health Care Improvement Act expressly referenced the Indian Children's Program or any other potential recipient/beneficiary other than general reference to "Indian health."  508 U.S. at 194.  By virtue of that omission, Congress, the Court held, left it to the sound discretion of the Indian Health Service how to spend or use the appropriated funds.  *Id.* at 185.  The Indian Children's Program, thus, had no continuing legal entitlement to same, and "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."  *Id.* at 192.

Importantly, the Indian Health Service's termination of the Indian Children's Program was exempt from § 533 notice and comment rule making based on § 553(b)(A)'s exemption of "rules of agency rulemaking" from same. *Id.* at 197. Here, per the intersection of GEPA and the APA, assessed at length in the court's memorandum opinion issued earlier this week, the Department's "agency priorities" vis-à-vis the Grant Programs (and Plaintiffs' members' Grant Awards) are squarely within the APA's notice and comment rule making requirement and, therefore, are not correctly categorized as items within "agency discretion" not subject to judicial review.

Outside of *Lincoln*, Defendants offer no substantive argument or authority to support their assertion that the Department's termination of the Grant Awards at issue here was "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2). The court will not undertake a prolix analysis where virtually none has been offered by movants, especially as Defendants request a ruling within 24 hours of their emergency Motion. The court is satisfied based upon the record before it that the APA's "basic presumption of judicial review" has been neither rebutted nor overcome. *See Holbrook*, 48 F.4th at 287 and *Abbott Lab'ys*, 387 U.S. at 140.

## IV.   <u>CONCLUSION</u>

Accordingly, it is this 19th day of March 2025:

**ORDERED** that the Motion (ECF No. 36) shall be, and is hereby, **DENIED**.


/S/

_____

Julie R. Rubin
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION,** *et al.*, | |
| *Plaintiffs*, | |
| **v.** | Civil No.: 1:25-cv-00702-JRR |
| **LINDA MCMAHON, in her official capacity as Secretary of Education,** *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OPINION AND ORDER[1]**

This matter comes before the court on Defendants Linda McMahon, in her official capacity as Secretary of Education, U.S. Department of Education, and Donald J. Trump's, in his official capacity as President of the United States, Motion to Stay and Suspend Injunction Pending Appeal. (ECF No. 44; the "Motion.")  The court has reviewed all papers.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2023).

I.    **BACKGROUND**

As discussed at length in its memorandum opinion issued March 17, 2025 (ECF No. 32), Plaintiffs AACTE, NCTR, and MACTE initiated this action on March 5, 2025, asserting two claims: violation of the Due Process Clause of the Fifth Amendment (Count I) and violation of the APA (Count II).  (ECF No. 1.)  Plaintiffs' claims arise from the Department's termination of grants awarded through the TQP, SEED, and TSL Grant Programs.  Following briefing and a hearing on Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction (ECF No. 5), the court granted in part and denied in part Plaintiffs' motion (construed, by agreement of the parties, as one

---

[1] All terms defined in the court's memorandum opinion at ECF No. 32 shall have the same meanings here.

for preliminary injunction only).  (ECF Nos. 32, 33.)  Specifically, the court held that Plaintiffs demonstrated a clear likelihood of success on their APA claim and issued a preliminary injunction that, *inter alia*, requires Defendants to reinstate TQP, SEED, and TSL Grant Awards of Plaintiff NCTR and Plaintiffs' members, and enjoins Defendants from terminating TQP, SEED, or TSL awards in a manner the court found likely violative of the APA.  *Id.*  Defendants are required to reinstate the aforementioned TQP, SEED, and TSL Grant Awards within five business days of the court's order.  (ECF No. 33.)

## II.  **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 62(c), a preliminary injunction is not stayed following a notice of appeal "[u]nless the court orders otherwise."  FED. R. CIV. P. 62(c); *see also* FED. R. APP. 8(a)(1) (providing that "[a] party must ordinarily move first in the district court for . . . an order suspending . . . an injunction while an appeal is pending").  The Supreme Court has set forth four factors to consider in determining whether to stay the order of preliminary injunction pending Defendants' appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).[2]

The first two factors are "the most critical."  *Nken v. Holder,* 556 U.S. 418, 434 (2009). The last two factors "merge when the Government is the opposing party."  *Id.* at 435.  Here,

---

[2] The *Hilton* factors are similar to the *Winter* factors a plaintiff bears on a motion for preliminary injunction.  *See* ECF No. 32 at pp. 14–15; *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."); *Nken v. Holder,* 556 U.S. 418, 434 (2009) (observing that "[t]here is substantial overlap between" the factors governing issuance of a stay pending appeal and "the factors governing preliminary injunctions.").

because Defendants are the parties seeking a stay, they bear the burden to demonstrate the factors weigh in favor of a stay. *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) (providing that "the burden is on the Government as applicant to show, among other things, a likelihood of success . . . and that the equities favor a stay").

