# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AMERICAN ASSOCIATION OF     *
COLLEGES FOR TEACHER
EDUCATION, *et al*     *

     *Plaintiffs-Appellees,*     *

                           Appeal No: 25-1281

v.     *

LINDA MCMAHON, *et al*     *

     *Defendants-Appellants.*     *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## APPELLEES' OPPOSITION TO APPELLANTS'
## TIME SENSITIVE MOTION FOR STAY PENDING APPEAL

Pursuant to Federal Rule of Appellate Procedure 27 and Local Rule 27(f)(2), Plaintiffs/Appellees American Association of Colleges for Teacher Education ("AACTE"), National Center for Teacher Residencies ("NCTR"), and Maryland Association of Colleges for Teacher Education ("MACTE," and collectively, "Appellees") hereby file this Opposition to the Time Sensitive Motion for Stay Pending Appeal filed by Defendants/Appellants Linda McMahon, in her official capacity as Secretary of Education (the "Secretary"), U.S. Department of Education (the "Department"), and Donald J. Trump, in his official capacity as President of the United States (collectively, "Appellants" or the "Government") and requests that this Court deny Appellants' Motion.

## INTRODUCTION

Appellees filed this case to reinstate Department of Education grants for teacher preparation programs that were unlawfully terminated without notice or reasonable explanation. The terminated grants were under three programs that Congress authorized to prepare educators in the United States and help mitigate dramatic teacher shortages, especially in high-need communities. While the grants were in the midst of approved budget periods, the Department sent form termination letters lacking any specificity or individualized consideration to Grant Recipients,[1] informing them the grants are "inconsistent with, and no longer effectuate[], Department priorities." The remainder of the boilerplate letters recited a disjunctive list of five nonspecific ways in which the specific grant might be "inconsistent" with Department Priorities.

The Government is unlikely to succeed on the merits of its appeal. The Government does its level best to sidestep the questions of the unlawfulness of the grant terminations by focusing on jurisdiction rather than the merits on appeal, but the District Court correctly concluded that the Government's actions likely violate the Administrative Procedure Act ("APA") for multiple reasons. First, Priorities for any Education Department grant program must be set by Congress or through notice

---

[1] NCTR and the member organizations of NCTR, ACTE, and MACTE with terminated grants are referred to herein as the "Grant Recipients."

and comment rulemaking, which the Department did not do here. Because the Department Priorities have not changed, and there is nothing in the record to support a conclusion by the Department that the grants fail to effectuate the still-current Priorities, the District Court appropriately found that the Government's termination was likely arbitrary and capricious. The District Court also properly found a likely APA violation because the reasons, such as they were, that the Department provided for its terminations were not reasonably explained and failed to reflect individualized considerations.

The District Court likewise correctly concluded that the Government's concession of irreparable harm to the Grant Recipients was correct, and that Appellees had made a clear showing that their members will suffer irreparable harm in the absence of an injunction. It also correctly concluded that the balance of the equities and public interest tips in Appellees' favor here where the injunction would restore the status quo had the grants not been unlawfully terminated. The Government's argument that it will be irreparably injured absent a stay on appeal, already rejected by the First Circuit on nearly identical terms, holds no water. The Grant Recipients' draw-down activities and the ability of the Government to recover funds are subject to federal regulatory safeguards, and, more than two weeks after the district court entered its injunction, no evidence has materialized of any improper attempt to draw down by any Grant Recipient.

As the District Court correctly found when the Government raised it for the first time on reconsideration, the Tucker Act is also no bar to relief. This is not a contract dispute; it is, as the Government has earlier conceded, a straightforward APA case. *See* Supp.Appx.0054 ("It's an APA case."). The Government's "agency discretion" argument also fails because there are numerous statutory and regulatory provisions that cabin the Department's authority in ways that provide "meaningful standards" for judicial review.

None of the factors here support a motion to stay pending appeal.

## BACKGROUND

### I.    Factual Background.

Three federal grant programs authorized by Congress underlie this case: (1) The Teacher Quality Partnership Grant Program ("TQP") provides funding to eligible partnerships to improve student achievement and the quality of prospective and new teachers (20 U.S.C. § 1022); (2) The Supporting Effective Educator Development Program ("SEED") provides funding to increase the number of highly effective educators by supporting the implementation of evidence-based practices that prepare, develop, or enhance educators' skills (20 U.S.C. § 6672); and (3) The Teacher and School Leader Incentive Program ("TSL") provides funding to educators in high-need schools who raise student academic achievement (20 U.S.C. § 6632).

On February 7, 2025, the Grant Recipients started receiving form letters from the Department ("Termination Letters") terminating their grants. (App.7). The boilerplate Termination Letters provided:

> The grant specified above provides funding for programs [1] that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; [2] that violate either the letter or purpose of Federal civil rights law; [3] that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; [4] that are not free from fraud, abuse, or duplication; or [5] that otherwise fail to serve the best interests of the United States. ***The grant is therefore inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. § 200.340(a)(4);*** see also 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [] in its entirety effective 2/[]/25.

(App.7-8). The Termination Letters did not offer any evidence that the grant-funded programs engaged in any of the purportedly disqualifying activities, nor did they identify which of the five disjunctively-listed bases applied to any given grant.

As cited in the Termination Letters, 2 C.F.R. § 200.340(a)(4) permits the Department to terminate grants if they no longer effectuate Department Priorities, however, "Department Priorities" is a term of art; in order to establish its Priorities, the Department must, by statute and regulation, go through a notice and comment rulemaking process. *See* 20 USC § 1232(d); 34 C.F.R. § 75.105(b)(2). While the APA (5 U.S.C. § 553) generally exempts federal agency grants from the rulemaking

process, the General Education Provisions Act ("GEPA") (20 U.S.C. § 1232(d)) alters that rule specifically for the Education Department and requires rulemaking.[2]

## II.    <u>Procedural Background.</u>

Appellees filed suit on March 3, 2025 (App.1-39) and requested injunctive relief to reinstate the unlawfully terminated grants. (ECF No. 5).[3] The Government responded on March 11 and the Court heard argument two days later. On March 17, the District Court granted Appellees' motion in part and ordered the Department to reinstate the grants at issue on the "terms and conditions in place immediately prior to issuance of Termination Letters[.]" (App.106-07).

On March 18, the Government filed an Emergency Motion for Reconsideration that the District Court denied, concluding that the Tucker Act does not divest it of jurisdiction and that the grants' terminations were not committed to agency discretion. (App.108-20). On March 20, the Government filed a motion to stay the injunction pending appeal that the District Court denied. (App.121-30). The Government filed a notice of appeal on March 21 and filed the instant motion for stay pending appeal on March 25.

---

[2] A grants exemption from rulemaking only applies to two circumstances, both of which the Government concedes are inapplicable here. (App.93, n. 15).

[3] Appellees cite to the District Court filings using the "ECF No. _" format.

## LEGAL STANDARD

A party seeking a stay pending appeal bears the burden of establishing: (1) a strong likelihood of success on the merits; (2) irreparable injury absent a stay; (3) lack of injury to the other parties interested in the proceeding from a stay; and (4) the public interest of a stay. *Nken v. Holder*, 556 U.S. 418, 426 (2009) (citation omitted). The first two factors are the most critical. *Id.* at 434.

## ARGUMENT

### I.   The Government Is Unlikely To Succeed on Appeal.

#### A. The District Court Correctly Assured Itself of Jurisdiction.

District courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Congress authorized judicial review by district courts under the APA in suits challenging agency actions that seek "relief other than money damages." 5 U.S.C. § 702.

The mere fact "that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). The Supreme Court has "long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief[.]" *Id.*

The Tucker Act's implied exception is narrow; courts routinely reject the "'broad' notion 'that any case requiring some reference to or incorporation of a

contract is necessarily on the contract and therefore directly within the Tucker Act[.]'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). A more capacious approach would improperly "deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

The grants at issue here are not contracts—express or implied—subject to the Tucker Act. (28 U.S.C. § 1491(a)(1)). For one thing, grants lack consideration; that is, they do not provide a "tangible" and "direct" benefit to the government. *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023). The advancement of "policy interests" or "generalized benefit[s]" is not a "benefit" to the United States that would amount to consideration. *Id.* at 133-34. Moreover, even the existence of an actual contract in the background (which the grants here are not) does not insulate the Government from challenges to illegal agency action, which the action at issue here patently *is*. *See, e.g.*, *Crowley*, 38 F.4th at 1102 (holding that APA claim challenging agency's authority belonged in district court because plaintiff "d[id] not seek to enforce or recover on [a] contract" and did not "seek monetary relief"); *see also Normandy Apartments, Ltd. v. HUD*, 554 F.3d 1290, 1300 (10th Cir. 2009).

Both the source of rights for Appellees' claims and the type of relief sought favor jurisdiction. *First*, this action challenges broad agency overreach—the heart of the APA. *See Bowen,* 487 U.S. at 904-05. The same would be true if Appellees challenged only a single grant termination, but is even more evident in the case of an official agency policy that violates the APA and GEPA, federal statutes whose application to this case the Court of Federal Claims has no jurisdiction to address. GEPA specifically—and uniquely—requires that the Department set its grant priorities using notice and comment rulemaking. 20 U.S.C. § 1232(d). Put differently, unlike other federal agencies, GEPA is clear with regard to the Department of Education alone: the ordinary APA exemption for grant rulemaking does not apply to the Department. *Id.* Congress' unequivocal determination resoundingly undermines the Government's argument to the contrary.

*Second*, the kind of relief sought in this case differs from the relief available from a Tucker Act claim. *Accord Megapulse*, 672 F.2d at 968. Appellees seek neither a money judgment nor an injunction directing the Government to pay a specific sum; instead, Appellees seek declaratory and injunctive relief returning the parties to the pre-existing *status quo*. The Supreme Court has made clear this type of suit may proceed in district court, because it "is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory [and regulatory] mandate itself[.]"

*Bowen*, 487 U.S. at 900. The Federal Circuit has correspondingly made clear that in a case like this, no jurisdiction would arise in the in the Claims Court. *See Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1318 (Fed. Cir. 2017) (holding that Court of Federal Claims lacks subject matter jurisdiction to order relief providing access to grant funds and remarking that "[t]o label the disbursement of [strings-attached grant] funds so thoroughly scrutinized and cabined as a remedy for 'damages' would strain the meaning of the term to its breaking point."); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) (concluding that sovereign immunity does not bar federal district courts' APA review of the government's refusal to release funding and likening entitlement to funds under a statute to the *Bowen* grant-in-aid applicants, not monetary compensation for losses that plaintiffs "will suffer as the result of the withholding of those funds")).

The fact that an injunction may later cause the Government to honor an obligation to make payments does not strip this Court of jurisdiction. *See Crowley*, 38 F.4th at 1108 ("[E]ven if the plaintiff filed the complaint with an eye to future monetary awards, a district court with otherwise appropriate jurisdiction may hear the claim and grant the proper equitable relief." (quotation omitted)). Appellees seek declaratory and injunctive relief declaring the Government's termination of the grants—and their placement on route pay—unlawful. (App.38). That is nothing like

an injunction to pay a specific sum. *See Crowley*, 38 F.4th at 1110-12; *Normandy Apartments*, 554 F.3d at 1296-97.

The Government's view appears to be that each affected Grant Recipient should file individual Tucker Act claims. But separate and apart from the lack of jurisdiction in the Claims Court, because Tucker Act relief is retrospective and monetary in nature, the Government seems to be suggesting that each affected Grant Recipient file a separate lawsuit **each time** the Department refuses to reimburse allowable costs. But the staggering inefficiency of this procedure is the least of it because it also does not get at the harm that Appellees seek to remedy. Appellees' claims are not for the failure to reimburse individual, liquidated costs, but rather the Department of Education's wholesale policy of indiscriminate and unlawful grant termination.

The Government's theory of the Tucker Act argument has been squarely rejected three times: in *California v. U.S. Department of Education*, No. 25-1244, 2025 WL 878431, at *2 (1st Cir. Mar. 21, 2025) (confirming jurisdiction, concluding that the essence of the claims are "assertions that the Department acted in violation of federal law -- not its contracts."); in *California v. United States Department of Education*, Civ. No. 1:25-cv-10548-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025) (observing that plaintiffs "seek to enjoin Defendants from . . . termination of any previously awarded TQP and SEED grants" in order to "preserve the previous

status quo to alleviate corresponding harm[,] not alleg[ed] claims for past pecuniary harms."); and below. This Court should do the same.

In sum, and as the District Court explained, Appellees "do not seek money damages for past wrongs," (App.116); Appellees seek "forward-looking equitable relief" to prevent further grant termination, (*id*.); the Court of Federal Claims lacks authority to grant the injunctive relief Appellees seek, (*id*.); Appellees' request for the removal of "route pay grant conditions" is necessarily "forward-looking equitable relief" unavailable in the Claims Court, (*id*. at 116-17); and the Complaint invokes a "constellation of sources," including the grants' authorizing statutes, federal regulations implementing same, and GEPA. (*Id*. at 117). Jurisdiction is proper.

### B. The Department's Decision To Terminate The Grants Was Not Committed To Agency Discretion.

Seeking to avoid review, the Government also attempts to invoke 5 U.S.C. § 701(a)(2), which excludes from the APA's judicial review provisions agency actions "committed to agency discretion by law." (Mot. 15-19). However, that exclusion applies only in "rare circumstances" in which a court would have "no meaningful standard against which to" review an agency's discretionary action. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). "[E]ven if the underlying statute does not include meaningful (or manageable) standards, 'regulations promulgated by an administrative agency in carrying out its statutory mandate can

provide standards for judicial review.'" *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 346 (4th Cir. 2001). The operative question, therefore, is whether a statute or regulation provides a "meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772. The answer here is yes.

"Meaningful standards" lie within GEPA and the notice and comment rulemaking to set Priorities for selecting Grant Recipients. (App.125) (reasoning that the Government's argument that the "authorizing statutes confer different levels of discretion for awarding funds and for terminating them, the former subject to the APA and the latter exempt from same" lacks any authority and "does not pass muster."). The Government's reliance on *Lincoln v. Vigil*, 508 U.S. 182 (1993) is unpersuasive. The District Court accurately highlighted the materially distinguishable facts as follows:

> [T]he Indian Health Service's termination of the Indian Children's Program was exempt from § 533 notice and comment rule making based on § 553(b)(A)'s exemption of "rules of agency rulemaking" from same. *Id*. at 197. Here, per the intersection of GEPA and the APA, . . . the Department's "agency priorities" vis-à-vis the Grant Programs (and Plaintiffs' members' Grant Awards) are squarely within the APA's notice and comment rule making requirement and, therefore, are not correctly categorized as items within "agency discretion" not subject to judicial review.

(App.120). The Government's fleeting attempt to analogize with *Lincoln* fails to contend with its statutory responsibility to use notice and comment rulemaking to set agency Priorities under GEPA, among other obligations under the APA.

To wit, the text of 2 C.F.R. § 200.340(a) also cabins the Department's authority in ways that provide a "meaningful standard" for this Court's review. *See California*, 2025 WL 878431 at *3 ("applicable regulations cabin the Department's discretion as to when it can terminate existing grants"). While the Government asserts that it has "significant discretion in determining how best to allocate appropriated funds across grant applicants" (Mot. 17), this case concerns the termination of grants *already awarded* to specific recipients.[4] Whatever discretion the Department may have when awarding *new* grants, the Government has not shown that it has unreviewable agency discretion to *terminate existing* grants. To the contrary, the text of the termination regulation specifically enumerates the four ways federal awards may be termination. *See also Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-78 (D.D.C. 2018) (holding that federal agency's otherwise-presumptively unreviewable decision to halt funding to an agency program was reviewable under the APA because applicable regulations

---

[4] While it is true that the authorizing statutes for the three programs at issue allow Department discretion regarding which grant recipients are awarded funds, the funds at issue are FY24 funds which expired September 30, 2024, prior to this Administration taking office. *See* Public Law No. 118-47 Section 5; 20 U.S.C. § 1223(a).

cabined its termination authority and therefore provided a standard by which the court could review the agency's decision).[5]

Finally, as correctly summarized by the First Circuit in *California*, Congress' instruction within the grants' statutes provides another avenue of meaningful standards:

> The statutes establishing the TQP and SEED programs set forth the purposes of the grants, including, for example, the "recruit[ment] of highly qualified . . . minorities . . . into the teaching force," 20 U.S.C. § 1022(4), and the provision of "pathways [for teachers] to serve in traditionally underserved local educational agencies," *id*. § 6672(a)(1). So too has Congress instructed recipients to "provide assurances to the Secretary," including, for example, that participants "receive training in providing instruction to diverse populations." *Id*. § 1022e(b). Certainly, given these statutory mandates, the Department could not terminate a grant merely because a recipient program attempts to prepare participating school leaders to serve in traditionally underserved communities; nor could it treat assurances that a program provides training in the instruction of "diverse populations" as a reason to terminate an award.

*California*, No. 25-1244, 2025 WL 878431, at *3. All of the above place limits on the Department's discretion and create "meaningful standard[s] by which to judge the [agency]'s action." *Dep't of Comm.*, 588 U.S. at 772.

_____

[5] The Government cites *Pol'y & Rsch.*, but that decision held that the APA did apply to the agency's grant termination decision because the termination regulation provided standards for the court's review. *Id*. The only other case the Government cites – *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) – is inapposite. *Milk Train* involved plaintiffs who failed to point to any applicable legal standards.

## C. Appellees Demonstrated A Likelihood of Success On The Merits Of Their APA Claim And The Government Has Not.

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

The District Court appropriately identified two ways in which the Government violated that standard. *First*, the Department's termination of the grants for being "inconsistent with, and no longer effectuat[ing], Department priorities" is contrary to the law. Statute and regulation require the Secretary to publish Department Priorities for program grants in the *Federal Register*, subject to a notice and comment period. (20 U.S.C. § 1232(d), 34 C.F.R. § 75.105(b)(2)). The Secretary then selects allowable Priorities to include in the applications for the grant competitions which are published in the *Federal Register*. (34 C.F.R. § 75.105(c)). The Department cannot, by law, change Department Priorities unless and until the Department engages in rulemaking to propose and issue new Priorities. (App.94). The current administration has not done that, so the current Priorities remain Department Priorities. (*Id*.) As a result, the grants at issue remain consistent with the current Department Priorities, as they were at the time they were awarded. (*Id*.)

(nothing in the record supports a conclusion that "the Department reviewed the grant award of each Grant Recipient and, on such review, in fact, found it to run afoul of previously lawfully established 'agency priorities.'").[6]

*Second*, even if the Government's assertion that the "agency priorities" referenced in the Termination Letters are not subject to notice and comment rulemaking were correct (it isn't), the District Court appropriately held that Appellees "still make a clear showing of likelihood of success on their APA claim because the Termination Letters fail to provide Grant Recipients any workable, sensible, or meaningful reason or basis for the termination of their awards. . . . The Department has not provided the 'reasonable explanation' of its final agency action the APA requires" (App.96). The Termination Letters simply list disjunctive, potential ways in which a Grant Recipient's program is "inconsistent" with Department Priorities, which "is so broad and vague as to be limitless; devoid of import, even." (*Id*.). A "reasonable explanation" as mandated by the APA, "considers relevant data and articulates a satisfactory explanation for the agency's

---

[6] Furthermore, the language in Section 200.340(a)(4) regarding "no longer effectuates" agency priorities does not authorize an agency to change agency priorities in the middle of an existing grant term. While the Department may set new policy priorities for future grant cycles, it has no authority to do so midstream for existing grants.

decision, 'including a rational connection between the facts found and the choice made.'" (App.97) (citing *Dep't of Commerce*, 588 U.S. at 773).

"When an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency . . . may not provide new [reasons]." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 21 (2020). The Department belatedly asserts that it terminated the grants at issue because they shared a "common characteristic (finding DEI)" and points to the declaration of the Chief of Staff of the Department to attempt to argue that the Department engaged in an individualized review. (Mot. 22-23). But the District Court properly considered this argument below and concluded that even if the declaration, which was indisputably not contained in the agency record, was credited as "merely explanatory of the original record,"[7] "it fails to remedy that the Termination Letters evinces no individualized consideration of Grant Recipient awards and does not shed light on which of the possible grounds for termination set forth in the disjunctive list applies to a termination Letter recipient." (App.98). Because the Termination Letters do not

---

[7] The Government's citations to *Roe v. Department of Def.*, 947 F.3d 207, 211 (4th Cir. 2020) and *Lana, Inc. v. United States*, 925 F. 3d 521, 525 (D.C. Cir. 2019) (Mot. 23) do nothing to advance its argument, as the District Court *did* consider the post-hac declaration in its finding. (App.98-99). Likewise, the Government's citation to *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989) is unpersuasive. *Hall* concerned whether the agency ignored its own past decisions and diverged from precedent, not whether similarly situated grants sweepingly terminated contemporaneously "honors the APA" as the Government misstates. (Mot. 23).

provide any "reasonable explanation" for the Department's actions, the Government is unlikely to succeed on appeal.

## II.      The Government Has Not Demonstrated Irreparable Injury.

The Government vaguely argues that an "outflow of significant amounts of money" will "irreparably harms the public fisc." (Mot. 24). Not so. Its argument, which is purely speculative, likewise ignores the many regulatory safeguards designed to protect the Government from the very harms it asserts are irreparable.

TQP, SEED and TSL grants are obligated for one fiscal year at a time. Various regulatory provisions prevent illegal drawdown of grant funds—the sort which the Government apparently contends might occur in the absence of a stay. *See* 2 C.F.R. § 200.305(b) (limiting advanced payments to minimum amounts needed and aligning timing with actual, immediate cash requirements of grant recipient); 2 C.F.R. § 200.302(b)(3) (requiring that costs incurred be supported by "source documentation" such as invoices or receipts); 2 CFR § 200.337(a) (requiring that grant recipients keep records demonstrating their compliance with these financial management requirements and must provide access to these records to the authorized representatives of the Agency for any official use).

Moreover, Federal regulations permit the Government to recover funds that were drawn down for unallowable costs. (2 C.F.R. § 200.410 (allowing for federal agencies' recovery of unallowable costs with interest); 2 C.F.R. § 200.345(a)(1)

(permitting agency "to disallow costs and recover funds on the basis of a later audit or review")). In compliance with the preliminary injunction, the Department restored the grants as of March 24. The Government points to no "immediate outflow of significant amounts of money" since that date, which, were the Government's argument not entirely speculative, would be expected to have happened already if it were likely to happen at all. The Government has not established irreparable injury and this Court should deny a stay.

### III. Issuance Of A Stay Will Substantially Injure Appellees.

The preliminary injunction here restored the status quo: it requires the Department to reverse its sudden and unlawful termination of grants. A stay of that decision would work the very irreparable harm that the Government conceded before the District Court. *See* ECF No. 24 at 13 ("Defendants do not dispute that Plaintiffs can establish irreparable harm"); Supp.Appx.0076-0077 ("[W]e have conceded irreparable harm here for the purpose of streamlining things[.]"); ECF No. 32 at 43 (crediting that "Defendants do not dispute Plaintiffs will suffer irreparable harm in the absence of an injunction"); *see also* (App.128) (recognizing the Government's "inappropriate effort to generate a dispute on this point for the first time. . . .").

The District Court also independently determined that Appellees "made a clear showing that their members will suffer irreparable harm in the absence of an injunction." (App.100). In so finding, the District Court credited declarations that

established: (1) "the loss of funding will cause some Grant Recipients to shutter their programs entirely"; and (2) Grant Recipients "will be forced to terminate staff that work on teacher preparation programs and will be unable to provide funding to teachers set to start in their respective training programs—teachers who often rely on such funding for their livelihoods." (*Id*.). Because the injury to Appellees is patent—and conceded by the Government—this Court should not disturb the preliminary injunction.

## IV.  Equities And The Public Interest Weigh Against A Stay Of The Preliminary Injunction.

The government suffers no harm under the preliminary injunction, just as it suffered no harm from the status quo before the grants were terminated. The Department must merely adhere to its obligation to provide Congressionally-directed funding to the Grant Recipients.

The Grant Recipients' teaching preparation programs provide an essential service furthering important public interest in education that will be significantly disturbed absent Court intervention. As appropriately found by the District Court, "[t]he harms [Appellees] identify also implicate grave effect on the public: fewer teachers for students in high-need neighborhoods, early childhood education, and special education programs" and "[t]he public 'undoubtedly has an interest in seeing its governmental institutions follow the law.'" (App.102). Because the

Government's method of blanket grant termination likely violates the APA, (*id*.), the public interest favors the continuance of the preliminary injunction.

## V.    The District Court's Order Is Appropriately Tailored.

In issuing a preliminary injunction, the District Court appropriately tailored its order to apply to the TQP, SEED, and TSL grant awards of NCTR and Appellees' member grant recipients. (App.106). The District Court gave careful consideration to the scope of its injunction, App.102-03, and there is no reason for this Court to constrain it.

Appellees initiated this litigation in their own right and on behalf of their individual members. Of the three Appellees in this litigation, the Government only challenged MACTE's organizational standing before the District Court, which the District Court rejected (App.77), and the Government rightly abandons the argument here. As a result, the preliminary injunction properly encompasses the terminated grants of Appellees' members. To be sure, this is the precise relief sought in the Complaint. (App.38) (requesting relief on behalf of all individual Grant Recipients).

The Government's passing attempt to suggest that there can be no irreparable harm to individual Grant Recipients rings hollow where, below, the Government conceded the existence of irreparable harm in the absence of an injunction and it belies the District Court's sound finding to the contrary. (App.100) ("Plaintiffs have

made a clear showing that ***their members*** will suffer irreparable harm. . .")
(emphasis added). The preliminary injunction is not overbroad.

## **CONCLUSION**

For the foregoing reasons, Appellees respectfully requests that this Court deny
Appellants' Time Sensitive Motion for Stay Pending Appeal.


Date: April 2, 2025                                    Respectfully Submitted,

                                                       */s/ Joshua W.B. Richards*
                                                       Joshua W.B. Richards
                                                       SAUL EWING LLP
                                                       1500 Market Street, 38th Floor
                                                       Philadelphia, Pennsylvania 19102
                                                       Tel: (215) 972-7737
                                                       Joshua.Richards@saul.com

                                                       Daniel M. Moore
                                                       SAUL EWING LLP
                                                       1001 Fleet Street, 9th Floor
                                                       Baltimore, Maryland 21202
                                                       Phone: (410) 332-8734
                                                       Daniel.Moore@saul.com

                                                       *Counsel for Appellees American Association*
                                                       *of Colleges for Teacher Education, National*
                                                       *Center for Teacher Residencies, and*
                                                       *Maryland Association of Colleges for*
                                                       *Teacher Education*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 27(d)(2)(A) and Local Rule 27, I certify that this Opposition to Time Sensitive Motion for Stay Pending Appeal is proportionately spaced, in 14-point Times New Roman font, and contains 5,142 words.

Date: April 2, 2025

Respectfully Submitted,

*/s/ Joshua W.B. Richards*
Joshua W.B. Richards
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 972-7737
Joshua.Richards@saul.com

*Counsel for Appellees American Association of Colleges for Teacher Education, National Center for Teacher Residencies, and Maryland Association of Colleges for Teacher Education*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on April 2, 2025, a copy of the foregoing Opposition to Time Sensitive Motion for Stay Pending Appeal and proposed order was served the CM/ECF system upon all persons entitled to such service.

