

**U.S. Department of Justice**
Civil Division, Appellate Staff
950 Pennsylvania Ave. NW
Washington, DC 20530

Tel: (202) 514-3388

April 4, 2025

**Via CM/ECF**

Nwamaka Anowi, Clerk of Court
U.S. Court of Appeals for the Fourth Circuit
Office of the Clerk
1100 East Main Street, Suite 501
Richmond, VA 23219

RE:  *American Association for Colleges for Teacher Education v. U.S. Department of Education*, No. 25-1282
(not scheduled for oral argument)

Dear Ms. Anowi:

I write to alert the Court to the Supreme Court's recent granting of the government's application for a stay pending appeal in *Department of Education v. California*, No. 24A910 (U.S. Apr. 4, 2025). Like this case, that case involves a challenge to the Department of Education's termination of various grants where the district court entered preliminary relief enjoining the government from giving effect to those terminations.

The Supreme Court has now stayed the district court's orders in *California*, explaining that the government is "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." Slip. Op. 1-2. Instead, the Court explained, suits seeking relief like that sought by the *California* plaintiffs likely belong in the Court of Federal Claims. *See id.* at 2. In addition, the Court concluded that the remaining stay factors were met, because the government will be harmed if it is unable to "recover the grant funds once they are disbursed" while, conversely, grant recipients "can recover any wrongfully withheld funds through suit in an appropriate forum." *Id.*

The Supreme Court's decision underscores that this Court should grant the government's pending motion for a stay pending appeal in this case—which, plaintiffs concede, raises "substantially overlapping issues of law" and concerns

"termination of grants under the same federal programs." Mot. to Suspend Briefing Schedule 2-3. Like the claims in *California*, plaintiffs' claims here belong in the Court of Federal Claims, not in district court. *See* Stay Mot. 9-14. And as in *California*, the equitable factors support staying the district court's preliminary injunction. The government will be harmed when grant recipients draw down money that the government might not recover. Plaintiffs, conversely, will not suffer substantial harm in the absence of an injunction because they can recover any wrongfully withheld funds through an appropriate suit. *See* Stay Mot. 23-25.

Sincerely,

*/s/ Sean R. Janda*
Sean R. Janda

cc:     All counsel (via CM/ECF)

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 24A910

––––––––––

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

### ON APPLICATION TO VACATE THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[April 4, 2025]

PER CURIAM.

On March 10, 2025, the United States District Court for the District of Massachusetts issued what it styled as a temporary restraining order (TRO) enjoining the Government from terminating various education-related grants. The order also requires the Government to pay out past-due grant obligations and to continue paying obligations as they accrue. The District Court's conclusion rested on a finding that respondents are likely to succeed on the merits of their claims under the Administrative Procedure Act (APA), 60 Stat. 237. On March 26, the Government filed this application to vacate the District Court's March 10 order (as extended on March 24) and requested an immediate administrative stay. The application was presented to JUSTICE JACKSON and by her referred to the Court.

Although the Courts of Appeals generally lack appellate jurisdiction over appeals from TROs, several factors counsel in favor of construing the District Court's order as an appealable preliminary injunction. Among other considerations, the District Court's order carries many of the hallmarks of a preliminary injunction. See *Sampson* v. *Murray*, 415 U. S. 61, 87 (1974); *Abbott* v. *Perez*, 585 U. S. 579, 594 (2018). Moreover, the District Court's "basis for issuing the order [is] strongly challenged," as the Government is likely

to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA. *Sampson*, 415 U. S., at 87. The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U. S. C. §702. Nor does the waiver apply to claims seeking "money damages." *Ibid.* True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U. S. C. §1491(a)(1).

As for the remaining stay factors, respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee "promised to return withdrawn funds should its grant termination be reinstated," and the District Court declined to impose bond. App. to Application To Vacate Order 15a, 17a. By contrast, the Government compellingly argues that respondents would not suffer irreparable harm while the TRO is stayed. Respondents have represented in this litigation that they have the financial wherewithal to keep their programs running. So, if respondents ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum. And if respondents instead decline to keep the programs operating, then any ensuing irreparable harm would be of their own making. "Such self-imposed costs are not properly the subject of inquiry on a motion for stay." *Cuomo* v. *NRC*, 772 F. 2d 972, 977 (CADC 1985) (*per curiam*).

