# IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

———————————

U.S. Department of Education, *et al.*,

Defendants-Appellants,

v.

American Association of Colleges for Teacher Education, *et al.*,

Plaintiffs-Appellees.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

## BRIEF FOR APPELLANTS

———————————

<div style="margin-left:40%">

BRETT A. SHUMATE
  *Assistant Attorney General*
KELLY O. HAYES
  *United States Attorney*
ERIC D. McARTHUR
  *Deputy Assistant Attorney
  General*
MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
BENJAMIN C. WEI
  *Attorneys, Appellate Staff
  Civil Division, Room 7235
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 616-2875*

</div>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF THE ISSUES.............................................................4

STATEMENT OF THE CASE .................................................................4

    A.   Statutory and Factual Background .........................................4

    B.   Prior Proceedings ..................................................................7

SUMMARY OF ARGUMENT ...............................................................14

STANDARD OF REVIEW.....................................................................18

ARGUMENT .........................................................................................18

I.   The Government Is Likely to Prevail on the Merits ......................18

    A.   The district court lacked jurisdiction under the APA
         because this case seeks to enforce a contractual
         obligation to pay money.........................................................19

    B.   The Department's decision to discontinue a previously
         funded program to reallocate those funds is committed
         to agency discretion and not reviewable under the
         APA. ......................................................................................30

    C.   The challenged grant terminations were reasonable
         and reasonably explained. .....................................................36

II.   The Equitable Factors Weigh Against a Preliminary
   Injunction ....................................................................................39

III.   The Preliminary Injunction Is Overbroad ..................................... 41

CONCLUSION ............................................................................. 44

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                        **Page(s)**

*Albrecht v. Committee on Emp. Benefits of the Fed.*
*Reserve Emp. Benefits Sys.*,
357 F.3d 62 (D.C. Cir. 2004) ........................................................ 20, 28

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ............................................................. 41

*Bennett v. New Jersey*,
470 U.S. 632 (1985) ......................................................................... 22

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ................................................................. 23-24, 26

*California v. U.S. Dep't of Educ.*:
132 F.4th 92 (1st Cir. 2025) .................................................. 12, 13, 21
Civ. No. 25-10548 MJJ, 2025 WL 760825
(D. Mass. Mar. 10, 2025) ........................................................ 11, 12

*Columbus Reg'l Hosp v. United States*,
990 F.3d 1330 (Fed. Cir. 2021) ......................................................... 22

*Crowley Gov't Servs., Inc. v. General Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022) .................................................... 19, 23

*Dennis Melancon, Inc. v. City of New Orleans*,
703 F.3d 262 (5th Cir. 2012), *cert. denied*,
569 U.S. 994 (2013) ......................................................................... 40

*Department of Educ. v. California*,
145 S. Ct. 966 (2025) ............ 1, 3, 13, 14, 15, 17, 19, 21, 22, 27, 40, 41

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .................................................................... 17, 36

*Frazier v. Prince George's County*,
86 F.4th 537 (4th Cir. 2023) ............................................................. 18

*Great-West Life & Annuity Ins. Co. v. Knudson*,
534 U.S. 204 (2002) .................................................................... 22, 23

*Hall v. McLaughlin,*
   864 F.2d 868 (D.C. Cir. 1989) ............................................................ 39

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .......................................................................... 31

*Ingersoll-Rand Co. v. United States,*
   780 F.2d 74 (D.C. Cir. 1985) ............................................................ 20

*James v. Caldera,*
   159 F.3d 573 (Fed. Cir. 1998) .......................................................... 20

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ........................................................ 30, 31, 32, 34

*Maine Cmty. Health Options v. United States,*
   590 U.S. 296 (2020) .......................................................................... 23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi*
   *Indians v. Patchak,*
   567 U.S. 209 (2012) ................................................................. 19-20, 20

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982) .......................................................... 20

*Milk Train, Inc. v. Veneman,*
   310 F.3d 747 (D.C. Cir. 2002) .......................................................... 32

*Nken v. Holder,*
   556 U.S. 418 (2009) .......................................................................... 39

*Rhea Lana, Inc. v. United States,*
   925 F.3d 521 (D.C. Cir. 2019) .......................................................... 38

*Roe v. Department of Def.,*
   947 F.3d 207 (4th Cir. 2020) ............................................................ 38

*Spectrum Leasing Corp. v. United States,*
   764 F.2d 891 (D.C. Cir. 1985) .......................................................... 29

*U.S. Conference of Catholic Bishops v. U.S. Dep't of State,*
   No. 1:25-cv-00465 (TNM), 2025 WL 763738
   (D.D.C. Mar. 11, 2025) .................................................................... 27

*United States v. J & E Salvage Co.*,
 55 F.3d 985 (4th Cir. 1995) ..................................... 20-21, 24

*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S.7 (2008) .................................................. 43

**Statutes:**

Administrative Procedure Act (APA):
 5 U.S.C. §§ 551-559 ................................................ 4
 5 U.S.C. § 553(a)(2) ............................................... 8
 5 U.S.C. § 701(a)(2) ............................................ 10, 16, 30

General Education Provisions Act (GEPA),
 20 U.S.C. § 1232(d) ............................................ 8, 25, 34

Tucker Act:
 28 U.S.C. § 1491 .................................................. 10
 28 U.S.C. § 1491(a) ............................................... 19