### III.    ANALYSIS

#### A.    *Whether Defendants Make a Strong Showing They Are Likely to Succeed on Merits*

As set forth at length in the memoranda opinions on Plaintiffs' Motion for Preliminary Injunction and on Defendants' Emergency Motion for Reconsideration (ECF Nos. 32 and 42), Plaintiffs ably met their burden to demonstrate a clear showing of likelihood of success on the merits of their APA claim (Count II) in two primary ways:

> . . . Plaintiffs have made a clear showing of likelihood of success on the merits of their APA claim. Specifically, the court finds that the Department's Termination Letter, and the Department's termination of the Grant Recipients' Grant Awards are likely to be proven arbitrary and capricious, because the Department's action was unreasonable, not reasonably explained, based on factors Congress had not intended the Department to consider (*i.e.*, not agency priorities), and otherwise not in accordance with law. 16 5 U.S.C. § 706(2)(A); *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018).

and

> . . . Plaintiffs . . . make a clear showing of likelihood of success on their APA claim because the Termination Letters fail to provide Grant Recipients any workable, sensible, or meaningful reason or basis for the termination of their awards. . . .  The Department has not provided the "reasonable explanation" of its final agency action the APA requires. *Prometheus,* 592 U.S. at 423.  The Termination Letter's list of ways in which a Grant Recipient's program is "inconsistent" with Department priorities is so broad and vague as to be limitless; devoid of import, even.  Coupled with the disjunctive nature of the list (". . . or that otherwise fail to serve the best interests

of the United States"), the Termination Letter effectively and practically renders meaningless the right to appeal, which, as described in the Termination Letter, requires a written appeal to be submitted within 30 days containing a "brief statement of your argument and the disputed factual, legal, or other issues." (ECF No. 1-2.) . . . . A reasonable explanation considers relevant data and articulates a satisfactory explanation for the agency's decision, "including a rational connection between the facts found and the choice made." *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43). The Department has not provided a satisfactory explanation of the facts found or the choice made, much less a rational connection between the two. The Termination Letter fails to mention or refer to data or information the Department considered, if any, in deciding that the Grant Programs no longer effectuate Department priorities. Further, the Department's use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiffs' argument that the Department did not consider individual, or any, data or information. *California v. U.S. Dep't of Educ.*, — F. Supp. 3d. — , No. CV 25-10548-MJJ, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025) (finding the same Termination Letter "does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all").

(ECF No. 32 at pp. 37–40.)

Defendants continue to ignore or misapprehend the court's analysis and resultant conclusion that, by application of GEPA, with two exceptions not relevant here, the APA's rulemaking carve-out for grant-related matters does not apply to the Department's asserted agency priorities on which it based its termination of the Grant Awards through its Termination Letter. The court did not find, as Defendants say, that "all priorities are identical in the regulations just because they include the word 'priorities.'" (ECF No. 44 at p. 3.) Defendants' watered-down misdescription of the court's reasoned discussion and findings regarding the interplay between the Grant Programs' authorizing statutes, Department regulations (within the Code of Federal Regulations) to implement those statutes, GEPA, and the APA, does not serve its aim to persuade the court that they are likely to succeed on appeal.

In the same vein, the court has never purported to cabin the Secretary's entitlement or ability to change her priorities regarding broader "policy objectives." (ECF No. 44 at p. 4.) Where such broader "policy objective" priorities are used as the premise to terminate Grant Awards, the court is (as it is here) tasked with redressing such termination if it runs afoul (as the court concluded it likely does here) of governing statutes and regulations. *See* 2 C.F.R. § 200.340(a)(4) (2025) ("The Federal award may be terminated in . . . its entirety . . . to the extent authorized by law, if an award no longer effectuates the . . . agency priorities."). Nothing in the court's order at ECF No. 33 prohibits, impairs, or limits Defendants' ability, right, or entitlement to terminate Plaintiffs' members' Grant Awards provided any such termination is not undertaken or effected in a manner the court determined is likely a violation of the APA.