Date: April 2, 2025

Respectfully Submitted,

*/s/ Joshua W.B. Richards*
Joshua W.B. Richards
Saul Ewing LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 972-7737
Joshua.Richards@saul.com

*Counsel for Appellees American Association of Colleges for Teacher Education, National Center for Teacher Residencies, and Maryland Association of Colleges for Teacher Education*

# SUPPLEMENTAL APPENDIX

## TABLE OF CONTENTS

**Page**

March 13, 2025 Hearing Transcript..........................................................Supp. Appx. 0001-0103

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MARYLAND
 2                       NORTHERN DIVISION

 3     AMERICAN ASSOCIATION OF COLLEGES )
       FOR TEACHER EDUCATION, et al.,   )
 4                                       )
                       Plaintiffs,       )
 5                                       )
                       vs.               )   CIVIL CASE NO.
 6                                       )   1:25-cv-00702-JRR
       LINDA MCMAHON, in her official    )
 7     capacity as Secretary of          )
       Education, et al.,                )
 8                     Defendants.       )   Courtroom 3A
       _____   )   Baltimore, Maryland
 9
                      THURSDAY, MARCH 13, 2025
10
            TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION
11               BEFORE THE HONORABLE JULIE R. RUBIN

12     For the Plaintiffs:

13     Joshua W. Richards, Esquire
       Carolyn M. Toll, Esquire
14      Saul Ewing, LLP
        Centre Square West, 38th Floor
15      1500 Market Street
        Philadelphia, PA 19102
16
       Daniel M. Moore, Esquire
17      Saul Ewing, LLP
        1001 Fleet Street, 9th Floor
18      Baltimore, MD 21202

19     For the Defendants:

20     Molissa H. Farber, Esquire
       Megan L. Micco, Esquire
21      US Attorney's Office - District of Maryland
        36 South Charles Street, 4th Fl.
22      Baltimore, MD 21201
       _____
23            (Computer-aided Transcription of Stenotype Notes)