Per Curiam

We construe the application as seeking a stay pending appeal and grant the application. The March 10, 2025 order and March 24, 2025 extension of the United States District Court for the District of Massachusetts, case No. 1:25–cv–10548, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

*It is so ordered.*

THE CHIEF JUSTICE would deny the application.

# SUPREME COURT OF THE UNITED STATES

––––––––––

No. 24A910

––––––––––

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION TO VACATE THE ORDER ISSUED BY THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS

[April 4, 2025]

JUSTICE KAGAN, dissenting.

It is a mistake for the Court to grant this emergency application. Nowhere in its papers does the Government defend the legality of canceling the education grants at issue here. And contra the *per curiam*, the respondent States have consistently represented that the loss of these grants will force them—indeed, has already forced them—to curtail teacher training programs. See, *e.g.,* Brief in Opposition to Application 39–40; App. to Application To Vacate Order 7a–8a, 34a–35a. The remaining issue is whether this suit, brought under the Administrative Procedure Act (APA), belongs in an ordinary district court or the Court of Federal Claims. As the Court acknowledges, the general rule is that APA actions go to district courts, even when a remedial order "may result in the disbursement of funds." *Ante*, at 2 (citing *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988)). To support a different result here, the Court relies exclusively on *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204 (2002). But *Great-West* was *not* brought under the APA, as the Court took care to note. See *id.,* at 212 (distinguishing *Bowen* for that reason). So the Court's reasoning is at the least under-developed, and very possibly wrong.

The risk of error increases when this Court decides

cases—as here—with barebones briefing, no argument, and scarce time for reflection. Sometimes, the Court must act in that way despite the risk. And there will of course be good-faith disagreements about when that is called for. But in my view, nothing about this case demanded our immediate intervention. Rather than make new law on our emergency docket, we should have allowed the dispute to proceed in the ordinary way. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 24A910

_____

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

### ON APPLICATION TO VACATE THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[April 4, 2025]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting.

This application concerns the Department of Education's decision to cancel, with no meaningful explanation, more than 100 grants the Federal Government had previously awarded to public schools and universities across the country. The District Court issued a temporary restraining order (TRO) finding that the Department's decision was likely unlawful and pausing the grant cancellations while the court considers a pending motion for a preliminary injunction. The TRO expires in three days, and it will become moot even earlier if the District Court rules on the preliminary-injunction motion this week.

With the TRO on its last legs, a majority of this Court has chosen to dive into this dispute today, allowing the Department to implement immediately its new summary grant-termination policy. It does so even though the TRO preserves the pretermination status quo and causes zero concrete harm to the Government. By contrast, reinstating the challenged grant-termination policy will inflict significant harm on grantees—a fact that the Government barely contests. Worse still, the Government does not deign to defend the lawfulness of its actions. Instead, it asks us to superintend the lower courts' real-time decisions about ancillary

threshold and remedial questions, which we could easily wait to address in the ordinary course.

It is beyond puzzling that a majority of Justices conceive of the Government's application as an emergency. It is likewise baffling that anyone is persuaded that the equities favor the Government when the Government does not even argue that the lower courts erred in concluding that it likely behaved unlawfully. This application should have been denied for numerous obvious and independent reasons, and the Court does itself—and the legal process—no favors in deciding to grant it.

# I

## A

To address a nationwide shortage of qualified teachers, Congress has enacted several competitive grant programs that facilitate the recruitment, training, and support of educators. This application concerns the Department's recent efforts to terminate grants that were awarded under two such programs: the Teacher Quality Partnership (TQP) program and the Supporting Effective Educator Development (SEED) program.