20 U.S.C. § 1022a(a) ............................................. 5, 33

20 U.S.C. § 1022a(c) ............................................. 5, 33

20 U.S.C. § 1232(d) ............................................... 34

20 U.S.C. § 6632(a) .............................................. 5, 33

20 U.S.C. § 6671(1) ................................................ 5

20 U.S.C. § 6672(a) .............................................. 5, 33

20 U.S.C. § 6621(4) ................................................ 5

28 U.S.C. § 1292(a)(1) ............................................. 3

28 U.S.C. § 1331 .................................................. 3

**Regulations:**

2 C.F.R. § 200.208 ............................................................... 28-29

2 C.F.R. § 200.340 ................................................................. 34

2 C.F.R. § 200.340(a)(4) .......................................... 1, 8, 16, 25, 26, 30, 35

2 C.F.R. § 200.341 ................................................................. 8, 25

2 C.F.R. § 3474.1 .................................................................. 34

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ........................................................ 3

**Other Authorities:**

85 Fed. Reg. 49,506 (Aug. 13, 2020) ........................................ 36

86 Fed. Reg. 70,612 (Dec. 10, 2021) ................................... 25, 35

# INTRODUCTION

The preliminary injunction in this case orders the Department of Education to pay money to members of the plaintiff organizations based on the government's alleged contractual obligation under certain teacher education grants. The district court should not have ruled at all. Instead, the court should have consigned this case to the Court of Federal Claims under the Tucker Act. As the Supreme Court explained in a case that the court later described as "this case's doppelganger," JA 711, "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the [Administrative Procedure Act (APA)]," *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam).

Like *California*, this case arises from grants terminated under the Department's broad authority to reallocate funding from programs that no longer serve either the Department's mission to "eliminate discrimination in all forms of education" or the American people. Specifically, the Department has authority to terminate a funding agreement that "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The district court erroneously

concluded that an allegedly improper exercise of that authority, which was incorporated into the written funding agreements, was properly adjudicated in district court rather than in the Court of Federal Claims. JA 695-696.  And although the parties requested that the district court vacate its injunction in the wake of the Supreme Court's decision in *California*, the district court refused, leaving that task to this Court.

Compounding its error, the district court concluded that the Department's discretionary decision of which programs should be funded to best achieve its goals was subject to review under the APA, and the court second-guessed the Department's determinations on that score.  JA 674.  The court went even further and interpreted a regulation that provides a menu of general considerations that can be optionally considered in future grant award decisions as limiting the Department's broad discretion to terminate an existing funding agreement when it "no longer effectuates the program goals or agency priorities."  *See* JA 671-674.

The district court also erred in weighing the equities.  As the Supreme Court also explained in *California*, the government would suffer irreparable harm because "it is unlikely to recover the grant

2

funds once they are disbursed," while plaintiffs "can recover any wrongfully withheld funds through suit in an appropriate forum." 145 S. Ct. at 969.

Finally, the district court granted relief to entities that had not been identified in this lawsuit on the ground that they were members of one of the plaintiff organizations. JA 685-686. In so doing, the court provided multiple bites at the apple for individual grant recipients, and premised relief for unnamed entities on irreparable harm ostensibly established by others.

## STATEMENT OF JURISDICTION

Plaintiffs brought this action alleging that certain federal grants for teacher education were improperly terminated. The district court believed it had jurisdiction under 28 U.S.C. § 1331, but the court lacked jurisdiction for the reasons stated in Part I.A-B, below. The court granted plaintiffs' motion for a preliminary injunction on March 17, 2025. JA 685-686. The United States filed a timely notice of appeal on March 21, 2025. JA 712; *see* Fed. R. App. P. 4(a)(1)(B) (60-day time limit). This Court has jurisdiction over the appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court had jurisdiction over claims that plaintiffs are entitled to monetary payments under a grant program, or whether those claims arise from contracts and thus are subject to the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act.

2. If the district court had jurisdiction, whether the plaintiffs are likely to establish the termination of grants violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559.

3. Whether the balance of the equities and public interest favor a preliminary injunction.

4. Whether, to the extent any injunction was warranted, the preliminary injunction is overbroad in giving relief to unnamed members of the plaintiff organizations.

## STATEMENT OF THE CASE

### A.    Statutory and Factual Background

1.  This case involves grants awarded under three programs implemented by the Department of Education pursuant to broad grants of statutory authority to prepare and develop educators.  The first, known as the Teacher Quality Partnership Program (TQP), authorizes

the Secretary of Education to "award grants, on a competitive basis, to eligible partnerships, to enable the eligible partnerships to carry out" certain activities, including "a program for the preparation of teachers," a "teaching residency program," and "a leadership development program." 20 U.S.C. § 1022a(a), (c). The second, known as the Supporting Effective Educator Development Grant Program (SEED), generally directs the Secretary to "award grants, on a competitive basis, to eligible entities for" five specified "purposes," such as "providing evidence-based professional development activities" and "making freely available services and learning opportunities to local education agencies." *Id.* § 6672(a). Finally, the Teacher and School Leader Incentive Program (TSL) provides grants to "develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems, in schools." *Id.* § 6632(a). Grants awarded under these programs are paid out of funds appropriated by Congress to the Department and "reserved by the Secretary." *Id.* §§ 6621(4), 6632(a), 6671(1).

Institutions who are members of the plaintiff organizations were selected to receive multiyear TQP grants that began in Fiscal Year (FY)

2020, 2022, and 2024, multiyear SEED grants that began in FY 2022, and multiyear TSL grants that began in FY 2023. JA 642. These grants are functionally identical. Each was embodied in a "Grant Award Notification" agreed to by the grantee and signed by the Department that specified: the amount of funding; the specific work the grantee was to perform by incorporation of the relevant grant application; the "performance period" for the work; and all applicable policies and procedures, including the conditions where the grant could be terminated. *See*, *e.g.*, JA 349-354 (TQP grant); JA 423-428 (SEED grant).