In the Motion, Defendants assert the Grant Programs' authorizing statutes confer on the Secretary "significant discretion to allocate funds across grant applicants to best advance the purposes of the programs" and "[n]othing about those statutory discretions constrains the Secretary's discretion to determine how best to allocate funding for each program among many different potential grant recipients." (ECF No. 44 at pp. 5–6.) Defendants' argument that the Grant Programs' authorizing statutes commit allocating Grant Awards to the Secretary's discretion ignores not only GEPA, but also the undisputed fact that the Department uses notice and comment rulemaking to set priorities for selecting Grant Recipients. *See, e.g.* ECF No. 24 at p. 26. Defendants seem to argue that the authorizing statutes confer different levels of discretion for awarding funds and for terminating them, the former subject to the APA and the latter exempt from same. Defendants identify no authority to support this contradiction; and it does not pass muster. Further, as the court previously explained, Defendants' reliance on *Lincoln v. Vigil*, 508 U.S. 182 (1993), is unpersuasive as *Lincoln* is materially distinguishable from this case.

Regarding Defendants' assertion that Plaintiffs' Complaint is essentially a contract dispute, the court incorporates its discussion of the non-application of the Tucker Act from its order of two days ago. (ECF No. 42 at pp. 4–11.) It bears more than a passing mention that, at the hearing on the preliminary injunction, Defendants' counsel asserted her clients' position as follows: "We believe this is a straightforward – I don't know if anything is straightforward in this administration, but it's a straightforward APA case," and "we have a final agency action, and now the question is was that action arbitrary and capricious . . . . It's an APA case." (Preliminary Injunction Hearing Tr. 58:23–25, 54:15–17.) The court agreed then and agrees now. The essence of Plaintiffs' claim is the equitable relief sought; Plaintiffs ask this court to review the lawfulness of the Department's termination decision, a decision that will have an immediate and ongoing impact on the relationship between the parties, namely the Plaintiffs' and their members' Grant Award status. *See* ECF No. 42 at p. 6.

Further, the court was wholly unpersuaded by Defendants' Emergency Motion for Reconsideration (ECF No. 36) in which Defendants sought dismissal of the action on the basis of two arguments that the court lacks subject matter jurisdiction over this action. (ECF No. 42, Memorandum Opinion and Order on Defendants' Emergency Motion for Reconsideration.) Nothing Defendants present in the instant Motion, or elsewhere, gives the court pause as to its proper subject matter jurisdiction over this action or as to the correctness of its determination on the Motion for Preliminary Injunction, including the strength of Plaintiffs' *Winter* factors showing. Indeed, the court found that Plaintiffs plainly and without question met their burden on likelihood of success, as well as irreparable harm, the balance of equities, and public interest. (ECF No. 32 at pp. 42–45.) Therefore, Defendants do not meet their burden to persuade the court they are likely

to succeed on the merits of their appeal of the court's order at ECF No. 33 granting preliminary injunctive relief (or the court's denial of Defendants' Emergency Motion for Reconsideration).

*B. Whether Defendants Will Be Irreparably Injured Absent a Stay*

The preliminary injunction requires the Department (and others subject to the order) essentially to do what the court finds the law otherwise (already) requires of it and to return the parties to their respective status immediately prior to the likely unlawful termination of the Grant Awards by the Department's Termination Letter. The injunction requires nothing of the Department (or any Defendant) that the Department had not already committed to do in accordance with its own regulations.

Defendants' purported concerns over the Executive Branch's authority are not compelling; they mistake the point. Defendants, in essence, purport to tee up a separation of powers question. But, no. In fact, none exists. The court's order does not impair Defendants' exercise of lawful authority; and to the extent the Department wishes to terminate the Grant Awards, it may do so by lawful means as delineated by GEPA, the APA, and the Grant Award GANs.[3] The Executive Branch's authority does not carry with it the right to bypass statutory obligations set by Congress. For all such reasons, the court discerns no irreparable injury to Defendants absent a stay pending appeal.