24            Reported by: Amanda L. Longmore, RPR, FCRR
                    Federal Official Court Reporter
25                 101 W. Lombard Street, 4th Floor
                     Baltimore, Maryland  21201
```

SUPP. APPX. 0001

1                    P R O C E E D I N G S

2          (10:06 a.m.)

3               THE CLERK:  The matter now pending before this Court

4      is Civil Docket Number JRR-25-cv-0072, American Association of

5      Colleges for Teacher Education, *et al.*, versus McMahon, *et al.*

6      This matter now comes before the Court for the purpose of a

7      preliminary injunction hearing.

8          Counsel for the plaintiffs, followed by counsel for the

9      defendants, will you please introduce yourselves for the

10     record?

11              MR. RICHARDS:  Good morning.  Josh Richards, Saul

12     Ewing, for the plaintiffs.

13              THE COURT:  Good morning.

14              MS. TOLL:  Carolyn Toll, Saul Ewing, for the

15     plaintiffs.

16              THE COURT:  Good morning.

17              MR. MOORE:  Good morning, Your Honor.  Daniel Moore

18     of Saul Ewing.

19              THE COURT:  Good morning.

20              MS. FARBER:  Good morning, Your Honor.  Molissa

21     Farber for the defendants.

22              THE COURT:  Good morning.

23              MS. MICCO:  Good morning, Your Honor.  Megan Micco

24     also for the defendants.

25              THE COURT:  Good morning to all.  Everyone can be

1   seated.  I'll just ask for just a few moments so I can organize

2   what I need to have directly in front of me.

3       All right.  Counsel, just because there are so many moving

4   parts in terms of documents that are at issue here that I'm

5   sure we'll talk about during argument, I will ask you to just,

6   if I need to, to have a moment or two to turn to whatever

7   document you're referring to so I can be sure to have them in

8   front of me.

9       And with that, I'm happy to hear from you, Mr. Moore.  Or

10  Mr. Richards, rather.

11      **MR. RICHARDS:**  Your Honor, would you like me to

12  stand while I'm addressing the Court or --

13      **THE COURT:**  I will -- whatever makes you comfortable

14  is fine with me.

15      **MR. RICHARDS:**  Then I'll stay sitting, thank you.

16      I think that the issues before the Court have been

17  narrowed significantly since we filed our motion in light of

18  the Government's response.  And it seems to me that, you know,

19  the Government has not challenged that irreparable harm will

20  result without an injunction.  And so I won't say more about

21  that unless the Court would like me to, except to say that

22  because we're not going to be talking about irreparable harm at

23  length today, I don't want the Court or the public to lose

24  sight of the fact that, you know, this case is really about the

25  potential destruction of the infrastructure to provide teacher

1   preparation in this country.  And the impact of allowing these

2   grants to be terminated is that the programs that support that

3   teacher preparation will be in a position where they're no

4   longer able to operate.  They'll lose staff, they'll lose the

5   things that they've built to allow them to do what they do, and

6   even if those programs are later refunded, they'll have to be

7   rebuilt from the ground up.  And so it's not a small thing that

8   we're here to talk about.

9            THE COURT:  So let me just put a pin in that for a

10  second and say that to the extent there are things that are not

11  challenged, and I know that you're not saying anything to the

12  contrary, but bear in mind that I still need to make a finding

13  in your favor as to each of those elements so I wouldn't, you

14  know, necessarily rest on your papers unless you want to but

15  you're welcome to.

16           MR. RICHARDS:  Thank you, Your Honor.  So I am happy

17  to speak more to that.

18       Before I begin, too, I wanted to just sort of note that

19  final agency action doesn't seem to be challenged here.  Again,

20  we did cover that in our briefs and I can cover that before the

21  Court.  And so it strikes me that the main disputed issues

22  before the Court are the jurisdictional issues that the

23  Government has raised with respect to standing and venue, the

24  Fifth Amendment claim that we've raised, and whether or not the

25  *NADOHE* order either applies or the same reasoning applies here,

1    and then the agency priorities issue that we've raised as our

2    principal APA claim.

3          I can start anywhere that the Court would prefer, but

4    maybe with the jurisdictional issues?

5                THE COURT:  Yeah, I would like to start with the

6    jurisdictional issues.

7          And, Ms. Farber, I will just -- I'm not asking you to make

8    argument about it now but just to confirm, does -- do

9    defendants concede the issue of final agency action?

10               MS. FARBER:  Yes, for the purposes of this motion we

11   do.

12               THE COURT:  I should say that's sort of, you know,

13   built into every sentence that we're about to say, for purposes

14   of this hearing, as well as the irreparable harm.

15               MS. FARBER:  Yes.

16               THE COURT:  All right.  Very good.  So those issues

17   are sort of in the can, although plaintiff still bears the

18   burden, because, you know, I'm not a potted plant, but go

19   ahead.

20               MR. RICHARDS:  Okay.  So as to the jurisdictional

21   issues, I'll start with standing, even though it's reversed

22   from how the Government raised them.

23         The only plaintiff I believe that standing was challenged

24   as to was MACTE.  I don't believe that there's any dispute that

25   MACTE is a membership organization and it's comprised of

1    principally, entirely, Maryland organizations that provide

2    teacher preparation services.

3        It is a matter of, at this point, public record that at

4    least three of its members, Towson University, College Park,

5    and Frostburg, have had grants cut as part of this program.

6        The Supreme Court ruled in lots of cases but most recently

7    in the *Students For Fair Admissions* case that an

8    organizational -- membership organization has standing if any

9    of its members suffered concrete harm.  I don't think that

10   there's any dispute that we have alleged concrete harm on

11   behalf of the members, and so I think that we've sort of easily

12   established standing for MACTE, and for the other plaintiffs I

13   don't believe it's been challenged.

14       And if there's no questions about that, I can move on.

15           THE COURT:  So Frostburg, Maryland, and Towson, just

16   to clarify, their grants were subject to -- and I don't know if

17   I'm mispronouncing the judge's name, Judge Joun -- Judge Joun,

18   were they subject to his TRO?

19           MR. RICHARDS:  They were.

20           THE COURT:  And have any of those -- have any of

21   those institutions whose grants were subject to his TRO gotten

22   their money out?

23           MR. RICHARDS:  I don't know.  I don't know whether or

24   not they have been able to draw down on that order yet.

25           THE COURT:  Do they plan to?

1      **MR. RICHARDS:**  I think that they do, once those

2  grants are turned back on.  But I think our position would be

3  there's no mootness issue there --

4      **THE COURT:**  Right.

5      **MR. RICHARDS:**  -- because the order is temporary.

6      **THE COURT:**  Well, but if they've taken their money

7  out in view of the declaration that it's pretty hard to claw

8  that back, what do I do with that?

9      **MR. RICHARDS:**  Well, again, our view would be that

10  because that relief is temporary and does not sort of --

11  "guarantee" is the wrong word, but does not even indicate that

12  future money will be able to be drawn down, and we have a clear

13  intent from the Government to terminate the loan, they've

14  appealed the order, that the dispute is still live.

15      **THE COURT:**  Okay.  Do they -- have they been granted

16  future grants?  In other words, are they -- and I don't know if

17  I'm asking this question the wrong way, but are those three

18  grant recipients, in their multiyear grants, are there any

19  grants that have been granted for future years that have not

20  yet begun in terms of, you know, their financial spending?

21      **MR. RICHARDS:**  I don't know, Your Honor.

22      **THE COURT:**  Okay.  And I don't even know if I asked

23  that the right way, but my point is, you know, because, in

24  other words, if there are other grants that are out there, that

25  might be something to know but --

1    **MR. RICHARDS:**  I agree, Your Honor.  I also think

2   that part of the reason that we've brought this claim in the

3   way that we have is because all grant recipients that are

4   members of the plaintiff organizations are essentially

5   identically situated with respect to these particular grants,

6   and they were terminated in exactly the same way, roughly the

7   exact time, using the exact reason.  I'm not sure whether that

8   will be true for future grants or not.

9        **THE COURT:**  Okay.

10        **MR. RICHARDS:**  Shall I move on to venue?

11        **THE COURT:**  That would be great.  Yep.

12        **MR. RICHARDS:**  Venue we also think is

13   straightforward.  You know, we did allege two different bases

14   for venue in our complaint.  The Government addressed only one

15   in their brief, in its argument that we didn't have venue, but

16   of course we alleged that we've established venue under

17   1391(e)(1)(C) because the Government is a defendant in this

18   case and MACTE, again, is a citizen of the State of Maryland;

19   therefore we have a single plaintiff for whom we have venue and

20   the vast majority of the case law that we were able to locate

21   makes completely clear that one plaintiff is all that's

22   sufficient to establish venue under (e)(1)(C).

23        **THE COURT:**  If MACTE is gone, does AACTE carry the

24   day on substantial?

25        **MR. RICHARDS:**  It does.

1          THE COURT:  Why?

2          MR. RICHARDS:  Because Towson and College Park and

3    Frostburg are all members of AACTE.

4          THE COURT:  I see.  So they're co-members, AACTE and

5    MACTE.

6          MR. RICHARDS:  Correct.

7          THE COURT:  Okay.  And are there any other Maryland

8    institutions that are members of AACTE that are not MACTE

9    members?

10          MR. RICHARDS:  I don't think so.

11          THE COURT:  That would be at issue here I guess is

12    the question.

13          MR. RICHARDS:  I don't think so, Your Honor.

14          THE COURT:  Okay.

15          MR. RICHARDS:  But I will just turn to one point that

16    the Government raises and that we addressed briefly in our rely

17    but mindful of the Court's suggestion that we flush these

18    things out.

19          You know, the Government's argument on venue appears to be

20    that venue isn't proper in Maryland, which we don't agree with,

21    but that it also would be unwise to transfer the case to D.C.

22    because D.C. is being overwhelmed, and the solution that they

23    propose to that venue challenge is that the case be transferred

24    to every jurisdiction in which a loan -- or rather which a

25    grant was terminated.  That strikes me as an extremely

1  impractical solution and a poor use of the venue provision,

2  particularly where the Court may exercise some discretion.

3       So to the extent that sort of the counterfactual here is,

4  you know, we have 50 or however many states we have here at

5  issue, different cases all deciding the same issue for

6  identically situated plaintiffs, that strikes me as a poor

7  suggestion.

8            THE COURT:  Okay.  I'm not suggesting that you're

9  finished at this point, but I think before we go headlong into

10 the *winter* factors, I'd want to ask the Government and defense

11 in general to respond to the standing mootness venue issues.

12 So are you finished as to those issues?

13           MR. RICHARDS:  Yes, Your Honor.  Thank you.

14           THE COURT:  Okay.  Let's just put those issues in a

15 can and then we'll go onto the meat.

16           MS. FARBER:  Thank you, Your Honor.  I'd prefer to

17 stand.

18           THE COURT:  That's fine.  Everybody has their

19 preference.  I once invited counsel to remove his suit jacket

20 because it was really hot in the courtroom and he said "I just

21 can't."

22      (Laughter.)

23           MS. FARBER:  I might need to take advantage of that

24 later.

25      Your Honor, I -- thank you for the opportunity to jump in

1     before we get to the merits.

2           **THE COURT:** Sure.

3           **MS. FARBER:** As I'm sure you noticed, the Government

4     made its best efforts to present the most streamlined possible

5     defense to this case as we could. And so that involved, you

6     know, not contesting irreparable harm in this context given

7     that we have kind of an institutional existential issue alleged

8     and then a final agency action as well.

9         There are significant standing and venue concerns here at

10    the threshold. At the outset, the allegations that are

11    specific to Maryland that show there were specific Maryland

12    grants that were terminated, how many there were, those all --

13    none of those are in the complaint. All of those come out in

14    later filings as a way to try to bootstrap the complaint or

15    bolster the complaint. And the case law in this jurisdiction

16    is clear that you cannot amend the complaint, add allegations

17    to the complaint by responding or replying in support of -- or

18    in opposition to a motion.

19         So where we point out fatal flaws in the complaint,

20    plaintiffs can't salvage those by adding supplemental

21    declarations or additional allegations in a reply as they seek

22    to do here.

23         Now, as Your Honor pointed out, there is a very similar

24    case in Massachusetts that was heard on a TRO hearing on

25    Monday, and relief was granted in that case, not only to MACTE,

1    but to a number of other plaintiffs --

2            THE COURT:  States.

3            MS. FARBER:  -- in other states.  And on the subject

4    of supplemental declarations, I am a little surprised that we

5    don't have supplemental declarations this morning from

6    plaintiff attesting to the fact that that money is back.

7        So we see from the filings in the Massachusetts case that

8    the AUSA on that case worked with ED to get the money released.

9    We have the declaration from someone at ED that all the money

10   is restored, that there are no conditions on that money, that

11   the grantees can withdraw all of the money if they want to, and

12   that grantees have started to do that already.

13       So, frankly, I'm a bit floored that plaintiffs' counsel

14   doesn't know whether -- whether their clients have withdrawn

15   any of the money that, for all intents and purposes, appears to

16   be completely released and fully available to them.

17           THE COURT:  Do you know?

18           MS. FARBER:  I don't know.

19           THE COURT:  Okay.

20           MS. FARBER:  I don't know.

21           THE COURT:  And I'm not suggesting it's your burden

22   to know.  I'm just inquiring.

23           MS. FARBER:  No, Your Honor, I don't know at this

24   point.  And, frankly, the reason that I sent those exhibits as

25   early as I did, almost as soon as I got them yesterday

1    afternoon, was to hopefully give plaintiffs a chance to inquire

2    and submit some kind of additional information to this court.

3          So to hear plaintiffs' counsel say that he doesn't know,

4    did he even ask?  Did he look at those things and even ask his

5    client if they got the money?  Because, as far as we know,

6    there might be zero dollars left to withdraw on that fund.

7    Like, the plaintiffs may have taken all of it out.

8          And to Your Honor's point about future money, it does seem

9    like there are some grants where there are future years to

10   dispute, but that takes us out of preliminary injunction land

11   because the plaintiff has all the money that they're going to

12   get this year on hand.  We no longer have an existential

13   threat.  So I'm surprised since we know plaintiffs know how to

14   file supplemental declarations that we don't have one here with

15   that information.

16         As far as whether the plaintiffs are identically situated,

17   we see from Exhibit 2 -- Defense Exhibit 2 -- so I should have

18   said that the exhibits that I referenced that I sent to the

19   Court last night from the Massachusetts case are Exhibits 1 and

20   2.  Exhibit 1 is a status report in that Massachusetts case;

21   and then Exhibit 2 is a declaration from Rachel Oglesby.

22         The Court has copies of those --

23               **THE COURT:**  Yes.

24               **MS. FARBER:**  -- I presume?  Okay.

25         So in Ms. Oglesby's declaration, she provides some

1    examples, I believe, of situations in which grants were

2    terminated.  And they're all different.  They're all different

3    circumstances why grants are terminated.  And so this is not a

4    case where everyone is identically situated.  At least based on

5    this declaration, we have different reasons why different

6    grants were subject to termination, and those are Paragraphs 11

7    through 16.  And we can all certainly disagree about the wisdom

8    of these terminations, but that's an APA challenge and that is

9    something that is going to be individual and fact specific for

10   each terminated grant.

11            THE COURT:  But when you say they're not -- I mean,

12   perhaps these are my words -- "similarly situated," are you

13   taking the position that the Department did not terminate these

14   grants because they were determined or identified, as

15   Ms. Oglesby describes, to involve programs related to DEI?

16            MS. FARBER:  No.  No, I'm not taking that position.

17            THE COURT:  So how are they materially different?

18            MS. FARBER:  Well, I think that --

19            THE COURT:  Materially different.

20            MS. FARBER:  I think that would depend on the facts

21   of the case.

22        So one example might be if there's a program that has a

23   set racial quota, for example, like we need to have a certain

24   percentage of teachers in these minority categories in order to

25   achieve diversity, that, under *Students for Fair Admission,*

1     might be materially distinct from a grant that just promotes

2     antiracism.

3         And I don't know what position the Department of Education

4     would take about an antiracism grant in light of *Students For*

5     *Fair Admission*, but I think *Students For Fair Admission* at

6     least is pretty clear that when we're thinking about quotas and

7     when we're thinking about admitting some people into a program

8     and not admitting others, according to the Supreme Court case

9     from 2023, that runs afoul of federal civil rights laws.

10         THE COURT:  Yeah, but to some extent the question of

11     being similarly situated is more an inquiry through the lens of

12     what were the criteria that your client used to terminate the

13     grants, not what another court says might also run afoul of the

14     law, right?

15         I mean, the reason they're similarly situated is because

16     the Department of Education has said you all fit in this same

17     basket and therefore we're terminating your grants.  Whether or

18     not that's substantively true or whether or not there might not

19     be other ways in which another onlooker might find the grant

20     programs, you know, to offend the law in some way doesn't

21     really seem to be at issue here in terms of whether they're

22     similarly situated for purposes of the lawsuit.

23         MS. FARBER:  I take that point, Your Honor, and I

24     think, you know, it comes to the level of abstraction that the

25     Court's going to use.

1          **THE COURT:**  Yeah.

2          **MS. FARBER:**  So in a bigger picture these grants were

3    terminated for relating to Diversity, Equity, and Inclusion,

4    but then when it comes down to what analysis a court would do

5    for each terminated grant under the APA, that's where they're

6    going to be looking at more fact-specific aspects of each

7    grant.  And so that's where I believe the plaintiffs and the

8    grantees would start to distinguish themselves.  So it's a

9    question of the level of abstraction the Court uses, and I

10   would suggest that finer grain, but the Court is correct that

11   the sort of overarching issue is DEI.

12         **THE COURT:**  I hear you.  But let me just -- you know,

13   in my preparation on the issue of standing, I went through the

14   complaint apart from the opposition to the motion itself and

15   created the following.  And these truly are in the nature of

16   notes to self.  So, you know, I know we've all kind of hurried

17   up to prepare so forgive me for being sort of abbreviated.

18         But with respect to the organizational standing of MACTE,

19   the complaint at Page 2 avers that MACTE members got grants.

20   The complaint at Page 3 says MACTE members got grants that

21   remained active through mid February 2025.  Page 4, MACTE

22   members' grants were terminated.

23         Paragraph 4, which is different from Page 4, defines GR,

24   Grant Recipients, to include MACTE members.  Paragraph 14

25   implicates MACTE's core mission -- core mission, and TQP and

1    SEED grants support teachers in Maryland, followed by the

2    declaration of Dr. Laurie Mullen.  I think that's at 5-5,

3    Paragraphs 6 and 7 attest that MACTE has ten member

4    organizations, all of which are Maryland residents; three of

5    their members got grants -- which I later learned were

6    Maryland, Towson, and Frostburg -- that were "impacted by the

7    terminations resulting in substantial loss of funds for teacher

8    preparation programs in Maryland."

9         You're taking the position that those things, all of which

10   are in the initial pleading, not in a response or a reply,

11   rather, don't satisfy organizational standing?

12             MS. FARBER:  Your Honor, you included a citation to

13   somewhere that explicitly says MACTE grants were terminated in

14   the complaint.

15             THE COURT:  Yes.

16             MS. FARBER:  Which you said Paragraph 4, but I didn't

17   see it there.

18             THE COURT:  Page 4.  I don't know -- I think it was

19   like publicly in an intro portion.  If I've misstated it, then

20   I'm sure you'll point out my flaw.

21             MS. FARBER:  Okay.  So what I see and the reason why

22   we thought this was confusing, and perhaps the Court reads it

23   differently, was that backing up to Page 3, there's sort of

24   this general allegation that grants were terminated under TQP,

25   SEED, and TSL.  And then Page 4, as Your Honor points out, they

1    say after terminating AACTE and MACTE's member organizations

2    and NCTRs and its member organizations TQP and SEED grants, so

3    they're sort of lumped in there together.  We don't see any

4    specific allegations about what grants were terminated.

5        There are specific allegations about other states and then

6    the -- that declaration that Your Honor referenced, the way I

7    read it described, you know, some impact of terminations

8    somewhere possibly being felt in Maryland, but there wasn't an

9    indication of whether programs in Maryland explicitly were

10   terminated.  At least that's how I read it.

11       And this was, you know, this was plaintiffs' complaint.

12   They chose to file this.  They picked the day that they were

13   going to file this.  They had all the time in the world that

14   they wanted to work on this.  They chose Maryland to file this

15   case.  They have very detailed allegations about grant

16   terminations in other states and not a single -- not a single

17   identification of one single grant that's terminated in

18   Maryland until we pushed them on it.

19       So that's the issue that we take there.

20            THE COURT:  Okay.  Okay.  Anything else about venue?

21            MS. FARBER:  Yes, Your Honor.  As to venue, we do

22   concede that Subsection (e) does allow for bringing a case

23   against the government if a government is a defendant and one

24   of the plaintiffs resides in Maryland, and we concede of course

25   that MACTE is located here.  However, we believe that we have

1  strong grounds to transfer venue in the lines of the

2  *Chakrabardi* case.

3       THE COURT:  Yeah, but that's not about improper

4  venue.  I mean, Judge Messitte kind of transitioned into a

5  forum *non conveniens* evaluation there, didn't he?

6       MS. FARBER:  That was part of it.  That was part of

7  it.  But, Your Honor, I think that the concern here is this

8  idea of --

9       THE COURT:  But what he said there specifically, he

10 expressly acknowledged that they could have properly served as

11 the venue there, but the plaintiffs there, to his point of

12 view, very loudly did not, in fact, file in their resident

13 state.  We don't have that situation here.

14      MS. FARBER:  There were some plaintiffs in

15 *Chakrabarti* who did -- who were Maryland residents, so that's

16 not exactly correct.

17      THE COURT:  Okay.

18      MS. FARBER:  And so it's similar.

19      THE COURT:  I'm just remember the opinion, but okay.

20      MS. FARBER:  Yeah, we were talking, Your Honor, about

21 whether you were on the bench when *Chakrabarti* happened.  I

22 think it might have been a year before you.

23      THE COURT:  What year did it come out?

24      MS. FARBER:  I want to say it was 2021 or '22 but I

25 don't remember offhand.

1    THE COURT:  So if it was 2021 it was just before me.

2    MS. FARBER:  Yeah.  It was a mess here.  There were

3    hundreds, hundreds of cases that got filed.

4    THE COURT:  Yeah.

5    MS. FARBER:  It was a complete disaster.  And

6    *Chakrabarti* gave enormous relief to the bench that was really

7    was doing nothing other than dealing with these cases because

8    USCIS just had the misfortune of moving their office across the

9    state line.

10    THE COURT:  Well, that was the nature of Judge

11    Messitte was to take it for the team.

12    MS. FARBER:  Yeah.  May he rest in peace.

13    Your Honor, we have here a similar posture to *Chakrabarti*

14    where there's one plaintiff with three grants, and we have no

15    idea how many total grants there are.  The complaint is

16    completely silent about how many grants we're talking about.

17    Exhibit 2 mentions that there were something in the

18    neighborhood of 100 or 104 grants that were, you know, sort of

19    in this chunk of grants terminated.  So three out of how many

20    grants are here in Maryland.  *Chakrabarti* had a handful of

21    plaintiffs who were in Maryland, but that was not enough to

22    defeat the venue concerns there.  And so we --

23    THE COURT:  But, again, that was on a forum *non*

24    *conveniens* sort of analysis.  So, I mean, here we're talking

25    about whether venue is proper, not whether it might make sense

1    to take it somewhere else.  That's a different motion.

2         MS. FARBER:  Yes, Your Honor.  And we would say that

3    the Court should consider not ruling on the preliminary

4    injunction to allow us the opportunity to brief the issue of

5    venue.

6         THE COURT:  Okay.

7         I'm not saying "okay" to your request.

8         MS. FARBER:  I understand.

9         THE COURT:  I understand.

10        MS. FARBER:  You conceded it, Your Honor.  Noted.

11        (Laughter.)

12        THE COURT:  Okay.  All right.  Anything else about

13   that?

14        MS. FARBER:  No, Your Honor.

15        THE COURT:  Okay.  Is there anything else that --

16        MS. FARBER:  Oh, you know, I guess there was one

17   other point about venue that I wanted to raise, which is that,

18   you know, there was a really clear effort to be in Maryland

19   here and specifically to be back in front of Judge Abelson.

20   And I think that that sort of informs the way we look at

21   whether venue is appropriate here.  You know, that might be

22   something that -- that would be something the Government would

23   like the opportunity to brief in a venue transfer motion.

24        THE COURT:  Why?  I mean, so?

25        MS. FARBER:  It relates to forum shopping and the

1    federal courts discouraging that type of practice.

2            THE COURT:  Okay.  All right.  Mr. Richards, are you

3    forum shopping?

4            MR. RICHARDS:  I am not, Your Honor.  We filed this

5    case in Maryland and specifically filed it as related to the

6    Judge Abelson case specifically because we believe this case

7    should have or was covered by the *NADOHE* order and therefore we

8    thought judicial economy would be served by doing so.

9        We are -- you know, this case was assigned to Your Honor,

10   and that's certainly within, you know, the scope of the rules

11   and so we're happy to argue it in front of this court but that

12   was the purpose.

13           THE COURT:  I will tell you, I mean, I don't view it

14   as forum shopping, Ms. Farber, and I understand the legal

15   argument that you're making and I'm not making any decisions

16   today at all, so I want to be clear that the things I say today

17   are really in the nature of inviting conversation, but I think

18   it is something that on which reasonable minds can differ as to

19   whether this is, you know, in the parlance of the Court a

20   related case and that has, you know, administrative

21   significance versus just sort of colloquial it's related

22   because the subject matters are so similar or overlap even.

23       So, I mean, I think it made -- I'm not talking about the

24   venue question, but I think it made absolute sense to introduce

25   this action as a case that was connected to or related to Judge

1   Abelson's order, particularly because if it were determined to

2   be inexorably connected or a determination in this case would

3   necessarily invoke his decision there, that it would make sense

4   really, frankly, out of respect for Judge Abelson to give him

5   the entitlement to determine how, if at all, his case affects

6   his case.  I mean, I hear your complaint but I don't share it.

7        Okay.  Mr. Richards, I'm happy to hear from you as to the

8   factors to consider on a PI.

9             **MR. RICHARDS:**  And I'm sorry, before I move on to

10  that, Your Honor, may I just reiterate one point for the

11  record, which is -- and this came out very briefly in your

12  exchange with the Government but, you know, our invocation of

13  standing as to MACTE I think is best supported by the injury to

14  MACTE's members but, of course, we did also invoke standing on

15  the basis of the institution's mission.

16            **THE COURT:**  Yes.

17            **MR. RICHARDS:**  And that is another basis for standing

18  that has been recognized by the Courts in which I think also,

19  you know, MACTE's clearly demonstrated here, so I think -- I

20  didn't want to be remiss and not mention that.

21            **THE COURT:**  Are you invoking -- and it may be clear

22  from your complaint so I'm not pretending it's not in there if

23  it is, but I'm just asking in good faith, are you also

24  invoking, from MACTE's standpoint or from Maryland members'

25  standpoint the notion of a certain impending doom, kind of a

1  Clapper theory, or are you basing it on injury already

2  experienced?

3         MR. RICHARDS:  For purposes of standing?

4         THE COURT:  Yeah.  I mean, in other words, is there

5  both here or are you strictly looking at past injury?

6         MR. RICHARDS:  There is -- there is both.

7         THE COURT:  Talk to me about the both.

8         MR. RICHARDS:  Well, and I'm not sure this is clear

9  from our complaint and we could amend it after the fact to make

10  that clear, you know, this is purely for purposes of the

11  preliminary injunction, but I think the answer is we don't know

12  what's going to happen here, and the termination --

13         THE COURT:  Well, that doesn't really, then, fall in

14  with Clapper.  I mean, in other words, if you're talking about

15  threatened injury, you know, for a PI's sake, I mean, that

16  needs to be concrete, clear, not theoretical, not hypothetical.

17  So the "we're not sure" probably doesn't get you there.

18         MR. RICHARDS:  I take the Court's point.  I didn't

19  want to make a concession for the case writ large.  I think --