Congress established the TQP program in 2008, authorizing the Department to award grants to high-need educational agencies and schools for the purpose of training teachers. 20 U. S. C. §§1021(6), 1022a(a), 1022a(c)(1), 1022h. In the statute that creates this program, Congress made plain its intent to (1) "improve student achievement," (2) "improve the quality of . . . teachers," (3) "hold teacher preparation programs at institutions of higher education accountable," and (4) "recruit highly qualified individuals, including minorities and individuals from other occupations, into the teaching force." §1022.

By statute, the Department awards each TQP grant based on a peer-review process "for a period of five years." §§1022b(a), (b)(3). Similarly, under the SEED program,

Congress has mandated that the Department "shall award grants" to institutions of higher education and nonprofit entities that provide certain education-related services, including "evidence-based professional development activities" for teachers. §§6672(a)(2), (f). Congress dictated that SEED grants "shall be" awarded for up to a 3-year period, subject to a possible 2-year extension. §§6672(b)(1)–(2).

On February 5, 2025, the Acting Secretary of Education issued an internal directive requiring Department personnel to review "'issued grants'" to "'ensur[e] that Department grants do not fund discriminatory practices'" that are "'contrary to law or to the Department's policy objectives'" and that "'all grants are free from fraud, abuse, and duplication.'" App. to Application To Vacate Order 12a (App.). The directive expressly extends to "'practices . . . in the form of [diversity, equity, and inclusion ("DEI")].'" *Ibid.* (alteration in original).

Two days later, TQP and SEED grant recipients began to receive letters from the Department announcing the termination of their grant awards. The letters were identical, save for differences in the addressees, grant-award numbers, and termination dates. Each letter included a single paragraph regarding the Department's justification for the grant termination, which stated, in full, as follows:

> "'The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The

> grant is therefore inconsistent with, and no longer ef-
> fectuates, Department priorities. See 2 C.F.R.
> §200.340(a)(4); see also 34 C.F.R. §75.253. Therefore,
> pursuant to, among other authorities, 2 C.F.R.
> §200.339–43, 34 C.F.R. §75.253, and the termination
> provisions in your grant award, the Department hereby
> terminates grant No. [grant award number] in its en-
> tirety effective '[date of letter].'"  Complaint in No. 25–
> cv–10548 (D Mass.), ECF Doc. 1, p. 35 (alterations in
> original).

Most grantees also received revised grant-award notifica-
tion letters stating solely that their grants had been
"deemed to be inconsistent with, and no longer effectuat[e],
Department priorities. See 2 C.F.R. 200.340(a)(4); see also
34 C.F.R. 75.253." *Id.*, at 36–37.

### B

On March 6, 2025, eight States sued the Department in
the District of Massachusetts, claiming that this mass,
summary termination of TQP and SEED grants was arbi-
trary and capricious, and not in accordance with law, in vi-
olation of the Administrative Procedure Act (APA).
5 U. S. C. §706(2)(A).  The Plaintiff States alleged that, as
a result of the grant terminations, their public universities,
schools, and other institutions "now face abrupt shortfalls
to their current year budgets collectively exceeding ten mil-
lion dollars."  ECF Doc. 1, at 41.  As relevant, the Plaintiff
States sought declaratory and injunctive relief to set aside
the termination of the previously awarded grants.  They
also sought a TRO to immediately block termination of the
grants.

After holding a 2-hour hearing, the District Court issued
a TRO on March 10.  The order "restore[d] Plaintiff States
to the pre-existing status quo prior to the termination un-
der all previously awarded TQP or SEED grants for recipi-

ents in Plaintiff States," and "temporarily enjoined" the Department from terminating any previously awarded or individual TQP or SEED grants for recipients in Plaintiff States. ___ F. Supp. 3d ___, ___–___ (Mass. 2025), App. 9a–10a. The order also contained an exception permitting the Department to make individual grant terminations consistent with applicable law and regulations.

By its terms, the TRO was "effective immediately" and would "remain in effect for 14 days," until March 24. *Id.*, at 10a. The District Court then separately construed the Plaintiff States' TRO motion as a motion for a preliminary injunction and set that motion for a hearing on March 28. The District Court subsequently extended the TRO for an additional 14 days, until April 7, while also expressing its "intent that the TRO be temporary and short." ECF Doc. 79.