2. On February 5, 2025, the Acting Secretary of Education issued a Directive on Department Grant Priorities, which coincided with an internal review to ensure that the Department's grants do not fund "discriminatory practices—including in the form of [diversity, equity, and inclusion (DEI)]—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication." JA 646. The Department individually reviewed all awarded grants—including all TQP, SEED, and TSL grants—by consulting each grant document and available

information about the funded program. JA 676-678. The Department

concluded that the majority, but not all, of TQP, SEED, and TSL grants

awarded to members of the organizations that are plaintiffs in this case

should be terminated. JA 646.

To terminate the relevant grants, the Department sent a letter to

the grant recipient stating that the funded program "promote[s] or

take[s] part in DEI initiatives or other initiatives that unlawfully

discriminate on the basis of race, color, religion, sex, national origin, or

another protected characteristic"; "violate either the letter or purpose of

Federal civil rights law"; "conflict with the Department's policy of

prioritizing merit, fairness, and excellence in education"; "are not free

from fraud, abuse, or duplication"; or "otherwise fail to serve the best

interests of the United States." JA 646-647 (quotation omitted). Citing

both "the termination provisions in" the grants and the Department's

authority under "2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253," the letters

terminated recipients' grants. *Id* (quotation omitted).

## B. Prior Proceedings

1. Plaintiffs filed this suit, JA 9, and, on the same day, moved for

immediate injunctive relief to remedy what they complained was the

"unlawful termination of Plaintiffs' members' grants," JA 57. The district court granted in part and denied in part the motion.

Although the district court rejected plaintiffs' constitutional claims, the court concluded that plaintiffs were likely to show the grant terminations violated the APA in three ways. First, the court held that the grants could be terminated due to a change in "program goals or agency priorities," 2 C.F.R. § 200.340(a)(4), only if those "program goals or agency priorities" were first changed in notice-and-comment rulemaking, which did not occur here. JA 671-673. According to the court, this was required by a provision of the General Education Provisions Act (GEPA), 20 U.S.C. § 1232(d), which carves out certain education-related regulations from the APA's blanket exception to notice-and-comment rulemaking for grants, 5 U.S.C. § 553(a)(2). JA 671-672.

Second, the district court held that the grant terminations did not provide notice of specific policy violations, which the court viewed as violating the requirement of 2 C.F.R. § 200.341 that any "notice of termination should include the reasons for termination." JA 674.

Finally, the district court held that the "Department has not provided the 'reasonable explanation' of its final agency action the APA requires," because the termination letters it sent failed to articulate "any workable, sensible, or meaningful reason or basis for the termination."  JA 675.  In particular, the court concluded that the termination letters were "so broad and vague as to be limitless," failed to mention any data or information considered, and did not reflect any individualized consideration.  JA 675-678.

Regarding the remaining elements for a preliminary injunction, the district court found that plaintiffs' members would suffer irreparable harm because some members would have to close their programs while others would be forced to lay off staff.  JA 679.  The court also found the balance of the equities and the public interest favor a preliminary injunction because the effect of such an injunction would be to restore the status quo prior to the grant terminations that the court viewed as likely violating the APA.  JA 681.

The district court entered a preliminary injunction that: (1) ordered the Department to reinstate the terminated TQP, SEED, and TSL grants that had been awarded to institutions that were

members of the plaintiff organizations and (2) enjoined the Department from terminating any TQP, SEED, or TSL grant that had been awarded to institutions that were members of the plaintiff organizations.  JA 685-686.

The following day, the government filed an Emergency Motion for Reconsideration that argued the district court lacked jurisdiction because the Tucker Act, 28 U.S.C. § 1491, vested exclusive jurisdiction with the Court of Federal Claims and because the Department's decision to terminate grants is "committed to agency discretion by law" and therefore outside of APA review, 5 U.S.C. § 701(a)(2).  The court rejected both arguments, reasoning that the Tucker Act was inapplicable because plaintiffs are "seeking redress for alleged statutory and regulatory violations," not "money damages for past wrongs," and plaintiffs seek "forward-looking equitable relief."  JA 695.  The court also concluded that the grant terminations were not committed to agency discretion by law given its prior conclusion that notice-and-comment rulemaking to change the Department's priorities was a prerequisite.  JA 699.

In response, the government filed a motion to stay and suspend the preliminary injunction pending appeal. The district court denied the motion the following day, primarily on the basis that it believed its previous opinions were correct. JA 702-709.

2. Parallel and overlapping with this case, eight States[1] filed a nearly identical suit in the District of Massachusetts. The plaintiff States challenged the Department's termination of teacher education grants following the aforementioned review of "discriminatory practices," including challenging the termination of some of the same grants at issue in this case. *See California v. U.S. Dep't of Educ.*, Civ. No. 25-10548 MJJ, 2025 WL 760825 (D. Mass. Mar. 10, 2025); *see, e.g.*, JA 355 (citing TQP grant to Townsen University and SEED grant to the University of Maryland that were also cited in *California*). That case was likewise premised on the same foundation: that the grant terminations violated the APA.