---

[3] For the same reasons, this court's order does not, as a matter of fact or law, impair the Department or the Secretary's compliance with President Trump's newest Executive Order titled *Improving Education Outcomes by Empowering Parents, States, and Communities* (available online at https://perma.cc/22QL-8HVT) (last accessed March 21, 2025). President Trump's Executive Order requires that any action undertaken in compliance with, or to give life to, its stated *Purpose and Policy* (Section 1) be done "to the maximum extent appropriate and permitted by law," and "[c]onsistent with the Department of Education's authorities;" and the President mandates that "this order shall be implemented consistent with applicable law." Nothing about, or within, the Executive Order (expressly or by implication) conflicts with, directs, encourages, or supports non-compliance with the court's order at ECF No. 33.

C.  *Whether a Stay Will Substantially Injure Plaintiffs and Public Interest*

As the court recognized above, these factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Entry of a stay will produce immediate, irreparable harm to Plaintiffs in precisely the ways the court identified in its memorandum opinion at ECF No. 33, because, here, a stay is the functional equivalent of denial of preliminary injunctive relief, which the court found is necessary to avoid certain doom for Grant Recipient programs, and resultant/related harms to their affiliated teachers and administrators, and the communities they serve.

Until this point, Defendants expressly conceded (in their papers and at oral argument) that Plaintiffs would experience irreparable harm in the absence of a preliminary injunction.  They now appear to retract that concession, arguing that "there is little to no evidence in the record regarding how many months it would take before Plaintiffs begin to feel the impact of the lack of funding." (ECF No. 44 at p. 7.)  Apart from their inappropriate effort to generate a dispute on this point for the first time in their Motion to stay the court's order, Defendants' position ignores the numerous undisputed attestations Plaintiffs offered in support of their preliminary injunction motion that detail the many concrete harms their members will experience from the loss of their Grant Award funding.  *See, e.g.*, NCTR Decl., ECF No. 5-4 ¶¶ 14–15; AU Decl., ECF No. 5-6 ¶ 13; UST Decl., ECF No. 5-7 ¶¶ 13–14; Alder GSE Decl., ECF No. 5-8 ¶ 13; Teaching Lab Decl., ECF No. 5-9 ¶ 19.

Moreover, Defendants' present assertion is undermined by their own subsequent assertion (also in the Motion) that Plaintiffs' members use their Grant Award funding for "purposes like salaries and living wage stipends," and they "would likely begin withdrawing immediately upon grant reinstatement."  (ECF No. 44 at p. 7.)  Defendants' concession on irreparable harm just days

ago; followed by their current retraction of the concession; followed by, in the same breath, an assertion that undermines their retraction exposes the untenable nature of their argument.

Further, as set forth at pages 44 and 45 of the court's memorandum opinion at ECF No. 32:

> The harms Plaintiffs identify also implicate grave effect on the public: fewer teachers for students in high-need neighborhoods, early childhood education, and special education programs. (AU Decl., ECF No. 5-6 ¶ 13; UST Decl., ECF No. 5-7 ¶¶ 6, 14–15.) Moreover, even to the extent Defendants assert such an interest in ending DEI-based programs, they have sought to effect change by means the court finds likely violate the law. "[T]he public 'undoubtedly has an interest in seeing its governmental institutions follow the law.'" *Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (quoting *Roe*, 947 F.3d at 230–31).

The court reiterates that here.

For the same reasons discussed at length in the court's memorandum opinion at ECF No. 32, Defendants' arguments fail to persuade the court that the risk of substantial injury to Plaintiffs and the public interest favor a stay pending appeal.

### D. Bond

Defendants also assert that the court's imposition of a nominal bond was error. (ECF No. 44 at p. 8.) As the court has previously addressed, at the hearing, defense counsel did not oppose Plaintiffs' request that the court require no bond. Then, Defendants retracted that concession too – by later filing a notice advising of their change of position and requesting bond in an amount "equal to the Federal Government's potential costs and damages from a wrongly issued injunction," per President Trump's March 11, 2025, Executive Order titled "Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)." (ECF Nos. 30, 30-1.) The court examined the issue as it is required to do, and determined that a nominal bond was warranted here based on the cited authorities – authorities Defendants do not address in their Motion. The court is not persuaded that the court's issuance of a nominal bond was error, and Defendants offer no

substantive legal argument for the court to change its mind now.  This similarly does not favor

entry of a stay pending appeal.

**IV.    <u>CONCLUSION</u>**

Accordingly, it is this 21st day of March 2025:

**ORDERED** that the Motion (ECF No. 44) shall be, and is hereby, **DENIED**.


/S/

_____

Julie R. Rubin
United States District Judge