20         THE COURT:  I understand.

21         MR. RICHARDS:  -- we're still working through this

22  from the perspective of what, how many, and which programs will

23  have to be shuttered because of this, but for purposes of the

24  PI, we're relying on the instant harm.

25         THE COURT:  Okay.  That's a clear answer.  I

1    appreciate that.  Okay.

2          MR. RICHARDS:  So does the Court have a preference in

3    terms of which order I take the other issues in, the Fifth

4    Amendment versus the APA?

5          THE COURT:  Let's go Fifth Amendment first.  And I

6    will apologize in advance for poking you with questions, as I'm

7    prone to do.  I'm going to try to be a little more hands-offy

8    than I usually am, but no promises.

9          MR. RICHARDS:  And I will not rely on any promises,

10   Your Honor.

11         THE COURT:  Okay.

12         MR. RICHARDS:  You know, I think the principal

13   argument here which we've tried to distill down in our papers

14   is that taking as a given that the *NADOHE* order prescribes

15   certain conduct by the Government because of the conclusion

16   that the J20 order is unconstitutionally vague, it is difficult

17   to conceive of, difficult to understand the argument that

18   continuing to enforce conduct that, if taken today, would

19   clearly be unlawful under the order, is nevertheless lawful

20   because it happened to have taken place before the order was

21   issued.  And that is in some way a derivative claim based on

22   the order, but it's also ultimately based on the Fifth

23   Amendment vagueness, vagueness principles that underlie the

24   order.

25         THE COURT:  Well, Ms. Farber's going to tell me that

1    that doesn't hold water because Judge Abelson was evaluating it

2    through a First Amendment lens.

3         MR. RICHARDS:  Yeah, and I think that that's -- it's

4    true that Judge Abelson was evaluating that order through both

5    a First Amendment and Fifth Amendment lens, but --

6         THE COURT:  And future harm.  In other words, how do

7    we comport ourselves?  We don't know what's illegal.  It's not

8    clear from J20's termination provision or the enforcement

9    provision.  I don't know what I'm allowed to do, what I'm not

10   allowed to do.  Aren't we talking about harm that's already

11   happened for reasons that we know about because you were

12   targeted as DEI grants?

13        MR. RICHARDS:  Well, I don't think so, Your Honor.  I

14   think the problem here is that the Government took action and,

15   again, it's -- perhaps it's clear to the Court, it continues to

16   be unclear to me whether the Government is saying that the

17   actions were or were not taken on behalf of DEI or were or were

18   not taken on behalf of the J20 -- on account of the J20 order.

19        THE COURT:  Oh, I think they've clearly -- well, you

20   know, I think actually what you've raised is sort of a concern

21   that I have, which is both can be true.

22        In other words, to some extent, and I'll just hone in on

23   this, and you don't have to address it now but we will need to

24   address it, is the Fifth Amendment argument that -- and forget

25   the other case before Judge Abelson for a moment, but, you

1    know, in reading the complaint, you know, it immediately came

2    off the page to me that there's essentially a transitive

3    argument, right, that the terminations came on the heels of the

4    Executive Order, the J20 order.

5        **MR. RICHARDS:**  Yep.

6        **THE COURT:**  And it's the timing, right?  It's the

7    timing and the rationale.  DEI's illegal, we're not going to

8    support it, it's discrimination.  Your clients' members and one

9    of your clients' grants were terminated with a termination

10   letter that includes a lot of reasons including discrimination

11   in the sense of DEI being discriminatory, otherwise unlawful,

12   or however you want to term it, press release, right?

13       The press release makes no mention of the Executive Order.

14   It's rather brief, as press releases often are, and your Fifth

15   Amendment claim to some extent necessarily requires that I

16   agree that the termination has its root in the Executive Order.

17   I mean, that's not subject to debate, right?

18       **MR. RICHARDS:**  No, I agree, Your Honor.

19       **THE COURT:**  And so that to me is flawed in logic,

20   because it opens up a giant political discussion about

21   President Trump has campaigned on certain things, including why

22   we're here today, President Trump issued his Executive Order,

23   it says what it says, President Trump is entitled to identify

24   people to work for him directly or to work in agencies of the

25   federal government that he feels are best suited to carry out

1   the agendas that he finds to be important, including
2   individuals who, on their own, might be like minded and
3   competent to carry those things out.
4       So to pursue a claim that the terminations violate the
5   Fifth Amendment because they are -- they happened because of,
6   because they obeyed the Executive Order or in furtherance of
7   the Executive Order omits to consider that Secretary McMahon or
8   her predecessor, Ms. Carter, had their own feelings about
9   DEI-related grants.  And, I'm not saying I credit it because I
10  haven't gotten there, but to some extent Ms. Oglesby's
11  declaration says as much.
12      And even if, even if I were to ask Ms. Farber, don't you
13  agree that your clients -- that the Executive Order effectively
14  mandates what happened here, that does not -- that is myopic.
15  It doesn't consider the fact that there might have been other
16  reasons to undertake the action about which your clients
17  complain.
18      So that to me is the biggest problem with your Fifth
19  Amendment claim because I don't know how, without speculating
20  on the record before me now, I am to draw the conclusion that
21  the Executive Order is why we are here.  I don't know how I get
22  there.  It's possible.  But there's no evidence of it.  That
23  press release doesn't say it, that termination letter doesn't
24  say it, Ms. Oglesby's declaration sure as heck doesn't say it.
25  How do I get there?

1      MR. RICHARDS:  So I think there is evidence of it,

2   right, because we decide matters on circumstantial evidence all

3   the time.

4      THE COURT:  Absolutely.  Absolutely.  And I agree

5   with you that you are not cabined to proving it by direct

6   evidence and, you know, for purposes of a clear record I

7   suppose I should say I'm talking about likelihood of success on

8   the merits when I talk about this.  And surely you are not

9   constrained to limit your arguments to direct evidence.

10      But on a clear and convincing PI spectacular relief sort

11   of standard, is it enough here?  I don't mean can

12   circumstantial evidence carry the day, but does it here?

13      MR. RICHARDS:  We believe so, Your Honor, and I

14   think, you know, I'm hoping your presentation of that thought

15   process is for purposes of discussion --

16      THE COURT:  It is.

17      MR. RICHARDS:  -- and not necessarily having

18   decision --

19      THE COURT:  I'm making zero findings.  I mean, and I

20   said to my staff this morning, part of the benefit of the

21   parties' agreement to sort of collapse the TRO into the PI is

22   that I can talk, listen, process without having the task of

23   decisionmaking today.

24      So I want to be crystal clear, all of my thoughts are in

25   process.  I am making no findings.  So when I make affirmative

1   statements, I want to be clear they are really designed to be

2   more in the nature of an inquiry and an invitation to engage.

3        **MR. RICHARDS:**  Thank you, Your Honor.

4        And so on that basis, I'm afraid I don't have a ton to

5   offer back to the Court besides what the Court has just

6   explained, but I would frame it differently.

7        The way that I would frame it is that the President of the

8   United States issued a clear and unambiguous directive.  He is

9   the direct supervisor of all of the agency heads, and he sets

10  the agenda for those agency heads to follow.  He instructed all

11  of them to review and within 60 days make proposals about how

12  to do very specific things with respect to very specific

13  principles.  They then did them and here we are.  And that

14  doesn't strike me as remotely difficult to conceive of.

15       And even if Linda McMahon or her predecessor also held

16  those views, that's actually immaterial, right, because whether

17  she held those views or different views, she still would have

18  had to follow the order.

19       And with respect to the order itself and the vagueness

20  issue, this isn't a First Amendment problem.  This is a Fifth

21  Amendment problem because these organizations are told, if you

22  have equity-related programs, we're cutting your funding.  What

23  does that mean?  Does it -- and let's talk about conduct.

24       Does it mean if it's in your mission statement but you

25  don't actually take any action that preferences one race over

1    another but in your mission statement you say we're dedicated

2    to equity, is that what you get your grant canceled over?  Or

3    do you actually have to engage in conduct that would be

4    unlawful under Title VI?  We know that that's not the case

5    because there was no finding here that any of these grant

6    recipients engaged in conduct that would violate Title VI.  How

7    are we to know?  How are we to conform our conduct?  One of

8    the --

9             THE COURT:  Except we're not talking about future,

10   right?  We're talking about as applied.

11            MR. RICHARDS:  I understand, but they took these

12   steps in a posture, and we talk about this in our brief and the

13   Court may or may not accept this, but they took these steps in

14   a posture where there was no ability to challenge the

15   pronouncement.

16            THE COURT:  I hear you, and I don't quarrel with that

17   as a, you know, philosophical principle.  And I want to be

18   clear, I'm not faulting you for this.  I'm just objectively

19   noticing chronology that the action was instituted because the

20   grants were terminated, not because your clients didn't know

21   how, if at all, they should conform to this pronouncement.

22        In other words -- and I know you're saying, you know,

23   there was no time and who could possibly have had time to

24   change a program on a dime.  I get it.  I'm not quarrelling

25   with that.  But that's -- that is background, right?  I mean,

1    that's sort of narrative.  That's not the basis of the claim.

2    The claim is my grant was terminated because we're surmising it

3    was identified as DEI-offensive.

4            **MR. RICHARDS:**  I think it's more that --

5            **THE COURT:**  I mean, isn't that what you just told me

6    that, you know, so far, here we are on the complaint because of

7    grants terminated, not imminent threat?

8            **MR. RICHARDS:**  I think it's we don't know why the

9    grant was terminated.  I mean, how are we to take action to

10   reinstate the grant, right?  It was terminated for this vague

11   reason publicly, privately for no reason at all, and we have a

12   due process right to be able to challenge that but we don't

13   know how to do that because we don't know what the actual

14   reason was.  And it's not capable of definition, as Judge

15   Abelson found.

16       And so we have an ongoing harm here.  Our ability to

17   remedy this is continually sort of frustrated by we can't put a

18   target on it.  We don't know whether to go and say we'd like

19   the grant reinstated because we don't actually do the thing

20   that you say that we're doing.

21           **THE COURT:**  I know that -- I know that if the answer

22   is no that the reason is because you can't know the basis, but

23   did any of the offended clients file a notice of challenge?

24           **MR. RICHARDS:**  Yes.

25           **THE COURT:**  How many?

1    **MR. RICHARDS:**  I don't know the answer to how many.

2    We communicated that they should all file challenges.

3        **THE COURT:**  And filing those challenges, do those

4    challenges include a basis?

5        **MR. RICHARDS:**  Yes, they do.

6        **THE COURT:**  What does the basis articulate?

7        **MR. RICHARDS:**  The basis articulates both the Fifth

8    Amendment problem with the vagueness and APA issue with the

9    termination.

10       **THE COURT:**  The "we don't know why we're here"

11   problem, okay.

12       **MR. RICHARDS:**  Yep.

13       **THE COURT:**  Okay.  So there was no appeal on the

14   basis that I was incorrectly terminated on grounds of DEI?  And

15   when I say "incorrectly," I don't mean it's unfair but I mean,

16   in other words --

17       **MR. RICHARDS:**  Misidentified me as being DEI?

18       **THE COURT:**  Yes.  None of your clients claims that

19   they were correctly identified as promoting or fostering the

20   principles -- I'm calling them DEI principles.

21       **MR. RICHARDS:**  So the answer is I don't know the

22   answer to that.

23       **THE COURT:**  Okay.  Okay.  Anyway, go ahead.

24       **MR. RICHARDS:**  I think that's it in a nutshell, Your

25   Honor.

1          **THE COURT:**  Okay.

2          **MR. RICHARDS:**  You know, I think it's the fact that

3     we are unable to restore access because we don't know why it

4     was terminated in the first instance.

5          And again, as I said earlier, the fact that this really

6     reflects conduct by the Government to continue to enforce a

7     decision, right?  I mean, the impact of the decision being made

8     tomorrow versus the impact of the decision being made two weeks

9     ago is the same on the grantee organization.

10         And so there's a temporal difference but not a functional

11    difference, and so we believe that we have the right to

12    challenge the continued enforcement of the termination just as

13    we could challenge the threat of the termination or anything

14    else connected with that.

15         **THE COURT:**  Okay.

16         **MR. RICHARDS:**  Would you like me to continue on to

17    the APA?  Okay.

18         **THE COURT:**  Do you want to talk about -- before you

19    move on to APA, do you want to talk about public interest

20    and --

21         **MR. RICHARDS:**  Sure.  You know, I think from our

22    perspective this is pretty simple, right?  There's no public

23    interest or equitable interest in the Government violating the

24    Constitution or federal statute.  And so if the Court makes a

25    determination that we are likely to succeed in either the Fifth

1   Amendment or the APA challenge, our view is that a finding that

2   the balance of the equities is required under the case law.

3          THE COURT:  Okay.  And just to be clear, you know, I

4   know we're collapsing balance of equities and public interest

5   given the defendant, but --

6          MR. RICHARDS:  Right.

7          THE COURT:  Okay.  All right.  I'm APA ready.

8          MR. RICHARDS:  All right.  You have been kind enough

9   to sort of give me some forewarning.  I'm going to give you a

10  little bit here.  I am going to resist the attempt to make this

11  more complicated than it needs to be.

12      We have intentionally brought this claim as fairly narrow.

13  There are at least a half a dozen other reasons why under the

14  APA the Government can't do what it did.  We haven't raised

15  those in our complaint.  We may amend to assert them later.

16  But here we're making one very simple argument, and it really

17  only requires the parsing of one regulation and one statute.

18         And so, you know, I anticipate the muddying of the waters

19  there and I, for one, am going resist that as we go and

20  certainly I'll have to answer the Court's questions, but I

21  think that the issue here has to do with one phrase and that is

22  "Agency Priorities" as it appears in § 340 of the Uniform

23  Guidance.  And what § 340 says and what we're all in agreement

24  about is that if an award no longer effectuates the program

25  goals or agency priorities, it can be terminated by the

1    Government.

2        That provision, § 340, is about termination of grants.

3    It's about the termination of the grant based on the whole

4    grant, right?  When a grant is awarded, it's awarded pursuant

5    to terms and conditions.  It's awarded pursuant to agency

6    priorities that had been established at that time.  It's

7    awarded pursuant to program goals that had been established.

8        And when the Department, this particular department

9    creates those agency priorities, it does so through formal

10   comment -- Notice-and-Comment Rulemaking.  And it's unique in

11   that regard.  I don't want to say no other agency has to do

12   that, but I don't think any other agencies have to do that.  I

13   know that the Department of Education has a special statute,

14   which I'm going to call GEPA for short, and under GEPA, the

15   general rule that agencies do not need to rulemake around

16   grants was specifically changed just for the Department of

17   Education.

18       So when we're looking at the whole grant and the granting

19   process, we know that the department has to set priorities for

20   the grants, it has to do so through Notice and Rulemaking, and

21   then if it wants to terminate the grant, we can look at all of

22   the things that went into that grant.  We can look at the terms

23   and conditions of that grant and we can look at whether or not

24   the grant at issue continues to effectuate the agency

25   priorities.

1       It doesn't make any sense to say with respect to this
2    Uniform Guidance those agency priorities are any different from
3    the agency priorities that are talked about with respect to
4    granting elsewhere in the statute and regulatory scheme.  And,
5    you know, you see that because it's hard to even talk about
6    without making up a new word for what the Government thinks
7    that this ought to be instead.
8       What happened here is that the Government came in and it
9    didn't have the same "little p" priorities as the previous
10   administration.  It's to be expected.  And in most other
11   agencies that means that the Government can go in and cancel
12   grants if that's what it wants to do pursuant to agency
13   priorities.
14       Now, I'm not saying that the Government could or couldn't
15   cancel grants for other reasons.  I'm not trying to expand that
16   to this here.  What I'm saying is that the Department of
17   Education is special and if this new administration had new
18   priorities, then they can go past them but they didn't.
19       And so one of two things has to be true.  Either we're
20   talking about the same priorities because we didn't go through
21   Rulemaking, in which case the Government hasn't explained how
22   these grants no longer effectuate those same priorities.  They
23   didn't give any reasons really at all when they terminated the
24   grants.
25       Or the only other option is that this doesn't mean agency

1    priorities.  It means something else even though it's the same

2    two words.  And that strikes me as incredibly implausible and

3    tortured.  And unless you agree with the Government that that's

4    a reasonable interpretation of this, as a matter of law the APA

5    issue is foreclosed to them, right?  There's nothing they can

6    do to change that.

7             THE COURT:  How does 34 C.F.R. § 75.105 apply here?

8             MR. RICHARDS:  That's EDGAR.  That's for the

9    continuation of grants.  It doesn't apply here at all.  I don't

10   know why they cited it.

11            THE COURT:  Okay.  In the terminate -- what I'm

12   calling the termination letters, the termination letters

13   regarding the continuation of the grants, among other portions

14   of the regulations that were cited, the Secretary cites

15   expressly 34 C.F.R. 75.253, and that's related to multiyear

16   grants.  Is that right, Mr. Richards?

17            MR. RICHARDS:  Right.  And that's -- again, that's

18   not what we're talking about here.  We're talking about the

19   continuation -- or we're talking about terminating a grant that

20   is in the middle of its grant period.

21            THE COURT:  So just so that I'm clear, so the

22   letters that -- so, in other words, when your clients' members

23   and when your clients received the notices of termination,

24   these were not on the precipice of being approved for

25   continuation of a multiyear grant?

1          MR. RICHARDS:  Correct.  That's correct.  They were

2     just -- they weren't requesting continuation.  So that's a

3     separate process, you go through a different set of requests.

4     This was mere -- they invoked 200.340, right, the termination

5     provision for grants that are continuing.  And I think I'm

6     using the wrong word on --

7          THE COURT:  But they also cite 75.253 for multiyear

8     grants, I think.

9          MR. RICHARDS:  In the termination letter, Your Honor?

10         THE COURT:  Yeah.  The termination letter says that

11    the termination, you know, otherwise fails to serve the best

12    interests of the United States and cites, among other things,

13    34 C.F.R. 75.253, and that says that in order for a grantee to

14    continue to receive funds in a multiyear project, among other

15    things, the grantee must receive a determination from the

16    Secretary that continuation of the project is in the best

17    interests of the federal government.

18         MR. RICHARDS:  Yeah.  That's a different process,

19    Your Honor.

20         THE COURT:  Okay.  So you're contending that that

21    does not apply at all and --

22         MR. RICHARDS:  Correct.

23         THE COURT:  -- so the citation of that was just

24    piling on.

25         MR. RICHARDS:  Piling on.

1          THE COURT:  Okay.  So instead, you're directing my

2     attention to 200.340.

3          MR. RICHARDS:  Right, which is the same provision the

4     Government relies on here.

5          THE COURT:  Yes, yes, yes, yes.  Okay.  And so walk

6     me through again your logic that "little p" is not in play?

7          MR. RICHARDS:  Yeah, and that -- so again, I just

8     want to -- the language issue here illustrates the point,

9     right?  We're already talking about agency priorities in the

10    context of grants.  We're talking about something -- there is

11    no "little p" I guess is my point in this context.

12        The "little p" is something that the President, I suppose,

13    or the head of the agency has as their personal or political

14    policy agenda.  It has nothing to do with agency priorities.

15    Agency priorities for the Department of Education are set by

16    Notice-and-Comment Rulemaking.  There is no "little p."

17         THE COURT:  And in your complaint, you know, goes

18    headlong into the provision of final rulemaking and all that

19    stuff.  So the priorities are set, the priorities are

20    published, and then your clients go through the competitive

21    process to try to, you know, conform their grant applications

22    to ensure that, you know, they're hopefully satisfying those

23    priorities so that they look like attractive grant recipients,

24    right?  They get the grant.

25         MR. RICHARDS:  Yeah, and I think the Government --

1    the Government introduces concepts here that don't belong.  So

2    the Government talks about things like invitational priorities

3    and annual priorities.  These derive from the agency priorities

4    that are set through Rulemaking.  And the Government can invite

5    based on those priorities or based on the statute people to

6    apply for grants, but it still derives from the agency

7    priorities that are set through Notice-and-Comment Rulemaking.

8        And again, just sort of walking you through the big

9    picture again and from a textual perspective why this makes

10   sense versus just from a pure commonsense perspective, right?

11       The prior commonsense perspective it's the same word.

12   We're used to using it to describe a specific thing, and the

13   Uniform Guidance applies to all federal agencies but only the

14   Department of Ed has to go through this Rulemaking, right, so

15   Department of Ed is told specifically you have to go through

16   this Rulemaking.

17       The textual reading is that 340 talks about the whole

18   grant.  I mean, Part 200 is all about grants.  That's all grant

19   stuff, right?  And 340 talks specifically to termination, and

20   it looks at the different parts of the grant.  And when we

21   award grants we award them with terms and conditions and we

22   award them pursuant to agency priorities.  And so when we

23   terminate them it is logical to think, okay, well, we're going

24   to terminate them on the same basis.

25               **THE COURT:**  Does "program goals" have a term of art?

1    Is that a term of art?

2          **MR. RICHARDS:**  Program goals are also established I

3    believe by Congress when it's authorized.  I haven't focused on

4    that piece of it but, you know --

5          **THE COURT:**  I guess what I'm asking is "program

6    goals" has a defined term that we're not saying is at issue

7    here --

8          **MR. RICHARDS:**  Yes.

9          **THE COURT:**  -- but that's not just sort of a

10   generalized mealy term, right?

11         **MR. RICHARDS:**  No, correct.

12         **THE COURT:**  That means something.  So program goals

13   or agency priorities doesn't weaken your argument --

14         **MR. RICHARDS:**  No.

15         **THE COURT:**  -- because program goals is a thing, it's

16   just not the thing here.

17         **MR. RICHARDS:**  Correct.

18         **THE COURT:**  Okay.  So walk me through

19   linguistically -- your linguistic argument on 340, walk me

20   through it.  I'm looking at it.

21         **MR. RICHARDS:**  Okay.  So, A, the award can be

22   terminated or in part or its entirety as follows, right?  The

23   first basis by which it can be terminated is if it fails to

24   comply with the terms and conditions of the federal award.

25         I will note that the terms and conditions of all these

1    federal awards which were similarly situated was merely a
2    citation to Part 200, so the terms and conditions were Part
3    200.
4          THE COURT:  Okay.  There's not a -- and you did say
5    this in your recent paper, but so there is not sort of a one,
6    two, three, four list of you got to do this, you got to do
7    that.
8          MR. RICHARDS:  No.  And this is another reason why
9    their argument fails that's beyond sort of the textual piece,
10   and I can get to that in a second, but -- so we have this terms
11   and conditions as the basis for a termination.  We're looking
12   at the grant, we're looking at the GAN, right, the notice that
13   you get when you receive the first grant, and there's a little
14   box and it has terms and conditions it in.  And we say, okay,
15   are they not following any of the terms and conditions.  That's
16   a basis for the termination of the grant, right?
17         THE COURT:  Sure.
18         MR. RICHARDS:  And those terms and conditions are
19   awarded at the -- are assigned at the time that the grant is
20   initially awarded.  So we're looking at does this grant, it
21   starts at (a), and does it continue now to be doing the things
22   that we were thinking that it had to do at (a).  (2) and (3)
23   aren't really applicable here.
24         THE COURT:  Right, yeah.
25         MR. RICHARDS:  And then we get to (4).  And it

1    says -- and again, there's a textual problem with the

2    Government's argument in (4) as well, but that isn't our

3    principal argument here, right, that pursuant to the terms and

4    conditions of the federal award, so when we're looking at the

5    terms and conditions, if, among those things, are that it no

6    longer effectuates the program goals or agency priorities, then

7    that is a basis for also terminating the grant.  So we look

8    back, what were the agency priorities and we say, okay, does it

9    no longer effectuate those agency priorities?

10       So now we're in this position where the Government I guess

11   could be arguing -- I don't think that they are -- that we've

12   changed the agency priorities and now it doesn't effectuate

13   them anymore, but they're not arguing that, right, because to

14   change agency priorities they know they have to go through

15   Notice-and-Comment.

16       So instead they're just arguing that agency priorities

17   doesn't really mean anything, right?  It means what we had for

18   breakfast.  And so every day that we wake up we can decide the

19   agency priorities are something different, and so every day we

20   can go look at 340(b) -- I'm sorry, 340(a)(4) and say, okay,

21   today we're going to cancel the grant for this reason.  That

22   just doesn't make any sense.  That's not the kind of

23   predicability, notice that we use in grant terminations.  So

24   that's the argument.

25       Now, there's a secondary argument here which I think we

1    really don't need to reach, but in order for their argument to
2    be right, and this is sort of like a spending clause argument
3    sort of the same principal, right, we have to unambiguously put
4    folks on notice of what the terms and conditions are under
5    which we might cancel, terminate your grant.
6          And so they have to not only be right textually, this is
7    what it should mean; they have to also unambiguously have
8    conveyed that to the grantees.  And they didn't do that either,
9    right, because they don't have anything in the box where it
10   says "Terms and Conditions" except for Part 200, so it's sort
11   of cursive in that sense.
12               THE COURT:  But that includes this.
13               MR. RICHARDS:  Yeah.
14               THE COURT:  So which way does that cut?
15               MR. RICHARDS:  Well, I don't think it cuts one way or
16   the other, right?  I mean, I think one could argue that just
17   dropping in a citation to an entire regulatory scheme probably
18   isn't sufficient notice, but we're not making that argument
19   here today.
20               THE COURT:  Thank goodness.
21               MR. RICHARDS:  Trying to keep it easy, Your Honor.
22         But I think it cuts against, right, because if the point
23   of 200.340 is that there's limitless, boundless discretion to
24   change priorities whenever you want, then why bother in the
25   first place to have -- I mean, why don't we just not have

1    200.340(a), no subparts, right?  Whenever we change our mind.

2              THE COURT:  Okay.

3              MR. RICHARDS:  On --

4              THE COURT:  What about including, though?  In other

5    words, if I'm going with you there that if changing priorities

6    because I feel like it is allowable under the terms and

7    conditions aspect which just sort of wholesale loops in 200 --

8              MR. RICHARDS:  Yeah.

9              THE COURT:  -- what significance does the word

10   "including" have?

11             MR. RICHARDS:  "Including" -- and again, I don't

12   think this is necessary for our argument, but I think the right

13   way to read the word "including" there is that the Government

14   can make a determination that a grant no longer effectuates the

15   purpose, the program goals or the agency --

16             THE COURT:  Priorities.

17             MR. RICHARDS:  -- priorities -- sorry -- if it lists

18   that as a reason that it can terminate grants in the terms and

19   conditions, which cuts against, frankly, the idea that even

20   putting Part 200 here is valid because that really does create

21   a feedback loop, right?

22        It's, you know, Part 200, which means including anything

23   that's in the box which goes back to "including."  It doesn't

24   really make a whole lot of sense as a drafting convention to

25   write it that way if you didn't mean you actually need to

1    include the specific grounds.  But, again, I'm trying very -- I

2    don't think we need to go there here today.  I just think that

3    that -- that reality of the way that this is drafted makes the

4    Government's argument very difficult.

5            THE COURT:  And what of "to the extent authorized by

6    law"?

7            MR. RICHARDS:  It's just under the APA, Your Honor.

8            THE COURT:  Okay.

9            MR. RICHARDS:  May I make one further point --

10            THE COURT:  Yes, you may.

11            MR. RICHARDS:  -- before we move on?

12        Unrelated to this, we have submitted declarations related