Seeking to enforce its termination decisions during the period in which the TRO remained in effect, the Government requested a stay pending appeal. The District Court denied the request, as did a unanimous panel of the First Circuit. The First Circuit panel assumed without deciding that it had jurisdiction to review the TRO and made several determinations, including: that the States were likely to succeed on the merits of their claim that the Department's termination of the grants was arbitrary and capricious; that the Government's assertions of irreparable harm consisted of "speculation and hyperbole"; and that the equitable stay factors cut against the Government. ___ F. 4th ___, ___–___ (2025), App. 24a–35a. The Government then turned to us for an emergency stay.

## II

First and foremost, the Government's application should have been swiftly denied because this Court lacks jurisdiction over this interlocutory order. It is clear beyond cavil that, ordinarily, "orders granting . . . temporary restraining

orders are not appealable." 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3922.1 (3d ed. 2012). This Court has recognized an exception for TROs and other interlocutory orders that are "potentially unlimited" in duration, *Sampson* v. *Murray*, 415 U. S. 61, 87 (1974), and risk imposing a "'serious, perhaps irreparable, consequence,'" *Carson* v. *American Brands, Inc.*, 450 U. S. 79, 84 (1981). But this time-limited TRO presents no such threat.

To start, the District Court has merely ordered restoration of the "pre-existing status quo prior to the termination" of the grants in the Plaintiff States. App. 9a. Its order comes in the form of an injunction only insofar as it has prohibited the Government from implementing the abruptly announced terminations—the District Court has *not* ordered that the Government do anything other than what was required by law before the termination letters issued.

Notably, the TRO also includes an exception that permits the Government to make individual grant terminations while the order is in effect "to the extent the final agency action is consistent with Congressional authorization and appropriations, relevant federal statute[s], including the requirements of the APA, the requirements of the relevant implementing regulations, [and] the grant terms and conditions." *Id.*, at 10a. Thus, the Government is only precluded from implementing what the Plaintiff States challenge as a "mass termination" of previously issued grants; the Government can still proceed with reasoned, individualized grant terminations under its usual review process.[1]

---

[1] The Department now rejects the "mass termination" characterization on the grounds that it allowed 5 TQP and SEED grants (out of 109) to remain in place. App. 14a. But Department employees previously informed grantees that "*[a]ll* the grants have been terminated." ECF Doc. 8–13, pp. 6, 60 (emphasis added). These inconsistent statements underscore the need for additional factual development below before this Court gets involved.

This TRO is also expressly time limited and is set to expire just three days from now. All agree that the order falls squarely within the time limitations prescribed by the Federal Rule of Civil Procedure governing TROs. See Fed. Rule Civ. Proc. 65(b)(2) (providing that a TRO is "not to exceed 14 days" unless "the court, for good cause, extends it for a like period"). That is true even though the District Court has granted a one-time extension of the TRO while it considers and rules upon the Plaintiff States' motion for a preliminary injunction. See *ibid*. The Government provides no reason to believe that the District Court intends to extend the order again. Quite to the contrary, the fact that the District Court construed the Plaintiff States' TRO motion as a motion for a preliminary injunction, and has already held a hearing, indicates that the court is moving with dispatch and is in no way attempting to shield its interim order from appellate review.

This TRO thus falls squarely within the "general congressional policy against piecemeal review." *Carson*, 450 U. S., at 84.

### III

Even assuming that the TRO is reviewable on appeal, the Government's application does not demonstrate the sort of exigency that warrants emergency relief—what I have elsewhere called a "line-jumping justification," *Labrador* v. *Poe*, 601 U. S. ___, ___ (2024) (opinion dissenting from grant of stay) (slip op., at 1). As explained above, TQP and SEED are statutorily authorized grant programs that have been implemented by the Department for more than a decade— since 2008 and 2015, respectively. What is new here is the Department's insistence that it need not go through the notice and review procedures the agency has traditionally used to terminate grants it has awarded. Instead, the Department now seeks to terminate the pending grants en masse, through the use of boilerplate language that is not

particularized to any grant recipient.