The District Court for the District of Massachusetts issued a temporary restraining order that required the Department to undo the

---

[1] California, Massachusetts, New Jersey, Colorado, Illinois, Maryland, New York, and Wisconsin.

termination of TQP and SEED grants for all "recipients in the Plaintiff States." *California*, 2025 WL 760825 at *5. The court's reasoning mirrors that of the challenged order here. Specifically, the court first concluded it had jurisdiction, notwithstanding the Court of Federal Claims' exclusive jurisdiction over certain contract claims, because "the source of the plaintiffs' rights was in federal statute and regulations and because the relief was injunctive in nature." *Id.* at *1. Turning to the merits, the court concluded that "there was no individualized analysis of any of the programs; rather, it appears that all TQP and SEED grants were simply terminated." *Id.* at *2 (emphasis omitted). The court also observed that each terminated program received the same termination letter, which lacked any reasoned explanation specific to the individual grants. *Id.* at *2-3. Finally, the court concluded that plaintiffs would suffer irreparable harm from the cessation of funding while the only harm to the government from a restraining order would be to disburse appropriated funds. *Id.* at *5.

The First Circuit denied a stay pending appeal. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 101 (1st Cir. 2025). The court agreed the district court had jurisdiction because, even though the "grant award

takes the form of a contract between the recipient and the government," "if the Department breached any contract, it did so by violating the APA." *Id.* at 96. Additionally, the court did not view the plaintiffs as seeking damages, but rather as seeking to force the "Department to once again make available already-appropriated federal funds for existing grant recipients." *Id.* at 96-97.

On the merits, the First Circuit also agreed that the grant terminations were likely arbitrary and capricious. *California*, 132 F.4th at 99. The court went on to dismiss the harm suffered by the government as "speculation and hyperbole," even as it acknowledged "the Department may incur some irreparable harm if it cannot recoup [the] money" being disbursed. *Id.* at 100.

The Supreme Court granted a stay pending appeal and any forthcoming writ of certiorari. *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). The Court explained that "the Government is likely to succeed in showing the District Court lacked jurisdiction" because "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *Id.* (quotation

omitted).  The Court also concluded the government would suffer irreparable harm from a restraining order because "it is unlikely to recover the grant funds once they are disbursed," while the plaintiffs would not because "they can recover any wrongfully withheld funds through suit in an appropriate forum." *Id.* at 969.

3.  In the wake of this decision, this Court granted the government's motion for a stay pending appeal of the district court's order in this case.  Additionally, the district court recognized that in further proceedings it would be "obliged to raise the issue [of jurisdiction] *sua sponte* in view of the Supreme Court's evaluation of the 'likelihood' that the Tucker Act applies in *California* – this case's doppelganger," but nonetheless rebuffed efforts by the parties to dissolve its preliminary injunction because the "Fourth Circuit already has before it this precise issue." JA 711.

## SUMMARY OF ARGUMENT

The district court ordered the Department of Education to pay funds in accordance with certain teacher education grants that the Department determined no longer effectuates program goals or agency

priorities.  The preliminary injunction was premised upon four layers of error.

First and foundationally, the district court wrongly determined that it had jurisdiction given that this case is, at its essence, a contract dispute where the Tucker Act vests exclusive jurisdiction with the Court of Federal Claims.  In what the court referred to as "this case's doppelganger," JA 711, the Supreme Court concluded that the government was likely to succeed in showing that a district court lacked jurisdiction to order the reinstatement of terminated teacher education grants under the APA—the relief ordered here—because the Tucker Act vested the Court of Federal Claims jurisdiction over such suits. *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam).  The court here had the opportunity to correct its error when plaintiffs moved to dissolve the challenged order but declined to do so. JA 710.  Had the court not demurred, it would have found it lacked jurisdiction, and this Court should do so now.

Second, even if the district court was correct that it had jurisdiction under the APA, it failed to apply that statute correctly.  To start, the court failed to realize that the decision here to discontinue

funding program to reallocate those funds to more productive uses is committed to agency discretion by law and not reviewable under the APA. 5 U.S.C. § 701(a)(2). Indeed, the relevant regulation vests the Department (and all Executive Branch agencies) with broad authority to terminate a grant that "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The court mistakenly concluded that this broad authority could not be invoked unless a separate regulation, listing priorities that "may be used" in grant programs, was first changed through notice-and-comment rulemaking. This extraordinary conclusion was based not on any specific statutory or regulatory language but, rather, a statute of general application that prescribes when the Department can forgo notice-and-comment procedures when promulgating new regulations relating to grants. That provision has no evident relevance given that the Department is relying upon existing, not new, authority.

Moreover, even if the decision here were not committed to agency discretion, it would still comport with the APA because the Department's actions were reasonable and reasonably explained. Specifically, the grant terminations were the result of an individualized

review and justified because each of the terminated grants included "DEI initiatives" that the Department considers contrary to the goal of educating teachers and the agency's priority of eliminating discrimination. While the district court might disagree with the Department's conclusion on this score, it "may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Third, the equities balance against a preliminary injunction. As the Supreme Court recently explained, the government would suffer irreparable harm because it is "unlikely to recover the grant funds once they are disbursed." *California*, 145 S. Ct. at 969. Conversely, the denial of injunctive relief would not prevent plaintiffs' members from "recover[ing] any wrongfully withheld funds through suit in an appropriate forum." *Id.*

Finally, the district court's preliminary injunction was overbroad in granting relief to unnamed members of the plaintiffs' organizations. This creates the fundamentally inequitable situation in which unidentified members of the organization can obtain relief if plaintiffs prevail but may not be precluded from separately obtaining relief if the

government prevails.  Indeed, following entry of the injunction, plaintiffs asked the government to restore grants to additional institutions who have suddenly "joined" plaintiffs as members. Moreover, there is no basis to conclude that irreparable harm, a necessary predicate for a preliminary injunction, would be suffered by unnamed grant recipients.