13    to different grant conditions that have been placed on grants.

14    And I didn't check last night but last I checked, the members

15    that were supporting this lawsuit, their grants are on what's

16    called route pay.  Route pay means you need to get advance

17    permission to spend money.  That is a significant burden and

18    it's a burden that the Department is allowed to impose after

19    making certain findings with respect to that specific grant and

20    it being at risk.

21        We are requesting as part of the preliminary injunction in

22    this case that the Government be ordered to follow its own

23    regulations with respect to placing those conditions on grants.

24            THE COURT:  So in the termination letter, I'm looking

25    at the one that was appended to the complaint, Document ECF

1    1-2, Page 11, the ECF pagination, "Costs incurred by you after

2    this termination are allowable only if, A, those costs were

3    properly incurred by you before the effective date of this

4    termination and not in anticipation of it; and B, those costs

5    would be allowable if your federal award was not suspended or

6    expired normally at the end of the period of performance in

7    which the termination takes effect," and they cite 200.343 and

8    then they encourage you to review your responsibilities, et

9    cetera, et cetera.

10          Are you claiming that that --

11          MR. RICHARDS:  No, that's -- so the rules for drawing

12   down grants posttermination are different than the rules when

13   you're on route pay.

14          THE COURT:  Okay.

15          MR. RICHARDS:  Two different --

16          THE COURT:  So I have drawn my attention to something

17   that I need not have.

18          MR. RICHARDS:  Right.

19          THE COURT:  I'm glad that I asked you because I was

20   confused why that was problematic.

21          So I know -- I've read the complaint and the issues of

22   route pay, so -- and I know Ms. Farber asserted that it was

23   unclear whether your requested relief for purposes of the PI

24   involved that.  So help make it clear, I know your rely asserts

25   it as clear, I'm not saying it's not, but help me understand it

1    better.

2         **MR. RICHARDS:**  It's in our form order, first of all,

3    that we were requesting that.

4         **THE COURT:**  I'm not saying you haven't --

5         **MR. RICHARDS:**  And I understand.  I'm just giving you

6    the reasons.

7         **THE COURT:**  Yeah.

8         **MR. RICHARDS:**  It was in our form order, first of

9    all; and second of all, we assert in our primary brief that

10   they've been placed on route pay, that they have not -- that

11   the Government has not gone through the process that it's

12   required to go through on an individualized basis prior to

13   placing them on route pay.

14        Presumably, you know, my friend has access to that

15   information because it's her client that placed that in that

16   status.  And so we're just asking generally that to the extent

17   that the Government has been placing grantees on route pay

18   without cause that it be ordered to cease doing so.

19        **THE COURT:**  Okay.  Anything else?

20        **MR. RICHARDS:**  I would love to have some rebuttal

21   time but not now.

22        **THE COURT:**  You will have rebuttal time.  Thank you.

23        Ms. Farber -- and if anyone needs a recess to use the

24   restroom or just to have a break, now is a good time if you

25   need to.  Would you like a recess?

1       **MS. FARBER:**  I'm flexible, Your Honor.

2       **THE COURT:**  Okay.  All right.  We'll keep going.  I'm

3   always told I don't think about that enough, so I'm trying to

4   think about that.

5       **MS. FARBER:**  Thank you for the offer.

6       So I'll start with the applicability of *NADOHE* and due

7   process and then move on to APA and kind of wrap up with the

8   balance of equities, if that works.

9       **THE COURT:**  Okay.

10      **MS. FARBER:**  I note plaintiffs' point that they don't

11  have a ton to offer you on the due process and applicability of

12  *NADOHE*.  We do have a ton to offer the Court on why *NADOHE* is

13  not applicable here.

14      **THE COURT:**  Okay.

15      **MS. FARBER:**  As the Court noted, *NADOHE* is based on

16  the, in relevant part, January 20th Executive Order signed by

17  President Trump, and there were -- the Court found that that

18  order, the language of that order was vague.  But this case

19  really doesn't properly challenge that order because here we

20  have termination letters.

21      And the phrase that troubled Judge Abelson the most in

22  *NADOHE*, which plaintiffs' counsel again mentioned in his

23  remarks here, was the phrase "equity related," the opinion in

24  *NADOHE* said what does that even mean, what is "equity related"?

25      The phrase "equity related" does not appear in any of the

1    actual termination letters that we have here.  We're not

2    dealing with the Executive Order.  We're dealing with a final

3    agency decision terminating these grants.  That's not vague.

4    We're in APA land.  We're not in Fifth Amendment land.

5         And to further that point, you know, although plaintiff

6    can show, you know, offer circumstantial evidence to say, well,

7    the timing is really convenient here, we have an Executive

8    Order and then we have the agency action several weeks later,

9    comparing the agency actions that you have in *NADOHE* with the

10   one that you have here really leaves very little doubt that we

11   are not talking about the Executive Orders.

12        I have two additional exhibits today to show the Court on

13   that topic, and I've provided copies of these to plaintiffs'

14   counsel already.  May I approach the bench?

15             **THE COURT:**  Yes, please.

16        Mr. Richards, you do not have any objection to these.  Am

17   I correct?

18             **MR. RICHARDS:**  I do not, Your Honor.

19             **THE COURT:**  Thank you.  I mean, I know you can argue

20   against them, but to my looking at them you have no objection.

21             **MS. FARBER:**  Your Honor, I've handed you what's

22   marked as Exhibit 3 and Exhibit 5.

23        Exhibit 3 is what was filed as an exhibit to the

24   Preliminary Injunction/Temporary Restraining Order Motion in

25   Exhibit 9 there, *NADOHE*, ECF number -- I'm sorry, I gave you my

1    comply and don't have the ECF number in front of me.

2            **THE COURT:** I have the -- it's 27-13.

3            **MS. FARBER:** 27-13, correct.

4            **THE COURT:** Let me take a moment and read it.

5            **MS. FARBER:** Sure.

6        (Pause in Proceedings.)

7            **THE COURT:** Okay.

8            **MS. FARBER:** And the second is Exhibit 5, which was

9    another *NADOHE* filing. This was ECF 39-10 in *NADOHE*.

10       Now, these are two -- I'll give all moment to look at

11   them.

12           **THE COURT:** Yes. Thank you.

13       (Pause in Proceedings.)

14           **THE COURT:** Okay. I get it.

15           **MS. FARBER:** So these are two letters that were part

16   of the record in *NADOHE*. These letters were sent to grant

17   recipients about potential threat -- you know, the potential

18   threats to their funding, issues related to the Executive

19   Order. They're dated, they're both dated before the *NADOHE*

20   opinion, of course, and they both very explicitly referenced

21   the Executive Order and were trying to comply with the

22   Executive Order.

23       Compare these two, compare Exhibit 3 and Exhibit 5, which

24   very clearly reference the Executive Order in that command,

25   with the termination letter that Your Honor pointed out at ECF

1    1-2 in this case at Page 10 and 11.

2         **THE COURT:**  Um-hmm.

3         **MS. FARBER:**  As you've pointed out, no reference to

4    the Executive Order there.  I didn't see the phrase "equity

5    related" in there.  And this also, this -- some of these are

6    undated but all -- we have no allegation that any of these came

7    after *NADOHE*.  As far as I can tell they all came before.

8         So there was no reason for the agency to hide the fact

9    that this was -- if this was because of the Executive Order,

10   they didn't have a court decision yet saying they couldn't do

11   that, that they couldn't rely on it.  So if that was the

12   reason, there was no reason for them to hide that at all.  But

13   these letters don't reference the Executive Order.  They

14   reference the department's priorities.

15        And, Your Honor, I think what might be our strongest

16   evidence on that is the leaked communication that we included

17   as an exhibit in our response at ECF 24-2.  That was an

18   internal communication by the -- I believe it was the Acting

19   Secretary at the time.  That was not intended to be seen by the

20   public.

21        **THE COURT:**  Bear with me for one second.  I want to

22   make sure I see that.

23        **MS. FARBER:**  ECF 24-2.

24        **THE COURT:**  Yeah, okay.

25        **MS. FARBER:**  It's formatted strangely because that

1    was a screenshot from someone's Twitter post leaking this

2    internal memo.

3         So again, this came before the *NADOHE* opinion.  The agency

4    would have no reason, as far as they know, to hide if they're

5    doing something based on an Executive Order.  This was supposed

6    to be an internal communication not meant for the public, and

7    this doesn't say anything about the Executive Order anywhere.

8    This is about the Department and the Secretary's own goals.

9         So I think, you know, these things all taken together

10   really show the sharp contrast between the case that Judge

11   Abelson had in front of him where no grants had been terminated

12   at all, people were trying to figure out what does this mean,

13   what might be terminated, are we going to get terminated or

14   not, and this case where they know their grants have been

15   terminated, we have a final agency action, and now the question

16   is was that action arbitrary and capricious.  It wasn't vague,

17   but was it arbitrary and capricious.  It's an APA case.  This

18   is not a Fifth Amendment vagueness case.

19        And more to that point why *NADOHE* doesn't apply here is

20   that the First Amendment component of the plaintiffs' claim in

21   *NADOHE* colored the entire case.  And that wasn't -- I'm not

22   saying that was incorrect.  I know *NADOHE* is being appealed so

23   I'm being very careful about what I say about the case.  But

24   Judge Abelson found that there was a likely First Amendment

25   violation in that case, and the law is very clear that when you

1    have a First Amendment -- potential First Amendment

2    infringement, you look at vagueness very differently.  It's a

3    very strict standard for vagueness when you're looking at it

4    through the lens of the First Amendment.  And Judge Abelson

5    mentions that repeatedly in his opinion, and there is -- there

6    is -- I think to put a really fine point on it, one of the

7    cases that plaintiff cites in their brief, in their opening

8    motion is *Humanitarian* from Central District of California.

9    And in that case, at Page 1062, the Court finds or holds,

10   "Outside the First Amendment context, a statute is

11   unconstitutionally vague on its face only if it is vague in all

12   of its applications."

13       Now, contrast that with what Judge Abelson found, which is

14   exactly the opposite.  So the *NADOHE* at Page 21, he says just

15   because it's not vague in some contexts doesn't mean it's

16   unconstitutionally vague, and that's because he was applying a

17   First Amendment standard.

18       And that's not what we have here.  We have a specific

19   application to plaintiffs who really should have known and I

20   believe knew why their grants were terminated.  So the way to

21   kind of think about *NADOHE*, I think, is if these plaintiffs did

22   stand in front of Judge Abelson today and say, okay, here's

23   what happened to us, we got our grants terminated --

24            THE COURT:  I'm moving to enforce your order.

25            MS. FARBER:  Yeah, apply the order to us, Judge.  Do

1    you think that Judge Abelson would be able to do that

2    lickety-split, or would he need to look at additional evidence,

3    would he need to have another hearing?  And I posit that he

4    wouldn't be able to do that.

5         THE COURT:  Apart from the retroactive application.

6         MS. FARBER:  Right, exactly.  It's certainly not

7    retroactive, and Judge Abelson, you know, really was mightily

8    struggling at the *NADOHE* hearing to try to understand what

9    situations might come under the purview of the Executive Order

10   because he just didn't have the advantage of having definite

11   facts.  There were no terminations in that case.

12        So I don't believe that Judge Abelson would be able to

13   just say, yep, you guys are included in the order, let's just

14   write it up.  It's a different case and a completely different

15   set of facts.

16        THE COURT:  So in other words, even if he decided I

17   am -- I'm going to do the analysis of the factors about whether

18   or not to give retroactive application to something, and let's

19   assume for sake of argument that he found in plaintiffs' favor

20   that retroactive application was appropriate, just generally

21   speaking, you're saying that the same analysis that applied in

22   his case would not answer the plaintiffs' assertions of harm

23   here.

24        MS. FARBER:  Exactly right, Your Honor.  Exactly

25   right.  And you can see how Judge Abelson sort of struggles

1    with the phrase "equity related "in the *NADOHE* opinion as a

2    main problem -- as a main source of the vagueness, and we don't

3    have -- that phrase doesn't appear here.

4         Here we have a finite termination letter.  It cites to a

5    number of different provisions of Code and Rules, and it cites

6    to sort of the reasons why this decision's being made.  You

7    know, and we can certainly -- you know, the sufficiency of that

8    letter is sort of a different issue and, frankly, not an issue

9    that the plaintiffs here have raised as the substantive

10   sufficiency of that letter, but that's not something Judge

11   Abelson had the benefit of and that doesn't come under the

12   purview of *NADOHE*.

13        And on the point of, if we set *NADOHE* aside and the Court

14   does its own vagueness analysis, I think plaintiffs' claims

15   there still fail, and that is because, first of all, we know

16   there is a lot more tolerance for vagueness in context of

17   civil -- civil issues as opposed to criminal issues.

18             **THE COURT:**  You're saying assuming the EO is the

19   reason.

20             **MS. FARBER:**  No, I'm saying let's say the EO is not

21   the reason and you're just trying to figure out whether this

22   action is somehow violative of the Fifth Amendment.

23        We believe this is just a straightforward -- I don't know

24   if anything is straightforward in this administration, but it's

25   a straightforward APA case and not a -- it doesn't entangle the

1    Fifth Amendment.

2         THE COURT:  But you're not making argument -- and I

3    realize it's hypothetical, but you're not making a hypothetical

4    where the Court allows that the termination letters are the

5    thing that is looked at as the Fifth Amendment violator?

6         MS. FARBER:  They shouldn't be.  I think that's what

7    I'm trying to -- that's the point I'm trying to make is that if

8    we take the executive orders out of it, which they should be

9    because here we have a finite termination letter, there's not a

10   vagueness argument as applied to the plaintiffs.

11        And I guess if the only way that we can consider their

12   vagueness claim is are the Executive Orders vague as applied to

13   plaintiffs, we have a termination letter that shows that

14   they're not.  The words in the termination letter were

15   "Diversity, Equity, Inclusion," these are words that have a

16   common meaning and according to *Hill*, when words have --

17        THE COURT:  There's a lot more words.  There's a lot

18   more words in the termination letter than that but, yes, those

19   words do appear.  But, yes, there's a lot more words.

20        MS. FARBER:  Yes.  And I would argue that the words

21   that are in the termination letter are words that plaintiff

22   likely used in their grant applications that appear in the

23   Federal Register.

24        THE COURT:  I don't know if they used "fraud" and

25   "duplication" and things like that in their grant applications,

1    but I understand your meaning.

2             MS. FARBER:  Yes.  I'm guessing they didn't use

3    "fraud" and "duplication" but those --

4             THE COURT:  Probably not.

5             MS. FARBER:  But those terms "fraud" and

6    "duplication" also appear in the Federal Register.  They appear

7    as grant conditions.  So those are not new terms to grantees.

8    When they accept grants, they accept the terms and conditions

9    that come with the grants, which I'll get to in a moment.  So,

10   you know, there's not -- there's just not a vagueness issue

11   here.

12            THE COURT:  Okay.

13            MS. FARBER:  I think that's my argument on vagueness.

14            THE COURT:  Okay.

15            MS. FARBER:  Is there anything -- does the Court have

16   any questions on that or should I move on to the APA?

17            THE COURT:  I don't.  Let's move on to the APA.

18            MS. FARBER:  So I took note of something that

19   plaintiffs' counsel said at the very start of our time together

20   today, which is that sort of what's happening here in the

21   agencies and with the presidential administration is going to

22   require these teacher training programs to rebuild from the

23   ground up.

24        And, you know, at the risk of like, you know, hard truth

25   pills, I think that's exactly what the people who voted for

1  this president voted for was rebuilding some of these systems

2  from the ground up, and that to some extent is what's

3  happening.

4         **THE COURT:**  Well, that may be his prerogative.  I

5  think it's the manner in which it's being done that is at issue

6  here.

7         **MS. FARBER:**  Yes, and let's get to that, Your Honor.

8  So the only argument is plaintiff admitted the singular

9  argument they're making here on arbitrary and capriciousness is

10  that agency priorities are subject to Rulemaking.

11         **THE COURT:**  Yes.

12         **MS. FARBER:**  And because the agency did not go

13  through the Rulemaking and public comment process about this

14  sort of big picture policy shift with this new administration

15  that they've acted arbitrary and capriciously, and there's not

16  a basis for that in the regulations, in the Federal Register,

17  in the appropriate rules.

18      I think the crux of plaintiffs' argument as to why

19  Rulemaking is required for these kind of big picture agency

20  priorities is that, at least what I heard plaintiffs' counsel

21  say just a moment ago, was it's the same word, right?  It

22  includes -- the phrase includes the word "priorities," and so

23  everywhere we see the word "priorities" in any rule or

24  regulation it means agency priorities.  And that's just not

25  consistent with a plain reading of any of these regulations.

1          And I'll point Your Honor to a couple of the citations

2   that I think plaintiffs' counsel said didn't belong before the

3   Court, but I think they do because this shows the fact that

4   just because the word "priority" appears it doesn't mean it's

5   the same thing across the board.

6          So we have funding priorities.  "Funding priorities"

7   appears in Appendix 1 to Part 200.  It is at (b)(3)(i)(B).  So

8   we have funding priorities there.  And then annual Priorities

9   from 75.105.  Annual priorities, those are subject to

10  Rulemaking, that's a different thing than funding priorities.

11  And then we have agency priorities, which we say are neither of

12  these.  We have funding priorities, we have annual priorities,

13  but then you have agency priorities.  It's a different word.

14  Sure, all three of these things includes the word "priorities"

15  but they're not the same.

16          Plaintiffs' argument essentially says that there's nothing

17  that the Department of Education can do that wouldn't be

18  subject to Rulemaking.  So if the Department of Education wants

19  to move someone's office because it doesn't effectuate the

20  interests of the agency, is that now something that is subject

21  to Rulemaking because it relates to an agency priority to move

22  somebody's office.  Where is the end to what the agency can't

23  do without subjecting itself to Notice and Rulemaking?

24          This is inconsistent with the termination provision at

25  200.340 and the changes to that termination provision in the

1    year 2020.  The clear intent there was to make it a bit easier

2    for agencies to terminate grants that didn't align with its

3    sort of big-picture mission.

4         I'd also point the Court to a couple of sections in the

5    Federal Register that announce, call for grants for the TQP,

6    the SEED, and the TSL programs.  So explicitly in the terms of

7    these grants, there is language related to abiding by federal

8    civil rights law and being able to terminate these grants with

9    broad discretion to the fullest extent of the law.

10        And that "fullest extent of the law" caveat is where we

11   get to is this arbitrary and capricious, right?  That's where

12   the APA comes in.  But I'll point to a couple pages of Federal

13   Register for each of these grants.

14        So for the TQP, it is at Page 23587.  That's where you

15   have -- the language is "projects will be awarded and must be

16   operated in a manner consistent with the nondiscrimination

17   requirements contained in federal civil rights laws."

18        And so that's where you kind of -- that's where the change

19   really happened with *Students For Fair Admission* was this

20   thought that, well, you know, some of these diversity-promoting

21   programs, they're all consistent with federal civil rights law

22   and then we get *Students For Fair Admission* that just turns

23   that on its head and says no, a lot of these programs that you

24   thought were fine actually violate civil rights law.

25        So we have that provision related to federal civil rights

1    law in TQP.  And then the termination provision in TQP is

2    located at Page 23590 of the Federal Register, and that says,

3    "Terminating agreements in whole or in part to the greatest

4    extent authorized by law if an award no longer effectuates the

5    program goals" -- which we all agree is a different thing --

6    "or agency priorities."  And then it cites to the termination

7    provision at 340.

8         And then there is almost identical, like functionally

9    identical language in the Federal Registers for SEED at Page

10   19492 and 19495, and then again for TSL, both on Page 33600.

11        So when we talk about what were the terms and conditions

12   of these grants, that's right there.  The terms and conditions

13   relate to abiding by federal civil rights law and we can

14   terminate these grants if they don't align with agency

15   priorities to the fullest extent allowed by law.

16        There was a -- plaintiffs made a brief reference to

17   whether the letters conveyed a good reason for the termination.

18   That's not a claim that they are advancing.  They're advancing

19   just this very simple straightforward was Rulemaking required.

20        THE COURT:  Well, not really.  Their count is very

21   broad, if you read the count.  I mean, so the -- I went to that

22   issue my very self and their count allows for all of it, in my

23   opinion.

24        MS. FARBER:  Okay.  Well, then, if that's the Court's

25   reading, which is distinct or is different from what plaintiffs

1    have said that they are advancing here --

2         THE COURT:  Well, I mean, inasmuch as we're relying

3    on pleadings here, which is what of course you correctly noted

4    at the outset, Count 2 which begins at Page 37, Paragraph 157,

5    is extraordinarily broad and asserts as a general proposition

6    that the termination letters and the decision to terminate is

7    unlawful, arbitrary, and capricious for the reasons set forth

8    above.

9         Now, I don't challenge you or quarrel with you about where

10   the arguments have focused mainly, but I read their APA claim

11   to be broader than you do, than you are.

12        MS. FARBER:  Okay.  Well, I'll take a moment, then,

13   to address that issue, but I do want to highlight that the

14   argument that they actually flush out, the argument they

15   advance is the singular Rulemaking issue, and I don't think

16   that that argument has merit.

17        As to sort of this bigger picture question of were these

18   letters adequate, is this sort of change in big picture

19   priorities arbitrary and capricious, you know, there we have --

20   the Government's position is that the reasoning set forth in

21   the letters is sufficient.  That reasoning sets forth the

22   reason why these grants were being terminated.

23        THE COURT:  Does it?  Does it, though?

24        MS. FARBER:  We think it does, but I will put a pin

25   in that because the Massachusetts court that considered this,

1    Judge Joun who considered this same issue whose plaintiffs did

2    advance the argument that these letters were insufficient found

3    that they were insufficient, that it was just kind of

4    boilerplate that was copy-pasted.  So if that's where Your

5    Honor's headed, I do have an argument there.  The Government's

6    position is these letters were sufficient.

7            THE COURT:  Okay.

8            MS. FARBER:  And I'll just briefly address that

9    before moving to what if you don't think the letters were

10   sufficient.

11       So what's required under the APA is just sort of a

12   reasonable, reasonably explained.  And I think the Supreme

13   Court in the *FCC* case and in I believe the *Motor Vehicle* case

14   as well talks -- sort of talks about this distinction between,

15   well, you could have done more, you know, you could have done

16   more, you could have explained more, but did you explain

17   enough, and the issue is really did you explain enough.  And a

18   short explanation can still be a reasoned explanation under the

19   APA.  That's from *Multicultural* at 936.

20       So in this case, we have an identification of, you know,

21   the Administration's position or the Department's position that

22   Diversity, Equity, Inclusion violates federal civil rights

23   laws, that the grants at issue -- let me pull up the language

24   from the letter -- that the grants at issue promote or take

25   part in DEI initiatives or other initiatives that unlawfully

1    discriminate on the basis of race, color, religion, sex,

2    national origin, or another protected characteristic that

3    violate either the letter or purpose of federal civil rights

4    law, which goes to that discrimination and goes to the terms

5    that we just reviewed, and then goes on and cites to a number

6    of the relevant sections from the Code of Federal Regulations.

7         And, you know, I think we can see that that explanation is

8    sufficient from looking at the complaint.  You know, the

9    complaint cites to the aspects of these terminated programs

10   that would arguably come -- that would come under this umbrella

11   of Diversity, Equity, and Inclusion that would have prompted

12   their grants to be canceled, at least in part.

13         THE COURT:  So, in other words, plaintiffs were able

14   to surmise why they were terminated, but you're taking the

15   position that the letter adequately tells them why they were

16   terminated.

17         MS. FARBER:  Yes.  I think that they're one and the

18   same.

19         THE COURT:  Okay.

20         MS. FARBER:  I think the letter provided enough

21   information to the plaintiffs to understand what was happening

22   and why.  And then there is a -- there is an appeal process

23   that's in this letter.  I --

24         THE COURT:  How would someone invoke that appellate

25   process exactly?  What's required?

1        **MS. FARBER:**  My understanding is just kind of on all

2    fours with what's in the letter.  So as far as process, I only

3    know what's listed in the letter.  The last communication we

4    had with the Department of Education indicated that there were

5    only two appeals filed and none of them were in Maryland.  But

6    I did not see any original documents for myself and that was --

7    the information is several days old so I do not know if that's

8    changed, if the Maryland plaintiffs have appealed.  But, you

9    know, our understanding from over the weekend was that this

10   wasn't a large number of appeals.

11       **THE COURT:**  Bear with me for one moment.

12       **MS. FARBER:**  Sure.

13       **THE COURT:**  And just to be clear before I ask my next

14   question, your position, your clients' position about the

15   § 200.340 is exactly what?

16       **MS. FARBER:**  Our position as to the termination

17   provision, let me pull that up.  Our position is that

18   Subsection (1), so 200.340(a)(1), when it talks about terms and

19   conditions, that's where we have the terms and conditions

20   related to federal civil rights laws, not violating federal

21   civil rights laws.  We see that same exact language in the

22   termination letter, and that comes from at least in parts

23   *Students For Fair Admission* saying that these types of programs

24   do violate federal civil rights laws.

25       I think we agree with plaintiffs that (2) and (3) don't

1    apply here, and then (4) is the argument that we went through

2    that just because the phrase "agency priorities" includes the

3    word "priorities" does not mean agency priorities is synonymous

4    with funding priorities is synonymous with annual priorities.

5    Agency priorities, big picture direction of the agency stuff

6    does not require Rulemaking.

7        THE COURT:  And turning back to the termination

8    letter itself which asserts that an appeal of the termination

9    shall include a brief statement of your argument and the

10    disputed factual legal or other issues.  It cites 200.342, and

11    I confess I don't have that in front of me.  I assume that

12    relates to appeals of terminations, but I'm asking you to tell

13    me what it says.

14        MS. FARBER:  I don't have that in front of me either,

15    Your Honor.

16        THE COURT:  Okay.

17        MS. FARBER:  But my esteemed colleague is telling me

18    that it does relate to the appeal process.

19        THE COURT:  Okay.

20        MS. FARBER:  And so, you know, I think the thing

21    that's a bit unprecedented about this APA challenge for this

22    Court is that typically a remedy for plaintiffs in the event

23    that there's not a sufficient agency record to show the

24    agency's process, the remedy typically is let's remand it to

25    the agency, they can develop the factual record, and then we

1    can look again and see did they explain it better.

2         So again, we maintain that the letter in itself is enough.

3    But here now we're in a situation where there are enormous

4    changes happening at the Department of Education.  I have

5    another exhibit, Exhibit 4, which is the publicly released

6    statement by the Department of Education about the Reductions

7    in Force that happened, I think it was just on Tuesday.

8              THE COURT:  Yes.  So how substantively effective

9    given its reduction in numbers would a remand possibly be?

10             MS. FARBER:  That's the issue, Your Honor.  So in my

11   filing, I suggested remand this back to the agency, they can do

12   an expedited review.  People that I was working with on this

13   case are gone.

14             THE COURT:  But my question is -- and I'm not being

15   smart when I say it and I'm not calling myself stupid.  What I

16   mean to say is I'm not trying to be sassy when I ask this.

17             MS. FARBER:  Thank you, Your Honor.

18             THE COURT:  But who's there to do this expedited

19   work?

20             MS. FARBER:  Correct.

21             THE COURT:  I mean, as a matter of practical reality,

22   even if I were to find that to be an attractive option, you

23   know, justice delayed is justice denied.  I mean, what's going