The Government has not provided any persuasive reason for why it urgently needs to be relieved of the lower court's requirement that it wait 14 days (and now 28) to execute its preferred grant-termination policy. Even if the Government is right about the merits of the arguments it raises in this application (which is doubtful), there is no reason why the Government cannot proceed through the usual litigation and appeals process to receive its vindication, as other litigants must. To reiterate, the TRO expires in three days, and the District Court held a hearing on the Plaintiff States' preliminary-injunction motion a week ago. The only hint of urgency that the Government offers to justify its unusual request for our intervention is that, during the waning days of the TRO period, some grant recipients might seek to draw down grant funds that the Government wants to terminate.

If true, that would be unfortunate, but worse things have happened. And that possibility does not come anywhere close to explaining why *this* Court must take the "'extraordinary'" step of intervening *now*. *Williams* v. *Zbaraz*, 442 U. S. 1309, 1311 (1979) (Stevens, J., in chambers); cf. *Nken* v. *Holder*, 556 U. S. 418, 433 (2009) ("'A stay is not a matter of right, even if irreparable injury might otherwise result'"). In my view, the patent lack of exigency alone warrants denying the Government's bid for emergency relief. See *Labrador*, 601 U. S., at ___ (JACKSON, J., dissenting from grant of stay) (slip op., at 1). But, wait, there's more.

The Government's assertions of harm are speculative, at best, and appear to be far from irreparable. Importantly, there is no evidence that grantees have rushed to draw down the remaining $65 million in grant funds since the District Court entered the TRO 25 days ago. If the past is the best predictor of the future, then there is no factual basis for concluding that any terminated-recipient grant runs are likely to occur in the three days remaining in the TRO.

The Government's speculation is also contrary to the way that the TQP and SEED programs operate. As the Plaintiff States explain, TQP and SEED grantees typically "receive funds spread over the multi-year period of their grants" and "generally submit periodic draw-down requests for expenses they have already incurred." Brief in Opposition to Application 7. Grant recipients are also closely supervised with respect to such withdrawals: "The Department is authorized to monitor draw-down activity for all grants," and certain recipients are even "subject to an annual audit." *Id.*, at 8–9.

Finally, even if the feared flood of recipient withdrawals occurs, the Government has various legal mechanisms to recoup these kinds of funds. See, *e.g.*, 20 U. S. C. §§1234a, 1234b; 2 CFR §200.346 (2024); see also J. Shaffer & D. Ramish, Federal Grant Practice §36:29 (2024 ed.) ("In the end, the Government usually gets its money"). It is likely that, given the Department's new policy position with respect to terminations, it will be extra vigilant about recording any withdrawals made while the TRO is in effect, so that the money can be clawed back if appropriate. Thus, the alleged funding drain at which the Government gestures does not even appear to be irreparable. The Government has certainly not met its burden to show otherwise. See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*) (stay applicants bear the burden to show, among other things, "a likelihood [of] irreparable harm").

The Court nonetheless swoops in to stay a TRO that will be mooted imminently by either the District Court's ruling on the preliminary-injunction motion or the natural expiration of the TRO period. Instead of playing remedy police in this nascent case, I would permit the litigation to proceed in the lower courts as usual, as we would expect in any other case in which the Government was not the applicant.

## IV

To review, the Court has now granted the Government's request for "emergency" relief, staying a TRO that will expire in just three days in a case where appellate jurisdiction is wanting and the Government's assertions of harm are illusory. One might reasonably assume that, for the Supreme Court of the United States to step in and grant relief in this posture, the applicant would have at least presented a rock-solid argument in support of its underlying merits position. Thus, here, one would expect the Government to vigorously maintain that the Department was legally entitled to all but eliminate two grant programs that Congress established a decade ago. But in this Court, the Government offers *no defense* against the Plaintiff States' claim that the Department's erasure of the grants at issue was arbitrary and capricious. Instead, the Government raises several threshold and remedial questions about the scope of the District Court's power to review the Government's allegedly unlawful conduct.[2]