## STANDARD OF REVIEW

A preliminary injunction is reviewed for an abuse of discretion. *Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023).  "In determining whether the district court abused its discretion, [this court] review[s] the district court's factual findings for clear error and its legal conclusions *de novo*."  *Id.*

## ARGUMENT

## I.     The Government Is Likely to Prevail on the Merits

The challenged preliminary injunction that commands the Department of Education to pay plaintiffs according to the terms of their grant agreements is contrary to law.  The district court, as the Supreme Court explained, lacks jurisdiction under the APA because this case seeks to enforce a contractual obligation to pay money and should have been brought in "an appropriate forum," the Court of

Federal Claims. *Department of Educ. v. California*, 145 S. Ct. 966, 968 (2025) (per curiam). And even were the APA the apposite framework, the court erred by failing to recognize that the grant terminations were not subject to APA review given their discretionary nature and, in any event, were reasonable and reasonably explained.

### A. The district court lacked jurisdiction under the APA because this case seeks to enforce a contractual obligation to pay money.

The federal government is "immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. General Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022). The Tucker Act provides a waiver for "any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a). Such claims seek monetary relief and must be brought in the United States Court of Federal Claims. *Id.* In contrast, the APA provides "a limited waiver of sovereign immunity for claims against the United States" seeking non-monetary relief, *Crowley*, 38 F.4th at 1105, that does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," *Match-E-Be-Nash-She-Wish Band of*

*Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quotation omitted). That carve-out "prevents plaintiffs from exploiting the APA's waiver to evade limitations on suit contained in other statutes." *Id.* Thus, the "Tucker Act impliedly forbids" the bringing of "contract actions" against "the government in a federal district court" under the APA. *Albrecht v. Committee on Emp. Benefits of the Fed. Reserve Emp. Benefits Sys.*, 357 F.3d 62, 67-68 (D.C. Cir. 2004) (quotation omitted). This jurisdictional division ensures that contract claims against the government are channeled into the court that has "unique expertise" in that area, *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985), and which Congress has generally not empowered to grant injunctive relief, *see James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998).

In determining whether "a particular action" is "at its essence a contract action" subject to the Tucker Act or instead a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982) (quotation omitted); *see also, e.g., United States v. J*

*& E Salvage Co.*, 55 F.3d 985, 987-88 (4th Cir. 1995) (applying *Megapulse*). Under that framework in what the district court called "this case's doppelganger," JA 711, the Supreme Court recently held that the government was likely to succeed in showing that a district court "lacked jurisdiction to order the payment of money under the APA." *California*, 145 S. Ct. at 968.

Specifically, in *Department of Education v. California*, several states brought an essentially identical case that covered some of the same grants at issue here. *See, e.g.*, JA 355 (citing TQP grant to Townsen University and SEED grant to the University of Maryland that were also cited in *California*). Like plaintiffs in this case, the plaintiffs in *California* alleged that the Department's termination of various teacher education grants for "discriminatory practices— including in the form of DEI" violated the APA. JA 646; *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96 (1st Cir. 2025). Also as in this case, the district court ordered the Department to reinstate the terminated grants. *Id.*; JA 685-686.

The First Circuit declined to stay that order, but the Supreme Court did not. In granting the government's request for emergency

relief, the Supreme Court explained that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). That explanation controls here.

Looking more closely, the source of plaintiffs' purported rights to payment are the grant agreements, which bear all the hallmarks of a contract. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (noting that "many . . . federal grant programs" are "much in the nature of a contract") (quotation omitted); *see also Columbus Reg'l Hosp v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021) ("[W]e have followed our predecessor court in treating federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound."). The grant agreements are written agreements, agreed to by both the government and grantee, and specify the amount the government agreed to pay, the work the grantee was to perform in exchange for the payment, the performance period for the work, and all applicable policies and procedures, including the

conditions under which the grant could be terminated.  *See*, *e.g.*, JA 349-354 (TQP grant); JA 423-428 (SEED grant).  Indeed, the cited termination provision at issue here—where the government is authorized to terminate a grant after concluding it "no longer effectuates the program goals or agency priorities"—is an express provision of the grant agreements.  JA 669 (quotation omitted).  The grant agreements are therefore contracts, and this case is a dispute over whether those contracts were violated.

The type of relief plaintiffs seek further reveals this case to be one about contracts.  Specifically, plaintiffs asked for an injunction "[o]rdering such grant funding reinstated forthwith," JA 48, to redress the fact that their members "have been and will continue to be deprived of essential funding," JA 59.  The payment of money, far from being merely incidental to or "hint[ed] at" by plaintiffs' request for relief, is the entire object of plaintiffs' suit.  *Crowley*, 38 F.4th at 1112 (quotation omitted).  This suit is thus not a challenge to some regulatory action with monetary implications, but rather a suit for "past due sums" from the government.  *Knudson*, 534 U.S. at 212; *see Maine Cmty. Health Options v. United States*, 590 U.S. 296, 326-27 (2020); *cf. Bowen v.*

23

*Massachusetts*, 487 U.S. 879 (1988). Where, as here, "the alpha and omega of this dispute" is a contract claim for moneys allegedly owned, the district court lacks jurisdiction under the APA. *J & E Salvage Co.*, 55 F.3d at 989.

Prior to the Supreme Court's decision in *California*, the district court cited five reasons why it believed the Tucker Act did not apply. Each fails to address the fact that plaintiffs seek to enforce a contractual relationship with the government. None draw any meaningful distinction between this case and *California*. The court could have corrected this error, even recognizing that it would "be obliged to raise the issue *sua sponte* in view of the Supreme Court's evaluation of the 'likelihood' that the Tucker Act applies in *California* – this case's doppelganger." JA 711. The court declined, however, leaving that task to this Court.