24   to happen?  I mean, you can't make me any promises.

25             MS. FARBER:  I can't.  And that's why I'm flagging

1   this for you is that was something that I put in my brief.

2           THE COURT:  Yeah, I hear you.

3           MS. FARBER:  And hours later, hours later the

4   situation changed and now we have an existential issue at the

5   Department of Education.

6           THE COURT:  No, I understand.  Of course you would be

7   remiss not to suggest that as an alternative outcome here, but

8   you know, as a practical reality --

9           MS. FARBER:  Yes.

10          THE COURT:  I mean -- yeah.

11          MS. FARBER:  I think we're on the same page there.  I

12  can say that the agency is trying to figure out if they can do

13  a remand, and I'd ask them to put the gears in motion there.

14          THE COURT:  To find out.

15          MS. FARBER:  To find out if they can.  And that would

16  be something that if this is something the Court was

17  considering.  And really, I mean, remand, in a normal

18  circumstance where the agency is not being cut in half, a

19  remand would be probably the most appropriate way to deal with,

20  just flush out this letter a little bit more.  We all

21  acknowledge we are in a different universe as far as that's

22  concerned.

23      But if the Court is open to that, I'm -- my understanding

24  is that I should have a -- we can do it or we can't do it

25  within 48 hours.  I'm hesitant to make any representations

1    because I don't even know if the people that told me that are

2    going to be there in 48 hours.

3            THE COURT:  So I'm not ethically allowed to provide

4    legal advice.

5            MS. FARBER:  Yes.

6            THE COURT:  But were I you, I would stop there.

7            MS. FARBER:  Yes.  So the main point I want to make

8    here is that the situation has definitely changed.

9            THE COURT:  I understand.  I appreciate your candor.

10           MS. FARBER:  In a normal world we'd be looking at a

11   remand, and we have an agency that is facing some existential

12   issues and I just don't know would be the way that I would say

13   that.

14           THE COURT:  Fair.  I have a question for you.  In the

15   termination letter, and I know you know what I'm about to ask

16   you but -- or perhaps you don't, but the first substantive

17   paragraph beginning "It is a priority," it makes -- you know, a

18   lot of largesse there about sort of positions and a sort of

19   framework, foundation for what we're gearing up to tell you.

20       The second full paragraph:

21       "The grant specified above provides funding for programs

22   that promote or take part in DEI initiatives or other

23   initiatives that unlawfully discriminate on protected

24   characteristics that violate either the letter or purpose of

25   federal civil rights law that conflict with the Department's

1   policy of prioritizing merit, fairness, and excellence in

2   education that are not free from fraud, abuse, or duplication,

3   or that otherwise fail to serve the best interests of the

4   United States.  The grant is therefore inconsistent with and no

5   longer effectuates Department priorities," and so it's

6   terminated.

7       The following page is where it talks about a grant

8   recipient's -- or, no, a terminated grant recipient's ability

9   to challenge the termination decision in writing within 30 days

10  and the appeal should contain the following, Number 3, a brief

11  statement of your argument and the disputed factual legal or

12  other issues.

13      And again, transcripts are lousy for tone, so I am not

14  being sarcastic when I ask this.

15      What exactly do you contend they've learned from this

16  termination letter that anybody who's been terminated could

17  effectively challenge in a, quote, brief statement?  What has

18  this advised them about the basis for their termination?

19      Now, because if I have an education grant or a grant from

20  the Department of Education and my program is called

21  "Underserved Youth from Transgender Communities Unite," I might

22  be fully aware that I am promoting and engaging in a program

23  that President Trump has determined is not okay anymore,

24  unlawful, even, and that he wishes and Secretary McMahon or her

25  predecessor on her own or in conjunction or however -- I'm not

1   getting into the Executive Order issue -- but has determined to

2   root out offenders of that principle and to terminate the

3   grant.

4       Now, a plaintiff here might surmise, wow, I really had a

5   target on my back, especially given the name of my program and

6   what I do and what I spend money on, the participants and the

7   teachers I teach, but what about this letter puts anybody on

8   notice about why they were terminated such that their appeal

9   right would actually have substance?  What am I supposed to do

10  with this?

11          MS. FARBER:  There are -- I think I have three points

12  I'd like to make there.

13          THE COURT:  Okay.

14          MS. FARBER:  It's possible the third one will

15  evaporate as I talk so I think it's two to three points I'd

16  like to make.

17          THE COURT:  Then hurry.

18          MS. FARBER:  Yeah.  The first point is that, you

19  know, we can see that the plaintiffs know what aspects of their

20  program were at issue because they include allegations in their

21  complaint that highlight the diversity and the equity and the

22  inclusion aspects of their program that they believe were what

23  prompted this termination.

24          THE COURT:  Yes.

25          MS. FARBER:  So we know that they know and this

1    letter gave them notice of that.  That's why we're here.

2    That's why we have this lawsuit is because they understand why

3    this happened.

4         As to how can their appeal be successful, there are --

5    there's a contact person here that they can contact with

6    questions.  I believe I read an allegation that some of the

7    plaintiffs have contacted that person and not heard back.

8              THE COURT:  And nobody got back.

9              MS. FARBER:  Yes.

10             THE COURT:  And there was more than one.

11             MS. FARBER:  Yes.

12             THE COURT:  And a lot of time had gone by.

13             MS. FARBER:  Yes.  And we take that as true.  I

14   certainly don't have any contrary information.  But, you know,

15   there is a process here that provides for some way to ask

16   questions.

17             THE COURT:  Well, I guess my point, though, is -- and

18   I'm -- that was rude of me to cut you off but I want to draw

19   you into really what is bothering me about this.

20             MS. FARBER:  Yes, please.

21             THE COURT:  A couple of things.  One, yeah, I'm a DEI

22   program so that might be a basis to cut me off, but

23   the "everything in the kitchen sink" list that is in this

24   letter and it's disjunctive, I mean, holy moly, what are we

25   supposed to do with that?  How do I know that I'm not being

1    terminated because of my super-obvious DEI program, but also

2    because I'm considered duplicative, or because they're accusing

3    me of fraud?  How does this tell a person?  It's disjunctive

4    and it's so broad.  The spirit of a law?  I mean, what does

5    that even mean?

6              MS. FARBER:  What does the spirit of the law mean?

7              THE COURT:  Yeah.  I mean, in other words, my point

8    is that the letter or purpose of a law, I mean, what is this

9    supposed to advise anybody about how to undertake an appeal of

10   this action?

11             MS. FARBER:  And I take your point, Your Honor, and I

12   think that you are -- and it seems that you and Judge Joun are

13   in agreement on that point that these letters are -- they're --

14   as you said, it's disjunctive, what am I supposed to take from

15   this.

16             THE COURT:  Yeah.

17             MS. FARBER:  And I think where I'd point to is, you

18   know, the plaintiffs took from it what happened here, you know,

19   an effective response would address these alternative -- these

20   alternative issues would address the known issues and then the

21   alternative issues.

22        And then I did have a third point and this is what it is,

23   is that when it come to APA challenges, you know, the question

24   is not could the letter have said more, could the letter have

25   been more detailed, because we all agree yes.

1          THE COURT:  Here it's could the letter have said less

2    is my issue.

3          MS. FARBER:  Sure.

4          THE COURT:  Right?  It's like what's that old saying,

5    if I had more time I would have written less?

6          MS. FARBER:  Right.

7          THE COURT:  Why does this not smack of an absolute

8    absence of individualized evaluation?  These are form letters,

9    obviously.

10          MS. FARBER:  So I think that the question there is,

11    you know, according to the law does the letter do enough.

12    Could it have been more narrow?  Yes.  Yes.

13          THE COURT:  Yeah.

14          MS. FARBER:  But does it do enough to put them on

15    notice, does it do enough, and the Government contends that it

16    does.

17          THE COURT:  Okay.

18          MS. FARBER:  And then, you know, yeah, I think I'll

19    leave it there.

20          THE COURT:  Okay.  I appreciate that.

21          MS. FARBER:  And then, Your Honor, I think as to the

22    other preliminary injunction factors, if I could speak to just

23    briefly.

24          THE COURT:  Yes, absolutely.

25          MS. FARBER:  So we have conceded irreparable harm

1    here for the purpose of streamlining things, but that's not

2    decisive.  Just the fact of irreparable harm is not enough.

3             THE COURT:  Of course.

4             MS. FARBER:  And importantly, importantly in the

5    *Winter* case, the Supreme Court even found that, sort of

6    assumed -- I'll back up a little bit.

7         In *Winter*, the Supreme Court found likelihood of

8    irreparable harm but then did a balancing of the equities and

9    public interest and found it weighed in favor of the Government

10   and against a preliminary injunction and they did not even

11   consider the question of the merits.

12            THE COURT:  Yeah, if you don't meet them all you

13   don't get it.

14            MS. FARBER:  Yeah, right.  So, well, yes.  Or at

15   least, you know, there's some balancing that's involved, right?

16   And so the Supreme Court there is saying that -- effectively is

17   saying it doesn't matter if you win the merits.  If the balance

18   of the equities doesn't go in your favor, then you don't get

19   this absolutely extraordinary remedy of a preliminary

20   injunction even if you're facing irreparable harm, even if this

21   is an existential issue for you.

22            THE COURT:  Yes.  No, I agree, I mean, I think the

23   likelihood of success on the merits and the irreparable harm

24   for obvious reasons get, you know, top billing, but I don't

25   disagree with you that balance of equities and public interest

1  are often sort of given the -- you know, they take a backseat,

2  I think, on a lot of these issues.  But to some extent I think

3  that's because if a movant satisfies those first two, it often

4  is the case.  I'm not saying it is the case --

5          MS. FARBER:  Right.

6          THE COURT:  -- as a matter of definition, but it

7  often is the case that the other two are quite obvious.

8          MS. FARBER:  Yes.  And I think that's where I would

9  just like to touch for a moment --

10         THE COURT:  All right.

11         MS. FARBER:  -- on the interest on the other side,

12 because it does seem like there is a sort of taking for

13 granted, well, there's no public interest on the other side.

14 The entire interest is in, you know, the --

15         THE COURT:  The people.

16         MS. FARBER:  Yeah, like these values that are --

17         THE COURT:  I understand.  You're saying there are

18 other people.

19         MS. FARBER:  Correct.  There are other people and I

20 think what the election showed us was that those other people

21 are here and they feel urgently about this issue and they went

22 out and voted, and that's why we're here.  And we ignore them

23 or don't weigh them or balance them at our peril that it's an

24 injustice to not factor in those interests.

25         THE COURT:  If I were to grant the injunction that

1    plaintiffs seek, what is the -- in other words, talking about

2    the balance of equities, in other words, in the absence of the

3    injunction who is to hurt more, in the presence of the

4    injunction who is to hurt more.  What is your argument that in

5    the presence of the injunction the -- I'll just say the common

6    American, not a plaintiff, would suffer?

7              **MS. FARBER:**  I think that the injury that the common

8    American feels is likely less immediately existential than what

9    the plaintiffs here feel.  But I think Judge Thomas in his

10   concurrence in *Students For Fair Admissions* has -- you know,

11   can disagree with him --

12             **THE COURT:**  Of course.

13             **MS. FARBER:**  -- on the content, but he has a really

14   interesting perspective on sort of the urgency with which we

15   need to do away or the urgency with which some of these

16   initiatives can be harmful, even to people of color, I found it

17   to be really, really interesting read with a different

18   perspective that I hadn't considered.

19        So, you know, I think that one of the things that Justice

20   Thomas mentions is this idea of, like, this really like kind of

21   hateful phrase that we have now the "DEI Hire," you know,

22   that's a really kind of lightning bolt, like just horrible,

23   kind of horrible thing to say.  The only reason we have that

24   phrase, Justice Thomas points out in the *Students For Fair*

25   *Admission* concurrence, is because we have DEI, you know, and I

1    certainly know people who feel as though -- you know, who

2    question whether they belong in places where they do.  They do

3    belong.  They're there on merit, but because there's this

4    specter, you know, that does cause an injury.  You know, not to

5    mention --

6            THE COURT:  Well, some might say that those who come

7    from a viewpoint that individuals who are not typically or

8    historically in power positions have misappropriated that term

9    through a lens of hate.

10           MS. FARBER:  Yes.  Yes.  Absolutely.  And I would

11   also, I'd be remiss --

12           THE COURT:  Or just simply discrimination, which also

13   is another way of saying hate.  But --

14           MS. FARBER:  Yes.  I would be remiss --

15           THE COURT:  -- it's a very interesting perspective

16   and I -- it's a very interesting perspective and I am always

17   endeavoring to be as intellectually honest as one could

18   possibly be, especially in my job.

19           MS. FARBER:  Of course.

20           THE COURT:  Yes.

21           MS. FARBER:  And I would be remiss if I did not point

22   out Justice Jackson and Justice Kagan's dissent which really

23   just shreds Justice Thomas's opinion.  So there is very heated

24   disagreement on all sides here.

25           THE COURT:  Of course.

1      MS. FARBER:  But just trying to zealously advocate

2  for my client on this and present the sort of opposing

3  viewpoint here.

4      THE COURT:  The public interest issue.  I understand.

5      MS. FARBER:  And then as far as the Government's

6  interest and, you know, I think this is where the Massachusetts

7  case is particularly interesting.  I mean, certainly the

8  Government has an interest in ending discrimination.  And what

9  we see in the Massachusetts case, at least according to Exhibit

10  2, the declaration, is that this money that has been released

11  in the Massachusetts case, it might be just flying out the

12  door.  It might be all gone.  And so when we talk about the

13  potential injury to the Government, we are seeing that

14  potentially in the Massachusetts case.

15      THE COURT:  But that assumes for purposes of your

16  argument that the judge was wrong.

17      MS. FARBER:  That the judge was wrong on the

18  constitutional --

19      THE COURT:  In other words, the money flying out the

20  door is a consequence of his determination that your client did

21  something not allowable by law and that's why the TRO was in

22  place.  In other words, the money flying out the door is

23  because the money was released again.  And so the idea that the

24  Government has been harmed necessarily has built into it the

25  fact that the judge was wrong as a matter of law.

1          MS. FARBER:  Yes.  And I see your point.  And yes,

2    the Government's contention is that that was an incorrect

3    opinion.

4          THE COURT:  Of course.

5          MS. FARBER:  And that there is an appeal.  The

6    Exhibit 1, which is the status report, mentioned that an appeal

7    is being filed in that case.

8          THE COURT:  I saw that.  I saw that.  I'm interested

9    to know what the basis of the TRO appeal would be.

10         MS. FARBER:  Me, too.

11         THE COURT:  Yes, particularly considering that a

12   briefing schedule was ordered, but we'll see.

13         MS. FARBER:  Yes.  Yes, I think we'll -- it will be

14   interesting to follow that one, yes.

15      Okay.  So I think that's the balance of equities point.  I

16   appreciate Your Honor's hearing that out --

17         THE COURT:  Of course.

18         MS. FARBER:  -- as I know you do every issue.

19      And then finally on the scope of relief, you know, we've

20   asked that it be -- we limit ourself to the grants that are at

21   issue here.  The plaintiffs had all the time in the world.  I

22   guess I shouldn't say all the time in the world, but they are

23   the ones who drafted this complaint, that they don't include

24   the grants that they want to have reinstated sort of makes it

25   difficult for us to figure out with which grants they're

1  talking about.  So we would ask that the relief be limited to

2  those grants that are identified and documented in the

3  complaint, and certainly that it be limited to at the very

4  least the plaintiffs who are here before you in this case.

5          THE COURT:  Okay.  And I'm going to ask Mr. Richards,

6  but since you're standing I'll ask you also -- or first.

7      If the Court were to issue a PI -- and again, for all of

8  those listening, this is strictly for purposes of inquiry --

9  what is the Government's position or the Government Defendant's

10 position on bond?

11         MS. FARBER:  In this case, and the Government's

12 not -- the position we take in this case is not meant to bind

13 the Government in any other case.

14         THE COURT:  Of course.

15         MS. FARBER:  But in this case we are not arguing

16 about bond.

17         THE COURT:  For bond.  In other words, you're content

18 with *de minimus* or no bond?

19         MS. FARBER:  In this case, yes.

20         THE COURT:  In this case, yes.  All right.  Thank

21 you.

22     Mr. Richards, did you want rebuttal?

23         MR. RICHARDS:  Very, very briefly, Your Honor.

24     The Court asked most of the questions that I would have

25 liked to have asked of my friend, and so I appreciate the need

1    to wrap this up.

2         Just one thing that I want to clean up is that the

3    Government argued that the terms and conditions of the grants

4    were set in the Federal Register.  That's not accurate.

5         Grants are issued through notices, and those grant award

6    notices expressly list the terms and conditions of the grant at

7    issue, and that's an obligation that the Government is held to.

8    I don't think it actually impacts this case but I just wanted

9    to make sure that that was clear that we're not talking about

10   terms and conditions, you know, hither and yon.  We're talking

11   about terms and conditions listed in the grant, in the award

12   notice.

13        **THE COURT:**  So what significance, if any, does the

14   F.R. have here?

15        **MR. RICHARDS:**  I don't think it has any, Your Honor.

16   I think it refers to the reason that the Government made a

17   change to regulation for a reason that doesn't have any bearing

18   on the outcome of the case.

19        **THE COURT:**  Okay.

20        **MR. RICHARDS:**  I don't think it's incredibly

21   significant here but, you know, counsel's example of changing

22   offices I think is sort of afield, right?  We're talking about

23   here a set of priorities that only has to be issued once in an

24   administration.  They can use it for the entire rest of the

25   administration, it doesn't have to be issued on a

1    grant-by-grant basis.  And the obligation to engage in

2    Notice-and-Comment Rulemaking with respect to grants is

3    specific from GEPA.  We're not talking about office changing

4    and that sort of thing, right?  So we think the argument that

5    this is going to have an impact on the minutia of the

6    Department's operation just isn't quite right, and to the

7    extent that's true is because Congress made it that way.

8         On the last point, we had anticipated if an injunction

9    were issued providing a list of the members of each of our

10   organizations to the Government so that they know exactly which

11   grants should be turned back on, which -- actually, a better

12   phrase would be which terminations should be vacated, and I

13   think that would be a practical way of handling that issue.

14        THE COURT:  Okay.  I think that you should file a

15   line, or whatever you want to call it, providing that list to

16   the Government now and including it in a court filing.

17        MR. RICHARDS:  I will do that, Your Honor.  And I

18   will just add, I don't think this affects the merits here, but

19   there is a reason that we didn't put every grantee in the

20   complaint.

21        THE COURT:  Why?

22        MR. RICHARDS:  The reason is that they all fear

23   retribution from the Government, and I think not unreasonably.

24   And for any of them to stick their heads out and be listed here

25   was a significant risk.

1    And so the idea that not exposing yourself to potential

2    retaliation from the Government is a reason to deny relief in a

3    case where all of the affected entities are similarly situated

4    strikes me as problematic.

5        **THE COURT:**  So the list that we're talking about,

6    this -- well, I'm not going to impose -- I don't mean by name,

7    but the list that you're proposing to provide if the Court were

8    to issue an injunction is all members of your clients or to the

9    extent it is one of the plaintiffs, but all members of your

10   clients whose grants have be terminated through receipt of a

11   termination letter that is identical to that attached to the

12   complaint.

13       **MR. RICHARDS:**  Correct, substantially identical,

14   right?  They are form letters, as Your Honor pointed out.

15   There are very minor differences.

16       **THE COURT:**  Well, I mean that the Paragraphs 2, 3 and

17   4 are the same thing.

18       **MR. RICHARDS:**  Yes.  Correct, Your Honor.

19       **THE COURT:**  Okay.  Well, then I do not need you to

20   file that list.  It has no bearing on my decision, but when I

21   make that decision, if the order is to be issued, I may require

22   such a list.

23       **MR. RICHARDS:**  I would anticipate that, Your Honor.

24   Thank you.

25       **THE COURT:**  Okay.  Mr. Richards, is there anything

1  else?

2            **MR. RICHARDS:**  No, Your Honor.

3            **THE COURT:**  Ms. Farber, is there anything else?

4            **MS. FARBER:**  No, Your Honor.

5            **THE COURT:**  All right.  I am going to take a five- or

6  ten-minute recess to look at my notes.  I used to give young

7  law firm associates advice that if a partner brings you in for

8  an assignment, make sure you ask all the questions you'll have

9  because you might never get that meeting again.

10       So I'm going to take my owned advice, I'm going to go look

11  at my notes and make sure I don't have anymore questions, and

12  then I'll come back out and if I don't, we'll go, and if I do,

13  we'll talk.  Court's in recess.

14       (A recess was taken from 12:09 p.m. to 12:31 p.m.)

15            **THE COURT:**  All right.  I have one question,

16  Mr. Richards, with respect to AACTE.

17            **MR. RICHARDS:**  Yep.

18            **THE COURT:**  I know its members also include Maryland,

19  Towson, and Frostburg.  There are two others, I believe,

20  Maryland members, two other Maryland members.  I need to know

21  who they are, what kind of grants they have, and what the

22  status of those grants is.

23            **MR. RICHARDS:**  Can I apprise the Court after the

24  hearing?

25            **THE COURT:**  Yes.

1     MR. RICHARDS:  I don't know off the top of my head.

2     THE COURT:  So I understood from the declaration at

3  5-3 that AACTE has five Maryland members, three of which have

4  been identified as Maryland, Towson, and Frostburg.  So we know

5  what the status of their grants is, and I want to know, again,

6  so who they are, what grants -- or grants, what grants they

7  have, what kind of grants they have, and what is the status of

8  those grants, in other words, have they been terminated, et

9  cetera, and whether they were affected by Judge Joun's order.

10       Yes, if I could --

11     MR. RICHARDS:  I'm sorry, just a point of

12 clarification.

13     THE COURT:  Yes.

14     MR. RICHARDS:  I'm not involved in that case.  My

15 understanding of the order is that it would apply to all TQP

16 and SEED grants --

17     THE COURT:  Correct.

18     MR. RICHARDS:  -- in the states where the AGs brought

19 suit, so that would cover everyone in Maryland one way or the

20 other.

21     THE COURT:  Except only for those two kinds of

22 grants.

23     MR. RICHARDS:  Correct.

24     THE COURT:  Right.

25     MR. RICHARDS:  Got it.

1    **THE COURT:**  Yeah.  So if you can just provide, you

2  know, you can do it on letterhead, it doesn't matter, by ECF

3  just by end of business will be great.

4    **MR. RICHARDS:**  Will do.

5    **THE COURT:**  Okay.  All right.  Thank you very much.

6  I appreciate cogent argument and your very well-done papers.

7    Thank you.  Court's adjourned.

8    (The proceedings concluded at 12:33 p.m.)

9    **CERTIFICATE OF OFFICIAL REPORTER**

10    I, Amanda L. Longmore, Registered Professional Reporter
and Federal Certified Realtime Reporter, in and for the United

11  States District Court for the District of Maryland, do hereby
certify, pursuant to 28 U.S.C. § 753, that the foregoing is a

12  true and correct transcript of the stenographically-reported
proceedings held in the above-entitled matter and that the

13  transcript page format is in conformance with the regulations
of the Judicial Conference of the United States.

14
    Dated this <u>18th</u> day of <u>March 2025</u>

15    *-S-*

16    _____
    AMANDA L. LONGMORE, RPR, FCRR
    FEDERAL OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25

'22 [1] - 19:24
1 [5] - 13:19; 61:7;
67:18; 82:6
1-2 [2] - 48:1; 53:1
10 [1] - 53:1
100 [1] - 20:18
104 [1] - 20:18
1062 [1] - 55:9
10:06 [1] - 2:2
11 [3] - 14:6; 48:1;
53:1
12:09 [1] - 87:14
12:31 [1] - 87:14
12:33 [1] - 89:8
1391(e)(1)(C [1] -
8:17
14 [1] - 16:24
157 [1] - 64:4
16 [1] - 14:7
18th [1] - 89:14
19492 [1] - 63:10
19495 [1] - 63:10
2 [11] - 13:17,
20-21; 16:19;
20:17; 43:22;
64:4; 67:25;
81:10; 86:16
200 [8] - 41:18;
43:2; 45:10;
46:7, 20, 22;
61:7
200.340 [5] - 39:4;
40:2; 45:23;
61:25; 67:15
200.340(a [1] -
46:1
200.340(a)(1 [1] -
67:18
200.342 [1] -
68:10
200.343 [1] - 48:7
2020 [1] - 62:1
2021 [2] - 19:24;
20:1
2023 [1] - 15:9
2025 [2] - 16:21;
89:14
20th [1] - 50:16
21 [1] - 55:14
23587 [1] - 62:14
23590 [1] - 63:2
24-2 [2] - 53:17,
23
27-13 [1] - 52:2
28 [1] - 89:11
3 [9] - 16:20;
17:23; 43:22;
51:22; 52:23;
67:25; 72:10;
86:16

30 [1] - 72:9
33600 [1] - 63:10
34 [3] - 38:7, 15;
39:13
340 [7] - 35:22;
36:2; 41:17, 19;
42:19; 63:7
340(a)(4 [1] -
44:20
340(b [1] - 44:20
37 [1] - 64:4
39-10 [1] - 52:9
4 [10] - 16:21, 23;
17:16, 18, 25;
44:2; 68:1; 69:5;
86:17
4) [1] - 43:25
48 [2] - 70:25;
71:2
5 [3] - 51:22; 52:8,
23
5-3 [1] - 88:3
5-5 [1] - 17:2
50 [1] - 10:4
6 [1] - 17:3
60 [1] - 30:11
7 [1] - 17:3
75.105 [2] - 38:7;
61:9
75.253 [3] - 38:15;
39:7, 13
753 [1] - 89:11
9 [1] - 51:25
936 [1] - 65:19
a) [1] - 43:22
a.m [1] - 2:2
AACTE [7] - 8:23;
9:3, 8; 18:1;
87:16; 88:3
abbreviated [1] -
16:17
Abelson [18] -
21:19; 22:6;
23:4; 26:1, 4,
25; 32:15;
50:21; 54:11,
24; 55:4, 13, 22;
56:1, 7, 12, 25;
57:11
Abelson's [1] -
23:1
abiding [2] - 62:7;
63:13
ability [3] - 31:14;
32:16; 72:8
able [10] - 4:4;
6:24; 7:12; 8:20;
32:12; 56:1, 4,
12; 62:8; 66:13
above-entitled [1]

- 89:12
absence [2] -
76:8; 79:2
absolute [2] -
22:24; 76:7
absolutely [5] -
29:4; 76:24;
77:19; 80:10
abstraction [1] -
15:24; 16:9
abuse [1] - 72:2
accept [3] - 31:13;
59:8
access [2] - 34:3;
49:14
according [4] -
15:8; 58:16;
76:11; 81:9
account [1] -
26:18
accurate [1] -
84:4
accusing [1] -
75:2
achieve [1] -
14:25
acknowledge [1]
- 70:21
acknowledged
[1] - 19:10
acted [1] - 60:15
acting [1] - 53:18
action [14] - 4:19;
5:9; 11:8; 22:25;
26:14; 28:16;
30:25; 31:19;
32:9; 51:8;
54:15; 57:22;
75:10
actions [2] -
26:17; 51:9
active [1] - 16:21
actual [2] - 32:13;
51:1
add [2] - 11:16;
85:18
adding [1] - 11:20
additional [4] -
11:21; 13:2;
51:12; 56:2
address [6] -
26:23; 64:13;
65:8; 75:19
addressed [2] -
8:14; 9:16
addressing [1] -
3:12
adequate [1] -
64:18
adequately [1] -

66:15
adjourned [1] -
89:7
administration
[7] - 37:10, 17;
57:24; 59:21;
60:14; 84:24
Administration's
[1] - 65:21
administrative [1]
- 22:20
admission [1] -
14:25
Admission [6] -
15:5; 62:19, 22;
67:23; 79:25
Admissions [2] -
6:7; 79:10
admitted [1] -
60:8
admitting [2] -
15:7
advance [4] -
25:6; 47:16;
64:15; 65:2
advancing [2] -
63:18; 64:1
advantage [2] -
10:23; 56:10
advice [3] - 71:4;
87:7, 10
advise [1] - 75:9
advised [1] -
72:18
advocate [1] -
81:1
affected [2] -
86:3; 88:9
affects [2] - 23:5;
85:18
afield [1] - 84:22
afoul [2] - 15:9,
13
afraid [1] - 30:4
afternoon [1] -
13:1
agencies [7] -
27:24; 36:12,
15; 37:11;
41:13; 59:21;
62:2
agency [59] -
4:19; 5:1, 9;
11:8; 30:9;
35:22, 25; 36:5,
9, 11, 24; 37:2,
12, 25; 40:9,
13-15; 41:3, 6,
22; 42:13; 44:6,
8-9, 12, 14, 16,

19; 46:15; 51:3,
8-9; 53:8; 54:3,
15; 60:10, 12,
19, 24; 61:11,
13, 20-22; 63:6,
14; 68:2, 5, 23,
25; 69:11;
70:12, 18; 71:11
agency's [1] -
68:24
agenda [2] -
30:10; 40:14
agendas [1] -
28:1
ago [2] - 34:9;
60:21
agree [11] - 8:1;
9:20; 27:16, 18;
28:13; 29:4;
38:3; 63:5;
67:25; 75:25;
77:22
agreement [3] -
29:21; 35:23;
75:13
agreements [1] -
63:3
AGs [1] - 88:18
ahead [2] - 5:19;
33:23
al [2] - 2:5
align [2] - 62:2;
63:14
allegation [3] -
17:24; 53:6;
74:6
allegations [7] -
11:10, 16, 21;
18:4, 15; 73:20
allege [1] - 8:13
alleged [3] - 6:10;
8:16; 11:7
allow [3] - 4:5;
18:22; 21:4
allowable [4] -
46:6; 48:2, 5;
81:21
allowed [5] - 26:9;
47:18; 63:15;
71:3
allowing [1] - 4:1
allows [2] - 58:4;
63:22
almost [2] -
12:25; 63:8
alternative [4] -
70:7; 75:19
Amanda [1] -
89:10
AMANDA [1] -

89:16
amend [3] -
11:16; 24:9;
35:15
Amendment [25] -
4:24; 25:4, 23;
26:2, 5, 24;
27:15; 28:5, 19;
30:20; 35:1;
51:4; 54:18, 20,
24; 55:1, 4, 10,
17; 58:1, 5
amendment [2] -
33:8; 57:22
American [3] -
2:4; 79:6, 8
analysis [5] -
16:4; 20:24;
56:17, 21; 57:14
announce [1] -
62:5
annual [5] - 41:3;
61:8, 12; 68:4
answer [8] -
24:11, 25;
32:21; 33:1,
21-22; 35:20;
56:22
anticipate [2] -
35:18; 86:23
anticipated [1] -
85:8
anticipation [1] -
48:4
antiracism [2] -
15:2, 4
anyway [1] -
33:23
APA [24] - 5:2;
14:8; 16:5; 25:4;
33:8; 34:17, 19;
35:1, 7, 14;
38:4; 47:7; 50:7;
51:4; 54:17;
57:25; 59:16;
62:12; 64:10;
65:11, 19;
68:21; 75:23
apart [2] - 16:14;
56:5
apologize [1] -
25:6
appeal [11] -
33:13; 66:22;
68:8, 18; 72:10;
73:8; 74:4; 75:9;
82:5, 9
appealed [3] -
7:14; 54:22;
67:8

appeals [3] - 67:5, 10; 68:12
appear [6] - 50:25; 57:3; 58:19, 22; 59:6
appellate [1] - 66:24
appended [1] - 47:25
Appendix [1] - 61:7
applicability [2] - 50:6, 11
applicable [2] - 43:23; 50:13
application [4] - 55:19; 56:5, 18, 20
applications [4] - 40:21; 55:12; 58:22, 25
applied [4] - 31:10; 56:21; 58:10, 12
applies [3] - 4:25; 41:13
apply [8] - 38:7, 9; 39:21; 41:6; 54:19; 55:25; 68:1; 88:15
applying [1] - 55:16
appreciate [6] - 25:1; 71:9; 76:20; 82:16; 83:25; 89:6
apprise [1] - 87:23
approach [1] - 51:14
appropriate [4] - 21:21; 56:20; 60:17; 70:19
approved [1] - 38:24
arbitrary [7] - 54:16; 60:9, 15; 62:11; 64:7, 19
arguably [1] - 66:10
argue [4] - 22:11; 45:16; 51:19; 58:20
argued [1] - 84:3
arguing [4] - 44:11, 13, 16; 83:15
argument [42] - 3:5; 5:8; 8:15; 9:19; 22:15;