The Government's request for emergency relief from this Court—without presenting any defense as to the merits of the Plaintiff States' arbitrary-and-capricious challenge—is striking. And the Court now blesses this strategic decision to sidestep the underlying merits by reinstating grant terminations that both lower courts have said are likely unlawful. This seems like a development in our practices related to emergency applications that, at a minimum, requires further exploration. If the emergency docket has now become a vehicle for certain defendants to obtain this

---

[2] To be specific, the Government argues that the lawfulness of the terminations is irrelevant for present purposes because (1) the Court of Federal Claims, not the District Court, has original jurisdiction over this dispute; (2) the Department's grant-termination decisions are "committed to agency discretion by law" and thus not reviewable under the APA, 5 U. S. C. §701(a)(2); and (3) the TRO at issue is too broad.

Court's real-time opinion about lower court rulings on various auxiliary matters, we should announce that new policy and be prepared to shift how we think about, and address, these kinds of applications.

I, for one, think it would be a grave mistake to permit parties seeking equitable emergency relief not only to make an inadequate showing of interim harm but also to seek relief on the basis of their concerns about issues that can be addressed later, in the ordinary course. In an appeals system that is supposed to provide prompt resolution of all legal challenges, this new avenue for piecemeal interlocutory review enables strategic delay and facilitates obfuscation of the weaknesses of the defendant's merits positions.

## A

Take this case, for example. In my preliminary evaluation, the lower courts' early assessment that the Department's mass grant terminations were probably unlawful is not unreasonable, for the reasons I explain in this section. If the lower courts were left alone, they would be able to provide prompt rulings on the core legal question that we could then review, together with the Department's other arguments, in the ordinary course.

The APA requires, among other things, that an agency must not act arbitrarily or capriciously, and that it must explain its actions. See, *e.g.*, *FCC* v. *Prometheus Radio Project*, 592 U. S. 414, 423 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained"). But a mere *two days* after the Acting Secretary instructed agency officials to review the TQP and SEED grants, the Department started issuing summary grant-termination letters that provide a general and disjunctive list of potential grounds for cancellation, without specifying *which* ground led to the termination of any particular grant. Nor did the letters detail the Depart-

ment's decisionmaking with respect to any individual termination decision. It also appears that the grant recipients did not receive any pretermination notice or any opportunity to be heard, much less a chance to cure, which the regulations seem to require. See, *e.g.*, 2 CFR §§200.339, 200.208(c) (permitting grant termination only after an agency "determines that noncompliance cannot be remedied by imposing additional conditions," such as by "[r]equiring additional project monitoring," by requiring that the recipient obtain technical or management assistance, or by "[e]stablishing additional prior approvals").

The Department's robotic rollout of its new mass grant-termination policy means that grant recipients and reviewing courts are "compelled to guess at the theory underlying the agency's action." *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196–197 (1947). Moreover, the agency's abruptness leaves one wondering whether any reasoned decisionmaking has occurred with respect to these terminations at all.[3] These are precisely the kinds of concerns that the APA's bar on arbitrary-and-capricious agency decisionmaking was meant to address. See *Prometheus Radio Project*, 592 U. S., at 423 (explaining that the APA requires a reviewing court to ensure that "the agency . . . has reasonably considered the relevant issues and reasonably explained the decision").

It also seems clear that at least one of the items included on the Department's undifferentiated laundry list of possible reasons for terminating these grants—that the entity may have participated in unspecified DEI practices—would

---

[3] The Government suggested before the First Circuit that its retention of 5 of the 109 previously awarded grants proves that it engaged in reasoned decisionmaking. But the Government has not yet supplied an administrative record to facilitate judicial review. App. 30a; accord, ECF Doc. 69, p. 13. Without documentation of the Department's reasoning, its failure to terminate every single grant could just as easily reflect neglect or even additional arbitrariness. Cf. ECF Doc. 76, p. 7, n. 1 (noting that one remaining grant "proposed to 'focus on culturally responsive practices'").