First, the district court concluded plaintiffs "do not seek money damages for past wrongs" and instead seek redress for "alleged statutory and regulatory violations." JA 695. While the court did not identify any statutes or regulations, its prior conclusion that the grant terminations violated the APA identified four possible candidates: (1) a

government-wide regulation permitting the termination of grants, as relevant here, "if an award no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4); (2) a government-wide regulation requiring the Department provide written notice of the reasons for any grant terminations, *id.* § 200.341; (3) a Department regulation that lists optional priorities and definitions that "may be used across the [Department's] discretionary grant programs to further the Department's mission," 86 Fed. Reg. 70,612, 70,612 (Dec. 10, 2021) ("The Secretary may choose to use an entire priority . . . or use one or more of the priority's subparts."); and (4) a statutory carve out for certain education-related regulations from the APA's blanket exception to notice-and-comment rulemaking for grants, 20 U.S.C. § 1232(d).

The district court's application of these authorities was wrong, as discussed in more detail below, *see infra* Part I.B, but for purposes of the jurisdictional analysis the essential point is that none of these regulations and statutes required the government to make payments. Rather, only the relevant grant agreements give plaintiffs' members any right to money, *i.e.*, the relief they seek. *See* JA 48. Indeed, the regulation permitting the termination of a grant that no longer

advances "program goals or agency priorities" and the regulation requiring written notice of termination are both express grant terms. JA 669 (quoting 2 C.F.R. § 200.340(a)(4)). Thus, this entire case can be resolved within the four corners of the grant agreements. Underscoring the point, compliance with the contractual agreements, and not with the relevant statutes and regulations, is what the court ultimately ordered. *See* JA 685-686 (requiring the Department to reinstate the TQP, SEED, and TSL grants "in accordance with the Grant Award Notification terms and conditions in place immediately prior to issuance of Termination Letters by the Department").

Nor does *Bowen* support the district court's reasoning. 487 U.S. at 879. That case, which did not involve contracts with the government, was a dispute over the policy governing reimbursement under Medicaid, the resolution of which could "requir[e] the Secretary to modify future practices" as part of the "complex ongoing relationship between the parties." *Id.* at 905. That is not this case, where specific monetary payments pursuant to a contractual agreement is the entire point. Indeed, the Supreme Court found nothing in *Bowen* inconsistent with its conclusion that cases like this belong in the Court of Federal Claims.

To the contrary, the Court explained that while "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," the relevant point here is that "the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here." *California*, 145 S. Ct. at 968 (quotation omitted) (quoting *Bowen*, 487 U.S. at 910).

Second and third, the district court viewed the remedies that plaintiffs seek as "forward-looking equitable relief to prevent Defendants from terminating other Grant Program awards," which were beyond the "narrow circumstances in which the Court of Federal Claims may issue injunctive relief per the Tucker Act." JA 695. But any breach-of-contract claim could be similarly recast as seeking future compliance with the contract rather than monetary damages. That is not enough to take such a claim outside the scope of the Tucker Act. *See U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-cv-00465 (TNM), 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025) (When claims like plaintiffs' are "[s]tripped of [their] equitable flair, the requested relief seeks one thing: . . . the Court to order the Government

to stop withholding the money due" under the grants. Such a claim for "the classic contractual remedy of specific performance" "must be resolved by the Claims Court." (quotation omitted)). And while the district court was correct in observing that the Court of Federal Claims lacks general equitable powers, JA 695, that does not provide a basis for circumventing the exclusive jurisdictional provisions of the Tucker Act. Rather, it reflects Congress's determination that specific performance should be generally unavailable in contract claims against the government. *See Albrecht*, 357 F.3d at 68 ("We have held that the Tucker Act impliedly forbids—in APA terms—not only district court awards of money damages, which the Claims Court may grant, but also injunctive relief, which the Claims Court may not." (quotation omitted)).

Fourth, the district court noted that in addition to restoring grants, plaintiffs sought to require the Department to remove route pay grant conditions, which is a pre-approval process to access grant funds. JA 695-696. But the authority to impose such conditions is also an express grant term. JA 669 n.13 (noting the grant agreements incorporate 2 C.F.R. Part 200 while grant pay conditions are part of 2 C.F.R. § 200.208). Thus, to the extent plaintiffs have a claim that the

Department improperly imposed a pay condition, that too is a claim for breach of contract subject to the Tucker Act.

Finally, the district court concluded that the fact that it had to examine "the parties' relationship pursuant to a constellation of sources," including statutes and regulations, weighed in favor of this being a proper APA suit. JA 696. But the possibility that the contractual arrangement might have incorporated various statutory or regulatory provisions, as was the case here, JA 669 n.13, does not change the fundamental nature of the dispute. In *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir. 1985), for example, the plaintiff alleged that the government had violated the Debt Collection Act, but the D.C. Circuit concluded that the claim was impliedly precluded by the Tucker Act because the plaintiff sought payments and "[t]he right to these payments is created in the first instance by the contract, not by the Debt Collection Act." *Id.* at 894. The same analysis applies here.

**B.** **The Department's decision to discontinue a previously funded program to reallocate those funds is committed to agency discretion and not reviewable under the APA.**

Although the Tucker Act's preclusion of review is itself dispositive, the district court further erred in adopting an improperly narrow view of the circumstances in which the Department could terminate a grant that "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). This well-established provision provides broad— indeed, largely unreviewable—authority for various Executive Branch agencies to terminate funding agreements that no longer serve the government's interests. The court's suggestion that it could second-guess these conclusions, or that notice-and-comment rulemaking was required before the government could exercise this authority, was mistaken.