25:13, 17; 26:24; 27:3; 35:16; 42:13, 19; 43:9; 44:2, 24-25; 45:1, 18; 46:12; 47:4; 56:19; 58:2, 10; 59:13; 60:8, 18; 61:16; 64:14, 16; 65:2, 5; 68:1, 9; 72:11; 79:4; 81:16; 85:4; 89:6
arguments [2] - 29:9; 64:10
art [2] - 41:25; 42:1
articulate [1] - 33:6
articulates [1] - 33:7
aside [1] - 57:13
aspect [1] - 46:7
aspects [4] - 16:6; 66:9; 73:19, 22
assert [2] - 35:15; 49:9
asserted [1] - 48:22
assertions [1] - 56:22
asserts [3] - 48:24; 64:5; 68:8
assigned [2] - 22:9; 43:19
assignment [1] - 87:8
associates [1] - 87:7
Association [1] - 2:4
assume [2] - 56:19; 68:11
assumed [1] - 77:6
assumes [1] - 81:15
assuming [1] - 57:18
attached [1] - 86:11
attempt [1] - 35:10
attention [2] - 40:2; 48:16
attest [1] - 17:3
attesting [1] - 12:6
attractive [2] -

40:23; 69:22
AUSA [1] - 12:8
authorized [3] - 42:3; 47:5; 63:4
available [1] - 12:16
avers [1] - 16:19
award [11] - 35:24; 41:21; 42:21, 24; 44:4; 48:5; 63:4; 84:5, 11
awarded [7] - 36:4, 7; 43:19; 62:15
awards [1] - 43:1
aware [1] - 72:22
b)(3)(i)(B) [1] - 61:7
background [1] - 31:25
backing [1] - 17:23
backseat [1] - 78:1
balance [8] - 35:2, 4; 50:8; 77:17, 25; 78:23; 79:2; 82:15
balancing [2] - 77:8, 15
based [8] - 14:4; 25:21; 36:3; 41:5; 50:15; 54:5
bases [1] - 8:13
basing [1] - 24:1
basis [21] - 23:15, 17; 30:4; 32:1, 22; 33:4, 6-7, 14; 41:24; 42:23; 43:11, 16; 44:7; 49:12; 60:16; 66:1; 72:18; 74:22; 82:9; 85:1
basket [1] - 15:17
bear [3] - 4:12; 53:21; 67:11
bearing [2] - 84:17; 86:20
bears [1] - 5:17
begin [1] - 4:18
beginning [1] - 71:17
begins [1] - 64:4
begun [1] - 7:20
behalf [3] - 6:11; 26:17
belong [4] - 41:1;

61:2; 80:2
bench [3] - 19:21; 20:6; 51:14
benefit [2] - 29:20; 57:11
best [6] - 11:4; 23:13; 27:25; 39:11, 16; 72:3
better [3] - 49:1; 69:1; 85:11
between [2] - 54:10; 65:14
beyond [1] - 43:9
big [6] - 41:8; 60:14, 19; 62:3; 64:18; 68:5
big-picture [1] - 62:3
bigger [2] - 16:2; 64:17
biggest [1] - 28:18
billing [1] - 77:24
bind [1] - 83:12
bit [6] - 12:13; 35:10; 62:1; 68:21; 70:20; 77:6
board [1] - 61:5
boilerplate [1] - 65:4
bolster [1] - 11:15
bolt [1] - 79:22
bond [4] - 83:10, 16
bootstrap [1] - 11:14
bother [1] - 45:24
bothering [1] - 74:19
boundless [1] - 45:23
box [3] - 43:14; 45:9; 46:23
break [1] - 49:24
breakfast [1] - 44:18
brief [12] - 8:15; 21:4, 23; 27:14; 31:12; 49:9; 55:7; 63:16; 68:9; 70:1; 72:10, 17
briefing [1] - 82:12
briefly [5] - 9:16; 23:11; 65:8; 76:23; 83:23
briefs [1] - 4:20
bringing [1] -

18:22
brings [1] - 87:7
broad [4] - 62:9; 63:21; 64:5; 75:4
broader [1] - 64:11
brought [3] - 8:2; 35:12; 88:18
built [3] - 4:5; 5:13; 81:24
burden [4] - 5:18; 12:21; 47:17
business [1] - 89:3
C.F.R [3] - 38:7, 15; 39:13
cabined [1] - 29:5
California [1] - 55:8
campaigned [1] - 27:21
cancel [4] - 37:11, 15; 44:21; 45:5
canceled [2] - 31:2; 66:12
candor [1] - 71:9
cannot [1] - 11:16
capable [1] - 32:14
capricious [5] - 54:16; 62:11; 64:7, 19
capriciously [1] - 60:15
capriciousness [1] - 60:9
careful [1] - 54:23
Carolyn [1] - 2:14
carry [4] - 8:23; 27:25; 28:3; 29:12
Carter [1] - 28:8
case [73] - 3:24; 6:7; 8:18, 20; 9:21, 23; 11:5, 15, 24-25; 12:7; 13:19; 14:4, 21; 15:8; 18:15, 22; 19:2; 22:5, 9, 20, 25; 23:2, 5-6; 24:19; 26:25; 31:4; 35:2; 37:21; 47:22; 50:18; 53:1; 54:10, 14, 17-18, 21, 23, 25; 55:9; 56:11, 14, 22; 57:25; 65:13, 20;

69:13; 77:5; 78:4, 7; 81:7, 9, 11, 14; 82:7; 83:4, 11-13, 15, 19-20; 84:8, 18; 86:3; 88:14
cases [5] - 6:6; 10:5; 20:3, 7; 55:7
categories [1] - 14:24
caveat [1] - 62:10
cease [1] - 49:18
Central [1] - 55:8
certain [5] - 14:23; 23:25; 25:15; 27:21; 47:19
certainly [9] - 14:7; 22:10; 35:20; 56:6; 57:7; 74:14; 80:1; 81:7; 83:3
CERTIFICATE [1] - 89:9
Certified [1] - 89:10
certify [1] - 89:11
cetera [3] - 48:9; 88:9
Chakrabardi [1] - 19:2
Chakrabarti [5] - 19:15, 21; 20:6, 13, 20
challenge [13] - 9:23; 14:8; 31:14; 32:12, 23; 34:12; 35:1; 50:19; 64:9; 68:21; 72:9, 17
challenged [5] - 3:19; 4:11, 19; 5:23; 6:13
challenges [4] - 33:2-4; 75:23
chance [1] - 13:1
change [8] - 31:24; 38:6; 44:14; 45:24; 46:1; 62:18; 64:18; 84:17
changed [5] - 36:16; 44:12; 67:8; 70:4; 71:8
changes [2] - 61:25; 69:4
changing [3] - 46:5; 84:21; 85:3

**characteristic** [1] - 66:2

**characteristics** [1] - 71:24

**check** [1] - 47:14

**checked** [1] - 47:14

**chose** [2] - 18:12, 14

**chronology** [1] - 31:19

**chunk** [1] - 20:19

**circumstance** [1] - 70:18

**circumstances** [1] - 14:3

**circumstantial** [3] - 29:2, 12; 51:6

**citation** [4] - 17:12; 39:23; 43:2; 45:17

**citations** [1] - 61:1

**cite** [2] - 39:7; 48:7

**cited** [2] - 38:10, 14

**cites** [9] - 38:14; 39:12; 55:7; 57:4; 63:6; 66:5, 9; 68:10

**citizen** [1] - 8:18

**civil** [15] - 15:9; 57:17; 62:8, 17, 21, 24-25; 63:13; 65:22; 66:3; 67:20, 24; 71:25

**Civil** [1] - 2:4

**claim** [14] - 4:24; 5:2; 8:2; 25:21; 27:15; 28:4, 19; 32:1; 35:12; 54:20; 58:12; 63:18; 64:10

**claiming** [1] - 48:10

**claims** [2] - 33:18; 57:14

**Clapper** [2] - 24:1, 14

**clarification** [1] - 88:12

**clarify** [1] - 6:16

**clause** [1] - 45:2

**claw** [1] - 7:7

**clean** [1] - 84:2

**clear** [27] - 7:12; 8:21; 11:16; 15:6; 21:18;

**characteristic** [1] - 66:2

22:16; 23:21; 24:8, 10, 16, 25; 26:8, 15; 29:6, 10, 24; 30:1, 8; 31:18; 35:3; 38:21; 48:24; 54:25; 62:1; 67:13; 84:9

**clearly** [4] - 23:19; 25:19; 26:19; 52:24

**CLERK** [1] - 2:3

**client** [5] - 13:5; 15:12; 49:15; 81:2, 20

**clients** [10] - 12:14; 28:13, 16; 31:20; 32:23; 33:18; 38:23; 40:20; 86:8, 10

**clients'** [4] - 27:8; 38:22; 67:14

**co** [1] - 9:4

**co-members** [1] - 9:4

**code** [1] - 57:5

**Code** [1] - 66:6

**cogent** [1] - 89:6

**collapse** [1] - 29:21

**collapsing** [1] - 35:4

**colleague** [1] - 68:17

**College** [2] - 6:4; 9:2

**Colleges** [1] - 2:5

**colloquial** [1] - 22:21

**color** [2] - 66:1; 79:16

**colored** [1] - 54:21

**comfortable** [1] - 3:13

**command** [1] - 52:24

**comment** [2] - 36:10; 60:13

**Comment** [5] - 36:10; 40:16; 41:7; 44:15; 85:2

**common** [3] - 58:16; 79:5, 7

**commonsense** [2] - 41:10

**communicated** [1] - 33:2

**communication** [4] - 53:16, 18; 54:6; 67:3

**communities** [1] - 72:21

**compare** [1] - 52:23

**comparing** [1] - 51:9

**competent** [1] - 28:3

**competitive** [1] - 40:20

**complain** [1] - 28:17

**complaint** [29] - 8:14; 11:13-17, 19; 16:14, 19-20; 17:14; 18:11; 20:15; 23:6, 22; 24:9; 27:1; 32:6; 35:15; 40:17; 47:25; 48:21; 66:8; 73:21; 82:23; 83:3; 85:20; 86:12

**complete** [1] - 20:5

**completely** [4] - 8:21; 12:16; 20:16; 56:14

**complicated** [1] - 35:11

**comply** [3] - 42:24; 52:1, 21

**component** [1] - 54:20

**comport** [1] - 26:7

**comprised** [1] - 5:25

**concede** [3] - 5:9; 18:22, 24

**conceded** [2] - 21:10; 76:25

**conceive** [2] - 25:17; 30:14

**concepts** [1] - 41:1

**concern** [2] - 19:7; 26:20

**concerned** [1] - 70:22

**concerns** [2] - 11:9; 20:22

**concession** [1] - 24:19

**concluded** [1] - 89:8

**conclusion** [2] -

25:15; 28:20

**concrete** [3] - 6:9; 24:16

**concurrence** [2] - 79:10, 25

**conditions** [29] - 12:10; 36:5, 23; 41:21; 42:24; 43:2, 11, 14-15, 18; 44:4; 45:4, 10; 46:7, 19; 47:13, 23; 59:7; 63:11; 67:19; 84:3, 6, 10

**conduct** [7] - 25:15, 18; 30:23; 31:3, 6-7; 34:6

**Conference** [1] - 89:13

**confess** [1] - 68:11

**confirm** [1] - 5:8

**conflict** [1] - 71:25

**conform** [3] - 31:7, 21; 40:21

**conformance** [1] - 89:13

**confused** [1] - 48:20

**confusing** [1] - 17:22

**Congress** [2] - 42:3; 85:7

**conjunction** [1] - 72:25

**connected** [3] - 22:25; 23:2; 34:14

**consequence** [1] - 81:20

**consider** [6] - 21:3; 23:8; 28:7, 15; 58:11; 77:11

**considered** [4] - 64:25; 65:1; 75:2; 79:18

**considering** [2] - 70:17; 82:11

**consistent** [3] - 60:25; 62:16, 21

**Constitution** [1] - 34:24

**constitutional** [1] - 81:18

**constrained** [1] - 29:9

**contact** [2] - 74:5

**contacted** [1] -

74:7

**contain** [1] - 72:10

**contained** [1] - 62:17

**contend** [1] - 72:15

**contending** [1] - 39:20

**contends** [1] - 76:15

**content** [2] - 79:13; 83:17

**contention** [1] - 82:2

**contesting** [1] - 11:6

**context** [5] - 11:6; 40:10; 55:10; 57:16

**contexts** [1] - 55:15

**continually** [1] - 32:17

**continuation** [6] - 38:9, 13, 19, 25; 39:2, 16

**continue** [4] - 34:6, 16; 39:14; 43:21

**continued** [1] - 34:12

**continues** [2] - 26:15; 36:24

**continuing** [2] - 25:18; 39:5

**contrary** [2] - 4:12; 74:14

**contrast** [2] - 54:10; 55:13

**conveniens** [2] - 19:5; 20:24

**convenient** [1] - 51:7

**convention** [1] - 46:24

**conversation** [1] - 22:17

**conveyed** [2] - 45:8; 63:17

**convincing** [1] - 29:10

**copies** [2] - 13:22; 51:13

**copy** [1] - 65:4

**copy-pasted** [1] - 65:4

**core** [2] - 16:25

**correct** [17] - 9:6; 16:10; 19:16;

39:1, 22; 42:11, 17; 51:17; 52:3; 69:20; 78:19; 86:13, 18; 88:17, 23; 89:12

**correctly** [2] - 33:19; 64:3

**Costs** [1] - 48:1

**costs** [2] - 48:2, 4

**counsel** [11] - 2:8; 3:3; 10:19; 12:13; 13:3; 50:22; 51:14; 59:19; 60:20; 61:2

**counsel's** [1] - 84:21

**count** [3] - 63:20

**Count** [1] - 64:4

**counterfactual** [1] - 10:3

**country** [1] - 4:1

**couple** [4] - 61:1; 62:4, 12; 74:21

**course** [13] - 8:16; 18:24; 23:14; 52:20; 64:3; 70:6; 77:3; 79:12; 80:19, 25; 82:4, 17; 83:14

**Court** [47] - 2:3, 6; 3:12, 16, 21, 23; 4:21; 5:3; 6:6; 10:2; 13:19, 22; 15:8; 16:9; 17:22; 21:3; 22:19; 25:2; 26:15; 30:5; 31:13; 34:24; 50:12, 15, 17; 51:12; 55:9; 57:13; 58:4; 59:15; 61:3; 62:4; 65:13; 68:22; 70:16, 23; 77:5, 7, 16; 83:7, 24; 86:7; 87:23; 89:11

**court** [7] - 13:2; 15:13; 16:4; 22:11; 53:10; 64:25; 85:16

**COURT** [242] - 2:13, 16, 19, 22, 25; 3:13; 4:9; 5:5, 12, 16; 6:15, 20, 25; 7:4, 6, 15, 22; 8:9, 11, 23; 9:1,

4, 7, 11, 14; 10:8, 14, 18; 11:2; 12:2, 17, 19, 21; 13:23; 14:11, 17, 19; 15:10; 16:1, 12; 17:15, 18; 18:20; 19:3, 9, 17, 19, 23; 20:1, 4, 10, 23; 21:6, 9, 12, 15, 24; 22:2, 13; 23:16, 21; 24:4, 7, 13, 20, 25; 25:5, 11, 25; 26:6, 19; 27:6, 19; 29:4, 16, 19; 31:9, 16; 32:5, 21, 25; 33:3, 6, 10, 13, 18, 23; 34:1, 15, 18; 35:3, 7; 38:7, 11, 21; 39:7, 10, 20, 23; 40:1, 5, 17; 41:25; 42:5, 9, 12, 15, 18; 43:4, 17, 24; 45:12, 14, 20; 46:2, 4, 9, 16; 47:5, 8, 10, 24; 48:14, 16, 19; 49:4, 7, 19, 22; 50:2, 9, 14; 51:15, 19; 52:2, 4, 7, 12, 14; 53:2, 21, 24; 55:24; 56:5, 16; 57:18; 58:2, 17, 24; 59:4, 12, 14, 17; 60:4, 11; 63:20; 64:2, 23; 65:7; 66:13, 19, 24; 67:11, 13; 68:7, 16, 19; 69:8, 14, 18, 21; 70:2, 6, 10, 14; 71:3, 6, 9, 14; 73:13, 17, 24; 74:8, 10, 12, 17, 21; 75:7, 16; 76:1, 4, 7, 13, 17, 20, 24; 77:3, 12, 22; 78:6, 10, 15, 17, 25; 79:12; 80:6, 12, 15, 20, 25; 81:4, 15, 19; 82:4, 8, 11, 17; 83:5, 14, 17, 20; 84:13, 19; 85:14, 21; 86:5, 16, 19, 25; 87:3, 5, 15, 18,

25; 88:2, 13, 17, 21, 24; 89:1, 5, 16
**Court's** [5] - 9:17; 15:25; 24:18; 35:20; 63:24
**court's** [2] - 87:13; 89:7
**courtroom** [1] - 10:20
**courts** [1] - 22:1
**Courts** [1] - 23:18
**cover** [3] - 4:20; 88:19
**covered** [1] - 22:7
**create** [1] - 46:20
**created** [1] - 16:15
**creates** [1] - 36:9
**credit** [1] - 28:9
**criminal** [1] - 57:17
**criteria** [1] - 15:12
**crux** [1] - 60:18
**crystal** [1] - 29:24
**cursive** [1] - 45:11
**cut** [5] - 6:5; 45:14; 70:18; 74:18, 22
**cuts** [3] - 45:15, 22; 46:19
**cutting** [1] - 30:22
**D.C** [2] - 9:21
**Daniel** [1] - 2:17
**date** [1] - 48:3
**Dated** [1] - 89:14
**dated** [2] - 52:19
**days** [3] - 30:11; 67:7; 72:9
**de** [1] - 83:18
**deal** [1] - 70:19
**dealing** [3] - 20:7; 51:2
**debate** [1] - 27:17
**decide** [2] - 29:2; 44:18
**decided** [1] - 56:16
**deciding** [1] - 10:5
**decision** [11] - 23:3; 29:18; 34:7; 51:3; 53:10; 64:6; 72:9; 86:20
**decision's** [1] - 57:6
**decisionmaking** [1] - 29:23
**decisions** [1] -

22:15
**decisive** [1] - 77:2
**declaration** [11] - 7:7; 12:9; 13:21, 25; 14:5; 17:2; 18:6; 28:11, 24; 81:10; 88:2
**declarations** [5] - 11:21; 12:4; 13:14; 47:12
**dedicated** [1] - 31:1
**defeat** [1] - 20:22
**defendant** [3] - 8:17; 18:23; 35:5
**Defendant's** [1] - 83:9
**defendants** [4] - 2:9, 21, 24; 5:9
**Defense** [1] - 13:17
**defense** [2] - 10:10; 11:5
**defined** [1] - 42:6
**defines** [1] - 16:23
**definite** [1] - 56:10
**definitely** [1] - 71:8
**definition** [2] - 32:14; 78:6
**DEI** [16] - 14:15; 16:11; 26:12, 17; 27:11; 28:9; 32:3; 33:14, 17, 20; 65:25; 71:22; 74:21; 75:1; 79:21, 25
**DEI's** [1] - 27:7
**DEI-offensive** [1] - 32:3
**DEI-related** [1] - 28:9
**delayed** [1] - 69:23
**demonstrated** [1] - 23:19
**denied** [1] - 69:23
**deny** [1] - 86:2
**department** [3] - 36:8, 19; 72:5
**Department** [19] - 14:13; 15:3, 16; 36:8, 13, 16; 37:16; 40:15; 41:14; 47:18; 54:8; 61:17; 67:4; 69:4, 6;

70:5; 72:20
**Department's** [2] - 65:21; 85:6
**department's** [2] - 53:14; 71:25
**derivative** [1] - 25:21
**derive** [1] - 41:3
**derives** [1] - 41:6
**describe** [1] - 41:12
**described** [1] - 18:7
**describes** [1] - 14:15
**designed** [1] - 30:1
**destruction** [1] - 3:25
**detailed** [2] - 18:15; 75:25
**determination** [5] - 23:2; 34:25; 39:15; 46:14; 81:20
**determine** [1] - 23:5
**determined** [4] - 14:14; 23:1; 72:23; 73:1
**develop** [1] - 68:25
**differ** [1] - 22:18
**difference** [2] - 34:10
**differences** [1] - 86:15
**different** [29] - 8:13; 10:5; 14:2, 5, 17, 19; 16:23; 21:1; 30:17; 37:2; 39:3, 18; 41:20; 44:19; 47:13; 48:12, 15; 56:14; 57:5, 8; 61:10, 13; 63:5, 25; 70:21; 79:17
**differently** [3] - 17:23; 30:6; 55:2
**difficult** [5] - 25:16; 30:14; 47:4; 82:25
**dime** [1] - 31:24
**direct** [3] - 29:5, 9; 30:9
**directing** [1] - 40:1
**direction** [1] -

68:5
**directive** [1] - 30:8
**directly** [2] - 3:2; 27:24
**disagree** [3] - 14:7; 77:25; 79:11
**disagreement** [1] - 80:24
**disaster** [1] - 20:5
**discouraging** [1] - 22:1
**discretion** [3] - 10:2; 45:23; 62:9
**discriminate** [2] - 66:1; 71:23
**discrimination** [5] - 27:8, 10; 66:4; 80:12; 81:8
**discriminatory** [1] - 27:11
**discussion** [2] - 27:20; 29:15
**disjunctive** [3] - 74:24; 75:3, 14
**dispute** [4] - 5:24; 6:10; 7:14; 13:10
**disputed** [3] - 4:21; 68:10; 72:11
**dissent** [1] - 80:22
**distill** [1] - 25:13
**distinct** [2] - 15:1; 63:25
**distinction** [1] - 65:14
**distinguish** [1] - 16:8
**District** [3] - 55:8; 89:11
**diversity** [5] - 14:25; 58:15; 62:20; 65:22; 73:21
**Diversity** [2] - 16:3; 66:11
**diversity-promoting** [1] - 62:20
**Docket** [1] - 2:4
**Document** [1] - 47:25
**document** [1] - 3:7
**documented** [1] - 83:2

**documents** [2] - 3:4; 67:6
**dollars** [1] - 13:6
**done** [4] - 60:5; 65:15; 89:6
**doom** [1] - 23:25
**door** [3] - 81:12, 20, 22
**doubt** [1] - 51:10
**down** [5] - 6:24; 7:12; 16:4; 25:13; 48:12
**dozen** [1] - 35:13
**Dr** [1] - 17:2
**drafted** [2] - 47:3; 82:23
**drafting** [1] - 46:24
**draw** [3] - 6:24; 28:20; 74:18
**drawing** [1] - 48:11
**drawn** [2] - 7:12; 48:16
**dropping** [1] - 45:17
**due** [3] - 32:12; 50:6, 11
**duplication** [4] - 58:25; 59:3, 6; 72:2
**duplicative** [1] - 75:2
**during** [1] - 3:5
**e)(1)(C)** [1] - 8:22
**early** [1] - 12:25
**easier** [1] - 62:1
**easily** [1] - 6:11
**easy** [1] - 45:21
**ECF** [9] - 47:25; 48:1; 51:25; 52:1, 9, 25; 53:17, 23; 89:2
**economy** [1] - 22:8
**ED** [2] - 12:8
**Ed** [2] - 41:14
**EDGAR** [1] - 38:8
**education** [2] - 72:2, 19
**Education** [14] - 2:5; 15:3, 16; 36:13, 17; 37:17; 40:15; 61:17; 67:4; 69:4, 6; 70:5; 72:20
**effect** [1] - 48:7
**effective** [3] - 48:3; 69:8;

75:19
**effectively** [3] - 28:13; 72:17; 77:16
**effectuate** [5] - 36:24; 37:22; 44:9, 12; 61:19
**effectuates** [5] - 35:24; 44:6; 46:14; 63:4; 72:5
**effort** [1] - 21:18
**efforts** [1] - 11:4
**either** [7] - 4:25; 34:25; 37:19; 45:8; 66:3; 68:14; 71:24
**election** [1] - 78:20
**elements** [1] - 4:13
**elsewhere** [1] - 37:4
**encourage** [1] - 48:8
**end** [3] - 48:6; 61:22; 89:3
**endeavoring** [1] - 80:17
**ending** [1] - 81:8
**enforce** [3] - 25:18; 34:6; 55:24
**enforcement** [2] - 26:8; 34:12
**engage** [3] - 30:2; 31:3; 85:1
**engaged** [1] - 31:6
**engaging** [1] - 72:22
**enormous** [2] - 20:6; 69:3
**ensure** [1] - 40:22
**entangle** [1] - 57:25
**entire** [4] - 45:17; 54:21; 78:14; 84:24
**entirely** [1] - 6:1
**entirety** [1] - 42:22
**entities** [1] - 86:3
**entitled** [2] - 27:23; 89:12
**entitlement** [1] - 23:5
**EO** [2] - 57:18, 20
**equitable** [1] - 34:23

**equities** [8] - 35:2, 4; 50:8; 77:8, 18, 25; 79:2; 82:15
**equity** [10] - 30:22; 31:2; 50:23-25; 53:4; 57:1; 58:15; 65:22; 73:21
**Equity** [2] - 16:3; 66:11
**equity-related** [1] - 30:22
**especially** [2] - 73:5; 80:18
**essentially** [3] - 8:4; 27:2; 61:16
**establish** [1] - 8:22
**established** [5] - 6:12; 8:16; 36:6; 42:2
**esteemed** [1] - 68:17
**et** [5] - 2:5; 48:8; 88:8
**ethically** [1] - 71:3
**evaluating** [2] - 26:1, 4
**evaluation** [2] - 19:5; 76:8
**evaporate** [1] - 73:15
**event** [1] - 68:22
**everywhere** [1] - 60:23
**evidence** [9] - 28:22; 29:1, 6, 9, 12; 51:6; 53:16; 56:2
**Ewing** [3] - 2:12, 14, 18
**exact** [3] - 8:7; 67:21
**exactly** [11] - 8:6; 19:16; 55:14; 56:6, 24; 59:25; 66:25; 67:15; 72:15; 85:10
**example** [3] - 14:22; 84:21
**examples** [1] - 14:1
**excellence** [1] - 72:1
**except** [4] - 3:21; 31:9; 45:10; 88:21
**exchange** [1] - 23:12

**Executive** [22] - 27:4, 13, 16, 22; 28:6, 13, 21; 50:16; 51:2, 7; 52:18, 21-22, 24; 53:4, 9, 13; 54:5, 7; 56:9; 73:1
**executive** [3] - 51:11; 58:8, 12
**exercise** [1] - 10:2
**Exhibit** [15] - 13:17, 20-21; 20:17; 51:22, 25; 52:8, 23; 69:5; 81:9; 82:6
**exhibit** [3] - 51:23; 53:17; 69:5
**exhibits** [3] - 12:24; 13:18; 51:12
**Exhibits** [1] - 13:19
**existential** [6] - 11:7; 13:12; 70:4; 71:11; 77:21; 79:8
**expand** [1] - 37:15
**expected** [1] - 37:10
**expedited** [2] - 69:12, 18
**experienced** [1] - 24:2
**expired** [1] - 48:6
**explain** [3] - 65:16; 69:1
**explained** [4] - 30:6; 37:21; 65:12, 16
**explanation** [3] - 65:18; 66:7
**explicitly** [4] - 17:13; 18:9; 52:20; 62:6
**exposing** [1] - 86:1
**expressly** [3] - 19:10; 38:15; 84:6
**extent** [16] - 4:10; 10:3; 15:10; 26:22; 27:15; 28:10; 47:5; 49:16; 60:2; 62:9; 63:4, 15; 78:2; 85:7; 86:9
**extraordinarily**

[1] - 64:5
**extraordinary** [1] - 77:19
**extremely** [1] - 9:25
**F.R** [1] - 84:14
**face** [1] - 55:11
**facing** [2] - 71:11; 77:20
**fact** [13] - 3:24; 12:6; 14:9; 16:6; 19:12; 24:9; 28:15; 34:2, 5; 53:8; 61:3; 77:2; 81:25
**fact-specific** [1] - 16:6
**factor** [1] - 78:24
**factors** [4] - 10:10; 23:8; 56:17; 76:22
**facts** [3] - 14:20; 56:11, 15
**factual** [3] - 68:10, 25; 72:11
**fail** [2] - 57:15; 72:3
**fails** [3] - 39:11; 42:23; 43:9
**Fair** [7] - 6:7; 15:5; 62:19, 22; 79:10, 24
**fair** [3] - 14:25; 67:23; 71:14
**fairly** [1] - 35:12
**fairness** [1] - 72:1
**faith** [1] - 23:23
**fall** [1] - 24:13
**far** [8] - 13:5, 16; 32:6; 53:7; 54:4; 67:2; 70:21; 81:5
**FARBER** [125] - 2:20; 5:10, 15; 10:16, 23; 11:3; 12:3, 18, 20, 23; 13:24; 14:16, 18, 20; 15:23; 16:2; 17:12, 16, 21; 18:21; 19:6, 14, 18, 20, 24; 20:2, 5, 12; 21:2, 8, 10, 14, 16, 25; 50:1, 5, 10, 15; 51:21; 52:3, 5, 8, 15; 53:3, 23, 25; 55:25; 56:6, 24; 57:20; 58:6, 20; 59:2, 5, 13, 15,

18; 60:7, 12; 63:24; 64:12, 24; 65:8; 66:17, 20; 67:1, 12, 16; 68:14, 17, 20; 69:10, 17, 20, 25; 70:3, 9, 11, 15; 71:5, 7, 10; 73:11, 14, 18, 25; 74:9, 11, 13, 20; 75:6, 11, 17; 76:3, 6, 10, 14, 18, 21, 25; 77:4, 14; 78:5, 8, 11, 16, 19; 79:7, 13; 80:10, 14, 19, 21; 81:1, 5, 17; 82:1, 5, 10, 13, 18; 83:11, 15, 19; 87:4
**Farber** [7] - 2:21; 5:7; 22:14; 28:12; 48:22; 49:23; 87:3
**Farber's** [1] - 25:25
**fatal** [1] - 11:19
**faulting** [1] - 31:18
**favor** [4] - 4:13; 56:19; 77:9, 18
**FCC** [1] - 65:13
**FCRR** [1] - 89:16
**fear** [1] - 85:22
**February** [1] - 16:21
**FEDERAL** [1] - 89:16
**federal** [21] - 15:9; 21:1; 27:25; 34:24; 39:17; 41:13; 42:24; 43:1; 44:4; 48:5; 62:7, 17, 21, 25; 63:13; 65:22; 66:3; 67:20, 24; 71:25
**Federal** [10] - 58:23; 59:6; 60:16; 62:5, 12; 63:2, 9; 66:6; 84:4; 89:10
**feedback** [1] - 46:21
**feelings** [1] - 28:8
**felt** [1] - 18:8
**few** [1] - 3:1
**Fifth** [16] - 4:24; 25:3, 5, 22; 26:5, 24; 27:14;

28:5, 18; 30:20; 33:7; 34:25; 51:4; 54:18; 58:1, 5
**fifth** [1] - 57:22
**figure** [4] - 54:12; 57:21; 70:12; 82:25
**file** [9] - 13:14; 18:12-14; 19:12; 32:23; 33:2; 85:14; 86:20
**filed** [7] - 3:17; 20:3; 22:4; 51:23; 67:5; 82:7
**filing** [4] - 33:3; 52:9; 69:11; 85:16
**filings** [2] - 11:14; 12:7
**final** [6] - 4:19; 5:9; 11:8; 40:18; 51:2; 54:15
**finally** [1] - 82:19
**financial** [1] - 7:20
**findings** [3] - 29:19, 25; 47:19
**fine** [4] - 3:14; 10:18; 55:6; 62:24
**finer** [1] - 16:10
**finished** [2] - 10:9, 12
**finite** [2] - 57:4; 58:9
**firm** [1] - 87:7
**first** [12] - 25:5; 34:4; 42:23; 43:13; 45:25; 49:2, 8; 57:15; 71:16; 73:18; 78:3; 83:6
**First** [10] - 26:2, 5; 30:20; 54:20, 24; 55:1, 4, 10, 17
**fit** [1] - 15:16
**five** [2] - 87:5; 88:3
**flagging** [1] - 69:25
**flaw** [1] - 17:20
**flawed** [1] - 27:19
**flaws** [1] - 11:19
**flexible** [1] - 50:1
**floored** [1] - 12:13
**flush** [3] - 9:17; 64:14; 70:20

**flying** [3] - 81:11, 19, 22
**focused** [2] - 42:3; 64:10
**folks** [1] - 45:4
**follow** [4] - 30:10, 18; 47:22; 82:14
**followed** [2] - 2:8; 17:1
**following** [4] - 16:15; 43:15; 72:7, 10
**follows** [1] - 42:22
**Force** [1] - 69:7
**foreclosed** [1] - 38:5
**foregoing** [1] - 89:11
**forewarning** [1] - 35:9
**forget** [1] - 26:24
**forgive** [1] - 16:17
**form** [4] - 49:2, 8; 76:8; 86:14
**formal** [1] - 36:9
**format** [1] - 89:13
**formatted** [1] - 53:25
**forth** [3] - 64:7, 20
**forum** [5] - 19:5; 20:23; 21:25; 22:3, 14
**fostering** [1] - 33:19
**foundation** [1] - 71:19
**four** [1] - 43:6
**fours** [1] - 67:2
**frame** [2] - 30:6
**framework** [1] - 71:19
**frankly** [5] - 12:13, 24; 23:4; 46:19; 57:8
**fraud** [5] - 58:24; 59:3, 5; 72:2; 75:3
**free** [1] - 72:2
**friend** [2] - 49:14; 83:25
**front** [9] - 3:2, 8; 21:19; 22:11; 52:1; 54:11; 55:22; 68:11, 14
**Frostburg** [6] - 6:5, 15; 9:3; 17:6; 87:19; 88:4
**frustrated** [1] - 32:17

**full** [1] - 71:20
**fullest** [3] - 62:9; 63:15
**fully** [2] - 12:16; 72:22
**functional** [1] - 34:10
**functionally** [1] - 63:8
**fund** [1] - 13:6
**funding** [9] - 30:22; 52:18; 61:6, 8, 10, 12; 68:4; 71:21
**funds** [2] - 17:7; 39:14
**furtherance** [1] - 28:6
**future** [8] - 7:12, 16, 19; 8:8; 13:8; 26:6; 31:9
**GAN** [1] - 43:12
**gearing** [1] - 71:19
**gears** [1] - 70:13
**general** [4] - 10:11; 17:24; 36:15; 64:5
**generalized** [1] - 42:10
**generally** [2] - 49:16; 56:20
**GEPA** [3] - 36:14; 85:3
**giant** [1] - 27:20
**given** [6] - 11:6; 25:14; 35:5; 69:9; 73:5; 78:1
**glad** [1] - 48:19
**goals** [11] - 35:25; 36:7; 41:25; 42:2, 6, 12, 15; 44:6; 46:15; 54:8; 63:5
**goodness** [1] - 45:20
**Government** [48] - 3:19; 4:23; 5:22; 7:13; 8:14, 17; 9:16; 10:10; 11:3; 21:22; 23:12; 25:15; 26:14, 16; 34:6, 23; 35:14; 36:1; 37:6, 8, 11, 14, 21; 38:3; 40:4, 25; 41:1, 4; 44:10; 46:13; 47:22; 49:11, 17; 76:15; 77:9;

81:8, 13, 24; 83:9, 13; 84:3, 7, 16; 85:10, 16, 23; 86:2
**government** [4] - 18:23; 27:25; 39:17
**Government's** [10] - 3:18; 9:19; 44:2; 47:4; 64:20; 65:5; 81:5; 82:2; 83:9, 11
**GR** [1] - 16:23
**grain** [1] - 16:10
**Grant** [1] - 16:24
**grant** [63] - 7:18; 8:3; 9:25; 14:10; 15:1, 4, 19; 16:5, 7; 18:15, 17; 31:2, 5; 32:2, 9-10, 19; 36:3, 18, 21-24; 38:19, 25; 40:21, 23-24; 41:18, 20; 43:12, 16, 19-20; 44:7, 21, 23; 45:5; 46:14; 47:13, 19; 52:16; 58:22, 25; 59:7; 71:21; 72:4, 7-8, 19; 73:3; 78:25; 84:5, 11; 85:1
**grant-by-grant** [1] - 85:1
**granted** [4] - 7:15, 19; 11:25; 78:13
**grantee** [4] - 34:9; 39:13, 15; 85:19
**grantees** [6] - 12:11; 16:8; 45:8; 49:17; 59:7
**granting** [2] - 36:18; 37:4
**grants** [98] - 4:2; 6:5, 16, 21; 7:2, 16, 18-19, 24; 8:5, 8; 11:12; 13:9; 14:1, 3, 6, 14; 15:13, 17; 16:2, 19-20, 22; 17:1, 5, 13, 24; 18:2, 4; 20:14-16, 18-20; 26:12; 27:9; 28:9; 31:20; 32:7;

36:2, 16, 20; 37:12, 15, 22, 24; 38:9, 13, 16; 39:5, 8; 40:10; 41:6, 18, 21; 46:18; 47:13, 15, 23; 48:12; 51:3; 54:11, 14; 55:20, 23; 59:8; 62:2, 5, 7-8, 13; 63:12, 14; 64:22; 65:23; 66:12; 82:20, 24-25; 83:2; 84:3, 5; 85:2, 11; 86:10; 87:21; 88:5-8, 16, 22
**great** [2] - 8:11; 89:3
**greatest** [1] - 63:3
**ground** [3] - 4:7; 59:23; 60:2
**grounds** [3] - 19:1; 33:14; 47:1
**guarantee** [1] - 7:11
**guess** [8] - 9:11; 21:16; 40:11; 42:5; 44:10; 58:11; 74:17; 82:22
**guessing** [1] - 59:2
**guidance** [3] - 35:23; 37:2; 41:13
**guys** [1] - 56:13
**half** [2] - 35:13; 70:18
**hand** [1] - 13:12
**handed** [1] - 51:21
**handful** [1] - 20:20
**handling** [1] - 85:13
**hands** [1] - 25:7
**hands-offy** [1] - 25:7
**happy** [4] - 3:9; 4:16; 22:11; 23:7
**hard** [3] - 7:7; 37:5; 59:24
**harm** [16] - 3:19, 22; 5:14; 6:9; 11:6; 24:24; 26:6, 10; 32:16;

56:22; 76:25; 77:2, 8, 20, 23
**harmed** [1] - 81:24
**harmful** [1] - 79:16
**hate** [2] - 80:9, 13
**hateful** [1] - 79:21
**head** [3] - 40:13; 62:23; 88:1
**headed** [1] - 65:5
**headlong** [2] - 10:9; 40:18
**heads** [3] - 30:9; 85:24
**hear** [7] - 3:9; 13:3; 16:12; 23:6; 31:16; 70:2
**heard** [3] - 11:24; 60:20; 74:7
**hearing** [7] - 2:7; 5:14; 11:24; 56:3, 8; 82:16; 87:24
**heated** [1] - 80:23
**heck** [1] - 28:24
**heels** [1] - 27:3
**held** [4] - 30:15, 17; 84:7; 89:12
**help** [2] - 48:24
**hereby** [1] - 89:11
**hesitant** [1] - 70:25
**hide** [3] - 53:8, 12; 54:4
**highlight** [2] - 64:13; 73:21
**hill** [1] - 58:16
**hire** [1] - 79:21
**historically** [1] - 80:8
**hither** [1] - 84:10
**hmm** [1] - 53:2
**hold** [1] - 26:1
**holds** [1] - 55:9
**holy** [1] - 74:24
**hone** [1] - 26:22
**honest** [1] - 80:17
**Honor** [58] - 2:17, 20, 23; 3:11; 4:16; 7:21; 8:1; 9:13; 10:13, 16, 25; 11:23; 12:23; 15:23; 17:12, 25; 18:6, 21; 19:7, 20; 20:13; 21:2, 10, 14; 22:4, 9; 23:10; 25:10;

26:13; 27:18; 29:13; 30:3; 33:25; 39:9, 19; 45:21; 47:7; 50:1; 51:18, 21; 52:25; 53:15; 56:24; 60:7; 61:1; 68:15; 69:10, 17; 75:11; 76:21; 83:23; 84:15; 85:17; 86:14, 18, 23; 87:2, 4
**Honor's** [3] - 13:8; 65:5; 82:16
**hopefully** [2] - 13:1; 40:22
**hoping** [1] - 29:14
**horrible** [1] - 79:22
**hot** [1] - 10:20
**hours** [4] - 70:3, 25; 71:2
**Humanitarian** [1] - 55:8
**hundreds** [2] - 20:3
**hurried** [1] - 16:16
**hurry** [1] - 73:17
**hurt** [2] - 79:3
**hypothetical** [2] - 24:16; 58:3
**idea** [6] - 19:8; 20:15; 46:19; 79:20; 81:23; 86:1
**identical** [4] - 63:8; 86:11, 13
**identically** [4] - 8:5; 10:6; 13:16; 14:4
**identification** [2] - 18:17; 65:20
**identified** [5] - 14:14; 32:3; 33:19; 83:2; 88:4
**identify** [1] - 27:23
**ignore** [1] - 78:22
**illegal** [2] - 26:7; 27:7
**illustrates** [1] - 40:8
**immaterial** [1] - 30:16
**immediately** [2] - 27:1; 79:8
**imminent** [1] - 32:7

**impact** [5] - 4:1; 18:7; 34:7; 85:5
**impacted** [1] - 17:6
**impacts** [1] - 84:8
**impending** [1] - 23:25
**implausible** [1] - 38:2
**implicates** [1] - 16:25
**important** [1] - 28:1
**importantly** [1] - 77:4
**impose** [2] - 47:18; 86:6
**impractical** [1] - 10:1
**improper** [1] - 19:3
**inasmuch** [1] - 64:2
**include** [7] - 16:24; 33:4; 47:1; 68:9; 73:20; 82:23; 87:18
**included** [3] - 17:12; 53:16; 56:13
**includes** [6] - 27:10; 45:12; 60:22; 61:14; 68:2
**including** [10] - 27:10, 21; 28:1; 46:4, 10-11, 13, 22-23; 85:16
**inclusion** [3] - 58:15; 65:22; 73:22
**Inclusion** [2] - 16:3; 66:11
**inconsistent** [2] - 61:24; 72:4
**incorrect** [2] - 54:22; 82:2
**incorrectly** [2] - 33:14
**incredibly** [2] - 38:2; 84:20
**incurred** [2] - 48:1, 3
**indicate** [1] - 7:11
**indicated** [1] - 67:4
**indication** [1] - 18:9
**individual** [1] -

14:9
**individualized** [2] - 49:12; 76:8
**individuals** [2] - 28:2; 80:7
**inexorably** [1] - 23:2
**information** [6] - 13:2, 15; 49:15; 66:21; 67:7; 74:14
**informs** [1] - 21:20
**infrastructure** [1] - 3:25
**infringement** [1] - 55:2
**initial** [1] - 17:10
**initiatives** [5] - 65:25; 71:22; 79:16
**injunction** [15] - 2:7; 3:20; 13:10; 21:4; 24:11; 47:21; 76:22; 77:10, 20; 78:25; 79:3-5; 85:8; 86:8
**injunction/ temporary** [1] - 51:24
**injury** [7] - 23:13; 24:1, 5, 15; 79:7; 80:4; 81:13
**injustice** [1] - 78:24
**inquire** [1] - 13:1
**inquiring** [1] - 12:22
**inquiry** [3] - 15:11; 30:2; 83:8
**instance** [1] - 34:4
**instant** [1] - 24:24
**instead** [3] - 37:7; 40:1; 44:16
**instituted** [1] - 31:19
**institution's** [1] - 23:15
**institutional** [1] - 11:7
**institutions** [2] - 6:21; 9:8
**instructed** [1] - 30:10
**insufficient** [2] - 65:2

**intellectually** [1] - 80:17
**intended** [1] - 53:19
**intent** [2] - 7:13; 62:1
**intentionally** [1] - 35:12
**intents** [1] - 12:15
**interest** [12] - 34:19, 23; 35:4; 77:9, 25; 78:11, 13-14; 81:4, 6, 8
**interested** [1] - 82:8
**interesting** [6] - 79:14, 17; 80:15; 81:7; 82:14
**interests** [5] - 39:12, 17; 61:20; 72:3; 78:24
**internal** [3] - 53:18; 54:2, 6
**interpretation** [1] - 38:4
**intro** [1] - 17:19
**introduce** [2] - 2:9; 22:24
**introduces** [1] - 41:1
**invitation** [1] - 30:2
**invitational** [1] - 41:2
**invite** [1] - 41:4
**invited** [1] - 10:19
**inviting** [1] - 22:17
**invocation** [1] - 23:12
**invoke** [3] - 23:3, 14; 66:24
**invoked** [1] - 39:4
**invoking** [2] - 23:21, 24
**involve** [1] - 14:15
**involved** [4] - 11:5; 48:24; 77:15; 88:14
**irreparable** [9] - 3:19, 22; 5:14; 11:6; 76:25; 77:2, 8, 20, 23
**issue** [45] - 3:4; 5:1, 9; 7:3; 9:11; 10:5; 11:7; 15:21; 16:11,

13; 18:19; 21:4; 30:20; 33:8; 35:21; 36:24; 38:5; 40:8; 42:6; 57:8; 59:10; 60:5; 63:22; 64:13, 15; 65:1, 17, 23-24; 69:10; 70:4; 73:1, 20; 76:2; 77:21; 78:21; 81:4; 82:18, 21; 83:7; 84:7; 85:13; 86:8
**issued** [8] - 25:21; 27:22; 30:8; 84:5, 23, 25; 85:9; 86:21
**issues** [22] - 3:16; 4:21; 5:4, 6, 16, 21; 10:11, 14; 25:3; 48:21; 52:18; 57:17; 68:10; 71:12; 72:12; 75:20; 78:2
**itself** [5] - 16:14; 30:19; 61:23; 68:8; 69:2
**J20** [4] - 25:16; 26:18; 27:4
**J20's** [1] - 26:8
**jacket** [1] - 10:19
**Jackson** [1] - 80:22
**January** [1] - 50:16
**job** [1] - 80:18
**Josh** [1] - 2:11
**Joun** [4] - 6:17; 65:1; 75:12
**Joun's** [1] - 88:9
**JRR-25-cv-0072** [1] - 2:4
**judge** [4] - 79:9; 81:16, 25
**Judge** [27] - 6:17; 19:4; 20:10; 21:19; 22:6, 25; 23:4; 26:1, 4, 25; 32:14; 50:21; 54:10, 24; 55:4, 13, 22, 25; 56:1, 7, 12, 25; 57:10; 65:1; 75:12; 88:9
**judge's** [1] - 6:17
**Judicial** [1] - 89:13
**judicial** [1] - 22:8

**jump** [1] - 10:25
**jurisdiction** [2] - 9:24; 11:15
**jurisdictional** [4] - 4:22; 5:4, 6, 20
**justice** [2] - 69:23
**Justice** [5] - 79:19, 24; 80:22
**Kagan's** [1] - 80:22
**keep** [2] - 45:21; 50:2
**kind** [18] - 11:7; 13:2; 16:16; 19:4; 23:25; 35:8; 44:22; 50:7; 55:21; 60:19; 62:18; 65:3; 67:1; 79:20, 22-23; 87:21; 88:7
**kinds** [1] - 88:21
**kitchen** [1] - 74:23
**known** [2] - 55:19; 75:20
**land** [3] - 13:10; 51:4
**language** [7] - 40:8; 50:18; 62:7, 15; 63:9; 65:23; 67:21
**large** [2] - 24:19; 67:10
**largesse** [1] - 71:18
**last** [5] - 13:19; 47:14; 67:3; 85:8
**Laughter** [2] - 10:22; 21:11
**Laurie** [1] - 17:2
**law** [26] - 8:20; 11:15; 15:14, 20; 35:2; 38:4; 47:6; 54:25; 62:8-10, 21, 24; 63:1, 4, 13, 15; 66:4; 71:25; 75:4, 6, 8; 76:11; 81:21, 25; 87:7
**lawful** [1] - 25:19
**laws** [4] - 15:9; 62:17; 65:23; 67:20, 24
**lawsuit** [3] - 15:22; 47:15; 74:2
**leaked** [1] - 53:16

**leaking** [1] - 54:1
**learned** [2] - 17:5; 72:15
**least** [11] - 6:4; 14:4; 15:6; 18:10; 35:13; 60:20; 66:12; 67:22; 77:15; 81:9; 83:4
**leave** [1] - 76:19
**leaves** [1] - 51:10
**left** [1] - 13:6
**legal** [4] - 22:14; 68:10; 71:4; 72:11
**length** [1] - 3:23
**lens** [5] - 15:11; 26:2, 5; 55:4; 80:9
**less** [3] - 76:1, 5; 79:8
**letter** [37] - 27:10; 28:23; 39:9; 47:24; 52:25; 57:4, 8, 10; 58:9, 13-14, 18, 21; 65:24; 66:3, 15, 20, 23; 67:2, 22; 68:8; 69:2; 70:20; 71:15, 24; 72:16; 73:7; 74:1, 24; 75:8, 24; 76:1, 11; 86:11
**letterhead** [1] - 89:2
**letters** [19] - 38:12, 22; 50:20; 51:1; 52:15; 53:13; 58:4; 63:17; 64:6, 18, 21; 65:2, 6, 9; 75:13; 76:8; 86:14
**level** [2] - 15:24; 16:9
**lickety** [1] - 56:2
**lickety-split** [1] - 56:2
**light** [2] - 3:17; 15:4
**lightning** [1] - 79:22
**likelihood** [3] - 29:7; 77:7, 23
**likely** [4] - 34:25; 54:24; 58:22; 79:8
**limit** [2] - 29:9;

82:20

**limited** [2] - 83:1, 3

**limitless** [1] - 45:23

**Linda** [1] - 30:15

**line** [2] - 20:9; 85:15

**lines** [1] - 19:1

**linguistic** [1] - 42:19

**linguistically** [1] - 42:19

**list** [9] - 43:6; 74:23; 84:6; 85:9, 15; 86:5, 7, 20, 22

**listed** [3] - 67:3; 84:11; 85:24

**listen** [1] - 29:22

**listening** [1] - 83:8

**lists** [1] - 46:17

**live** [1] - 7:14

**loan** [2] - 7:13; 9:24

**locate** [1] - 8:20

**located** [2] - 18:25; 63:2

**logic** [2] - 27:19; 40:6

**logical** [1] - 41:23

**Longmore** [1] - 89:10

**LONGMORE** [1] - 89:16

**look** [14] - 13:4; 21:20; 36:21-23; 40:23; 44:7, 20; 52:10; 55:2; 56:2; 69:1; 87:6, 10

**looked** [1] - 58:5

**looking** [13] - 16:6; 24:5; 36:18; 42:20; 43:11, 20; 44:4; 47:24; 51:20; 55:3; 66:8; 71:10

**looks** [1] - 41:20

**loop** [1] - 46:21

**loops** [1] - 46:7

**lose** [3] - 3:23; 4:4

**loss** [1] - 17:7

**loudly** [1] - 19:12

**lousy** [1] - 72:13

**love** [1] - 49:20

**lumped** [1] - 18:3

**MACTE** [17] -

5:24; 6:12; 8:18, 23; 9:5, 8; 11:25; 16:18-21, 24; 17:3, 13; 18:25; 23:13

**MACTE's** [5] - 16:25; 18:1; 23:14, 19, 24

**main** [4] - 4:21; 57:2; 71:7

**maintain** [1] - 69:2

**majority** [1] - 8:20

**mandates** [1] - 28:14

**manner** [2] - 60:5; 62:16

**March** [1] - 89:14

**marked** [1] - 51:22

**Maryland** [31] - 6:1, 15; 8:18; 9:7, 20; 11:11; 17:1, 4, 6, 8; 18:8, 14, 18, 24; 19:15; 20:20; 21:18; 22:5; 23:24; 67:5, 8; 87:18, 20; 88:3, 19; 89:11

**Massachusetts** [9] - 11:24; 12:7; 13:19; 64:25; 81:6, 9, 11, 14

**materially** [3] - 14:17, 19; 15:1

**matter** [10] - 2:3, 6; 6:3; 38:4; 69:21; 77:17; 78:6; 81:25; 89:2, 12

**matters** [2] - 22:22; 29:2

**McMahon** [4] - 2:5; 28:7; 30:15; 72:24

**mealy** [1] - 42:10

**mean** [53] - 14:11; 15:15; 19:4; 20:24; 21:24; 22:13, 23; 23:6; 24:4, 14-15; 27:17; 29:11, 19; 30:23; 31:25; 32:5, 9; 33:15; 34:7; 37:25; 41:18; 44:17; 45:7, 16, 25; 46:25; 50:24; 51:19;

54:12; 55:15; 61:4; 63:21; 64:2; 68:3; 69:16, 21, 23-24; 70:10, 17; 74:24; 75:4-8; 77:22; 81:7; 86:6, 16