not suffice as a basis for termination under the law as it currently exists. That is because termination is only permissible for recipient conduct that is inconsistent with the terms of the grants and the statutes that authorize them. But the TQP and SEED statutes *expressly contemplate* that grant recipients will train educators on teaching "diverse populations" in "traditionally underserved" schools, and on improving students' "social, emotional, and physical development." 20 U. S. C. §§1022e(b)(4), 6672(a)(1), 1022a(d)(1)(ii).[4] It would be manifestly arbitrary and capricious for the Department to terminate grants for funding diversity-related programs that the law expressly requires. Cf. *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (explaining that an agency acts arbitrarily and capriciously if it relies "on factors which Congress has not intended it to consider").

## B

It is thus small wonder that the Government has chosen not to press its merits arguments in this emergency application. See n. 2, *supra*. What better way to avoid prompt consideration of the Plaintiff States' serious claims about the unlawful arbitrariness of the Government's conduct than to demand that jurists turn away from those core questions and entertain a host of side issues about the power of the District Court on an "emergency" basis?

_____

[4] See also, *e.g.*, §1022a(d)(5) (encouraging TQP grantees to "recrui[t] into the teaching profession . . . individuals from under[-]represented populations," "former military personnel," and "individuals to teach in rural communities"); §1022a(e)(2)(A)(vi) (permitting TQP teacher-residency programs to consider choosing "applicants who reflect the communities in which they will teach as well as consideration of individuals from underrepresented populations"); §6672(b)(3) (requiring the Department to ensure that SEED grants are, to the extent practicable, "distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas").

Courts that are properly mulling interim injunctive relief (to prevent imminent harms and thereby facilitate fair adjudication of potentially meritorious claims) should be wary of allowing defendants with weak underlying arguments to divert all attention to ancillary threshold and remedial questions. Children, pets, and magicians might find pleasure in the clever use of such shiny-object tactics. But a court of law should not be so easily distracted.

Yet, here we are. Instead of leaving the lower court judges alone to do the important work of efficiently adjudicating all of the parties' legal claims, the Supreme Court has decided to enter the fray. We have intervened to stay an almost-expired TRO that is plainly preventing the Plaintiff States from suffering imminent harm—*not* because the harms will not occur (no one seriously disputes this), and *not* because the Government has shown that any harm will actually befall it if the TRO remains in place for another three days, but because the Government has technical questions about which court is the proper forum to hear this case and what relief that court can order. Albeit interesting, and perhaps even ultimately dispositive, surely those nonurgent issues can get sorted out in the ordinary course as part of the lower court's expedited consideration of the legal claims both sides have made. There is no reason they have to be addressed by *this* Court at *this* moment. And it is truly bizarre that a Court that purports to be "a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005), has seen fit to rouse itself to respond to the Government's queries by addressing these tangential legal issues and disturbing a well-justified, harm-based TRO in the process.[5]

―――――――

[5] Indeed, other than paving the way for the Plaintiff States' immediate suffering, it appears that the primary effect of today's emergency stay is to hand the Government an early "win"—a notch in its belt at the start of a legal battle in which the long-term prospects for its eventual success

V

Finally, even if this were a "close cas[e]," *Hollingsworth*, 558 U. S., at 190, the balance of the equities clearly counsel against staying the TRO and reinstating the grant terminations. On one side of the balance, the Government's assertions of harm if the TRO remains in place amount to "speculation and hyperbole," as the First Circuit put it. App. 33a. On the other, there is ample evidence that the loss of grants during the remaining days of the TRO period will inflict significant harm on the Plaintiff States and their instrumentalities.[6]

Those harms are concrete. In Massachusetts, Boston Public Schools has already had to fire multiple full-time employees due to this loss of grant funding. ECF Doc. 8–2, pp. 11–12. In New Jersey, the College of New Jersey has canceled the remainder of its teacher-residency program for the same reason. ECF Doc. 8–9, pp. 8–9. In Illinois, Chi-

_____

seem doubtful. And I don't blame the Government for trying. If you're likely to lose on the merits, why not use the Court's procedures to fight on new and creative fronts? The Government has now gotten this Court to nullify clearly warranted interim injunctive relief, deflecting attention away from the Government's own highly questionable behavior, all without any showing of urgency or need. I worry that permitting the emergency docket to be hijacked in this way, by parties with tangential legal questions unrelated to imminent harm, damages our institutional credibility.