1. The Supreme Court made clear in *Lincoln v. Vigil*, 508 U.S. 182 (1993), that agency decisions like this—to discontinue a previously funded program to reallocate those funds to more productive uses—are committed to agency discretion by law and not reviewable under the APA. 5 U.S.C. § 701(a)(2).

In *Lincoln*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision-making standards. 508 U.S. at 185-88. The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion" because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. Thus,

> an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'

*Lincoln*, 508 U.S. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).

"Of course," the Court went on, this discretion is not unbounded because "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Lincoln*, 508 U.S. at 193. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.*

Although *Lincoln* addressed lump-sum appropriations, courts have made clear that its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Id.* at 752 (quotation omitted).

The programs at issue here are such programs as they provide significant discretion in determining how best to allocate appropriated

funds across grant applicants.  The statute governing TQP grants

provides simply that "the Secretary is authorized to award grants, on a

competitive basis, to eligible partnerships, to enable the eligible

partnerships to carry out" certain activities, including "a program for

the preparation of teachers," a "teaching residency program," and "a

leadership development program."  20 U.S.C. § 1022a(a), (c).  Similarly,

the SEED grant statute generally directs the Secretary to "award

grants, on a competitive basis, to eligible entities" to provide "pathways

to serve in traditionally underserved local educational agencies,"

"evidence-based professional" development and enhancement activities,

and "services and learning opportunities to local educational agencies."

*Id.* § 6672(a).  The TSL grant statute follows this pattern, and also

generally directs the Secretary to "award grants, on a competitive basis,

to eligible entities to enable the eligible entities to develop, implement,

improve, or expand performance-based compensation systems or human

capital management systems."  *Id.* § 6632(a).

None of these statutes constrains the Department's discretion to

determine how best to allocate funding among potential grant

recipients.  As a result, there is no meaningful standard for a court to

apply in reviewing the Department's exercise of its broad discretion within the outer bounds of those "permissible statutory objectives." *Lincoln*, 508 U.S. at 193. Thus, the Department's decision to award or terminate a grant is reviewable—at most, and in an appropriate forum—only for compliance with the terms of the governing statutes, regulations, and funding instruments.

2. The district court's contrary conclusion was premised on two regulations. The first is a provision that limits the circumstances in which the Department can forgo notice-and-comment procedures when promulgating regulations relating to grants. *See* JA 671-672 (citing 20 U.S.C. § 1232(d)). That provision has no evident relevance here. The Department neither promulgated a new regulation—with or without notice and comment—nor accused grant recipients of failing to comply with a new policy with the force of law that would need to be codified in a regulation. Instead, it relied upon existing authority to terminate grants that it no longer considers effective in carrying out the Department's broader goals. *See* 2 C.F.R. § 3474.1 (adopting 2 C.F.R. § 200.340).

The other regulation the district court viewed as restricting the Department's discretion was one that set forth a list of priorities and definitions that "may be used across the [Department's] discretionary grant programs to further the Department's mission." 86 Fed. Reg. at 70,612 ("The Secretary may choose to use an entire priority . . . or use one or more of the priority's subparts."). That regulation lays out a permissible set of criteria that can be used to allocate resources going forward but does not purport to limit the Department's discretion in terminating grants. Much less does that regulation purport to provide an exhaustive list of considerations that might come into play in determining whether a particular funding agreement is ineffectual or counterproductive. Indeed, the Department's authority to terminate grants that do not "effectuate[] the program goals," 2 C.F.R. § 200.340(a)(4), has little to do with announced priorities.

One would expect a clear indication if such permissive factors were intended to limit the Department's ability to exercise its separate authority, arising from Executive Branch-wide regulations, to terminate a funding agreement that "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). That is particularly true

given that the termination provision was adopted precisely to give the Department maximum flexibility. As the Office of Management and Budget explained at the time it promulgated the regulation, the language was chosen "to strengthen the ability of the Federal awarding agency to terminate Federal awards," expressly in rejection of numerous requests to allow termination only "for cause," and to facilitate terminations that are "in the interest of the government." 85 Fed. Reg. 49,506, 49,507-08 (Aug. 13, 2020). There is no basis for this broad termination provision to be constrained, *sub silentio*, by an entirely different regulation setting forth an optional list of priorities and definitions for future grant programs.

### C. The challenged grant terminations were reasonable and reasonably explained.

Even if the Department's discretionary decisions were subject to review, they would be upheld under the arbitrary-and-capricious standard, which "requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.*

As explained, the challenged grant terminations came after the Department conducted an individualized review pursuant to the Acting Secretary's directive to identify grants that fund programs that are contrary to the Department's policy priorities.  JA 676-678.  The Department confirmed that the grants at issue here in fact funded such programs and terminated those grants on that basis.  JA 676.  This decision-making process was both reasonable and reasonably explained, particularly in this context of discretionary grants where the Department is vested with substantial discretion.

The district court purported to identify a lack of clarity in the termination letters, but each identified "DEI initiatives" that conflict with the Department's current policies as the root cause of the termination.  *See* JA 667-668.  The possibility that some individual programs might suffer additional defects justifying termination—such as being unlawful, violating the purpose of federal law, suffer other policy defects, or some combination—does not obscure the clear thrust of the letter as targeted at DEI programs that the Department did not wish to continue funding.  No further explanation is required.