**meaning** [2] - 58:16; 59:1

**means** [7] - 37:11; 38:1; 42:12; 44:17; 46:22; 47:16; 60:24

**meant** [2] - 54:6; 83:12

**meat** [1] - 10:15

**meet** [1] - 77:12

**meeting** [1] - 87:9

**Megan** [1] - 2:23

**member** [3] - 17:3; 18:1

**members** [23] - 6:4, 9, 11; 8:4; 9:3, 8-9; 16:19, 24; 17:5; 23:14; 27:8; 38:22; 47:14; 85:9; 86:8; 87:18, 20; 88:3

**members'** [2] - 16:22; 23:24

**membership** [2] - 5:25; 6:8

**memo** [1] - 54:2

**mention** [3] - 23:20; 27:13; 80:5

**mentioned** [2] - 50:22; 82:6

**mentions** [3] - 20:17; 55:5; 79:20

**mere** [1] - 39:4

**merely** [1] - 43:1

**merit** [3] - 64:16; 72:1; 80:3

**merits** [6] - 11:1; 29:8; 77:11, 17, 23; 85:18

**mess** [1] - 20:2

**Messitte** [2] - 19:4; 20:11

**MICCO** [1] - 2:23

**Micco** [1] - 2:23

**mid** [1] - 16:21

**middle** [1] - 38:20

**might** [24] - 7:25; 10:23; 13:6; 14:22; 15:1, 13,

18-19; 19:22; 20:25; 21:21; 28:2, 15; 45:5; 53:15; 54:13; 56:9; 72:21; 73:4; 74:22; 80:6; 81:11; 87:9

**mightily** [1] - 56:7

**mind** [2] - 4:12; 46:1

**minded** [1] - 28:2

**mindful** [1] - 9:17

**minds** [1] - 22:18

**minimus** [1] - 83:18

**minor** [1] - 86:15

**minority** [1] - 14:24

**minute** [1] - 87:6

**minutia** [1] - 85:5

**misappropriated** [1] - 80:8

**misfortune** [1] - 20:8

**misidentified** [1] - 33:17

**mispronouncing** [1] - 6:17

**mission** [6] - 16:25; 23:15; 30:24; 31:1; 62:3

**misstated** [1] - 17:19

**Molissa** [1] - 2:20

**moly** [1] - 74:24

**moment** [9] - 3:6; 26:25; 52:4, 10; 59:9; 60:21; 64:12; 67:11; 78:9

**moments** [1] - 3:1

**Monday** [1] - 11:25

**money** [18] - 6:22; 7:6, 12; 12:6, 8-11, 15; 13:5, 8, 11; 47:17; 73:6; 81:10, 19, 22

**MOORE** [1] - 2:17

**Moore** [2] - 2:17; 3:9

**mootness** [2] - 7:3; 10:11

**morning** [11] - 2:11, 13, 16-17, 19-20, 22-23, 25; 12:5; 29:20

**most** [6] - 6:6; 11:4; 37:10; 50:21; 70:19; 83:24

**motion** [9] - 3:17; 5:10; 11:18; 16:14; 21:1, 23; 51:24; 55:8; 70:13

**motor** [1] - 65:13

**movant** [1] - 78:3

**move** [10] - 6:14; 8:10; 23:9; 34:19; 47:11; 50:7; 59:16; 61:19, 21

**moving** [4] - 3:3; 20:8; 55:24; 65:9

**MR** [112] - 2:11, 17; 3:11, 15; 4:16; 5:20; 6:19, 23; 7:1, 5, 9, 21; 8:1, 10, 12, 25; 9:2, 6, 10, 13, 15; 10:13; 22:4; 23:9, 17; 24:3, 6, 8, 18, 21; 25:2, 9, 12; 26:3, 13; 27:5, 18; 29:1, 13, 17; 30:3; 31:11; 32:4, 8, 24; 33:1, 5, 7, 12, 16, 21, 24; 34:2, 16, 21; 35:6, 8; 38:8, 17; 39:1, 9, 18, 22, 25; 40:3, 7, 25; 42:2, 8, 11, 14, 17, 21; 43:8, 18, 25; 45:13, 15, 21; 46:3, 8, 11, 17; 47:7, 9, 11; 48:11, 15, 18; 49:2, 5, 8, 20; 51:18; 83:23; 84:15, 20; 85:17, 22; 86:13, 18, 23; 87:2, 17, 23; 88:1, 11, 14, 18, 23, 25; 89:4

**MS** [127] - 2:14, 20, 23; 5:10, 15; 10:16, 23; 11:3; 12:3, 18, 20, 23; 13:24; 14:16, 18, 20; 15:23; 16:2; 17:12, 16,

21; 18:21; 19:6, 14, 18, 20, 24; 20:2, 5, 12; 21:2, 8, 10, 14, 16, 25; 50:1, 5, 10, 15; 51:21; 52:3, 5, 8, 15; 53:3, 23, 25; 55:25; 56:6, 24; 57:20; 58:6, 20; 59:2, 5, 13, 15, 18; 60:7, 12; 63:24; 64:12, 24; 65:8; 66:17, 20; 67:1, 12, 16; 68:14, 17, 20; 69:10, 17, 20, 25; 70:3, 9, 11, 15; 71:5, 7, 10; 73:11, 14, 18, 25; 74:9, 11, 13, 20; 75:6, 11, 17; 76:3, 6, 10, 14, 18, 21, 25; 77:4, 14; 78:5, 8, 11, 16, 19; 79:7, 13; 80:10, 14, 19, 21; 81:1, 5, 17; 82:1, 5, 10, 13, 18; 83:11, 15, 19; 87:4

**muddying** [1] - 35:18

**Mullen** [1] - 17:2

**multicultural** [1] - 65:19

**multiyear** [5] - 7:18; 38:15, 25; 39:7, 14

**must** [2] - 39:15; 62:15

**myopic** [1] - 28:14

**NADOHE** [26] - 4:25; 22:7; 25:14; 50:6, 12, 15, 22, 24; 51:9, 25; 52:9, 16, 19; 53:7; 54:3, 19, 21-22; 55:14, 21; 56:8; 57:1, 12

**name** [3] - 6:17; 73:5; 86:6

**narrative** [1] - 32:1

**narrow** [2] - 35:12; 76:12

**narrowed** [1] - 3:17

**national** [1] - 66:2
**nature** [4] - 16:15; 20:10; 22:17; 30:2
**NCTRs** [1] - 18:2
**necessarily** [5] - 4:14; 23:3; 27:15; 29:17; 81:24
**necessary** [1] - 46:12
**need** [19] - 3:2, 6; 4:12; 10:23; 14:23; 26:23; 36:15; 45:1; 46:25; 47:2, 16; 48:17; 49:25; 56:2; 79:15; 83:25; 86:19; 87:20
**needs** [3] - 24:16; 35:11; 49:23
**neighborhood** [1] - 20:18
**never** [1] - 87:9
**nevertheless** [1] - 25:19
**new** [5] - 37:6, 17; 59:7; 60:14
**next** [1] - 67:13
**night** [2] - 13:19; 47:14
**nobody** [1] - 74:8
**non** [2] - 19:5; 20:23
**nondiscriminati on** [1] - 62:16
**none** [3] - 11:13; 33:18; 67:5
**normal** [2] - 70:17; 71:10
**normally** [1] - 48:6
**note** [4] - 4:18; 42:25; 50:10; 59:18
**noted** [3] - 21:10; 50:15; 64:3
**notes** [3] - 16:16; 87:6, 11
**nothing** [4] - 20:7; 38:5; 40:14; 61:16
**Notice** [4] - 36:10; 40:16; 41:7; 85:2
**notice** [12] - 32:23; 36:20; 43:12; 44:15, 23; 45:4, 18;

61:23; 73:8; 74:1; 76:15; 84:12
**notice-and-Comment** [1] - 44:15
**Notice-and-Comment** [4] - 36:10; 40:16; 41:7; 85:2
**noticed** [1] - 11:3
**notices** [3] - 38:23; 84:5
**noticing** [1] - 31:19
**notion** [1] - 23:25
**number** [6] - 12:1; 51:25; 52:1; 57:5; 66:5; 67:10
**Number** [2] - 2:4; 72:10
**numbers** [1] - 69:9
**nutshell** [1] - 33:24
**obeyed** [1] - 28:6
**objection** [2] - 51:16, 20
**objectively** [1] - 31:18
**obligation** [2] - 84:7; 85:1
**obvious** [3] - 75:1; 77:24; 78:7
**obviously** [1] - 76:9
**OF** [1] - 89:9
**offend** [1] - 15:20
**offended** [1] - 32:23
**offenders** [1] - 73:2
**offensive** [1] - 32:3
**offer** [5] - 30:5; 50:5, 11-12; 51:6
**offhand** [1] - 19:25
**office** [4] - 20:8; 61:19, 22; 85:3
**offices** [1] - 84:22
**OFFICIAL** [2] - 89:9, 16
**offy** [1] - 25:7
**often** [4] - 27:14; 78:1, 3, 7
**Oglesby** [2] -

13:21; 14:15
**Oglesby's** [3] - 13:25; 28:10, 24
**old** [2] - 67:7; 76:4
**omits** [1] - 28:7
**once** [3] - 7:1; 10:19; 84:23
**one** [39] - 8:14, 21; 9:15; 13:14; 14:22; 18:17, 23; 20:14; 21:16; 23:10; 27:8; 30:25; 31:7; 35:16, 19, 21; 37:19; 43:5; 45:15; 47:9, 25; 51:10; 53:21; 55:6; 66:17; 67:11; 73:14; 74:10, 21; 79:19; 80:17; 82:14; 84:2; 86:9; 87:15; 88:19
**ones** [1] - 82:23
**ongoing** [1] - 32:16
**onlooker** [1] - 15:19
**open** [1] - 70:23
**opening** [1] - 55:7
**opens** [1] - 27:20
**operate** [1] - 4:4
**operated** [1] - 62:16
**operation** [1] - 85:6
**opinion** [9] - 19:19; 50:23; 52:20; 54:3; 55:5; 57:1; 63:23; 80:23; 82:3
**opportunity** [3] - 10:25; 21:4, 23
**opposed** [1] - 57:17
**opposing** [1] - 81:2
**opposite** [1] - 55:14
**opposition** [2] - 11:18; 16:14
**option** [2] - 37:25; 69:22
**Order** [22] - 27:4, 13, 16, 22; 28:6, 13, 21; 50:16; 51:2, 8; 52:19, 21-22, 24; 53:4,

9, 13; 54:5, 7; 56:9; 73:1
**order** [33] - 4:25; 6:24; 7:5, 14; 14:24; 22:7; 23:1; 25:3, 14, 16, 19-20, 22, 24; 26:4, 18; 27:4; 30:18; 39:13; 45:1; 49:2, 8; 50:18; 51:24; 55:24; 56:13; 86:21; 88:9, 15
**ordered** [4] - 47:22; 49:18; 82:12
**orders** [3] - 51:11; 58:8, 12
**organization** [3] - 5:25; 6:8; 34:9
**organizational** [3] - 6:8; 16:18; 17:11
**organizations** [7] - 6:1; 8:4; 17:4; 18:1; 30:21; 85:10
**organize** [1] - 3:1
**origin** [1] - 66:2
**original** [1] - 67:6
**otherwise** [3] - 27:11; 39:11; 72:3
**ought** [1] - 37:7
**ourself** [1] - 82:20
**ourselves** [1] - 26:7
**outcome** [2] - 70:7; 84:18
**outset** [2] - 11:10; 64:4
**outside** [1] - 55:10
**overarching** [1] - 16:11
**overlap** [1] - 22:22
**overwhelmed** [1] - 9:22
**own** [6] - 28:2, 8; 47:22; 54:8; 57:14; 72:25
**owned** [1] - 87:10
**p.m** [3] - 87:14; 89:8
**Page** [15] - 16:19-21, 23; 17:18, 23, 25; 48:1; 53:1; 55:9,

14; 62:14; 63:9; 64:4
**page** [5] - 27:2; 63:2; 70:11; 72:7; 89:13
**pages** [1] - 62:12
**pagination** [1] - 48:1
**paper** [1] - 43:5
**papers** [3] - 4:14; 25:13; 89:6
**Paragraph** [3] - 16:23; 17:16; 64:4
**paragraph** [3] - 16:24; 71:17, 20
**Paragraphs** [3] - 14:6; 17:3; 86:16
**Park** [2] - 6:4; 9:2
**parlance** [1] - 22:19
**parsing** [1] - 35:17
**Part** [7] - 41:18; 43:2; 45:10; 46:20, 22; 61:7
**part** [13] - 6:5; 8:2; 19:6; 29:20; 42:22; 47:21; 50:16; 52:15; 63:3; 65:25; 66:12; 71:22
**participants** [1] - 73:6
**particular** [2] - 8:5; 36:8
**particularly** [4] - 10:2; 23:1; 81:7; 82:11
**parties'** [1] - 29:21
**partner** [1] - 87:7
**parts** [3] - 3:4; 41:20; 67:22
**past** [2] - 24:5; 37:18
**pasted** [1] - 65:4
**Pause** [2] - 52:6, 13
**pay** [7] - 47:16; 48:13, 22; 49:10, 13, 17
**peace** [1] - 20:12
**pending** [1] - 2:3
**people** [13] - 15:7; 27:24; 41:5; 54:12; 59:25; 69:12; 71:1; 78:15, 18-20;

79:16; 80:1
**percentage** [1] - 14:24
**performance** [1] - 48:6
**perhaps** [4] - 14:12; 17:22; 26:15; 71:16
**peril** [1] - 78:23
**period** [2] - 38:20; 48:6
**permission** [1] - 47:17
**person** [3] - 74:5, 7; 75:3
**personal** [1] - 40:13
**perspective** [9] - 24:22; 34:22; 41:9-11; 79:14, 18; 80:15
**philosophical** [1] - 31:17
**phrase** [12] - 35:21; 50:21, 23, 25; 53:4; 57:1, 3; 60:22; 68:2; 79:21, 24; 85:12
**PI** [6] - 23:8; 24:24; 29:10, 21; 48:23; 83:7
**PI's** [1] - 24:15
**picked** [1] - 18:12
**picture** [8] - 16:2; 41:9; 60:14, 19; 62:3; 64:17; 68:5
**piece** [2] - 42:4; 43:9
**piling** [2] - 39:24
**pills** [1] - 59:25
**pin** [2] - 4:9; 64:24
**place** [3] - 25:20; 45:25; 81:22
**placed** [3] - 47:13; 49:10, 15
**places** [1] - 80:2
**placing** [3] - 47:23; 49:13, 17
**plain** [1] - 60:25
**plaintiff** [14] - 5:17, 23; 8:4, 19, 21; 12:6; 13:11; 20:14; 51:5; 55:7; 58:21; 60:8; 73:4; 79:6
**plaintiffs** [37] - 2:8, 12, 15;

6:12; 10:6; 11:20; 12:1; 13:1, 7, 13, 16; 16:7; 18:24; 19:11, 14; 20:21; 55:19, 21; 57:9; 58:10, 13; 63:16, 25; 65:1; 66:13, 21; 67:8, 25; 68:22; 73:19; 74:7; 75:18; 79:1, 9; 82:21; 83:4; 86:9

**plaintiffs'** [15] - 12:13; 13:3; 18:11; 50:10, 22; 51:13; 54:20; 56:19, 22; 57:14; 59:19; 60:18, 20; 61:2, 16

**plan** [1] - 6:25

**plant** [1] - 5:18

**play** [1] - 40:6

**pleading** [1] - 17:10

**pleadings** [1] - 64:3

**point** [39] - 6:3; 7:23; 9:15; 10:9; 11:19; 12:24; 13:8; 15:23; 17:20; 19:11; 21:17; 23:10; 24:18; 40:8, 11; 45:22; 47:9; 50:10; 51:5; 54:19; 55:6; 57:13; 58:7; 61:1; 62:4, 12; 71:7; 73:18; 74:17; 75:7, 11, 13, 17, 22; 80:21; 82:1, 15; 85:8; 88:11

**pointed** [4] - 11:23; 52:25; 53:3; 86:14

**points** [4] - 17:25; 73:11, 15; 79:24

**poking** [1] - 25:6

**policy** [3] - 40:14; 60:14; 72:1

**political** [2] - 27:20; 40:13

**poor** [2] - 10:1, 6

**portion** [1] - 17:19

**portions** [1] - 38:13

**posit** [1] - 56:3

**position** [19] - 4:3; 7:2; 14:13, 16; 15:3; 17:9; 44:10; 64:20; 65:6, 21; 66:15; 67:14, 16-17; 83:9, 12

**positions** [2] - 71:18; 80:8

**possible** [3] - 11:4; 28:22; 73:14

**possibly** [4] - 18:8; 31:23; 69:9; 80:18

**post** [1] - 54:1

**posttermination** [1] - 48:12

**posture** [3] - 20:13; 31:12, 14

**potential** [6] - 3:25; 52:17; 55:1; 81:13; 86:1

**potentially** [1] - 81:14

**potted** [1] - 5:18

**power** [1] - 80:8

**practical** [3] - 69:21; 70:8; 85:13

**practice** [1] - 22:1

**precipice** [1] - 38:24

**predecessor** [3] - 28:8; 30:15; 72:25

**predicability** [1] - 44:23

**prefer** [2] - 5:3; 10:16

**preference** [2] - 10:19; 25:2

**preferences** [1] - 30:25

**preliminary** [9] - 2:7; 13:10; 21:3; 24:11; 47:21; 51:24; 76:22; 77:10, 19

**preparation** [5] - 4:1, 3; 6:2; 16:13; 17:8

**prepare** [1] - 16:17

**prerogative** [1] - 60:4

**prescribes** [1] - 25:14

**presence** [2] - 79:3, 5

**present** [2] - 11:4; 81:2

**presentation** [1] - 29:14

**president** [2] - 40:12; 60:1

**President** [6] - 27:21-23; 30:7; 50:17; 72:23

**presidential** [1] - 59:21

**press** [4] - 27:12-14; 28:23

**presumably** [1] - 49:14

**presume** [1] - 13:24

**pretending** [1] - 23:22

**pretty** [3] - 7:7; 15:6; 34:22

**previous** [1] - 37:9

**primary** [1] - 49:9

**principal** [4] - 5:2; 25:12; 44:3; 45:3

**principally** [1] - 6:1

**principle** [2] - 31:17; 73:2

**principles** [4] - 25:23; 30:13; 33:20

**priorities** [67] - 5:1; 35:22, 25; 36:6, 9, 19, 25; 37:2, 9, 13, 18, 20, 22; 38:1; 40:9, 14-15, 19, 23; 41:2, 5, 7, 22; 42:13; 44:6, 8-9, 12, 14, 16, 19; 45:24; 46:5, 16-17; 53:14; 60:10, 20, 22-24; 61:6, 8-14; 63:6, 15; 64:19; 68:2-5; 72:5; 84:23

**prioritizing** [1] - 72:1

**priority** [3] - 61:4, 21; 71:17

**privately** [1] - 32:11

**problem** [8] - 26:14; 28:18;

30:20; 33:8, 11; 44:1; 57:2

**problematic** [2] - 48:20; 86:4

**Proceedings** [2] - 52:6, 13

**proceedings** [2] - 89:8, 12

**process** [18] - 29:15, 22, 25; 32:12; 36:19; 39:3, 18; 40:21; 49:11; 50:7, 11; 60:13; 66:22, 25; 67:2; 68:18, 24; 74:15

**Professional** [1] - 89:10

**program** [21] - 6:5; 14:22; 15:7; 31:24; 35:24; 36:7; 41:25; 42:2, 5, 12, 15; 44:6; 46:15; 63:5; 72:20, 22; 73:5, 20, 22; 74:22; 75:1

**programs** [15] - 4:2, 6; 14:15; 15:20; 17:8; 18:9; 24:22; 30:22; 59:22; 62:6, 21, 23; 66:9; 67:23; 71:21

**project** [2] - 39:14, 16

**projects** [1] - 62:15

**promises** [3] - 25:8; 69:24

**promote** [2] - 65:24; 71:22

**promotes** [1] - 15:1

**promoting** [3] - 33:19; 62:20; 72:22

**prompted** [2] - 66:11; 73:23

**prone** [1] - 25:7

**pronouncement** [2] - 31:15, 21

**proper** [2] - 9:20; 20:25

**properly** [3] - 19:10; 48:3; 50:19

**proposals** [1] - 30:11

**propose** [1] - 9:23

**proposing** [1] - 86:7

**proposition** [1] - 64:5

**protected** [2] - 66:2; 71:23

**provide** [5] - 3:25; 6:1; 71:3; 86:7; 89:1

**provided** [2] - 51:13; 66:20

**provides** [3] - 13:25; 71:21; 74:15

**providing** [2] - 85:9, 15

**proving** [1] - 29:5

**provision** [13] - 10:1; 26:8; 36:2; 39:5; 40:3, 18; 61:24; 62:25; 63:1, 7; 67:17

**provisions** [1] - 57:5

**public** [12] - 3:23; 6:3; 34:19, 22; 35:4; 53:20; 54:6; 60:13; 77:9, 25; 78:13; 81:4

**publicly** [3] - 17:19; 32:11; 69:5

**published** [1] - 40:20

**pull** [2] - 65:23; 67:17

**pure** [1] - 41:10

**purely** [1] - 24:10

**purpose** [7] - 2:6; 22:12; 46:15; 66:3; 71:24; 75:8; 77:1

**purposes** [12] - 5:10, 13; 12:15; 15:22; 24:3, 10, 23; 29:6, 15; 48:23; 81:15; 83:8

**pursuant** [7] - 36:4, 7; 37:12; 41:22; 44:3; 89:11

**pursue** [1] - 28:4

**purview** [2] - 56:9; 57:12

**pushed** [1] - 18:18

**put** [10] - 4:9;

10:14; 32:17; 45:3; 55:6; 64:24; 70:1, 13; 76:14; 85:19

**puts** [1] - 73:7

**putting** [1] - 46:20

**quarrel** [2] - 31:16; 64:9

**quarrelling** [1] - 31:24

**questions** [9] - 6:14; 25:6; 35:20; 59:16; 74:6, 16; 83:24; 87:8, 11

**quite** [2] - 78:7; 85:6

**quota** [1] - 14:23

**quotas** [1] - 15:6

**quote** [1] - 72:17

**race** [2] - 30:25; 66:1

**Rachel** [1] - 13:21

**racial** [1] - 14:23

**raise** [1] - 21:17

**raised** [7] - 4:23; 5:1, 22; 26:20; 35:14; 57:9

**raises** [1] - 9:16

**rather** [4] - 3:10; 9:24; 17:11; 27:14

**rationale** [1] - 27:7

**reach** [1] - 45:1

**read** [9] - 18:7, 10; 46:13; 48:21; 52:4; 63:21; 64:10; 74:6; 79:17

**reading** [4] - 27:1; 41:17; 60:25; 63:25

**reads** [1] - 17:22

**ready** [1] - 35:7

**reality** [3] - 47:3; 69:21; 70:8

**realize** [1] - 58:3

**really** [36] - 3:24; 10:20; 15:21; 20:6; 21:18; 22:17; 23:4; 24:13; 30:1; 34:5; 35:16; 37:23; 43:23; 44:17; 45:1; 46:20, 24; 50:19; 51:7, 10; 54:10; 55:6, 19; 56:7; 62:19;

63:20; 65:17; 70:17; 73:4; 74:19; 79:13, 17, 20, 22; 80:22

**Realtime** [1] - 89:10

**reason** [26] - 8:2, 7; 12:24; 15:15; 17:21; 32:11, 14, 22; 43:8; 44:21; 46:18; 53:8, 12; 54:4; 57:19, 21; 63:17; 64:22; 79:23; 84:16; 85:19, 22; 86:2

**reasonable** [3] - 22:18; 38:4; 65:12

**reasonably** [1] - 65:12

**reasoned** [1] - 65:18

**reasoning** [3] - 4:25; 64:20

**reasons** [11] - 14:5; 26:11; 27:10; 28:16; 35:13; 37:15, 23; 49:6; 57:6; 64:7; 77:24

**rebuild** [1] - 59:22

**rebuilding** [1] - 60:1

**rebuilt** [1] - 4:7

**rebuttal** [3] - 49:20, 22; 83:22

**receipt** [1] - 86:10

**receive** [3] - 39:14; 43:13

**received** [1] - 38:23

**recent** [1] - 43:5

**recently** [1] - 6:6

**recess** [5] - 49:23, 25; 87:6, 13

**recipient's** [2] - 72:8

**recipients** [5] - 7:18; 8:3; 31:6; 40:23; 52:17

**Recipients** [1] - 16:24

**recognized** [1] - 23:18

**record** [8] - 2:10; 6:3; 23:11; 28:20; 29:6; 52:16; 68:23, 25

reduction [1] - 69:9

**Reductions** [1] - 69:6

**reference** [5] - 52:24; 53:3, 13-14; 63:16

**referenced** [3] - 13:18; 18:6; 52:20

**referring** [1] - 3:7

**refers** [1] - 84:16

**reflects** [1] - 34:6

**refunded** [1] - 4:6

**regard** [1] - 36:11

**regarding** [1] - 38:13

**Register** [7] - 58:23; 59:6; 60:16; 62:5, 13; 63:2; 84:4

**Registered** [1] - 89:10

**Registers** [1] - 63:9

**regulation** [3] - 35:17; 60:24; 84:17

**regulations** [5] - 38:14; 47:23; 60:16, 25; 89:13

**Regulations** [1] - 66:6

**regulatory** [2] - 37:4; 45:17

**reinstate** [1] - 32:10

**reinstated** [2] - 32:19; 82:24

**reiterate** [1] - 23:10

**relate** [2] - 63:13; 68:18

**related** [18] - 14:15; 22:5, 20-21, 25; 28:9; 30:22; 38:15; 47:12; 50:23-25; 52:18; 53:5; 57:1; 62:7, 25; 67:20

**relates** [3] - 21:25; 61:21; 68:12

**relating** [1] - 16:3

**release** [3] - 27:12; 28:23

**released** [5] - 12:8, 16; 69:5; 81:10, 23

releases [1] - 27:14

**relevant** [2] - 50:16; 66:6

**relief** [8] - 7:10; 11:25; 20:6; 29:10; 48:23; 82:19; 83:1; 86:2

**relies** [1] - 40:4

**religion** [1] - 66:1

**rely** [4] - 9:16; 25:9; 48:24; 53:11

**relying** [2] - 24:24; 64:2

**remained** [1] - 16:21

**remand** [7] - 68:24; 69:9, 11; 70:13, 17, 19; 71:11

**remarks** [1] - 50:23

**remedy** [4] - 32:17; 68:22, 24; 77:19

**remember** [2] - 19:19, 25

**remiss** [5] - 23:20; 70:7; 80:11, 14, 21

**remotely** [1] - 30:14

**remove** [1] - 10:19

**repeatedly** [1] - 55:5

**reply** [2] - 11:21; 17:10

**replying** [1] - 11:17

**report** [2] - 13:20; 82:6

**reported** [1] - 89:12

**REPORTER** [2] - 89:9, 16

**Reporter** [2] - 89:10

**representations** [1] - 70:25

**request** [1] - 21:7

**requested** [1] - 48:23

**requesting** [3] - 39:2; 47:21; 49:3

**requests** [1] - 39:3

require [2] - 59:22; 68:6; 86:21

**required** [6] - 35:2; 49:12; 60:19; 63:19; 65:11; 66:25

**requirements** [1] - 62:17

**requires** [2] - 27:15; 35:17

**resident** [1] - 19:12

**residents** [2] - 17:4; 19:15

**resides** [1] - 18:24

**resist** [2] - 35:10, 19

**respect** [12] - 4:23; 8:5; 16:18; 23:4; 30:12, 19; 37:1, 3; 47:19, 23; 85:2; 87:16

**respond** [1] - 10:11

**responding** [1] - 11:17

**response** [4] - 3:18; 17:10; 53:17; 75:19

**responsibilities** [1] - 48:8

**rest** [3] - 4:14; 20:12; 84:24

**restore** [1] - 34:3

**restored** [1] - 12:10

**restraining** [1] - 51:24

**restroom** [1] - 49:24

**result** [1] - 3:20

**resulting** [1] - 17:7

**retaliation** [1] - 86:2

**retribution** [1] - 85:23

**retroactive** [4] - 56:5, 7, 18, 20

**reversed** [1] - 5:21

**review** [3] - 30:11; 48:8; 69:12

**reviewed** [1] - 66:5

**RICHARDS** [111] - 2:11; 3:11, 15; 4:16; 5:20; 6:19,

3; 7:1, 5, 9, 21; 8:1, 10, 12, 25; 9:2, 6, 10, 13, 15; 10:13; 22:4; 23:9, 17; 24:3, 6, 8, 18, 21; 25:2, 9, 12; 26:3, 13; 27:5, 18; 29:1, 13, 17; 30:3; 31:11; 32:4, 8, 24; 33:1, 5, 7, 12, 17, 21, 24; 34:2, 16, 21; 35:6, 8; 38:8, 17; 39:1, 9, 18, 22, 25; 40:3, 7, 25; 42:2, 8, 11, 14, 17, 21; 43:8, 18, 25; 46:3, 8, 11, 17; 47:7, 9, 11; 48:11, 15, 18; 49:2, 5, 8, 20; 51:18; 83:23; 84:15, 20; 85:17, 22; 86:13, 18, 23; 87:2, 17, 23; 88:1, 11, 14, 18, 23, 25; 89:4

**Richards** [10] - 2:11; 3:10; 22:2; 23:7; 38:16; 51:16; 83:5, 22; 86:25; 87:16

**rights** [13] - 15:9; 62:8, 17, 21, 24-25; 63:13; 65:22; 66:3; 67:20, 24; 71:25; 72:10

**risk** [3] - 47:20; 59:24; 85:25

**root** [2] - 27:16; 73:2

**roughly** [1] - 8:6

**route** [7] - 47:16; 48:13, 22; 49:10, 13, 17

**RPR** [1] - 89:16

**rude** [1] - 74:18

**rule** [2] - 36:15; 60:23

**ruled** [1] - 6:6

**rulemake** [1] - 36:15

**Rulemaking** [16] - 36:10; 40:16; 41:4, 7, 14, 16; 60:13, 19;

61:10, 18, 21, 23; 63:19; 64:15; 68:6; 85:2

**rulemaking** [4] - 36:20; 37:21; 40:18; 60:10

**rules** [5] - 22:10; 48:11; 57:5; 60:17

**ruling** [1] - 21:3

**run** [1] - 15:13

**runs** [1] - 15:9

**sake** [2] - 24:15; 56:19

**salvage** [1] - 11:20

**sarcastic** [1] - 72:14

**sassy** [1] - 69:16

**satisfies** [1] - 78:3

**satisfy** [1] - 17:11

**satisfying** [1] - 40:22

**Saul** [3] - 2:11, 14, 18

**saw** [2] - 82:8

**schedule** [1] - 82:12

**scheme** [2] - 37:4; 45:17

**scope** [2] - 22:10; 82:19

**screenshot** [1] - 54:1

**seated** [1] - 3:1

**second** [6] - 4:10; 43:10; 49:9; 52:8; 53:21; 71:20

**secondary** [1] - 44:25

**secretary** [1] - 53:19

**Secretary** [4] - 28:7; 38:14; 39:16; 72:24

**Secretary's** [1] - 54:8

**sections** [2] - 62:4; 66:6

**see** [19] - 9:4; 12:7; 13:17; 17:17, 21; 18:3; 37:5; 53:4, 22; 56:25; 60:23; 66:7; 67:6, 21; 69:1; 73:19; 81:9; 82:1, 12

**SEED** [6] - 17:1,

25; 18:2; 62:6; 63:9; 88:16
**seeing** [1] - 81:13
**seek** [2] - 11:21; 79:1
**seem** [4] - 4:19; 13:8; 15:21; 78:12
**self** [2] - 16:16; 63:22
**sense** [9] - 20:25; 22:24; 23:3; 27:11; 37:1; 41:10; 44:22; 45:11; 46:24
**sent** [3] - 12:24; 13:18; 52:16
**sentence** [1] - 5:13
**separate** [1] - 39:3
**serve** [2] - 39:11; 72:3
**served** [2] - 19:10; 22:8
**services** [1] - 6:2
**set** [13] - 14:23; 36:19; 39:3; 40:15, 19; 41:4, 7; 56:15; 57:13; 64:7, 20; 84:4, 23
**sets** [2] - 30:9; 64:21
**several** [2] - 51:8; 67:7
**sex** [1] - 66:1
**shall** [2] - 8:10; 68:9
**share** [1] - 23:6
**sharp** [1] - 54:10
**shift** [1] - 60:14
**shopping** [3] - 21:25; 22:3, 14
**short** [2] - 36:14; 65:18
**show** [5] - 11:11; 51:6, 12; 54:10; 68:23
**showed** [1] - 78:20
**shows** [2] - 58:13; 61:3
**shreds** [1] - 80:23
**shuttered** [1] - 24:23
**side** [2] - 78:11, 13
**sides** [1] - 80:24
**sight** [1] - 3:24

**signed** [1] - 50:16
**significance** [3] - 22:21; 46:9; 84:13
**significant** [4] - 11:9; 47:17; 84:21; 85:25
**significantly** [1] - 3:17
**silent** [1] - 20:16
**similar** [4] - 11:23; 19:18; 20:13; 22:22
**similarly** [6] - 14:12; 15:11, 15, 22; 43:1; 86:3
**simple** [3] - 34:22; 35:16; 63:19
**simply** [1] - 80:12
**single** [4] - 8:19; 18:16
**singular** [2] - 60:8; 64:15
**sink** [1] - 74:23
**sitting** [1] - 3:15
**situated** [10] - 8:5; 10:6; 13:16; 14:4, 12; 15:11, 15, 22; 43:1; 86:3
**situation** [4] - 19:13; 69:3; 70:4; 71:8
**situations** [2] - 14:1; 56:9
**smack** [1] - 76:7
**small** [1] - 4:7
**smart** [1] - 69:15
**solution** [2] - 9:22; 10:1
**someone** [2] - 12:9; 66:24
**somewhere** [3] - 17:13; 18:8; 21:1
**soon** [1] - 12:25
**sorry** [5] - 23:9; 44:20; 46:17; 51:25; 88:11
**sort** [48] - 4:18; 5:12, 17; 6:11; 7:10; 10:3; 16:11, 17; 17:23; 18:3; 20:18, 24; 21:20; 22:21; 26:20; 29:10, 21; 32:1, 17; 35:9; 41:8; 42:9;

43:5, 9; 45:2, 10; 46:7; 56:25; 57:6, 8; 59:20; 60:14; 62:3; 64:17; 65:11, 14; 71:18; 77:5; 78:1, 12; 79:14; 81:2; 82:24; 84:22; 85:4
**source** [1] - 57:2
**speaking** [1] - 56:21
**special** [2] - 36:13; 37:17
**specific** [13] - 11:11; 14:9; 16:6; 18:4; 30:12; 41:12; 47:1, 19; 55:18; 85:3
**specifically** [7] - 19:9; 21:19; 22:5; 36:16; 41:15, 19
**specified** [1] - 71:21
**spectacular** [1] - 29:10
**specter** [1] - 80:4
**speculating** [1] - 28:19
**spend** [2] - 47:17; 73:6
**spending** [2] - 7:20; 45:2
**spirit** [2] - 75:4, 6
**split** [1] - 56:2
**staff** [2] - 4:4; 29:20
**stand** [3] - 3:12; 10:17; 55:22
**standard** [3] - 29:11; 55:3, 17
**standing** [15] - 4:23; 5:21, 23; 6:8, 12; 10:11; 11:9; 16:13, 18; 17:11; 23:13, 17; 24:3; 83:6
**standpoint** [2] - 23:24
**start** [6] - 5:3, 5, 21; 16:8; 50:6; 59:19
**started** [1] - 12:12
**starts** [1] - 43:21
**State** [1] - 8:18
**state** [2] - 19:13; 20:9
**statement** [6] -

30:24; 31:1; 68:9; 69:6; 72:11, 17
**statements** [1] - 30:1
**states** [6] - 10:4; 12:2; 18:5, 16; 88:18
**States** [5] - 30:8; 39:12; 72:4; 89:11, 13
**status** [6] - 13:20; 49:16; 82:6; 87:22; 88:5, 7
**statute** [6] - 34:24; 35:17; 36:13; 37:4; 41:5; 55:10
**stay** [1] - 3:15
**stenographicall y** [1] - 89:12
**stenographicall y-reported** [1] - 89:12
**steps** [2] - 31:12
**stick** [1] - 85:24
**still** [8] - 4:12; 5:17; 7:14; 24:21; 30:17; 41:6; 57:15; 65:18
**stop** [1] - 71:6
**straightforward** [5] - 8:13; 57:23-25; 63:19
**strangely** [1] - 53:25
**streamlined** [1] - 11:4
**streamlining** [1] - 77:1
**strict** [1] - 55:3
**strictly** [2] - 24:5; 83:8
**strike** [1] - 30:14
**strikes** [5] - 4:21; 9:25; 10:6; 38:2; 86:4
**strong** [1] - 19:1
**strongest** [1] - 53:15
**struggles** [1] - 56:25
**struggling** [1] - 56:8
**Students** [7] - 6:7; 15:4; 62:19, 22; 79:10, 24
**students** [2] - 14:25; 67:23

**stuff** [3] - 40:19; 41:19; 68:5
**stupid** [1] - 69:15
**subject** [11] - 6:16, 18, 21; 12:3; 14:6; 22:22; 27:17; 60:10; 61:9, 18, 20
**subjecting** [1] - 61:23
**submit** [1] - 13:2
**submitted** [1] - 47:12
**subparts** [1] - 46:1
**Subsection** [2] - 18:22; 67:18
**substance** [1] - 73:9
**substantial** [2] - 8:24; 17:7
**substantially** [1] - 86:13
**substantive** [2] - 57:9; 71:16
**substantively** [2] - 15:18; 69:8
**succeed** [1] - 34:25
**success** [2] - 29:7; 77:23
**successful** [1] - 74:4
**suffer** [1] - 79:6
**suffered** [1] - 6:9
**sufficiency** [2] - 57:7, 10
**sufficient** [7] - 8:22; 45:18; 64:21; 65:6, 10; 66:8; 68:23
**suggest** [2] - 16:10; 70:7
**suggested** [1] - 69:11
**suggesting** [2] - 10:8; 12:21
**suggestion** [2] - 9:17; 10:7
**suit** [2] - 10:19; 88:19
**suited** [1] - 27:25
**super** [1] - 75:1
**super-obvious** [1] - 75:1
**supervisor** [1] - 30:9
**supplemental** [4] - 11:20; 12:4;

13:14
**support** [4] - 4:2; 11:17; 17:1; 27:8
**supported** [1] - 23:13
**supporting** [1] - 47:15
**suppose** [2] - 29:7; 40:12
**supposed** [5] - 54:5; 73:9; 74:25; 75:9, 14
**Supreme** [6] - 6:6; 15:8; 65:12; 77:5, 7, 16
**surely** [1] - 29:8
**surmise** [2] - 66:14; 73:4
**surmising** [1] - 32:2
**surprised** [2] - 12:4; 13:13
**suspended** [1] - 48:5
**synonymous** [2] - 68:3
**systems** [1] - 60:1
**talks** [7] - 41:2, 17, 19; 65:14; 67:18; 72:7
**target** [2] - 32:18; 73:5
**targeted** [1] - 26:12
**task** [1] - 29:22
**teach** [1] - 73:7
**Teacher** [1] - 2:5
**teacher** [5] - 3:25; 4:3; 6:2; 17:7; 59:22
**teachers** [3] - 14:24; 17:1; 73:7
**team** [1] - 20:11
**temporal** [1] - 34:10
**temporary** [2] - 7:5, 10
**ten** [2] - 17:3; 87:6
**ten-minute** [1] - 87:6
**term** [6] - 27:12; 41:25; 42:1, 6, 10; 80:8
**terminate** [14] - 7:13; 14:13; 15:12; 36:21; 38:11; 41:23; 45:5; 46:18;

62:2, 8; 63:14; 64:6; 73:2

**terminated** [45] - 4:2; 8:6; 9:25; 11:12; 14:2, 10; 16:3, 5, 22; 17:13, 24; 18:4, 10, 17; 20:19; 27:9; 31:20; 32:2, 7, 9-10; 33:14; 34:4; 35:25; 37:23; 42:22; 54:11, 13, 15; 55:20, 23; 64:22; 66:9, 14, 16; 72:6, 8, 16; 73:8; 75:1; 86:10; 88:8

**terminating** [6] - 15:17; 18:1; 38:19; 44:7; 51:3; 63:3

**termination** [51] - 14:6; 24:12; 26:8; 27:9, 16; 28:23; 33:9; 34:12; 36:2; 38:12, 23; 39:4, 9-11; 41:19; 43:11, 16; 47:24; 48:2, 4, 7; 50:20; 51:1; 52:25; 57:4; 58:4, 9, 13-14, 18, 21; 61:24; 63:1, 6, 17; 64:6; 67:16, 22; 68:7; 71:15; 72:9, 16, 18; 73:23; 86:11

**terminations** [10] - 14:8; 17:7; 18:7, 16; 27:3; 28:4; 44:23; 56:11; 68:12; 85:12

**terms** [33] - 3:4; 7:20; 15:21; 25:3; 36:5, 22; 41:21; 42:24; 43:2, 10, 14-15, 18; 44:3, 5; 45:4, 10; 46:6, 18; 59:5, 7-8; 62:6; 63:11; 66:4; 67:18; 84:3, 6, 10

**textual** [4] - 41:9, 17; 43:9; 44:1

**textually** [1] -

45:6

**THE** [242] - 2:3, 13, 16, 19, 22, 25; 3:13; 4:9; 5:5, 12, 16; 6:15, 20, 25; 7:4, 6, 15, 22; 8:9, 11, 23; 9:1, 4, 7, 11, 14; 10:8, 14, 18; 11:2; 12:2, 17, 19, 21; 13:23; 14:11, 17, 19; 15:10; 16:1, 12; 17:15, 18; 18:20; 19:3, 9, 17, 19, 23; 20:1, 4, 10, 23; 21:6, 9, 12, 15, 24; 22:2, 13; 23:16, 21; 24:4, 7, 13, 20, 25; 25:5, 11, 25; 26:6, 19; 27:6, 19; 29:4, 16, 19; 31:9, 16; 32:5, 21, 25; 33:3, 6, 10, 13, 18, 23; 34:1, 15, 18; 35:3, 7; 38:7, 11, 21; 39:7, 10, 20, 23; 40:1, 5, 17; 41:25; 42:5, 9, 12, 15, 18; 43:4, 17, 24; 45:12, 14, 20; 46:2, 4, 9, 16; 47:5, 8, 10, 24; 48:14, 16, 19; 49:4, 7, 19, 22; 50:2, 9, 14; 51:15, 19; 52:2, 4, 7, 12, 14; 53:2, 21, 24; 55:24; 56:5, 16; 57:18; 58:2, 17, 24; 59:4, 12, 14, 17; 60:4, 11; 63:20; 64:2, 23; 65:7; 66:13, 19, 24; 67:11, 13; 68:7, 16, 19; 69:8, 14, 18, 21; 70:2, 6, 10, 14; 71:3, 6, 9, 14; 73:13, 17, 24; 74:8, 10, 12, 17, 21; 75:7, 16; 76:1, 4, 7, 13, 17, 20, 24; 77:3, 12, 22; 78:6, 10, 15, 17, 25;

79:12; 80:6, 12, 15, 20, 25; 81:4, 15, 19; 82:4, 8, 11, 17; 83:5, 14, 17, 20; 84:13, 19; 85:14, 21; 86:5, 16, 19, 25; 87:3, 5, 15, 18, 25; 88:2, 13, 17, 21, 24; 89:1, 5

**themselves** [1] - 16:8

**theoretical** [1] - 24:16

**theory** [1] - 24:1

**therefore** [4] - 8:19; 15:17; 22:7; 72:4

**they've** [7] - 4:5; 7:6, 13; 26:19; 49:10; 60:15; 72:15

**thinking** [3] - 15:6; 43:22

**thinks** [1] - 37:6

**third** [2] - 73:14; 75:22

**Thomas** [3] - 79:9, 20, 24

**Thomas's** [1] - 80:23

**thoughts** [1] - 29:24

**threat** [4] - 13:13; 32:7; 34:13; 52:17

**threatened** [1] - 24:15

**threats** [1] - 52:18

**three** [10] - 6:4; 7:17; 17:4; 20:14, 19; 43:6; 61:14; 73:11, 15; 88:3

**threshold** [1] - 11:10

**timing** [1] - 27:6; 51:7

**Title** [2] - 31:4, 6

**today** [12] - 3:23; 22:16; 25:18; 27:22; 29:23; 44:21; 45:19; 47:2; 51:12; 55:22; 59:20

**together** [3] - 18:3; 54:9; 59:19

**tolerance** [1] - 57:16

**TOLL** [1] - 2:14

**Toll** [1] - 2:14

**tomorrow** [1] - 34:8

**ton** [3] - 30:4; 50:11

**tone** [1] - 72:13

**took** [5] - 26:14; 31:11, 13; 59:18; 75:18

**top** [2] - 77:24; 88:1

**topic** [1] - 51:13

**tortured** [1] - 38:3

**total** [1] - 20:15

**touch** [1] - 78:9

**Towson** [6] - 6:4, 15; 9:2; 17:6; 87:19; 88:4

**TQP** [8] - 16:25; 17:24; 18:2; 62:5, 14; 63:1; 88:15

**training** [1] - 59:22

**transcript** [2] - 89:12

**transcripts** [1] - 72:13

**transfer** [3] - 9:21; 19:1; 21:23

**transferred** [1] - 9:23

**transgender** [1] - 72:21

**transitioned** [1] - 19:4

**transitive** [1] - 27:2

**tried** [1] - 25:13

**TRO** [6] - 6:18, 21; 11:24; 29:21; 81:21; 82:9

**troubled** [1] - 50:21

**true** [8] - 8:8; 15:18; 26:4, 21; 37:19; 74:13; 85:7; 89:12

**truly** [1] - 16:15

**Trump** [5] - 27:21-23; 50:17; 72:23

**truth** [1] - 59:24

**try** [4] - 11:14; 25:7; 40:21; 56:8

**trying** [12] - 37:15; 45:21; 47:1;

50:3; 52:21; 54:12; 57:21; 58:7; 69:16; 70:12; 81:1

**TSL** [3] - 17:25; 62:6; 63:10

**Tuesday** [1] - 69:7

**turn** [2] - 3:6; 9:15

**turned** [1] - 7:2; 85:11

**turning** [1] - 68:7

**turns** [1] - 62:22

**Twitter** [1] - 54:1

**two** [18] - 3:6; 8:13; 34:8; 37:19; 38:2; 43:6; 48:15; 51:12; 52:10, 15, 23; 67:5; 73:15; 78:3, 7; 87:19; 88:21

**type** [1] - 22:1

**types** [1] - 67:23

**typically** [3] - 68:22, 24; 80:7

**U.S.C** [1] - 89:11

**ultimately** [1] - 25:22

**um-hmm** [1] - 53:2

**umbrella** [1] - 66:10

**unable** [1] - 34:3

**unambiguous** [1] - 30:8

**unambiguously** [2] - 45:3, 7

**unclear** [2] - 26:16; 48:23

**unconstitutionally** [3] - 25:16; 55:11, 16

**undated** [1] - 53:6

**under** [18] - 8:16, 22; 14:25; 16:5; 17:24; 25:19; 31:4; 35:2, 13; 36:14; 45:4; 46:6; 47:7; 56:9; 57:11; 65:11, 18; 66:10

**underlie** [1] - 25:23

**underserved** [1] - 72:21

**understood** [1] - 88:2

**undertake** [2] - 28:16; 75:9

**unfair** [1] - 33:15

**uniform** [3] - 35:22; 37:2; 41:13

**unique** [1] - 36:10

**unite** [1] - 72:21

**United** [5] - 30:8; 39:12; 72:4; 89:10, 13

**universe** [1] - 70:21

**University** [1] - 6:4

**unlawful** [5] - 25:19; 27:11; 31:4; 64:7; 72:24

**unlawfully** [2] - 65:25; 71:23

**unless** [3] - 3:21; 4:14; 38:3

**unprecedented** [1] - 68:21

**unreasonably** [1] - 85:23

**unrelated** [1] - 47:12

**unwise** [1] - 9:21

**up** [16] - 4:7; 16:17; 17:23; 27:20; 37:6; 44:18; 50:7; 56:14; 59:23; 60:2; 65:23; 67:17; 71:19; 77:6; 84:1

**urgency** [2] - 79:14

**urgently** [1] - 78:21

**USCIS** [1] - 20:8

**uses** [1] - 16:9

**vacated** [1] - 85:12

**vague** [10] - 25:16; 32:10; 50:18; 51:3; 54:16; 55:11, 15-16; 58:12

**vagueness** [14] - 25:23; 30:19; 33:8; 54:18; 55:2; 57:2, 14, 16; 58:10, 12; 59:10, 13

**valid** [1] - 46:20

**values** [1] - 78:16

**vast** [1] - 8:20

**vehicle** [1] - 65:13

**venue** [26] - 4:23; 8:10, 12, 14-16,

19, 22; 9:19, 23;
10:1, 11; 11:9;
18:20; 19:1, 4,
11; 20:22, 25;
21:5, 17, 21, 23;
22:24
**versus** [5] - 2:5;
22:21; 25:4;
34:8; 41:10
**VI** [2] - 31:4, 6
**view** [5] - 7:7, 9;
19:12; 22:13;
35:1
**viewpoint** [2] -
80:7; 81:3
**views** [3] - 30:16
**violate** [6] - 28:4;
31:6; 62:24;
66:3; 67:24;
71:24
**violates** [1] -
65:22
**violating** [2] -
34:23; 67:20
**violation** [1] -
54:25
**violative** [1] -
57:22
**violator** [1] - 58:5
**voted** [3] - 59:25;
60:1; 78:22
**wake** [1] - 44:18
**walk** [3] - 40:5;
42:18
**walking** [1] - 41:8
**wants** [3] - 36:21;
37:12; 61:18
**water** [1] - 26:1
**waters** [1] - 35:18
**ways** [1] - 15:19
**weaken** [1] -
42:13
**weekend** [1] -
67:9
**weeks** [2] - 34:8;
51:8
**weigh** [1] - 78:23
**weighed** [1] - 77:9
**welcome** [1] -
4:15
**well-done** [1] -
89:6
**whole** [5] - 36:3,
18; 41:17;
46:24; 63:3
**wholesale** [1] -
46:7
**win** [1] - 77:17
**Winter** [1] - 10:10
**winter** [2] - 77:5,

7
**wisdom** [1] - 14:7
**wishes** [1] - 72:24
**withdraw** [2] -
12:11; 13:6
**withdrawn** [1] -
12:14
**word** [13] - 7:11;
37:6; 39:6;
41:11; 46:9, 13;
60:21-23; 61:4,
13-14; 68:3
**words** [30] - 7:16,
24; 14:12; 24:4,
14; 26:6, 22;
31:22; 33:16;
38:2, 22; 46:5;
56:16; 58:14-21;
66:13; 75:7;
79:1; 81:19, 22;
83:17; 88:8
**works** [1] - 50:8
**world** [4] - 18:13;
71:10; 82:21
**wow** [1] - 73:4
**wrap** [2] - 50:7;
84:1
**writ** [1] - 24:19
**write** [2] - 46:25;
56:14
**writing** [1] - 72:9
**written** [1] - 76:5
**year** [4] - 13:12;
19:22; 62:1
**years** [2] - 7:19;
13:9
**yesterday** [1] -
12:25
**yon** [1] - 84:10
**young** [1] - 87:6
**yourself** [1] - 86:1
**yourselves** [1] -
2:9
**youth** [1] - 72:21
**zealously** [1] -
81:1
**zero** [2] - 13:6;
29:19
**§** [6] - 35:22; 36:2;
38:7; 67:15;
89:11