[6] The majority asserts that the Plaintiff States' harms may not be irreparable because they "have represented in this litigation that they have the financial wherewithal to keep their programs running." *Ante*, at 2. At most, the Plaintiff States represented below that the Department's decision to terminate grants would require their institutions to either "expend public funds . . . or suffer the obvious public harms resulting from a scarcity of qualified teachers." Appellees' Opposition to Appellants' Motion for Stay in No. 25-1244 (CA1), p. 22. In any event, the majority ignores the District Court's finding that the abrupt grant terminations have caused the Plaintiff States numerous harms that money cannot remedy. App. 8a.

cago Public Schools—which already faces a multimillion-dollar budget deficit—may have to shut down its successful teacher-pipeline program. ECF Doc. 8–13, p. 7. In California, California State University has ended support for 26 students currently enrolled in its teacher-residency program and has eliminated financial assistance for about 50 incoming students. ECF Doc. 8–3, p. 7.

On the current record, I perceive no clear error in the District Court's conclusion that, absent immediate relief, "dozens of programs upon which public schools, public universities, students, teachers, and faculty rely will be gutted." App. 9a. The harms that will result from permitting the Department to reinstate these terminations are directly contrary to Congress's goals in enacting the TQP and SEED programs and in entrusting the Department with their implementation. It boggles the mind to equate the devastation wrought from such abrupt funding withdrawals with the mere risk that some grantees might seek to draw down previously promised funds that the Department wants to yank away from them.

*    *    *

This Court's eagerness to insert itself into this early stage of ongoing litigation over the lawfulness of the Department's actions—even when doing so facilitates the infliction of significant harms on the Plaintiff States, and even though the Government has not bothered to press any argument that the Department's harm-causing conduct is lawful—is equal parts unprincipled and unfortunate. It is also entirely unwarranted. We do not ordinarily exercise jurisdiction over TROs, and this one is no different. The Government has not articulated any concrete harm it will suffer if the grant terminations are not implemented in the next three days. And this Court will have every opportunity to address all of the legal issues the Government has hastily

shoved up the chain of review, and more, in due course. Because we could have and should have easily denied this application, I respectfully dissent.[7]

_____

[7]Apparently not content to insert itself into this action for no reason, the majority goes further, seizing on this opportunity. Without oral argument and with less than one week's worth of deliberation, the Court now has determined that, at least in this context, restoring the grants at issue might qualify as an order to "'enforce a contractual obligation to pay money'" such that it is the Court of Federal Claims, rather than the District Court, that has jurisdiction over the Plaintiff States' challenge. *Ante*, at 2 (quoting *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002)). Even assuming that *Great-West* has any bearing on this issue, the majority's characterization of the relief granted by the District Court is dubious given what the Plaintiff States actually say in their complaint about the legal problem and the relief they are requesting. *See* ECF Doc. 1, pp. 46–47, 51–52; see also *Bowen* v. *Massachusetts*, 487 U. S. 879, 893 (1988) ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'"). And the majority does not dispute the "basic reality" that some APA challenges to grant-related administrative action may proceed in district court, even if they have as their "natural consequence . . . the release of funds to the plaintiff down the road." *Department of State* v. *AIDS Vaccine Advocacy Coalition*, 604 U. S. ___, ___ (2025) (ALITO, J., dissenting from denial of application) (slip op., at 6).

In any event, the District Court in this case is now hard at work evaluating this and other arguments in the context of the pending preliminary-injunction motion. The majority's attempt to inject itself into the ongoing litigation by suggesting new, substantive principles for the District Court to consider in this case is unorthodox and, in my view, inappropriate.