The district court further faulted the Department for sending template letters and for not engaging in any "individualized analysis." *See* JA 676. But the Department engaged in individualized review, a fact the court summarily dismissed as a "post-hoc rationalization[]" because the Department's description of that process was contained in a declaration filed in litigation challenging the terminations. JA 677 (quotation omitted). That was improper. As this Court has explained, a declaration that is "explanatory of the original record and contain[s] no new rationalizations" is properly considered in determining whether the challenged agency complied with the APA. *Roe v. Department of Def.*, 947 F.3d 207, 221 (4th Cir. 2020) (alteration omitted) (quotation omitted); *see also Rhea Lana, Inc. v. United States*, 925 F.3d 521, 524 (D.C. Cir. 2019) (explaining that courts may consider such declarations when they "accurately reflect[] the contemporaneous reasoning of the" agency). The fact the Department conducted an individualized review is not a "new rationalization" for the grant terminations but is rather explanatory of the original record and the court should not have simply ignored it.

Finally, the district court glossed over the fact the Department did not terminate all grants held by members of plaintiffs' organizations, further confirming that review was individualized. JA 646. And because the Department identified grants with a common characteristic (funding DEI) and terminated the grants on that basis, the Department reasonably provided a common explanation to grantees. Indeed, treating similarly situated grants equally is required by the APA, for "[r]easoned decisionmaking requires treating like cases alike." *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989).

## II. The Equitable Factors Weigh Against a Preliminary Injunction

The balance of equities and the public interest counsel against a preliminary injunction. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that these factors merge in cases involving the government). In particular, the district court's order will cause significant and irreparable harm to the government. Beyond the obvious harms to the President's ability to execute core Executive Branch policies, the order irreparably harms the public fisc. The order requires the Department to reinstate access of grantees to TQP, SEED, and TSL funds, and enjoins the Department from re-terminating the grants or imposing any

additional payment protections.  JA 685-686.  Moreover, plaintiffs'

members indicate they will immediately spend any grant money they

receive on operational costs. *See* JA 679.  Thus, the challenged order

will result in the immediate outflow of significant amounts of money

from the public fisc with minimal oversight and limited prospects for

recovery if it is ultimately determined that the grant terminations were

lawful.

In contrast, the gravamen of plaintiffs' claim is monetary and

plaintiffs' members will receive any funds they are owed if they

ultimately prevail in an appropriate forum.  The "possibility that

adequate compensatory or other corrective relief will be available at a

later date, in the ordinary course of litigation, [weighs] heavily against

a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New

Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (alteration in original)

(quotation omitted), *cert. denied*, 569 U.S. 994 (2013).

The Supreme Court assessed these factors in *California* and found

that the balance weighs against an injunction.  As the Court explained,

the government suffers irreparable harm because it is "unlikely to

recover the grant funds once they are disbursed."  145 S. Ct. at 969.

Conversely, nothing about the denial of a preliminary injunction would prevent plaintiffs from "recover[ing] any wrongfully withheld funds through suit in an appropriate forum." *Id.*

## III. The Preliminary Injunction Is Overbroad

Even accepting the district court's conclusions on the merits, the court's order is overbroad because it extends to all "TQP, SEED, and TSL Grant Awards of Plaintiff NCTR and Plaintiffs' Grant Recipient members." JA 686. In so doing, the order is not limited to the specific grants and grant recipients identified in the Complaint. JA 28-41. That leads to a fundamentally inequitable situation in which unidentified members of the organization can obtain relief if plaintiffs prevail but may not be precluded from separately obtaining relief if the government prevails; although plaintiffs purport to represent the interests of their members, they have never claimed authority to bind them to an adverse judgment. *Cf. Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton C.J., concurring) (explaining the equitable and historical problems with "asymmetric" suits).

These concerns are particularly acute here, since there is a separate set of ostensibly representative plaintiffs seeking overlapping

remedies in another case. As noted above, many of the grants at issue here are also at issue in the *California* case that is currently pending in the District of Massachusetts. *See, e.g.*, JA 355 (citing TQP grant to Townsen University and SEED grant to the University of Maryland that were also cited in *California*). Granting an injunction to entities that have not agreed to be bound by an adverse judgment provides two (or more) bites at the apple for those entities.

Exacerbating the problem, plaintiffs do not even purport to be limited by the membership of their organizations at the time the litigation was filed. Rather, following entry of the injunction, plaintiffs asked the government to restore grants to additional institutions who have suddenly "joined" plaintiffs as members. Although that effort should be rejected even under the terms of the existing injunction, it highlights the unfairness of allowing members to identify themselves once they learn that the plaintiffs have prevailed, but to lie low and seek relief in a different forum if the government wins.

Finally, there is no basis to conclude that irreparable harm, a necessary predicate for a preliminary injunction, would be suffered by unnamed grant recipients. Here, the district court relied upon

individual declarations by grant recipients that they would suffer

"programmatic closures" and "staff terminations" as a basis for its

finding of irreparable harm.  JA 681.  There is obviously no such

evidence concerning unnamed grant recipients, even if they are

members of the plaintiff organizations.  As such, there is no basis to

conclude a preliminary injunction is appropriate for those unnamed

grant recipients.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S.7,

22 (2008) (A plaintiff seeking a preliminary injunction must

"demonstrate that irreparable injury is *likely* in the absence of an

injunction.").

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

KELLY O. HAYES
   *United States Attorney*

ERIC D. MCARTHUR
   *Deputy Assistant Attorney*
     *General*

MARK R. FREEMAN
DANIEL TENNY

 */s/*
——————————————
SEAN R. JANDA
BRIAN J. SPRINGER
BENJAMIN C. WEI
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7260*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, D.C. 20530*
   *(202) 616-2875*
   *benjamin.c.wei@usdoj.gov*

June 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 7995 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/*
_____
Benjamin C. Wei

**CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

<div style="text-align: right;">

*/s/*_____

Benjamin C. Wei

</div>