**No. 25-1281**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

———————————

U.S. Department of Education, *et al.*,

Defendants-Appellants,

v.

American Association of Colleges for Teacher Education, *et al.*,

Plaintiffs-Appellees.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

### JOINT APPENDIX VOLUME 1

———————————

JOSHUA W.B. RICHARDS
CAROLYN M. TOLL
  *SAUL EWING LLP*
  *1500 Market Street, 38th Floor*
  *Philadelphia, PA 19102*
  *(215) 972-7737*

DANIEL M. MOORE
  *SAUL EWING LLP*
  *1001 Fleet Street, Ninth Floor*
  *Baltimore, MD 21202-4359*
  *(410) 332-8734*

*Counsel for Plaintiffs*

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney*
  *General*

MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
BENJAMIN C. WEI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7235*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-2875*

*Counsel for Defendants*

# TABLE OF CONTENTS

Docket Report ........................................................................ JA 1

Complaint (Dkt. No. 1) ........................................................ JA 9

Plaintiffs' Motion for Temporary Restraining Order / Preliminary
    Injunction (Dkt. No. 5) ............................................... JA 48

Plaintiffs' Memorandum of Law In Support of Their Motion for
    Temporary Restraining Order / Preliminary Injunction with
    Attachments (Dkt. Nos. 5-1 to 5-10) ..................................... JA 52

Defendants' Response in Opposition to Motion for Temporary
    Restraining Order / Preliminary Injunction with
    Attachments (Dkt. Nos. 24 to 24-4) .................................... JA 260

Plaintiffs' Reply in Further Support of their Motion for a
    Temporary Restraining Order / Preliminary Injunction with
    Attachments (Dkt. Nos. 25 to 25-3) .................................... JA 313

Transcript of March 13, 2025, Hearing
    on Preliminary Injunction .................................................... JA 534

# 1:25cv702, American Association Of Colleges For Teacher Education Et Al V. Mcmahon Et Al

US District Court Docket

United States District Court, Maryland

(Baltimore)

**This case was retrieved on 06/08/2025**

## Header

**Case Number:** 1:25cv702
**Date Filed:** 03/03/2025
**Assigned To:** Judge Julie Rebecca Rubin
**Nature of Suit:** Other Civil Rights (440)
**Cause:** Administrative Procedures Act
**Lead Docket:** None
**Other Docket:** 1:25cv00333, Fourth Circuit Court of Appeals, 25-01281
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 05:551
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Civil Rights

## Participants

| Litigants | Attorneys |
|---|---|
| American Association of Colleges for Teacher Education<br>**Plaintiff** | Carolyn M Toll<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Saul Ewing LLP<br>Centre Square West, 38th Floor 1500 Market Street<br>Philadelphia, PA  19102<br>USA<br>215-972-8391 Fax: 215-972-1852<br>Email:Carolyn.Toll@saul.Com<br><br>Joshua W Richards<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Saul Ewing LLP<br>Centre Sq. West, 1500 Market Street 38th Floor<br>Philadelphia, PA  19102<br>USA<br>215-972-7737 Email:Joshua.Richards@saul.Com<br><br>Daniel McDevitt Moore<br>ATTORNEY TO BE NOTICED<br>Saul Ewing LLP<br>1001 Fleet Street Ste 9th Floor<br>Baltimore, MD  21202<br>USA<br>410-332-8734 Email:Daniel.Moore@saul.Com |
| National Center for Teacher Residencies<br>**Plaintiff** | Carolyn M Toll<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Saul Ewing LLP |

JA 1

1:25cv702, American Association Of Colleges For Teacher Education Et Al V. Mcmahon Et Al

| Litigants | Attorneys |
|---|---|
| | Centre Square West, 38th Floor 1500 Market Street Philadelphia, PA 19102 USA 215-972-8391 Fax: 215-972-1852 Email:Carolyn.Toll@saul.Com |
| | Joshua W Richards PRO HAC VICE;ATTORNEY TO BE NOTICED Saul Ewing LLP Centre Sq. West, 1500 Market Street 38th Floor Philadelphia, PA 19102 USA 215-972-7737 Email:Joshua.Richards@saul.Com |
| | Daniel McDevitt Moore ATTORNEY TO BE NOTICED Saul Ewing LLP 1001 Fleet Street Ste 9th Floor Baltimore, MD 21202 USA 410-332-8734 Email:Daniel.Moore@saul.Com |
| The Maryland Association of Colleges for Teacher Education **Plaintiff** | Carolyn M Toll PRO HAC VICE;ATTORNEY TO BE NOTICED Saul Ewing LLP Centre Square West, 38th Floor 1500 Market Street Philadelphia, PA 19102 USA 215-972-8391 Fax: 215-972-1852 Email:Carolyn.Toll@saul.Com |
| | Joshua W Richards PRO HAC VICE;ATTORNEY TO BE NOTICED Saul Ewing LLP Centre Sq. West, 1500 Market Street 38th Floor Philadelphia, PA 19102 USA 215-972-7737 Email:Joshua.Richards@saul.Com |
| | Daniel McDevitt Moore ATTORNEY TO BE NOTICED Saul Ewing LLP 1001 Fleet Street Ste 9th Floor Baltimore, MD 21202 USA 410-332-8734 Email:Daniel.Moore@saul.Com |
| Linda McMahon Secretary of Education | **Defendant** | Molissa Heather Farber LEAD ATTORNEY;ATTORNEY TO BE NOTICED US Attorney's Office District Of Md 36 S Charles St 4th Fl Baltimore, MD 21201 USA 4102094862 Fax: 4109622310 Email:Molissa.Farber@usdoj.Gov |
| | Megan Lynn Micco ATTORNEY TO BE NOTICED DOJ-USAO Civil Division 36 S. Charles Street Suite 400 Baltimore, MD 21201 |

JA 2

1:25cv702, American Association Of Colleges For Teacher Education Et Al V. Mcmahon Et Al

## Litigants

## Attorneys

| Litigants | Attorneys |
|---|---|
| | USA<br>410-209-4800 Fax: 410-962-0717<br>Email:Megan.Micco@usdoj.Gov |
| U.S. Department of Education<br>**Defendant** | Molissa Heather Farber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>US Attorney's Office<br>District Of Md 36 S Charles St 4th Fl<br>Baltimore, MD  21201<br>USA<br>4102094862 Fax: 4109622310<br>Email:Molissa.Farber@usdoj.Gov |
| | Megan Lynn Micco<br>ATTORNEY TO BE NOTICED<br>DOJ-USAO<br>Civil Division 36 S. Charles Street Suite 400<br>Baltimore, MD  21201<br>USA<br>410-209-4800 Fax: 410-962-0717<br>Email:Megan.Micco@usdoj.Gov |
| Donald J. Trump<br>in his official capacity as President of the United States \|<br>**Defendant** | Molissa Heather Farber<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>US Attorney's Office<br>District Of Md 36 S Charles St 4th Fl<br>Baltimore, MD  21201<br>USA<br>4102094862 Fax: 4109622310<br>Email:Molissa.Farber@usdoj.Gov |
| | Megan Lynn Micco<br>ATTORNEY TO BE NOTICED<br>DOJ-USAO<br>Civil Division 36 S. Charles Street Suite 400<br>Baltimore, MD  21201<br>USA<br>410-209-4800 Fax: 410-962-0717<br>Email:Megan.Micco@usdoj.Gov |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 03/03/2025 | COMPLAINT  against Denise Carter, Donald J. Trump, U.S. Department of Education ( Filing fee $ 405 receipt number AMDDC-11817361.), filed by American Association of Colleges for Teacher Education, The Maryland Association of Colleges for Teacher Education, National Center for Teacher Residencies. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Civil Cover Sheet, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons)(Moore, Daniel) (Additional attachment(s) added on 3/4/2025: # 11 Flattened Exhibit B) (bg3s). (Entered: 03/03/2025) | |
| 2 | 03/03/2025 | Local Rule 103.3 Disclosure Statement by American Association of Colleges for Teacher Education (Moore, Daniel) (Entered: 03/03/2025) | |
| 3 | 03/03/2025 | Local Rule 103.3 Disclosure Statement by National Center for Teacher Residencies (Moore, Daniel) (Entered: 03/03/2025) | |
| 4 | 03/03/2025 | Local Rule 103.3 Disclosure Statement by The Maryland | |

1:25cv702, American Association Of Colleges For Teacher Education Et Al V. Mcmahon Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | Association of Colleges for Teacher Education (Moore, Daniel) (Entered: 03/03/2025) | |
| 5 | 03/03/2025 | MOTION for Temporary Restraining Order /Preliminary Injunction by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education (Attachments: # 1 Memorandum in Support, # 2 Declaration of Joshua W. B. Richards, Esq., # 3 Declaration of Cheryl Holcomb-McCoy, Ph.D., # 4 Declaration of Kathlene Campbell, Ph.D., # 5 Declaration of Laurie Mullen, Ph.D., # 6 Declaration of Carolyn Parker, Ph.D., # 7 Declaration of Amy Smith, Ph.D., # 8 Declaration of Heather Kirkpatrick, Ph.D., # 9 Declaration of Dr. Sarah Johnson, # 10 Text of Proposed Order)(Moore, Daniel) (Entered: 03/03/2025) | |
| 6 | 03/03/2025 | MOTION to Appear Pro Hac Vice for Joshua W. B. Richards (Filing fee $100, receipt number AMDDC-11817544.) by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education(Moore, Daniel) (Entered: 03/03/2025) | |
| 7 | 03/03/2025 | MOTION to Appear Pro Hac Vice for Carolyn M. Toll  (Filing fee $100, receipt number AMDDC-11817547.) by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education(Moore, Daniel) (Entered: 03/03/2025) | |
| 8 | 03/04/2025 | QC NOTICE: 1 Complaint, filed by National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education, American Association of Colleges for Teacher Education was filed incorrectly.  **Not all pdf documents were flattened prior to filing. All pdfs uploaded to CM/ECF MUST BE FLATTENED for all future filings. Failure to comply may result in rejected filings and delays in case processing. **This filing has been corrected by court staff and no further corrective action is required.  (bg3s, Deputy Clerk) (Entered: 03/04/2025) | |
| 9 | 03/04/2025 | Summons Issued 60 days as to Denise Carter, Donald J. Trump, U.S. Department of Education, U.S. Attorney and U.S. Attorney General(bg3s, Deputy Clerk) (Entered: 03/04/2025) | |
| 10 | 03/04/2025 | PAPERLESS ORDER granting 6 Motion to Appear Pro Hac Vice on behalf of Joshua W Richards. Directing attorney Joshua W Richards to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 3/4/2025. (mh4s, Deputy Clerk) (Entered: 03/04/2025) | |
| 11 | 03/04/2025 | PAPERLESS ORDER granting 7 Motion to Appear Pro Hac Vice on behalf of Carolyn Toll. Directing attorney Carolyn Toll to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 3/4/2025. (mh4s, Deputy Clerk) (Entered: 03/04/2025) | |
| 12 | 03/04/2025 | ORDER directing that Plaintiffs shall promptly file returns of service upon effectuating service of process upon Defendants; directing that if Plaintiffs' counsel have been in communications with defense counsel to provide notice of this action, Plaintiffs' counsel shall promptly so advise chambers. Signed by Judge Julie Rebecca Rubin on 3/4/2025. (bg3s, Deputy Clerk) (Entered: 03/04/2025) | |
| 13 | 03/05/2025 | PAPERLESS ORDER: With the consent of counsel, the court will convene a status conference at 12:00 p.m. today, March 5, 2025. A public access line will be provided and published on the court's | |

1:25cv702, American Association Of Colleges For Teacher Education Et Al V. Mcmahon Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
|  |  | website. Signed by Judge Julie Rebecca Rubin on 3/5/2025. (jf3s, Deputy Clerk) (Entered: 03/05/2025) |  |
| 14 | 03/05/2025 | SUMMONS Returned Executed by American Association of Colleges for Teacher Education, The Maryland Association of Colleges for Teacher Education, National Center for Teacher Residencies. Denise Carter served on 3/5/2025, answer due 3/26/2025.(Moore, Daniel) (Entered: 03/05/2025) |  |
| 15 | 03/05/2025 | SUMMONS Returned Executed by American Association of Colleges for Teacher Education, The Maryland Association of Colleges for Teacher Education, National Center for Teacher Residencies. U.S. Department of Education served on 3/4/2025, answer due 3/25/2025.(Moore, Daniel) (Entered: 03/05/2025) |  |
| 16 | 03/05/2025 | NOTICE of Appearance by Molissa Heather Farber on behalf of All Defendants (Farber, Molissa) (Entered: 03/05/2025) |  |
|  | 03/05/2025 | Set Deadlines: Denise Carter answer due 3/25/2025. (bg3s, Deputy Clerk) (Entered: 03/05/2025) |  |
| 17 | 03/05/2025 | Hybrid Status Conference held via Telephone on 3/5/2025 before Judge Julie Rebecca Rubin.(Court Reporter: Patricia Klepp) (td4s, Deputy Clerk) (Entered: 03/05/2025) |  |
| 18 | 03/05/2025 | ORDER Setting Hearing 5 MOTION for Preliminary Injunction : Motion Hearing set for 3/13/2025 10:00 AM in Courtroom 3A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Julie Rebecca Rubin. Signed by Judge Julie Rebecca Rubin on 3/5/2025. (bg3s, Deputy Clerk) (Entered: 03/05/2025) |  |
| 19 | 03/06/2025 | ORDER re: Security Protocol. Signed by Judge Julie Rebecca Rubin on 3/6/2025. (bg3s, Deputy Clerk) (Entered: 03/06/2025) |  |
| 20 | 03/06/2025 | ORDER directing the Clerk to substitute Defendant Linda McMahon, Secretary of Education, for Denise Carter. Signed by Judge Julie Rebecca Rubin on 3/6/2025. (bg3s, Deputy Clerk) (Entered: 03/06/2025) |  |
| 21 | 03/06/2025 | NOTICE by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education re 5 MOTION for Temporary Restraining Order /Preliminary Injunction with Supplemental Declarations and Exhibits (Richards, Joshua) (Entered: 03/06/2025) |  |
| 22 | 03/11/2025 | MOTION for Extension of Time to File Response/Reply as to 18 Order Setting Hearing on Motion,, Set Scheduling Order Deadlines,  by Linda McMahon, Donald J. Trump, U.S. Department of Education (Attachments: # 1 Text of Proposed Order)(Farber, Molissa) (Entered: 03/11/2025) |  |
| 23 | 03/11/2025 | PAPERLESS ORDER: Although Defendants cite no cause or basis for their motion and the deadline for Defendants' brief was proposed by Defendants (and agreed upon by Plaintiffs), the court exercises its discretion to grant the motion at ECF No. 22 ; Defendants shall have until 3:00PM today to file their brief in opposition to the motion at ECF No. 5 . Chambers courtesy copies (per the court's previous order) shall be delivered without delay upon filing of the Government Defendants' papers. Signed by Judge Julie Rebecca Rubin on 3/11/2025. (bg3s, Deputy Clerk) (Entered: 03/11/2025) |  |
| 24 | 03/11/2025 | RESPONSE in Opposition re 5 MOTION for Temporary Restraining Order /Preliminary Injunction  filed by Linda McMahon, Donald J. Trump, U.S. Department of Education. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Farber, Molissa) (Entered: 03/11/2025) |  |
| 25 | 03/12/2025 | REPLY to Response to Motion re 5 MOTION for Temporary Restraining Order /Preliminary Injunction  filed by American Association of Colleges for Teacher Education, National Center |  |

1:25cv702, American Association Of Colleges For Teacher Education Et Al V. Mcmahon Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | for Teacher Residencies, The Maryland Association of Colleges for Teacher Education. (Attachments: # 1 Supplemental Declaration of Laurie Mullen, PH.D., # 2 Declaration of Joshua W. B. Richards, Esq., # 3 Supplemental Declaration of Kathlene Campbell, PH.D.)(Moore, Daniel) (Entered: 03/12/2025) | |
| 26 | 03/12/2025 | NOTICE of Appearance by Megan Lynn Micco on behalf of Linda McMahon, Donald J. Trump, U.S. Department of Education (Micco, Megan) (Entered: 03/12/2025) | |
| 27 | 03/13/2025 | Preliminary Injunction Hearing held on 3/13/2025 before Judge Julie Rebecca Rubin.(Court Reporter: Amanda Longmore) (jh2s, Deputy Clerk) (Entered: 03/13/2025) | |
| 28 | 03/13/2025 | EXHIBIT LIST by McMahon, et al. (jh2s, Deputy Clerk) (Entered: 03/13/2025) | |
| 29 | 03/13/2025 | Correspondence re: Awarded Grants for Maryland Programs and Status of Same (Moore, Daniel) (Entered: 03/13/2025) | |
| 30 | 03/14/2025 | NOTICE by Linda McMahon, Donald J. Trump, U.S. Department of Education re 24 Response in Opposition to Motion, request for bond (Attachments: # 1 Exhibit Mar. 11, 2025 Executive Order)(Farber, Molissa) (Entered: 03/14/2025) | |
| 31 | 03/14/2025 | PAPERLESS ORDER: The court is in receipt of the Notice at ECF No. 30 regarding Rule 65(c). Plaintiffs may respond no later than 3:00PM today, March 14, 2025; absent a response, the court will rely on Plaintiffs' previous submissions addressing the issue of bond. Signed by Judge Julie Rebecca Rubin on 3/14/2025. (bg3s, Deputy Clerk) (Entered: 03/14/2025) | |
| 32 | 03/17/2025 | MEMORANDUM OPINION. Signed by Judge Julie Rebecca Rubin on 3/17/2025. (bg3s, Deputy Clerk) (Entered: 03/17/2025) | |
| 33 | 03/17/2025 | ORDER granting in part and denying in part 5 Plaintiffs' Motion for Preliminary Injunction; directing that the parties shall file a joint status report within 7 business days of entry of this order, apprising the court of the status of the parties' compliance with this order; directing that Plaintiffs collectively shall post a bond of $100 with the Clerk of Court within 3 business days of entry of this order. Signed by Judge Julie Rebecca Rubin on 3/17/2025. (bg3s, Deputy Clerk) (Entered: 03/17/2025) | |
| 34 | 03/18/2025 | STATUS REPORT by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education(Moore, Daniel) (Entered: 03/18/2025) | |
| 35 | 03/18/2025 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (Preliminary Injunction) held on 03/15/2025, before Judge Julie R. Rubin. Court Reporter Amanda Longmore, Telephone number 4109624474; amanda_longmore@mdd.uscourts.gov. Total number of pages filed: 103. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 4/8/2025. Redacted Transcript Deadline set for 4/18/2025. Release of Transcript Restriction set for 6/16/2025.(al6, Court Reporter) (Entered: 03/18/2025) | |
| 36 | 03/18/2025 | Emergency MOTION for Reconsideration re 32 Memorandum Opinion, 33 Order on Motion for TRO, by Linda McMahon, Donald J. Trump, U.S. Department of Education (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit U.S. Conf. of Catholic Bishops v. U.S. Dept. of State)(Farber, Molissa) (Entered: 03/18/2025) | |
| 37 | 03/18/2025 | PAPERLESS ORDER - The court is in receipt of the Emergency Motion for Reconsideration filed at 7:53PM this evening (March 18, 2025) at ECF No. 36 . Plaintiffs shall file a response by | |

1:25cv702, American Association Of Colleges For Teacher Education Et Al V. Mcmahon Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 12:00PM tomorrow, March 19, 2025. Signed by Judge Julie Rebecca Rubin on 3/18/2025. (kns, Deputy Clerk) (Entered: 03/18/2025) | |
| 38 | 03/19/2025 | RESPONSE in Opposition re 36 Emergency MOTION for Reconsideration re 32 Memorandum Opinion, 33 Order on Motion for TRO,   filed by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education. (Attachments: # 1 Declaration of Joshua W.B. Richards, Esq.)(Moore, Daniel) (Entered: 03/19/2025) | |
| 39 | 03/19/2025 | QC NOTICE: 38 Response in Opposition to Motion, filed by National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education, American Association of Colleges for Teacher Education was filed incompletely. **The following attachments or exhibits are missing - Proposed Order. To correct this problem, file Proposed Order using the event Notice (Other) and link Proposed Order to 38 . (bg3s, Deputy Clerk) (Entered: 03/19/2025) | |
| 40 | 03/19/2025 | REPLY to Response to Motion re 36 Emergency MOTION for Reconsideration re 32 Memorandum Opinion, 33 Order on Motion for TRO,   filed by Linda McMahon, Donald J. Trump, U.S. Department of Education.(Farber, Molissa) (Entered: 03/19/2025) | |
| 41 | 03/19/2025 | NOTICE by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education re 38 Response in Opposition to Motion, Proposed Order (Moore, Daniel) (Entered: 03/19/2025) | |
| 42 | 03/19/2025 | MEMORANDUM OPINION AND ORDER denying 36 Emergency Motion for Reconsideration. Signed by Judge Julie Rebecca Rubin on 3/19/2025. (kns, Deputy Clerk) (Entered: 03/19/2025) | |
| 43 | 03/20/2025 | Registry Deposit Received on 3/19/2025 from Saul Ewing LLP. Check Number: 242433. Amount: $100. (bg3s, Deputy Clerk) (Entered: 03/20/2025) | |
| 44 | 03/20/2025 | MOTION to Stay re 33 Order on Motion for TRO,  by Linda McMahon, Donald J. Trump, U.S. Department of Education (Attachments: # 1 Text of Proposed Order, # 2 Exhibit Redacted list of grantees)(Farber, Molissa) (Entered: 03/20/2025) | |
| 45 | 03/21/2025 | MEMORANDUM OPINION AND ORDER denying 44 Defendants' Motion to Stay and Suspend Injunction Pending Appeal. Signed by Judge Julie Rebecca Rubin on 3/21/2025. (bg3s, Deputy Clerk) (Entered: 03/21/2025) | |
| 46 | 03/21/2025 | NOTICE OF APPEAL as to 33 Order on Motion for TRO, by Linda McMahon, Donald J. Trump, U.S. Department of Education. (Farber, Molissa) (Entered: 03/21/2025) | |
| 47 | 03/24/2025 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 46 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 03/24/2025) | |
| 48 | 03/24/2025 | USCA Case Number 25-1281 for 46 Notice of Appeal filed by U.S. Department of Education, Linda McMahon, Donald J. Trump. Case Manager - Jeffrey Neal. (slss, Deputy Clerk) (Entered: 03/24/2025) | |
| 49 | 03/26/2025 | STATUS REPORT  by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education(Moore, Daniel) (Entered: 03/26/2025) | |

1:25cv702, American Association Of Colleges For Teacher Education Et Al V. Mcmahon Et Al

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 50 | 04/10/2025 | ORDER of USCA Granting the governments motion to stay the preliminary injunction as to 46 Notice of Appeal filed by U.S. Department of Education, Linda McMahon, Donald J. Trump. (slss, Deputy Clerk) (Entered: 04/11/2025) | |
| 51 | 04/22/2025 | Request for Conference (Moore, Daniel) (Entered: 04/22/2025) | |
| 52 | 04/27/2025 | MOTION for Other Relief Pursuant to Rule 60(b) and Request for Indicative Ruling Pursuant to Rule 62.1 by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Moore, Daniel) (Entered: 04/27/2025) | |
| 53 | 04/27/2025 | MOTION to Shorten Time to Respond to Plaintiffs' Rule 60(b) Motion and Request for Indicative Ruling Pursuant to Rule 62.1 by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education (Attachments: # 1 Text of Proposed Order)(Moore, Daniel) (Entered: 04/27/2025) | |
| 54 | 04/28/2025 | ORDER denying 53 Plaintiffs' Expedited Motion to Shorten Time. Signed by Judge Julie Rebecca Rubin on 4/28/2025. (bg3s, Deputy Clerk) (Entered: 04/28/2025) | |
| 55 | 05/02/2025 | NOTICE by American Association of Colleges for Teacher Education, National Center for Teacher Residencies, The Maryland Association of Colleges for Teacher Education  (Moore, Daniel) (Entered: 05/02/2025) | |
| 56 | 05/02/2025 | PAPERLESS ORDER: With the consent of counsel, the court will convene a status conference at 2:00 p.m. on May 5, 2025. Signed by Judge Julie Rebecca Rubin on 5/2/2025. (bg3s, Deputy Clerk) (Entered: 05/02/2025) | |
| 57 | 05/05/2025 | Telephone Status Conference held via Webex on 5/5/2025 before Judge Julie Rebecca Rubin.(Court Reporter: Ronda Thomas, Courtroom 3A) (cb5s, Deputy Clerk) (Entered: 05/05/2025) | |
| 58 | 05/06/2025 | ORDER denying 52 Plaintiffs' Rule 60(b) Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Under Rule 62.1. Signed by Judge Julie Rebecca Rubin on 5/6/2025. (bg3s, Deputy Clerk) (Entered: 05/06/2025) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.

*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

JA 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION,<br>1307 New York Ave NW #300, Washington, DC 20005, | : <br> : <br> : <br> :    Case No.<br> : <br> : |
| NATIONAL CENTER FOR TEACHER RESIDENCIES,<br>1332 N. Halsted Street, Suite 304<br>Chicago, IL 60642. | : <br> : <br> : <br> : |
| and, | : <br> : |
| THE MARYLAND ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION,<br>304 Hawkins Hall<br>Towson University,<br>Towson, MD. 21252 | : <br> : <br> : <br> : <br> : <br> : |
| *Plaintiffs*,<br> v. | : <br> : <br> : |
| DENISE CARTER, in her official capacity as Acting Secretary of Education<br>400 Maryland Avenue, SW Washington, DC 20202, | : <br> : <br> : <br> : <br> : |
| U.S. DEPARTMENT OF EDUCATION,<br>400 Maryland Avenue, SW Washington, DC 20202, | : <br> : <br> : <br> : |
| and, | : <br> : |
| DONALD J. TRUMP, in his official capacity as President of the United States,<br>c/o Attorney General of the United States<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001 | : <br> : <br> : <br> : <br> : <br> : |
| *Defendants*. | : <br> : |

JA 9

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs the American Association of Colleges for Teacher Education ("AACTE"), the National Center for Teacher Residencies ("NCTR"), and the Maryland Association of Colleges for Teacher Education ("MACTE") (collectively, "Plaintiffs") file this action against Defendants Denise Carter, in her official capacity as Acting Secretary of Education, the United States Department of Education (the "Department"), and Donald Trump, in his official capacity as President of the United States (collectively, "Defendants"), for declaratory and injunctive relief.

AACTE's, NCTR's, and MACTE's members together comprise hundreds of teacher preparation programs throughout the United States. Many of Plaintiffs' members received grants from the Department through the Teacher Quality Partnership Program ("TQP"), the Supporting Effective Educator Development Program ("SEED"), and the Teacher and School Leader Incentive Program ("TSL"), which were used to fund programs to prepare and develop educators. Without prior warning, and in reliance on the President's recent Executive Order regarding DEI initiatives, the Department of Education recently summarily terminated many of Plaintiffs' members' TQP, SEED, and TSL grants. Not only were those terminations unlawful in reliance on Executive Order 14151, the Department also failed to follow statute and Federal regulations in terminating the grants, making the terminations unlawful under the Administrative Procedures Act too.

In the years that the Department of Education held competitions to award TQP, SEED, and TSL grants, the Department selected Priorities for applicants from a set of allowable agency Priorities enacted through a rulemaking process required by statute. These Priorities were used in the competitions to award TQP, SEED, and TSL grants to AACTE's and MACTE's member organizations and to NCTR and its member organizations. Pursuant to statute and Department

JA 10

regulation, Priorities for any competitive grant program must generally be set by Congress or through notice and comment rulemaking by the Department.[1] Only then can the final published agency Priorities apply to the competitive grant programs for selection of grantees in a particular fiscal year.

In compliance with statute and its regulation, the Department followed the notice and comment rulemaking process and established several Priorities that were allowable at the time the TQP, SEED, and TSL grants' Notices for Inviting Applications at issue in this case were published in the *Federal Register* in 2020, 2022, 2023, and 2024. The Department then awarded AACTE's and MACTE's member organizations and NCTR and its member organizations up to five-year TQP grants, up to three-year SEED grants, and/or up to three-year TSL grants that remained active through early to mid-February 2025.

But in February 2025, the Department summarily terminated grants awarded under TQP, SEED, and TSL. The purported basis provided by the Department for termination was that the grants are "inconsistent with, and no longer effectuate[], Department priorities." In form letters sent along with the official termination notifications, the Department explained that:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race,

---

[1] While there are limited exceptions to this general rule, none of those exceptions are applicable here.

color, religion, sex, national origin, or another protected
characteristic; that violate either the letter or purpose of Federal civil
rights law; that conflict with the Department's policy of prioritizing
merit, fairness, and excellence in education; that are not free from
fraud, abuse, or duplication; or that otherwise fail to serve the best
interests of the United States. The grant is therefore inconsistent
with, and no longer effectuates, Department priorities.

After terminating AACTE's and MATCE's member organizations' and NCTR's and its

member organizations' TQP and SEED grants, the Department issued a press release titled "U.S.

Department of Education Cuts $600 Million in Grants Used to Train Teachers and Education

Agencies on Divisive Ideologies." *See* https://www.ed.gov/about/news/press-release/us-

department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

Neither the Department's "official" reason for terminating the grants, as articulated in the

Grant Award Notifications regarding Department Priorities, nor its actual, publicly-articulated

reason for termination regarding DEI initiatives, were lawful. The "official" justification is

unlawful because the federal government has published a regulation governing the termination of

grants that the Department did not follow here. The Department's publicly articulated reason for

terminating the grants was unlawful because it was predicated on portions of an Executive Order

that has been enjoined by this Court.

The Department's stated reason relied, erroneously, on an implied change in "Department

priorities." Department Priorities," however, is a term of art; they are not subject to whim or fiat

and, by statute, must instead be established through notice and comment rulemaking. The

Department Priorities applicable to Plaintiffs' members' TQP, SEED, and TSL grants are the same

today as they were when the grants were awarded because (a) no subsequent rulemaking has taken

place; and (b) the statutes that established Priorities allowable for TQP, SEED, and TSL have not

been repealed or amended. Given that the Department Priorities have not changed, and the grants

were determined to meet the still-current Priorities during the competition process, it would be arbitrary *per se* for the Department to conclude that these grants are not consistent with or do not effectuate those same "Department Priorities" now.

As a result of the Department's improper early terminations, the Grant Recipients have been and will continue to be deprived of essential funding required to continue their teacher preparation programs and the continuation of the Department's unlawful terminations will irreparably harm Plaintiffs and their members. As such, Plaintiffs respectfully request that this Court award relief to address the irreparable harm that continues to result from Defendants' unlawful actions.

In support of their claims, Plaintiffs further aver as follows:

1.    The Supporting Effective Educator Development Program, authorized by Congress under section 2242 of the Elementary and Secondary Education Act of 1965, as amended (20 U.S.C. § 6672), provides funding to increase the number of highly effective educators in the United States by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of educators. SEED was authorized in statute to support educators' development across the continuum of their careers and requires the Secretary of the Department of Education to award grants to eligible entities for the purpose of:

> (1) providing teachers, principals, or other school leaders from nontraditional preparation and certification routes or pathways to serve in traditionally underserved local educational agencies;

> (2) providing evidence-based professional development activities that address literacy, numeracy, remedial, or other needs of local educational agencies and the students the agencies serve;

> (3) providing teachers, principals, or other school leaders with professional development activities that enhance or enable the provision of postsecondary coursework through dual or concurrent enrollment programs and early college high school settings across a local educational agency;

JA 13

(4) making freely available services and learning opportunities to local educational agencies, through partnerships and cooperative agreements or by making the services or opportunities publicly accessible through electronic means; or

(5) providing teachers, principals, or other school leaders with evidence-based professional enhancement activities, which may include activities that lead to an advanced credential.

20 U.S.C. § 6672(a).

2.      The Teacher Quality Partnership Grant Program, authorized by section 202 of the Higher Education Act of 1965, as amended (20 U.S.C. § 1022), provides funding to eligible partnerships to improve student achievement; improve the quality of prospective and new teachers by improving the preparation of prospective teachers and enhancing professional development activities for new teachers; hold teacher preparation programs at institutions of higher education accountable for preparing teachers who meet applicable State certification and licensure requirements; and recruit highly qualified individuals, including individuals of color and individuals from other occupations, into the teaching force. TQP funds teacher preparation programs at the pre-baccalaureate or "fifth-year" level, and teaching residency programs for individuals new to teaching, or mid-career professionals from outside the field of education, with strong academic and professional backgrounds.

3.      The Teacher and School Leader Incentive Program, authorized by section 2212 of the Elementary and Secondary Education Act of 1965, as amended (20 U.S.C. § 6632), serves educators in high-need schools who raise student academic achievement and close the achievement gap between high- and low-performing students. TSL helps develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders.

JA 14

4.      Plaintiff AACTE's and MACTE's member organizations and Plaintiff NCTR and its member organizations (the "Grant Recipients") receive TQP, SEED, and/or TSL funding through grants awarded by the Department of Education. Specifically, the Grant Recipients were awarded up to five-year TQP grants through the FY 2020 TQP competition, FY 2022 TQP competition, and FY 2024 TQP competition, up to three-year SEED grants through the FY 2022 SEED competition, and up to three-year TSL grants though the FY 2023 TSL competition.

5.      In February 2025, the majority of the Grant Recipients received updated Grant Award Notifications and form letters from the Department ("Termination Letters") terminating their TQP, SEED, and TSL grants.[2] True and correct representative copies of the Grant Award Notifications are attached as **Exhibit A**. True and correct representative copies of the Termination Letters are attached as **Exhibit B**.

6.      All of the Grant Recipients are similarly situated because the substance of each Termination Letter and added terms and conditions in the Grant Award Notifications from the Department are identical, indicating the same reasons with the same terminology for the grant terminations. *See* Exhibits A, B.

7.      In terminating the Grant Recipients' TQP, SEED, and TSL grants in their entirety, effective the same day as the termination letters were sent/dated, the updated Grant Award Notifications provided the following reason for termination: "The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities." (Exhibit A at pages 4, 10, 16, 22, 28, 34, 40). The Termination Letter articulated the same reason along with additional language regarding DEI initiatives:

> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate

---

[2] While the Department terminated the majority of the Grant Recipients' grants, some of Plaintiffs' member organizations did not have their TQP grants terminated yet.

on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. **The grant is therefore inconsistent with, and no longer effectuates, Department priorities**. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [] in its entirety effective 2/[]/25.

Exhibit B at pages 1, 3, 5, 7, 9, 11, 13 (emphasis added).

8.     The Department's articulated basis for terminating the grants and denying access to the funds is contrary to statute and regulations, and the immediate termination constitutes final agency action that is arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act ("APA").

9.     The Grant Recipients offer programs to provide supports to improve the quality of teaching and school leadership. The unlawful termination of the TQP, SEED, and TSL grants will force the immediate closure of many of these programs and irreparably harm the Grant Recipients and the educators, students, and communities they serve. Plaintiffs thus bring this action to enjoin Defendants from terminating the TQP, SEED, and TSL grants.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action because the claims arise under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because Defendants are United States officials, *see* 28 U.S.C. § 1346(a)(2). This Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), (e)(1), because Defendants are agencies of the United States and officers of the United States acting in their official

capacity, and a substantial part of the events or omissions giving rise to the claims occurred in this District, and Plaintiff MACTE resides in this district.

**PARTIES**

12.     Plaintiff American Association of Colleges for Teacher Education is a nonprofit association of educator preparation programs, comprised of hundreds of public and private colleges and universities and nonprofit organizations.[3] AACTE's member organizations prepare professional educators across the United States and its territories, encompassing teachers, counselors, PK-12 administrators, and college faculty. AACTE's mission is to elevate education and educator preparation through research, professional practice, advocacy, and collaboration. The termination of the TQP, SEED, and TSL grants directly threatens this mission. These grants fund initiatives that benefit PK-12 students and schools nationwide by supporting innovative approaches to educator preparation and professional development. Through their work, grantees produce evidence-based practices that lead to the preparation of highly qualified teachers, principals, and school-based educators. As the nation's largest organization dedicated to educator preparation, AACTE prioritizes ensuring that every child has access to credentialed, well-prepared educators. These grants are vital to that goal. AACTE plays a crucial role in amplifying their impact by sharing grantees' research, policy insights, and best practices with the broader education community through publications, convenings, annual meetings, and other resources. Preserving these funding sources is essential to sustaining and advancing the quality of educator preparation and, ultimately, student success. AACTE's principal place of business is 1602 L St., NW, Suite 601, Washington, DC 20036.

---

[3] AACTE's member organizations can be found at https://aacte.org/membership/our-members/.

13.     Plaintiff The National Center for Teacher Residencies supports the design of new teacher residency programs and provides consulting to strengthen existing programs across the United States. NCTR is comprised of dozens of network members, including colleges, universities, and nonprofit teaching organizations.[4] NCTR's mission is to transform educator preparation by advancing the teacher residency movement to prepare, support, and retain more effective educators who represent and value the communities they serve. The termination of the TQP, SEED, and TSL grants implicates NCTR's core mission because it removes the financial supports needed to reduce tuition costs for aspiring teachers called teacher residents, pay host K-12 teachers for the work they are doing to support the aspiring teachers, offset the cost for licensure examinations and test prep workshops, and provide a stipend or pay for work the teacher residents are completing through their internships. Without these necessary supports, teacher residencies will be unable to continue to lower the financial barrier to becoming a teacher and ensure the necessary comprehensive preparation is provided to prepare future teachers. NCTR's principal place of business is 1332 N. Halsted Street, Suite 304 Chicago, IL 60642.

14.     Plaintiff the Maryland Association of Colleges for Teacher Education is a membership organization with a mission to serve as a distinct statewide voice on matters of importance to educator preparation programs at Maryland's colleges and universities. AACTE and MACTE collaborate to strengthen their advocacy efforts, share experience and expertise, and expand their members' professional development opportunities. MACTE's members include regionally accredited colleges and universities engaged in the preparation of professional school personnel with state program approval. In addition to hosting regular professional learning activities, MACTE serves on the Council of Educational, Administrative and Supervisory

---

[4] NCTR's member organizations can be found at https://nctresidencies.org/nctr-network/members/.

Organizations of Maryland Leadership Team, nominates three representatives to serve on the Professional Standards and Teacher Education Board, and represents Maryland preparation programs at AACTE. The termination of the TQP and SEED grants implicates MACTE's core mission. MACTE serves the institutions of higher education in Maryland for both the recruitment and retention of future teachers as well as the support and advancement of current classroom teachers. Both the TQP and SEED grants were focused on recruitment, retention of future teachers as well as the support of practicing teachers in Maryland. MACTE's principal place of business is 304 Hawkins Hall, Townson University, Townson, MD 21252.

15.     Defendant Denise Carter is the Acting Secretary of Education and is sued in her official capacity.

16.     Defendant the United States Department of Education is an agency of the United States.

17.     Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

## FACTUAL AND LEGAL BACKGROUND

### I.     Overview of Agency Priorities.

18.     In 2008, Congress authorized TQP to support high-quality teacher preparation and professional development for prospective teachers and school leaders. In 2015, Congress authorized SEED to increase the number of highly effective educators by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of teachers, principals, or other school leaders. Also in 2015, Congress authorized TSL to assist local educational agencies and nonprofit organizations to develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems

JA 19

for teachers, principals, or other school leaders, especially for teachers, principals, or other school

leaders in high-need schools who raise student growth and academic achievement and close the

achievement gap between high- and low-performing students.

19.     Congress directed the Secretary of the Department of Education to award grants,

on a competitive basis, to eligible entities to provide funding consistent with the goals of TQP (20

U.S.C. § 1022a(a)), SEED (20 U.S.C. § 6672(a)), and TSL (20 U.S.C. § 6632(a)).

20.     Federal regulations govern the procedures and the basis by which a Federal agency,

such as the Department of Education, may terminate a Federal award. *See* 85 F.R. 49506-49582.

A Federal award may be terminated by the Federal agency or pass-through entity if an award no

longer effectuates the program goals or agency priorities. *See* 2 C.F.R. § 200.340(a)(2) (2020); *see*

*also* 2 C.F.R. § 200.340(a)(4) (2024).

21.     The Secretary of Education (the "Secretary") is required to publish agency

Priorities in the *Federal Register*, which must be used to select the Priorities for a competition and

must have gone through public comment, unless one of the following exceptions apply:

> (i) The final annual priorities will be implemented only by inviting applications that
> meet the priorities;
>
> (ii) The final annual priorities are chosen from a list of priorities already established
> in the program's regulations;
>
> (iii) Publishing proposed annual priorities would seriously interfere with an orderly,
> responsible grant award process or would otherwise be impracticable, unnecessary,
> or contrary to the public interest;
>
> (iv) The program statute requires or authorizes the Secretary to establish specified
> priorities; or
>
> (v) The annual priorities are chosen from allowable activities specified in the
> program statute.

34 C.F.R. § 75.105(b)(2); 20 USC § 1232(d).

JA 20

22.     The Secretary is likewise required to establish the specific Priorities that are included in the application for each competitive federal grant program, such as TQP, SEED, and TSL, by publishing the Priorities in the Notice Inviting Applications for the grant in the *Federal Register*. (34 C.F.R. § 75.105(b)(1)).

23.     As a federal agency, the Department is unique in the statutory requirement it has to follow for setting agency Priorities for discretionary grants. While the APA (5 U.S.C. § 553) exempts grants from the rulemaking process, the General Education Provisions Act (20 U.S.C. § 1232(d)) ("GEPA") states that, for the Department of Education, the grants exemption for rulemaking only applies to regulations (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines rulemaking will cause extreme hardship to the intended beneficiaries of the program.

24.     In other words, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process, unless one of the above exceptions apply.

## II.    Department of Education Priorities Applicable to the Now-Terminated TQP, SEED, and TSL Grants.

25.     After going through the proper notice and comment rulemaking process, the Department published a Notice of Final Priority for discretionary grant programs in the *Federal Register* on November 27, 2019. (84 F.R. 65300-65303).[5] Also after following the required notice and comment rulemaking process, the Department published a Notice of Final Priorities for all discretionary grant programs in the *Federal Register* on March 9, 2020.[6] (85 F.R. 13640-13644).

---

[5] The Department of Education published a Notice of Proposed Priorities for public comment on July 29, 2019. (84 F.R. 36504-36507).

[6] The Department of Education published a Notice of Proposed Priorities for public comment on November 29, 2019. (84 F.R. 65734-65739).

JA 21

26.     Then, after going through the proper notice and comment rulemaking process, the Department published its Notice of Final Priorities for TQP, SEED, and TSL grant competitions in the *Federal Register* on July 9, 2021.[7] The final Priorities consisted of: Priority 1—Supporting Educators and Their Professional Growth; and Priority 2—Increasing Educator Diversity. (86 F.R. 36217-36220).

27.     On July 9, 2021, after going through the proper notice and comment rulemaking process, the Department published a Notice of Final Priority for TSL.[8] The Priority was for "High-Need Schools." (86 F.R. 36220-36222).

28.     After following the required notice and comment rulemaking process, the Department of Education published a Notice of Final Priorities for the Secretary's Supplemental Priorities for all discretionary grant programs in the *Federal Register* on December 10, 2021.[9] The final supplemental Priorities consisted of the following: Priority 1—Addressing the Impact of COVID-19 on Students, Educators, and Faculty; Priority 2—Promoting Equity in Student Access to Educational Resources and Opportunities; Priority 3—Supporting a Diverse Educator Workforce and Professional Growth To Strengthen Student Learning; Priority 4—Meeting Student Social, Emotional, and Academic Needs; Priority 5—Increasing Postsecondary Education Access, Affordability, Completion, and Post-Enrollment Success; and Priority 6—Strengthening Cross-Agency Coordination and Community Engagement To Advance Systemic Change. (86 F.R. 70612-70641).

---

[7] The Department of Education published a Notice of Proposed Priorities for public comment on April 20, 2021. (86 F.R. 20471-20475).

[8] The Department of Education published a Notice of Proposed Priority for public comment on April 9, 2021. (86 F.R. 18519-18523).

[9] The Department of Education published a Notice of Proposed Priorities for public comment on June 30, 2021. (86 F.R. 34664-34674).

III.    **Notice Inviting Applications for FY 2020, FY 2022, and FY 2024 TQP Grants.**

29.    On May 18, 2020, the Department published a Notice Inviting Applications for the FY 2020 TQP competition inviting applicants to apply for the grant funds. (85 F.R. 29691-29704). In addition, on February 25, 2022, the Department published a Notice Inviting Applications for the FY 2022 TQP competition inviting applicants to apply for the grant funds. (87 F.R. 10906-10923). The Department similarly published a Notice Inviting Applications for the FY 2024 TQP competition on April 4, 2024. (89 F.R. 23573-23592).

30.    The project period for the FY 2020, FY 2022, and FY 2024 TQP competitions (the maximum amount of time for which the grants can be awarded) was up to five years. (85 F.R. 29699, 87 F.R. 10918, 89 F.R. 23587).

31.    All three TQP grant competitions included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TQP's authorizing statute (20 U.S.C. § 1022).

32.    Grant Recipients were selected to receive funding from the FY 2020 TQP competition for up to a five-year period.

33.    Grant Recipients were selected to receive funding from the FY 2022 TQP competition for up to a five-year period.

34.    Grant Recipients were selected to receive funding from the FY 2024 TQP competition for up to a five-year period.

IV.    **Notice Inviting Applications for FY 2022 SEED Grants.**

35.    On April 4, 2022, the Department published a Notice Inviting Applications for the FY 2022 SEED competition, inviting applicants to apply for the grant funds. (87 F.R. 19487-19496).

JA 23

36.    The project period for the FY 2022 SEED competition was up to three years. (87 F.R. 19492).

37.    The SEED grant competition included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in SEED's authorizing statute (20 U.S.C. § 6672).

38.    Grant Recipients were selected to receive funding from the FY 2022 SEED competition for up to a three-year period.

**V.    Notice Inviting Applications for FY 2023 TSL Grants.**

39.     On May 24, 2023, the Department published a Notice Inviting Applications for the FY 2023 TSL competition, inviting applicants to apply for the grant funds. (88 F.R. 33592-33601).

40.    The project period for the FY 2023 TSL competition was up to three years. (88 F.R. 33598).

41.    The TSL grant competition included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TSL's authorizing statute (20 U.S.C. § 6632).

42.    Grant Recipients were selected to receive funding from the FY 2023 TSL competition for up to a three-year period.

**VI.    The Department's Decision to Terminate the TQP, SEED, and TSL Grants.**

43.    In February 2025, the Department sent Termination Letters and updated Grant Award Notifications to Grant Recipients, informing them that their TQP, SEED, and TSL grants were terminated. The termination of the grants was effective "in [their] entirety" immediately. *See* Exhibits A, B.

44.    The only stated reason for the termination of the grants was that they are "inconsistent with, and no longer effectuate[], the Department priorities." *See id*.

16

JA 24

VII.    **The Preliminary Injunction Granted in *NADOHE et al. v. Trump et al.* Prohibits the Department from Enforcing the Termination of the Grants.**

45.     On February 21, 2025, this Court granted a preliminary injunction blocking the President's administration from enforcing certain provisions of Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive Order of January 20, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) (the "J20 Order"), and Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("J21 Order"). *National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) (the "NADOHE Order"). A true and correct copy of the NADOHE Order is attached as **Exhibit C**.

46.     In relevant part, the NADOHE Order enjoins the President's administration from enforcing a provision in Executive Order 14151 requiring "[e]ach agency, department, . . . [to] take the following actions within sixty days of this order: (i) terminate, to the maximum extent allowed by law, . . . all . . . 'equity-related' grants or contracts" (the "Termination Provision").

47.     In granting the preliminary injunction, the Court held that the plaintiffs showed a likelihood of success on their claim that the Termination Provision is void for vagueness under the Fifth Amendment.

48.     While the Grant Award Notification and Termination Letters did not reference Executive Order 14151 as the reason for terminating the grants, the Department released a press release on February 17, 2025 that makes clear that the grant terminations at issue in this lawsuit were pursuant to the Termination Provision in Executive Order 14151 requiring the Department to terminate "equity-related" grants or contracts. A true and correct copy of the press release is

JA 25

attached as **Exhibit D**.[10] The press release explains that the grants were terminated because they were using taxpayer funds to train teachers and education agencies on divisive ideologies, such as "Diversity, Equity, and Inclusion" and "equity training"– the same directive of the Termination Provision. *See id*.

49.    The Termination Letters likewise reference the Department's position to "ensure[] that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives[.]" (Exhibit B at pages 1, 3, 5, 7, 9, 11, 13).

50.    While the Grant Award Notifications and Termination Letters state that the grants were terminated because they were "inconsistent with, and no longer effectuate[], Department priorities," it is clear from the Government's conduct that the grants were terminated pursuant to the now-enjoined Termination Provision.

51.    The NADOHE Order benefits not just the named plaintiffs in that action, but all contractors and grantees who were subjected to the Termination Provision. *NADOHE v. Trump,* No. 1:25-CV-00333-ABA, 2025 WL 573764 at *28-29.

52.    As such, this Court's NADOHE Order covers, and forbids, the continued enforcement of the termination of the grants at issue in this lawsuit. Plaintiffs seek relief directing the Department to return the Grant Awardees to the *status quo ante* with respect to Executive Order 14151 and rescind the termination of their TQP, SEED, and TSL grants.

---

[10]    *See*  https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

VIII.    **The Department's Termination of the Grants also Violates the Administrative Procedures Act ("APA").**

53.    Even if the Department's termination of the grants at issue in this lawsuit were not governed by the NADOHE Order, the terminations were unlawful because they constituted an unlawful, arbitrary, and capricious action that violates the APA.

54.    Statute and regulation require the Secretary to publish Department Priorities for program grants in the *Federal Register*, subject to a notice and comment period. (20 U.S.C. § 1232(d), 34 C.F.R. § 75.105(b)(2)). The Secretary then selects allowable Priorities to include in the applications which are published in the *Federal Register*. (34 C.F.R. § 75.105(c)).

55.    The proffered reason by the Department for the termination of the grants because they "are inconsistent with, and no longer effectuates, Department priorities," is contrary to statute and regulation and arbitrary and capricious.

56.    The Department cannot, by law, determine that with a change in administration, specific Department Priorities for grant programs are no longer allowable unless and until the Department engages in rulemaking to propose and issue new Final Priorities. The present administration has not done that, so the current Priorities remain Department Priorities.

57.    The Department Priorities for the grants that were awarded from the respective competitions were lawfully selected for, and articulated in, the published Notices Inviting Applications in 2020, 2022, 2023 and 2024 pursuant to program statutes or after the proper notice and comment rulemaking process.

58.    As a result, and contrary to the Department's official reasons, the grants at issue are consistent with the current Department Priorities. If the Department wishes to establish new Department Priorities, it may do so only through the means established by statute and regulation, not through whim or fiat.

JA 27

IX.    **Effect of Termination on Plaintiffs and Their Member Organizations.**

59.    As of the date of the Termination Letters, all funding from the grants has been halted and the Grant Recipients are no longer receiving any funds from the Department under the grants they were awarded under TQP, SEED, and TSL.

60.    Without the TQP, SEED, and TSL grants, Grant Recipients are unable to continue funding their work.

61.    The loss of funding is an economic harm so great that it threatens the very existence of Plaintiffs' members' teacher preparation programs.

62.    The TQP, SEED, and TSL grants together fund hundreds of teacher preparation programs in the United States, and the termination *en masse* of these grants threatens the system that prepares our nation's teaching workforce.

63.    The harm to Plaintiffs and their member organizations from the terminations has been severe, and a continuation of the harm is certain and irreparable.

64.    The following represent just a few of many examples of the harm to Plaintiffs and their member organizations caused by the Department's termination of the Grant Recipients' TQP, SEED, and TSL grants:

### A.  Plaintiff NCTR

65.    Plaintiff NCTR has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. Plaintiff NCTR was awarded a three-year SEED grant in 2022.

66.    NCTR's SEED grant funded thirteen teacher residency programs spanning five states. The teacher residency programs consist of partnerships between higher education

JA 28

institutions and K-12 school districts in traditional public and charter schools located in rural, suburban, and urban areas.

67.    The teacher residency programs provide financial support to their participants in the following ways: tuition support, living expense stipends, tutoring in licensing examinations, and emergency funds. The programs also provide mentorship, intensive training and professional development, and summer institutes for mentor teachers.

68.    Plaintiff NCTR's SEED grant is also used to fund a cross-organizational (twelve residency programs) collaborative effort to create and field-test a coherent and aligned vision of mentoring excellence and collective responsibility. One of the goals of the grant funds was to complete a study of attainable metrics to evaluate mentor teacher impacts on resident learning.

69.    Plaintiff NCTR's SEED grant was terminated in its third year.

70.    The termination of the SEED grant will result in a $1,188,070 overall loss, including a $332,000 direct loss to the grant winning organization, as well as a loss of $360,000 in expenses to contractors and a $495,000 loss in subgrants to the thirteen teacher residency programs.

71.    This $495,000 loss in subgrants will have an adverse impact on the thirteen teacher residency programs, and will directly lead to staff cuts at a number of those institutions. In addition, the grant termination directly affects the 128 teacher residents currently enrolled in the thirteen programs as part of the 2024-25 school year and will also impact the ability of those thirteen programs to enroll the projected 190 teacher residents who plan to begin their residency year this summer 2025. With the termination of the grant, some of the thirteen teacher residency programs will be forced to close.

JA 29

72.    Programs intended to use subgrant funds to provide tuition relief and stipends for both groups of teacher residents, which would total over 300 teacher residents. This will no longer be possible with the termination of the grant.

73.    The termination of the grant will also directly affect at least 7,500 K-12 students across the five states.

74.    In addition, with the grant's termination, the study of the mentor teacher impact and teacher resident learning will not be completed, depriving Plaintiff NCTR of its capacity to engage in core mission-driven activities, such as publishing about the most promising practices for developing skilled, experienced teachers into impactful mentors of new teacher residents.

75.    Furthermore, without its ability to continue these thirteen teacher residency programs due to the loss of grant funding, Plaintiff NCTR is deprived of its ability to serve the K-12 school districts where there is high turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages.

76.    These harms prevent NCTR from engaging in the core activities compelled by its mission and reason for existence.

### B. AACTE Member Organization - American University

77.    American University ("AU") is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. AU is in the second year of a five-year TQP grant.

78.    AU's TQP grant funds a teacher preparation program for special education (learning disabilities) and early childhood education, the Residency for Excellence in Teaching and Learning ("RETL").

JA 30

79.     RETL is a partnership between AU's School of Education and its charter network, Washington D.C. Friendship Public Charter Schools, consisting of five charter campuses. The purpose of the partnership is to provide a pathway for educator development to address critical areas of need, including early childhood education and special education,[11] and recruit highly motivated preservice teacher candidates who are committed to teaching in diverse early childhood and special education settings (pre-K through grade five).

80.     The partnership enables participants to complete a residency-based master's degree with an initial teaching license in Early Childhood Education or Special Education - Learning Disabilities. In addition to earning their Masters of Arts in Teaching degree, program participants receive comprehensive coaching, professional development, and ongoing support during the entirety of the three-year program -the residency year (the first year) and the induction years (the second and third year).

81.     RETL supports pathways in high-need teaching areas of early childhood education and special education, specifically targeting urban and underserved geographic areas with their partner charter network. RETL services five Friendship Public Charter campuses.

82.     RETL provides a living stipend to participants and reduced tuition (by roughly 35% of the AU graduate tuition rate) to one of two AU's School of Education's Master of Arts in Teaching degrees, Special Education in Learning Disabilities and Early Childhood Education.

83.     AU was in its second year of RETL when the Department terminated the grant, with eight students who are expected to graduate from AU in December 2025. With the funding from the TQP grant, AU planned to recruit an additional forty participants. As a result of the loss

---

[11] Washington D.C. is in need of educators for special education to serve students with disabilities. *See* https://specialedcoop.org/news-articles/the-state-of-special-education-in-the-district-of-columbia/, https://www.washingtonpost.com/opinions/2022/10/27/dc-students-disabilities-urgent-reform/.

JA 31

of funding from the terminated TQP grant, AU will no longer be able to recruit future cohorts. As a result, forty-eight future RETL participants who would have had the opportunity to earn a Master of Arts in Teaching degree and deepen their expertise and longevity as teachers in Washington D.C. will no longer have that opportunity.

84. The termination of the TQP grant will halt AU's efforts to remedy dramatic teacher shortages and improve outcomes for early childhood and special education students in Washington D.C. Up to 1,500 Washington D.C. students will be impacted by the termination of the grant, in addition to the educators at the charter school partners.

85. In addition, AU planned to expand to at least two additional charter schools in the remaining years of the TQP grant. As a result of the Department's termination of AU's grant, there is no opportunity for additional students and educators to be served.

86. The termination of the TQP grant will also result in AU terminating the employment of its full-time coach/program director.

87. If funding through the TQP grant is not reinstated, the RETL program will be forced to close.

88. These harms prevent AU/RETL from engaging in the core activities compelled by their missions and reason for existence.

### C.  AACTE Member Organization – University of St. Thomas

89. The University of St. Thomas ("UST") is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. UST is in the second year of a three-year SEED grant and the fifth year of a five-year TQP grant.

JA 32

90.    The UST SEED grant funds three pathway models to a career in education: (1) a residency program for graduate students in partnership with St. Paul Public Schools, Minneapolis Public Schools, and a consortium of charter schools; (2) a "work and learn" program for graduate students in partnership with schools throughout the state of Minnesota where paraprofessionals and teachers are employed while completing their teacher preparation program; and (3) an undergraduate program which prepares undergraduate students for educational careers in their junior and senior years at UST.

91.    The SEED grant provides funds of up to $20,000 per year for graduate students and up to $40,000 per year to undergraduate students who are pursuing teacher licensure in special education and elementary education.

92.    UST is currently in year two of the three year SEED grant. In year two, the grant was set to fund over 300 scholarships to future educators over the three year grant period, most of whom were preparing to be special education teachers, for approximately $2,000,000. Scholarships for fall and spring semester were disbursed to students prior to the grant termination. However, without access to the SEED grant funds, UST can no longer provide summer funding to the majority of these future educators. As a result, many of the future educators may not be able to afford the schooling required to continue their path to becoming teachers.

93.    Year three of the SEED grant was set to fund scholarships in the amount of $2,200,000; termination of the grants will result in a loss of all of these scholarships. In addition, termination of the SEED grants will result in a loss of funding for mentor teachers for professional development.

94.    To date, nearly 80 communities across the state of Minnesota have been taught by teachers who received SEED scholarship funds, including schools in rural, urban, suburban, and

exurban communities. Without continued SEED funding, the teacher pipeline program at UST will graduate fewer students capable of serving in high-needs areas such as special education, which will have widespread negative impacts on the many communities, teachers and students these teacher pipeline programs benefit.

95.    UST's TQP grant removes financial barriers to careers in education by providing funding for UST to partner with charter schools to provide living wage stipends to student teaching residents preparing to become licensed educators. UST is in year five of this TQP grant, and at present, 21 student teaching residents are in the middle of their second semester of student teaching. Collectively, the student teaching residents were set to receive $819,000 for stipends (the first half of which has already been paid), however, the termination of the TQP grant will put the living-expense stipends for these students at risk.

96.    These harms interfere with UST's ability to serve its students, and through them, to serve the community and fulfill its mission to advance the common good.

### D. NCTR and AACTE Member Organization – Alder Graduate School of Education

97.    Alder Graduate School of Education ("Alder GSE") is a member organization of Plaintiff NCTR and Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. Alder GSE was awarded a five-year TQP grant in 2020, as well as a five-year TQP grant in 2022.

98.    Both of Alder GSE's TQP grants fund teacher residency programs.

99.    The teacher residency programs consist of partnerships between Alder GSE and partner K-12 school systems, including public school districts and a Special Education Planning Area, to operate community-based workforce development pathways for aspiring teachers.

JA 34

100.    Alder GSE and its partner K-12 school systems recruit and prepare community members through a one-year teacher residency program, where candidates co-teach with a highly qualified mentor teacher while earning their Master's degree and teaching credential. They are often hired immediately upon completion of the program, most often by the school systems where they trained.

101.    The 2020 TQP grant's goals are: (i) launch and scale a new and sustainable residency program with three partner local education agency that meets local human capital needs; (ii) train, support and retain effective new teachers in schools with high concentrations of high need students; and (iii) demonstrate the capacity of partners to scale, sustain, and replicate teacher residency and development model. The 2022 TQP grant's goals are: (i) build a pipeline of high-quality and diverse teachers in partnership with high-need local education agencies that effectively meets their human capital needs and certification shortage areas; (ii) promote equity, strengthen student learning, and meet the social, emotional, and academic needs of students by modeling for and by building the capacity of mentors and residents to use evidence based practices and to create positive and inclusive learning environments; and (iii) increase impact by building capacity, sustainability and scale of the partnership and high-leverage strategies.

102.    The termination of the grants has had and will continue to have immense impacts on the aspiring teacher candidates, mentor teachers, the partner K-12 school systems, and Alder GSE.

103.    For the 2024-2025 academic year, the teacher residency programs have 83 aspiring teacher candidates who were receiving a living stipend supplemented by the funds from the TQP grants. The teaching candidates depend on these stipends to live, eat, and support their families – for most they are their only source of income. The teaching candidates signed Letters of

27

Commitment before June 2024, with the expectation of a level of stipend for the entirety of the school year. The teacher residency programs also presently have 83 mentor teachers who receive a stipend funded by grant funds for their work in support of their efforts to train and develop new teachers. With the termination of the grants, the 83 aspiring teacher candidates and 83 mentor teachers will no longer receive the level of stipends they were promised.

104.    Alder GSE has already recruited 40 new teacher candidates for the 2025-2026 academic year and K-12 school systems had planned to provide the living stipends – the majority of which were planned to be supplemented with TQP grant funds. Alder GSE recruited the majority of these residents with the expectation of a level of funding for their living stipend that was supplemented by the grant funding. The majority of these residents are enrolled, have signed letters of commitment, or are in final rounds of interviews/admissions. The financial impact of the grants' termination will affect many of their decisions to become teachers. Similarly, the grants' termination affects the stipend funding levels for mentors, which will have an impact on their decision to continue with the role.

105.    Alder GSE similarly planned to recruit 40 new teacher candidates and 40 new mentors for the 2026-2027 academic year, however, with the loss in grant funds, it will be more difficult for Alder GSE to recruit and prepare these future prospective candidates.

106.    The termination of the 2020 and 2022 TQP grants has caused and will continue to cause harm to the partner K-12 school systems as well. They are at risk of losing the teacher candidates who taught in their schools, which will have a negative impact on the school and its community. Alder GSE expects about $2.1 million of lost funding for their partner K-12 school systems.

JA 36

107.    There were also a number of programmatic roles at Alder GSE that were partially supported by these TQP grants. These roles were supporting operation of these partnerships and these residency programs - including recruitment, admissions, enrollment, student services, financial support, data and impact, academic programs, and clinical programs. Alder GSE expects about $2.2 million of lost funding supporting Alder GSE costs to support these partnerships and residency programs.

108.    Additionally, the terminations will cause Alder GSE to lose approximately $600,000 in funding for evaluation contracts. Alder GSE's evaluation partner was providing an important source of formative feedback and evidence of program effectiveness. The evaluation from TQP 2020 has a retention study in progress that is six months to completion, but will likely not be completed as a result of the termination of the grant. The evaluation for TQP 2022 still had 2.5 more years of data collection that has been terminated mid-cycle.

109.    In addition to the dollars lost, the time and resource demands to meet this sudden news has been extraordinary. There have been countless hours of work to communicate clearly to all affected parties and to work with Alder GSE's Board and team on determining ways to mitigate these significant and completely unexpected losses.

110.    These harms prevent Alder GSE from engaging in the core activities compelled by its mission and reason for existence.

### E.  AACTE Member Organization – Teaching Lab

111.    Teaching Lab is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. In 2023, Teaching Lab was awarded a three-year TSL grant.

JA 37

112.    Teaching Lab's TSL grant funds Project Refine, Innovate, Share, and Elevate ("Project RISE"). Project RISE involves the following: (i) implementation of Teaching Lab's teacher leadership and coaching model for public K-12 school systems located in Milwaukee, Wisconsin, Kemper, Mississippi, El Paso, Texas, and Osceola, Arkansas (the "Public School Beneficiaries"); (ii) development of human capital management systems in the foregoing districts; and (iii) a rigorous, randomized controlled trial on Teaching Lab's teacher development and coaching model, to be conducted in partnership with the American Institutes for Research, focused on the work in Milwaukee.

113.    Across all of the Public School Beneficiaries, Teaching Lab's programs through the TSL grant impact more than 40 schools and more than 150 teachers, whose instruction in turn reaches well over 6,000 K-12 students.

114.    Teaching Lab's TSL grant was terminated by the Department, resulting in great uncertainty regarding the future of Project Rise. Absent the grant funding, Teaching Lab will no longer be able to provide the curriculum-based professional learning and coaching services through Project RISE to the Public School Beneficiaries. At this time, Teaching Lab does not have an alternate source of funding. The Public School Beneficiaries do not have room in their budget to unexpectedly pay for the services.

115.    Teaching Lab has hired more than two dozen employees and contractors to support Project RISE. If the TSL grant funding is suspended for any amount of time, Teaching Lab will likely have to furlough or layoff many or all of these workers.

116.    The termination of the grant also puts the American Institutes for Research study evaluating how school districts can best spend their limited funds and limited teacher development time and resources at risk. Teaching Lab is not able to fund the study without the TSL grant funds.

JA 38

117.    In addition to the loss of the study, the Public School Beneficiaries and the public will be significantly harmed by the termination of the grant, as one or more of the Public School Beneficiaries is likely to lose the benefit of Teaching Lab's services. Specifically, the Public School Beneficiaries stand to lose value of up to roughly $7 million in services if the termination moves forward.

118.    These harms prevent Project RISE from engaging in the core activities compelled by its mission and reason for existence.

### F.  AACTE Member Organization – University A[12]

119.    University A is a member organization of Plaintiff AACTE that has been and will continue to be substantially and irreparably harmed by the Department's grant terminations. In 2022, University A was awarded a five-year TQP grant.

120.    University A's TQP grant funds Program A, a program that supports talented rural individuals to receive an undergraduate degree and license without leaving their hometown. Candidates can receive a Bachelor of Arts degree and a teaching license in early childhood education, elementary education, special education, middle school math education, and secondary science education. University A partners with rural community colleges employing many rural educators.

121.    Program A was created to address the extreme teacher shortage in rural State A. Pre-K through year 12 students can go years without a qualified teacher, forcing rural districts to hire people without degrees or experience and negatively impacting rural students' learning.

---

[12] University A is an AACTE member organization that is fearful of retaliation, and therefore, did not wish to disclose its name in this Complaint or provide a Declaration that identified it by name. However, it wanted to share the severe and devastating impact the Department's termination of its TQP grant has caused and will continue to cause, absent Court intervention. This Complaint refers to the member organization as "University A" in State A, and its teacher preparation program as "Program A."

JA 39

122.    Program A's TQP grant has an immensely positive economic impact on rural communities in State A. Specifically, the program funded by the grant serves 57 rural State A school districts in partnership with four rural community colleges. These districts stretch across State A representing some of the most financially impoverished communities in State A, and have some of the highest teacher shortage areas in the state. Program A was able to provide teachers for more than 2,500 students in pre-K through year 12 each year.

123.    Program A graduated 49 teachers who are presently teaching in State A rural schools. Currently, there are 77 students supported through the grant, as well as eight recent graduates supported within required induction supports.

124.    The termination of the grant forced University A to terminate the employment of the instructors who teach the courses, and eliminated the infrastructure and human resources that support Program A. University A anticipated preparing 146 teachers by the end of the five-year grant in 2027 and anticipated supporting these new teachers in their beginning years of teaching. The termination of the grant will result in a loss of 69 new teachers for these hard-hit rural areas.

125.    Furthermore, there was a total of 11 full-time equivalent positions in both rural communities and in State A's major city funded through the grant, however with the grant's termination, the money supporting rural grant employee salaries was lost immediately; State A's community college partners are uncertain about the ability to utilize emergency institutional funds to continue them, even short term. University A is using emergency funding to support State A grant employees until the end of the Spring 2025 semester, however, after the end of the semester, all of the rural grant employees will be forced to be let go.

126.    With the grant's termination, Program A will no longer be able to continue, which will have significant consequences on University A and its community as well as the rural communities it serves.

127.    These harms prevent Program A from engaging in the core activities compelled by its mission and reason for existence.

## X.    Defendants' Actions Will Cause Plaintiffs and Their Member Organizations Immediate and Irreparable Harm.

128.    Defendants' actions have harmed Plaintiffs and their member organizations by unlawfully depriving them of funding, which without Court intervention, will continue to cause immediate and irreparable harm.

129.    The funding was also used towards tuition support for enrollment at many of the colleges and universities. Without this ability of the Grant Recipients to address significant financial barriers for students, many will no longer be able to afford to continue to pursue a career in teaching and the programs' attendance will plummet.

130.    Due to the lack of funding for these programs, the Grant Recipients presently have, and will continue to have, a more difficult time recruiting new students. The tuition and other financial supports provided by the grants was used as a recruitment tool by the Grant Recipients. Without these tools to make it more affordable for cohorts of future teachers to pursue education careers, enrollment will decline, and significant structural changes will have to be made to address that decline, including changes that it may take years to repair, such as loss of staff and infrastructure that cannot be easily re-scaled.

131.    The termination of grants will jeopardize the pipeline of high-quality educators entering into schools nationwide. The forced closure of the teacher preparation programs as a result

JA 41

of the lack of funding results in losing talented candidates who are ready and eager to serve students, particularly in high-need areas like special education.

132.    The loss of funding will not only significantly reduce the Grant Recipients' ability to address the ongoing teacher shortage, but also exacerbate the teacher shortages, especially in rural and urban communities, across the country.

133.    Without the grant funding, the Grant Recipients will no longer be able to provide targeted resources and training, peer support networks, professional development, and mentorship that are critical to teachers' success in the classroom.

134.    The termination of the grants is also resulting in, and will continue to result in, loss of employment for the dedicated staff members and grant managers who worked to make the teacher preparation programs run.

135.    The harm suffered by Plaintiffs is actual, not theoretical, as the funding was terminated in February 2025, immediately resulting in the Grant Recipients' inability to continue their programs, particularly given that the terminations occurred in the middle of the academic year.

136.    The loss of the funding will frustrate the Grant Recipients' abilities to fulfil their mission of providing programs to offer supports to improve the quality of teaching and school leadership.

137.    The Termination Letters provide that the Grant Recipients may challenge the termination decision by submitting information documenting their position in writing to the Department within thirty days of the termination. *See* Exhibit B at pages 2, 4, 6, 8, 10, 12, 14.

138. However, any appeal to the Department does not alter the fact that the termination of funding was effective on the date of notification in February 2025. There is no funding provided starting the date of termination pending any appeals.

139. There is no timeframe by which the Department is obliged to make a determination regarding an appeal. Therefore, even if the Grant Recipients appeal the termination decision, the timeframe in which a determination would be made is unknown. While any appeals are pending, the Grant Recipients will continue to be deprived of funding.

140. Absent Court intervention, regardless of whether the Grant Recipients submit an appeal to the Department, many Grant Recipients will be forced to shut down their programs as a result of Defendants' unlawful actions, resulting in great harm.

## XI. Plaintiffs were Further Harmed by Defendants' Unlawfully Imposed Grant Conditions.

141. Generally, unless a grantee poses a specific risk, they can draw down funds from their grant award based on the allowable, allocable and reasonable costs approved in their grant budget without prior approval.

142. In addition to the unlawful actions concerning terminating the grants discussed above, the Department also added a special condition to impacted grants after they were terminated requiring prior approval for them to draw down funds. This special condition is referred to as "route pay."

143. The grantees are eligible for costs that were properly incurred before their termination date and costs that would not have occurred if the grant was not terminated. They have 120 days to draw down the funds after the termination date. (2 C.F.R. §§ 200.343, 200.472, 200.344(b)).

JA 43

144.    The regulations that govern federal grants set the reasons that the Department can put conditions on grants and the requirements for notice prior to doing so. Imposing a special condition, such as establishing additional prior approvals, on a grant can only be done if the grantee is determined to pose a risk. Factors that may be considered are financial stability, quality of management systems and standards, history of performance, audit reports and filings, ability to effectively implement requirements, history of compliance with conditions of a federal award, or a responsibility determination. (2 C.F.R. § 200.208).

145.    The rule also states that before conditions are put in place, the agency has to notify the grantee as to: (1) The nature of the additional requirements; (2) The reason why the additional requirements are being imposed; (3) The nature of the action needed to remove the additional requirement, if applicable; (4) The time allowed for completing the actions if applicable; and (5) The method for requesting reconsideration of the additional requirements imposed. (*Id*.).

146.    Without notice or any finding of individual grantee risk, the Department put a blanket condition on the terminated grants to require prior approval for all drawdowns.

147.    This new, unlawfully-imposed condition will cause delays in the Grant Recipients receiving their grant funds and add potential subjectivity to already approved costs.

148.    Therefore, placing the grants on route pay was unlawful.

### FIRST CAUSE OF ACTION

### (Fifth Amendment Due Process (Vagueness))

149.    All preceding paragraphs of this Complaint are incorporated as if fully set forth herein.

150.    Under the Fifth Amendment to the United States Constitution, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of

36

JA 44

ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).

151.    The Termination Provision of Executive Order 14151 "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

152.    Executive Order 14151 does not define key terms, including "DEI," "DEIA," "equity" or "equity-related" and fails to satisfy the constitutional minimum.

153.    This Court previously granted a preliminary injunction enjoining the President's administration from terminating any awards on the basis of the Termination Provision in the NADOHE Order.

154.    The NADOHE Order applies to not just the named plaintiffs in that action, but to *all* contractors and grantees who were subjected to the Termination Provision.

155.    Plaintiffs and their member organizations were subjected to the Termination Provision when the Department terminated the grants at issue in this lawsuit under the instructions provided in Executive Order 14151.

156.    It follows, therefore, that Plaintiffs should also be returned to the *status quo ante* – their status prior to the Department subjecting them to the unlawful Termination Provision when it terminated their grants – just as the NADOHE Order intended.

## SECOND CAUSE OF ACTION

### (Violation of APA – Arbitrary and Capricious Decision)

157.    All preceding paragraphs of this Complaint are incorporated as if fully set forth herein.

JA 45

158.    The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or are made] without observance of procedure required by law[.]" (5 U.S.C. § 706(2)).

159.    Defendants' termination of the Grant Recipients' grants constitutes final agency action under the APA. The Termination Letters provide that the "Department hereby terminates grant No. [] in its entirety effective 2/[]/25," marking it the consummation of the Department's decision-making process and demanding immediate compliance with the announced position. As of the date of the Termination Letters, the Department stopped providing all funding approved by the grants, thereby having a direct and immediate effect on Plaintiffs and their member organizations.

160.    Defendants' decision to terminate the grants is unlawful, arbitrary, and capricious for the reasons set forth above.

WHEREFORE, Plaintiffs pray that this Court:

(A)    Declare Defendants' termination of the TQP, SEED, and TSL grants unlawful;

(B)    Declare Defendants' actions placing TQP, SEED, and TSL grants on route pay unlawful;

(C)    Enter a preliminary injunction or temporary restraining order (a) enjoining Defendants' enforcement of the termination of the TQP, SEED, and TSL grants; (b) ordering such grant funding reinstated forthwith; (c) ordering Defendants to provide the Grant Recipients reimbursement for all otherwise allowable expenditures incurred between the date of termination and the Court's order; (d) enjoining Defendants' termination of any additional TQP, SEED, and TSL grants if such termination would be inconsistent with the Court's order; and (e) removing the route pay grant conditions from TQP, SEED, and TSL grants;

JA 46

(D)     Issue a permanent injunction providing the same relief;

(E)     Award Plaintiffs their costs and reasonable attorneys' fees; and

(F)     Grant such other relief as this Court may deem just and proper.

Dated: March 3, 2025                    Respectfully Submitted,

                                        */s/ Daniel M. Moore*
                                        Daniel M. Moore (Bar No. 21834)
                                        SAUL EWING LLP
                                        1001 Fleet Street, Ninth Floor
                                        Baltimore, Maryland 21202-4359
                                        Telephone: (410) 332-8734
                                        Facsimile: (410) 332-8862
                                        daniel.moore@saul.com

                                        Joshua W.B. Richards (*Pro Hac Vice Forthcoming*)
                                        Carolyn M. Toll (*Pro Hac Vice Forthcoming*)
                                        SAUL EWING LLP
                                        1500 Market Street, 38th Floor
                                        Philadelphia, Pennsylvania 19102
                                        Tel: (215) 972-7737
                                        joshua.richards@saul.com
                                        carolyn.toll@saul.com

                                        *Counsel for Plaintiffs*

JA 47

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER
EDUCATION, *et al.,*

                    *Plaintiffs*,

     v.                                                    Civil Action No.  25-cv-00702

DENISE CARTER, *et al.,*

                    *Defendants*.

---

**PLAINTIFFS AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER
EDUCATION, NATIONAL CENTER FOR TEACHER RESIDENCIES, AND THE
MARYLAND ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION'S
<u>MOTION FOR TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION</u>**

     Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs the American Association of Colleges for Teacher Education, the National Center for Teacher Residencies, and the Maryland Association of Colleges for Teacher Education (collectively, "Plaintiffs"), by and through their undersigned counsel, respectfully applies to the Court for issuance of a temporary restraining order and/or preliminary injunction against Defendants Denise Carter, in her official capacity as Acting Secretary of Education, the United States Department of Education, and Donald Trump, in his official capacity as President of the United States, (collectively, "Defendants") as follows:

     (a) Enjoining Defendants' enforcement of the termination of the TQP, SEED, and TSL grants;

     (b) Ordering such grant funding reinstated forthwith;

     (c) Ordering Defendants to provide the Grant Recipients reimbursement for all otherwise allowable expenditures incurred between the date of termination and the Court's order;

JA 48

(d) Enjoining Defendants' termination of any additional TQP, SEED, and TSL grants if such termination would be inconsistent with the Court's order; and

(e) Removing the route pay grant conditions from TQP, SEED, and TSL grants.

This Motion is supported by a Memorandum of Law, Declarations, and the exhibits thereto, which are incorporated herein by reference.

WHEREFORE, Plaintiffs respectfully request that this Court grant their Motion for Temporary Restraining Order and/or Preliminary Injunction and issue an Order enjoining Defendants.

**[*Signatures Follow on Next Page*]**

Dated: March 3, 2025

Respectfully Submitted,

*/s/ Daniel M. Moore*
Daniel M. Moore (Bar No. 21834)
SAUL EWING LLP
1001 Fleet Street, Ninth Floor
Baltimore, Maryland 21202-4359
Telephone: (410) 332-8734
Facsimile: (410) 332-8862
daniel.moore@saul.com

Joshua W.B. Richards (*Pro Hac Vice Forthcoming*)
Carolyn M. Toll (*Pro Hac Vice Forthcoming*)
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 972-7737
joshua.richards@saul.com
carolyn.toll@saul.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of March, 2025, a copy of the foregoing **(1) Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction, (2) Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction and Supporting Documents; and (3) Proposed Order** will be served on the following via Private Process Server and email contemporaneously with service of the Complaint:

DENISE CARTER, in her official capacity as Acting Secretary of Education
400 Maryland Avenue, SW
Washington, DC 20202,

U.S. DEPARTMENT OF EDUCATION,
400 Maryland Avenue, SW
Washington, DC 20202,

DONALD J. TRUMP, in his official capacity as President of the United States, c/o Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

PAMELA BONDI, United States Attorney General
950 Pennsylvania Avenue
Washington, DC 20530-0001

KELLY O. HAYES, Acting United States Attorney
United States Attorney's Office for the District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201

_/s/ Daniel M. Moore_____
Daniel M. Moore

JA 51

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.,* |  |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-00702 |
| DENISE CARTER, *et al.,* | |
| *Defendants*. | |

**PLAINTIFFS AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER
EDUCATION, NATIONAL CENTER FOR TEACHER RESIDENCIES, AND
MARYLAND ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR
<u>TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 4

    A.    OVERVIEW OF TQP, SEED, AND TSL GRANTS AND DEPARTMENT PRIORITIES. ................. 4
        1.    Congress Created and Funded the TQP, SEED, and TSL Grants. ................................. 4
        2.    Regulations Governing Grant Terminations. .................................................................. 4
        3.    Statute and Department Regulation Requirements for Setting Priorities ...................... 5
        4.    Department of Education Priorities Applicable to Now-Terminated TQP, SEED, and
    TSL Grants. ......................................................................................................................... 6

    B.    AACTE'S AND MACTE'S MEMBER ORGANIZATIONS AND NCTR AND ITS MEMBER
    ORGANIZATIONS WERE AWARDED TQP, SEED, AND/OR TSL GRANTS. ......................... 7
        1.    Notice Inviting Applications for FY 2020, FY 2022, and FY 2024 TQP Grants. ........... 7
        2.    Notice Inviting Applications for FY 2022 SEED Grants. ............................................. 8
        3.    Notice Inviting Applications for FY 2023 TSL Grants ................................................. 8

    C.    THE DEPARTMENT'S TERMINATION OF THE TQP, SEED, AND TSL GRANTS IN FEBRUARY
    2025 .............................................................................................................................. 9

    D.    THIS COURT'S ORDER GRANTING PRELIMINARY INJUNCTION IN *NADOHE ET AL. V. TRUMP
    ET AL.* ............................................................................................................................ 10

    E.    THE EFFECTS OF TERMINATION ON PLAINTIFFS AND THEIR MEMBER ORGANIZATIONS. .... 11
        1.    Effect of Grant Termination on Ability to Maintain Programs. .................................... 11
        2.    Effect of Special Condition on Grants. .......................................................................... 13

III.  LEGAL STANDARD ........................................................................................ 13

IV.   ARGUMENT ..................................................................................................... 14

    A.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ............................................... 14
        1.    Plaintiffs are Likely To Succeed on their Fifth Amendment Due Process (Vagueness)
    Claim. ................................................................................................................................. 15
        2.    The Department's Termination of the TQP, SEED, and TSL Grants Violates the
    Administrative Procedures Act (Count II). ........................................................................ 18

    B.    IN THE ABSENCE OF AN INJUNCTION, PLAINTIFFS ARE CERTAIN TO SUFFER IRREPARABLE
    HARM. ........................................................................................................................... 23
        1.    Certain and Irreparable Harm to Plaintiffs and Their Member Organizations ........... 25
        2.    Harm Resulting from Defendants' Unlawfully Imposed Grant Conditions .................. 28
    C.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF. .............. 30
    D.    NO BOND IS NECESSARY. ............................................................................................. 31

V.    CONCLUSION .................................................................................................. 31

i

<u>**TABLE OF AUTHORITIES**</u>

F**EDERAL** C**ASES**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)................................................................19

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 485324 (D.D.C. Feb. 13, 2025), *enforced*, No. CV 25-00400 (AHA), 2025 WL 569381 (D.D.C. Feb. 20, 2025) ......................................................................................24

*Am. Acad. of Pediatrics v. Food and Drug Admin.*, 379 F. Supp. 3d 461 (D. Md. 2019).............18

*Arizona State Bd. v. U.S. Dep't of Educ.*, 391 F. Supp. 2d 800 (D. Az. 2005)..............................19

*Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379 (D. Md. 2022) ...................14, 23, 30

*Bennett v. Spear*, 520 U.S. 154 (1997) ...........................................................................18

*Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013) ......................................23, 30

*ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425 (D. Md. 2024)..................................14

*Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162 (2008) ....................................................................................................................24

*Den-Mat Corp. v. U.S., Food & Drug Admin.*, No. CIV. A. MJG-92-444, 1992 WL 208962 (D. Md. Aug. 17, 1992)..........................................................................................19

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414 (2021) ...........................22

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)......................................................19, 21

*Frazier v. Prince George's Cnty.*, 86 F.4th 537 (4th Cir. 2023) ...................................................14

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ......................................................14

*Hill v. Colorado*, 530 U.S. 703 (2000) ...........................................................................16

*Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049 (C.D. Cal. 2006)...16

*Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133 (9th Cir. 2009)..............15, 16

*ICENY USA, LLC v. M & M's, LLC*, 421 F. Supp. 3d 204 (D. Md. 2019).................................30

*Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 466 (D. Md. 2024) ...........................................14

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021)........24, 25

JA 54

*Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019) ....................................16

*Md. Dept. of Hum. Resources v. U.S. Dept. of Agric.*, 976 F.2d 1462 (4th Cir. 1992)................31

*Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 904 F. Supp. 2d 530 (D. Md. 2012) .31

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)....................................................24

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022).....................................................................14

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 9 (1983).......................................................................................................................................22

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019) ..........................................................................................................23

*Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932 (D.C. Cir. 2017) .......................................................................................................................22

*Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046 (D. Or. 2018) ..................................................19

*National Ass'n of Diversity Officers in Higher Educ. v. Trump*, Case No. 1:25-cv-00333-ABA, 2025 WL 53764 (D. Md. Feb. 21, 2025) .................................................................................24

*National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) .......................... passim

*Newsom ex. rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249 (4th Cir. 2003) .................30

*Open Communities All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ......................................24

*Packard Elevator v. I.C.C.*, 782 F. 2d 112 (8th Cir. 1986).........................................................24

*Pashby v. Delia*, 709 F.3d 307 (4th Cir. 2013) ...........................................................................31

*Sackett v. EPA*, 566 U.S. 120 (2012) ..........................................................................................20

*Sterling Commercial Credit—Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8 (D.D.C. 2011) ..........................................................................................................................25

*Stinnie v. Holcomb*, 77 F.4th 200 (4th Cir. 2023) .......................................................................13

*Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224 (D.D.C. 2014).......................................25

*United States v. South Carolina,* 720 F.3d 518 (4th Cir. 2013)...................................................13

*United States v. Williams*, 553 U.S. 285 (2008) ..........................................................................15

*Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023) ...........................................................................23

iii

JA 55

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) .............................................. 14, 23

*XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38 (D.D.C. 2015) ..................... 19

FEDERAL STATUTES AND REGULATIONS

2 C.F.R. § 200.208 ................................................................................................. 13, 29

2 C.F.R. § 200.340 ..................................................................................................... 4, 5

2 C.F.R. §§ 200.343, 200.344, 200.472 ........................................................................ 29

34 C.F.R. § 75.105 ............................................................................................ 5, 22, 23

5 U.S.C. § 704 ............................................................................................................ 18

5 U.S.C. § 706 ............................................................................................................ 18

20 U.S.C. § 1022 ....................................................................................................... 4, 8

20 U.S.C. § 6632 ....................................................................................................... 4, 8

20 U.S.C. § 6672 ....................................................................................................... 4, 8

20 U.S.C. § 6672(a) ........................................................................................................ 4

20 U.S.C. § 1232 ..................................................................................................... 5, 22

Fed. R. Civ. P. 65 ....................................................................................................... 31

U.S. Const. Amendment V ................................................................................... *passim*

JA 56

## I.    INTRODUCTION

Plaintiffs the American Association of Colleges for Teacher Education ("AACTE"), the National Center for Teacher Residencies ("NCTR"), and the Maryland Association of Colleges for Teacher Education ("MACTE") (collectively, "Plaintiffs") seek immediate injunctive relief against Defendants Denise Carter, in her official capacity as Acting Secretary of Education, the United States Department of Education (the "Department"), and Donald Trump, in his official capacity as President of the United States, (collectively, "Defendants") to remedy the unlawful termination of Plaintiffs' members' grants.

AACTE's, NCTR's, and MACTE's members together comprise hundreds of teacher preparation programs throughout the United States. Many of Plaintiffs' members (the "Grant Recipients") received grants from the Department through the Teacher Quality Partnership Program ("TQP"), the Supporting Effective Educator Development Program ("SEED"), and the Teacher and School Leader Incentive Program ("TSL"), which were used to fund programs to prepare and develop educators. Without prior warning, and in reliance on the President's recent Executive Order regarding DEI initiatives, the Department of Education recently summarily terminated many of Plaintiffs' members' TQP, SEED, and TSL grants. Not only were those terminations unlawful in reliance on Executive Order 14151, the Department also failed to follow statute and Federal regulations in terminating the grants, making the terminations unlawful under the Administrative Procedures Act too.

In the years that the Department of Education held competitions to award TQP, SEED, and TSL grants, the Department selected Priorities for applicants from a set of allowable agency Priorities enacted through a rulemaking process required by statute. These Priorities were used in the competitions to award TQP, SEED, and TSL grants to AACTE's and MACTE's member organizations and to NCTR and its member organizations. Pursuant to statute and Department

JA 57

regulation, Priorities for any competitive grant program must generally be set by Congress or through notice and comment rulemaking by the Department. Only then can the final published agency Priorities apply to the competitive grant programs for selection of grantees in a particular fiscal year.

In compliance with statute and its regulation, the Department followed the notice and comment rulemaking process and established several Priorities that were allowable at the time the TQP, SEED, and TSL grant Notices for Inviting Applications at issue in this case were published in the *Federal Register* in 2020, 2022, 2023, and 2024. The Department then awarded AACTE's and MACTE's member organizations and NCTR and its member organizations up to five-year TQP grants, up to three-year SEED grants, and/or up to three-year TSL grants that remained active through early to mid-February 2025.

But in February 2025, the Department summarily terminated grants awarded under TQP, SEED, and TSL. The purported basis provided by the Department for termination was that the grants are "inconsistent with, and no longer effectuate[], Department priorities." In form letters sent along with the official termination notifications, the Department explained that:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic.

After terminating AACTE's and MACTE's member organizations' and NCTR's and its member organization's TQP and SEED grants, the Department issued a press release titled "*U.S. Department of Education Cuts $600 Million in Grants Used to Train Teachers and Education*

JA 58

*Agencies on Divisive Ideologies.*" *See* https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

Neither the Department's "official" reason for terminating the grants, as articulated in the Grant Award Notifications regarding Department Priorities, nor its actual, publicly-articulated reason for termination regarding DEI initiatives, were lawful. The "official" justification is unlawful because the federal government has published a regulation governing the termination of grants that the Department did not follow here. The Department's publicly articulated reason for terminating the grants was unlawful because it was predicated on portions of an Executive Order that has been enjoined by this Court.

The Department's stated reason relied, erroneously, on an implied change in "Department priorities." But Department Priorities are not subject to whim or fiat and, by statute, must instead be established through notice and comment rulemaking. The Department Priorities applicable to Plaintiffs' members' TQP, SEED, and TSL grants are the same today as they were when the grants were awarded because (a) no subsequent rulemaking has taken place; and (b) the statutes that established Priorities allowable for TQP, SEED, and TSL have not been repealed or amended. Given that the Department Priorities have not changed, and the grants were determined to meet the still-current Priorities during the competition process, it would be arbitrary *per se* for the Department to conclude that these grants are not consistent with or do not effectuate those same "Department Priorities" now.

As a result of the Department's improper early terminations, the Grant Recipients have been and will continue to be deprived of essential funding required to continue their teacher preparation programs and the continuation of the Department's unlawful terminations will irreparably harm Plaintiffs and their members. As such, Plaintiffs respectfully request that this

Court award relief to address the irreparable harm that continues to result from Defendants' unlawful actions.

## II.    BACKGROUND

### A.    Overview of TQP, SEED, and TSL Grants and Department Priorities.

#### 1.    *Congress Created and Funded the TQP, SEED, and TSL Grants.*

Congress authorized three programs to prepare and develop educators in the United States: TQP, SEED, and TSL. The Teacher Quality Partnership Grant Program provides funding to eligible partnerships to improve student achievement and the quality of prospective and new teachers by improving the preparation of prospective teachers and enhancing professional development activities for new teachers. *See* 20 U.S.C. § 1022. The Supporting Effective Educator Development Program provides funding to increase the number of highly effective educators in the United States by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of educators. *See* 20 U.S.C. § 6672. The Teacher and School Leader Incentive Program provides funding to serve educators in high-need schools who raise student academic achievement and close the achievement gap between high- and low-performing students. TSL helps develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders. *See* 20 U.S.C. § 6632.

Congress directed the Secretary of the Department of Education (the "Secretary") to award grants, on a competitive basis, to eligible entities to provide funding consistent with the goals of TQP (20 U.S.C. § 1022a(a)), SEED (20 U.S.C. § 6672(a)), and TSL (20 U.S.C. § 6632(a)).

#### 2.    *Regulations Governing Grant Terminations.*

Federal regulation permits the Department of Education to terminate grants if the grants no longer effectuate Department of Education Priorities. *See* 2 C.F.R. § 200.340(a)(2) (2020);

JA 60

2 C.F.R. § 200.340(a)(4) (2024)). "Department Priorities," however, is a term of art; in order to establish its Priorities, the Department must, by statute and regulation, go through a notice and comment rulemaking process. *See* 20 USC § 1232(d); 34 C.F.R. § 75.105(b)(2).

### 3.     *Statute and Department Regulation Requirements for Setting Priorities.*

To set Department Priorities, the Secretary is required to publish agency Priorities in the *Federal Register*, which must be used to select the Priorities for a competition, and must have gone through public comment (there are five exceptions to this rule, but none are implicated here). The Secretary is likewise required to establish the specific Priorities that are included in the application for each competitive federal grant program, such as TQP, SEED, and TSL, by publishing the Priorities in the Notice Inviting Application for the grant in the *Federal Register*. (34 C.F.R. § 75.105(b)(1)).

As a federal agency, the Department is unique in the statutory requirement it has to follow for setting agency Priorities for discretionary grants. While the Administrative Procedures Act (5 U.S.C. § 553) generally exempts federal agency grants from the rulemaking process, the General Education Provisions Act (20 U.S.C. § 1232(d)) alters that rule for the Department of Education; for the Department, the grants exemption for rulemaking only applies to regulations (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines rulemaking will cause extreme hardship to the intended beneficiaries of the program. (20 U.S.C. § 1232(d)).

In sum, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process.[1]

---

[1] While there are limited exceptions to this rule, none of the exceptions are applicable to the analysis here. (*See* 34 C.F.R. 75.105(b)(2)).

JA 61

Germane here, the Department held competitions for TQP grants in 2020, 2022, and 2024. It also held competitions for SEED grants in 2022, and a competition for TSL grants in 2023. For each of these competitions, and in compliance with statute and Department regulation, the Priorities were set either by Congress in the program's authorizing statute or through notice and comment rulemaking. (85 F.R. 29691-29704, 87 F.R. 10906-10923, 89 F.R. 23573-23592, 87 F.R. 19487-19496, 88 F.R. 33592-33601).

### 4.    *Department of Education Priorities Applicable to Now-Terminated TQP, SEED, and TSL Grants.*

In 2019-2021, the Department established a set of allowable Department Priorities through the proper notice and comment rulemaking process. First, after going through the proper notice and comment rulemaking process, the Department published its Notice of Final Priority for discretionary grant programs in the *Federal Register* on November 27, 2019. (84 F.R. 65300-65303).[2] Second, also after the notice and comment rulemaking process, the Department published a Notice of Final Priorities for all discretionary grant programs in the *Federal Register* on March 9, 2020.[3] (85 F.R. 13640-13644). Then the Department went through the proper notice and comment rulemaking process once again and published its Notice of Final Priorities for TQP, SEED, and TSL grant competitions in the *Federal Register* on July 9, 2021.[4] (86 F.R. 36217-

---

[2] The Department of Education published a Notice of Proposed Priorities for public comment on July 29, 2019. (84 F.R. 36504-36507).

[3] The Department of Education published a Notice of Proposed Priorities for public comment on November 29, 2019. (84 F.R. 65734-65739).

[4] The Department of Education published a Notice of Proposed Priorities for public comment on April 20, 2021. (86 F.R. 20471-20475).

JA 62

36220). That same day, again after the proper notice and comment rulemaking process, the Department published a Notice of Final Priority specific for TSL.[5]

Finally, and most recently, the Department went through the required notice and comment rulemaking process and published a Notice of Final Priorities for the Secretary's Supplemental Priorities for all discretionary grant programs in the *Federal Register* on December 10, 2021.[6] (86 F.R. 70612-70641).

### B. AACTE's and MACTE's Member Organizations and NCTR and its Member Organizations were Awarded TQP, SEED, and/or TSL Grants.

#### 1. Notice Inviting Applications for FY 2020, FY 2022, and FY 2024 TQP Grants.

There were three TQP competitions relevant to this civil action. First, on May 18, 2020, the Department published a Notice Inviting Applications for the FY 2020 TQP competition inviting applicants to apply for the grant funds. (85 F.R. 29691-29704). Second, on February 25, 2022, the Department published a Notice Inviting Applications for the FY 2022 TQP competition inviting applicants to apply for the grant funds. (87 F.R. 10906-10923). Third, the Department published a Notice Inviting Applications for the FY 2024 TQP competition on April 4, 2024 inviting applicants to apply for the grant funds. (89 F.R. 23573-23592).

The project period for the FY 2020, FY 2022, and FY 2024 TQP competitions (the maximum amount of time for which the grants can be awarded) was up to five years. (85 F.R. 29699, 87 F.R. 10918, 89 F.R. 23587). All three TQP grant competitions included Priorities that

---

[5] The Department of Education published a Notice of Proposed Priority for public comment on April 9, 2021. (86 F.R. 18519-18523).

[6] The Department of Education published a Notice of Proposed Priorities for public comment on June 30, 2021. (86 F.R. 34664-34674).

were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TQP's authorizing statute (20 U.S.C. § 1022).

Grant Recipients were selected to receive funding from the FY 2020 TQP, FY 2022 TQP, and FY 2024 TQP competitions for up to a five-year period for each competition.

### 2. *Notice Inviting Applications for FY 2022 SEED Grants.*

On April 4, 2022, the Department published a Notice Inviting Applications for the FY 2022 SEED competition, inviting applicants to apply for the grant funds. (87 F.R. 19487-19496). The project period for the FY 2022 SEED competition was up to three years. (87 F.R. 19492). Just like the TQP grant competitions, the SEED grant competition included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in SEED's authorizing statute (20 U.S.C. § 6672). Grant Recipients were selected to receive funding from the FY 2022 SEED competition for up to a three-year period.

### 3. *Notice Inviting Applications for FY 2023 TSL Grants.*

Finally, there is one TSL grant competition relevant to this action. On May 24, 2023, the Department published a Notice Inviting Applications for the FY 2023 TSL competition, inviting applicants to apply for the grant funds. (88 F.R. 33592-33601). The project period for the FY 2023 TSL competition was up to three years. (88 F.R. 33598). As with the TQP and SEED grant competitions, the TSL grant competition also included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TSL's authorizing statute (20 U.S.C. § 6632). Grant Recipients were selected to receive funding from the FY 2023 TSL competition for up to a three-year period.

The five-year TQP grants, three-year SEED grants, and/or three-year TSL grants all remained active through early to mid-February 2025.

C.    **The Department's Termination of the TQP, SEED, and TSL Grants in February 2025.**

With no notice, and without lawful reason, the Department sent Termination Letters and updated Grant Award Notifications to the majority of the Grant Recipients in February 2025, informing them that their TQP, SEED, and TSL grants were terminated, effective immediately on the date of the letter.[7] The substance of every one of the Termination Letters sent to the Grant Recipients are identical, indicating the same reasons with the same terminology for the grant terminations. *See* Exhibit B to Complaint.

While the Termination Letters provide that the Grant Recipients may challenge the termination decision by submitting information documenting their position in writing to the Department within thirty days of the termination, any appeal to the Department does not alter the fact that the termination of funding was effective on the date of notification in February 2025. There is no funding provided starting the date of termination pending any appeals.

In both the Grant Award Notifications and the Termination Letters, the purported basis provided by the Department for termination was that the grants are "inconsistent with, and no longer effectuate[], Department priorities." In the Termination Letters, the Department went on to explain that:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's

---

[7] While the Department terminated the majority of the Grant Recipients' grants, some of Plaintiffs' member organizations did not have their TQP grants terminated yet.

policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

After terminating the Grant Recipients' grants, the Department issued a press release titled "*U.S. Department of Education Cuts $600 Million in Grants Used to Train Teachers and Education Agencies on Divisive Ideologies*." (Exhibit D to Complaint).[8] The press release explains that the grants were terminated because they were using taxpayer funds to train teachers and education agencies on divisive ideologies, such as "Diversity, Equity, and Inclusion" and "equity training." *See id.*

**D.** **This Court's Order Granting Preliminary Injunction in *NADOHE et al. v. Trump et al.***

On February 21, 2025, this Court granted a preliminary injunction blocking the President's administration from enforcing certain provisions of Executive Order 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive Order of January 20, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) (the "J20 Order"), and Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025) ("J21 Order"). *National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) (the "NADOHE Order").

---

[8]   *See*   https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants.

JA 66

In relevant part, the NADOHE Order enjoins the President's administration from enforcing a provision in Executive Order 14151 requiring "[e]ach agency, department, . . . [to] take the following actions within sixty days of this order: (i) terminate, to the maximum extent allowed by law, . . . all . . . 'equity-related' grants or contracts" (the "Termination Provision"). In granting the preliminary injunction, the Court held that the plaintiffs showed a likelihood of success on their claim that the Termination Provision is void for vagueness under the Fifth Amendment. Specifically, the Order provides:

> Defendants other than the President, and other persons who are in active concert or participation with Defendants (the "Enjoined Parties"), shall not:
>
> a. pause, freeze, impede, block, cancel, or terminate any awards, contracts or obligations ("Current Obligations"), or change the terms of any Current Obligation, on the basis of the Termination Provision;

Exhibit C to Complaint at page 3. The NADOHE Order benefits not just the named plaintiffs in that action, but **all** contractors and grantees who were subjected to the Termination Provision. *NADOHE v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764 at *28-29. As of the date this Court entered the NADOHE Order (February 21, 2025), Grant Recipients had already received the Termination Letters terminating their grants effective immediately.

### E. The Effects of Termination on Plaintiffs and Their Member Organizations.

#### 1. Effect of Grant Termination on Ability to Maintain Programs.

As of the date of the Termination Letters, funding from the terminated grants has been halted and the Grant Recipients are no longer receiving any funds from the Department under the grants they were awarded pursuant to TQP, SEED, and TSL. (Declaration of Kathlene Campbell on behalf of NCTR ("NCTR Declaration") at ¶ 12, Declaration of Carolyn Parker on behalf of American University ("AU Declaration") at ¶ 12, Declaration of Amy Smith on behalf of the University of St. Thomas ("UST Declaration") at ¶ 12, Declaration of Heather Kirkpatrick on

JA 67

behalf of Alder Graduate School of Education ("Alder GSE Declaration") at ¶ 11, Declaration of Sarah Johnson on behalf of Teaching Lab ("Teaching Lab Declaration") at ¶ 12). Without the TQP, SEED, and TSL grants, Grant Recipients are unable to continue funding their work, which in turn imperils Grant Recipients' ability to maintain the programs funded by the grants. The harm to Plaintiffs and their member organizations has been severe, and a continuation of the harm is certain and irreparable in the absence of relief from this Court. (*See e.g.*, NCTR Declaration at ¶¶ 13-18, AU Declaration at ¶¶ 13-16, UST Declaration at ¶¶ 13-14, Alder GSE Declaration at ¶¶ 12-20, Teaching Lab Declaration at ¶¶ 17-26).

For example, the termination of Plaintiff NCTR's SEED grant deprives it the ability to serve K-12 school districts where there is high turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages. (NCTR Declaration at ¶ 18). In addition, absent Court intervention to reinstate American University's TQP grant, it will be forced to shut down its teacher preparation program for special education and early childhood education, impacting up to 1,5000 Washington D.C. children and 48 future educators. (AU Declaration at ¶¶ 13-14). Similarly, the University of St. Thomas is at risk of losing its student pipeline in areas of high-need, such as special education, as a result of the loss of funding for its teacher preparation program (UST Declaration at ¶ 13) and the termination of TQP grant funds for Alder Graduate School of Education has had and will continue to have immense impacts for more than 100 aspiring teacher candidates and mentor teachers, and hundreds of K-12 students at partner school systems. (Alder GSE Declaration at ¶¶ 13-16). In addition, the termination of TSL grant funds will result in a loss of curriculum-based professional learning and coaching services by a non-profit organization, Teaching Lab, impacting more than 40 public schools and more than 150 teachers,

JA 68

whose instruction in turn reaches well over 6,000 K-12 students. (Teaching Lab Declaration at ¶¶ 8-9).

Further, as a direct result of the termination of the grants, Plaintiffs' member organizations will see a decline in enrollment, and it will exacerbate the on-going teacher shortages nationwide, and thwart their efforts to prepare future educators for success.

Finally, the termination of the Grant Recipients' grants imperils their ability to perform their primary missions as nonprofit membership organizations that depend on grants to fulfill their primary purposes for existence.

### 2.    *Effect of Special Condition on Grants.*

In addition to the immediate and irreparable effects of terminating the grants, the Department added a special condition to impacted grants requiring prior approval for them to draw down funds, referred to as "route pay." In violation of Federal regulations, the Department did not provide any notice or explanation for this blanket condition imposed on terminated grants. *See* 2 C.F.R. § 200.208. This new, unlawfully-imposed condition will cause delays in the Grant Recipients receiving their grant funds and add subjectivity to already approved costs, which the Grant Recipients reasonably fear will provide further opportunities for the Department to unlawfully deprive them of funding.

## III.    LEGAL STANDARD

A preliminary injunction is intended "to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina,* 720 F.3d 518, 524 (4th Cir. 2013); *see also Stinnie v. Holcomb*, 77 F.4th 200, 212 (4th Cir. 2023) ("The traditional office of a preliminary injunction . . . is to protect the status quo . . . ."). Such injunctive relief is warranted where a moving party has demonstrated that: "(1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the

JA 69

balance of hardships weighs in the party's favor; and (4) the injunction serves the public interest." *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021); *see also Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The same standard applies to a temporary restraining order ("TRO"). *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425 (D. Md. 2024) ("The standards for granting a TRO and granting a preliminary injunction are the same.") (citation omitted).

## IV.    ARGUMENT

The harms from the prospective and continuing effects of the grant terminations on Plaintiffs and their member organizations are devastating and irreparable. Defendants' actions violate both the Constitution and the Administrative Procedure Act. Neither principles of equity nor the public have any interest in violation of the law, much less where the violation compromises the public interest by terminating funding for programs designed to prepare, develop, and promote educators across the United States. A TRO and preliminary injunction should issue to prevent these further harms until the Court has the opportunity to further consider the merits of the case.

### A.    Plaintiffs are Likely to Succeed on the Merits.

"To secure a preliminary injunction, a plaintiff must 'make a clear showing that [it is] likely to succeed at trial, [but it] need not show a certainty of success.'" *Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 388 (D. Md. 2022) (quoting *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013)) (alterations in original); *see also Jensen v. Md. Cannabis Admin.*, 719 F. Supp. 466, 473 (D. Md. 2024) (same).

JA 70

Plaintiffs are likely to succeed on the merits of their claims because Defendants' actions in terminating the grants were unlawful in two respects. First, the Department's publicly-articulated reason for termination in reliance on the Executive Order 14151's directive to terminate "equity-related" grants was unlawful because that portion of the Executive Order has been enjoined by this Court and found likely to violate the law. It follows that its use to terminate the grants was unlawful, and the justification for perpetuating those terminations likewise unlawful. Second, the Department's "official" reason for terminating the grants – purported inconsistency with Department Priorities – is also unlawful, arbitrary, and capricious because the federal government has published a regulation governing the termination of grants that the Department did not follow.

1. ***Plaintiffs are Likely To Succeed on their Fifth Amendment Due Process (Vagueness) Claim.***

a. The Termination Provision is Impermissibly Vague and Violates the Fifth Amendment's Protection of Due Process (Count I).

This Court has already determined that the Termination Provision is likely to be impermissibly vague in violation of the Fifth Amendment. Its use to terminate the Grant Recipients' grants, and its potential future use to terminate more of Plaintiffs' members' grants, is likewise unlawful. As a result, Plaintiffs are likely to prevail on their claim that the Department's continuing refusal to fund the grants is unlawful.

The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. A federal law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."[9] *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v.*

---

[9] While many void for vagueness arguments are directed at statutes, the same principles apply when the subject of the challenge is an executive order. *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d

JA 71

*Colorado*, 530 U.S. 703, 732 (2000)); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (applying void for vagueness doctrine to "purely civil statutes").

"[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09 (footnotes omitted). If an executive order's terms are not "susceptible of a clear meaning," and the executive order does not "mitigate the vagueness of the term by supplying any definition," then the provision "lends itself to subjective interpretation" and is unconstitutional. *Humanitarian Law Project v. U.S. Dep't of Treasury*, 463 F. Supp. 2d 1049, 1070 (C.D. Cal. 2006).

The Termination Provision of Executive Order 14151 is unconstitutionally vague because it invites arbitrary and discriminatory enforcement. It does not define key terms, including "DEI," "DEIA," "equity" or "equity- related" and, as a result, fails to satisfy the constitutional minimum. Instead, it leaves federal agencies discretion to enforce the provision in a "seriously discriminatory" manner. *See Hill*, 530 U.S. at 732. These are broad terms; their meanings are not readily limited. As a result, the Termination Provision leaves Department's decisionmakers "the job of shaping a vague statute's contours through their enforcement decisions." *Sessions*, 584 U.S. at 182 (Gorsuch, J., concurring). Because the Department is impermissibly free to pick and choose in an arbitrary and discriminatory fashion, the Termination Provision in Executive Order 14151 is unconstitutionally vague.

---

1133, 1146-47 (9th Cir. 2009) (applying statutory void for vagueness principles and caselaw to challenge concerning executive order).

JA 72

      b. <u>This Court's NADOHE Order Applies to Plaintiffs in this Action and the Department should be Enjoined from Enforcing the Termination of the TQP, SEED, and TSL Grants.</u>

The nationwide injunction in the NADOHE Order is not explicit as to whether it requires the Department to refrain from enforcement of final action taken with respect to the subject matter covered by the Order but undertaken *before* the Order was published. While the Order's spirit makes clear that the Government's refusal to continue to fund grants canceled in adherence to the Termination Clause is prospectively unlawful, the Order does not explicitly vacate such orders or return parties to the status quo prior to agency action predicated on the Termination Clause. The Court should issue a new injunction in this case clarifying that issue as to the Grant Recipients and all similarly-situated grantees.

The Grant Award Notifications and Termination Letters did not make an explicit reference to Executive Order 14151 as the reason for terminating the grants, but the Department published a press release on February 17, 2025 that explains that the grants were terminated because they were using taxpayer funds to train teachers and education agencies on divisive ideologies, such as "Diversity, Equity, and Inclusion" and "equity training" – the same directive of the Termination Provision. (Exhibit D to Complaint). This explicit (and plainly intentional) connection of the Termination Provision in Executive Order 14151 with the grant terminations by the Government is unambiguous.

The Termination Letters also reference the Department's position to "ensure[] that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ('DEI') initiatives[.]" (Exhibit B to Complaint at pages 1, 3, 5, 7, 9, 11, 13). While the Grant Award Notifications and Termination Letters state that the grants were terminated because they were "inconsistent with, and no longer effectuate[], Department priorities," it is clear from the Government's conduct that the grants were terminated pursuant to

17

the now-enjoined Termination Provision (which, as discussed below, is not actually a Department Priority in any case).

The NADOHE Order benefits all contractors and grantees who were subject to the Termination Provision. *NADOHE v. Trump*, No. 1:25-CV-00333-ABA, 2025 WL 573764 at *28-29. Even so, this Court's NADOHE Order has left a gap of unlawful conduct where the Department continues to enforce what it would be enjoined from undertaking now. Plaintiffs seek relief directing the Department to return the Grant Recipients to the *status quo ante* with respect to Executive Order 14151 and vacate or order rescinded the terminations of their TQP, SEED, and TSL grants.

## 2. The Department's Termination of the TQP, SEED, and TSL Grants Violates the Administrative Procedures Act (Count II).

The Department's termination of the grants because they were allegedly "inconsistent with, and no longer effectuate[], Department priorities" is also unlawful because it is contrary to statute and regulation the Department is obliged to follow, and thus violates the APA. 5 U.S.C. § 706(2)(A) (courts must "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

### a. Defendants' Grant Terminations were Final Agency Actions.

Under the APA, courts may review "final agency action." 5 U.S.C. § 704. There are two hallmarks of final agency action: first, the action "mark[s] the 'consummation' of the agency's decisionmaking process;" and second, it is an action by which "rights or obligations have been determined" or "from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *see also Am. Acad. of Pediatrics v. Food and Drug Admin.*, 379 F. Supp. 3d 461, 487 (D. Md. 2019). Put another way, "[t]he core question is whether the agency has

JA 74

completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

The Supreme Court has instructed that the finality requirement be applied in a "flexible" and "pragmatic" way. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-50 (1967). In determining whether agency action is final, the Supreme Court has instructed courts to consider whether the action "'is sufficiently direct and immediate,' and has a 'direct effect on day-to-day business.'" *Franklin*, 505 U.S. at 796-97 (quoting *Abbott Labs.*, 387 U.S. at 152). One indicator of finality is "whether the agency views its deliberative process as sufficiently final to demand compliance with its announced position." *Den-Mat Corp. v. U.S., Food & Drug Admin.*, Civ. No. MJG-92-444, 1992 WL 208962, at *3 (D. Md. Aug. 17, 1992) (quoting *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 436 (D.C. Cir. 1986)).

Federal district courts across the country have concluded that legal consequences flow from an agency's decision to terminate future federal funding. *Multnomah Cnty. v. Azar*, 340 F. Supp. 3d 1046, 1056 (D. Or. 2018) ("With respect to the second prong, legal consequences flow from an agency's decision that prohibits future federal funding."); *Arizona State Bd. v. U.S. Dep't of Educ.*, 391 F. Supp. 2d 800, 802 (D. Az. 2005) (explaining that there is "no dispute that the DOE's Determination results in 'legal consequences,' namely the prohibition of future federal funding of for-profit charter schools"); *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 60 (D.D.C. 2015) ("It is clear beyond cavil that the rejection of a request for a government benefit . . . 'fixes some legal relationship' between a private party and the government.").

Here, Defendants' termination of the Grant Recipients' grants constitutes final agency action. The Termination Letters each provide that the "Department hereby terminates grant No. [] in its entirety effective 2/[]/25." This demand for immediate compliance with the Department's

position marks the consummation of the Department's decision-making process. As of the date of the Termination Letters, the Department stopped providing funding approved by the grants. (NCTR Declaration at ¶ 12, AU Declaration at ¶ 12, UST Declaration at ¶ 12, Alder GSE Declaration at ¶ 11, Teaching Lab Declaration at ¶ 12). The Department's action unequivocally established that the rights of Grant Recipients to receive the funds was terminated. Instantly following the Department's determination to halt funding, there was a direct and immediate effect on Plaintiffs and their member organizations – without the funding from the grants, Grant Recipients cannot continue to operate their teacher preparation programs.

While the Termination Letters provide that the Grant Recipients may challenge the termination decision by submitting information documenting their position in writing to the Department within thirty days of the termination, the Department's termination took effect immediately, and even if a Grant Recipient challenges the determination, the funding will not resume absent intervention from this Court. And while the Termination Letters invite Grant Recipients to submit an objection to the termination decision, they contain no promise that the Department will conduct a further review, nor any timeframe or process by which the Department intends review such a challenge, if at all.[10] In any event, "[t]he mere possibility that an agency might reconsider" its decision "does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012). Accordingly, the Department's termination of the grants constitutes final action under the APA. *See id*.

---

[10] The Termination Letters are problematic for other reasons, too. Most notably, the form letters failed to provide basic notice by omitting any specificity about the reason that the Department found any individual grant "inconsistent with. . . Department priorities." The letters instead merely list, disjunctively, five vague ways in which the specific grant at issue might be "inconsistent." This does not put the Grant Recipients on notice for the reason for termination and of course thereby deprives them of any meaningful basis to challenge the termination.

JA 76

The consequences of the termination of grant funds has already been felt by the Grant Recipients. As a result of the termination of their TQP, SEED, and TSL grants, Grant Recipients will be unable to continue their teacher preparation programs established and run by the grants' funding, which of course has a direct impact on their day-to-day business. *See Franklin*, 505 U.S. at 796-97 (quoting *Abbott Labs.*, 387 U.S. at 152). For example, the termination of NCTR's SEED grant will result in a $1,188,070 overall loss, including a $332,000 direct loss to NCTR, as well as a loss of $360,000 in expenses to contractors and a $495,000 loss in subgrants to the thirteen teacher residency programs funded by the grant. (NCTR Declaration at ¶ 13). Without their terminated grant funds, American University will no longer be able to maintain its teacher preparation program designed to remedy the dramatic teacher shortage and improve outcomes for early childhood and special education students in Washington D.C. (AU Declaration at ¶ 13). Likewise, due to the termination of its TQP grant, the University of St. Thomas is at risk of losing in student pipeline, such as special education, resulting in widespread negative impacts on the many communities, teachers and students these teacher pipeline programs benefit. (UST Declaration at ¶ 13). By way of yet another example, the Department's termination of two TQP grants for Alder Graduate School of Education has immense impacts on its day-to-day business, affecting teacher preparation programs with 83 current teacher candidates and thwarted plans to recruit 80 additional teacher candidates in the remaining years of the grants. (Alder GSE Declaration at ¶¶ 13-15). Furthermore, as a direct result of the termination of a TSL grant, a non-profit organization which provides professional learning and coaching services to improve teacher practice and student learning will no longer be able to provide such services to over 40 schools. (Teaching Lab Declaration at ¶¶ 9, 17-18).

The termination of the Grant Recipients' TQP, SEED, and TSL grants is also resulting in, and will continue to result in, loss of employment for the dedicated staff members and grant managers who worked to make the teacher preparation programs run, a harm that cannot be remedied at summary judgment when fundamental changes to the structure and business of Plaintiffs' members have already been made by necessity. (*See e.g.*, NCTR Declaration at ¶ 14, AU Declaration at ¶ 16, Alder GSE at ¶ 17). Termination of the grants will also lead to a decline in enrollment at many of Plaintiffs' member organizations. (*See e.g.*, AU Declaration at ¶ 13, Alder GSE Declaration at ¶¶ 14-15, NCTR Declaration at ¶ 14).

b.  Defendants' Action are Arbitrary and Capricious.

The termination of the subject grants is unlawful, arbitrary, and capricious because it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). While a court may not "substitute its own policy judgment for that of the agency," *id.*, it must ensure that the agency has "examine[d] the relevant data and articulate[d] 'a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 9, 43 (1983). Agency action is "substantive[ly] unreasonable[]" when "the agency exercised its discretion unreasonably." *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.). Where, as here, the Department exercises its discretion to act counter to statute and regulation, its action is *per se* unreasonable.

The proffered reason by the Department for the termination of the grants – that they "are inconsistent with, and no longer effectuates, Department priorities" – is contrary to the law. Statute and regulation require the Secretary to publish Department Priorities for program grants in the *Federal Register*, subject to a notice and comment period. (20 U.S.C. § 1232(d), 34 C.F.R.

§ 75.105(b)(2)). The Secretary then selects allowable Priorities to include in the applications for the grant competitions which are published in the *Federal Register*. (34 C.F.R. § 75.105(c)). The Department cannot, by law, determine that with a change in administration, specific Department Priorities for grant programs are no longer allowable unless and until the Department engages in rulemaking to propose and issue new Final Priorities.

Simply put, the current administration has not gone through a notice and comment rulemaking process to issue new Final Priorities, so the current Final Priorities remain Department Priorities. As a result, and contrary to the Department's official reasons, the grants at issue ***are*** consistent with the current Department Priorities. It would be arbitrary *per se* for the Department to conclude that these grants are not consistent with or do not effectuate those same "Department Priorities" merely because they say so. If the Department wishes to establish new Department Priorities, it may do so only through the means established by law, not through whim or fiat.

**B.**     **In the Absence of an Injunction, Plaintiffs are Certain to Suffer Irreparable Harm.**

To obtain a preliminary injunction, a plaintiff must "demonstrate irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original, collecting cases); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Harm is irreparable if the injury "cannot be fully rectified by the final judgment after trial." *Ass'n of Am. Publishers*, 586 F. Supp. 3d at 388 (quoting *Mountain Valley Pipeline, LLC*, 915 F.3d at 216; *Vitkus v. Blinken*, 79 F.4th

JA 79

352, 367 (4th Cir. 2023) (finding existence of irreparable harm where no adequate relief could be recovered at the conclusion of trial).

A showing of irreparable harm occurs where a plaintiff demonstrates a likelihood of success on the merits of a constitutional claim. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied.") (citation omitted); *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

A mission-oriented organization also has a likelihood of irreparable injury where "the 'actions taken by the defendant have perceptively impaired the organization's program'" and "make it more difficult for [organizations] to accomplish [their] primary mission[s]." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017); *AIDS Vaccine Advoc. Coal. v. United States Dep't of Stat*e, No. CV 25-00400 (AHA), 2025 WL 485324, at *4 (D.D.C. Feb. 13, 2025), *enforced*, No. CV 25-00400 (AHA), 2025 WL 569381 (D.D.C. Feb. 20, 2025) (finding irreparable injury where loss of funding would make it more difficult to accomplish organization's primary mission).

In addition, economic harm may also prove irreparable if it is severe enough to threaten an organization's existence. *Packard Elevator v. I.C.C.*, 782 F. 2d 112, 115 (8th Cir. 1986) ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the [plaintiff]'s business."); *see also National Ass'n of Diversity Officers in Higher Educ. v. Trump*, Case No. 1:25-cv-00333-ABA, 2025 WL 53764, at *26 (D. Md. Feb. 21, 2025) (same); *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp.

2d 162, 168 (2008) ("To successfully shoehorn potential economic loss into a showing of irreparable harm, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence.") (citations omitted); *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 243-44 (D.D.C. 2014) (finding irreparable harm that is economic in nature where non-profit completely "shut out" of hospital funding program). "The critical consideration under this exception is the effect that the purported economic harm will have on a movant's business or its very existence—not any monetary amount per se." *Sterling Commercial Credit—Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 15 (D.D.C. 2011).

### 1. *Certain and Irreparable Harm to Plaintiffs and Their Member Organizations.*

*First*, there is a likelihood of success on the merits of a constitutional claim here, and thus the irreparable harm factor is *per se* satisfied. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

*Second*, the Grant Recipients are being deprived of essential funding required to continue their teacher preparation programs. Without Court intervention, Defendants' actions unlawfully depriving them of funding will:

– Force many Grant Recipients to shutter their programs, including teacher preparation programs designed to support educators in critical areas of need, including special education and early childhood education. (*See e.g.*, AU Declaration at ¶ 13).

– Significantly reduce the Grant Recipients' ability to address the on-going teacher shortage and cause an exacerbation of the teacher shortage, especially in rural and urban communities, across the country. (*See e.g.*, NCTR Declaration at ¶ 18; Alder GSE Declaration at ¶ 16).

25

JA 81

– Result in termination of employment for the dedicated staff members, coaches, and grant managers who work to make the teacher preparation programs run. (*See e.g.*, NCTR Declaration at ¶ 14; AU Declaration at ¶ 16; Alder GSE Declaration at ¶ 17; Teaching Lab Declaration at ¶¶ 19-20).

– Result in a widespread cut and/or reduction of scholarships and living wage stipends for future educators to pursue degrees in education in underserved rural, urban, suburban, and exurban communities. (*See e.g.*, UST Declaration at ¶¶ 7-8; Alder GSE Declaration at ¶¶ 13-15).

– Result in a widespread cut and/or reduction of mentor teacher stipends for teachers in K-12 schools who work to train and develop new teachers in areas of high-need. (*See e.g.*, Alder GSE Declaration at ¶¶ 13-15).

– Cut curriculum-based professional learning and coaching services designed to improve teacher practice and student learning at over 40 K-12 schools and result in a loss of a rigorous study to help school districts evaluate how best to spend their limited funds and limited teacher development time and resources. (Teaching Lab Declaration at ¶¶ 9, 17-18, 21-22).

– Lead to a decline in enrollment at many of Plaintiffs' member organizations. This includes a decline in current enrollment for students participating in teacher preparation programs who will no longer be able to afford to attend Plaintiffs' member organizations due to the termination of funding supplied for stipends, support for licensure examinations and tutoring, and tuition assistance. The termination of grants also impairs the ability of Plaintiffs' member organizations to recruit future students. (*See e.g.*, AU Declaration at ¶ 13, Alder GSE Declaration at ¶¶ 14-15, NCTR Declaration at ¶ 14).

26

JA 82

For the Grant Recipients, the harm is actual, not theoretical, as the funding was terminated in February 2025, immediately resulting in many of the Grant Recipients' inability to continue their programs. The harm to the participants was even more impactful given that the terminations occurred in the middle of the school year. Similarly, for any Grant Recipients whose grants have not yet been terminated, but whose termination is forthcoming, and similarly situated to the grants at issue here, the imminence of their injuries is evident from the Department's publicly-articulated desire to cut these grants used to train teachers and education agencies and the plain language of the directive from the Executive Order to take immediate action with *at most* 60 days from the date of the January 20, 2025 order. It is clear that the Department is moving swiftly to eliminate funding for all teacher preparation grants, and the termination of the grants that have not been terminated is imminent. The harm that this loss of funding will cause nationally is likewise immense, strangling the viability of the teacher preparation programs that schools and communities desperately need.

The termination of the grants also completely eviscerates' Plaintiffs' missions to "elevate education and educator preparation through research, professional practice, advocacy, and collaboration," to "transform educator preparation by advancing the teacher residency movement to prepare, support, and retain more effective educators who represent and value the communities they serve" and to "serve as a distinct statewide voice on matters of importance to educator preparation programs at [] colleges and universities." [11] Without the TQP, SEED, and TSL grants to fund the teacher preparation programs, Plaintiffs and their member organizations will no longer be able to prepare/support and retain educators, which not only thwarts their missions, but also has

---

[11] *See* https://aacte.org/about/, https://nctresidencies.org/about-nctr/, https://mactemaryland.wixsite.com/maryland-association.

a devastating impact on the communities they serve. With the loss of funding and slashed programs, Plaintiffs' member organizations will no longer be able to support and train teaching candidates to work in partner K-12 schools. Many pre-K through year 12 schools rely on the teacher preparation programs funded by the TQP, SEED, and TSL grants to support their students. For example, without their TQP grant funding, American University will no longer be able to fund additional cohorts of its teacher residency program. As a result, the Washington D.C. Friendship Public Charter Schools will lose the support of the teacher candidates working in their early childhood and special education classrooms. (AU Declaration at ¶ 13). The University of St. Thomas will no longer be able to fund a majority of scholarships for undergraduate and graduate students who are pursuing teacher licensure and degrees in special education and elementary education. (UST Declaration at ¶¶ 6, 7). The stipends for Alder Graduate School of Education's aspiring teachers and mentor teachers at its partner K-12 school systems will lose the majority of their funding, resulting in expected harm of over $2 million for the partner K-12 school systems. (Alder GSE Declaration at ¶¶ 13-16). Teaching Lab will no longer be able to provide professional learning and coaching services to over 40 K-12 schools. (Teaching Lab Declaration at ¶¶ 9, 17-18). NCTR's thirteen teacher residency programs that were funded by a terminated grant are all in jeopardy, depriving Plaintiff NCTR of its ability to serve K-12 school districts where there is a high turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages. (NCTR Declaration at ¶ 18).

## 2. *Harm Resulting from Defendants' Unlawfully Imposed Grant Conditions.*

The Grant Recipients are also being harmed by the Department's special condition put on the grants during their period for drawing down the funds. Generally, unless a grantee poses a specific risk, they can draw down funds from their grant award based on the allowable, allocable

JA 84

and reasonable costs approved in their grant budget without prior approval. Here, the Department added a special condition to impacted grants after they were terminated requiring prior approval for them to draw down funds. This special condition is referred to as "route pay." The grantees are eligible for costs that were properly incurred before their termination date and costs that would not have occurred if the grant was not terminated. They have 120 days to draw down the funds after the termination date. (2 C.F.R. §§ 200.472, 200.343, 200.344(b)).

The regulations that govern federal grants set the reasons that the Department can put conditions on grants and the requirements for notice prior to doing so. Imposing a special condition, such as establishing additional prior approvals, on a grant can only be done if the grantee is determined to pose a risk. Factors that may be considered are financial stability, quality of management systems and standards, history of performance, audit reports and filings, ability to effectively implement requirements, history of compliance with conditions of a federal award, or a responsibility determination. (2 C.F.R. § 200.208).

Before conditions are placed on a grant, the agency must notify the grantee as to: (1) the nature of the additional requirements; (2) the reason why the additional requirements are being imposed; (3) the nature of the action needed to remove the additional requirement, if applicable; (4) the time allowed for completing the actions if applicable; and (5) the method for requesting reconsideration of the additional requirements imposed. (*Id*.).

Without notice or any finding of individual grantee risk, the Department put a blanket condition on the terminated grants to require prior approval for all remaining drawdowns. This new, unlawfully-imposed condition will cause delays in the Grant Recipients receiving their grant funds and potential subjectivity added to disturbing already approved costs.

JA 85

C.    **The Balance of Equities and Public Interest Favor Injunctive Relief.**

With regard to the final two factors, which merge for purposes of this analysis, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Ass'n of Am. Publishers*, 586 F. Supp. 3d at 388 (quoting *Winter*, 555 U.S. at 23; *see also ICENY USA, LLC v. M & M's, LLC*, 421 F. Supp. 3d 204, 222-23 (D. Md. 2019).

Here, the balance of the equities favors preliminary relief because Fourth Circuit caselaw "counsels that '[the government] is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac*, 722 F.3d at 191 (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)). Similarly, it is axiomatic that the public interest favors protecting constitutional rights. *See id.* ("It also teaches that 'upholding constitutional rights surely serves the public interest.'") (quoting *Giovani Carandola*, 303 F.3d at 521); *see also Newsom ex. rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (recognizing that a governmental entity "is in no way harmed by issuance of a preliminary injunction" that prevents enforcement of a policy likely to be found unconstitutional).

The equities also tip in Plaintiffs' favor. On one hand, requiring the Department to continue the Grant Recipients' grants would continue the status quo that would have resulted had the Department not unlawfully terminated the grants. The government would suffer no harm if the preliminary injunction is granted, just as they suffered no harm from the status quo before the grants were terminated. The Department would simply be directed to continue its regular obligation of Congressionally-approved funding that it had already committed to spend to fund the TQP, SEED, and TSL grants. On the other hand, the Grant Recipients' teaching preparation programs provide an essential service furthering important public interest in education that will be

JA 86

destroyed absent Court intervention. Accordingly, the balance of equities and public interest favor injunctive relief.

      **D.**    **No Bond Is Necessary.**

      Fed. R. Civ. P. 65(c) contemplates "security" the Court can order to "pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A district court may waive the bond requirement. *See Md. Dept. of Hum. Resources v. U.S. Dept. of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (recognizing "a district court's discretion to set a bond amount of zero where the enjoined or restrained party faces no likelihood of material harm") (citing cases); *see also Metro. Reg'l Info. Sys. v. Am. Home Realty Network, Inc.*, 904 F. Supp. 2d 530, 536 (D. Md. 2012) ("Where the district court determines that the risk of harm is remote, or that the circumstances otherwise warrant, the court may fix the amount of bond accordingly. In some circumstances, a nominal bond may suffice.") (quoting *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 Fed. App'x. 134, 139 (4th Cir. 2001)); *Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district court retains the discretion to set the bond amount as it sees fit or waive the security requirement."). Indeed, in *NADOHE*, this Court effectively waived the bond requirement and "set a nominal bond of zero dollars." No. 1:25-CV-00333-ABA, 2025 WL 573764 at *30. Accordingly, Plaintiffs request that no bond or security be ordered. In the alternative, Plaintiffs request a nominal bond of $100.

## V.    CONCLUSION

      For these reasons, and the reasons set forth herein, Plaintiffs respectfully request that the Court enter a temporary restraining order or preliminary injunction. A proposed order accompanies the instant Motion.

JA 87

Dated: March 3, 2025                    Respectfully Submitted,

                                        */s/ Daniel M. Moore*
                                        Daniel M. Moore (Bar No. 21834)
                                        SAUL EWING LLP
                                        1001 Fleet Street, Ninth Floor
                                        Baltimore, Maryland 21202-4359
                                        Telephone: (410) 332-8734
                                        Facsimile: (410) 332-8862
                                        daniel.moore@saul.com

                                        Joshua W.B. Richards (*Pro Hac Vice Forthcoming*)
                                        Carolyn M. Toll (*Pro Hac Vice Forthcoming*)
                                        SAUL EWING LLP
                                        1500 Market Street, 38th Floor
                                        Philadelphia, Pennsylvania 19102
                                        Tel: (215) 972-7737
                                        joshua.richards@saul.com
                                        carolyn.toll@saul.com

                                        *Counsel for Plaintiffs*

JA 88

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER
EDUCATION, *et al.,*

        *Plaintiffs*,

     v.                            Civil Action No. 25-cv-00702

DENISE CARTER, *et al.,*

        *Defendants*.

### DECLARATION OF JOSHUA W. B. RICHARDS, ESQ.

I, JOSHUA W. B. RICHARDS, declare as follows:

1.     I have sought or intend to imminently seek *pro hac vice* admission in this Court in connection with the above captioned matter.

2.     I am a partner at the law firm Saul Ewing LLP, counsel for Plaintiffs the American Association of Colleges for Teacher Education, the National Center for Teacher Residencies, and the Maryland Association of Colleges for Teacher Education (collectively, "Plaintiffs").

3.     I submit this declaration in support of Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction and Memorandum of Law in Support thereof.

4.     In support of Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction, I attach true and correct copies of the following exhibits:

     a.    <u>Exhibit A</u>: Examples of Grant Award Notifications sent to grant recipients in February 2025;

     b.    <u>Exhibit B</u>: Examples of Termination Letters sent to grant recipients in February 2025;

JA 89

    c.   <u>Exhibit C</u>: This Court's Order entered in *National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025); and

    d.   <u>Exhibit D</u>: The Department of Education's February 17, 2025 Press Release.

I declare that the foregoing is true and correct.

Respectfully submitted,

Date: March 3, 2025

_____

Joshua W. B. Richards
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102
(215) 972-7737
joshua.richards@saul.com

*Attorney for Plaintiffs*

JA 90

# Exhibit A

S423A220008 - 24

Bill Kennedy

National Center for Teacher Residencies

1332 N. Halsted Street

#304

Chicago, IL 60642

S423A220008 - 24

Bill Kennedy
National Center for Teacher Residencies
1332 N. Halsted Street
#304
CHICAGO, IL 60642



S423A220008 - 24

**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

| | | | |
|---|---|---|---|
| **1** | RECIPIENT NAME<br><br>National Center for Teacher Residencies<br>1332 N. Halsted Street<br>#304<br>CHICAGO, IL 60642 | **2** | AWARD INFORMATION<br><br>PR/AWARD NUMBER    S423A220008 - 24<br>ACTION NUMBER      9<br>ACTION TYPE        Administrative<br>AWARD TYPE         Discretionary |
| **3** | PROJECT STAFF<br><br>RECIPIENT PROJECT DIRECTOR<br>  Bill Kennedy          (312) 330-8311<br>  bkennedy@nctresidencies.org<br>EDUCATION PROGRAM CONTACT<br>  Melissa Harper-Butler    (202) 453-5631<br>  Mel.Harper-<br>  Butler@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK      888-336-8930<br>  obssed@servicenowservices.com | **4** | PROJECT TITLE<br><br>84.423A<br>Centering Equity: Building & Scaling Teacher Residencies |

| | |
|---|---|
| **5** | KEY PERSONNEL |

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Bill Kennedy | Project Director | 62 % |

| | |
|---|---|
| **6** | AWARD PERIODS<br><br>      BUDGET PERIOD      10/01/2024 - 02/10/2025<br>      PERFORMANCE PERIOD  10/01/2022 - 02/10/2025<br><br>FUTURE BUDGET PERIODS<br><br>N/A |

| | |
|---|---|
| **7** | AUTHORIZED FUNDING<br><br>            THIS ACTION        N/A<br>            BUDGET PERIOD      $1,614,988.00<br>            PERFORMANCE PERIOD  $6,262,866.00 |

| | |
|---|---|
| **8** | ADMINISTRATIVE INFORMATION<br><br>      UEI          DMKFJA9LJ9J5<br>      REGULATIONS  CFR PART XXX<br>                   EDGAR AS APPLICABLE<br>                   2 CFR AS APPLICABLE<br>      ATTACHMENTS  N/A |

| | |
|---|---|
| **9** | LEGISLATIVE AND FISCAL DATA<br><br>   AUTHORITY:          PL P.L. 114–95 II DEPARTMENT OF DEFENSE AND FULL YEAR<br>                       CONTINUING APPROPRIATIONS ACT<br>   PROGRAM TITLE:      SUPPORTING EFFECTIVE EDUCATOR DEVELOPMENT<br>   CFDA/SUBPROGRAM NO:  84.423A |

JA 94

S423A220008 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S423A220008 - 24 |
| RECIPIENT NAME: | National Center for Teacher Residencies |
| GRANTEE NAME: | NATIONAL CENTER FOR TEACHER RESIDENCIES, INC |
| | 1332 N HALSTED ST STE 304, |
| | CHICAGO, IL 60642 - 2694 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1)   The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253.

**AUTHORIZING OFFICIAL**                          **DATE**

Ver. 1

JA 95

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**     (See Block 2 of the Notification)

**1. RECIPIENT NAME** - The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION** -   Unique items of information that identify this notification.

    **PR/AWARD NUMBER** -   A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

    **ACTION NUMBER** -   A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

    **ACTION TYPE** -   The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

    **AWARD TYPE** -   The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF** -   This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

    **\*RECIPIENT PROJECT DIRECTOR** -   The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

    **EDUCATION PROGRAM CONTACT** -   The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

    **EDUCATION PAYMENT CONTACT** -   The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER** -   Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL** - Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS** -   Project activities and funding are approved with respect to three different time periods, described below:

    **BUDGET PERIOD** -   A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

    **PERFORMANCE PERIOD** -   The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

    **\*FUTURE BUDGET PERIODS** -   The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING** -   The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

    **\*THIS ACTION** - The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

    **\*BUDGET PERIOD** - The total amount of funds available for use by the grantee during the stated budget period to this date.

    **\*PERFORMANCE PERIOD** - The amount of funds obligated from the start date of the first budget period to this date.

    **RECIPIENT COST SHARE** -   The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

    **RECIPIENT NON-FEDERAL AMOUNT** - The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION** -   This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

    **UEI** -   The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

JA 96

**\*REGULATIONS -**  Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -**  Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -**  The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -** The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.

**AMOUNT -**  The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -**  Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -**  The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -**  The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -**  The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -**  The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -**  The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -**  The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -**  The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -**  If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

---

\* This item differs or does not appear on formula and block grants.

S336S230042 - 24

Carolyn Parker

American University

American University

4400 Massachusetts Ave. NW

Washington, DC 20016

S336S230042 - 24

Diana Burley
American University
American University
4400 Massachusetts Avenue, NW
Washington, DC 20016

S336S230042 - 24



## US Department of Education
### Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| | | | |
|---|---|---|---|
| **1** | RECIPIENT NAME<br><br>American University<br>American University<br>4400 Massachusetts Avenue, NW<br>Washington, DC 20016 | **2** | AWARD INFORMATION<br><br>PR/AWARD NUMBER   S336S230042 - 24<br>ACTION NUMBER   4<br>ACTION TYPE   Administrative<br>AWARD TYPE   Discretionary |

| | | | |
|---|---|---|---|
| **3** | PROJECT STAFF<br><br>RECIPIENT PROJECT DIRECTOR<br>  Carolyn Parker    (202) 885-6259<br>  caparker@american.edu<br>EDUCATION PROGRAM CONTACT<br>  Louis Edwards    (202) 453-6778<br>  LOUIS.EDWARDS@ED.GOV<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK    888-336-8930<br>  obssed@servicenowservices.com | **4** | PROJECT TITLE<br><br>84.336S<br>Residency for Excellence in Teaching and Learning (RETL) |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Carolyn Parker | Project Director | 0 % |

**6** AWARD PERIODS

            BUDGET PERIOD     10/01/2024 - 02/12/2025
       PERFORMANCE PERIOD     10/01/2023 - 02/12/2025

FUTURE BUDGET PERIODS

N/A

**7** AUTHORIZED FUNDING

            THIS ACTION     N/A
            BUDGET PERIOD     $299,619.00
      PERFORMANCE PERIOD     $514,788.00

**8** ADMINISTRATIVE INFORMATION

            UEI    H4VNDUN2VWU5
     REGULATIONS    EDGAR AS APPLICABLE
                    2 CFR AS APPLICABLE
     ATTACHMENTS    N/A

**9** LEGISLATIVE AND FISCAL DATA

    AUTHORITY:             PL P.L. 110-315 TITLE II HIGHER EDUCATION ACT, AS AMENDED
    PROGRAM TITLE:      TEACHER QUALITY ENHANCEMENT GRANTS FOR STATE AND
                            PARTNERSHIPS
    CFDA/SUBPROGRAM NO:    84.336S

JA 100

S336S230042 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S336S230042 - 24 |
| RECIPIENT NAME: | American University |
| | American University |
| GRANTEE NAME: | AMERICAN UNIVERSITY |
| | 4400 MASSACHUSETTS AVE NW, |
| | WASHINGTON, DC 20016 - 8003 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1)    THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)    The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253.

_____          _____

**AUTHORIZING OFFICIAL**                                             **DATE**

Ver. 1

JA 101

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

> **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

> **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

> **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

> **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

> **\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

> **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

> **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

> **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

> **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

> **\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

> **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

> **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

> **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

> **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

> **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

> **UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

JA 102

**\*REGULATIONS –** Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.

**AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

\* This item differs or does not appear on formula and block grants.

JA 103

S336S200016 - 23

Shelley Neilsen Gatti
University of St. Thomas
School of Education
2115 Summit Avenue
Saint Paul, MN 55105

S336S200016 - 23

Michael Warnock
University of St. Thomas
School of Education
2115 Summit Ave W
St. Paul, MN 55105

S336S200016 - 23



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| University of St. Thomas<br>School of Education<br>2115 Summit Ave W<br>St. Paul, MN 55105 | PR/AWARD NUMBER    S336S200016 - 23<br>ACTION NUMBER    9<br>ACTION TYPE    Administrative<br>AWARD TYPE    Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>   Shelley Neilsen Gatti      (651) 962-4396<br>   slneilsengat@stthomas.edu<br>EDUCATION PROGRAM CONTACT<br>   Diana Schneider      (202) 401-1456<br>   diana.schneider@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>   G5 PAYEE HELPDESK      888-336-8930<br>   obssed@servicenowservices.com | 84.336S<br>PREPARE Highly Effective Diverse and Culturally Relevant<br>Educators through Residency Pathways |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Shelley Neilsen Gatti | Project Director | 25 % |
| Michael Warnock | Authorized Representative | 1 % |

**6** AWARD PERIODS

     BUDGET PERIOD      10/01/2023 - 09/30/2024
     PERFORMANCE PERIOD      10/01/2020 - 02/12/2025

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 5 | 10/01/2024 - 02/12/2025 | $691,352.00 |

**7** AUTHORIZED FUNDING

     THIS ACTION      N/A
     BUDGET PERIOD      $689,988.00
     PERFORMANCE PERIOD      $2,804,102.00

**8** ADMINISTRATIVE INFORMATION

     UEI      LVV9V64A8449
     REGULATIONS      EDGAR AS APPLICABLE
                    2 CFR AS APPLICABLE
     ATTACHMENTS      N/A

**9** LEGISLATIVE AND FISCAL DATA

     AUTHORITY:      PL P.L. 110-315 TITLE II HIGHER EDUCATION ACT, AS AMENDED
     PROGRAM TITLE:      TEACHER QUALITY ENHANCEMENT GRANTS FOR STATE AND
                    PARTNERSHIPS
     CFDA/SUBPROGRAM NO:      84.336S

JA 106

S336S200016 - 23



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S336S200016 - 23 |
| RECIPIENT NAME: | University of St. Thomas |
| | School of Education |
| GRANTEE NAME: | UNIVERSITY OF ST. THOMAS |
| | 2115 SUMMIT AVE, |
| | SAINT PAUL, MN 55105 - 1048 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 2% |

TERMS AND CONDITIONS

(1) THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2) The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253.

_____     _____

**AUTHORIZING OFFICIAL**                  **DATE**

Ver. 1

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**    (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

> **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

> **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

> **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

> **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

> ***RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

> **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

> **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

> **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

> **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

> ***FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

> ***THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

> ***BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

> ***PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

> **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

> **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

> **UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

**\*REGULATIONS –** Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

\* This item differs or does not appear on formula and block grants.

S423A230033 - 24

Laroye L Stansberry Brusnahan
University of St. Thomas
School of Education
2115 Summit Avenue
St. Paul, MN 55105

S423A230033 - 24

Michael J Warnock
University of St. Thomas
School of Education
2115 Summit Avenue
2115 Summit Ave W
St. Paul, MN 55105



S423A230033 - 24

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| | | | |
|---|---|---|---|
| **1** | RECIPIENT NAME<br><br>University of St. Thomas<br>School of Education<br>2115 Summit Avenue<br>2115 Summit Ave W<br>St. Paul, MN 55105 | **2** | AWARD INFORMATION<br><br>PR/AWARD NUMBER  S423A230033 - 24<br>ACTION NUMBER  5<br>ACTION TYPE  Administrative<br>AWARD TYPE  Discretionary |
| **3** | PROJECT STAFF<br><br>RECIPIENT PROJECT DIRECTOR<br>  Laroye L Stansberry    (414) 759-8917<br>  Brusnahan<br>  llstansberry@stthomas.edu<br>EDUCATION PROGRAM CONTACT<br>  Melissa Harper-Butler    (202) 453-5631<br>  Mel.Harper-<br>  Butler@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK    888-336-8930<br>  obssed@servicenowservices.com | **4** | PROJECT TITLE<br><br>84.423A<br>Learn, Work, and Earn: "Grow Your Own" Practice-Based<br>Residency Pathways to Prepare Effective Educators |

| | |
|---|---|
| **5** | KEY PERSONNEL |

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Laroye L Stansberry<br>Brusnahan | Project Director | 11 % |

| | |
|---|---|
| **6** | AWARD PERIODS |

        BUDGET PERIOD      10/01/2024 - 02/07/2025
     PERFORMANCE PERIOD      10/01/2023 - 02/07/2025

FUTURE BUDGET PERIODS

N/A

| | |
|---|---|
| **7** | AUTHORIZED FUNDING |

             THIS ACTION        N/A
          BUDGET PERIOD     $3,219,601.00
    PERFORMANCE PERIOD    $5,296,329.00

| | |
|---|---|
| **8** | ADMINISTRATIVE INFORMATION |

           UEI     MEQUD34ZB1Y6
    REGULATIONS     CFR PART XXX
                 EDGAR AS APPLICABLE
                 2 CFR AS APPLICABLE
    ATTACHMENTS    2 , 3 , 6 , 8 , 9 , 11 , 12 , 13 , 14 , GE1 , GE2 , GE3 , GE4 , GE5 , TERMUST

| | |
|---|---|
| **9** | LEGISLATIVE AND FISCAL DATA |

  AUTHORITY:             PL P.L. 114–95 II DEPARTMENT OF DEFENSE AND FULL YEAR
                         CONTINUING APPROPRIATIONS ACT
  PROGRAM TITLE:      SUPPORTING EFFECTIVE EDUCATOR DEVELOPMENT
  CFDA/SUBPROGRAM NO:    84.423A

JA 112

S423A230033 - 24



### US Department of Education
### Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S423A230033 - 24 |
| RECIPIENT NAME: | University of St. Thomas |
| | School of Education |
| GRANTEE NAME: | UNIVERSITY OF ST THOMAS |
| | 2115 SUMMIT AVE, |
| | SAINT PAUL, MN 55105 - 1048 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1) THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2) The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253.

_____    _____

**AUTHORIZING OFFICIAL**                        **DATE**

Ver. 1

JA 113

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

   **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

   **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

   **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

   **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

   **\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

   **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

   **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

   **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

   **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

   **\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

   **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

   **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

   **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

   **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

   **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

   **UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

JA 114

**\*REGULATIONS –** Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -** The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.

**AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

---

\* This item differs or does not appear on formula and block grants.

S336S200017 - 24
David Roth
Alder Graduate School of Education
2946 Broadway
Suite B
Redwood City, CA 94062

S336S200017 - 24

Heather Kirkpatrick
Alder Graduate School of Education
2946 Broadway
Suite B
Redwood City, CA 94062

S336S200017 - 24



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| Alder Graduate School of Education<br>2946 Broadway<br>Suite B<br>Redwood City, CA 94062 | PR/AWARD NUMBER  S336S200017 - 24<br>ACTION NUMBER  14<br>ACTION TYPE  Administrative<br>AWARD TYPE  Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>  David Roth  (805) 234-4944<br>  droth@aldergse.edu<br>EDUCATION PROGRAM CONTACT<br>  Louis Edwards  (202) 453-6778<br>  LOUIS.EDWARDS@ED.GOV<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK  888-336-8930<br>  obssed@servicenowservices.com | 84.336S<br>Empowering Districts to Build Sustainable Pipelines of<br>Effective Teachers for High-Need Schools |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| David Roth | Project Director | 25 % |

**6** AWARD PERIODS

　　　　BUDGET PERIOD　　　　10/01/2024 - 02/13/2025
　　　　PERFORMANCE PERIOD　　10/01/2020 - 02/13/2025

FUTURE BUDGET PERIODS

N/A

**7** AUTHORIZED FUNDING

　　　　　　　　THIS ACTION　　　　　N/A
　　　　　　　　BUDGET PERIOD　　　$365,262.00
　　　　　　PERFORMANCE PERIOD　　$6,513,745.00

**8** ADMINISTRATIVE INFORMATION

　　　　　　　UEI　　　Q5UNGJK7K1M4
　　　REGULATIONS　　EDGAR AS APPLICABLE
　　　　　　　　　　　2 CFR AS APPLICABLE
　　　ATTACHMENTS　　N/A

**9** LEGISLATIVE AND FISCAL DATA

　　AUTHORITY:　　　　　　PL P.L. 110-315 TITLE II HIGHER EDUCATION ACT, AS AMENDED
　　PROGRAM TITLE:　　　　TEACHER QUALITY ENHANCEMENT GRANTS FOR STATE AND
　　　　　　　　　　　　　PARTNERSHIPS
　　CFDA/SUBPROGRAM NO:　84.336S

JA 118

S336S200017 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S336S200017 - 24 |
| RECIPIENT NAME: | Alder Graduate School of Education |
| GRANTEE NAME: | ALDER GRADUATE SCHOOL OF EDUCATION |
| | 2946 BROADWAY, |
| | REDWOOD CITY, CA 94062 - 1510 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1)  THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)  On Wednesday, February 12, 2025, you received an administrative action notice through the G5 system, alerting you through an updated grant award notice (GAN) that one of your grants had been deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253. An email notification terminating the grant should have preceded the administrative action, but in fact, there was a subset of them that were not dispatched until today, Thursday, February 13, 2025. What this means for your grant and program is that the effective date will be extended, and the effective date of the termination action will be as of today, February 13, 2025 instead, and not yesterday, February 12, 2025. We apologize for this timing error, and we regret any confusion or inconvenience the sequence of these actions may have caused. This GAN reflects the new effective date for the termination, replacing yesterday s date. Thank you for your understanding.

_____     _____

**AUTHORIZING OFFICIAL**                          **DATE**

Ver. 1

JA 119

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**     (See Block 2 of the Notification)

**1. RECIPIENT NAME –** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION –** Unique items of information that identify this notification.

    **PR/AWARD NUMBER –** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

    **ACTION NUMBER –** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

    **ACTION TYPE –** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

    **AWARD TYPE –** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF –** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

    **\*RECIPIENT PROJECT DIRECTOR –** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

    **EDUCATION PROGRAM CONTACT –** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

    **EDUCATION PAYMENT CONTACT –** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER –** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL –** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS –** Project activities and funding are approved with respect to three different time periods, described below:

    **BUDGET PERIOD –** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

    **PERFORMANCE PERIOD –** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

    **\*FUTURE BUDGET PERIODS –** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING –** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

    **\*THIS ACTION –** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

    **\*BUDGET PERIOD –** The total amount of funds available for use by the grantee during the stated budget period to this date.

    **\*PERFORMANCE PERIOD –** The amount of funds obligated from the start date of the first budget period to this date.

    **RECIPIENT COST SHARE –** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

    **RECIPIENT NON-FEDERAL AMOUNT –** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION –** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

    **UEI –** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

**\*REGULATIONS –**  Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -**  Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -**  The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.

**AMOUNT -**  The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -**  Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -**  The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -**  The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -**  The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -**  The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -**  The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -**  The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -**  The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -**  If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

* This item differs or does not appear on formula and block grants.

S336S220029 - 24
David Roth
Alder Graduate School of Education
2946 Broadway
Suite B
Redwood City, CA 94062

S336S220029 - 24

Heather Kirkpatrick
Alder Graduate School of Education
2946 Broadway
Suite B
Redwood City, CA 94062

S336S220029 - 24



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| | | | |
|---|---|---|---|
| **1** | RECIPIENT NAME<br><br>Alder Graduate School of Education<br>2946 Broadway<br>Suite B<br>Redwood City, CA 94062 | **2** | AWARD INFORMATION<br><br>PR/AWARD NUMBER  S336S220029 - 24<br>ACTION NUMBER  9<br>ACTION TYPE  Administrative<br>AWARD TYPE  Discretionary |
| **3** | PROJECT STAFF<br><br>RECIPIENT PROJECT DIRECTOR<br>  David Roth<br>  droth@aldergse.edu<br>EDUCATION PROGRAM CONTACT<br>  Louis Edwards          (202) 453-6778<br>  LOUIS.EDWARDS@ED.GOV<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK      888-336-8930<br>  obssed@servicenowservices.com | **4** | PROJECT TITLE<br><br>84.336S<br>Promoting Equity by Building Sustainable Pipelines of Diverse, Effective Educators |

| | |
|---|---|
| **5** | KEY PERSONNEL |

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| David Roth | Project Director | 30 % |

| | |
|---|---|
| **6** | AWARD PERIODS |

|  |  |
|---|---|
| BUDGET PERIOD | 10/01/2024 - 02/13/2025 |
| PERFORMANCE PERIOD | 10/01/2022 - 02/13/2025 |

FUTURE BUDGET PERIODS

N/A

| | |
|---|---|
| **7** | AUTHORIZED FUNDING |

|  |  |
|---|---|
| THIS ACTION | N/A |
| BUDGET PERIOD | $1,484,225.00 |
| PERFORMANCE PERIOD | $3,797,124.00 |

| | |
|---|---|
| **8** | ADMINISTRATIVE INFORMATION |

|  |  |
|---|---|
| UEI | Q5UNGJK7K1M4 |
| REGULATIONS | EDGAR AS APPLICABLE |
|  | 2 CFR AS APPLICABLE |
| ATTACHMENTS | N/A |

| | |
|---|---|
| **9** | LEGISLATIVE AND FISCAL DATA |

|  |  |
|---|---|
| AUTHORITY: | PL P.L. 110-315 TITLE II HIGHER EDUCATION ACT, AS AMENDED |
| PROGRAM TITLE: | TEACHER QUALITY ENHANCEMENT GRANTS FOR STATE AND PARTNERSHIPS |
| CFDA/SUBPROGRAM NO: | 84.336S |

JA 124

S336S220029 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S336S220029 - 24 |
| RECIPIENT NAME: | Alder Graduate School of Education |
| GRANTEE NAME: | ALDER GRADUATE SCHOOL OF EDUCATION |
| | 2946 BROADWAY, |
| | REDWOOD CITY, CA 94062 - 1510 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1)  THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)  On Wednesday, February 12, 2025, you received an administrative action notice through the G5 system, alerting you through an updated grant award notice (GAN) that one of your grants had been deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253. An email notification terminating the grant should have preceded the administrative action, but in fact, there was a subset of them that were not dispatched until today, Thursday, February 13, 2025. What this means for your grant and program is that the effective date will be extended, and the effective date of the termination action will be as of today, February 13, 2025 instead, and not yesterday, February 12, 2025. We apologize for this timing error, and we regret any confusion or inconvenience the sequence of these actions may have caused. This GAN reflects the new effective date for the termination, replacing yesterday s date. Thank you for your understanding.

_____          _____

**AUTHORIZING OFFICIAL**                                         **DATE**

Ver. 1

JA 125

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

   **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

   **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

   **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

   **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

   **\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

   **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

   **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

   **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

   **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

   **\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

   **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

   **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

   **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

   **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

   **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

   **UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

JA 126

**\*REGULATIONS –** Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

* This item differs or does not appear on formula and block grants.

S374A230040 - 24
Cynite Ola
Teaching Lab
1802 Vernon St NW
Pmb 533
Washington, DC 20009

S374A230040 - 24

Sarah Johnson
Teaching Lab
1802 Vernon St. NW
PMB 533
Washington, DC 20009

S374A230040 - 24



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| Teaching Lab<br>1802 Vernon St. NW<br>PMB 533<br>Washington, DC 20009 | PR/AWARD NUMBER    S374A230040 - 24<br>ACTION NUMBER    5<br>ACTION TYPE    Administrative<br>AWARD TYPE    Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>   Cynite Ola      512.293.5854<br>   cynite.ola@teachinglab.org<br>EDUCATION PROGRAM CONTACT<br>   Bryan Hale<br>   bryan.hale@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>   G5 PAYEE HELPDESK    888-336-8930<br>   obssed@servicenowservices.com | 84.374A<br>Teaching Lab's Project RISE: Refine, Innovate, Share, and Elevate |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Cynite Ola | Project Director | 100 % |

**6** AWARD PERIODS

       BUDGET PERIOD      10/01/2024 - 02/18/2025
       PERFORMANCE PERIOD      10/01/2023 - 02/18/2025

FUTURE BUDGET PERIODS

N/A

**7** AUTHORIZED FUNDING

| | |
|---|---|
| THIS ACTION | N/A |
| BUDGET PERIOD | $4,578,311.00 |
| PERFORMANCE PERIOD | $11,099,378.00 |
| RECIPIENT COST-SHARE | 0.00% |
| RECIPIENT NON-FEDERAL AMOUNT | $0.00 |

**8** ADMINISTRATIVE INFORMATION

| | |
|---|---|
| UEI | S79QLA3H92D7 |
| REGULATIONS | CFR PART D |
| | EDGAR AS APPLICABLE |
| | 2 CFR AS APPLICABLE |
| ATTACHMENTS | N/A |

**9** LEGISLATIVE AND FISCAL DATA

| | |
|---|---|
| AUTHORITY: | PL 109-149 V ELEMENTARY AND SECONDARY EDUCATION ACT, AS AMENDED |
| PROGRAM TITLE: | TEACHER INCENTIVE FUND |
| CFDA/SUBPROGRAM NO: | 84.374A |

JA 130

S374A230040 - 24



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

**10**

PR/AWARD NUMBER:          S374A230040 - 24
RECIPIENT NAME:           Teaching Lab
GRANTEE NAME:             TEACHING LAB
                          1802 VERNON ST NW,
                          WASHINGTON, DC -
PROGRAM INDIRECT COST TYPE:   Restricted
PROJECT INDIRECT COST RATE:   10%

TERMS AND CONDITIONS

(1)   THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE
      DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)   The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)
      (4); see also 34 C.F.R. 75.253.

_____          _____

**AUTHORIZING OFFICIAL**                                 **DATE**

Ver. 1

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME –** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION –** Unique items of information that identify this notification.

    **PR/AWARD NUMBER –** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

    **ACTION NUMBER –** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

    **ACTION TYPE –** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

    **AWARD TYPE –** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF –** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

    **\*RECIPIENT PROJECT DIRECTOR –** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

    **EDUCATION PROGRAM CONTACT –** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

    **EDUCATION PAYMENT CONTACT –** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER –** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL –** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS –** Project activities and funding are approved with respect to three different time periods, described below:

    **BUDGET PERIOD –** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

    **PERFORMANCE PERIOD –** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

    **\*FUTURE BUDGET PERIODS –** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING –** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

    **\*THIS ACTION –** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

    **\*BUDGET PERIOD –** The total amount of funds available for use by the grantee during the stated budget period to this date.

    **\*PERFORMANCE PERIOD –** The amount of funds obligated from the start date of the first budget period to this date.

    **RECIPIENT COST SHARE –** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

    **RECIPIENT NON-FEDERAL AMOUNT –** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION –** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

    **UEI –** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

JA 132

**\*REGULATIONS –**  Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -**  Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -**  The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT -**  The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -**   Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -**   The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -**  The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -**  The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -**  The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -**  The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -**  The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -**   The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -**   The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -**   The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -**  If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

---

\* This item differs or does not appear on formula and block grants.

Exhibit B



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

RE: Grant Award Termination

Dear _____:

This letter provides notice that the United States Department of Education is terminating your federal award, _____. *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253.  Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. _____ in its entirety effective _____.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 135

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice. Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Thank you,

cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 136



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

Carolyn  Parker
Project Director
AMERICAN UNIVERSITY
4400 Massachusetts Ave. NW
Washington, DC 20016

RE: Grant Award Termination

Dear  Carolyn  Parker  :

This letter provides notice that the United States Department of Education is terminating your federal award,  S336S230042          . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No.  S336S230042         in its entirety effective _____.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 137

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice. Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,



 Deputy Assistant Secretary for Management and Planning


cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 138



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

Shelley  Neilsen Gatti
Project Director
UNIVERSITY OF ST. THOMAS
2115 Summit Avenue
Saint Paul, MN 55105

RE: Grant Award Termination

Dear  Shelley  Neilsen Gatti

This letter provides notice that the United States Department of Education is terminating your
federal award,  S336S200016        . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education
throughout the United States. The Acting Secretary of Education has determined that, per the
Department's obligations to the constitutional and statutory law of the United States, this priority
includes ensuring that the Department's grants do not support programs or organizations that
promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives
that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another
protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose
of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness,
and excellence in education. In addition to complying with the civil rights laws, it is vital that the
Department assess whether all grant payments are free from fraud, abuse, and duplication, as well
as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI
initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex,
national origin, or another protected characteristic; that violate either the letter or purpose of
Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness,
and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise
fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no
longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. §
75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. §
75.253, and the termination provisions in your grant award, the Department hereby terminates
grant No.  S336S200016        in its entirety effective _____.

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by*
*fostering educational excellence and ensuring equal access.*

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice.  Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,



 Deputy Assistant Secretary for Management and Planning


cc: Ruth Ryder

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 140



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SECONDARY AND ELEMENTARY EDUCATION
OFFICE OF ADMINISTRATION

February 7, 2025

Laroye Stansberry Brusnahan, Ph.D.
Project Director
University of St. Thomas School of Education
c/o 2115 Summit Avenue
St. Paul, MN  55105

RE: Grant Award Termination

Dear Dr. Brusnahan:

This letter provides notice that the United States Department of Education is terminating your federal award, S423A230033. *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253.  Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. S423A230033in its entirety effective February 7, 2025.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 141

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice. Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Thank you,

Mark Washington
Deputy Assistant Secretary for Management & Planning

cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 142



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

David  Roth
Project Director
ALDER GRADUATE SCHOOL OF EDUCATION
2946 Broadway
Suite B
Redwood City, CA 94062

RE: Grant Award Termination

Dear  David  Roth         :

This letter provides notice that the United States Department of Education is terminating your federal award,  S336S200017        . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No.  S336S200017         in its entirety effective _____.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 143

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice. Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,



 Deputy Assistant Secretary for Management and Planning


cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 144



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

David  Roth
Project Director
ALDER GRADUATE SCHOOL OF EDUCATION
2946 Broadway
Suite B
Redwood City, CA 94062

RE: Grant Award Termination

Dear  David  Roth      :

This letter provides notice that the United States Department of Education is terminating your federal award,  S336S220029      . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No.  S336S220029      in its entirety effective  2/13/25      .

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 145

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice. Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,


 Deputy Assistant Secretary for Management and Planning

cc: Ruth Ryder

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 146



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

2/18/2025

Cynite  Ola
Project Director
TEACHING LAB
1802 Vernon St NW
Pmb 533
Washington, DC 20009

RE: Grant Award Termination

Dear  Cynite  Ola          :

This letter provides notice that the United States Department of Education is terminating your federal award,  S374A230040          . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No.  S374A230040          in its entirety effective   2/18/2025          .

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 147

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice.  Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,

Mark Washington
Deputy Assistant Secretary for Management and Planning

cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 148

Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

NATIONAL ASSOCIATION OF
DIVERSITY OFFICERS IN HIGHER
EDUCATION, *et al.*,

    *Plaintiffs*,

    v.

DONALD J. TRUMP, *et al.*,

    *Defendants*

Case No. 1:25-cv-00333-ABA

### PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65, and upon consideration of the

Motion for a Temporary Restraining Order and/or Preliminary Injunction filed by

Plaintiffs National Association of Diversity Officers in Higher Education, the American

Association of University Professors, Restaurant Opportunities Centers United, and the

Mayor and City Council of Baltimore, Maryland (ECF No. 27) (the "Motion"),

Defendants' memorandum in opposition to the Motion (ECF No. 35), Plaintiffs' reply

brief (ECF No. 39), and the exhibits to those submissions, and having held a hearing on

the Motion on February 19, 2025, and for the reasons set forth in the accompanying

Memorandum Opinion, it is hereby ORDERED as follows:

1.    The Motion is GRANTED IN PART and DENIED IN PART.

2.    This Order addresses the following provisions in Exec. Order 14151,

*Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive

Order of January 20, 2025, 90 Fed. Reg. 8339 (Jan. 29, 2025) (the "J20 Order"), and

Exec. Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based*

JA 150

*Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633 (Jan. 31, 2025)

("J21 Order"):

    J20 Order § 2(b)(i) (in part) (the "**Termination Provision**"):

        Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:

            (i) terminate, to the maximum extent allowed by law, . . . all . . . "equity-related" grants or contracts[.]

    J21 Order § 3(b)(iv) (the "**Certification Provision**"):

        The head of each agency shall include in every contract or grant award:

            (A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and

            (B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

    J21 Order § 4(b)(iii) (the "**Enforcement Threat Provision**"):

        To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to encourage the private sector to end illegal discrimination and

preferences, including DEI. The report shall contain a proposed strategic enforcement plan identifying

> . . . (iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars.

3. Defendants other than the President, and other persons who are in active concert or participation with Defendants (the "Enjoined Parties"), shall not:

a. pause, freeze, impede, block, cancel, or terminate any awards, contracts or obligations ("Current Obligations"), or change the terms of any Current Obligation, on the basis of the Termination Provision;

b. require any grantee or contractor to make any "certification" or other representation pursuant to the Certification Provision; or

c. bring any False Claims Act enforcement action, or other enforcement action, pursuant to the Enforcement Threat Provision, including but not limited to any False Claims Act enforcement action premised on any certification made pursuant to the Certification Provision.

Date:  February 21, 2025

_____/s/_____
Adam B. Abelson
United States District Judge

3

JA 152

# Exhibit D

🇺🇸 An official website of the United States government  Here's how you know

U.S. Department of Education

HOME  /  ABOUT US  /  NEWSROOM  /  PRESS RELEASES

PRESS RELEASE

# U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants

U.S. Department of Education Cuts $600 Million in Grants Used to Train Teachers and Education Agencies on Divisive Ideologies

FEBRUARY 17, 2025

The U.S. Department of Education today announced it has terminated over $600 million in grants to institutions and nonprofits that were using taxpayer funds to train teachers and education agencies on divisive ideologies. Training materials included inappropriate and unnecessary topics such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; "anti-racism"; and instruction on white privilege and white supremacy. Additionally, many of these grants included teacher and staff recruiting strategies implicitly and explicitly based on race.

The grants are awarded to teacher preparation programs that train future classroom teachers. Examples from the grant applications included:

- Requiring practitioners to take personal and institutional responsibility for systemic inequities (e.g., racism) and critically reassess their own practices;
- Receiving professional development workshops and equity training on topics such as "Building Cultural Competence," "Dismantling Racial Bias" and "Centering Equity in the Classroom";
- Acknowledging and responding to systemic forms of oppression and inequity, including racism, ableism, "gender-based" discrimination, homophobia, and

JA 154

ageism;

- Building historical and sociopolitical understandings of race and racism to interrupt racial marginalization and oppression of students in planning instruction relationship building discipline and assessment;
- Providing "targeted practices in culturally relevant and responsive teaching abolitionist pedagogies and issues of diversity in classroom management"; and
- Providing spaces for critical reflection to help educators confront biases and have transformative conversations about equity.

---

**CONTACT**

Press Office  |  press@ed.gov  |  (202) 401-1576  |  Office of Communications and Outreach (OCO)

---

**Office of Communications and Outreach (OCO)**

Page Last Reviewed: February 18, 2025

# Related Content

## Office for Civil Rights Launches Title IX Violation Investigations into Maine Department of Education and Maine School District

The Office for Civil Rights announced that it is initiating a directed investigation of the Maine Department of Education amid allegations that it continues to allow male athletes to compete in girls' interscholastic athletics.

FEBRUARY 21, 2025

## U.S. Department of Education's Statement on Title IX Compliance

The U.S. Department of Education's Office for Civil Rights today commended state athletic associations in Wisconsin and New Hampshire for changing their athletic policies to conform to President Trump's Executive Order and antidiscrimination laws.

FEBRUARY 20, 2025

JA 155

## U.S. Department of Education Reduces Federal Overreach in Charter Schools Program

The U.S. Department of Education announced that it has reigned in the federal government's influence over state Charter School Program (CSP) grant awards.

FEBRUARY 20, 2025

**Pay for College**

Fill out the FAFSA

529 Plans

Loan Forgiveness

1098 Tax Forms

**Educational Resources**

504 Plans

FERPA

IEPs (Individualized Education Program)

**Teaching Resources**

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

**File a Report**

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

Student Privacy Complaint Forms

**About Us**

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

**News**

Press Releases

Homeroom Blog

Subscriptions

**Site Notices and Privacy Policies**

Accessibility Support

**ED Archive**

# U.S. Department of Education

     
ES

## Contact Us
### 1-800-USA-LEARN

 www.ed.gov
**An official website of the Department of Education**

About Dept of Education        Accessibility Support        No FEAR Act data

Office of the Inspector General        Performance reports        FOIA        Privacy Policy

ED Archive

JA 157

Looking for U.S. government information and services? **Visit USA.gov**

JA 158

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.,* | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-00702 |
| DENISE CARTER, *et al.,* | |
| *Defendants*. | |

**DECLARATION OF CHERYL HOLCOMB-MCCOY, PH.D., IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY
INJUNCTION**

I, Cheryl Holcomb-McCoy, Ph.D., declare and state under penalty of perjury the following:

1.    I am the Chief Executive Officer/President of American Association of Colleges for Teacher Education ("AACTE"), one of the plaintiffs in this case. I am also a Distinguished Professor of Education at American University.

2.    I am over the age of 18, and I am competent in all respects to testify to the matters below. I understand that this Declaration is for use in connection with the above-captioned civil action, and I make this Declaration based upon my own personal knowledge and my review of the AACTE's business records.

3.    AACTE is a nonprofit association of educator preparation programs, composed of hundreds of public and private colleges and universities and nonprofit teaching organizations. AACTE's member organizations prepare professional educators across the United States and its territories, encompassing teachers, counselors, PK-12 administrators, and college faculty. AACTE's principal place of business is 1602 L St., NW, Suite 601, Washington, DC 20036.

JA 159

4.    AACTE's mission is to elevate education and educator preparation through research, professional practice, advocacy, and collaboration. The termination of the Teacher Quality Partnership Program ("TQP") grants, the Supporting Effective Educator Development Program ("SEED") grants, and the Teacher and School Leader Incentive Program ("TSL") grants directly threatens this mission. These grants fund initiatives that benefit PK-12 students and schools nationwide by supporting innovative approaches to educator preparation and professional development. Through their work, grantees produce evidence-based practices that lead to the preparation of highly qualified teachers, principals, and school-based educators. As the nation's largest organization dedicated to educator preparation, AACTE prioritizes ensuring that every child has access to credentialed, well-prepared educators. These grants are vital to that goal. AACTE plays a crucial role in amplifying their impact by sharing grantees' research, policy insights, and best practices with the broader education community through publications, convenings, annual meetings, and other resources. Preserving these funding sources is essential to sustaining and advancing the quality of educator preparation and, ultimately, student success.

5.    AACTE has 54 member organizations nationwide which were awarded TQP, SEED, and TSL grants and have been and will continue to be substantially and irreparably harmed by the termination of these grants in February 2025.

6.    AACTE has five member organizations which were awarded TQP, SEED, and TSL grants for programs in Maryland, which has resulted in a substantial loss of funds for teacher preparation programs in Maryland.

Pursuant to 28 U. S. C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the  3  day of March, 2025

By: *Cheryl C. Holcomb-McCoy*
Cheryl Holcomb-McCoy, PhD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.,* | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-00702 |
| DENISE CARTER, *et al.,* | |
| *Defendants*. | |

**DECLARATION OF KATHLENE CAMPBELL, PH.D., IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY
INJUNCTION**

I, Kathlene Campbell, Ph.D., declare and state under penalty of perjury the following:

1.      I am the Chief Executive Officer of the National Center for Teacher Residencies ("NCTR"), one of the plaintiffs in this case.

2.       I am over the age of 18, and I am competent in all respects to testify to the matters below.  I understand that this Declaration is for use in connection with the above-captioned civil action, and I make this Declaration based upon my own personal knowledge and my review of the NCTR's business records.

3.      NCTR supports the design of new teacher residency programs and provides consulting to strengthen existing programs across the United States. NCTR is comprised of dozens of network members, including colleges, universities, and nonprofit teaching organizations. NCTR's principal place of business is 1332 N. Halsted Street, Suite 304 Chicago, IL 60642.

4.      NCTR's mission is to transform educator preparation by advancing the teacher residency movement to prepare, support, and retain more effective educators who represent and value the communities they serve. The termination of the TQP, SEED, and TSL grants implicates

JA 162

NCTR's core mission because it removes the financial supports needed to reduce tuition costs for aspiring teachers called teacher residents, pay host K-12 teachers for the work they are doing to support the aspiring teachers, offset the cost for licensure examinations and test prep workshops, and provide a stipend or pay for work the teacher residents are completing through their internships. Without these necessary supports, teacher residencies will be unable to continue to lower the financial barrier to becoming a teacher and ensure the necessary comprehensive preparation is provided to prepare future teachers.

5.      NCTR has twenty-five member organizations nationwide which were awarded SEED, TQP, and TSL grants and have been and will continue to be substantially and irreparably harmed by the termination of these grants in February 2025.

6.      In 2022, NCTR was awarded a three-year grant under the Supporting Effective Educator Development grant program ("SEED").

7.      NCTR's SEED grant funded thirteen teacher residency programs spanning five states. The teacher residency programs consist of partnerships between higher education institutions and K-12 school districts in traditional public and charter schools located in rural, suburban, and urban areas.

8.      The teacher residency programs provide financial support to their participants in the following ways: tuition support, living expense stipends, tutoring in licensing examinations, and emergency funds. The programs also provide mentorship, intensive training and professional development, and summer institutes for mentor teachers.

9.      NCTR's SEED grant is also used to fund a cross-organizational (twelve residency programs) collaborative effort to create and field-test a coherent and aligned vision of mentoring

excellence and collective responsibility. One of the goals of the grant funds was to complete a study of attainable metrics to evaluate mentor teacher impacts on resident learning.

10.    On February 10, 2025, NCTR received an updated Grant Award Notification from the Department of Education that stated that the grant was terminated because it is "inconsistent with, and no longer effectuates, Department priorities." A true and correct copy of the Grant Award Notification is attached as **Exhibit A**.

11.    Also on February 10, 2025, NCTR received a letter from the Department of Education that stated as follows:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

A true and correct copy of the above-referenced letter is attached as **Exhibit B**.

12.    As of February 10, 2025, the Department stopped providing all funding approved by the grant.

13.    The termination of the SEED grant will result in a $1,188,070 overall loss, including a $332,000 direct loss to the grant winning organization, as well as a loss of $360,000 in expenses to contractors and a $495,000 loss in subgrants to the thirteen teacher residency programs.

14.    This $495,000 loss in subgrants will have an adverse impact on the thirteen teacher residency programs, and will directly lead to staff cuts at a number of those institutions. In addition, the grant termination directly affects the 128 teacher residents currently enrolled in the thirteen programs as part of the 2024-25 school year and will also impact the ability of those thirteen programs to enroll the projected 190 teacher residents who plan to begin their residency year this summer 2025. With the termination of the grant, some of the thirteen teacher residency programs will be forced to close.

15.    Programs intended to use subgrant funds to provide tuition relief and stipends for both groups of teacher residents, which would total over 300 teacher residents. This will no longer be possible with the termination of the grant.

16.    The termination of the grant will also directly affect at least 7,500 K-12 students across the five states.

17.    In addition, with the grant's termination, the study of the mentor teacher impact and teacher resident learning will not be completed, depriving Plaintiff NCTR of its capacity to engage in core mission-driven activities, such as publishing about the most promising practices for developing skilled, experienced teachers into impactful mentors of new teacher residents.

18.    Furthermore, without its ability to continue these thirteen teacher residency programs due to the loss of the grant funding, Plaintiff NCTR is deprived of its ability to serve the

K-12 school districts where there is high turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages.

19.    These harms prevent NCTR from engaging in the core activities compelled by its mission and reason for existence.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 2 day of March, 2025

By: _Kathlene H. Campbell_____

Kathlene Campbell, Ph.D.

JA 166

Exhibit A

S423A220008 - 24

Bill Kennedy

National Center for Teacher Residencies

1332 N. Halsted Street

#304

Chicago, IL 60642

S423A220008 - 24

Bill Kennedy
National Center for Teacher Residencies
1332 N. Halsted Street
#304
CHICAGO, IL 60642



S423A220008 - 24

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| National Center for Teacher Residencies<br>1332 N. Halsted Street<br>#304<br>CHICAGO, IL 60642 | PR/AWARD NUMBER   S423A220008 - 24<br>ACTION NUMBER   9<br>ACTION TYPE   Administrative<br>AWARD TYPE   Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>  Bill Kennedy    (312) 330-8311<br>  bkennedy@nctresidencies.org<br>EDUCATION PROGRAM CONTACT<br>  Melissa Harper-Butler    (202) 453-5631<br>  Mel.Harper-<br>  Butler@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK    888-336-8930<br>  obssed@servicenowservices.com | 84.423A<br>Centering Equity: Building & Scaling Teacher Residencies |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Bill Kennedy | Project Director | 62 % |

**6** AWARD PERIODS

        BUDGET PERIOD    10/01/2024 - 02/10/2025
      PERFORMANCE PERIOD    10/01/2022 - 02/10/2025

FUTURE BUDGET PERIODS

N/A

**7** AUTHORIZED FUNDING

            THIS ACTION    N/A
           BUDGET PERIOD    $1,614,988.00
      PERFORMANCE PERIOD    $6,262,866.00

**8** ADMINISTRATIVE INFORMATION

            UEI    DMKFJA9LJ9J5
     REGULATIONS    CFR PART XXX
                  EDGAR AS APPLICABLE
                  2 CFR AS APPLICABLE
     ATTACHMENTS    N/A

**9** LEGISLATIVE AND FISCAL DATA

  AUTHORITY:               PL P.L. 114–95 II DEPARTMENT OF DEFENSE AND FULL YEAR
                                CONTINUING APPROPRIATIONS ACT
  PROGRAM TITLE:          SUPPORTING EFFECTIVE EDUCATOR DEVELOPMENT
  CFDA/SUBPROGRAM NO:    84.423A

S423A220008 - 24



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S423A220008 - 24 |
| RECIPIENT NAME: | National Center for Teacher Residencies |
| GRANTEE NAME: | NATIONAL CENTER FOR TEACHER RESIDENCIES, INC |
| | 1332 N HALSTED ST STE 304, |
| | CHICAGO, IL 60642 - 2694 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1) The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253.

**AUTHORIZING OFFICIAL**        **DATE**

Ver. 1

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

  **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

  **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

  **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

  **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

  **\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

  **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

  **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

  **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

  **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

  **\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

  **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

  **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

  **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

  **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

  **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

  **UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

*REGULATIONS – Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

*ATTACHMENTS – Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA** – The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS** – The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT** – The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS** – Requirements of the award that are binding on the recipient.

*PARTICIPANT NUMBER – The number of eligible participants the grantee is required to serve during the budget year.

*GRANTEE NAME – The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

*PROGRAM INDIRECT COST TYPE – The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

*PROJECT INDIRECT COST RATE – The indirect cost rate applicable to this grant.

*AUTHORIZING OFFICIAL – The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF** – The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

CURRENT AWARD AMOUNT – The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

PREVIOUS CUMULATIVE AMOUNT – The total amount of funds awarded under the grant before this action.

CUMULATIVE AMOUNT – The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE** – If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

* This item differs or does not appear on formula and block grants.

Exhibit B



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

RE: Grant Award Termination

Dear _____ :

This letter provides notice that the United States Department of Education is terminating your federal award, _____. *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253.  Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. _____ in its entirety effective _____.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 175

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice.  Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Thank you,

cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 176

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER
EDUCATION, *et al.,*

        *Plaintiffs*,

    v.                                Civil Action No. 25-cv-00702

DENISE CARTER, *et al.,*

        *Defendants*.

**DECLARATION OF LAURIE MULLEN, PH.D., IN SUPPORT OF APPLICATION FOR
TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION**

I, Laurie Mullen, Ph.D., declare and state under penalty of perjury the following:

1.     I am the President of Maryland Association of Colleges for Teacher Education ("MACTE"), one of the plaintiffs in this case. I am also the Dean of the College of Education at Towson University.

2.     I am over the age of 18, and I am competent in all respects to testify to the matters below. I understand that this Declaration is for use in connection with the above-captioned civil action, and I make this Declaration based upon my own personal knowledge and my review of the MACTE's business records.

3.     MACTE is a member organization that serves as a distinct statewide voice on matters of importance to educator preparation programs at Maryland's colleges and universities. AACTE and MACTE collaborate to strengthen their advocacy efforts, share experience and expertise, and expand their members' professional development opportunities. MACTE's members include regionally accredited colleges and universities engaged in the preparation of professional school personnel with state program approval. In addition to hosting regular

JA 177

professional learning activities, MACTE serves on the Council of Educational, Administrative and Supervisory Organizations of Maryland (CEASOM) Leadership Team, nominates three representatives to serve on the Professional Standards and Teacher Education Board, and represents Maryland preparation programs at AACTE.

4.     MACTE's principal place of business is 304 Hawkins Hall, Towson University, Towson, MD 21252.

5.     MACTE's mission is to serve as a distinct statewide voice on matters of importance to educator preparation programs at Maryland's colleges and universities. The termination of the Teacher Quality Partnership Program ("TQP") grants and the Supporting Effective Educator Development Program ("SEED") grants implicates MACTE's core mission. MACTE serves the institutions of higher education in Maryland for both the recruitment and retention of future teachers as well as the support and advancement of current classroom teachers. Both the TQP and SEED grants were focused on recruitment, retention of future teachers as well as the support of practicing teachers in Maryland.

6.     MACTE has ten member organizations, all of which are residents of Maryland.

7.     MACTE has three member organizations which were awarded SEED and TQP grants and impacted by the termination of the grants in February 2025, resulting in a substantial loss of funds for teacher preparation programs in Maryland.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 3 day of March, 2025

By: _Laurie Mullen_____
        Laurie Mullen, Ph.D.

JA 178

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.,* | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-00702 |
| DENISE CARTER, *et al.,* | |
| *Defendants*. | |

**DECLARATION OF CAROLYN PARKER, PH.D., IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION**

I, Carolyn Parker, Ph.D., declare and state under penalty of perjury the following:

1.       I am the Associate Dean for Research, Programs, and Partnerships Director of Graduate Teacher Education and Academic Programs School of Education at American University.

2.       I am over the age of 18, and I am competent in all respects to testify to the matters below.  I understand that this Declaration is for use in connection with the above-captioned civil action, and I make this Declaration based upon my own personal knowledge and my review of the American University's business records.

3.       American University ("AU") is a member organization of the American Association of Colleges for Teacher Education, which is a plaintiff in this action.

4.       In 2023, AU was awarded a five-year grant under the Teacher Quality Partnership grant program ("TQP").

5.      AU's TQP grant funds a teacher preparation program for special education (learning disabilities) and early childhood education, the Residency for Excellence in Teaching and Learning ("RETL").

6.      RETL is a partnership between AU's School of Education and its charter network, Washington D.C. Friendship Public Charter Schools, consisting of five charter campuses. The purpose of the partnership is to provide a pathway for educator development to address critical areas of need, including early childhood education and special education,[1] and recruit highly motivated preservice teacher candidates who are committed to teaching in diverse early childhood and special education settings (pre-K through grade five).

7.      The partnership enables participants to complete a residency-based master's degree with an initial teaching license in Early Childhood Education or Special Education - Learning Disabilities. In addition to earning their Masters of Arts in Teaching degree, program participants receive comprehensive coaching, professional development, and ongoing support during the entirety of the three-year program -the residency year (the first year) and the induction years (the second and third year)

8.      RETL supports pathways in high-need teaching areas of early childhood education and special education, specifically targeting urban and underserved geographic areas with their partner charter network. RETL services five Friendship Public Charter campuses.

9.      RETL provides a living stipend to participants and reduced tuition (by roughly 35% of the AU graduate tuition rate) to one of two AU's School of Education's Master of Arts in Teaching degrees, Special Education in Learning Disabilities and Early Childhood Education.

---

[1] Washington D.C. is in need of educators for special education to serve students with disabilities. *See* https://specialedcoop.org/news-articles/the-state-of-special-education-in-the-district-of-columbia/, https://www.washingtonpost.com/opinions/2022/10/27/dc-students-disabilities-urgent-reform/.

10.    On February 12, 2025, AU received an updated Grant Award Notification from the Department of Education that stated that the grant was terminated because it is "inconsistent with, and no longer effectuates, Department priorities." A true and correct copy of the Grant Award Notification is attached as **Exhibit A**.

11.    Also on February 12, 2025, AU received a letter from the Department of Education that stated as follows:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

A true and correct copy of the above-referenced letter is attached as **Exhibit B**.

12.    As of February 12, 2025, the Department stopped providing all funding approved by the grant.

13.    AU was in the second year of RETL when the Department terminated the grant, with eight students who are expected to graduate from AU in December 2025. With the funding from the TQP grant, AU planned to recruit an additional forty participants. As a result of the loss

of funding from the terminated TQP grant, AU will no longer be able to recruit future cohorts. As a result, forty-eight future RETL participants who would have had the opportunity to earn a Master of Arts in Teaching degree and deepen their expertise and longevity as teachers in Washington D.C. will no longer have that opportunity. If funding through the TQP grant is not reinstated, the RETL program will be shut down for lack of funding.

14.     The termination of the TQP grant will halt AU's efforts to remedy dramatic teacher shortages and improve outcomes for early childhood and special education students in Washington D.C. Up to 1,500 Washington D.C. students will be impacted by the termination of the grant, in addition to the educators at the charter school partners.

15.     In addition, AU planned to expand to at least two additional charter schools in the remaining years of the TQP grant. As a result of the Department's termination of AU's grant, there is no opportunity for additional students and educators to be served.

16.     The termination of the TQP grant will also result in AU terminating the employment of its full-time coach/program director.

17.     These harms prevent AU/RETL from engaging in the core activities compelled by their missions and reason for existence.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 2 day of March, 2025

By: *Carolyn Parker* Ph.D
Carolyn Parker, Ph.D.

# Exhibit A

S336S230042 - 24

Carolyn Parker
American University
American University
4400 Massachusetts Ave. NW
Washington, DC 20016

S336S230042 - 24

Diana Burley
American University
American University
4400 Massachusetts Avenue, NW
Washington, DC 20016

S336S230042 - 24



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| American University<br>American University<br>4400 Massachusetts Avenue, NW<br>Washington, DC 20016 | PR/AWARD NUMBER    S336S230042 - 24<br>ACTION NUMBER    4<br>ACTION TYPE    Administrative<br>AWARD TYPE    Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>  Carolyn Parker          (202) 885-6259<br>  caparker@american.edu<br>EDUCATION PROGRAM CONTACT<br>  Louis Edwards          (202) 453-6778<br>  LOUIS.EDWARDS@ED.GOV<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK          888-336-8930<br>  obssed@servicenowservices.com | 84.336S<br>Residency for Excellence in Teaching and Learning (RETL) |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Carolyn Parker | Project Director | 0 % |

**6** AWARD PERIODS

|  |  |
|---|---|
| BUDGET PERIOD | 10/01/2024 - 02/12/2025 |
| PERFORMANCE PERIOD | 10/01/2023 - 02/12/2025 |

FUTURE BUDGET PERIODS

N/A

**7** AUTHORIZED FUNDING

|  |  |
|---|---|
| THIS ACTION | N/A |
| BUDGET PERIOD | $299,619.00 |
| PERFORMANCE PERIOD | $514,788.00 |

**8** ADMINISTRATIVE INFORMATION

|  |  |
|---|---|
| UEI | H4VNDUN2VWU5 |
| REGULATIONS | EDGAR AS APPLICABLE<br>2 CFR AS APPLICABLE |
| ATTACHMENTS | N/A |

**9** LEGISLATIVE AND FISCAL DATA

|  |  |
|---|---|
| AUTHORITY: | PL P.L. 110-315 TITLE II HIGHER EDUCATION ACT, AS AMENDED |
| PROGRAM TITLE: | TEACHER QUALITY ENHANCEMENT GRANTS FOR STATE AND PARTNERSHIPS |
| CFDA/SUBPROGRAM NO: | 84.336S |

JA 186

S336S230042 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S336S230042 - 24 |
| RECIPIENT NAME: | American University |
| | American University |
| GRANTEE NAME: | AMERICAN UNIVERSITY |
| | 4400 MASSACHUSETTS AVE NW, |
| | WASHINGTON, DC 20016 - 8003 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1)  THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)  The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253.

————————————————————————          ——————————

**AUTHORIZING OFFICIAL**                                    **DATE**

Ver. 1

JA 187

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**       (See Block 2 of the Notification)

**1. RECIPIENT NAME** - The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION** - Unique items of information that identify this notification.

  **PR/AWARD NUMBER** - A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

  **ACTION NUMBER** - A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

  **ACTION TYPE** - The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

  **AWARD TYPE** - The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF** - This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

  ***RECIPIENT PROJECT DIRECTOR** - The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

  **EDUCATION PROGRAM CONTACT** - The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

  **EDUCATION PAYMENT CONTACT** - The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER** - Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.* KEY PERSONNEL** - Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS** - Project activities and funding are approved with respect to three different time periods, described below:

  **BUDGET PERIOD** - A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

  **PERFORMANCE PERIOD** - The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

  ***FUTURE BUDGET PERIODS** - The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING** - The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

  ***THIS ACTION** - The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

  ***BUDGET PERIOD** - The total amount of funds available for use by the grantee during the stated budget period to this date.

  ***PERFORMANCE PERIOD** - The amount of funds obligated from the start date of the first budget period to this date.

  **RECIPIENT COST SHARE** - The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

  **RECIPIENT NON-FEDERAL AMOUNT** - The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION** - This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

  **UEI** - The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

**\*REGULATIONS –**  Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -**  Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -**  The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.

**AMOUNT -**  The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -**  Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -**  The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -**  The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -**  The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -**  The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -**  The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -**  The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -**  The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -**  If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

---

\* This item differs or does not appear on formula and block grants.

Exhibit B



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

Carolyn  Parker
Project Director
AMERICAN UNIVERSITY
4400 Massachusetts Ave. NW
Washington, DC 20016

RE: Grant Award Termination

Dear  Carolyn  Parker  :

This letter provides notice that the United States Department of Education is terminating your federal award,  S336S230042        . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No.  S336S230042       in its entirety effective _____.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 191

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice.  Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,

 Deputy Assistant Secretary for Management and Planning

cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 192

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER
EDUCATION, *et al.,*

        *Plaintiffs*,

    v.                                            Civil Action No. 25-cv-00702

DENISE CARTER, *et al.,*

        *Defendants*.

**DECLARATION OF AMY SMITH, PH.D., IN SUPPORT OF APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION**

I, Amy Smith, Ph.D., declare and state under penalty of perjury the following:

    1.    I am the Dean of the School of Education at the University of St. Thomas.

    2.    I am over the age of 18, and I am competent in all respects to testify to the matters

below. I understand that this Declaration is for use in connection with the above-captioned civil

action, and I make this Declaration based upon my own personal knowledge and my review of the

University of St. Thomas' business records.

    3.    The University of St. Thomas ("UST") is a member organization of the American

Association of Colleges for Teacher Education, which is a plaintiff in this action.

    4.    UST was awarded both a five-year grant under the Teacher Quality Partnership

grant program ("TQP") and a three-year grant under the Supporting Effective Educator

Development grant program ("SEED"). UST is in the second year of the SEED grant and in the

fifth year of the TQP grant.

    5.    The UST SEED grant funds three pathway models to a career in education: (1) a

residency program for graduate students in partnership with St. Paul Public Schools, Minneapolis

JA 193

Public Schools, and a consortium of charter schools; (2) a "work and learn" program for graduate students in partnership with schools throughout the state of Minnesota where paraprofessionals and teachers are employed while completing their teacher preparation program; and (3) an undergraduate program which prepares undergraduate students for educational careers in their junior and senior years at UST.

6.       The SEED grant provides funds of up to $20,000 per year for graduate students and up to $40,000 per year to undergraduate students who are pursuing teacher licensure in special education and elementary education.

7.       UST is currently in year two of the three year SEED grant. The grant was set to fund over 300 scholarships to future educators over the three year grant period, most of whom were preparing to be special education teachers. The year two budget is approximately $2,000,000. Scholarships for fall and spring semester were disbursed to students prior to the grant termination. However, without access to the SEED grant funds, UST can no longer provide summer funding to the majority of these future educators. As a result, many of the future educators may not be able to afford the schooling required to continue their path to becoming teachers.

8.       Year three of the SEED grant was set to fund scholarships in the amount of $2,200,000; termination of the grants will result in a loss of all of these scholarships. In addition, termination of the SEED grants will result in a loss of funding for mentor teachers for professional  development.

9.       To date, nearly 80 communities across the state of Minnesota have been taught by teachers who received SEED scholarship funds, including schools in rural, urban, suburban, and exurban communities.

10.    On February 7, 2025, UST received an updated Grant Award Notification from the Department of Education concerning its SEED grant. On February 12, 2025, UST received an updated Grant Award Notification from the Department of Education concerning its TQP grant. Both Grant Award Notification stated that the grants were terminated because they are "inconsistent with, and no longer effectuates, Department priorities." True and correct copies of the Grant Award Notifications are attached as **Exhibit A**.

11.    Also on February 7, 2025 (concerning the SEED grant) and on February 13, 2025 (concerning the TQP grant), UST received letters from the Department of Education that stated as follows:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

True and correct copies of the above-referenced letters are attached as **Exhibit B**.

JA 195

12. As of February 7, 2025, the Department stopped providing funding approved by the SEED grant, and as of February 13, 202, the Department stopped providing funding approved by the TQP grant.

13. Without continued SEED funding, the teacher pipeline program at UST will graduate fewer students capable of serving in high-needs areas such as special education, which I believe will have widespread negative impacts on the many communities, teachers and students these teacher pipeline programs benefit.

14. UST's TQP grant removes financial barriers to careers in education by providing funding for UST to partner with charter schools to provide living wage stipends to student teaching residents preparing to become licensed educators. UST is in year five of this TQP grant, and at present, 21 student teaching residents are in the middle of their second semester of student teaching. Collectively, the student teaching residents were set to receive $819,000 for stipends this academic year (the first half of which has already been paid), however, the termination of the TQP grant will put at risk living-expense stipends for these students after the grant termination date.

15. These harms interfere with UST's ability to serve its students, and through them, to serve the community and fulfill its mission to advance the common good.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. ___

Executed on the   3rd   day of March, 2025

By: _Amy I. Smith_____

Amy Smith, Ph.D.

Exhibit A

S336S200016 - 23

Shelley Neilsen Gatti
University of St. Thomas
School of Education
2115 Summit Avenue
Saint Paul, MN 55105

S336S200016 - 23

Michael Warnock
University of St. Thomas
School of Education
2115 Summit Ave W
St. Paul, MN 55105



S336S200016 - 23

**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| University of St. Thomas<br>School of Education<br>2115 Summit Ave W<br>St. Paul, MN 55105 | PR/AWARD NUMBER   S336S200016 - 23<br>ACTION NUMBER     9<br>ACTION TYPE       Administrative<br>AWARD TYPE       Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>  Shelley Neilsen Gatti    (651) 962-4396<br>  slneilsengat@stthomas.edu<br>EDUCATION PROGRAM CONTACT<br>  Diana Schneider    (202) 401-1456<br>  diana.schneider@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK    888-336-8930<br>  obssed@servicenowservices.com | 84.336S<br>PREPARE Highly Effective Diverse and Culturally Relevant<br>Educators through Residency Pathways |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Shelley Neilsen Gatti | Project Director | 25 % |
| Michael Warnock | Authorized Representative | 1 % |

**6** AWARD PERIODS

        BUDGET PERIOD      10/01/2023 - 09/30/2024
      PERFORMANCE PERIOD      10/01/2020 - 02/12/2025

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 5 | 10/01/2024 - 02/12/2025 | $691,352.00 |

**7** AUTHORIZED FUNDING

          THIS ACTION          N/A
        BUDGET PERIOD     $689,988.00
    PERFORMANCE PERIOD    $2,804,102.00

**8** ADMINISTRATIVE INFORMATION

        UEI     LVV9V64A8449
    REGULATIONS     EDGAR AS APPLICABLE
                 2 CFR AS APPLICABLE
    ATTACHMENTS     N/A

**9** LEGISLATIVE AND FISCAL DATA

    AUTHORITY:          PL P.L. 110-315 TITLE II HIGHER EDUCATION ACT, AS AMENDED
    PROGRAM TITLE:      TEACHER QUALITY ENHANCEMENT GRANTS FOR STATE AND
                       PARTNERSHIPS
    CFDA/SUBPROGRAM NO:    84.336S

JA 200

S336S200016 - 23



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S336S200016 - 23 |
| RECIPIENT NAME: | University of St. Thomas<br>School of Education |
| GRANTEE NAME: | UNIVERSITY OF ST. THOMAS |
| | 2115 SUMMIT AVE, |
| | SAINT PAUL, MN 55105 - 1048 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 2% |

TERMS AND CONDITIONS

(1)  THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)  The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a) (4); see also 34 C.F.R. 75.253.

**AUTHORIZING OFFICIAL**                                        **DATE**

Ver. 1

JA 201

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

**PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

**ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

**ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

**AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

**\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

**EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

**EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

**BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

**PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

**\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

**\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

**\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

**\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

**RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

**RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

**UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

**\*REGULATIONS –**  Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -**  Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -**  The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT -**  The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -**  Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -**  The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -**  The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -**  The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -**  The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -**  The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -**  The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -**  The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -**  If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

\* This item differs or does not appear on formula and block grants.

S423A230033 - 24

Laroye L Stansberry Brusnahan
University of St. Thomas
School of Education
2115 Summit Avenue
St. Paul, MN 55105

S423A230033 - 24

Michael J Warnock
University of St. Thomas
School of Education
2115 Summit Avenue
2115 Summit Ave W
St. Paul, MN 55105



S423A230033 - 24

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| University of St. Thomas<br>School of Education<br>2115 Summit Avenue<br>2115 Summit Ave W<br>St. Paul, MN 55105 | PR/AWARD NUMBER   S423A230033 - 24<br>ACTION NUMBER   5<br>ACTION TYPE   Administrative<br>AWARD TYPE   Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>  Laroye L Stansberry   (414) 759-8917<br>  Brusnahan<br>  llstansberry@stthomas.edu<br>EDUCATION PROGRAM CONTACT<br>  Melissa Harper-Butler   (202) 453-5631<br>  Mel.Harper-<br>  Butler@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK   888-336-8930<br>  obssed@servicenowservices.com | 84.423A<br>Learn, Work, and Earn: "Grow Your Own" Practice-Based<br>Residency Pathways to Prepare Effective Educators |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Laroye L Stansberry<br>Brusnahan | Project Director | 11 % |

**6** AWARD PERIODS

        BUDGET PERIOD    10/01/2024 - 02/07/2025
      PERFORMANCE PERIOD    10/01/2023 - 02/07/2025

FUTURE BUDGET PERIODS

N/A

**7** AUTHORIZED FUNDING

            THIS ACTION       N/A
           BUDGET PERIOD    $3,219,601.00
      PERFORMANCE PERIOD    $5,296,329.00

**8** ADMINISTRATIVE INFORMATION

            UEI    MEQUD34ZB1Y6
     REGULATIONS    CFR PART XXX
                   EDGAR AS APPLICABLE
                   2 CFR AS APPLICABLE
     ATTACHMENTS    2 , 3 , 6 , 8 , 9 , 11 , 12 , 13 , 14 , GE1 , GE2 , GE3 , GE4 , GE5 , TERMUST

**9** LEGISLATIVE AND FISCAL DATA

  AUTHORITY:             PL P.L. 114–95 II DEPARTMENT OF DEFENSE AND FULL YEAR<br>                                CONTINUING APPROPRIATIONS ACT
  PROGRAM TITLE:       SUPPORTING EFFECTIVE EDUCATOR DEVELOPMENT
  CFDA/SUBPROGRAM NO:   84.423A

S423A230033 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S423A230033 - 24 |
| RECIPIENT NAME: | University of St. Thomas |
| | School of Education |
| GRANTEE NAME: | UNIVERSITY OF ST THOMAS |
| | 2115 SUMMIT AVE, |
| | SAINT PAUL, MN 55105 - 1048 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1) THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2) The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253.

_____          _____

**AUTHORIZING OFFICIAL**                          **DATE**

Ver. 1

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

   **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

   **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

   **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

   **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

   **\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

   **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

   **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

   **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

   **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

   **\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

   **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

   **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

   **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

   **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

   **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

   **UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

JA 208

**\*REGULATIONS –**  Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -**  Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -**  The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT -**  The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -**  Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -**  The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -**  The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -**  The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -**  The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -**  The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -**  The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -**  The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -**  If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

* This item differs or does not appear on formula and block grants.

Exhibit B

JA 210



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

Shelley  Neilsen Gatti
Project Director
UNIVERSITY OF ST. THOMAS
2115 Summit Avenue
Saint Paul, MN 55105

RE: Grant Award Termination

Dear  Shelley  Neilsen  Gatti

This letter provides notice that the United States Department of Education is terminating your federal award, __S336S200016__ . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. __S336S200016__ in its entirety effective _____.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 211

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice. Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,



 Deputy Assistant Secretary for Management and Planning

cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 212



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF SECONDARY AND ELEMENTARY EDUCATION
OFFICE OF ADMINISTRATION

February 7, 2025

Laroye Stansberry Brusnahan, Ph.D.
Project Director
University of St. Thomas School of Education
c/o 2115 Summit Avenue
St. Paul, MN 55105

RE: Grant Award Termination

Dear Dr. Brusnahan:

This letter provides notice that the United States Department of Education is terminating your federal award, S423A230033. *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. S423A230033in its entirety effective February 7, 2025.

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 213

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice. Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Thank you,

Mark Washington
Deputy Assistant Secretary for Management & Planning

cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC 20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 214

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER
EDUCATION, *et al.,*

                *Plaintiffs*,

      v.

DENISE CARTER, *et al.,*

                *Defendants*.

Civil Action No. 25-cv-00702

**DECLARATION OF HEATHER KIRKPATRICK, PH.D., IN SUPPORT OF
APPLICATION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY
<u>INJUNCTION</u>**

I, Heather Kirkpatrick, Ph.D., declare and state under penalty of perjury the following:

      1.     I am the President and Chief Executive Officer at Alder Graduate School of Education.

      2.     I am over the age of 18, and I am competent in all respects to testify to the matters below. I understand that this Declaration is for use in connection with the above-captioned civil action, and I make this Declaration based upon my own personal knowledge and my review of Alder Graduate School of Education's business records.

      3.     Alder Graduate School of Education ("Alder GSE") is a member organization of the National Center for Teacher Residencies ("NCTR") and American Association of Colleges for Teacher Education ("AACTE"), which are plaintiffs in this action.

      4.     Alder GSE was awarded a five-year grant under the Teacher Quality Partnership grant program ("TQP") in 2020, as well as a five-year TQP grant in 2022.

      5.     Both of Alder GSE's TQP grants fund teacher residency programs.

6.      The teacher residency programs consist of partnerships between Alder GSE and partner K-12 school systems, including public school districts and a Special Education Planning Area, to operate community-based workforce development pathways for aspiring teachers.

7.      Alder GSE and its partner K-12 school systems recruit and prepare community members through a one-year teacher residency program, where candidates co-teach with a highly qualified mentor teacher while earning their Master's degree and teaching credential. They are often hired immediately upon completion of the program, most often by the school systems where they trained.

8.      Both of Alder GSE's TQP grants are five-year grants. The 2020 TQP grant's goals are (i) launch and scale a new and sustainable residency program with three partner local education agency that meets local human capital needs; (ii) train, support and retain effective new teachers in schools with high concentrations of high need students; and (iii) demonstrate the capacity of partners to scale, sustain, and replicate teacher residency and development model. The 2022 TQP grant's goals are: (i) build a pipeline of high-quality and diverse teachers in partnership with high-need local education agencies that effectively meets their human capital needs and certification shortage areas; (ii) promote equity, strengthen student learning, and meet the social, emotional, and academic needs of students by modeling for and by building the capacity of mentors and residents to use evidence based practices and to create positive and inclusive learning environments; and (iii) increase impact by building capacity, sustainability and scale of the partnership and high-leverage strategies.

9.      On February 13, 2025, Alder GSE received updated Grant Award Notifications from the Department of Education that stated that the grants were terminated because they are

"inconsistent with, and no longer effectuates, Department priorities." True and correct copies of

the Grant Award Notifications are attached as **Exhibit A**.

10.     Also on February 13, 2025, Alder GSE received letters from the Department of

Education that stated as follows:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

True and correct copies of the above-referenced letters are attached as **Exhibit B**.

11.     As of February 13, 2025, the Department stopped providing all funding approved

by the grants.

12.     The termination of the grants has had and will continue to have immense impacts

on the aspiring teacher candidates, mentor teachers, the partner K-12 school systems, and Alder

GSE.

13.     For the 2024-2025 academic year, the teacher residency programs have 83 aspiring

teacher candidates who were receiving a living stipend supplemented by the funds from the TQP

grants. The teaching candidates depend on these stipends to live, eat, and support their families–for most they are their only source of income. The teaching candidates signed Letters of Commitment before June 2024, with the expectation of a level of stipend for the entirety of the school year. The teacher residency programs also presently have 83 mentor teachers who receive a stipend funded by grant funds for their work in support of their efforts to train and develop new teachers. With the termination of the grants, the 83 aspiring teacher candidates and 83 mentor teachers will no longer receive the level of stipends they were promised.

14.    Alder GSE has already recruited 40 new teacher candidates for the 2025-2026 academic year and K-12 school systems had planned to provide the living stipends – the majority of which were planned to be supplemented with TQP grant funds. Alder GSE recruited the majority of these residents with the expectation of a level of funding for their living stipend that was supplemented by the grant funding. The majority of these residents are enrolled, have signed letters of commitment, or are in final rounds of interviews/admissions. The financial impact of the grants' termination will affect many of their decisions to become teachers. Similarly, the grants' termination affects the stipend funding levels for mentors, which will have an impact on their decision to continue with the role.

15.    Alder GSE similarly planned to recruit 40 new teacher candidates and 40 new mentors for the 2026-2027 academic year, however, with the loss in grant funds, it will be more difficult for Alder GSE to recruit and prepare these future prospective candidates.

16.    The termination of the TQP grants has caused and will continue to cause harm to the partner K-12 school systems as well. They are at risk of losing the teacher candidates who taught in their schools, which will have a negative impact on the school and its community. Alder GSE expects about $2.1 million of lost funding for their partner K-12 school systems.

17.    There were also a number of programmatic roles at Alder GSE that were partially supported by these TQP grants. These roles were supporting operation of these partnerships and these residency programs - including recruitment, admissions, enrollment, student services, financial support, data and impact, academic programs, and clinical programs. Alder GSE expects about $2.2 million of lost funding supporting Alder GSE costs to support these partnerships and residency programs.

18.    Additionally, the terminations will cause Alder GSE to lose approximately $600,000 in funding for evaluation contracts. Alder GSE's evaluation partner was providing an important source of formative feedback and evidence of program effectiveness. The evaluation from TQP 2020 has a retention study in progress that is six months to completion, but will likely not be completed as a result of the termination of the grant. The evaluation for TQP 2022 still had 2.5 more years of data collection that has been terminated mid-cycle.

19.    In addition to the dollars lost, the time and resource demands to meet this sudden news has been extraordinary. There have been countless hours of work to communicate clearly to all affected parties and to work with Alder GSE's Board and team on determining ways to mitigate these significant and completely unexpected losses.

20.    These harms prevent Alder GSE from engaging in the core activities compelled by its mission and reason for existence.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the <u>3rd</u> day of March, 2025

By: _____

Heather Kirkpatrick, Ph.D.

# Exhibit A

S336S200017 - 24
David Roth
Alder Graduate School of Education
2946 Broadway
Suite B
Redwood City, CA 94062

S336S200017 - 24

Heather Kirkpatrick
Alder Graduate School of Education
2946 Broadway
Suite B
Redwood City, CA 94062



S336S200017 - 24

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| 1 | RECIPIENT NAME | 2 | AWARD INFORMATION |
|---|---|---|---|

**1  RECIPIENT NAME**

Alder Graduate School of Education
2946 Broadway
Suite B
Redwood City, CA 94062

**2  AWARD INFORMATION**

| PR/AWARD NUMBER | S336S200017 - 24 |
|---|---|
| ACTION NUMBER | 14 |
| ACTION TYPE | Administrative |
| AWARD TYPE | Discretionary |

**3  PROJECT STAFF**

RECIPIENT PROJECT DIRECTOR
David Roth                           (805) 234-4944
droth@aldergse.edu
EDUCATION PROGRAM CONTACT
Louis Edwards                        (202) 453-6778
LOUIS.EDWARDS@ED.GOV
EDUCATION PAYMENT HOTLINE
G5 PAYEE HELPDESK        888-336-8930
obssed@servicenowservices.com

**4  PROJECT TITLE**

84.336S
Empowering Districts to Build Sustainable Pipelines of
Effective Teachers for High-Need Schools

**5  KEY PERSONNEL**

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| David Roth | Project Director | 25 % |

**6  AWARD PERIODS**

|  |  |
|---|---|
| BUDGET PERIOD | 10/01/2024 - 02/13/2025 |
| PERFORMANCE PERIOD | 10/01/2020 - 02/13/2025 |

FUTURE BUDGET PERIODS

N/A

**7  AUTHORIZED FUNDING**

|  |  |
|---|---|
| THIS ACTION | N/A |
| BUDGET PERIOD | $365,262.00 |
| PERFORMANCE PERIOD | $6,513,745.00 |

**8  ADMINISTRATIVE INFORMATION**

| UEI | Q5UNGJK7K1M4 |
|---|---|
| REGULATIONS | EDGAR AS APPLICABLE |
|  | 2 CFR AS APPLICABLE |
| ATTACHMENTS | N/A |

**9  LEGISLATIVE AND FISCAL DATA**

| AUTHORITY: | PL P.L. 110-315 TITLE II HIGHER EDUCATION ACT, AS AMENDED |
|---|---|
| PROGRAM TITLE: | TEACHER QUALITY ENHANCEMENT GRANTS FOR STATE AND PARTNERSHIPS |
| CFDA/SUBPROGRAM NO: | 84.336S |

JA 224

S336S200017 - 24



## US Department of Education
## Washington, D.C. 20202

## GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S336S200017 - 24 |
| RECIPIENT NAME: | Alder Graduate School of Education |
| GRANTEE NAME: | ALDER GRADUATE SCHOOL OF EDUCATION |
| | 2946 BROADWAY, |
| | REDWOOD CITY, CA 94062 - 1510 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1)  THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)  On Wednesday, February 12, 2025, you received an administrative action notice through the G5 system, alerting you through an updated grant award notice (GAN) that one of your grants had been deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253. An email notification terminating the grant should have preceded the administrative action, but in fact, there was a subset of them that were not dispatched until today, Thursday, February 13, 2025. What this means for your grant and program is that the effective date will be extended, and the effective date of the termination action will be as of today, February 13, 2025 instead, and not yesterday, February 12, 2025. We apologize for this timing error, and we regret any confusion or inconvenience the sequence of these actions may have caused. This GAN reflects the new effective date for the termination, replacing yesterday s date. Thank you for your understanding.

_____        _____
**AUTHORIZING OFFICIAL**                                                   **DATE**

Ver. 1

JA 225

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**          (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

    **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

    **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

    **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

    **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

    **\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

    **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

    **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

    **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

    **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

    **\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

    **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

    **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

    **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

    **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

    **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

    **UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

JA 226

**\*REGULATIONS –**  Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -**  Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -**  The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT -**  The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -**  Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -**  The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -**  The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -**  The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -**  The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -**  The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -**  The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -**  The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -**  If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

* This item differs or does not appear on formula and block grants.

S336S220029 - 24
David Roth
Alder Graduate School of Education
2946 Broadway
Suite B
Redwood City, CA 94062

S336S220029 - 24

Heather Kirkpatrick
Alder Graduate School of Education
2946 Broadway
Suite B
Redwood City, CA 94062

S336S220029 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

| | | | |
|---|---|---|---|
| **1** | RECIPIENT NAME<br><br>Alder Graduate School of Education<br>2946 Broadway<br>Suite B<br>Redwood City, CA 94062 | **2** | AWARD INFORMATION<br><br>PR/AWARD NUMBER   S336S220029 - 24<br>ACTION NUMBER   9<br>ACTION TYPE   Administrative<br>AWARD TYPE   Discretionary |

| | | | |
|---|---|---|---|
| **3** | PROJECT STAFF<br><br>RECIPIENT PROJECT DIRECTOR<br>  David Roth<br>  droth@aldergse.edu<br>EDUCATION PROGRAM CONTACT<br>  Louis Edwards      (202) 453-6778<br>  LOUIS.EDWARDS@ED.GOV<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK   888-336-8930<br>  obssed@servicenowservices.com | **4** | PROJECT TITLE<br><br>84.336S<br>Promoting Equity by Building Sustainable Pipelines of<br>Diverse, Effective Educators |

**5**    KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| David Roth | Project Director | 30 % |

**6**    AWARD PERIODS

        BUDGET PERIOD      10/01/2024 - 02/13/2025
       PERFORMANCE PERIOD    10/01/2022 - 02/13/2025

FUTURE BUDGET PERIODS

N/A

**7**    AUTHORIZED FUNDING

             THIS ACTION         N/A
           BUDGET PERIOD    $1,484,225.00
      PERFORMANCE PERIOD    $3,797,124.00

**8**    ADMINISTRATIVE INFORMATION

             UEI    Q5UNGJK7K1M4
     REGULATIONS    EDGAR AS APPLICABLE
                      2 CFR AS APPLICABLE
    ATTACHMENTS    N/A

**9**    LEGISLATIVE AND FISCAL DATA

    AUTHORITY:               PL P.L. 110-315 TITLE II HIGHER EDUCATION ACT, AS AMENDED
    PROGRAM TITLE:       TEACHER QUALITY ENHANCEMENT GRANTS FOR STATE AND
                                PARTNERSHIPS
    CFDA/SUBPROGRAM NO:    84.336S

JA 230

S336S220029 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S336S220029 - 24 |
| RECIPIENT NAME: | Alder Graduate School of Education |
| GRANTEE NAME: | ALDER GRADUATE SCHOOL OF EDUCATION |
| | 2946 BROADWAY, |
| | REDWOOD CITY, CA 94062 - 1510 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1)　THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)　On Wednesday, February 12, 2025, you received an administrative action notice through the G5 system, alerting you through an updated grant award notice (GAN) that one of your grants had been deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253. An email notification terminating the grant should have preceded the administrative action, but in fact, there was a subset of them that were not dispatched until today, Thursday, February 13, 2025. What this means for your grant and program is that the effective date will be extended, and the effective date of the termination action will be as of today, February 13, 2025 instead, and not yesterday, February 12, 2025. We apologize for this timing error, and we regret any confusion or inconvenience the sequence of these actions may have caused. This GAN reflects the new effective date for the termination, replacing yesterday s date. Thank you for your understanding.

_____　　　_____

**AUTHORIZING OFFICIAL**　　　　　　　　　　　　**DATE**

Ver. 1

JA 231

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**       (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

    **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

    **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

    **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

    **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

    **\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

    **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

    **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

    **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

    **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

    **\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

    **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

    **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

    **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

    **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

    **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

    **UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

**\*REGULATIONS –** Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA –** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -** The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award. **AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS –** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER –** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME –** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE –** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE –** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL –** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award


**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF –** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT –** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT –** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT –** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

---

\* This item differs or does not appear on formula and block grants.

Exhibit B

JA 234



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

David  Roth
Project Director
ALDER GRADUATE SCHOOL OF EDUCATION
2946 Broadway
Suite B
Redwood City, CA 94062

RE: Grant Award Termination

Dear  David  Roth          :

This letter provides notice that the United States Department of Education is terminating your federal award, ___S336S200017___ . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. ___S336S200017___ in its entirety effective _____.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 235

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice.  Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,



 Deputy Assistant Secretary for Management and Planning


cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 236



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

David  Roth
Project Director
ALDER GRADUATE SCHOOL OF EDUCATION
2946 Broadway
Suite B
Redwood City, CA 94062

RE: Grant Award Termination

Dear  David  Roth    :

This letter provides notice that the United States Department of Education is terminating your federal award,  S336S220029    . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No.  S336S220029    in its entirety effective  2/13/25    .

JA 237

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice.  Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,




 Deputy Assistant Secretary for Management and Planning


cc: Ruth Ryder




400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 238

DocuSign Envelope ID: 63B5D8A3E-484D-B322-33527073FDA7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.,* | |
| *Plaintiffs,* | |
| v. | Civil Action No. 25-cv-00702 |
| DENISE CARTER, *et al.,* | |
| *Defendants.* | |

**DECLARATION OF DR. SARAH JOHNSON IN SUPPORT OF APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION**

I, Dr. Sarah Johnson, declare and state under penalty of perjury the following:

1.      I am the Chief Executive Officer of Teaching Lab, and have served in this role since 2018.  Teaching Lab is a national not-for-profit corporation with a mission to improve teacher practice and student learning through curriculum-based professional learning and coaching.

2.       I am over the age of 18, and I am competent in all respects to testify to the matters below. I understand that this Declaration is for use in connection with the above-captioned civil action, and I make this Declaration based upon my own personal knowledge and my review of the Teaching Lab's business records.

3.      Teaching Lab is a member organization of the American Association of Colleges for Teacher Education, which is a plaintiff in this action.

4.      I received my doctorate in Education Leadership from the Harvard Graduate School of Education. I also hold an undergraduate degree in neuroscience at Emory University, where I graduated *summa cum laude,* and received my Master's degree in teaching from American University.

DocuSign Envelope ID: 63B5D4D823A3E-4840-B322-83527073FDA7

5.    I have dedicated my life to public service, with the goal of improving instructional quality and educational outcomes for students of all backgrounds.

6.    To prepare this declaration, I relied upon information known to me personally and which I directed my staff to collect and verify based on my organization's records.

7.    In October of 2023, Teaching Lab was awarded a Teacher and School Leader Incentive Program ("TSL") grant of $16,996,398 to be disbursed over three years (the "Grant"). The total award was subsequently reduced to $14,147,653 due to Congressional appropriations activity.

8.    The Grant covers what has been codenamed Teaching Lab Project RISE (Refine, Innovate, Share, and Elevate). For this Grant, Project RISE involved: (i) implementation of Teaching Lab's teacher leadership and coaching model for public K-12 school systems located in Milwaukee, Wisconsin, Kemper, Mississippi, El Paso, Texas, and Osceola, Arkansas (the "Public School Beneficiaries"); (ii) development of human capital management systems in the foregoing districts; and (iii) a rigorous, randomized controlled trial on Teaching Lab's teacher development and coaching model, to be conducted in partnership with American Institutes for Research ("AIR"), focused on the work in Milwaukee.

9.    Across all of the Public School Beneficiaries, Teaching Lab's programs through the Grant impact more than 40 schools and more than 150 teachers, whose instruction in turn reaches well over 6,000 K-12 students.

10.    On February 18, 2025, Teaching Lab received an updated Grant Award Notification from the Department of Education that stated that the grant was terminated because it is "inconsistent with, and no longer effectuates, Department priorities." A true and correct copy of the Grant Award Notification is attached as **Exhibit A**.

DocuSign Envelope ID: 63B5D4D8-83A3E-484A-B322-83527073FDA7

11.     Also on February 18, 2025, Teaching Lab received a letter from the Department of

Education that stated as follows:

> It is a priority of the Department of Education to eliminate
> discrimination in all forms of education throughout the United
> States. The Acting Secretary of Education has determined that, per
> the Department's obligations to the constitutional and statutory law
> of the United States, this priority includes ensuring that the
> Department's grants do not support programs or organizations that
> promote or take part in diversity, equity, and inclusion ("DEI")
> initiatives or any other initiatives that unlawfully discriminate on the
> basis of race, color, religion, sex, national origin, or another
> protected characteristic. Illegal DEI policies and practices can
> violate both the letter and purpose of Federal civil rights law and
> conflict with the Department's policy of prioritizing merit, fairness,
> and excellence in education….the grant specified above provides
> funding for programs that promote or take part in DEI initiatives or
> other initiatives that unlawfully discriminate on the basis of race,
> color, religion, sex, national origin, or another protected
> characteristic; that violate either the letter or purpose of Federal civil
> rights law; that conflict with the Department's policy of prioritizing
> merit, fairness, and excellence in education; that are not free from
> fraud, abuse, or duplication; or that otherwise fail to serve the best
> interests of the United States. The grant is therefore inconsistent
> with, and no longer effectuates, Department priorities.

A true and correct copy of the above-referenced letter is attached as **Exhibit B**.

12.     After February 18, 2025, Teaching Lab has not received additional funding from

the Department in connection with the Grant.

13.     The Grant purported to give Teaching Lab 30 days to serve an appeal. The

Department did not commit to any timeline to review the appeal, nor any procedures or standards

upon which the appeal would be evaluated.[1]

---

[1] Teaching Lab is evaluating the content of the notice and does not acknowledge or admit that any part of
the termination notice or process contemplated therein is lawful or enforceable. This Declaration should
not be read as an exhaustive account of all potential bases to challenge the termination of the Grant.
Teaching Lab is reserving all rights and remedies under applicable law.

DocuSign Envelope ID: 63B5D4D8-3A3E-484C-B327-33527073FDA7

14.     Through meetings with other educational leaders I have been made aware that other TSL grant recipients have received similar letters terminating their grants. Though I am not familiar with the particulars of all of these programs, my understanding is that the termination of these other TSL programs follow a similar playbook, with similar contents and asserted justifications.

15.     As of the date of this Declaration, Teaching Lab has drawn $6,606,954 from the Grant.

16.     As of the date of this Declaration, undisbursed funds under the Grant equal $7,540,698. This figure collectively represents the value of our services to the Public School Beneficiaries, pass through costs for necessary functions such as software licensing, and the aforementioned research services provided by AIR.

17.     The Termination Letter, the Department's failure to withdraw the Termination Letter, and the resulting uncertainty regarding the future of the Grant and its programming are causing and will continue to cause serious, irreparable harm to Teaching Lab, the Public School Beneficiaries, and the public.

18.     Teaching Lab operates under a fee for service model. Its resources will not enable it to provide the Grant services to the Public School Beneficiaries for free. At this time, Teaching Lab does not have an alternate source of funding. The Public School Beneficiaries have not indicated to me that they have room in their budget to unexpectedly pay for the services, nor have they indicated that additional budget could be immediately procured.

19.     Teaching Lab has hired more than two dozen employees and contractors to support the Grant. If the Grant is suspended for any amount of time, Teaching Lab will likely have to furlough or layoff many or all of these workers. As for part time and contracted workers, their

desire to work with Teaching Lab is driven by our ability to provide them hours. They may move on to other opportunities or refuse to work with Teaching Lab again if it cannot provide stable hours as it expected to be able to do through the Grant.

20.     Even if the Grant is ultimately restored several months from now, Teaching Lab may not (and probably will not) be able to rehire all of these professionals, depriving us forever of the training it has invested, as well as the learnings and specialized knowledge Teaching Lab gained working closely on Project RISE and with the Public School Beneficiaries and the teachers that work in their communities.

21.     Teaching Lab is also extremely concerned about the loss of the rigorous, AIR study which will result from the termination of the Grant. In my experience, it is very difficult to organize such a study using only private resources.

22.     The AIR study afforded by the Grant is a material benefit not only to Teaching Lab, but also to other school districts who are evaluating how to spend their limited funds and limited teacher development time and resources to programs with the biggest bang for the buck. An independent study funded impartially by the federal government, and which must be published regardless of the outcome of the study, has immeasurable benefits to the credibility and impact of the study and the public's ability to trust the results.

23.     I am also very concerned that if the professionals and the teachers they serve are forced to operate under fear that the Grant programs will be cut, this may irreparably impact the effectiveness of the professionals' work and the buy-in from teachers. So even if Teaching Lab could fund the AIR study itself and achieve the same impact (which it cannot), interrupting the work even for a few months may also impair or infect the results of the study, to the detriment of Teaching Lab and the public.

JA 243

DocuSign Envelope ID: 63B5D4D8-A3A3E-4840-B322-33527073FDA7

24.    In addition to the loss of the study noted above, the Public School Beneficiaries and the public will be significantly harmed if the Department is permitted to move forward with the termination, as one or more of the Public School Beneficiaries is likely to lose the benefit of Teaching Lab's services.

25.    As noted above, Teaching Lab is unable to absorb providing the services contemplated by the Grant for free. Accordingly, the Public School Beneficiaries stand to lose value of up to roughly $7 million in services if the termination moves forward.

26.    I also expect that the resource-constrained Public School Beneficiaries, their teachers, and their students, will be permanently deprived of the opportunity to benefit from improved instructional methods and professional development during the first semester of 2025, a harm that could permanently impair outcomes for students who attend schools in the Public School Beneficiaries' districts, if not rectified.

27.    Attached hereto as **Exhibit C** is true and accurate copy of a summary showing the positive impact of Teaching Lab's prior work upon student outcomes in a recent project for a public school district in New York City.

28.    Though Teaching Lab is only in the first year of its work for the Public School Beneficiaries, its work is currently tracking the significant positive outcomes experienced in New York City.

29.    For instance, Teaching Lab's data shows that in Milwaukee, the percentage of 3rd – 5th graders who have demonstrated proficiency on grade level tasks has increased by ***26%*** compared to baseline data before Teaching Lab began its work there. In Osceola, the percentage of student work that was on grade level increased from 68.31% to ***100%*** from the beginning of the year to mid-year, reflecting the impact of our modules enabling teachers to internalize and better

DocuSign Envelope ID: 63B5D4D8-63A3E-484C-B322-83527073FDA7

deliver state-selected curricula. Teaching Lab has also experienced substantial improvements in instructional practices and student work quality in El Paso and Kemper, among other benefits already apparent from our early data analysis.

     30.    These harms prevent Project RISE from engaging in the core activities compelled by its mission and reason for existence.

     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 3rd day of March, 2025

By: _Sarah Johnson_____
       Sarah J. Johnson

JA 245

Exhibit A

S374A230040 - 24

Cynite Ola

Teaching Lab

1802 Vernon St NW

Pmb 533

Washington, DC 20009

S374A230040 - 24

Sarah Johnson
Teaching Lab
1802 Vernon St. NW
PMB 533
Washington, DC 20009

S374A230040 - 24



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| Teaching Lab<br>1802 Vernon St. NW<br>PMB 533<br>Washington, DC 20009 | PR/AWARD NUMBER    S374A230040 - 24<br>ACTION NUMBER    5<br>ACTION TYPE    Administrative<br>AWARD TYPE    Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>  Cynite Ola          512.293.5854<br>  cynite.ola@teachinglab.org<br>EDUCATION PROGRAM CONTACT<br>  Bryan Hale<br>  bryan.hale@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK      888-336-8930<br>  obssed@servicenowservices.com | 84.374A<br>Teaching Lab's Project RISE: Refine, Innovate, Share, and Elevate |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Cynite Ola | Project Director | 100 % |

**6** AWARD PERIODS

        BUDGET PERIOD      10/01/2024 - 02/18/2025
        PERFORMANCE PERIOD      10/01/2023 - 02/18/2025

FUTURE BUDGET PERIODS

N/A

**7** AUTHORIZED FUNDING

                THIS ACTION          N/A
             BUDGET PERIOD      $4,578,311.00
       PERFORMANCE PERIOD      $11,099,378.00
      RECIPIENT COST-SHARE      0.00%
RECIPIENT NON-FEDERAL AMOUNT      $0.00

**8** ADMINISTRATIVE INFORMATION

        UEI      S79QLA3H92D7
    REGULATIONS      CFR PART D
                 EDGAR AS APPLICABLE
                 2 CFR AS APPLICABLE
    ATTACHMENTS      N/A

**9** LEGISLATIVE AND FISCAL DATA

    AUTHORITY:               PL 109-149 V ELEMENTARY AND SECONDARY EDUCATION ACT, AS AMENDED
    PROGRAM TITLE:          TEACHER INCENTIVE FUND
    CFDA/SUBPROGRAM NO:      84.374A

JA 249



S374A230040 - 24

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

**10**

PR/AWARD NUMBER:            S374A230040 - 24
RECIPIENT NAME:             Teaching Lab
GRANTEE NAME:               TEACHING LAB
                            1802 VERNON ST NW,
                            WASHINGTON, DC -
PROGRAM INDIRECT COST TYPE: Restricted
PROJECT INDIRECT COST RATE: 10%

TERMS AND CONDITIONS

(1)   THE BUDGET PERIOD AND PERFORMANCE PERIOD FOR THIS PROJECT ARE CHANGED TO THE
      DATES IN BLOCK 6. NO ADDITIONAL FUNDS ARE PROVIDED BY THIS ACTION.

(2)   The grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)
      (4); see also 34 C.F.R. 75.253.

_____        _____

**AUTHORIZING OFFICIAL**                                        **DATE**

Ver. I

JA 250

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**       (See Block 2 of the Notification)

**1. RECIPIENT NAME** - The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION** -   Unique items of information that identify this notification.

    **PR/AWARD NUMBER** -   A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

    **ACTION NUMBER** -   A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

    **ACTION TYPE** -   The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

    **AWARD TYPE** -   The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF** -  This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

    **\*RECIPIENT PROJECT DIRECTOR** -  The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

    **EDUCATION PROGRAM CONTACT** -  The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

    **EDUCATION PAYMENT CONTACT** -  The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER** -  Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL** - Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS** -   Project activities and funding are approved with respect to three different time periods, described below:

    **BUDGET PERIOD** -  A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

    **PERFORMANCE PERIOD** -  The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

    **\*FUTURE BUDGET PERIODS** -  The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING** -  The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

    **\*THIS ACTION** - The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

    **\*BUDGET PERIOD** - The total amount of funds available for use by the grantee during the stated budget period to this date.

    **\*PERFORMANCE PERIOD** - The amount of funds obligated from the start date of the first budget period to this date.

    **RECIPIENT COST SHARE** -  The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

    **RECIPIENT NON-FEDERAL AMOUNT** - The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION** -  This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

    **UEI** -       The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

**\*REGULATIONS –**  Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -**  Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -**  The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -** The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award. **AMOUNT -**  The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -**  Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -**  The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -**  The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -**  The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -**  The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -**  The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award


**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -**  The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -**  The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -**  If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

---

\* This item differs or does not appear on formula and block grants.

# Exhibit B



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

2/18/2025

Cynite  Ola
Project Director
TEACHING LAB
1802 Vernon St NW
Pmb 533
Washington, DC 20009

RE: Grant Award Termination

Dear  Cynite  Ola            :

This letter provides notice that the United States Department of Education is terminating your federal award,  S374A230040            . *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No.  S374A230040            in its entirety effective   2/18/2025            .

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 254

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice. Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,

Mark Washington
Deputy Assistant Secretary for Management and Planning

cc: Ruth Ryder

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

Exhibit C



# NYC District 9 Literacy Outcomes

In our SY22-23 partnership with NY District 9 schools, Teaching Lab supported 61 K-2 teachers. We compared classrooms of teachers supported by Teaching Lab to classrooms that were not supported by Teaching Lab and saw the following impacts on student performance on Acadience testing.

**The main finding is that a higher percentage of classrooms supported by Teaching Lab outperform their school and district averages compared to classrooms not supported by Teaching Lab** on measures of % of students at/above benchmark in the spring and typical/better progress from fall to spring.

**Teaching Lab supported classrooms outperformed non Teaching Lab classrooms within respective schools.**

72% of Teaching Lab classrooms were **at or above their respective school's average of % students At/Above Benchmark** for Spring 2023, while this was only 43% of classrooms not supported by Teaching Lab. Similarly, 64% of Teaching Lab classrooms were **at or above their respective school's average of % students with Typical or Better Progress** from Fall 2022 to Spring 2023, while this was only 44% of classrooms not supported by Teaching Lab.



**Teaching Lab supported classrooms outperformed non Teaching Lab classrooms and district averages within D9.**

Compared to the district averages, 55% of Teaching Lab classrooms were **at or above the NY D9 Average** of % students At/Above Benchmark for Spring 2023, while this was only 32% of classrooms not supported by Teaching Lab.

Additionally, the average % of students At or Above Benchmark for Spring 2023 for Teaching Lab supported classrooms was higher than the D9 District Average at 40%, while the average for classrooms not supported by Teaching Lab was below the D9 District Average at 31%. In Teaching Lab supported classrooms, each grade level outperformed the NY D9 District Average for % of Students At/Above Benchmark for Spring 2023.





JA 257

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-00702 |
| DENISE CARTER, *et al.*, | |
| *Defendants*. | |

**[*PROPOSED*] ORDER GRANTING PLAINTIFFS AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER EDUCATION, NATIONAL CENTER FOR TEACHER
RESIDENCIES, AND THE MARYLAND ASSOCIATION OF COLLEGES FOR
TEACHER EDUCATION'S MOTION FOR TEMPORARY RESTRAINING ORDER/
<u>PRELIMINARY INJUNCTION</u>**

This matter comes before the Court on the American Association of Colleges for Teacher

Education, the National Center for Teacher Residencies, and the Maryland Association of Colleges

for Teacher Education's (collectively, "Plaintiffs") Motion for a Temporary Restraining Order

and/or Preliminary Injunction. Having reviewed the papers filed in support of and in opposition to

this motion and, in accordance with Federal Rule of Civil Procedure 65, the Court finds that

Plaintiffs have satisfied the requirements for issuance of a temporary restraining order and/or

preliminary injunction. Plaintiffs have shown a substantial likelihood of success on the merits.

Plaintiffs suffer a substantial threat of irreparable injury if an injunction does not issue. The

threatened injury outweighs any harm that will result if the injunction is granted. And, the grant of

an injunction will serve the public interest.

It is therefore ORDERED that:

    1. Defendants are ENJOINED from enforcing the terminations of the TQP, SEED,

       and TSL grants on a nationwide basis;

JA 258

2. Defendants are ORDERED to reinstate such grant funding immediately;

3. Defendants are further ORDERED to provide the Grant Recipients reimbursement for all otherwise allowable expenditures incurred between the date of termination and the Court's order;

4. Defendants are further ENJOINED from terminating any additional TQP, SEED, and TSL grants if such termination would be inconsistent with the Court's rulings; and

5. Defendants are further ORDERED to remove the route pay grant conditions from TQP, SEED, and TSL grants.

This preliminary injunction shall take effect immediately and shall remain in effect pending further order of the Court.

Plaintiffs are not required to post a bond. The Court finds that security is not required under the circumstances of this case.

**SO ORDERED.**

DATED this _____ day of _____, 2025, at _____ a.m./p.m.

_____
United States District Judge

JA 259

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AACTE, *et. al.*,                                    *
                                                     *
      PLAINTIFFS,                              *
                                                     *
v.                                                   *          No. 25-cv-702 (JRR)
                                                     *
McMAHON, *et al.*,                                   *
                                                     *
      DEFENDANTS.                              *
                                                  ******

## RESPONSE IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. 1

TABLE OF AUTHORITIES .......................................................................................... 3

TABLE OF ACRONYMS ............................................................................................... 6

I.      INTRODUCTION ................................................................................................ 7

II.     BACKGROUND FACTS ..................................................................................... 8

      A.     Department of Education ("DOE") terminated a number of grants that participated in Diversity, Equity, and Inclusion ("DEI") programming...................................... 8

      B.     On February 21, 2025, Judge Adam Abelson in the District of Maryland enjoined the government from enforcing three provisions in the J20 and J21 orders. ........ 10

      C.     The evening of March 10, 2025, the United States District Court for the District of Massachusetts entered a temporary restraining order in an APA challenge to DOE grant termination that provides relief to at least some of the Plaintiffs in this action. ...................................................................................................................... 11

III.    LEGAL STANDARD........................................................................................ 12

IV.    ARGUMENT ...................................................................................................... 12

      A.     Venue is not proper in the State of Maryland because no substantial part of the events or omissions giving rise to the claim occurred here. ................................ 13

1

JA 260

B.      The complaint lacks sufficient facts to establish Plaintiff MACTE's organizational standing. ................................................................................................... 16

C.      Plaintiffs cannot piggyback on *NADOHE*'s analysis because *NADOHE* is not binding and they are differently situated. ........................................................... 17

        1.      *NADOHE's* holding hinged on First Amendment violations but these Plaintiffs have no First Amendment claim. ............................................. 18

        2.      *NADOHE* held that the likelihood of establishing vagueness stemmed from uncertainty regarding grant termination, but the instant Plaintiffs have already had their grants terminated. ........................................................ 19

        3.      *NADOHE* challenged the potential enforcement of the J20 termination provision, while the instant case challenges an actual agency decision not definitively tied to the J20 termination provision. ................................... 20

D.      Plaintiffs are unlikely to succeed on the merits of their vagueness claim. ........... 21

E.      Plaintiffs are unlikely to succeed on their APA claim because enacting a new administration's priorities, consistent with federal law, is not arbitrary or capricious. ............................................................................................................ 23

F.      Two of the final three preliminary injunction factors – balance of equities and public interest – weigh in favor of the Government. ............................................. 27

G.      To the extent the Court is inclined to grant a preliminary injunction, it should instead remand to DOE for further development of the record. ........................... 29

H.      If the Court grants a preliminary injunction, its scope should be limited only to the cancelled grants identified in Plaintiffs' motion. ................................................. 30

V.      CONCLUSION ................................................................................................. 31

JA 261

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*,
__ F. Supp. 3d __, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ........................................ 20, 30

*Ass'n of Jewish Camp Operators v. Cuomo*,
470 F. Supp. 3d 197 (N.D.N.Y. 2020) ........................................................................ 27

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
501 U.S. 1301 (1991) ................................................................................................ 27

*Brown v. Board of Education*,
347 U.S. 483 (1954) .................................................................................................... 8

*Chakrabarti v. U.S. Citizenship and Immigration Servs., No 21-1945 PJM*,
2021 WL 4458899 (D. Md. Sept. 29, 2021) ....................................... 13, 14, 15, 16

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .................................................................................................. 17

*Covenant Media of SC, LLC v. N. Charleston*,
493 F.3d 421 (4th Cir. 2007) ................................................................................... 16

*Educ. Media Co. v. Insley*,
731 F.3d 291 (4th Cir. 2013) ................................................................................... 20

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
592 U.S. 414 (2021) ............................................................................................ 24, 30

*Frazier v. Prince George's Cnty.*,
86 F.4th 537 (4th Cir. 2023) .................................................................................... 12

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .................................................................................................. 22

*Havtech, LLC v. AAON Inc., No. CV SAG-22-00453*,
2023 WL 200117 (D. Md. Jan. 17, 2023) ............................................................... 22

*Hoffler v. Mattis*,
677 Fed. Appx. 119 (4th Cir. 2017) ........................................................................ 24

*Indus. Union Dep't, AFL-CIO v. Bingham*,
570 F.2d 965 (D.C. Cir. 1977) ................................................................................ 13

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .................................................................................................. 16

*Marsh v. Oregon Nat. Res. Council*,

3

JA 262

490 U.S. 360 (1989) ......................................................................................... 24

*Miranda v. Garland*,
    34 F.4th 338 (4th Cir. 2022) ...................................................................... 27

*Nat'l Assoc. of Diversity Officers in Higher Educ. (NADOHE) v. Trump*,
    __ F. Supp. 3d. __, 2025 WL 573764 (D. Md. Feb. 21, 2025) ......................... ibid

*Nat. Res. Def. Council, Inc. v. Envtl. Prot. Agency*,
    16 F.3d 1395 (4th Cir. 1993) ...................................................................... 24

*Nat'l Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) .................................................................................. 22

*Nat'l Union Fire Ins. Co. v. Allfirst Bank*,
    282 F. Supp. 2d 339 (D. Md. 2003) ....................................................... 17-18

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................ 12, 27

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) .................................................................................... 24

*Students for Fair Admissions, Inc. v. Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) .............................................................................. 8, 28

*Trump v. Int'l Refugee Assistance Project*,
    582 U.S. 571–80 (2017) ............................................................................. 30

*United States v. Davis*,
    588 U.S. 445 (2019) .................................................................................. 21

*United States v. Saunders*,
    828 F.3d 198 (4th Cir. 2016) ..................................................................... 21

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) .................................................................................. 16

*Vill. Of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*
    455 U.S. 489, 498 (1982) .............................................................. 18, 19, 21 22

*Wilson v. PL Phase One Operations L.P.*,
    422 F. Supp. 3d 971 (D. Md. 2019) ............................................................ 22

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008) ..................................................................................... 12

*Wolf v. Menh, No. 1:18-cv-1180*,
    2019 WL 13292992 (E.D. Va. Feb. 5, 2019) ............................................... 14

4

**Statutes**

20 U.S.C. § 1232 ............................................................................................... 25

28 U.S.C. § 1391 ............................................................................................... 13

28 U.S.C. § 1404 ............................................................................................... 16

**Rules**

F.R. 19487-01 .................................................................................................. 23

F.R. 23573 ....................................................................................................... 23

F.R. 33592 ....................................................................................................... 23

**Regulations**

2 C.F.R. § 200.340 ............................................................................. 9, 23, 25, 26

34 C.F.R. § 75.105 .................................................................................... 25, 26

90 Fed. Reg. 8339, 8339 (Jan. 29, 2025) .......................................................... 8

90 Fed. Reg. 8633, 8634-35 (Jan. 31, 2025) ..................................................... 8

**Other**

*Eloise Pasachoff, Executive Branch Control of Federal Grants: Policy, Pork, and Punishment,*
83 Ohio St. L.J. 1113 (2022) ............................................................... 26, 27

JA 264

**TABLE OF ACRONYMS**

| Acronym | Full Name |
| --- | --- |
| AACTE | American Association of Colleges for Teacher Education |
| APA | Administrative Procedure Act |
| AU | American University |
| CFR | Code of Federal Regulations |
| DEI | Diversity, Equity, and Inclusion |
| DOE | Department of Education |
| EO | Executive Order |
| FR | Federal Register |
| GSE | Graduate School of Education |
| J20 | Exec. Order No. 14,151, Ending Radical and Wasteful Government DEI Programs and Preferencing, Executive Order of January 20, 2025, 90 Fed. Reg. 8339, 8339 (Jan. 29, 2025) |
| J21 | Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633, 8634-35 (Jan. 31, 2025) |
| MACTE | Maryland Association of Colleges for Teacher Education |
| NADOHE | National Diversity Officers in Higher Education |
| NCTR | National Center for Teacher Residencies |
| PI | Preliminary Injunction |
| RETL | Residency for Excellence in Teaching and Learning |
| RISE | Refine, Innovate, Share, and Elevate |
| SEED | Supporting Effective Educator Development Program |
| SFFA | *Students for Fair Admissions, Inc. v. Fellows of Harvard Coll.*, 600 U.S. 181 (2023) |

JA 265

| TQP | Teacher Quality Partnership Program |
| TRO | Temporary Restraining Order |
| TSL | Teacher and School Leader Incentive Program |
| UST | University of St. Thomas |

## I.    **INTRODUCTION**

This Court should reject Plaintiffs' attempt to glom onto Judge Abelson's decision in *National Association of Diversity Officers in Higher Education* ("NADOHE") *v. Trump*.[1]  Despite advancing no First Amendment claims, Plaintiffs argue that the more stringent Fifth Amendment vagueness standard applicable to free speech challenges applied in *NADOHE* should apply to them.  And despite receiving concrete grant terminations specifying the reasons for their grant terminations, Plaintiffs argue that *NADOHE*'s analysis about potentially vague grant terminations in the abstract should also apply to them.  These arguments lack merit.  Not only is venue improper in Maryland and not only does the only Maryland plaintiff lack standing, but Plaintiffs are also unlikely to succeed on the merits of their Due Process or Administrative Procedure Act ("APA") claims.  Because the balance of equities and public interest also weigh in favor of the government, the Court must deny Plaintiffs' motion for a Preliminary Injunction ("PI") or Temporary Restraining Order ("TRO").

---

[1]    ECF 1 No. 1:25-CV-00333-ABA.  Hereafter, "*NADOHE*."

7

II.     **BACKGROUND FACTS**

A.     **Department of Education ("DOE") terminated grants that participated in Diversity, Equity, and Inclusion ("DEI") programming.**

On January 20, 2025, President Trump issued Executive Order 14,151, 90 FR 8339, entitled *Ending Radical and Wasteful Government DEI Program and Preferencin*g [hereafter J20]. J20 sought to eliminate "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," in the Government.   J20 § 1. As is relevant here, J20 includes a Termination Provision, which directs that within 60 days of its issuance, "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM … terminate . . . 'equity-related' grants or contracts."  *Id.* § 2(b)(i).  This has been referred to as the "Termination Provision."  The President also issued a second executive order related to DEI on January 21, 2025 [hereafter J21], but Plaintiffs do not challenge that order.

On February 5, 2025, DOE's Office of Planning, Evaluation, and Policy Development issued a "Directive on Department Grant Priorities."  ECF 24-2 (Directive on Development Grant Priorities, U.S. Dept. of Educ. (Feb. 5, 2025)) [hereafter, "DOE Directive"].  *Available online at* Prem Thakker, X.com, https://x.com/prem_thakker/status/1887261853350318163?s=46 (last accessed Mar. 11, 2025).  The internal directive reaffirms the Department's priority "to eliminate discrimination in all forms of education."  ECF 24-2 (DOE Directive) (citing to *Brown v. Board of Education*, 347 U.S. 483 (1954) and *Students for Fair Admissions, Inc. v. Fellows of Harvard Coll.*, 600 U.S. 181 (2023) [hereafter "*SFFA*"]).  It notes that Diversity, Equity, and Inclusion ("DEI") initiatives "unlawfully discriminate on the basis of race, color, religion, sex, national origin, or other protected characteristic" and "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education."  *Id.*  The directive instructs DOE personnel to conduct a review of issued grants to ensure they "do not fund discriminatory practices – including in the

8

form of DEI – that are either contrary to law or to the Department's policy objectives." *Id.* The directive further requires DOE to "comply with all notice and procedural requirements in each affected award, agreement, or other instrument." *Id.* Finally, it notes that "[g]rants deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements." *Id.* The directive does not reference any executive order related to DEI but rather relies on DOE's own policies and priorities. *Id.*

Plaintiffs are member organizations comprised of some members who received grant money from three DOE programs: The Teacher Quality Partnership Program ("TQP"); the Supporting Effective Educator Development Program ("SEED"); and the Teacher and School Leader Incentive Program ("TSL"). The grants were multi-year grants meant to support teacher professional development and training programs. ECF 1 at ¶¶ 65–127. Plaintiffs' programs included diversity, equity, and inclusion components. *See, e.g.*, ECF 1 at ¶¶ 79, 81, 101.

The complaint alleges that between approximately February 7 and 18, 2025, DOE terminated eight of its member association grants. ECF 1 at ¶¶ 119–27 (describing anonymous grant recipient); ECF 1-2 (identifying named grant recipients). The termination letters specified that the grants were terminated for "promot[ing] or tak[ing] part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic." *See, e.g.*, ECF 1-2 at 4. The letter noted that the grants "no longer effectuate[] Department priorities" pursuant to 2 C.F.R. § 200.340(a)(4). Each letter included statutory authority for the action, advised recipients of their appeal rights, and advised regarding closeout responsibilities. *See, e.g.*, ECF 1-2 at 4–5. No letter referenced any Presidential Executive Order as a source of authority.

9

**B.** **On February 21, 2025, Judge Adam Abelson in the District of Maryland enjoined the government from enforcing three provisions in the J20 and J21 orders.**

The District of Maryland was one of the first courts in the country to hear a challenge to the J20 and J21 orders. In *NADOHE*, Judge Abelson considered a challenge to three provisions in the orders, including a provision in the J20 order that called for government agencies to "terminate. . . equity-related' grants or contracts."[2] *See generally, NADOHE*, ECF 1, No. 1:25-CV-00333-ABA. The *NADOHE* Plaintiffs were federal grant recipients whose grants remained active, but who feared termination pursuant to the J20 order. *See, e.g.*, *NADOHE*, ECF 1 at ¶¶ 5–6. They claimed that the fear of losing their funding chilled their freedom of speech, as they were afraid that engaging with DEI values would cause them to lose their funding. *Id.* at ¶ 12. They also claimed the J20 order was vague because it "failed to define any material terms, including 'DEI,' 'illegal DEI,' 'DEI programs or principles,' or 'illegal discrimination or preferences.'" *Id*. at ¶ 4. Plaintiffs filed a motion for a TRO or PI about ten days after filing the complaint. *NADOHE*, ECF 27. Because no plaintiff grants had been terminated, the challenge was a "facial" challenge to the entire order without reference to how the order might be applied in any individual case. *NADOHE*, __ F. Supp. 3d. __, 2025 WL 573764, at *16 (D. Md. Feb. 21, 2025).

Judge Abelson held a hearing and ultimately granted the plaintiffs' motion for a preliminary injunction on February 21, 2025. In so doing, Judge Abelson considered the plaintiffs' Fifth Amendment challenge to the J20 order's termination provision through the lens of a free speech challenge, applying "a more stringent vagueness test." *NADOHE*, 2025 WL 573764, at

---

[2]    *NADOHE* also challenged the J21 Executive Order, but since that Order is not the subject of the instant lawsuit it is not discussed here.

*26.  Applying this more rigorous test, Judge Abelson determined that plaintiffs were likely to show that the termination provision did not provide sufficient notice of prohibited activity and carried the potential for arbitrary enforcement.  *Id.* at *19–21.  Because no *NADOHE* plaintiff had experienced a grant termination, Judge Abelson's ruling considered the general landscape and hypothetical scenarios.  *See id.* at *20.  His preliminary injunction order prevented "Defendants other than the President, and other persons who are in active concert or participation with Defendants," from, in relevant part, "paus[ing], freez[ing], imped[ing], block[ing], cancel[ing], or terminat[ing] any awards, contracts, or obligations ("Current Obligations") or change the terms of any Current Obligation, on the basis of the Termination Provision."  ECF 1-3 at 3 (*NADOHE* Preliminary Injunction Order).

On March 10, 2025, following supplemental motions practice, Judge Abelson clarified that "persons who are in active concert or participation with Defendants" meant "all other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions directed pursuant to the J20 and J21 Orders."  *NADOHE,* ECF 67 at 3.  Neither the initial order nor the clarified order applied retroactively to any grants cancelled before entry of the order on February 21, 2025.  The clarified order reiterated that *NADOHE's* holding regarding vagueness of the J20 termination provision utilized "the more stringent vagueness test that applies when a law interferes with the right of free speech or of association."  *NADOHE,* ECF 66 at 5.

**C.    The evening of March 10, 2025, the United States District Court for the District of Massachusetts entered a temporary restraining order in an APA challenge to DOE grant termination that provides relief to at least some of the Plaintiffs in this action.**

On March 6, 2025, the States of California, Colorado, Illinois, Maryland, Massachusetts, New Jersey, New York, and Wisconsin filed a motion for temporary restraining order challenging the allegedly arbitrary and capricious termination of TQP and SEED grants.  *See generally*, Mot.

11

JA 270

for Temp. Restr'g O., *California v. U.S. Dep't of Educ.*, 1:25-cv-10548-MJJ, ECF No. 2 (D. Mass. Mar. 6, 2025). Judge Joun held a hearing on March 10, 2025, seemingly without the benefit of written briefing from the government. *See generally*, ECF 24-3 (Docket, 1:25-cv-10548-MJJ (reflecting no motion response from the government)). After the hearing, the Judge Joun granted Plaintiffs' motion for a temporary restraining order and required DOE to "immediately restore . . . all previously awarded TQP or SEED grants for recipients in Plaintiff states." ECF 24-4 (Order, *California v. U.S. Dep't of Educ.*, 1:25-cv-10548-MJJ, ECF No. 41, at 9 (D. Mass. Mar. 6, 2025)).

## III.    **LEGAL STANDARD**

A preliminary injunction is "extraordinary" relief that may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22, 24 (2008). Plaintiffs must satisfy four elements to show entitlement to a preliminary injunction: first, they must show that they are likely to succeed on the merits; second, that they will likely experience irreparable harm unless the court grants relief; third, that the balance of equities weighs in their favor; and fourth that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543 (4th Cir. 2023); *NADOHE*, 2025 WL 573764, at *7. The last two factors – balance of equities and the public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## IV.    **ARGUMENT**

Plaintiffs cannot establish entitlement to a preliminary injunction. Their case fails at the threshold due to improper venue and lack of standing. The Court should decline to extend the *NADOHE* holding to these Plaintiffs due to the dissimilarity of their claims. On the merits, Plaintiffs' case fails because their actual grant terminations were not vague as applied to them. Nor did DOE act arbitrarily and capriciously when it terminated Plaintiffs' grants consistently with

its departmental priorities.  For the purposes of this motion, Defendants do not dispute that Plaintiffs can establish irreparable harm, but the government does contend that the balance of equities and public interest weighs in the government's favor.  Should the Court consider granting relief, Defendants respectfully request that the Court instead remand to DOE to provide a more detailed explanation for each grant termination.  Finally, if the Court does issue a PI, Defendants ask that the injunction be limited only to the named grants in Plaintiffs' complaint and motion.

###     A.    Venue is not proper in the State of Maryland because no substantial part of the events or omissions giving rise to the claim occurred here.

This Court should decline to hear this case because it does not belong in the State of Maryland.  In cases based on federal question jurisdiction, venue is only proper in a district where either a defendant resides or where "a substantial part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b) (providing additional venue grounds not relevant here).  Because no defendant resides in Maryland and because the grant terminations at issue occurred in eight states but not in Maryland, venue is not proper here.

Although cases involving the federal government are often appropriately brought in the District of Columbia, this may not be appropriate where it would lead to a crush of litigation.  In cases involving national organizations "challeng[ing] agency action of nationwide scope," the District of Columbia is nearly always the most convenient venue.  *Indus. Union Dep't, AFL-CIO v. Bingham*, 570 F.2d 965, 971 (D.C. Cir. 1977).  However, this may not be true where a given district has "limited manpower to process a large number of claims."  *Chakrabarti v. U.S. Citizenship and Immigration Servs.*, No 21-1945 PJM, 2021 WL 4458899, at *5 (D. Md. Sept. 29, 2021).  Just a few years ago, this District declined to become the default district for hundreds of lawsuits alleging delays in adjudication of immigration applications, merely because the offices of United States Citizenship and Immigration Services moved to the state.  *Id.* at *5.  Rather, the court

13

JA 272

noted that hearing adjudication delay cases in each plaintiff's home district would decrease the burden on the District of Maryland and prevent "derogat[ion] from the other important matters the Court must attend to." *Id.* at *6.

Moreover, simply naming one organizational Plaintiff headquartered in a state who experienced little or no actual harm is not sufficient to establish that "a substantial part of the events" occurred in that given state. *Cf. Wolf v. Menh*, No. 1:18-cv-1180, 2019 WL 13292992, at *3 (E.D. Va. Feb. 5, 2019) (finding receipt of defamatory statements by Virginia individuals and involvement of "a Virginia organization" did not amount to "a substantial part of the events or omissions giving rise to the claim"). Similarly, the fact that some portion of events are experienced in Maryland is not sufficient to establish "a substantial part" where most events occur outside the state. *Chakrabarti*, 2021 WL 4458899, at *3, 7.

Judge Gallagher recently signaled her concern about the District of Maryland becoming a default district for litigation stemming from President Trump's policies. In *Am. Fed. of Teachers, et al. v. Dept. of Ed.*, which involves similar allegations as those in the instant case, Judge Gallagher observed that the complaint contained only "generalized facts describing the impact of certain executive actions on members of two nationwide professional organizations," and "specific, detailed facts" relating to impacts in another state. Letter Order, *Am. Fed. of Teachers, et al. v. Dept. of Ed.*, No. 25-cv-628-SAG, ECF 16 at 1 (Mar. 5, 2025). The only connection to Maryland was not any "harm occurring in the State of Maryland," but rather "the naming of [American Federation of Teacher's] AFT's Maryland chapter as a separate Plaintiff without identifying any particularized injury to the Maryland chapter distinct from the national chapter." *Id.* ("It thus appears to this Court that the Maryland chapter was named separately solely to

14

JA 273

manufacture venue in this District."). Judge Gallagher ordered briefing about venue but has not yet ruled on the issue. *Id.*

Her concerns are not misplaced. According to the "Trump Litigation Tracker" compiled by JustSecurity.org, approximately twelve challenges to the administration's actions have been filed in Maryland so far, second only to the District of Columbia, which has more than sixty. *See* Litigation Tracker: Legal Challenges to Trump Administration Actions, https://www.justsecurity.org/107087/tracker-litigation-legal-challenges-trump-administration/ (Last visited Mar. 10, 2025).

Like *AFT* and *Chakrabarti*, venue in this case is not proper in Maryland. Plaintiffs are two national professional organizations and one Maryland chapter. *See e.g.*, ECF 1 at ¶ 14. The complaint's utter lack of connection to Maryland is so striking that not only is the sole Maryland plaintiff the third of three named Plaintiffs, but that plaintiff's principal place of business in Towson, Maryland is misspelled "Townson" – twice. *Id.* The complaint contains no allegations of any grant terminations in Maryland, and the declaration of Plaintiff Maryland Association of Colleges for Teacher Education's ("MACTE") President does not specify whether actual grants were terminated in the State of Maryland, only that three of ten member organizations were "impacted by the termination" of SEED and TQP grants. The complaint does not specifically mention any Maryland grant terminations, but only avers that the termination of others' grants "implicates MACTE's core mission." ECF 1 at ¶ 14. In contrast, the complaint and associated documents allege specific allegations of injury occurring in Illinois, Minnesota, California, District

15

JA 274

of Columbia, Wisconsin, Mississippi, Texas, and Arkansas.  *See* ECF 1-2 at 2, 6, 8, 10, 12, 14;

ECF 1 at ¶ 112.  Given these facts, venue is unlikely to be proper in Maryland.[3]

The Court should decline to hear this preliminary injunction challenge and instead allow

the parties to brief the issue of venue transfer pursuant to 28 U.S.C. § 1404.

**B.    The complaint lacks sufficient facts to establish Plaintiff MACTE's organizational standing.**

The only Plaintiff with any Maryland connection, MACTE, lacks organizational standing.

"[A] plaintiff must establish that he has standing to challenge each provision . . . by showing that

he was injured by application of those provisions."  *Covenant Media of SC, LLC v. N. Charleston*,

493 F.3d 421, 430 (4th Cir. 2007).  To establish standing, a plaintiff must show: (1) an "injury in

fact," that is, a violation of a legally protected interest that is "concrete and particularized" and

"actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury

and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action";

and (3) that it is "likely, as opposed to merely speculative that the injury will be redressed by a

favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

An organizational plaintiff cannot establish standing merely by showing an "intens[e] . . .

interest" in the case or "strong opposition to the government's conduct."  *Valley Forge Christian*

*Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982).  The

Supreme Court has emphasized that "threatened injury must be *certainly impending* to constitute

_____

[3]    As in *Chakrabarti,* the government currently intends to move to transfer venue to the individual states in which Plaintiffs' grants were cancelled given the current crush of litigation in the District of Columbia.

16

JA 275

injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

The complaint and motion for preliminary injunction lack specific allegations regarding actual injury to MACTE. Rather, the complaint alleges only an "implicat[ion of] MACTE's core mission." ECF 1 at ¶ 14. The declaration drafted by MACTE's President does not specifically identify any Maryland grants that were cancelled, but only alleges that three of its ten member organizations were "impacted by the termination of the grants . . . resulting in a substantial loss of funds for teacher preparation programs in Maryland." ECF 5-5 at 2. Unlike the other allegations in the complaint and preliminary injunction motion, there is no indication of which member grants were cancelled if any, or how much money was lost. *See generally, e.g.*, ECF 1-2 (identifying cancelled grants in Illinois, Minnesota, California, and District of Columbia, but none in Maryland).

Moreover, to the extent Maryland grants were terminated, Maryland has already received relief in a different case. *See* Order, *California v. U.S. Dep't of Educ.*, 1:25-cv-10548-MJJ, ECF No. 41 (D. Mass. Mar. 6, 2025) (requiring DOE to "immediately restore" terminated TQP and SEED grants for recipients in Maryland, California, Colorado, Illinois, Massachusetts, New Jersey, New York, and Wisconsin).

Thus, Plaintiff MACTE is unlikely to establish standing.

**C.     Plaintiffs cannot piggyback on *NADOHE*'s analysis because *NADOHE* is not binding and they are differently situated.**

Even though all of Plaintiffs' grant terminations occurred before Judge Abelson issued his order in *NADOHE*, Plaintiffs seek to have that order apply to them retroactively. Although Judge Abelson's decision is due "substantial deference," it is not retroactive nor is it binding on this court. *Nat'l Union Fire Ins. Co. v. Allfirst Bank*, 282 F. Supp. 2d 339, 351 (D. Md. 2003) ("Of

17

JA 276

course, no decision of a district court judge is technically binding on another district court judge, even within the same district."). The material differences between the instant Plaintiffs and those in *NADOHE* underscores the importance of analyzing the instant case out of the shadow of *NADOHE*. First, Plaintiffs here allege no First Amendment violations. Second, rather than fearing the threat of grant terminations for unknown reasons, the instant Plaintiffs have received definitive notices of grant termination with stated reasons. Third, DOE's decisions in this case were based on the agency's own determinations apart from the J20 order. To the extent *NADOHE* could apply to this case, the Court should decline to extend it.

1.     ***NADOHE's* holding hinged on First Amendment violations but these Plaintiffs have no First Amendment claim.**

A First Amendment violation rested at the core of the *NADOHE* decision. The specter of this free speech infringement permeated every aspect of the Court's decision in *NADOHE*, including its holding that the J20 and J21 EOs were likely void for vagueness under the Fifth Amendment. Plaintiffs allege no such free speech violation here, so the Court should decline to follow *NADOHE*.

Although Judge Abelson found the J20 termination provision void for vagueness, he did so while holding the government to a "more stringent vagueness test" due to the plaintiffs' alleged free speech infringement. *NADOHE*, 2025 WL 573764, at *16 (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)). As Judge Abelson acknowledged, "[t]he vagueness doctrine analysis is not uniform across all case types." *NADOHE*, 2025 WL 573764, at *18. On the contrary, he observed that courts would have "some tolerance for vagueness" in cases involving "government awards [of] 'selective subsidies'" if it were not for the alleged impingement on free speech. *Id.* This chilling of free speech was also important in the court's weighing of irreparable injury and public interest supporting an injunction. *Id.* at *27–28.

18

JA 277

The instant Plaintiffs allege no chilling of their right to free speech. Thus, the government should receive the benefit of a vagueness analysis that has "some tolerance for vagueness." *Id.* at *18. This important distinction cautions against applying *NADOHE*'s holding to this case.

> **2.** ***NADOHE* held that the likelihood of establishing vagueness stemmed from uncertainty regarding grant termination, but the instant Plaintiffs have already had their grants terminated.**

*NADOHE* made two vagueness holdings using the "more stringent vagueness test" required in cases involving a First Amendment violation. *Id.* at *16. First, Judge Abelson found that the termination provision was likely void because "the vagueness of the term 'equity-related' grants or contracts" invites arbitrary and discriminatory enforcement." *Id.* at *19. Second, the Court held that the same term "offers insufficient notice to current grantees about whether and how they can adapt their conduct to avoid termination of their grants or contracts." *Id.* at *20. The fact that no *NADOHE* plaintiff had yet been notified of a grant termination was central to both holdings. *See, e.g.*, *id.* at *3 (acknowledging "Plaintiffs . . . are left to guess . . . whether their federal grants or contracts will be terminated" (internal quotations omitted). Neither of these vagueness holdings should apply to the current Plaintiffs because DOE did terminate their grants.

As to the differences in Judge Abelson's analysis regarding arbitrary and discriminatory enforcement,[4] *NADOHE* focused on the fears of plaintiffs facing uncertain enforcement. *See, e.g.*, *id.* at *3, *20. In contrast, the instant case presents a more concrete question because Plaintiffs challenge the termination of several discrete grants. *See generally*, ECF 1. Judge Abelson acknowledged that the termination provision of the J20 order could be vague as to some while

---

[4]    This filing addresses the concern about the merits of Plaintiffs' arbitrary and discriminatory enforcement more fully in Section IV.E, below.

giving other grantees "notice that their grants are subject to termination." *NADOHE*, 2025 WL 573764, at *21. Indeed, the District Court for the District of Columbia found that an agency action terminating grants for particularized reasons was distinct from a blanket termination in response to an executive order. *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, __ F. Supp. 3d __, 2025 WL 752378 (D.D.C. Mar. 10, 2025).

So too here, the Court's analysis must focus on whether DOE's termination of Plaintiffs' grants was vague or arbitrary as applied to them. *See Educ. Media Co. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013) (noting that as-applied challenges are "based on a developed factual record and the application of a statute to a specific person"). Defendants argue it was not. *See* Section IV.E, below. Given the actual grant terminations here, *NADOHE*'s holding should not apply.

### 3. *NADOHE* challenged the potential enforcement of the J20 termination provision, while the instant case challenges an actual agency decision not definitively tied to the J20 termination provision.

Although Plaintiffs assume DOE terminated their grants because of the J20 Executive Order that *NADOHE* enjoined, DOE does not concede this and the documentary record indicates independent agency review. Judge Abelson held plaintiffs were likely to establish a direct connection between their injuries and the J20 and J21 EOs because the plaintiffs received letters explicitly tying potential grant termination to the EOs. *NADOHE*, 2025 WL 573764, at *11. Thus, Judge Abelson's analysis of the constitutionality of the EOs more directly applied to the plaintiffs' challenge.

But no such direct communication link here. Plaintiffs attached DOE's communications terminating their grants, and each communication cited to applicable provisions of the Code of Federal Regulations ("CFR") and more general changes in overarching "Department priorities." *See, e.g.*, ECF 5-8 at 23–24. The letters cite to a determination by the "Acting Secretary of

20

Education" based on "constitutional and statutory law." *Id.* (going on to identify the constitutional and statutory authority). Because *NADOHE* focuses on a facial challenge to the J20 and J21 EOs, and the instant case focuses on a series of discrete grant terminations stemming from an agency action, the Court should decline to extend *NADOHE*'s reasoning.

In sum, although Judge Abelson's opinion in *NADOHE* deserves deference from this Court, the decision is not binding and material differences between *NADOHE* and this case caution against extending it.

### D.    Plaintiffs are unlikely to succeed on the merits of their vagueness claim.

Plaintiffs' Fifth Amendment vagueness claim fails because their grant terminations were not vague.  "A statute is unconstitutionally vague if it (1) fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or (2) authorizes or even encourages arbitrary and discriminatory enforcement."  *United States v. Saunders*, 828 F.3d 198, 206 (4th Cir. 2016) (citation omitted).  To assess fair notice, courts ask whether "the ordinary person exercising ordinary common sense can sufficiently understand" the language.  *Id.* (quoting *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012)).  Courts also consider whether unclear language may encourage arbitrary and discriminatory enforcement.  *United States v. Davis*, 588 U.S. 445, 451 (2019).  Because the grant terminations specified the reasons for the termination, and because both the complaint and the preliminary injunction motion identified the grant features that fall under the "DEI" umbrella, the terminations were not vague.

Where a Fifth Amendment challenge involves the impact of economic policies to organizations and does not implicate a free speech concern, courts apply a relaxed vagueness test.  *Hoffman Estates,* 455 U.S. at 498 (holding that "economic regulation" is subject to "a less strict vagueness test" compared to criminal statutes, since "businesses, which face economic demands

21

JA 280

to plan behavior carefully, can be expected to consult relevant legislation in advance of action"). *Compare id.* at 499 (noting that "the most important factor affecting the clarity that the Constitution demands of a law is whether it . . . interferes with the right of free speech") *with* ECF 1 (failing to raise any free speech claim). Generally, "[a] civil statute . . . that does not implicate constitutionally-protected conduct is not unconstitutional unless it is 'impermissibly vague in all of its applications.'" *Havtech, LLC v. AAON Inc.*, No. CV SAG-22-00453, 2023 WL 200117, at *4 (D. Md. Jan. 17, 2023) (quoting *Hoffman Estates*, 455 U.S. at 495).

Courts are particularly generous when it comes to selective government subsidies, applying a relaxed vagueness analysis to imprecise government priorities. *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). *See also Grayned v. City of Rockford*, 408 U.S. 104 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language."). For example, where challenged language does not provide definitions but the words "can be interpreted by people of common intelligence," no additional definition is required. *Havtech*, 2023 WL 200117, at *5 (internal quotation omitted). *See also Finley*, 524 U.S. at 589 (noting that scholarships and grants awarded for "subjective criteria such as 'excellence'" are selective subsidies not void for vagueness). Moreover, where challenged language may have differing definitions but there is no real dispute for the existing plaintiffs of the language's application, the language is not vague. *See Wilson v. PL Phase One Operations L.P.*, 422 F. Supp. 3d 971, 983 (D. Md. 2019).

Here, DOE provided grant termination letters that specified the reasons for each grant termination. The letters explain that DOE grants will no longer support "diversity, equity, and inclusion ("DEI") initiatives." *See, e.g.*, ECF 1-2 at 8 (noting that DOE will not fund any other forms of unlawful discrimination, either). The letters also note that the terminated grant programs

22

"take part in DEI initiatives" or other forms of unlawful discrimination. *Id.* The letters also cite to the specific sections of the CFR that allow DOE to terminate grants due to changes in "Department priorities." *Id.* (referencing 2 C.F.R. § 200.340(a)(4), 34 C.F.R. § 75.253, and 2 C.F.R. § 200.339-43). Although Plaintiffs complain that they were not "put . . . on notice for the reason for the grant termination," this is not genuine given the letters' explanations. ECF 5-1 n.10.

Moreover, any claim that the terms "diversity," "equity," and "inclusion" are vague is belied by the fact that not only did Plaintiffs use these very words in naming their grant projects and describing their programs, but these terms also appeared in the solicitation for grant applications DOE published in the Federal Register when Plaintiffs applied for their grant funding. *See, e.g.*, ECF 1 at ¶¶ 79, 81, 101 (describing terminated grants as involving diversity, equity, and inclusion); 89 F.R. 23573 (TQP application notice, which includes the words diversity, equity, and inclusion); 87 F.R. 19487-01 (same for the SEED application notice); 88 F.R. 33592 (same for the TSL notice). Plaintiffs also identified these program components in their complaint, suggesting their awareness of the reasons for their grant termination. In other words, Plaintiffs knew what these terms meant when they applied for funding and when they filed the instant complaint, so it is a fair inference that they also knew what they meant when they read the termination letters. These terms are not vague, especially under the more relaxed standard applicable to selective funding decisions like government grants.

### E. Plaintiffs are unlikely to succeed on their APA claim because enacting a new administration's priorities, consistent with federal law, is not arbitrary or capricious.

Plaintiffs' APA claim is also unavailing. Plaintiffs' singular point in support of their arbitrary and capricious argument is that DOE acted "contrary to the law" by failing to publish any change in "Department priorities" in the Federal Register with a "notice and comment" period.

ECF 5-1 at 27. They do not clearly allege any other procedural irregularities establishing arbitrary and capricious agency action.[56] This one argument cannot carry the day because there is no requirement that big-picture Department priorities follow the same public rulemaking and commenting process as priorities for grant awards.

"Arbitrary and capricious" is a "narrow" standard of review in which DOE's action is presumed valid. *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) (narrow standard); *Nat. Res. Def. Council, Inc. v. Envtl. Prot. Agency*, 16 F.3d 1395, 1400 (4th Cir. 1993) (presumed validity). The Court merely "consider[s] whether the agency considered the relevant factors and whether a clear error of judgment was made." *Hoffler v. Mattis*, 677 Fed. Appx. 119, 120 (4th Cir. 2017) (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009)). In other words, courts ask if "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The APA is not a mechanism for judicial policy revision, because "courts lack authority 'to impose upon [an] agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015) (cleaned up)

---

[5]    It is unclear whether Plaintiffs allege that placement on "route pay" constitutes arbitrary and capricious agency action. Although their filings reference the route pay condition, the argument is not fleshed out in their motion.

[6]    Of note, the plaintiffs in *California v. U.S. Dep't of Educ.* appear to have advanced different APA arguments in support of their TRO motion not offered by Plaintiffs in the instant case. *See* Order, 1:25-cv-10548-MJJ, ECF No. 41 (D. Mass. Mar. 6, 2025) (referencing lack of "individualized analysis of any of the programs" in termination letters).

24

(quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 549 (1978)).

Federal regulations explicitly allow agencies to terminate grants for no other reason besides "an award no longer effectuates . . . agency priorities." 2 C.F.R. § 200.340. This language came from Office of Management and Budget (OMB) changes to Uniform Guidance in the year 2020. Guidance for Grants and Agreements, Published Doc. No. 2020-17468, 85 FR 49506 (Aug. 13, 2020), available at https://www.federalregister.gov/documents/2020/08/13/2020-17468/guidance-for-grants-and-agreements (last visited Mar. 11, 2025). The comments to this change to the Uniform Guidance note that the language is meant to allow "awarding agencies [to] prioritize ongoing support to Federal awards that meet program goals" and "terminate the Federal award" where it does not. *Id.*

Plaintiffs argue that "Department priorities" may only change if subjected to a notice and comment period pursuant to 20 U.S.C. § 1232(d) and 34 C.F.R. § 75.105(b)(2). ECF 5-1 at 22–23. These provisions do not support Plaintiffs' argument. § 1232(d) governs regulations and § 75.105(b)(2) governs annual priorities. Neither of these regulations relate to the big-picture departmental priorities that changed with the new Presidential administration, and neither undermines the ability of a federal agency to terminate an award for no longer aligning with agency priorities. Rather, the regulations distinguish between "annual absolute, competitive preference, and invitational priorities," as identified and described in 34 C.F.R. § 75.105, and general Agency or Administrative priorities, as referred to in 2 C.F.R. § 200.340(a)(4). The fact that two different regulations from two different chapters of the CFR address the different types of priorities underscores the distinction between them.

JA 284

"Annual absolute, competitive preference, and invitational priorities" are specific priorities established by the Secretary of Education which are utilized in Agency grant programs. *See* 34 C.F.R. § 75.105. Per 34 C.F.R. § 75.105, such priorities are used for selection of applications for Agency programs. Annual absolute, competitive preference, and invitational priorities are subject to a notice and comment period and rulemaking, unless an exemption applies. *Id.* Unlike these specific annual absolute, competitive preference, and invitational priorities, Agency or Administration priorities are general and issued at the discretion of the Agency or Administration. Agency and Administration priorities stem from an Agency or Administration's mission and agenda and can be changed at any time without a vote or notice and comment from the public. Plaintiff's interpretation of federal regulation renders every federal agency powerless to shift its activities with new Presidential administrations absent a lengthy public rulemaking process. There is no authority for the proposition that agencies must go through this process any time they change their overarching policies or goals.

It is true that an agency's ability to terminate funding pursuant to 2 C.F.R. § 200.340 is relatively untested and there is a paucity of caselaw interpreting the provision. An Ohio State Law Journal article considered 2 C.F.R. § 200.340 and acknowledged that, before President Trump's first administration, "[t]erminating multiyear grants simply because of a claimed change in priority was . . . unheard of" and "clearly illegal." Eloise Pasachoff, *Executive Branch Control of Federal Grants: Policy, Pork, and Punishment*, 83 Ohio St. L.J. 1113, 1184 (2022). The current § 200.340 language allowing unilateral termination of a federal grant award "if [it] no longer effectuates the program goals or agency priorities" only appeared in 2020 towards the end of President Trump's first term and did not see much use during the Biden administration. *Id.* But the language makes such a funding termination consistent with federal regulations. While Ms. Pasachoff's article

26

acknowledges the "troublesome" implications of this change, including "fuel[ing] autocracy," she also acknowledges that the plain language of the regulation allows an agency, consistently with the law, to terminate grant funding "because the President or other senior political officials say so." *Id.*

Because Plaintiffs' "arbitrary and capricious" argument is likely to fail, preliminary injunction is further unwarranted.

### F.    Two of the final three preliminary injunction factors – balance of equities and public interest – weigh in favor of the Government.

In addition to proving likelihood of success on the merits, Plaintiffs must also show irreparable harm and that the balance of equities and public interest weigh in their favor.  For the purposes of this motion only, Defendants do not contest that Plaintiffs can establish irreparable harm.  However, the final two factors weigh in the government's favor and compel denial of Plaintiffs' motion.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken*, 556 U.S. at 435).  To balance the equities, the Court considers "the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)).  Irreparable harm to Plaintiffs is not decisive. *See Ass'n of Jewish Camp Operators v. Cuomo*, 470 F. Supp. 3d 197, 228–29 (N.D.N.Y. 2020) (finding irreparable harm to Plaintiffs from closure of overnight camps, but still finding important governmental interest weighed against preliminary injunction).

While Plaintiffs' Complaint and motion lay out the public interest in favor of an injunction, there are several compelling interests that weigh against an injunction.  First, the government and

27

JA 286

the public both have a compelling interest in ending discrimination. In 2023, the Supreme Court recognized that educational policies or programs favoring one race – even a historically disadvantaged race – were not equitable but instead were discriminatory. *SFFA*, 600 U.S. at 206. DOE must be allowed to act upon this binding interpretation of federal civil rights laws by ending its support for programs that show preferences based on protected class.

Second, although many Americans support diversity, equity, and inclusion programs, many others view DEI policies as a scourge, "creating new prejudices and allowing old ones to fester," causing some to "resent members of what they perceive to be favored races, believing that the successes of those individuals are unearned." *SFFA*, 600 U.S. at 275–76 (Thomas, J., concurring). The public interest in ending DEI must be weighed against the preference of those who wish to keep it.

Finally, the Court is charged with protecting *all* Americans, which requires the Court to weigh the interest of more than seventy-seven million people who voted for President Trump in the 2024 Presidential election. These Americans voted for a President who openly and fervently campaigned on the promise to end diversity, equity, and inclusion in all its forms. *See, e.g.*, Alexis Agathocleous et al., *Trump on DEI and Anti-Discrimination Law*, ACLU.org, at 2 (Jul. 2, 2024), https://www.aclu.org/publications/trump-on-dei-and-anti-discrimination-law ("The 2024 Trump campaign . . . has promised . . . to eradicate both public and private diversity, equity, and inclusion (DEI) policies); *id.* ("Trump has promised to cut federal funding for schools with curricula that touch on these 'disfavored' subjects. . . ."); Jessica Guynn, *RIP DEI? The war on 'woke' America has a new commander-in-chief*, USAtoday.com (Nov. 22, 2024), https://www.usatoday.com/story/money/2024/11/22/rip-dei-donald-trump-president/76116276007/ ("On the campaign trail, Donald Trump promoted the idea that white

JA 287

Americans were targets of racism and made reversing Joe Biden's 'woke takeover' of Washington a priority of his second term in office. . . . On the chopping block: diversity, equity, and inclusion programs."). The President's DEI agenda was no secret.

While it may be an understatement to say that not everyone agrees with President Trump's views on DEI, his voters have a significant public interest in ending DEI as quickly as possible. *See, e.g.*, Eliza Collins & Elizabeth Findell, *The Minority Voters Who Love Trump's Dismantling of DEI*, MSN.com (Feb. 9, 2025), https://www.msn.com/en-us/news/politics/the-minority-voters-who-love-trump-s-dismantling-of-dei/ar-AA1yGJ0B (originally published in the Wall Street Journal) (quoting Latino man as saying, "I'm very happy that DEI is hopefully going to disappear starting from the government and hopefully it'll catch on") [hereafter, "*Minority Voters*"]; Ingrid Jacques, *Trump is waging war against DEI in schools. New incidents show why he's right.*, MSN.com (Mar. 5, 2025), https://www.msn.com/en-us/news/opinion/trump-is-waging-war-against-dei-in-schools-new-incidents-show-why-he-s-right-opinion/ar-AA1AcXrc (originally published in USA Today) ("The innocuous sounding goals of this [DEI] ideology . . . have in practice had the opposite effect – promoting division and suspicion."). A balance of equities and the public interest also must factor in the plurality of the country who have a substantial interest in ensuring that millions in federal grant money is not forever lost to these terminated grant programs.

> **G.    To the extent the Court is inclined to grant a preliminary injunction, it should instead remand to DOE for further development of the record.**

Due to the expedited preliminary injunction briefing schedule, there was not sufficient time to assemble a thorough evidentiary record to show that DOE's grant terminations were not based on the J20 and J21 EOs, were consistent with federal civil rights law, and were based on particularized issues with each program.

JA 288

To the extent the Court considers granting a preliminary injunction, Defendants respectfully request the Court instead remand the matter back to DOE to provide a more detailed explanation for each grant termination on an expedited schedule.[7]  Armed with a more grant-specific explanation, Plaintiffs could then determine whether they still wish to pursue legal action and the Court could then reconsider the matter with a more fulsome record.  Courts allowed for similar remands in *Prometheus* and *AIDS*.  *See, e.g.*, *Prometheus*, 592 U.S. at 422; *AIDS*, 2025 WL 752378, at *13.

Moreover, to the extent Plaintiffs argue that imposition of route pay was arbitrary and capricious – an argument referenced in the complaint but not fully fleshed out in their motion – DOE can also resolve any lack of specificity and notice on remand.

### H.    If the Court grants a preliminary injunction, its scope should be limited only to the cancelled grants identified in Plaintiffs' motion.

To the extent the Court decides a preliminary injunction is appropriate, the Court should limit relief only to the cancelled grants specifically identified in the complaint and motion for preliminary injunction.  "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017) (noting courts may "mold its decree to meet the exigencies of the particular case" (internal quotations omitted)).  Due to the potential variation in grant entitlement, amount of harm, extent of funding, and degree of mismatch between a grant recipient and department priorities, issuing a

---

[7]    It does not appear that Judge Joun considered the possibility of remand in *California v. Dept. of Educ.*, despite concerns that the termination letters failed to provide "a reasoned explanation" for termination.  Order, 1:25-cv-10548-MJJ, ECF No. 41 at 5 (D. Mass. Mar. 6, 2025).  It is unclear whether either party raised the possibility of an agency remand.

30

JA 289

nationwide order that applies to undisclosed terminated grants by both parties and nonparties would amount to overbroad relief.

## V.    **CONCLUSION**

For the foregoing reasons, the Court should deny the motion for improper venue and lack of standing, or allow the parties to brief a venue transfer.  If the Court reaches the merits, it should deny the motion.  Alternatively, the Court should remand to DOE to provide a more specific explanation for the grant terminations.  Finally, if the Court grants the PI, it should limit the scope of the PI to only the grants specifically identified in the Complaint and motion.

Respectfully submitted,

KELLY O. HAYES
U.S. Attorney

_____/s/_____
Molissa H. Farber (802255)
Assistant U.S. Attorney
U.S. Attorney's Office, District of Maryland
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201
(410) 209-4862
Molissa.Farber@usdoj.gov

JA 290

## CERTIFICATE OF SERVICE

I hereby certify that I filed a copy of the foregoing response, along with accompanying exhibits, via the Court's CM/ECF system, which automatically transmitted a copy to all registered parties.  I further certify that my office will provide a courtesy copy of this filing and supporting materials to chambers pursuant to the Court's Order at ECF 18.


_____/s/ Molissa H. Farber_____
Molissa H. Farber

JA 291

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AACTE, *et. al.*,                    *
                                     *
      PLAINTIFFS,           *
                                     *
v.                                   *        No. 25-cv-702 (JRR)
                                     *
McMAHON, *et al.*,                   *
                                     *
      DEFENDANTS.           *
                                  ******

## <u>ORDER</u>

Upon consideration of Plaintiff's motion for Preliminary Injunction or Temporary Restraining Order and the opposition thereto, it is this _____ day of March, 2025, hereby ORDERED that the motion is DENIED.

_____
Julie R. Rubin
United States District Judge

JA 292

UNITED STATES DEPARTMENT OF EDUCATION
WASHINGTON, D.C. 20202

### Directive on Department Grant Priorities

Agency: U.S. Department of Education

Office of Planning, Evaluation and Policy Development (OPEPD)

Action: Directive

**FOR FURTHER INFORMATION CONTACT:**

U.S. Department of Education
Office of Planning, Evaluation and Policy Development

EFFECTIVE DATE: February 5, 2025.

### Eliminating Discrimination and Fraud in Department Grant Awards

From the Supreme Court's 1954 landmark opinion in *Brown v. Board of Education* to its 2023 decision in *Students for Fair Admissions, Inc. v. Fellows of Harvard College*, education has played a central role in this Nation's fight against discrimination. It remains a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. This includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

For these reasons, pursuant to, among other authorities, 20 U.S.C. § 3411 and 2 C.F.R. § 200.339–341, the Secretary of Education hereby directs as follows:

> **Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication.**

This Directive shall be implemented by all ED personnel, including but not limited to those in the Office of Planning, Evaluation and Policy Development's Grants Policy Office, Office of Finance and Operations' Office of Grants Management, Office of Elementary and Secondary Education, Office of Postsecondary Education, Office of Special Education and Rehabilitative Services,

Office of Career, Technical and Adult Education, Office of English Language Acquisition, Institute for Education Sciences, and the Office of Discretionary Grants and Support Services, who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Grants deemed inconsistent with these priorities shall, where permitted by applicable law, be terminated in compliance with all notice and procedural requirements in the relevant award, agreement, or other instrument. *See* 2 C.F.R. § 200.340(a)(4)–341.

Notwithstanding this Directive, any disbursements on open grant awards paused due to Office of Management and Budget Memorandum M-25-13 or any Executive Order underlying that Memorandum shall be immediately released.

Authority: 20 U.S.C. § 3411; 2 C.F.R. § 200.339–341.
Dated: February 5, 2025.

Denise L. Carter,
Acting Secretary of Education

3/11/25, 12:07 PM                    CM/ECF - USDC Massachusetts – Version 1.8.2 as of 12/23/2024

USCA4 Appeal: 25-1281      Doc: 37-1      Filed: 06/16/2025      Pg: 296 of 638
Case 1:25-cv-00702-JRR      Document 24-3      Filed 03/11/25      Page 1 of 9

Query     Reports     Utilities     Help     Log Out

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:25-cv-10548-MJJ

State of California et al v. U.S Department of Education et al
Assigned to: Judge Myong J. Joun
Cause: 05:551 Administrative Procedure Act

Date Filed: 03/06/2025
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedures Act/Review or
Appeal of Agency Decision
Jurisdiction: Federal Question

**Plaintiff**

**State of California**                    represented by   **Chris Pappavaselio**
                                                            Massachusetts Attorney General's Office
                                                            One Ashburton Place
                                                            Boston, MA 02108
                                                            213-219-0765
                                                            Email: chris.pappavaselio2@mass.gov
                                                            *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Commonwealth of Massachusetts**          represented by   **Adelaide H. Pagano**
                                                            Massachusetts Attorney General's Office
                                                            One Ashburton Place
                                                            Boston, MA 02108
                                                            617-963-2122
                                                            Email: adelaide.pagano@mass.gov
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Chris Pappavaselio**
                                                            (See above for address)
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Matthew G. Lindberg**
                                                            Office of the Attorney General
                                                            10 Mechanic Street
                                                            #301
                                                            Boston, MA 01608
                                                            617-963-2169
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Megan E. Barriger**
                                                            Massachusetts Office of the Attorney
                                                            General
                                                            One Ashburton Place
                                                            Boston, MA 02108
                                                            617-963-2038
                                                            Email: megan.barriger@mass.gov

JA 294

3/11/25, 12:07 PM
CM/ECF - USDC Massachusetts - Version 1.8.2 as of 12/23/2024

USCA4 Appeal: 25-1281     Doc: 37-1     Filed: 06/16/2025     Pg: 297 of 638
Case 1:25-cv-00702-JRR     Document 24-3     Filed 03/11/25     Page 2 of 9

*ATTORNEY TO BE NOTICED*

**Yael Shavit**
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2197
Email: yael.shavit@mass.gov
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**State of New Jersey**          represented by **Amanda I. Morejon**
New Jersey Attorney General's Office
124 Halsey St., 5th Fl.
Newark, NJ 07101
609-696-5279
Email: amanda.morejon@law.njoag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Elizabeth R. Walsh**
New Jersey Office of the Attorney General
124 Halsey Street
PO Box 45029
Newark, NJ 07101
609-696-5289
Email: elizabeth.walsh@law.njoag.gov
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jessica L Palmer**
NJ Office of the Attorney General
25 Market Street
Trenton, NJ 08861
609-696-4607
Email: jessica.palmer@law.njoag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Plaintiff**</u>

**State of Colorado**

<u>**Plaintiff**</u>

**State of Illinois**          represented by **Darren Bernens Kinkead**
Illinois Attorney General's Office
115 South LaSalle Street
Chicago, IL 60603
773-590-6967
Email: darren.kinkead@ilag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chris Pappavaselio**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**State of Maryland**

**Plaintiff**

**State of New York**                   represented by   **Sandra S. Park**
                                                          NYS Office of The Attorney General
                                                          28 Liberty Street
                                                          Ste 20th Floor
                                                          New York, NY 10005
                                                          212-416-8250
                                                          Email: sandra.park@ag.ny.gov
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Alex Finkelstein**
                                                          NYS Office of The Attorney General
                                                          The Capitol
                                                          Albany, NY 12224
                                                          212-416-6129
                                                          Email: alex.finkelstein@ag.ny.gov
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Chris Pappavaselio**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kathryn Meyer**
                                                          NYS Office of The Attorney General
                                                          28 Liberty Street
                                                          New York, NY 10005
                                                          212-416-8844
                                                          Fax: 212-416-6030
                                                          Email: kathryn.meyer@ag.ny.gov
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Monica Hanna**
                                                          NYS Office of The Attorney General
                                                          28 Liberty Street
                                                          New York, NY 10005
                                                          212-416-8227
                                                          Fax: 212-416-6009
                                                          Email: monica.hanna@ag.ny.gov
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Rabia Muqaddam**
                                                          NYS Office of The Attorney General
                                                          28 Liberty St.
                                                          New York, NY 10005
                                                          917-715-4172
                                                          Email: rabia.muqaddam@ag.ny.gov
                                                          *ATTORNEY TO BE NOTICED*

JA 296

**Plaintiff**

| | | |
|---|---|---|
| **State of Wisconsin** | represented by | **Aaron Bibb**<br>Wisconsin Department of Justice<br>Special Litigation & Appeals<br>17 West Main St.<br>Madison, WI 53703<br>608-266-0810<br>Email: bibbaj@doj.state.wi.us<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Chris Pappavaselio**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

V.

**Defendant**

| | | |
|---|---|---|
| **U.S Department of Education** | represented by | **Michael Fitzgerald**<br>United States Attorney's Office MA<br>1 Courthouse Way<br>Suite 9200<br>Boston, MA 02210<br>617-748-3266<br>Email: Michael.fitzgerald2@usdoj.gov<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Denise Carter**<br>*in her official capacity as former Acting Secretary of Education and current acting Chief Operating Officer, Federal Student Aid* | represented by | **Michael Fitzgerald**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Linda McMahon**<br>*in her official capacity as Secretary of Education* | represented by | **Michael Fitzgerald**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 03/06/2025 | 1 | COMPLAINT against All Defendants Filing fee: $ 405, receipt number AMADC-10876076 (Fee Status: Filing Fee paid), filed by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Civil Cover Sheet, # 4 Category Form)(Pagano, Adelaide) Modified on 3/6/2025 (NMC). (Entered: 03/06/2025) |
| 03/06/2025 | 2 | MOTION for Temporary Restraining Order by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, |

JA 297

USCA4 Appeal: 25-1281   Doc: 37-1   Filed: 06/16/2025   Pg: 300 of 638
3/11/25, 12:07 PM    CM/ECF - USDC Massachusetts - Version 1.8.2 as of 12/23/2024
Case 1:25-cv-00702-JRR   Document 24-3   Filed 03/11/25   Page 5 of 9

| | | |
|---|---|---|
| | | State of New York, State of Wisconsin. (Attachments: # 1 Text of Proposed Order)(Pagano, Adelaide) Modified on 3/6/2025 (NMC). (Entered: 03/06/2025) |
| 03/06/2025 | 3 | MOTION for Leave to File Excess Pages by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin.(Pagano, Adelaide) Modified on 3/6/2025 (NMC). (Entered: 03/06/2025) |
| 03/06/2025 | 4 | ELECTRONIC NOTICE of Case Assignment. Judge Myong J. Joun assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (CEH) (Entered: 03/06/2025) |
| 03/06/2025 | 5 | Summons Issued as to All Defendants. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (NMC) (Entered: 03/06/2025) |
| 03/06/2025 | 6 | Judge Myong J. Joun: ELECTRONIC ORDER entered granting 3 Plaintiffs' Motion for Leave to File Excess Pages. (JL) (Entered: 03/06/2025) |
| 03/06/2025 | 7 | MEMORANDUM in Support re 2 MOTION for Temporary Restraining Order filed by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin. (Pagano, Adelaide) (Entered: 03/06/2025) |
| 03/06/2025 | 8 | DECLARATION re 7 Memorandum in Support of Motion, 2 MOTION for Temporary Restraining Order *Declar* by State of California, Commonwealth of Massachusetts, State of New Jersey, State of Colorado, State of Illinois, State of Maryland, State of New York, State of Wisconsin. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21)(Pagano, Adelaide) (Entered: 03/06/2025) |
| 03/06/2025 | 9 | NOTICE of Appearance by Chris Pappavaselio on behalf of Commonwealth of Massachusetts (Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/06/2025 | 10 | NOTICE of Appearance by Amanda I. Morejon on behalf of State of New Jersey (Morejon, Amanda) (Entered: 03/06/2025) |
| 03/06/2025 | 11 | MOTION for Leave to Appear Pro Hac Vice for admission of Aaron Bibb Filing fee: $ 125, receipt number AMADC-10877340 by State of Wisconsin. (Attachments: # 1 Certificate of Aaron Bibb)(Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/06/2025 | 12 | NOTICE of Appearance by Megan E. Barriger on behalf of Commonwealth of Massachusetts (Barriger, Megan) (Entered: 03/06/2025) |
| 03/06/2025 | 13 | MOTION for Leave to Appear Pro Hac Vice for admission of Alex Finkelstein, Kathryn Claire Meyer, Monica Hanna, Rabia Muqaddam, Sandra Park, Wil Handley Filing fee: $ 750, receipt number AMADC-10877343 by State of New York. (Attachments: # 1 Certificate of Alex Finkelstein, # 2 Certificate of Kathryn Claire Meyer, # 3 Certificate of Monica Hanna, # 4 Certificate of Rabia Muqaddam, # 5 Certificate of Sandra Park, # 6 Certificate of Wil Handley)(Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/06/2025 | 14 | MOTION for Leave to Appear Pro Hac Vice for admission of Alexis Piazza, Garrett Lindsey, Heidi Joya, Laura Faer, Maureen Onyeagbako Filing fee: $ 625, receipt number AMADC-10877345 by State of California. (Attachments: # 1 Certificate of Alexis Piazza, |

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 301 of 638

| | | |
|---|---|---|
| | | # 2 Certificate of Garrett Lindsey, # 3 Certificate of Heidi Joya, # 4 Certificate of Laura Faer, # 5 Certificate of Maureen Onyeagbako)(Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/06/2025 | 15 | MOTION for Leave to Appear Pro Hac Vice for admission of Darren Kinkead Filing fee: $ 125, receipt number AMADC-10877347 by State of Illinois. (Attachments: # 1 Certificate of Darren Kinkead)(Pappavaselio, Chris) (Entered: 03/06/2025) |
| 03/07/2025 | 16 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 11 Motion for Leave to Appear Pro Hac Vice Added Aaron J. Bibb.<br><br>**Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account.<br><br>(SP) (Entered: 03/07/2025) |
| 03/07/2025 | 17 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 13 Motion for Leave to Appear Pro Hac Vice Added Alex Finkelstein, Kathryn Claire Meyer, Monica Hanna, Rabia Muqaddam, Sandra Park, Wil Handley.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SP) (Entered: 03/07/2025) |
| 03/07/2025 | 18 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 14 Motion for Leave to Appear Pro Hac Vice Added Laura Faer, Heidi Joya, Maureen Onyeagbako, Alexis Piazza, and Garrett Lindsey.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(SP) (Entered: 03/07/2025) |
| 03/07/2025 | 19 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** 15 Motion for Leave to Appear Pro Hac Vice Added Darren Kinkead. |

JA 299

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 302 of 638
3/11/25, 12:07 PM                    CM/ECF - USDC Massachusetts - Version 1.8.2 as of 12/23/2024
Case 1:25-cv-00702-JRR    Document 24-3    Filed 03/11/25    Page 7 of 9

**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**

Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.

A Notice of Appearance must be entered on the docket by the newly admitted attorney.

(SP) (Entered: 03/07/2025)

| 03/07/2025 | 20 | Judge Myong J. Joun: ORDER Setting Hearing on Motion<br><br>Motion Hearing Doc. 2 set for 3/10/2025 02:30 PM in Courtroom 20 (In person only) before Judge Myong J. Joun.<br><br>**It is further ORDERED that Plaintiffs shall serve a copy of this Order on Defendants immediately upon receipt to ensure that Defendants' counsel will appear at the hearing.** (SP) (Entered: 03/07/2025) |
| --- | --- | --- |
| 03/07/2025 | 21 | NOTICE of Appearance by Yael Shavit on behalf of Commonwealth of Massachusetts (Shavit, Yael) (Entered: 03/07/2025) |
| 03/07/2025 | 22 | MOTION for Leave to Appear Pro Hac Vice for admission of Jessica L. Palmer by State of New Jersey. (Attachments: # 1 Affidavit Certificate of Jessica L. Palmer)(Morejon, Amanda) (Entered: 03/07/2025) |
| 03/07/2025 | 23 | MOTION for Leave to Appear Pro Hac Vice for admission of Elizabeth R. Walsh by State of New Jersey. (Attachments: # 1 Affidavit Certificate of Elizabeth R. Walsh)(Morejon, Amanda) (Entered: 03/07/2025) |
| 03/07/2025 | 24 | NOTICE of Appearance by Darren Bernens Kinkead on behalf of State of Illinois (Kinkead, Darren) (Entered: 03/07/2025) |
| 03/07/2025 | 25 | NOTICE of Appearance by Alex Finkelstein on behalf of State of New York (Finkelstein, Alex) (Entered: 03/07/2025) |
| 03/07/2025 | 26 | NOTICE of Appearance by Kathryn Meyer on behalf of State of New York (Meyer, Kathryn) (Entered: 03/07/2025) |
| 03/07/2025 | 27 | NOTICE of Appearance by Rabia Muqaddam on behalf of State of New York (Muqaddam, Rabia) (Entered: 03/07/2025) |
| 03/07/2025 | 28 | NOTICE of Appearance by Sandra S. Park on behalf of State of New York (Park, Sandra) (Entered: 03/07/2025) |
| 03/07/2025 | 29 | NOTICE of Appearance by Monica Hanna on behalf of State of New York (Hanna, Monica) (Entered: 03/07/2025) |
| 03/07/2025 | 30 | NOTICE of Appearance by Michael Fitzgerald on behalf of Denise Carter, Linda McMahon, U.S Department of Education (Fitzgerald, Michael) (Entered: 03/07/2025) |
| 03/07/2025 | 31 | NOTICE of Appearance by Adelaide H. Pagano on behalf of Commonwealth of Massachusetts (Pagano, Adelaide) (Entered: 03/07/2025) |
| 03/10/2025 | 32 | NOTICE OF ATTORNEY PAYMENT OF FEES as to 22 MOTION for Leave to Appear Pro Hac Vice for admission of Jessica L. Palmer, 23 MOTION for Leave to Appear Pro Hac Vice for admission of Elizabeth R. Walsh by Plaintiff State of New Jersey. Filing fee $ |

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 303 of 638
3/11/25, 12:07 PM                          CM/ECF - USDC Massachusetts - Version 1.8.2 as of 12/23/2024
Case 1:25-cv-00702-JRR    Document 24-3    Filed 03/11/25    Page 8 of 9

| | | 250, receipt number AMADC-10880513. Payment Type : PRO HAC VICE. (Morejon, Amanda) (Entered: 03/10/2025) |
|---|---|---|
| 03/10/2025 | [33](#) | NOTICE of Appearance by Matthew G. Lindberg on behalf of Commonwealth of Massachusetts (Lindberg, Matthew) (Entered: 03/10/2025) |
| 03/10/2025 | 34 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** [22](#) Motion for Leave to Appear Pro Hac Vice Added Jessica L. Palmer. **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. A Notice of Appearance must be entered on the docket by the newly admitted attorney. (SP) (Entered: 03/10/2025) |
| 03/10/2025 | 35 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** [23](#) Motion for Leave to Appear Pro Hac Vice Added Elizabeth R. Walsh. **Attorneys admitted Pro Hac Vice must have an individual upgraded PACER account, not a shared firm account, to electronically file in the District of Massachusetts. Counsel may need to link their CM/ECF account to their upgraded individual pacer account.** Instructions on how to link CM/ECF accounts to upgraded pacer account can be found at https://www.mad.uscourts.gov/caseinfo/nextgen-current-pacer-accounts.htm#link-account. (SP) (Entered: 03/10/2025) |
| 03/10/2025 | [36](#) | NOTICE of Appearance by Elizabeth R. Walsh on behalf of State of New Jersey (Walsh, Elizabeth) (Entered: 03/10/2025) |
| 03/10/2025 | [37](#) | MOTION for Leave to Appear Pro Hac Vice for admission of Lauren E. Van Driesen Filing fee: $ 125, receipt number AMADC-10882878 by State of New Jersey. (Attachments: # [1](#) Affidavit Certificate of Lauren E. Van Driesen)(Morejon, Amanda) (Entered: 03/10/2025) |
| 03/10/2025 | 38 | Electronic Clerk's Notes for proceedings held before Judge Myong J. Joun: Hearing held on 3/10/2025 re [2](#) MOTION for Temporary Restraining Order filed by State of Wisconsin, State of California, State of New Jersey, State of Maryland, State of Illinois, Commonwealth of Massachusetts, State of New York, State of Colorado. Caee no. 25cv702, out of Maryland noted; Court heard arguments and took said motion under advisement. (Court Reporter: Jamie Halpin at jkhhalpin@gmail.com)(Attorneys present: Barriger, Pagano, Faer, Palmer, and Shavit for the pltffs; Fitzgerald for the defts) (JL) (Entered: 03/10/2025) |
| 03/10/2025 | [39](#) | NOTICE of Appearance by Jessica L Palmer on behalf of State of New Jersey (Palmer, Jessica) (Entered: 03/10/2025) |
| 03/10/2025 | 40 | Judge Myong J. Joun: ELECTRONIC ORDER entered **GRANTING** [37](#) Motion for Leave to Appear Pro Hac Vice Added Lauren E. Van Drisen. |

JA 301

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 304 of 638
Case 1:25-cv-00702-JRR    Document 24-3    Filed 03/11/25    Page 9 of 9

| | | **Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.** <br><br> Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm. <br><br> A Notice of Appearance must be entered on the docket by the newly admitted attorney. <br><br> (SP) (Entered: 03/10/2025) |
|---|---|---|
| 03/10/2025 | 41 | Judge Myong J. Joun: ORDER entered. MEMORANDUM AND ORDER **GRANTING** Doc. 2 on Plaintiff States' Motion for Temporary Restraining Order(SP) (Entered: 03/10/2025) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/11/2025 11:03:21 | | |
| **PACER Login:** | mhfarber | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-10548-MJJ |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

JA 302

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 305 of 638
Case 1:25-cv-10548-MJJ    Document 41    Filed 03/10/25    Page 1 of 10
Case 1:25-cv-00702-JRR    Document 24-4    Filed 03/11/25    Page 1 of 10

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br>STATE OF CALIFORNIA; )<br>COMMONWEALTH OF MASSACHUSETTS; )<br>STATE OF NEW JERSEY; STATE OF )<br>COLORADO; STATE OF ILLINOIS; STATE )<br>OF MARYLAND; STATE OF NEW YORK; )<br>and STATE OF WISCONSIN, )<br> )<br>Plaintiffs, )<br> )<br>v. )<br> )<br>U.S. DEPARTMENT OF EDUCATION; )<br>DENISE CARTER, in her official capacity as )<br>former Acting Secretary of Education and )<br>current acting Chief Operating Officer, Federal )<br>Student Aid; LINDA MCMAHON, in her )<br>official capacity as Secretary of Education, )<br> )<br>Defendants. )<br>_____ ) | Civil Action No. 25-10548-MJJ |

## MEMORANDUM AND ORDER ON PLAINTIFF STATES' MOTION FOR TEMPORARY RESTRAINING ORDER

March 10, 2025

JOUN, D.J.

On March 6, 2025, the states of California, Massachusetts, New Jersey, Colorado,

Illinois, Maryland, New York, and Wisconsin (collectively, "Plaintiff States") filed suit against

defendants Secretary of Education Linda McMahon and former Acting Secretary of Education

Denise Carter, in their official capacities, and the United States Department of Education

("Department"; collectively, "Defendants"). Plaintiff States allege that, starting on February 7,

2025, the Department arbitrarily terminated all grants previously awarded under the Teacher

JA 303

USCA4 Appeal: 25-1281   Doc: 37-1      Filed: 06/16/2025    Pg: 306 of 638
Case 1:25-cv-10548-MJJ      Document 41      Filed 03/10/25    Page 2 of 10
Case 1:25-cv-00702-JRR      Document 24-4      Filed 03/11/25    Page 2 of 10

Quality Partnership ("TQP") Program and the Supporting Effective Educator Development ("SEED") Grant Program in violation of the Administrative Procedures Act ("APA").[1]

Plaintiff States filed a Motion for Temporary Restraining Order, [Doc. No. 2], and a hearing was held this afternoon at 2:30 P.M. Upon consideration of Plaintiff States' briefs and supporting evidence, the parties' oral argument, and for the reasons explained below, I <u>GRANT</u> Plaintiff States' Motion and enter a temporary restraining order ("TRO") against Defendants pursuant to the terms outlined at the end of this Order.

## I.     DISTRICT COURT JURISDICTION

Defendants argue the waiver of sovereign immunity in the APA, 5 U.S.C § 702, does not extend to actions of contract which are within the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491. Plaintiff States disagree, arguing waiver of sovereign immunity allows for suit in this Court.

Very recently, another session in this District examined this precise issue in a substantially similar case to this one. *Massachusetts v. Nat'l Institutes of Health,* No. 25-cv-10338, 2025 WL 702163 (D. Mass. Mar. 5, 2025). In that case, in a thoughtful analysis, Judge Angel Kelley determined that the "essence" of the action was not contractual in nature since the source of the plaintiffs' rights was in federal statute and regulations and because the relief was injunctive in nature. *See id.* at *8. I agree with, and adopt, Judge Kelley's reasoning and conclusion. Here, similarly, Plaintiff States seek equitable relief in the form of reinstatement of the TQP and SEED grants. Plaintiff States also seek to enjoin Defendants from implementing, giving effect to, maintaining, or reinstating under a different name the termination of any

---

[1] The parties do not dispute that the termination of SEED and TQP grants constituted final agency action.

2

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 307 of 638
Case 1:25-cv-10548-MJJ    Document 21    Filed 03/10/25    Page 3 of 10
Case 1:25-cv-00702-JRR    Document 24-4    Filed 03/11/25    Page 3 of 10

previously awarded TQP and SEED grants. In other words, Plaintiff States seek to preserve the previous status quo to alleviate corresponding harm; they are not alleging claims for past pecuniary harms. Plaintiff States have also sufficiently shown that the dispute does not hinge on the terms of a contract between the parties, but rather "federal statute and regulations put in place by Congress and the [Department]." *See id.* at *6. This Court retains jurisdiction.[2]

## II. TEMPORARY RESTRAINING ORDER

The standard for issuing a TRO—an "extraordinary and drastic remedy"—is "the same as for a preliminary injunction." *Orkin v. Albert*, 557 F. Supp. 3d 252, 256 (D. Mass. 2021) (cleaned up). Plaintiff States must show that weighing the following four interests favors granting a TRO:

> (i) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and (iv) the effect of the court's ruling on the public interest.

*Coquico, Inc. v. Rodriguez-Miranda*, 562 F.3d 62, 66 (1st Cir. 2009).

### A. Likelihood of Success

I begin with the likelihood of success on the merits, which is considered the most important of the four elements and the "sine qua non" of the calculus. *Ryan v. U.S. Immigr. & Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020). Plaintiff States allege that Defendants committed substantive violations of the APA by taking an agency action that is (1) arbitrary and capricious and an abuse of discretion, and (2) not in accordance with law. Based on the evidence before me now, I find that Plaintiff States are likely to succeed on the merits of their claims.

---

[2] For purposes of the TRO, Plaintiff States have established their recipient institutions of higher education and local educational agencies are public instrumentalities of Plaintiff States, which have standing to bring suit on their behalf.

USCA4 Appeal: 25-1281    Doc: 37-1       Filed: 06/16/2025    Pg: 308 of 638
Case 1:25-cv-10548-MJJ       Document 41    Filed 03/10/25    Page 4 of 10
Case 1:25-cv-00702-JRR       Document 24-4    Filed 03/11/25    Page 4 of 10

The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (cleaned up); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[A] fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." (cleaned up)). That "reasoned explanation requirement . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

The record reflects that there was no individualized analysis of any of the programs; rather, it appears that <u>all</u> TQP and SEED grants were simply terminated. See Doc. 8-13 at 60. And all the programs received the same standardized form letter notifying them of the grant terminations ("Termination Letter"), which states as follows:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. . . . In addition to complying

4

JA 306

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 309 of 638
Case 1:25-cv-10548-MJJ    Document 41    Filed 03/10/25    Page 5 of 10
Case 1:25-cv-00702-JRR    Document 24-4    Filed 03/11/25    Page 5 of 10

with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

[Doc. No. 1-1 at 2].

I see no reasoned explanation articulated for the Department's action here. First, the Termination Letter lists several theoretical bases for the grant terminations—stating the grants fund programs that, for example, "promote or take part in DEI initiatives" *or* "are not free from fraud, abuse, or duplication" *or* "otherwise fail to serve the best interests of the United States"—but fails to identify which of these bases applies here. This does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all. Second, even accepting any one of these bases as justification for the agency action, such as discrimination related to DEI initiatives, the Termination Letter is arbitrary and capricious because its statements are only conclusory. "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Amerijet*, 753 F.3d at 1350 (cleaned up); *see also Nat'l Institutes of Health*, 2025 WL 702163, at *18 ("[The agency's] proffered 'reasons' fail to grapple with the relevant factors or pertinent aspects of the problem and fails to demonstrate a rational connection between the facts and choice that was made."). There is no indication that the Department "examine[d] the relevant data," *Motor Vehicle Mfrs.*, 463 U.S. at 29; to the contrary, the record reflects a lack of the individualized reasoning and analysis required. To the extent that Defendants claim that it is sufficient explanation for the Department to baldly assert that the grants "no longer effectuate[]

JA 307

USCA4 Appeal: 25-1281    Doc: 37-1       Filed: 06/16/2025    Pg: 310 of 638
Case 1:25-cv-10548-MJJ    Document 41     Filed 03/10/25    Page 6 of 10
Case 1:25-cv-00702-JRR    Document 24-4    Filed 03/11/25    Page 6 of 10

Department policies," such an assertion cannot stand. In the absence of any reasoning, rationale, or justification for the termination of the grants, the Department's action is arbitrary and capricious.

The Department's failure to provide a reasoned explanation is "even more egregious in light of the drastic change" from the existing policies under which the grant awards had been authorized. *Nat'l Institutes of Health*, 2025 WL 702163, at *18. "Although a change in policy does not result in a heightened standard of review, if an agency's 'new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests' an agency's failure to consider such factors 'would be arbitrary or capricious.'" *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). In such cases, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016). As described, the Termination Letter failed to provide any reasoned explanation, let alone one that considered the facts and circumstances underlying the prior policy.

For these reasons, Plaintiff States are likely to succeed in their claims that the Department's action in terminating the grants is arbitrary and capricious.[3]

### B.  Irreparable Harm

Plaintiff States have adequately shown that they would be irreparably harmed if temporary relief were not granted. An "irreparable injury" for the purposes of preliminary relief is "an injury that cannot adequately be compensated for either by a later-issued permanent

---

[3] This suffices for purpose of the present TRO and I need not, at this time, reach the argument in Count II that there exists a separate ground for a substantive violation of the APA, i.e., an action not in accordance with the law.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 311 of 638
Case 1:25-cv-10548-MJJ    Document 41    Filed 03/10/25    Page 7 of 10
Case 1:25-cv-00702-JRR    Document 24-4    Filed 03/11/25    Page 7 of 10

injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies. The two are flip sides of the same coin: if money damages will fully alleviate harm, then the harm cannot be said to be irreparable." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989). Here, there is ample evidence that the Department's termination of all previously awarded TQP and SEED grants has already harmed, and will continue to harm, the programs and employees of those programs that rely on these grants. *See* [Doc. No. 8; Doc. Nos. 8-1 to 8-21].

The termination of funding for a program at the California State University with the objective of training and developing "highly qualified community-centered teachers who could staff and support high-need or high-poverty urban K-12 schools and students, particularly with regard in the areas of special education," has resulted in the loss of mentoring, training, and vital support for 26 students, and the loss of financial stipends for about 50 incoming students who need these stipends to participate in classroom teaching. [Doc. No. 8-3 at ¶¶ 7, 16, 22]. In New Jersey, The College of New Jersey was forced to cancel the remainder of its urban teacher residency program due to the loss of its TQP grant. [Doc. No. 8-9 at ¶ 21]. Here in Massachusetts, where Boston Public Schools had relied on their TQP grant to support their teacher pipeline programming designed to address the need and shortage of multilingual educators, [Doc. No. 8-2 at ¶ 8], the abrupt termination of this grant has resulted in the loss of three-full time employees who were being funded by the grant. [*Id.* at ¶ 28]. Thus, it is apparent that the harms which have already resulted, and which will continue to result, from the grant terminations are irreparable.

JA 309

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 312 of 638
Case 1:25-cv-10548-MJJ    Document 41    Filed 03/10/25    Page 8 of 10
Case 1:25-cv-00702-JRR    Document 24-4    Filed 03/11/25    Page 8 of 10

Moreover, I agree with Plaintiff States that a later-issued permanent injunction or damages remedy cannot compensate for such loss of federal funding. [*See* Doc. No. 7 at 24]. Plaintiff States have sufficiently established that the loss of this funding "threatens the very existence" of the teacher pipeline programs implemented by Plaintiff States, and there is no traditional remedy that can compensate Plaintiff States for the disruptions and discord resulting from the abrupt terminations of these grants. *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986); *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014) (unrecoverable funds can constitute irreparable harm). The record shows how the terminations have "upended months, if not years" of work required to implement programs that rely on these grants, and how terminations have impacted "budgets for staff, coursework, partner organizations, school districts, and student populations" and existing projects or projects already in progress. [Doc. No. 7 at 25]; *see, e.g.*, [Doc. No. 8-1 at ¶¶ 20-22 (loss of grant hindered a program at University of Massachusetts Amherst that was one and a half years into a five-year project with significant deliverables already scheduled); [Doc. No. 8-12 at ¶ 18 (grant termination interrupted recruitment and retention activities)].

For these reasons, Plaintiff States have established irreparable harm. *See K–Mart*, 875 F.2d at 915 ("District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief") (cleaned up).

### C.  Balance of Hardships/Effect on Public Interest

Finally, upon consideration of the last two factors, the balance of the equities weighs heavily in favor of granting Plaintiff States' TRO, and a TRO would serve the public interest.[4]

---

[4] The last two factors "merge when the Government is the party opposing the [TRO]." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 313 of 638
Case 1:25-cv-10548-MJJ    Document 41    Filed 03/10/25    Page 9 of 10
Case 1:25-cv-00702-JRR    Document 24-4    Filed 03/11/25    Page 9 of 10

The record shows that if I were to deny the TRO, dozens of programs upon which public schools, public universities, students, teachers, and faculty rely will be gutted. On the other hand, if I were to grant the TRO, as another court has put it, Defendants "merely would have to disburse funds that Congress has appropriated to the States and others." *New York v. Trump*, 25-cv-39, 2025 WL 357368, at *4 (D.R.I. Jan. 31, 2025) (cleaned up). I find that, "absent such an order, there is a substantial risk that the States and its citizens will face a significant disruption in health, education, and other public services that are integral to their daily lives due to this pause in federal funding." *Id.* Further, "[t]he fact that [Plaintiff States] have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest." *Id.* Accordingly, the last two factors weigh in favor of granting Plaintiff States' TRO.

### III.    CONCLUSION

For the reasons stated above, Plaintiff States' Motion for Temporary Restraining Order, [Doc. No. 2], is <u>GRANTED</u>. It is therefore <u>ORDERED</u> that, until further order is issued by this Court:

1.    Defendants shall immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded TQP or SEED grants for recipients in Plaintiff States;

2.    Defendants are temporarily enjoined from implementing, giving effect to, maintaining, or reinstating under a different name the termination of any previously awarded TQP or SEED grants for recipients in Plaintiff States, including but not limited to through the Termination Letter, Termination GAN, and any other agency actions implementing such terminations, such as suspension or withholding of any funds approved and obligated for the grants;

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 314 of 638
Case 1:25-cv-10548-MJJ    Document 41    Filed 03/10/25    Page 10 of 10
Case 1:25-cv-00702-JRR    Document 24-4    Filed 03/11/25    Page 10 of 10

3.      Defendants are temporarily enjoined from terminating any individual TQP and SEED grant for recipients in Plaintiff States, except to the extent the final agency action is consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's Order;

4.      Within 24 hours of entry of this Order, Defendants shall provide notice of the TRO to their employees and anyone acting in concert with them, and to all TQP and SEED grantees in Plaintiff States;

5.      Defendants shall file a status report with the Court, within 24 hours of entry of this Order, confirming their compliance with the Court's TRO;

6.      This TRO shall become effective immediately upon entry by this Court. The TRO shall remain in effect for 14 days; and

7.      By March 11, 2025 at 5 P.M., the parties shall jointly propose a briefing schedule regarding Plaintiff States' request for preliminary injunction.


SO ORDERED.

/s/ Myong J. Joun
United States District Judge

10

JA 312

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF<br>COLLEGES FOR TEACHER<br>EDUCATION, *et al.,* | |
| *Plaintiffs*, | |
| v. | Civil Action No.  1:25-cv-00702-JRR |
| LINDA MCMAHON,<br>AS SECRETARY OF EDUCATION, *et al.,* | |
| *Defendants*. | |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR A**
**TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

JA 313

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................1

II. ARGUMENT ...............................................................................................................1

    A.  Venue is Proper in The State of Maryland...........................................................1

    B.  MACTE has Established Standing.........................................................................4

    C.  Plaintiffs Are Likely To Succeed On The Merits. ...............................................7

        1. This Court's NADOHE Order Applies to Plaintiffs in this Action and the Department should be Enjoined from Enforcing the Termination of the TQP, SEED, and TSL Grants............................................................................................................ 7

        2. The Department's Termination of the TQP, SEED, and TSL Grants Violates the Administrative Procedures Act. ............................................................................ 9

    D.  Government's Argument with Respect to the Scope of Relief. ............................13

    E.  Plaintiffs' Request for Removing the Route Pay Condition is Clear.........................14

III. CONCLUSION ...........................................................................................................14

JA 314

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290 (N.D. Ala. 2003) .........................................2

*Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183 (4th Cir. 2018).................................................4

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ...........................................................4

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................................................5, 6

*Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012) ...................................................................5

*Manning v. Caldwell for City of Roanoke*, 930 F.3d 264 (4th Cir. 2019) .......................................8

*Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*,
    No. 1:25-CV-00333-ABA, 2025 WL 573764 (D. Md. Feb. 21, 2025) ............................5, 6, 7

*People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*,
    843 F. App'x 493 (4th Cir. 2021) .........................................................................5

*Republican Nat'l Comm. v. North Carolina State Board of Elections*, 120 F.4th 390
    (4th Cir. 2024)................................................................................................5

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) .............................................................................5, 6

*Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336 (6th Cir. 2005).............................................2

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ..................................................................4

**FEDERAL STATUTES**

2 C.F.R. § 200.340 ...............................................................................9, 10, 11, 12

20 U.S.C. § 1232................................................................................................10, 11

28 U.S.C. § 1391...................................................................................................2

U.S. Const. Amendment V .......................................................................................1

JA 315

## I.    INTRODUCTION

Plaintiffs have demonstrated that they are likely to succeed on the merits of their claims and that an injunction is both in the public interest and in the interest of the equities at play here. The Government does not dispute that in the absence of an injunction, Plaintiffs will suffer irreparable harm. ECF No. 24 ("Def. Br.") at 13. The Government also does not dispute that the termination of the TQP, SEED, and TSL grants constituted final agency action, or that the terminations, if undertaken today, would violate the NADOHE order. *See generally* Def. Br.

As a result, the remaining live issues are: (1) whether Plaintiffs are properly before this Court; (2) whether continued enforcement of terminations that would be unlawful if taken today is permissible because it preceded a court order; and (3) whether "agency Priorities" as used in Section 200.340(a)(4) provides for essentially limitless discretion in terminating grants, as the Government argues. As shown below, Plaintiffs have established both standing and venue in this action; the Department's continued enforcement of the terminations violates the Fifth Amendment to the Constitution via the NADOHE order; and the Government's interpretation of "agency priorities" is completely unsupported by the text and a common-sense read of the law at issue. The Court should enter a preliminary injunction ordering the Department to vacate the grant terminations for Plaintiffs and their members on both Fifth Amendment and APA grounds.

## II.    ARGUMENT

### A.    <u>Venue is Proper in The State of Maryland.</u>

Plaintiffs have invoked venue pursuant to § 1391(b)(2) and (e)(1), ECF No. 1 at ¶ 11, and venue is proper in this District under both provisions. Section 1391(e) establishes venue in this district because Plaintiff MACTE resides in this District, a proposition the Government neither challenges nor addresses in its brief. This is really the end of the inquiry, but since the Government challenges venue under (b)(2) as well, Plaintiffs will address it as well.

Where, as here, a defendant is an officer or employee of the United States acting in her official capacity (Defendant McMahon), or an agency of the United States (Defendant Department of Education), the action may be brought in a judicial district where "the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1)(C). Federal courts applying this venue provision have concluded that only a single plaintiff need reside in the district to establish venue. *See A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1301 (N.D. Ala. 2003) (collecting cases and remarking that "[f]or over thirty years federal courts have conclusively and consistently held that the statutory language in 28 U.S.C. § 1391(e)(3)[1] regarding the residency of 'the plaintiff' should be interpreted to mean ***any*** plaintiff rather than ***all*** plaintiffs.") (emphasis in original); *see also id.* at 1302 ("This court concludes that under 28 U.S.C. § 1391(e)(3), a suit can be brought in any district in which a single plaintiff resides."); *Sidney Coal Co. v. Soc. Sec. Admin.*, 427 F.3d 336, 345-46 (6th Cir. 2005) ("[T]he case law and legislative history compel this Court to hold that the residency requirement of 28 U.S.C. § 1391(e)(3) is satisfied if at least one plaintiff resides in the district in which the action has been brought."). This action names as defendants an executive branch official sued in her official capacity and an agency of the United States. ECF No. 1 at ¶ 15-16. MACTE is a resident of Maryland with its principal place of business located at 304 Hawkins Hall, Towson University, Towson, Maryland 21252. ECF No. 1 at ¶ 14. Venue is, therefore, plainly proper pursuant to § 1391(e)(1)(C).

And as noted, although Plaintiffs need not satisfy two different bases for venue, they do. Venue is also proper in this District because a substantial part of the events giving rise to the claim occurred in Maryland. As a threshold matter, MACTE is a member organization—not a "Maryland

---

[1] 28 U.S.C. § 1391(e) was restyled in 2011 to remove the numeric list—e.g., (1), (2), (3)—and insert the letters (A), (B), and (C).

JA 317

chapter" of a national organization. ECF No. 1 at ¶ 14 (describing MACTE as "membership organization" that includes "regionally accredited colleges and universities engaged in the preparation of professional school personnel with state program approval"); ECF No. 24 at 15.

More specifically, three of MACTE's member organizations—Towson University, the University of Maryland, and Frostburg State University—suffered termination of SEED and/or TQP grants. Supplemental Declaration of Laurie Mullen ("Supp. Mullen Decl.") at ¶ 4. Towson University's TQP grant was terminated in February 2025 by the Department. The TQP grant was approved on September 4, 2024, for a period of one year (October 1, 2024 to September 30, 2025), in the amount of $849,659. Future budget periods were outlined as follows: budget period 2 (10/1/2025-9/30/2026) - $811,249; budget period 3 (10/1/2026-9/30/2027) - $1,099,920; budget period 4 (10/1/2027-9/30/2028) - $1,240,123; budget period 5 (10/1/2028-9/30/2029) - $1,152,933. Supp. Mullen Decl. at ¶ 6. The University of Maryland's SEED grant was terminated in February 2025 by the Department. The terminated SEED grant was approved to begin on October 1, 2022, for a period of three years, in the amount of $4,808,683. Supp. Mullen Decl. at ¶ 7. Frostburg State University's TQP grant was also terminated in February 2025. Supp. Mullen Decl. at ¶ 8.

The Government represents that the grant terminations described in the Complaint "occurred in eight states but not in Maryland," ECF No. 24 at 13, a perplexing assertion not just because the Plaintiffs attached a declaration to their motion making clear that Maryland programs were impacted by the grant termination (ECF No. 5-5 (stating the grant terminations "result[ed] in a substantial loss of funds for teacher preparation programs in Maryland")), but because the Government cites, and is thus presumably familiar with, litigation proceeding as *California v. U.S. Dep't of Educ.*, 1:25-cv-10548-MJJ, in the District of Massachusetts. ECF No. 24 at 11-12, 17

3

JA 318

(recognizing that "Maryland grants were terminated"), in which multiple declarations and the

Court's opinion entering a TRO confirmed that Maryland-based grants were terminated.

Specifically, the Department terminated MACTE member Towson University's TQP grant

funding, which effectively terminated Towson's Preparing and Retaining Inclusive Maryland

Educators ("PRIME") project. A true and accurate copy of the Towson declaration filed in that

case is attached as Exhibit A to the Declaration of Joshua W.B. Richards ("Richards Decl.").

Another declaration in that case detailed resultant harm of SEED grant termination in Maryland

for another MACTE member, the University of Maryland. *California v. U.S. Dep't of Educ.*, 1:25-

cv-10548-MJJ, ECF No. 8-15. A true and accurate copy of that declaration is attached as Exhibit

B to the Richards Declaration. Not only that, but it is a matter of public record, of which this Court

may take judicial notice, that Maryland grants were awarded, including those to Towson, Frostburg

State, and the University of Maryland: https://www.ed.gov/grants-and-programs/teacher-

prep/teacher-quality-partnership-program#awards, https://www.ed.gov/grants-and-

programs/teacher-prep/supporting-effective-educator-development-grant-program#awards; It is

also not in matter of reasonable dispute that the Government has terminated all teaching grants.

*See* Richards Decl. Ex. C. Accordingly, a substantial portion of events took place in Maryland and

venue in this District is proper pursuant to § 1391(b)(2) as well.

### B.    MACTE has Established Standing.

To demonstrate standing, a plaintiff must show "(i) that she has suffered or likely will

suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant,

and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. All. for

Hippocratic Med.*, 602 U.S. 367, 380 (2024); *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183,

187 (4th Cir. 2018). "To establish injury in fact, a plaintiff must show that he or she suffered an

invasion of a legally protected interest that is concrete and particularized and actual or imminent,

JA 319

not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (cleaned up).

An organization can establish standing in one of two ways: either "in its own right to seek judicial relief for injury to itself," or "as a representative of its members who have been harmed." *People for Ethical Treatment of Animals, Inc. v. Tri-State Zoological Park of W. Md., Inc.*, 843 F. App'x 493, 495 (4th Cir. 2021) (citation omitted). An organization must only "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (emphasis omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)); *see also Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *9 (D. Md. Feb. 21, 2025) ("When an organization is alleging harm, it may establish standing based on its own injury or based on its members' injuries, the latter of which is called representational or associational standing.") (citing *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023)).

Moreover, "[a]n organization may have standing to sue on its own behalf for injuries it sustains as a result of a defendant's actions." *Republican Nat'l Comm. v. North Carolina State Board of Elections*, 120 F.4th 390, 395 (4th Cir. 2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). "[T]he organization must make the necessary showing to demonstrate Article III standing—an injury-in-fact, caused by the defendant, that can be redressed by a favorable decision from the court." *Id.* (quoting *Hippocratic Medicine*, 602 U.S. at 393–94); *see also Lane v. Holder*, 703 F.3d 668, 674 (4th Cir. 2012) (recognizing that an organization must show it has suffered an "injury in fact," in that defendant's "actions impede its efforts to carry out its mission." (citation omitted); *Havens Realty*, 455 U.S. at 379 (observing that an organization

JA 320

has standing to sue in its own right if the organization has suffered a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests").

MACTE has done more than show an "intense interest" or "strong opposition" to the challenged conduct. ECF No. 24 at 16. It has demonstrated that numerous of its members suffered actual harm. ECF No. 1 at ¶ 14. If there were any doubt, the Supplemental Mullen Declaration, attached hereto, makes the point abundantly clear. Defendants terminated grant funding for three Maryland educational institutions, each of which are MACTE members: Towson University, Supp. Mullen Decl. at ¶ 6; the University of Maryland, Supp. Mullen Decl. at ¶ 7; and Frostburg State University, Supp. Mullen Decl. at ¶ 8. Because MACTE's member organizations suffered an injury in fact—*i.e.*, termination of grant funding—MACTE has standing to pursue this action. *See S. Walk*, 713 F.3d at 184.

To be sure, the termination of its member organizations' SEED and/or TQP grants also significantly impairs MACTE's core mission. ECF No. 1 at 14. This is a "concrete and demonstrable injury" to MACTE that drains its resources. *Havens Realty*, 455 U.S. at 379.

Finally, Plaintiffs alleged that all of the grant recipients are similarly situated. ECF No. 1 at ¶ 6 ("All of the Grant Recipients are similarly situated because the substance of each Termination Letter and added terms and conditions in the Grant Award Notifications from the Department are identical, indicating the same reasons with the same terminology for the grant terminations."). MACTE has, therefore, established organization standing.

JA 321

C.    **Plaintiffs Are Likely To Succeed On The Merits.**

> *1.    This Court's NADOHE Order Applies to Plaintiffs in this Action and the Department should be Enjoined from Enforcing the Termination of the TQP, SEED, and TSL Grants.*

The heart of the Government's argument with respect to the NADOHE order[2] is that, yes, the Department terminated the grants at issue here because of DEI, which flowed from the J20 order, *see* ECF No. 24 at 8 (citing Department directives, including one that "Diversity, Equity, and Inclusion initiatives unlawfully discriminate on the basis of race, color, religion, sex, national origin, or other protected characteristic") (cleaned up), but, the Government argues, because the Department terminated the grants *before* the NADOHE order was issued, neither the order nor the reasoning supporting it apply. The Government is wrong.

*First*, and as set forth in Plaintiff's brief, the Government's argument turns the principles underlying the NADOHE order on their head. The J20 order was unconstitutionally vague because it did not sufficiently define what kind of conduct was unlawful, and therefore deprived courts of the ability to test its lawfulness and deprived grant recipients (and others) of the opportunity to seek to conform their conduct to the law *before* being deprived of rights. *See Nat'l Assoc. of Diversity Officers in Higher Ed., et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA, 2025 WL 573764, at *19-20 (D. Md. Feb. 21, 2025).

The fact that Plaintiffs here had no opportunity to even attempt to conform their conduct because the Government acted pursuant to an unlawful order before Plaintiffs sought relief does

---

[2] The Court issued a Clarified Preliminary Injunction on March 10, 2025 in *National Association of Diversity Officers in Higher Education, et al. v. Donald J. Trump, et al.*, No. 1:25-CV-00333-ABA. The Clarified Preliminary Injunction redefines "Enjoined Parties" to include: "Defendants other than the President, as well as all other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions directed pursuant to the J20 and J21 Orders[.]" It does not modify the Court's prior Order issued on February 21, 2025 in any substantive way relevant to this action.

JA 322

not make the J20 order less unconstitutionally vague or, critically, the continued enforcement of deprivations that flowed from the order less unlawful. *See Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019) (observing that the purpose of the fair notice requirement is to provide an opportunity for individuals to "conform their conduct to the proscriptions of the law") (citation omitted); *see also id.* at 278 (condemning unconstitutionally vague statutory language that invited arbitrary enforcement). To conclude otherwise would create incredible perverse incentives for government officials to shoot first and answer questions later, which is in fact what seems to have happened here. Plaintiffs' deprivation was compounded by the lack of any real opportunity for a post-deprivation challenge to the termination decisions because the form termination letters failed to provide any specificity about the reason that the Department found any individual grant allegedly "inconsistent with. . . Department priorities." The form termination letters instead merely list, disjunctively, five vague ways in which the specific grant at issue might be "inconsistent" with purported agency priorities.

Second, the Government argues at page 20 of its brief that the "documentary record indicates agency review;" this is presumably meant to be contrasted with generalized and unreasoned terminations based on the vague and undefined concepts in the J20 Order. The Government provides no citation to support its assertion of "agency review," which is, in fact, belied by the record before the Court. The termination letters and Grant Award Notifications ("GANs") filed with the Court, which Plaintiffs have alleged are essentially identical across all their members' terminations, *see* ECF 1 at ¶¶ 5-6, demonstrate that no independent agency review of individual grants, underscoring the fears that accompany a vague order like J20.

No exemplar grant termination presented by the Government lists any actual reason that any individual grant violates any term or condition of the award, to say nothing of how it might

8

violate the J20 Order (even if that order were not unlawful). None of the termination letters presented by Plaintiffs do either. *See* ECF No. 1-1 at 4, 10, 16, 22, 28, 34, 40; ECF No. 1-2 at 1, 3, 5, 7, 9, 11, 13; *see also* Richards Decl. Ex. A at 68, 72, Ex. B at 68. To the contrary, the Department undertook no individualized inquiry into specific grants, instead sending a form letter and a form basis in each GAN terminating the grants, and then issued a press release.

The Government mounts no serious challenge to the proposition that its terminations of Plaintiffs' members grants would be unlawful under the NADOHE order if undertaken today. Its argument that continued enforcement of those terminations is somehow insulated from scrutiny under the same standard lacks any justification and should be rejected by the Court.

### 2.    *The Department's Termination of the TQP, SEED, and TSL Grants Violates the Administrative Procedures Act.*

The Government does not dispute that the grant terminations at issue here constitute final agency action under the APA.

In attempting to justify the terminations, the Government begins by conceding that Federal regulations allow agencies to terminate grants for "no other reason" apart from when "an award no longer effectuates . . . agency priorities." ECF No. 24 at 25 (citing 2 C.F.R. § 200.340).[3] As an initial matter, the Government points to no explanation as to *how* the individual terminated awards, or even the awards writ large, failed to effectuate those priorities, or what the priorities are, or by what process the priorities were "issued," beyond arguing that there are "big picture" priorities that every administration may have and that the grants here were terminated for that reason. The closest the Government comes to articulating a reason is a hedged denial that it was because of

---

[3] While it is true that the failure to effectuate agency priorities is the only ground for termination at issue here, there are actually four reasons a federal award could be terminated, all enumerated in Section 200.340(a).

JA 324

DEI. *See* Def. Br. at 20 ("Although Plaintiffs assume DOE terminated their grants because of the J20 Executive Order that NADOHE enjoined, DOE does not concede this and the documentary record indicates independent agency review.") The Government's arguments here are neither developed nor persuasive.

First, the Government argues that the provision in the Uniform Guidance, 2 CFR Part 200 – the federal government rules for grants – stating that the Federal agency can terminate an award if it no longer "effectuates the program goals or agency priorities," 2 C.F.R. § 200.340, confusingly does not actually refer to agency grant Priorities at all. The Government acknowledges that if that were the case, the Priorities would need to be set through notice and comment rulemaking. *See* ECF No. 24 at 24. The Government's reading, divorcing the term "agency priorities" from the context of grants in which it appears, requires a willful disregard for the provisions that surround the use of the term. Section 200.340 is about termination of grants and 2 C.F.R. Part 200, in which it appears, is devoted entirely to the administration of federal awards. Section 200.340(a)(1) states that the terms and conditions of the grant must be followed, and 200.340(a)(4) refers to the goals of the grant program or agency priorities. A plain reading of 200.340(a)(4) makes it clear that throughout the subclause, the regulation speaks to different aspects of *grants* – namely, grant program goals and grant Priorities, the very Priorities that were set when the grant was awarded and which can only be reset through rulemaking.

As explained in Plaintiffs' brief in support of their motion, the statute governing how the Education Department specifically must set Priorities for grants is GEPA, 20 U.S.C. § 1232(d). The Department of Education is unique in being obliged by a specific statute to use notice and comment rulemaking for grants. GEPA instructs clearly that the ordinary and general APA exemption for rulemaking for grants does not apply to the Education Department (except in limited

JA 325

circumstances, not relevant here). 20 U.S.C. § 1232(d). This matters because the Government argues as a policy matter, and erroneously, that if the rule is interpreted to mean what it says, every federal agency would be powerless to shift its activities with new Presidential administrations absent a lengthy public rulemaking process. But in fact, only the Education Department is subject to GEPA, and Congress stated that decision unambiguously, so the Government's argument in that regard holds no water.

The parties agree that agency Priorities do and must reflect each Administration's specific missions and agenda. Even so, Congress specifically passed a law stating that for the Department of Education, agency Priorities for grants must go through rulemaking. This Department has not done so, it cannot utilize new, un-set "Priorities" to determine what has or has not been effectuated.

But even if the Department's attenuated position that the words "agency priorities" for grants in the termination regulation did not refer to the same "priorities" explicitly required elsewhere in Department grant regulations, it would not change the fact that Defendants *still* did not follow the proper procedure in terminating the TQP, SEED, and TSL grants in February 2025. The Government's deflection on agency priorities just opens the door to greater problems.

The Department's articulated reason for the grant terminations in the GANs and termination letters, which Defendants repeat in their Opposition, is that the grants were terminated because they are "inconsistent with,[4] and no longer effectuate[], Department priorities," citing to 2 C.F.R. § 200.340(a)(4). But Section 200.340(a)(4) actually provides that a federal award may be terminated "[b]y the Federal agency or pass-through entity *pursuant to the terms and conditions of the Federal award,* including*,* to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." (emphasis added). The word "including," in this instance,

---

[4] The phrase "inconsistent with" does not appear in the termination regulation. *See* 2 C.F.R. § 200.340(a)(4).

JA 326

must be read to bring everything that follows it within the scope of the phrase that immediately precedes it, to wit: "pursuant to the terms and conditions of the grant award." Section 200.340(b) goes on to provide that "[t]he Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."

In other words, all reasons that the Federal agency may terminate the grant **must** be "clearly and unambiguously" specified in the terms and conditions of that particular grant, and **only if** the terms and conditions specify that the Federal agency may terminate for "no longer effectuat[ing] [] agency priorities" in a clear and unambiguous way is the Federal agency permitted to do so. This raises a number of obvious problems for the Government's proposed alternative reading of (a)(4), because the terms and conditions of the Federal awards here contain just one line that states that "2 CFR PART 200." *See* Supplemental Declaration of Kathlene Campbell on behalf of NCTR Ex. A at 4; Richards Decl. Ex. A at 15; Richards Decl. Ex. B at 14.

The Government points to nowhere in the Federal awards at issue where the terms and conditions specifically state that a grant may be terminated for no longer effectuating actual agency priorities, let alone a tortured reading of "agency priorities" so far divorced from the rest of the statutory and regulatory scheme so as to provide for limitless flexibility. It goes without saying, then, that the terms and conditions do not state in a "clear and unambiguous" manner that the Department may terminate awards on the basis of a change in what the Government somewhat mushily calls "big-picture Department priorities," which require no notice, no reasoned basis, and appear to be the definition of the arbitrariness the APA was intended to avoid.

It bears emphasis that agency priorities are not subject to whim. In pointing out the error of the Government's argument on this point, and the implications of their argument, Plaintiffs are

JA 327

not inviting the Court to rule on matters beyond the scope of those necessary to resolve the claims at issue; this motion can and should be resolved by ruling that "agency priorities" do not change without rulemaking, and the Department has neither engaged in rulemaking nor explained how any of the terminated grants have ceased to effectuate priorities they met when they were awarded. But in the event the Court finds it necessary to test the Government's contrary argument, the Government fails in its task because nothing approaching the level of discretion to unilaterally terminate appeared alongside "2 CFR PART 200" in Plaintiffs' notices of award, so regardless of what "agency priorities" in the termination provision refers to, the Department failed to follow its regulations.

### D.    Government's Argument with Respect to the Scope of Relief.

The Government argues that if relief is granted, it should be limited in two ways. First, the Government argues that if granted, a preliminary injunction should be limited in scope to include only the terminated grants of those member organizations which were specifically identified by name in Plaintiffs' Complaint. However, the Government fails to acknowledge that Plaintiffs alleged that all of the grant recipients are similarly situated. ECF No. 1 at ¶ 6 ("All of the Grant Recipients are similarly situated because the substance of each Termination Letter and added terms and conditions in the Grant Award Notifications from the Department are identical, indicating the same reasons with the same terminology for the grant terminations."). Simply providing relief to the member organizations which submitted Declarations in conjunction with the Complaint would deprive all of the similarly situated member organizations the relief to which they are similarly entitled and subject them to harm that the Government has already conceded is irreparable. *See also* Richards Decl. Ex. C (email from the Department on February 21, 2025 confirming that "[a]ll the grants have been terminated[.]"). Accordingly, it would be inequitable for relief to be limited in the manner suggested by the Government.

13

JA 328

Second, while it is unclear if the Government is asking for the Court to remand the matter to the Department to provide an explanation for each grant termination in the absence of a preliminary injunction, or to limit an injunction to such relief, in any event, such a remand would likewise perpetuate irreparable harm and is accordingly inequitable and not in the public interest as a remedy.

### E.    Plaintiffs' Request for Removing the Route Pay Condition is Clear.

While the Government attempts to sidestep responding to Plaintiffs' allegations with respect to route pay by briefly arguing that Plaintiffs' reference to route pay is unclear, that is simply not the case. Not only does Plaintiffs' brief devote an entire section to detail how the imposition of the route pay condition is unlawful (ECF No. 5-1 at 33-34), but Plaintiffs' Motion expressly requests relief in the form of ordering Defendants to "[r]emoving the route pay grant conditions from TQP, SEED, and TSL grants." ECF No. 5 at 2. Plaintiffs' request is clear, as is its right to relief, and so Plaintiffs continue to request that its right to preliminary relief sought in its motion not be impaired by the Department unlawfully placing further roadblocks in the way of their continued access to grant funding.

## III.    CONCLUSION

For the foregoing reasons, and the reasons set forth in Plaintiffs' Memorandum of Law in Support of Their Motion for Temporary Restraining Order/Preliminary Injunction, Plaintiffs respectfully request that the Court enter a preliminary injunction consistent with its request.

JA 329

Dated: March 12, 2025                    Respectfully Submitted,

                             */s/ Joshua W.B. Richards*

Joshua W.B. Richards (*Admitted Pro Hac Vice*)
Carolyn M. Toll (*Admitted Pro Hac Vice*)
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 972-7737
joshua.richards@saul.com
carolyn.toll@saul.com

Daniel M. Moore (Bar No. 21834)
SAUL EWING LLP
1001 Fleet Street, Ninth Floor
Baltimore, Maryland 21202-4359
Telephone: (410) 332-8734
Facsimile: (410) 332-8862
daniel.moore@saul.com

*Counsel for Plaintiffs*

JA 330

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 12th day of March, 2025, **Plaintiffs' Reply in Further Support of Their Motion for Temporary Restraining Order/Preliminary Injunction and Exhibits** was filed with the Clerk of the Court by using the CM/ECF system. I certify that the following counsel of record are registered as ECF filers and that they will be served by the CM/ECF system:

**Molissa Heather Farber**
US Attorney's Office District of MD
36 S Charles St, 4th Fl
Baltimore, MD 21201
410-209-4862
molissa.farber@usdoj.gov

*Attorney for Defendants*

*/s/ Joshua W.B. Richards*
Joshua W.B. Richards

JA 331

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.,* | |
| *Plaintiffs*, | |
| v. | Civil Action No.  1:25-cv-00702-JRR |
| LINDA MCMAHON, AS SECRETARY OF EDUCATION, *et al.,* | |
| *Defendants*. | |

**SUPPLEMENTAL DECLARATION OF LAURIE MULLEN, PH.D., IN FURTHER SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER / <u>PRELIMINARY INJUNCTION</u>**

I, Laurie Mullen, Ph.D., declare and state under penalty of perjury the following:

1.      I am the President of Maryland Association of Colleges for Teacher Education ("MACTE"), one of the plaintiffs in this case. I am also the Dean of the College of Education at Towson University.

2.       I am over the age of 18, and I am competent in all respects to testify to the matters below.  I understand that this Supplemental Declaration is for use in connection with the above-captioned civil action, and I make this Supplemental Declaration based upon my own personal knowledge and my review of the MACTE's business records.

3.      MACTE has ten member organizations, all of which are residents of Maryland.

4.      MACTE has three member organizations which were awarded SEED and/or TQP grants which were termination in February 2025, resulting in a substantial loss of funds for teacher preparation programs in Maryland.

JA 332

5.      Specifically, Towson University, the University of Maryland, and Frostburg State University are all member organizations of MACTE.

6.      Towson University's TQP grant was terminated in February 2025 by the Department. The TQP grant was approved on September 4, 2024, for a period of one year (October 1, 2024 September 30, 2025), in the amount of $849,659. Future budget periods were outlined as follows: budget period 2 (10/1/2025 9/30/2026) - $811,249; budget period 3 (10/1/2026 9/30/2027) - $1,099,920; budget period 4 (10/1/2027 9/30/2028) - $1,240,123; budget period 5 (10/1/2028 9/30/2029) - $1,152,933.

7.      The University of Maryland's SEED grant was terminated in February 2025 by the Department. The terminated SEED grant was approved to begin on October 1, 2022, for a period of three years, in the amount of $4,808,683.

8.      Frostburg State University's TQP grant was terminated in February 2025 by the Department.

9.      The loss of the funding of the TQP and SEED grants in Maryland for MACTE's member organizations has caused, and will continue to cause, a substantial loss of funds for teacher preparation programs in Maryland.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the _12_ day of March, 2025

By: *Laurie Mullen*
   Laurie Mullen, Ph.D.

JA 333

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

|  |  |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.,*<br><br>        *Plaintiffs,*<br><br>    v.<br><br>LINDA MCMAHON,<br>AS SECRETARY OF EDUCATION, *et al.,*<br><br>        *Defendants.* | Civil Action No.  1:25-cv-00702-JRR |

## <u>DECLARATION OF JOSHUA W. B. RICHARDS, ESQ.</u>

I, JOSHUA W. B. RICHARDS, declare as follows:

1.    I am admitted *pro hac vice* in this Court in connection with the above captioned matter.

2.    I am a partner at the law firm Saul Ewing LLP, counsel for Plaintiffs the American Association of Colleges for Teacher Education, the National Center for Teacher Residencies, and the Maryland Association of Colleges for Teacher Education (collectively, "Plaintiffs").

3.    I submit this declaration in support of Plaintiffs' Reply in Further Support of Their Motion for Temporary Restraining Order/Preliminary Injunction.

4.    In support of Plaintiffs' Reply in Further Support of Their Motion for Temporary Restraining Order/Preliminary Injunction, I attach true and correct copies of the following exhibits:

JA 334

a. <u>Exhibit A</u>: Declaration of Laurie Mullen on Behalf of Towson University filed in *State of California et al. v. U.S. Department of Education et al.,* District of Massachusetts Case No. 1:25-cv-10548-MJJ, Dkt. No. 8-14.

b. <u>Exhibit B</u>: Declaration of Segun Eubanks on Behalf of the University of Maryland filed in *State of California et al. v. U.S. Department of Education et al.,* District of Massachusetts Case No. 1:25-cv-10548-MJJ, Dkt. No. 8-15.

c. <u>Exhibit C</u>: Email exchange between the Department of Education and Chicago Public Schools dated February 21, 2025 confirming termination of all grants and filed in *State of California et al. v. U.S. Department of Education et al.,* District of Massachusetts Case No. 1:25-cv-10548-MJJ, Dkt. No. 8-13.

I declare that the foregoing is true and correct.

Respectfully submitted,

Date: March 12, 2025

Joshua W. B. Richards
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania  19102
(215) 972-7737
joshua.richards@saul.com

*Attorney for Plaintiffs*

JA 335

Exhibit A

JA 336

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 339 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 1 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 4 of 152

# E  HIBIT

USCA4 Appeal: 25-1281   Doc: 37-1      Filed: 06/16/2025   Pg: 340 of 638   Page 2 of 75
Case 1:25-cv-10548-MJJ   Document 8-14   Filed 03/06/25
Case 1:25-cv-00702-JRR   Document 25-2   Filed 03/12/25   Page 5 of 152

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| STATE OF CALIFORNIA; COMMONWEALTH OF MASSACHUSETTS; STATE OF NEW JERSEY; STATE OF COLORADO; STATE OF ILLINOIS; STATE OF MARYLAND; STATE OF NEW YORK; and STATE OF WISCONSIN, | |
| Plaintiffs, | |
| v. | Case No. 1:25-cv-10548 |
| U.S. DEPARTMENT OF EDUCATION; DENISE CARTER, in her official capacity as former Acting Secretary of Education and current acting Chief Operating Officer, Federal Student Aid; LINDA MCMAHON, in her official capacity as Secretary of Education, | |
| Defendants. | |

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 341 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 3 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 6 of 152

## DECLARATION OF LAURIE MULLEN

I, Laurie Mullen, declare as follows:

1.      I am a resident of the State of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein, except as to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.      I am currently employed by Towson University as the Dean of the College of Education. Towson University is a constituent institution of the University System of Maryland, the State of Maryland's public system of higher education.

3.      As Dean, I lead the oldest and largest College of Education in the State of Maryland and support 198 faculty and 4,431 students.

4.      In 2024, the Department of Education (ED) invited applications for the Teacher Quality Preparation Program (TQP).

5.      Per the funding announcement in the Federal Register, the purposes of the TQP program are to improve student achievement; improve the quality of prospective and new teachers by improving the preparation of prospective teachers and enhancing professional development activities for new teachers; hold teacher preparation programs at institutions of higher education accountable for preparing teachers who meet applicable State certification and licensure requirements; and recruit highly qualified individuals, including individuals of color and individuals from other occupations, into the teaching force.

6.      As set out in its grant proposal, Towson University intended to use the TQP grant, which Towson titled Preparing and Retaining Inclusive Maryland Educators ("PRIME"), to collaborate with community college and school system partners to improve the quality of Maryland's teacher pipeline, Towson's teacher preparation program, and induction in two large

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 342 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 4 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 7 of 152

districts, thereby improving the academic achievement of PreK-6 students. The PRIME project intended to create 'Expert Groups' to revise and improve preparation and induction through strong advising; evidence-based practices in teaching literacy, math, and science; social and emotional learning; meeting needs of English Learners and special education students; incorporating Universal Design for Learning; and improving cultural competencies. PRIME was designed to effectively train 400 new elementary, early childhood, special education, and English Learner teachers over the 5-year grant.

7.    Intended outcomes also included that these graduates would be hired in high-need schools and high-need districts and persist in teaching for at least three years; approximately 50 mentor teachers supporting PRIME pre-service teachers would earn National Board Certification; partnerships with the Teacher Academy of Maryland and local school systems would boost grow-your-own program size and quality; partnerships with community colleges would improve teacher recruitment and diversity; and the development of a new degree in bilingual education would support state needs for ESOL teachers.

8.    The PRIME grant was approved on September 4, 2024, for a  period of one year (October 1, 2024 – September 30, 2025), in the amount of $849,659. Future budget periods were outlined as follows: budget period 2 (10/1/2025 – 9/30/2026) - $811,249; budget period 3 (10/1/2026 – 9/30/2027) - $1,099,920; budget period 4 (10/1/2027 – 9/30/2028) - $1,240,123; budget period 5 (10/1/2028 – 9/30/2029) - $1,152,933.

9.    On September 4, 2024, ED produced a Grant Award Notification (GAN) setting forth the terms and conditions of the grant award. A true and correct copy of the corresponding GAN and its attachments, dated September 4, 2024, is attached as Exhibit A. The September 4, 2024, GAN budget was modified slightly by ED and reissued on September 6, 2024.  A true and

JA 340

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 343 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 5 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 8 of 152

correct copy of the revised GAN, dated September 6, 2024, is attached as Exhibit B.  As set forth therein, termination of the grant by ED is permitted only if a recipient or subrecipient (1) "materially fails to comply with any term of an award" (September 4 GAN Attachment 5); or (2) engages in violations of human trafficking (September 4 GAN Attachment 8).

10.    Since October 1, 2024, Towson University has used the TQP grant funds in a manner fully consistent with ED's statements regarding the nature of the grant and Towson University's PRIME grant application.

11.    Upon notification of the grant award, the project principal investigator (PI) Laila Richman, Ph.D., notified all grant partners of the award and shared that meetings would begin in late fall/early spring after a project director was hired. In alignment with the proposed management plan and grant requirements, the project staff had completed the search for a project director and had extended an offer to the candidate selected on February 3, 2025. Given the timing of the offer and concerns related to the stability of federal awards, the candidate declined the position; the grant was terminated before Towson could make an offer to the next candidate. Search committees for two additional positions (Program Specialist and Advising Coach) were also set to begin in February. All three positions were anticipated to be filled by March 31, 2025, as required by the grant. Partner meetings with community colleges and school systems were planned for March 2025.

12.    Upon notification of the grant award, co-principal investigators began work in each grant outcome area: induction, curriculum redesign, multilingual education, advising, and pathways. A draft proposal for the new multilingual education program was developed, a gap analysis of the current curriculum and new regulations was completed, and a faculty workgroup focused on induction was established. Internal budgets were also developed to support workgroups

3

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 344 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 7 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 9 of 152

designated for students at the community colleges, payment to Southern Regional Education Board for site visit and curriculum audit, payment to RMC Research Corporation for evaluation work, and stipends to teachers, community college faculty, and TU faculty for participation in workgroups related to grant activities. These expenditures are in alignment with the approved budget timeline.

15.    Towson University remained in compliance with the terms of the award throughout the entire period of performance, including timely submission of revised documents requested by ED, immediate award setup upon receipt of the initial award documents and drawing down funds from the G5 grants management system on a regular basis for expenses incurred. Project staff complied with all project deadlines, attended all required activities, and submitted all required documentation. The submitted budget, logic model, and project plan were all approved, and the Quarter 1 meeting with the program director was successful, with the project meeting all requirements.

16.    On February 12, 2025, without any prior notice or indication, ED informed Towson University that effective February 12, 2025, its PRIME grant was being terminated. A true and correct copy of ED's grant award termination letter is attached as Exhibit C. A true and correct copy of ED's email from Mark Washington to PRIME grant PI Dr. Richman attaching the grant award termination letter is attached as Exhibit D.

17.    Per the ED grant termination notice, the TU PRIME grant was terminated because it provides funding for programs that "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or other protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education;

5

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 345 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 8 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 10 of 152

that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States." The ED grant termination notice also stated that, "the grant is therefore inconsistent with, and no longer effectuates, Department priorities."

18.     At 10:57 a.m. on February 12, 2025, Dr. Richman received an email notification from the G5 grants management system indicating that an administrative action GAN was available for review. Towson University's research administration office was not able to access the G5 system for the entirety of February 12, 2025. The 10:57 a.m. G5 notification preceded an email to Dr. Richman from Deputy Assistant Secretary Mark Washington, received at 12:55 p.m. on February 12, 2025. The email from Mr. Washington stated that a GAN notice would be forthcoming, when in fact the GAN had been received several hours earlier. In addition, the email from Mr. Washington was addressed to Ms. Laila Richman, rather than Dr. Laila Richman. Finally, the letter attached to Mr. Washington's email included a date field that remained editable, which is inconsistent with ED practices. The GAN issued on November 12, 2025 stated that the PRIME award was terminated because "[t]he grant is deemed to be inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4); see also 34 C.F.R. 75.253."

19.     Towson University relied and acted upon its expectation and understanding that ED would fulfill its commitment to provide the TQP funding it had awarded to Towson University. Towson University has signed agreements with project partners and committed project resources to partner school districts and community colleges in furtherance of the PRIME grant. Funds for these agreements are no longer available. Also, grant activities already in process (faculty work groups, evaluation plan, site visit, conference attendance, hiring of project director) were interrupted without warning.

USCA4 Appeal: 25-1281   Doc: 37-1      Filed: 06/16/2025   Pg: 346 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25   Page 9 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25   Page 11 of 152

20.     Project staff had no communication from ED that the grant might be terminated. Indeed, on February 11, 2025, the day before the grant termination notice was received, the PI received an email instructing her to reserve her hotel for the EED Annual Grantee Summit being held June 12 and 13, 2025, in Virginia.

21.     Prior to the grant award termination on February 12, 2025, ED had never provided Towson University with notice, written or otherwise, that the grant administered by Towson University engaged in any of the activities described in the termination letter. In particular, ED had never provided notice that Towson University's programs "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic"; "violate either the letter or purpose of Federal civil rights law"; "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education"; "are not free from fraud, abuse, or duplication"; or "otherwise fail to serve the best interests of the United States.

22.     PRIME was developed in close partnership with community college and school district partners with the express goal of increasing the number of well-prepared teachers in Maryland so that every P-12 student has access to high-quality learning experiences. Maryland is currently experiencing a teacher shortage crisis, with over 6,000 conditionally/emergency certified teachers across the state. The loss of TQP funding prevents Towson University from being able to address the needs of local school districts and P-12 learners. The grant intended to prepare 400 new teachers for Maryland who would teach in the state for at least three years. Estimating that each classroom has approximately 22 students, the loss of this project impacts over 26,000 Maryland students.

JA 344

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 347 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 10 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 12 of 152

23.     Towson University has objected to ED's termination of the TQP grant, specifically requesting that ED hold the termination in abeyance and continue to provide funding while the objection is considered and/or void the termination and reinstate the obligated funds. Towson University also requested that ED respond by March 5, 2025, as to whether it will take one or both of these actions. As of the date of this declaration, ED has not responded.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 4, 2025.

/s/ Laurie Mullen

_____

Laurie Mullen, Ph.D.

JA 345

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 348 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 11 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 13 of 152

# EXHIBIT A

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 349 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 12 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 14 of 152

S336S240059

Laila Richman

Towson University

College of Education

8000 York Road

Towson, MD 21252

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 350 of 638    Page 13 of 75
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 13 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 15 of 152

S336S240059

Anne Greene
Towson University
College of Education
8000 York Road
Towson, MD 21252

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 352 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 15 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 17 of 152



S336S240059



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

| FUND CODE | FUNDING YEAR | AWARD YEAR | ORG. CODE | CATEGORY | LIMITATION | ACTIVITY | CFDA | OBJECT CLASS | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0201A | 2024 | 2024 | ES000000 | B | JDK | 000 | 336 | 4101C | $849,659.00 |

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S336S240059 |
| RECIPIENT NAME: | Towson University |
| | College of Education |
| GRANTEE NAME: | TOWSON UNIVERSITY |
| | 8000 YORK RD, |
| | TOWSON, MD 21252 - 0002 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1)   THE FOLLOWING ITEMS ARE INCORPORATED IN THE GRANT AGREEMENT:

1) THE RECIPIENT'S APPLICATION (BLOCK 2);
2) THE APPLICABLE EDUCATION DEPARTMENT REGULATIONS: 2 CFR PART 180; NONPROCUREMENT DEBARMENT AND SUSPENSION AS ADOPTED AT 2 CFR PART 3485; 2 CFR PART 200 AS ADOPTED AT 2 CFR 3474 (BLOCK 8), AND 34 CFR PARTS 75, 77, 79, 81, 82, 84, 86, 97, 98, 99; AND THE PROGRAM REGULATIONS SPECIFIED IN BLOCK 8; AND
3) THE SPECIAL TERMS AND CONDITIONS SHOWN AS ATTACHMENTS IN BLOCK 8 ON THE INITIAL AWARD APPLY UNTIL CHANGED.

THIS AWARD SUPPORTS ONLY THE BUDGET PERIOD SHOWN IN BLOCK 6. IN ACCORDANCE WITH 34 CFR 75.253, THE SECRETARY CONSIDERS, AMONG OTHER THINGS, CONTINUED FUNDING IF:

1) CONGRESS HAS APPROPRIATED SUFFICIENT FUNDS UNDER THE PROGRAM;
2) THE DEPARTMENT DETERMINES THAT CONTINUING THE PROJECT WOULD BE IN THE BEST INTEREST OF THE GOVERNMENT;
3) THE GRANTEE HAS MADE SUBSTANTIAL PROGRESS TOWARD MEETING THE GOALS AND OBJECTIVES OF THE PROJECT;
4) THE SECRETARY ESTABLISHED PERFORMANCE MEASUREMENT REQUIREMENTS FOR THE GRANT IN THE APPLICATION NOTICE, THE PERFORMANCE TARGETS IN THE GRANTEE'S APPROVED APPLICATION;
5) THE RECIPIENT HAS SUBMITTED REPORTS OF PROJECT PERFORMANCE AND BUDGET EXPENDITURES THAT MEET THE REPORTING REQUIREMENTS FOUND AT 34 CFR 75.118, 2 CFR 200.328 AND 200.329, AND ANY OTHER REPORTING REQUIREMENTS ESTABLISHED BY THE SECRETARY; AND
6) THE GRANTEE HAS MAINTAINED FINANCIAL AND ADMINISTRATIVE MANAGEMENT SYSTEMS THAT MEET THE REQUIREMENTS IN 2 CFR 200.302, FINANCIAL MANAGEMENT, AND 2 CFR 200.303, INTERNAL CONTROLS.

IN ACCORDANCE WITH 2 CFR 200.308(c)(2) CHANGES TO KEY PERSONNEL IDENTIFIED IN BLOCK 5 MUST RECEIVE PRIOR APPROVAL FROM THE DEPARTMENT.

THE SECRETARY ANTICIPATES FUTURE FUNDING FOR THIS AWARD ACCORDING TO THE SCHEDULE IDENTIFIED IN BLOCK 6. THESE FIGURES ARE ESTIMATES ONLY AND DO NOT BIND THE SECRETARY TO FUNDING THE AWARD FOR THESE PERIODS OR FOR THE SPECIFIC AMOUNTS SHOWN. THE RECIPIENT WILL BE NOTIFIED OF SPECIFIC FUTURE FUNDING ACTIONS THAT THE SECRETARY TAKES FOR THIS AWARD.

JA 350

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 353 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 16 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 18 of 152



S336S240059

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

(2)    The Office of Management and Budget requires all Federal agencies to assign a Federal Award Identifying Number (FAIN) to each of their financial assistance awards. The PR/AWARD NUMBER identified in Block 2 is your FAIN. If subawards are permitted under this grant, and you choose to make subawards, you must document the assigned PR/AWARD NUMBER (FAIN) identified in Block 2 of this Grant Award Notification on each subaward made under this grant. The term subaward means:
1. A legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient. (See 2 CFR 200.331(a))
2. The term does not include your procurement of property and services needed to carry out the project or program (The payments received for goods or services provided as a contractor are not Federal awards, see 2 CFR 200.501(f) of the OMB Uniform Guidance: "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards").
3. A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract. (See 2 CFR 200.1)

(3)    Unless this grant solely funds research, you must comply with new regulations regarding awards to faith-based organizations (FBOs) that provide beneficiary services under this grant or under a contract you award to provide beneficiary services under this grant. These new regulations clarify the rights of FBOs and impose certain duties on FBOs regarding the referral of beneficiaries they serve. See 34 CFR 75.52, 75.712-75.714, appendix A to part 75, and 2 CFR 3474.15. The Department has established a web page that provides guidance on the new regulations, including FAQs and other implementation tools, which is available at http://www2.ed.gov/policy/fund/reg/fbci-reg.html. If you have any questions about these regulations, please contact the Education Program Contact identified in Block 3 of this GAN.

(4)    Reimbursement of indirect costs is subject to the availability of funds and statutory and regulatory restrictions. The negotiated indirect cost rate agreement authorizes a non-Federal entity to draw down indirect costs from the grant awards. The following conditions apply to the below entities.

A. All entities (other than institutions of higher education (IHE))

The GAN for this grant award shows the indirect cost rate that applies on the date of the initial grant for this project. However, after the initial grant date, when a new indirect cost rate agreement is negotiated, the newly approved indirect cost rate supersedes the indirect cost rate shown on the GAN for the initial grant. This new indirect cost rate should be applied according to the period specified in the indirect cost rate agreement, unless expressly limited under EDGAR or program regulations. Any grant award with an approved budget can amend the budget to account for a change in the indirect cost rate. However, for a discretionary grant award any material changes to the budget which may impact the scope or objectives of the grant must be discussed with the program officer at the Department. See 34 CFR 75.560 (d)(3) (ii) (part 75 of EDGAR).

B. Institutions of higher education (IHE)

Under 2 CFR part 200, Appendix III, Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), the Department must apply the negotiated indirect cost rate in effect on the date of the initial grant award to every budget period of the project, including all continuation grants made for this project. See 2 CFR Part 200, Appendix III, paragraph C.7. Therefore, the GAN for each continuation grant will show the original indirect cost rate and it applies to the entire period of performance of this project. If the indirect cost rate agreement that is applicable to this grant does not extend to the end of the grant s project period, the indirect cost rate set at the start of the project period must still be applied to the end of project period regardless of the fact that the rate has otherwise expired.

(5)    Frontload: The following condition will be imposed on the grantees who are proposed to be frontloaded:
This grant is a frontloaded grant, i.e., funds indicated in Block 7 were requested by the grantee, and approved by the Department, for expenditure in more than one budget period. For the current budget period and any subsequent budget period, the grantee may only draw down funds in accordance with its approved budget for that budget period and may not draw down funds in excess of that amount without prior approval. If you wish to request reconsideration of these specific conditions, please send written notification describing why such conditions should not be imposed on this grant to your Department program officer.

JA 351

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 354 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 17 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 19 of 152

S336S240059



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

(6)   Revised Budget: The following condition will be imposed on all grantees recommended for funding:
The grantee must submit a revised budget covering Year 1 of the grant award that aligns with the actual amount of funding that the grantee receives from the Department. The revised budget must be within the scope of the approved project and must align with all initial goals and objectives of the approved application. The grantee must submit this revised budget within 60 days of the grant award. If you wish to request reconsideration of these specific conditions, please send written notification describing why such conditions should not be imposed on this grant to your Department program officer.

LAVANNA WEEMS   Digitally signed by LAVANNA WEEMS
Date: 2024.09.04 15:56:16 -04'00'

**AUTHORIZING OFFICIAL**                                      **DATE**

Ver. 1

JA 352

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 355 of 638
Case 1:25-cv-10548-MJJ    Document 28-14    Filed 03/06/25    Page 18 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 20 of 152

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME** – The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION** –   Unique items of information that identify this notification.

   **PR/AWARD NUMBER** –   A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

   **ACTION NUMBER** –   A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

   **ACTION TYPE** –   The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

   **AWARD TYPE** –   The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF** – This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

   ***RECIPIENT PROJECT DIRECTOR** –   The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

   **EDUCATION PROGRAM CONTACT** –   The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

   **EDUCATION PAYMENT CONTACT** –   The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER** –   Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL** – Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS** –   Project activities and funding are approved with respect to three different time periods, described below:

   **BUDGET PERIOD** –   A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

   **PERFORMANCE PERIOD** –   The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

   ***FUTURE BUDGET PERIODS** –   The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING** – The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

   ***THIS ACTION** – The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

   ***BUDGET PERIOD** – The total amount of funds available for use by the grantee during the stated budget period to this date.

   ***PERFORMANCE PERIOD** – The amount of funds obligated from the start date of the first budget period to this date.

   **RECIPIENT COST SHARE** –   The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

   **RECIPIENT NON-FEDERAL AMOUNT** – The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION** –   This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

   **UEI** –   The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 356 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 19 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 21 of 152

*REGULATIONS – Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

*ATTACHMENTS – Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA –** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS –**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT –** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS –** Requirements of the award that are binding on the recipient.

*PARTICIPANT NUMBER – The number of eligible participants the grantee is required to serve during the budget year.

*GRANTEE NAME – The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

*PROGRAM INDIRECT COST TYPE – The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

*PROJECT INDIRECT COST RATE – The indirect cost rate applicable to this grant.

*AUTHORIZING OFFICIAL – The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award


**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF –** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

CURRENT AWARD AMOUNT – The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

PREVIOUS CUMULATIVE AMOUNT – The total amount of funds awarded under the grant before this action.

CUMULATIVE AMOUNT – The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE –** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

* This item differs or does not appear on formula and block grants.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 357 of 638    Page 20 of 75
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 20 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 22 of 152

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF THE CHIEF FINANCIAL OFFICER
## & CHIEF INFORMATION OFFICER

Laila Richman
Towson University
College of Education
8000 York Road

Towson, MD 21252

SUBJECT: Payee Identification for Grant Award S336S240059

This is to inform you that the United States Department of Education does not have a payee and bank account of record designated for the above listed grant award. You will not be able to request funds for this grant award until a payee and bank account of record are established.

1) All SF-1199A, Direct Deposit and Fedwire Sign-Up forms must be mailed to the Department of Education. The SF-1199A must contain original signatures for both the recipient and bank officials.

2) First time recipients establishing a bank account for a new award must include a copy of the grant award document with the cover letter and SF-1199A, Direct Deposit or Fedwire Sign-Up forms.

3) The Grant Administration and Payment System (GAPS) has been enhanced to produce an automated notification when bank account data has been changed or deleted. This automated notification is transmitted via e-mail to Payees having e-mail capacity or mailed to recipients without an e-mail address.

4) All banking information requests, including establishing a new bank account, modifying an existing bank account or deleting a bank account must be accompanied with a cover letter requesting the specific action. The cover letter must be on the letterhead of the requesting payee. The cover letter must contain the following information:

   - UEI

   - e-mail address (if available) for the person to receive automated notification

   - signature and phone number of the person requesting the bank information change

Mail Cover Letters and accompanying forms to:

U.S. Department of Education
400 Maryland Ave, SW, Rm. 4C146
Washington, DC 20202-4110

JA 355

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 358 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 21 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 23 of 152

UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF THE CHIEF FINANCIAL OFFICER
& CHIEF INFORMATION OFFICER

Attn: Financial Management Operations

If you have any questions or require assistance concerning establishing a payee record for a bank
account please contact the G5 Hotline at 1-888-336-8930.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 359 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 22 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 24 of 152

Dear G5 Payee:

To obtain your G5 Login ID, you will need to complete the G5 External User Access Request Form and return it notarized to the U.S. Department of Education. Attached are the instructions for accessing and completing the form. Upon receiving the notarized form, the Department will send you an email with your new G5 Login ID.

Please mail the form to:

> U.S. Department of Education
>
> Office of the Chief Information Officer
>
> Mail Stop - 4110
>
> 400 Maryland Avenue S.W.
>
> Washington, DC 20202
>
> Attn: Functional Applications Team

Thank you for your continued support of the U.S. Department of Education's G5 Grant Management System. Please contact the G5 Hotline (888-336-8930) if you have any

> Sincerely,
>
> G5 Administration

JA 357

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 360 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 23 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 25 of 152

## Instructions for Completing the G5 External User Access Request Form

To establish direct access to your U.S. Department of Education G5 Grant Management System account, please complete the G5 External User Access Request Form attached, have it notarized, and mail the completed form to the address below.

Steps for Completing the G5 External User Access Request Form -

1. Go to http://www.g5.gov and click on the link, "Not Registered? Sign up".

2. Compete each data element of the form including the following elements:

   a. User Type (Select Payee unless you are specifically a Servicer)

   b. Unique Entity Identifier (UEI)

   b. Desired Role (Select Full Access to enable you to continue to draw funds, or View Only if you will only need to review account activity).

3. Print the form and then Submit your online registration.

4. You will immediately receive an email asking you to activate your account.

5. Click on the link in the email and select your password and Secret Question and Answer.

6. Congratulations! You now have an active account. Only one more step!!

7. Sign the printed (from step 3) G5 External User Access Request Form as the Authorized Payee in the presence of a Notary Public.

8. Assure the G5 External User Access Request Form is notarized with appropriate seal and signature and expiration date.

9. Mail the completed, notarized G5 External User Access Request Form to the following address:

   **U.S. Department of Education**
   **Office of the Chief Information Officer**
   **Mail Stop - 4110**
   **400 Maryland Avenue S.W.**
   **Washington DC 20202**
   **Attn: Functional Applications Team**

10. Allow two weeks for delivery and account updates.

11. You will receive Email notification that your G5 External User Access Request Form has been processed and your roles have been assigned.

12. Congratulations, You're now able to access G5 directly.

As always, please contact the G5 Hotline (888-336-8930) with any questions.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 361 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 24 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 26 of 152

**INSTRUCTIONS**
**ACH DIRECT DEPOSIT SIGN-UP FORM**
**SF-1199A**

Recipients can obtain an SF-1199A (Figure D-1) from their financial insitution. The preprinted instructions on the reverse side of the SF-1199A should be disregarded and the following instructions should be followed in completing the SF-1199A.

The recipient is to complete Sections 1 and 2 of the SF-1199A. The recipient's financial institution is to complete Section 3 and mail the completed form to the Department of Education. The financial institution will mail a copy of the completed SF-1199A to the recipient.

<u>**INSTRUCTIONS - SECTION 1**</u>

| | | |
|---|---|---|
| ITEM A | Name of Payee | Enter the name and address of payee's organization. |
| | Address | |
| | Telephone Number | Enter telephone number of person authorized to certify the payment request. |
| ITEM B | Name of Person(s) Entitled to Payment | Leave Blank. |
| ITEM C | Claim or Payroll ID Number | Enter the following information |
| | | Prefix: 9 digit D-U-N-S Number, |
| | | Suffix: 11 character Grant Award nUmber. |
| ITEM D | Type of Depositor | Place an "X" in the Appropriate Box. |
| ITEM E | Depositor Account | Enter the payee's account number at the financial institution in which funds are to be deposited. Include blanks or dashes when entering the account number. |
| ITEM F | Type of Payement | Enter "X" in the "Other" box. |
| ITEM G | Box for Allotment of Payment Only | Leave Blank. |
| Payee/Joint Certification | | Authorized Certifying Official for the payee is to sign the form. |

<u>**INSTRUCTIONS - SECTION 2**</u>

| | | |
|---|---|---|
| Government Agency Name | Enter: | U.S. Department of Education |
| Government Agency Address | Enter: | 400 Maryland Avenue, SW |
| | | Room 4C138 |
| | | Washington, DC 20202 |

<u>**INSTRUCTIONS - SECTION 3**</u>

To be completed by financial institution.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 362 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 25 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 27 of 152

Director, Financial Payment Group
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202 - 4331

Ref: PR/Award No. S336S240059

Dear Sir:

Please transfer FEDWIRE payments for Towson University to the following financial institution and depositor account beginning on this date: Month_____, Day_____, Year_____.

Information regarding the financial institution to which payments for D-U-N-S_____ are to be transferred is provided below.

Financial Institution                                    Corresponding Bank (if applicable):

Name:_____              Name:_____
Street:_____             Street:_____
City:_____                 City:_____
State:_____               State:_____
Zip:_____                   Zip:_____

ABA Number:_____       ABA Number:_____
Account Number:_____   Telegraphic Abbrev.:_____
Contact Name:_____
Telephone No:_____

Please update my account with the information as indicated above. If you have any questions, I may be reached at (____) _____.

                          Sincerely,



                          Chief Financial Officer


JA 360

USCA4 Appeal: 25-1281     Doc: 37-1        Filed: 06/16/2025      Pg: 363 of 638
Case 1:25-cv-10548-MJJ     Document 8-14      Filed 03/06/25     Page 26 of 75
Case 1:25-cv-00702-JRR     Document 25-2      Filed 03/12/25     Page 28 of 152

GAN ATTACHMENT 2
Revised 03/2021

## SPECIFIC GRANT TERMS AND CONDITIONS FOR
## FINANCIAL AND PERFORMANCE REPORTS

**PERFORMANCE REPORTS**:

**(1) FINAL REPORTS - ALL RECIPIENTS** are required to submit a final performance report within 120 days after the expiration or termination of grant support in accordance with submission instructions provided in box 10 of the Grant Award Notification (GAN), or through another notification provided by the Department of Education (Department) (2 CFR § 200.329(c)).

**(2) ANNUAL, QUARTERLY, or SEMIANNUAL REPORTS - ALL RECIPIENTS** of a multi-year discretionary award must submit an annual Grant Performance Report (34 CFR § 75.118). The annual performance report shall provide the most current performance and financial expenditure information that is sufficient to meet the reporting requirements of 2 CFR §§ 200.328, 200.329, and 34 CFR § 75.720.

Your education program contact will provide you with information about your performance report submissions, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification provided by the Department. The grant term or condition in box 10 on the GAN or another notification may reflect any of the following:

1. That a performance report is due before the next budget period begins. The report should contain current performance and financial expenditure information for this grant. It will either identify the date the performance report is due or state that the Department will provide additional information about this report, including due date, at a later time.

2. That an interim performance report is required because of the nature of the award or because of statutory or regulatory provisions governing the program under which this award is made, and that the report is due more frequently than annually as indicated, e.g., due quarterly and submitted within 30 days after the end of each quarter, or due semiannually and submitted within 30 days after the end of each 6-month period (2 CFR § 200.329(c)(1)).

3. That other reports are required, e.g., program specific reports required in a program's statute or regulation.

**(3) FINANCIAL REPORTS – SOME RECIPIENTS:**

If a financial report is required, your education program contact will provide you with information about your financial report submission, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification.

A Standard Form (SF) 425 Federal Financial Report (FFR) is required if:

1. A grant involves cost sharing, and the ED 524B, which collects cost sharing information, is not submitted or a program-specific report approved by U.S. Office of Management and Budget (OMB) does not collect cost sharing information;
2. Program income was earned;

1

JA 361

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 364 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 27 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 29 of 152

**GAN ATTACHMENT 2**
**Revised 03/2021**

3.  Indirect cost information is to be reported and the ED 524B was not used or a program-specific report approved by OMB does not collect indirect cost information;
4.  Program regulations or statute require the submission of the FFR; or
5.  Specific Award Conditions, or specific grant or subgrant conditions for designation of "high risk," were imposed in accordance with 2 C.F.R. part 200.208 and part 3474.10 and required the submission of the FFR.

If the FFR is required, the notification may indicate one of the following (see the form and its instructions at Standard Form (SF) 425 Federal Financial Report (FFR)):

1.  Quarterly - FFRs are required for reporting periods ending on 12/31, 03/31, 06/30, 09/30, and are due within 30 days after each reporting period.

2.  Semi-annual - FFRs are required for reporting periods ending on 03/31 and 09/30, and are due within 30 days after each reporting period.

3.  Annual - FFRs are required for reporting period ending 09/30, and is due within 30 days after the reporting period.

4.  Final - In coordination with the submission of final performance reports, FFRs are due within 120 days after the project or grant period end date (2 CFR 200.328).

When completing an FFR for submission, the following must be noted:

1.  *Multiple Grant Reporting Using SF 425A Prohibited:* While the FFR is a governmentwide form that is designed for single grant and multiple grant award reporting, the Department's policy is that multiple grant award reporting is not permitted for Department grants. Thus, a Department grantee that is required to submit an FFR in accordance with any of the above referenced selections must complete and submit one FFR for each of its grants. Do not use the FFR attachment (Standard Form 425A), which is available for reporting multiple grants, for reporting on Department grants. As such, references to multiple grant reporting and to the FFR attachment in items 2, 5 and 10 of the FFR are not applicable to Department grantees. With regards to item 1 of the note found in the FFR Instructions, a grantee must complete items 10(a) through 10(o) for each of its grants. The multiple award, multiple grant, and FFR attachment references found in items 2, 5, 6, before 10(a), in item 10(b), before 10(d), before 10(i) and before 10(l) of the Line Item Instructions for the FFR are not applicable to Department grants.

2.  *Program Income*: Unless disallowed by statute or regulation, a grantee will complete item 10(m) or 10(n) in accordance with the options or combination of options as provided in 2 CFR Part 200.307. A grantee is permitted, in accordance with 2 CFR Part 200.307, to add program income to its Federal share to further eligible project or program objectives, use program income to finance the non-Federal share of the project or program; and deduct program income from the Federal share of the total project costs.

3.  *Indirect Costs:* A grantee will complete item 11(a) by listing the indirect cost rate type identified on its indirect cost rate agreement, as approved by its cognizant agency for indirect costs.

2

JA 362

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 365 of 638    Page 28 of 75
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 28 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 30 of 152

**GAN ATTACHMENT 2**
**Revised 03/2021**

A Department grantee that does not have an indirect cost rate agreement approved by its cognizant agency for indirect costs, and that is using the Department approved (beyond the 90-day temporary period) temporary indirect cost rate of 10% of budgeted direct salaries and wages, or the de minimis rate of 10% of modified total direct cost (MTDC) must list its indirect cost rate in 11(a) as a Department Temporary Rate or De Minimis Rate.  The de minimis rate of 10% of MTDC consists of:

> All direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $25,000 of each subaward (i.e., subgrant). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items, including contract costs in excess of $25,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (see definition of MTDC at 2 CFR § 200.1).

A training program grantee whose recovery of indirect cost limits indirect cost recovery to 8% of MTDC or the grantees negotiated indirect cost rate, whichever is less in accordance with EDGAR § 75.562 (c), must list its rate in 11(a) as a Department Training Grant Rate.  The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States[1] as defined in 2 CFR § 200.1

A restricted program grantee must list its rate as a Restricted Indirect Cost Rate in 11(a).  A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant agency for indirect costs, or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR 75.563 and 76.564 – 76.569, is not less than 8% MTDC.  A State or local government[2] that is a restricted program grantee may not elect to utilize the 8% MTDC rate.  Additionally, restricted program grantees may not utilize the de minimis rate, but may utilize the temporary rate until a restricted indirect cost rate is negotiated.  If a restricted program grantee elects to utilize the temporary rate, it must list its rate as a Department Temporary Rate in 11(a).

Grantees with indirect cost rates prescribed in program statute or regulation must list their rate as a Rate Required in Program Statute or Regulation in 11(a).  Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery.

For detailed information including restrictions related to temporary, de minimis, training, restricted, and program prescribed indirect cost rates see GAN ATTACHMENT 4.

4. *Supplemental Pages:* If grantees need additional space to report financial information, beyond what is available within the FFR, they should provide supplemental pages. These additional pages must indicate the following information at the top of each page: the PR/Award Number

---

[1] Note that a State-funded institution of higher education is not considered a "State government" for these purposes; and a Tribal college or university funded by a federally-recognized Tribe is not considered a Tribe for these purposes.
[2] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.

JA 363

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 366 of 638    Page 29 of 75
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 29 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 31 of 152

**GAN ATTACHMENT 2**
**Revised 03/2021**

also known as the Federal Identifying Number or FAIN, recipient organization, Unique Entity Identifier, Employer Identification Number (EIN), and period covered by the report.

4

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 367 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 30 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 32 of 152

GAN ATTACHMENT 3
Revised 03/2021

## AN OVERVIEW OF SINGLE AUDIT REQUIREMENTS OF STATES, LOCAL GOVERNMENTS, AND NONPROFIT ORGANIZATIONS

This GAN ATTACHMENT is **not** applicable to for-profit organizations.  For-profit organizations comply with audit requirements specified in block 10 of their Grant Award Notification (GAN).

**Summary of Single Audit Requirements for States, Local Governments and Nonprofit Organizations:**

1. Single Audit.  A non-Federal entity (a State, local government, Indian tribe, Institution of Higher Education (IHE)[1], or nonprofit organization) that expends $750,000 or more during the non-Federal entity's fiscal year in Federal awards must have a single audit conducted in accordance with 2 CFR 200.501, "Audit Requirements," except when it elects to have a program specific audit conducted.

2. Program-specific audit election.  When an auditee expends Federal awards under only one Federal program (excluding research and development (R&D)), and the Federal program's statutes, regulations, or the terms and conditions of the Federal award do not require a financial statement audit of the auditee, the auditee may elect to have a program–specific audit conducted.  A program–specific audit may not be elected for R&D unless all of the Federal awards expended were received from the same Federal agency, or the same Federal agency and the same pass-through entity, and that Federal agency, or pass-through entity in the case of a subrecipient, approves in advance a program-specific audit.

3. Exemption when Federal awards expended are less than $750,000.  A non-Federal entity that expends less than $750,000 during the non-Federal entity's fiscal year in Federal awards is exempt from Federal audit requirements for that year, except as noted in 2 CFR 200.503, but records must be available for review or audit by appropriate officials of the Federal agency, pass-through entity, and Government Accountability Office (GAO). Generally, grant records must be maintained for a period of three years after the date of the final expenditure report (2 CFR § 200.334)

4. Federally Funded Research and Development Centers (FFRDC).  Management of an auditee that owns or operates a FFRDC may elect to treat the FFRDC as a separate entity.

5. Report Submission.  To meet audit requirements of U.S. Office of Management and Budget (OMB) Uniform Guidance: Cost Principles, Audit, and Administrative Requirements for Federal Awards (Uniform Guidance), grantees must submit all audit documents required by Uniform Guidance 2 CFR 200.512, including Form SF-SAC: Data Collection Form electronically to the Federal Audit Clearinghouse at:

---

[1] As defined under the Higher Education Act of 1965, as amended (HEA) section 101.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 368 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 31 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 33 of 152

**GAN ATTACHMENT 3**
Revised 03/2021

https://facides.census.gov/Account/Login.aspx.

The audit must be completed, and the data collection form and reporting package must be submitted within the earlier of 30 calendar days after receipt of the auditor's report(s), or nine months after the end of the audit period.  If the due date falls on a Saturday, Sunday, or Federal holiday, the reporting package is due the next business day.  Unless restricted by Federal statutes or regulations, the auditee must make copies available for public inspection.  Auditees and auditors must ensure that their respective parts of the reporting package do not include protected personally identifiable information. (2 CFR 200.512)

Grantees are strongly urged to obtain the "OMB Compliance Supplement" and to contact their cognizant agency for single audit technical assistance.

The designated cognizant agency for single audit purposes is "the Federal awarding agency that provides the predominant amount of direct funding to the recipient."  Grantees should obtain a copy of the OMB Compliance supplement.  This supplement will be instructive to both grantees and their auditors. Appendix III of the supplement provides a list of Federal Agency Contacts for Single Audits, including addresses, phone numbers, fax numbers, and e-mail addresses for technical assistance.

For single audit-related questions, if the U.S. Department of Education is the cognizant agency, grantees should contact the Non-Federal Audit Team in the Department's Office of Inspector General, at oignon-federalaudit@ed.gov.  Additional resources for single audits are also available on the Non-Federal Audit Team's website at https://www2.ed.gov/about/offices/list/oig/nonfed/index.html.  For programmatic questions, grantees should contact the education program contact shown on the Department's GAN.

Grantees can obtain information on single audits from:

The OMB website at www.omb.gov.  Look under Office of Management and Budget (in right column) then click Office of Federal Financial Management (to obtain OMB Compliance Supplement).  The SF-SAC: Data Collection Form can be found at the Federal Audit Clearinghouse at: https://facides.census.gov/Files/2019-2021%20Checklist%20Instructions%20and%20Form.pdf.

The American Institute of Certified Public Accountants (AICPA) has illustrative OMB Single Audit report examples that might be of interest to accountants, auditors, or financial staff at www.aicpa.org.

2

JA 366

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 369 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 32 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 34 of 152

**GAN ATTACHMENT 6**
**Revised 03/2021**

### REQUEST FOR APPROVAL OF PROGRAM INCOME

In projects that generate program income, the recipient calculates the amount of program income according to the guidance given in 2 CFR Part 200.307.

**\*\*\* IF YOU RECEIVED YOUR GRANT AWARD NOTIFICATION ELECTRONICALLY AND YOU ARE SUBJECT TO ANY OF THE RESTRICTIONS IDENTIFIED BELOW, THE RESTRICTION(S) WILL APPEAR IN BOX 10 ON YOUR GRANT AWARD NOTIFICATION AS A GRANT TERM OR CONDITION OF THE AWARD. \*\*\***

Unless checked below as NOT ALLOWED, the recipient may exercise any of the options or combination of options, as provided in 2 CFR Part 200.307, for using program income generated in the course of the recipient's authorized project activities:

\_\_\_\_\_ Not Allowed  Adding program income to funds committed to the project by the Secretary and recipient and using it to further eligible project or program objectives;

\_\_\_\_\_ Not Allowed  Using program income to finance the non-Federal share of the project or program; and

\_\_\_\_\_ Not Allowed  Deducting program income from the total allowable cost to determine the net allowable costs.

JA 367

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 370 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 33 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 35 of 152

**GAN ATTACHMENT 8**
**Revised 03/2021**

## TRAFFICKING IN PERSONS

The Department of Education adopts the requirements in the Code of Federal Regulations at 2 CFR 175 and incorporates those requirements into this grant through this condition. The grant condition specified in 2 CFR 175.15(b) is incorporated into this grant with the following changes. Paragraphs a.2.ii.B and b.2. ii. are revised to read as follows:

> "a.2.ii.B. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 34 CFR part 85."

> "b.2. ii. Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 34 CFR part 85."

Under this condition, the Secretary may terminate this grant without penalty for any violation of these provisions by the grantee, its employees, or its subrecipients.

JA 368

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 371 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 34 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 36 of 152

### FEDERAL FUNDING ACCOUNTABILITY TRANSPARENCY ACT
### REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION

The Federal Funding Accountability and Transparency Act (FFATA) is designed to increase transparency and improve the public's access to Federal government information.  To this end, FFATA requires that Department of Education (Department) grant recipients:

1. Report **first-tier subawards** made under Federal grants that are funded at $30,000 or more that meet the reporting conditions as set forth in this grant award term;
2. Report their executives' compensation for all new Federal grants that are funded at $30,000 and that meet the reporting conditions as set forth in this grant award term; and
3. Report executive compensation data for their **first-tier subrecipients** that meet the reporting conditions as set forth in this grant award term.

For FFATA reporting purposes, the Department grant recipient is the entity listed in box 1 of the Grant Award Notification.

Only **first-tier subawards** made by the Department grant recipient to its **first-tier subrecipients** and the **first-tier subrecipients'** executive compensation are required to be reported in accordance with FFATA.

*Subaward, Subrecipient, Recipient, Total Compensation, Executives*, and other key terms, are defined within item 5, Definitions, of this grant award term.

This grant award term is issued in accordance with 2 CFR Part 170—Reporting Subaward And Executive Compensation Information.

1. ***Reporting of First-tier Subawards -***

a. *Applicability and what to report.*

Unless you are exempt as provided item 4, Exemptions, of this grant award term, you must report each obligation that **equals or exceeds $30,000** in Federal funds for a first-tier subaward to a non-Federal entity or Federal agency.

You must report the information about each obligating action that are specified in the submission instructions posted at FSRS.

b. *Where and when to report.*

The Department grant recipient must report each obligating action described in paragraph **1.a.** of this award term to FSRS.

Report subaward information no later than the end of the month following the month in which the subaward obligation was made. For example, if the obligation was made on November 7, 2020, the obligation must be reported by no later than December 31, 2020.

2. ***Reporting Total Compensation of the Department's Grant Recipients' Executives -***

1

JA 369

USCA4 Appeal: 25-1281   Doc: 37-1     Filed: 06/16/2025   Pg: 372 of 638
Case 1:25-cv-10548-MJJ   Document 8-14    Filed 03/06/25   Page 35 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 37 of 152

GAN ATTACHMENT – 9
Revised 03/2021

a. *Applicability and what to report.*

You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

i   The total Federal funding authorized to date under this Federal award **equals or exceeds $30,000**;

ii   In the preceding fiscal year, you received—

A.  80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**
B.  $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and**,
C.  The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at SEC Investor.gov Executive Compensation.)

b. *Where and when to report.*

You must report executive total compensation described in paragraph **2.a.** of this grant award term:

i.   As part of your registration profile at SAM.gov.

ii.  By the end of the month following the month in which this award is made (for example, if the obligation was made on November 7, 2020 the executive compensation must be reported by no later than December 31, 2020), and annually thereafter.

**3. *Reporting of Total Compensation of Subrecipient Executives –***

a. *Applicability and what to report.*

Unless you are exempt as provided in item 4, Exemptions, of this award term, for each first-tier **non-Federal entity** subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

i.   In the subrecipient's preceding fiscal year, the subrecipient received—

JA 370

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 373 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 36 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 38 of 152

GAN ATTACHMENT – 9
Revised 03/2021

    A.   80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**

    B.   $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and**,

    C.   The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at SEC Investor.gov Executive Compensation.)

b.   *Where and when to report.*

    You must report subrecipient executive total compensation described in paragraph **3.a.** of this grant award term:

    i.   In FSRS.  You must include a condition on subawards that requires the subrecipients to timely report the information required under paragraph **3.a.** to you the prime awardee, or in the SAM.gov.  Subrecipient executive compensation entered in SAM.gov by the subrecipient will pre-populate in FSRS, so you do not have to report when subrecipients enter this information in SAM.gov. Subrecipient executive compensation not entered in SAM.gov by the subrecipient is reported in FSRS by you the Department grant recipient.

    ii.   By the end of the month following the month during which you make the subaward.  For example, if the subaward obligation was made on November 7, 2020 the subrecipient's executive compensation must be reported by no later than December 31, 2020.

**4.  *Exemptions –***

a.   If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

    i.   Subawards, and

    ii.   The total compensation of the five most highly compensated executives of any **subrecipient**.

**5.  *Definitions -***

a.   For purposes of this award term:

    i.   Federal *Agency* means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).

    ii.   Non-Federal *Entity* means all of the following, as defined in 2 CFR part 25:

    A Governmental organization, which is a State, local government, or Indian tribe;

USCA4 Appeal: 25-1281    Doc: 37-1       Filed: 06/16/2025    Pg: 374 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 37 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 39 of 152

**GAN ATTACHMENT – 9**
**Revised 03/2021**

A foreign public entity;

A domestic or foreign nonprofit organization; and,

A domestic or foreign for-profit organization

iii.   *Executive* means officers, managing partners, or any other employees in management positions.

iv.   *Obligation*, when used in connection with a non-Federal entity's utilization of funds under a Federal award, means orders placed for property and services, contracts and subawards made, and similar transactions during a given period that require payment by the non-Federal entity during the same or a future period.

v.   *Subaward:*

This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

The term does not include your procurement of property and services (such as payments to a contractor, small purchase agreements, vendor agreements, and consultant agreements) that are needed for the benefit of the prime awardee to carry out the project or program (for further explanation, see 2 CFR 200.331).  For example, the following are not considered subawards:

   *Cleaning Vendors:* Vendors that are hired by a grantee to clean its facility.
   *Payroll Services Vendors:* Vendors that carryout payroll functions for the grantee.
   *Information Technology Vendors:* Vendors that provide IT support to grant staff.

Payments to individuals that are beneficiaries of Federal programs are not considered subawards.

A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

v.   *Subrecipient* means a non-Federal entity or Federal agency that:

Receives a subaward from you (the recipient) under this award; and

Is accountable to you for the use of the Federal funds provided by the subaward.

In accordance with its subaward, uses the Federal funds to carry out a program for a public purpose specified in authorizing statute, as opposed to providing goods or services for the benefit of the Department prime awardee.

4

JA 372

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 375 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 38 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 40 of 152

GAN ATTACHMENT – 9
Revised 03/2021

vii.   *Recipient* means a non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program. The term recipient does not include subrecipients.  See also §200.69 Non-Federal entity.

viii.  *Total compensation* means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

Salary and bonus.

Awards of stock, stock options, and stock appreciation rights.  Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

Earnings for services under non-equity incentive plans.  This does not include group life, health, hospitalization, or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

Change in pension value.  This is the change in present value of defined benefit and actuarial pension plans.

Above-market earnings on deferred compensation which is not tax-qualified.

Other compensation, if the aggregate value of all such other compensation (e.g., severance, termination payments, value of life insurance paid on behalf of the employee, perquisites, or property) for the executive exceeds $10,000.

JA 373

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 376 of 638    Page 39 of 75
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 39 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 41 of 152

### SPECIFIC CONDITIONS FOR DISCLOSING
### FEDERAL FUNDING IN PUBLIC ANNOUNCEMENTS

When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, U.S. Department of Education grantees shall clearly state:

1) the percentage of the total costs of the program or project which will be financed with Federal money;

2) the dollar amount of Federal funds for the project or program; and

3) the percentage and dollar amount of the total costs of the project or program that will be financed by non-governmental sources.

Recipients must comply with these conditions under Division H, Title V, Section 505 of Public Law 116-260, Consolidated Appropriations Act, 2021.

JA 374

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 377 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 40 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 42 of 152

**GAN ATTACHMENT 12**
**Revised 03/2021**

**PROHIBITION OF TEXT MESSAGING AND EMAILING WHILE DRIVING**
**DURING OFFICIAL FEDERAL GRANT BUSINESS**

Federal grant recipients, sub recipients and their grant personnel are prohibited from text messaging while driving a government owned vehicle, or while driving their own privately-owned vehicle during official grant business, or from using government supplied electronic equipment to text message or email when driving.

Recipients must comply with these conditions under Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," October 1, 2009.

JA 375

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 378 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 41 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 43 of 152

**GAN ATTACMENT 13**
Revised 03/2021

**REGISTRATION OF UNIQUE ENTITY IDENTIFIER (UEI) NUMBER AND TAXPAYER**
**IDENTIFICATION NUMBER (TIN) IN THE SYSTEM FOR AWARD MANAGEMENT (SAM)**

The U.S. Department of Education (Department) Grants Management System (G5) disburses payments via the U.S. Department of Treasury (Treasury).  The U.S. Treasury requires that we include your Tax Payer Identification Number (TIN) with each payment.   Therefore, in order to do business with the Department you must have a registered Unique Entity Identifier (UEI) and TIN number with the SAM, the U.S. Federal Government's primary registrant database.  If the payee UEI number is different than your grantee UEI number, both numbers must be registered in the SAM. Failure to do so will delay the receipt of payments from the Department.

A TIN is an identification number used by the Internal Revenue Service (IRS) in the administration of tax laws. It is issued either by the Social Security Administration (SSA) or by the IRS. A Social Security number (SSN) is issued by the SSA whereas all other TINs are issued by the IRS.

The following are all considered TINs according to the IRS.

- Social Security Number "SSN"
- Employer Identification Number "EIN"
- Individual Taxpayer Identification Number "ITIN"
- Taxpayer Identification Number for Pending U.S. Adoptions "ATIN"
- Preparer Taxpayer Identification Number "PTIN"

If your UEI number is not currently registered with the SAM, you can easily register by going to www.sam.gov.  Please allow 3-5 business days to complete the registration process.  If you need a new TIN, please allow 2-5 weeks for your TIN to become active.  If you need assistance during the registration process, you may contact the SAM Federal Service Desk at 866-606-8220.

If you are currently registered with SAM, you may not have to make any changes.  However, please take the time to validate that the TIN associated with your UEI is correct.

If you have any questions or concerns, please contact the G5 Hotline at 888-336-8930.

JA 376

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 379 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 42 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 44 of 152

## SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS

**1.    Requirement for System for Award Management (SAM)**

Unless you are exempted from this requirement under 2 CFR 25.110, you are, in accordance with your grant program's Notice Inviting Applications, required to maintain an active SAM registration with current information about your organization, including information on your immediate and highest level owner and subsidiaries, as well as on all predecessors that have been awarded a Federal contract or grant within the last three years, if applicable, at all times during which you have an active Federal award or an application or plan under consideration by a Federal awarding agency.  To remain registered in the SAM database after your initial registration, you are required to review and update your information in the SAM database on an annual basis from the date of initial registration or subsequent updates to ensure it is current, accurate and complete.

**2.    Requirement for Unique Entity Identifier (UEI) Numbers**

If you are authorized to make subawards under this award, you:

1.    Must notify potential subrecipients that they may not receive a subaward from you unless they provided their UEI  number to you.
2.    May not make a subaward to a subrecipient when the subrecipient fails to provide its UEI number to you.

**3.    Definitions**

For purposes of this award term:

1.    System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient.  Additional information about registration procedures may be found at the SAM internet site (currently at https://www.sam.gov).

2.    Unique Entity Identifier (UEI) means the identifier assigned by SAM registration to uniquely identify business entities.

3.    Recipient means a non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program.  The term recipient does not include subrecipients.  See 2 CFR 200.86.

4.    Subaward means an award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity.  It does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program.  A subaward may be provided through any form of legal agreement, including an agreement that the pass-through entity considers a contract. See 2 CFR 200.92.

1

USCA4 Appeal: 25-1281     Doc: 37-1        Filed: 06/16/2025      Pg: 380 of 638     Page 43 of 75
Case 1:25-cv-10548-MJJ     Document 8-14     Filed 03/06/25     Page 43 of 75
Case 1:25-cv-00702-JRR     Document 25-2     Filed 03/12/25     Page 45 of 152

5. Subrecipient means a non-Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program.  A subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency. See 2 CFR 200.93.

JA 378

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 381 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 44 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 46 of 152

GAN ATTACHMENT 17
07/2024

### PARTICIPATION OF FAITH-BASED ORGANIZATIONS

1. A faith-based organization that participates in this program retains its independence from the Government and may continue to carry out its mission consistent with religious freedom and conscience protections in Federal law.

2. A faith-based organization may not use direct Federal financial assistance from the Department to support or engage in any explicitly religious activities except when consistent with the Establishment Clause of the First Amendment and any other applicable requirements. Such an organization also may not, in providing services funded by the Department, or in outreach activities related to such services, discriminate against a program beneficiary or prospective program beneficiary on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.

3. If a grantee under a discretionary grant program of the Department has the authority under the grant to select a private organization to provide services supported by direct Federal financial assistance under the program by subgrant, contract, or other agreement, the grantee must ensure compliance with applicable Federal requirements governing contracts, grants, and other agreements with faith-based organizations, including, as applicable, (Education Department General Administrative Regulations) EDGAR §§ 75.52 and 75.532, Appendices A and B to 34 C.F.R. Part 75, and 2 C.F.R. § 3474.15 (see EDGAR § 75.714).

JA 379

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 382 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 45 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 47 of 152

GAN ATTACHMENT 18
07/2024

## WRITTEN NOTICE OF BENEFICIARY PROTECTIONS

In accordance with the Education Department General Administrative Regulations (EDGAR), 34 C.F.R. § 75.712, all grantees providing social services under a Department program supported by direct Federal financial assistance (e.g., programs that provide or support employment, independent living, education, or related services to individuals or groups of individuals) must give written notice to a beneficiary or prospective beneficiary of certain protections.

The written notice that an organization uses to notify beneficiaries or prospective beneficiaries of certain religious non-discrimination protections must include language substantially similar to that in Appendix C to 34 C.F.R. Part 75. Grantees have discretion regarding how to provide the notice, which may include providing the notice directly to each beneficiary, posting it on the grantee's website, or other means. A grantee or subgrantee that participates in multiple Department programs may provide a single notice covering all applicable programs. Additionally, grantees must ensure that the notice is accessible to individuals with disabilities and limited English proficient individuals as required by law. **Unless notified by the applicable program office, a grantee is not required to include in the notice the information in paragraph (5) of Appendix C to 34 C.F.R. Part 75 , i.e., the opportunity of a beneficiary to receive information about other similar providers.**

### Appendix C to 34 C.F.R. Part 75

Name of Organization:

Name of Program:

Contact Information for Program Staff: [provide name, phone number, and email address, if appropriate]

Because this program is supported in whole or in part by financial assistance from the U.S. Department of Education, we are required to provide you the following information:
  (1) We may not discriminate against you on the basis of religion, a religious belief, a refusal to hold a religious belief, or a refusal to attend or participate in a religious practice.

  (2) We may not require you to attend or participate in any explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization) that may be offered by our organization, and any participation by you in such activities must be purely voluntary.

  (3) We must separate in time or location any privately funded explicitly religious activities (including activities that involve overt religious content such as worship, religious instruction, or proselytization) from activities supported with direct Federal financial assistance.

  (4) You may report violations of these protection, including any denials of services or benefits by an organization, by filing a written complaint with the U.S. Department of Education at BeneficiaryNoticeComplaints@ed.gov.

[When required by the Department, the notice must also state:] (5) If you would like information about whether there are any other federally funded organizations that provide the services available under this program in your area, please contact the awarding agency.

This written notice must be given to you before you enroll in the program or receive services from the program, unless the nature of the service provided, or exigent circumstances make it impracticable to provide such notice before we provide the actual service. In such an instance, this notice must be given to you at the earliest available opportunity.

JA 380

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 383 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 46 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 48 of 152

**GAN ENCLOSURE 1**
Revised 03/2021

**KEY FINANCIAL MANAGEMENT REQUIREMENTS FOR DISCRETIONARY GRANTS AWARDED BY THE DEPARTMENT OF EDUCATION**

The Department expects grantees to administer Department grants in accordance with generally accepted business practices, exercising prudent judgment so as to maintain proper stewardship of taxpayer dollars.  This includes using fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds.  In addition, grantees may use grant funds only for obligations incurred during the funding period.

Title 2 of the Code of Federal Regulations Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," establishes requirements for Federal awards made to non-Federal entities.  The Education Department General Administrative Regulations in 34 CFR (EDGAR) 75, 76, 77, 79, 81, 82, 84, 86, 97, 98, and 99 contain additional requirements for administering discretionary grants made by this Department.  The most recent version of these regulations may be accessed at the following URLs:

[The Education Department General Administrative Regulations (EDGAR)](#)

[ 2 CFR Part 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards](#)

The information on page 2, "Selected Topics in Administering Department Discretionary Grants," highlights major administrative requirements of 2 CFR Part 200.  In addition, a few of the topics discuss requirements that the Department imposes on its discretionary grantees under EDGAR, Part 75 (Direct Grants).  The specific sections of 2 CFR Part 200 and of EDGAR that address the topics discussed are shown in parentheses.  The Department urges grantees to read the full text of these and other topics in EDGAR and in 2 CFR Part 200.

Grantees are reminded that a particular grant might be subject to additional requirements of the authorizing statute for the program that awarded the grant and/or any regulations issued by the program office.  Grantees should become familiar with those requirements as well, because program-specific requirements might differ from those in 2 CFR Part 200 and in EDGAR.

The Department recommends that the project director and the fiscal management staff of a grantee organization communicate frequently with each other about the grant budget.  Doing so will help to assure that you use Federal funds only for those expenditures associated with activities that conform to the goals and objectives approved for the project.

Grantees may direct any questions regarding  the topics discussed on page 2, "Selected Topics in Administering Department Discretionary Grants,"or about any other aspect of administering your grant award to the Department program staff person named in Block 3 of the Grant Award Notification.

JA 381

USCA4 Appeal: 25-1281     Doc: 37-1        Filed: 06/16/2025     Pg: 384 of 638
Case 1:25-cv-10548-MJJ     Document 8-14     Filed 03/06/25     Page 47 of 75
Case 1:25-cv-00702-JRR     Document 25-2     Filed 03/12/25     Page 49 of 152

**GAN ENCLOSURE 1**
**Revised 03/2021**

**SELECTED TOPICS IN ADMINISTERING DEPARTMENT DISCRETIONARY GRANTS**

**I.     Financial Management Systems (2 CFR Part 200.302)**

In general, grantees are required to have financial management systems that:

∗   provide for accurate, current, and complete disclosure of results regarding the use of funds under grant projects;

∗   provide adequate source documentation for Federal and non-Federal funds used under grant projects;

∗   contain procedures to determine the allowability, allocability, and reasonableness of obligations and expenditures made by the grantee; and

∗   enable the grantee to maintain effective internal control and fund accountability procedures, e.g., requiring separation of functions so that the person who makes obligations for the grantee is not the same person who signs the checks to disburse the funds for those obligations.

State systems must account for funds in accordance with State laws and procedures that apply to the expenditure of and the accounting for a State's own funds. A State's procedures, as well as those of its subrecipients and cost-type contractors, must be sufficient to permit the preparation of reports that may be required under the award as well as provide the tracing of expenditures to a level adequate to establish that award funds have not been used in violation of any applicable statutory restrictions or prohibitions.

**II.     Federal Payment (2 CFR Part 200.305)**

Under this part --

∗   the Department pays grantees in advance of their expenditures if the grantee demonstrates a willingness and ability to minimize the time between the transfer of funds to the grantee and the disbursement of the funds by the grantee;

∗   grantees repay to the Federal government interest earned on advances; and

∗    grantees, generally, must maintain advance payments of Federal awards in interest bearing accounts.

In general, grantees should make payment requests frequently, only for small amounts sufficient to meet the cash needs of the immediate future.

The Department has recently encountered situations where grantees failed to request funds until long after the grantee actually expended its own funds for the costs of its grant.  Grantees need to be aware that, by law, Federal funds are available for grantees to draw down for only a limited period of time, after which the funds revert to the U.S. Treasury.  In some cases grantees have requested funds too late for the Department to be able to pay the grantees for legitimate costs incurred during their project periods.

JA 382

USCA4 Appeal: 25-1281     Doc: 37-1       Filed: 06/16/2025     Pg: 385 of 638
Case 1:25-cv-10548-MJJ     Document 8-14     Filed 03/06/25     Page 48 of 75
Case 1:25-cv-00702-JRR     Document 25-2     Filed 03/12/25     Page 50 of 152

**GAN ENCLOSURE 1**
Revised 03/2021

The Department urges financial managers to regularly monitor requests for payment under their grants to assure that Federal funds are drawn from the Department G5 Payment System at the time those funds are needed for payments to vendors and employees.

### III.    Personnel (EDGAR §§ 75.511-75.519 and 2 CFR Part 200 Subpart D and E)

The rules governing personnel costs are located in EDGAR Part 75 and 2 CFR Part 200 Subparts D and E.  Part 75 covers issues such as paying consultants with grant funds, prohibiting dual compensation of staff, and waiving the requirement for a full-time project director.  The rules clarifying changes in key project staff are located in 2 CFR Part 200.308 (c)(2).  General rules governing reimbursement of salaries and compensation for staff working on grant projects are addressed in the cost principles in 2 CFR Part 200 Subpart D and E.  In all cases, payments of any type to personnel must be supported by complete and accurate records of employee time and effort.  For those employees that work on multiple functions or separately funded programs or projects, the grantee must also maintain time distribution records to support the allocation of employee salaries among each function and separately funded program or project.

### IV.    Cost Principles (2 CFR Part 200 Subpart E)

All costs incurred under any grant are subject to the cost principles found in 2 CFR Part 200 Subpart E.  The cost principles provide lists of selected items of allowable and unallowable costs, and must be used in determining the allowable costs of work performed under the grant.

### V.    Procurement Standards (2 CFR Part 200.317-327)

Under 2 CFR Part 200.317, States are required to follow the procurement rules the States have established for purchases funded by non-Federal sources.  When procuring goods and services for a grant's purposes, all other grantees may follow their own procurement procedures, but only to the extent that those procedures meet the minimum requirements for procurement specified in the regulations.  These requirements include written competition procedures and codes of conduct for grantee staff, as well as requirements for cost and price analysis, record-keeping and contractor compliance with certain Federal laws and regulations.  These regulations also require grantees to include certain conditions in contracts and subcontracts, as mandated by the regulations and statutes.

### VI.    Indirect Costs (EDGAR §§75.560-564 and 2 CFR Part 200.414)

In addition to the information presented beslow, see GAN ATTACHMENT 4 for addional information including restrictions related to temporary, de minimis, training, restricted, and program prescribed indirect cost rates.

A.   Unrestricted Indirect Cost Rate

To utilize an unrestricted indirect cost rate, a grantee must have an indirect cost agreement with its cognizant agency, submit an indirect cost rate proposal to its cognizant agency for indirect

JA 383

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 386 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 49 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 51 of 152

costs (cognizant agency) within 90 days after the award of this grant or elect to utilize the de minimis rate under 2 CFR § 200.414(f) or the temporary indirect cost rate (subject to limitations described below).

The grantee must provide proof of its negotiated indirect cost rate agreement to the Department as soon as it has signed such an agreement with its cognizant agency.

B.   Temporary Indirect Cost Rate

A grantee that does not have a current negotiated indirect cost rate agreement may recover indirect costs at a temporary rate, which is limited to 10% of budgeted direct salaries and wages (See 34 CFR § 75.560(c)); or it may choose not to charge indirect costs to the grant. The temporary rate can only be used for 90 days unless the exceptional circumstances apply under 34 CFR § 75.560(d)(2).

If the grantee has not submitted its indirect cost proposal to its cognizant agency within the 90-day period, it may no longer recover indirect costs utilizing the temporary indirect cost rate until it has negotiated an indirect cost rate agreement with its cognizant agency. Once a grantee obtains a federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

C.   De minimis Indirect Cost Rate

Institutions of Higher Education (IHEs), federally-recognized Indian Tribes, State and Local Governments[1] receiving less than $35 million in direct federal funding, and nonprofit organizations, if they do not have a current negotiated (including provisional) rate, and are not subject to the Department's training rate or restricted rate (supplement-not-supplant provisions) may elect to charge a de minimis indirect cost rate of 10% of modified total direct costs (MTDC). This rate may be used indefinitely.

MTDC consists of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $25,000 of each subaward (i.e., subgrant). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items, including contract costs in excess of $25,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (see definition of MTDC at 2 CFR § 200.1).

Additionally, the de minimis rate may not be used by grantees that are subject to the Department's training indirect cost rate (34 CFR § 75.562) or restricted indirect cost rate. The de minimis rate may be used indefinitely. However, if a grantee chooses to use the de minimis rate to recover indirect costs, it must do so for all of its Federal awards until such time as the grantee negotiates an indirect cost rate with its cognizant agency. Once a grantee obtains a federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

---

[1] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.

4

USCA4 Appeal: 25-1281   Doc: 37-1      Filed: 06/16/2025   Pg: 387 of 638
Case 1:25-cv-10548-MJJ   Document 8-14   Filed 03/06/25   Page 50 of 75
Case 1:25-cv-00702-JRR   Document 25-2   Filed 03/12/25   Page 52 of 152

**GAN ENCLOSURE 1**
Revised 03/2021

D.   Programs with a Supplement-not-supplant requirement (restricted indirect cost rate)

A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant agency for indirect costs, or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR 75.563 and 76.564 – 76.569, is not less than 8% MTDC.  A State or local government[2] that is a restricted program grantee may not elect to utilize the 8% MTDC rate.  Additionally, restricted program grantees may not utilize the de minimis rate, but may utilize the temporary rate until a restricted indirect cost rate is negotiated.

E.   Training Grant Indirect Cost Rate

If the grantee is a training grant recipient and is not a State, local, or Tribal government[3], the grantee must negotiate a rate under 34 CFR 75.562. This provision limits indirect cost recovery to 8% of modified total direct costs or the grantees negotiated indirect cost rate, whichever is less.

The recovery using the training grant indirect cost rate is subject to the following limitations:

i.    The lesser of the 8% indirect cost rate or negotiated indirect cost rate also applies to sub-awards that fund training.
ii.   The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States as defined in 2 CFR § 200.1, respectively.
iii.  Indirect costs in excess of the 8% limit may not be charged directly, used to satisfy matching or cost-sharing requirements, or charged to another Federal award.
iv.   A grantee using the training rate of 8% is required to have documentation available for audit that shows that its negotiated indirect cost rate is at least 8%.

F.   Program-Specific Indirect Cost Rate

Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery instead of the general requirements described here.

**VII.   Audit Requirements (2 CFR Part 200 Subpart F)**

2 CFR 200 Subpart F requires that grantees that are non-Federal entities (a State, local government, Indian tribe, IHE, or nonprofit organization that carries out a Federal award as a recipient or subrecipient) obtain a non-Federal audit of their expenditures under their Federal grants if the grantee expends more than $750,000 in Federal funds in one fiscal year.  2 CFR Part 200 Subpart F contains the requirements imposed on grantees for

---

[2] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.
[3] Note that a State-funded institution of higher education is not considered a "State government" for these purposes; and a Tribal college or university funded by a federally-recognized Tribe is not considered a Tribe for these purposes.

JA 385

USCA4 Appeal: 25-1281      Doc: 37-1          Filed: 06/16/2025      Pg: 388 of 638
Case 1:25-cv-10548-MJJ      Document 8-14      Filed 03/06/25      Page 51 of 75
Case 1:25-cv-00702-JRR      Document 25-2      Filed 03/12/25      Page 53 of 152

**GAN ENCLOSURE 1**
**Revised 03/2021**

audits done in connection with the law.

The Department recommends hiring auditors who have specific experience in auditing Federal awards under the regulations and the Compliance Supplement.

## VIII.   Other Considerations

Some other topics of financial management covered in 2 CFR Part 200 that might affect particular grants include program income (2 CFR Part 200.307), cost sharing or matching (2 CFR Part 200.306), property management requirements for equipment and other capital expenditures (2 CFR Parts 200.313, 200.439).

JA 386

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 389 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 52 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 54 of 152

**GAN ENCLOSURE 2**
Revised 03/2021

## MEMORANDUM TO ED DISCRETIONARY GRANTEES

You are receiving this memorandum to remind you of Federal requirements, found in 2 CFR Part 200, *Uniform Administrative Requirements, Cost Principles, and Audit Requirements,* regarding cash drawdowns under your grant account.

For any cash that you draw from your Department of Education (*the* Department) grant account, you must:

- draw down only as much cash as is necessary to meet the immediate needs of the grant project;
- keep to the minimum the time between drawing down the funds and paying them out for grant activities; and
- return to the Government the interest earned on grant funds deposited in interest-bearing bank accounts except for a small amount of interest earned each year that your entity is allowed to keep to reimburse itself for administrative expenses).

In order to meet these requirements, you are urged to:

- take into account the need to coordinate the timing of drawdowns with prior internal clearances (e.g., by boards, directors, or other officials) when projecting immediate cash needs so that funds drawn down from ED do not stay in a bank account for extended periods of time while waiting for approval;
- monitor the fiscal activity (drawdowns and payments) under your grant on a continuous basis;
- plan carefully for cash flow in your grant project during the budget period and review project cash requirements before each drawdown; and
- pay out grant funds for project activities as soon as it is practical to do so after receiving cash from the Department.

Keep in mind that the Department monitors cash drawdown activity for all grants. Department staff will contact grantees who appear to have drawn down excessive amounts of cash under one or more grants during the fiscal quarter to discuss the particular situation. For the purposes of drawdown monitoring, the Department will contact grantees who have drawn down 50% or more of the grant in the first quarter, 80% or more in the second quarter, and/or 100% of the cash in the third quarter of the budget period. However, even amounts less than these thresholds could still represent excessive drawdowns for your particular grant activities in any particular quarter. Grantees determined to have drawn down excessive cash will be required to return the excess funds to the Department, along with any associated earned interest, until such time as the money is legitimately needed to pay for grant activities. If you need assistance with returning funds and interest, please contact the Department's G5 Hotline by calling 1-888-336-8930.

Grantees that do not follow Federal cash management requirements and/or consistently appear on the Department's reports of excessive drawdowns could be:

- subjected to specific award conditions or designated as a "high-risk" grantee [2 CFR Part 200.208 and 2 CFR 3474.10], which could mean being placed on a "cash-reimbursement" payment method (i.e., a grantee would experience the inconvenience of having to pay for grant activities with its own money and waiting to be reimbursed by the Department afterwards);

JA 387

USCA4 Appeal: 25-1281    Doc: 37-1       Filed: 06/16/2025    Pg: 390 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 53 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 55 of 152

**GAN  ENCLOSURE 2**
Revised 03/2021

- subject to further corrective action;
- denied selection for funding on future ED grant applications [EDGAR 75.217(d)(3)(ii)]; and/or
- debarred or suspended from receiving future Federal awards from any executive agency of the Federal government.

You are urged to read 2 CFR Part 200.305 to learn more about Federal requirements related to grant payments and to determine how to apply these requirements to any subgrantees. You are urged to make copies of this memorandum and share it with all affected individuals within your organization.

2

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 391 of 638    Page 54 of 75
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 54 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 56 of 152

**GAN ENCLOSURE 3**
**Revised 03/2021**

## THE USE OF GRANT FUNDS FOR CONFERENCES AND MEETINGS

You are receiving this memorandum to remind you that grantees must take into account the following factors when considering the use of grant funds for conferences and meetings:

- Before deciding to use grant funds to attend or host a meeting or conference, a grantee should:
  - Ensure that attending or hosting a conference or meeting is consistent with its approved application and is reasonable and necessary to achieve the goals and objectives of the grant;
  - Ensure that the primary purpose of the meeting or conference is to disseminate technical information, (e.g., provide information on specific programmatic requirements, best practices in a particular field, or theoretical, empirical, or methodological advances made in a particular field; conduct training or professional development; plan/coordinate the work being done under the grant); and
  - Consider whether there are more effective or efficient alternatives that can accomplish the desired results at a lower cost, for example, using webinars or video conferencing.
- Grantees must follow all applicable statutory and regulatory requirements in determining whether costs are reasonable and necessary, especially the Cost Principles for Federal grants set out at 2 CFR Part 200 Subpart E of the, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards."  In particular, remember that:
  - Federal grant funds cannot be used to pay for alcoholic beverages; and
  - Federal grant funds cannot be used to pay for entertainment, which includes costs for amusement, diversion, and social activities.
- Grant funds may be used to pay for the costs of attending a conference.  Specifically, Federal grant funds may be used to pay for conference fees and travel expenses (transportation, per diem, and lodging) of grantee employees, consultants, or experts to attend a conference or meeting if those expenses are reasonable and necessary to achieve the purposes of the grant.
  - When planning to use grant funds for attending a meeting or conference, grantees should consider how many people should attend the meeting or conference on their behalf.  The number of attendees should be reasonable and necessary to accomplish the goals and objectives of the grant.
- A grantee hosting a meeting or conference may not use grant funds to pay for food for conference attendees unless doing so is necessary to accomplish legitimate meeting or conference business.
  - A working lunch is an example of a cost for food that might be allowable under a Federal grant if attendance at the lunch is needed to ensure the full participation by conference attendees in essential discussions and speeches concerning the purpose of the conference and to achieve the goals and objectives of the project.
- A meeting or conference hosted by a grantee and charged to a Department grant must not be promoted as a U.S. Department of Education conference.  This means that the seal of the U.S. Department of Education must not be used on conference materials or signage without Department approval.

JA 389

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 392 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 55 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 57 of 152

**GAN ENCLOSURE 3**
Revised 03/2021

- o All meeting or conference materials paid for with grant funds must include appropriate disclaimers, such as the following:

  > The contents of this (insert type of publication; e.g., book, report, film) were developed under a grant from the Department of Education.  However, those contents do not necessarily represent the policy of the Department of Education, and you should not assume endorsement by the Federal Government.

- Grantees are strongly encouraged to contact their project officer with any questions or concerns about whether using grant funds for a meeting or conference is allowable prior to committing grant funds for such purposes.
  - o A short conversation could help avoid a costly and embarrassing mistake.
- Grantees are responsible for the proper use of their grant awards and may have to repay funds to the Department if they violate the rules on the use of grant funds, including the rules for meeting- and conference-related expenses.

JA 390

USCA4 Appeal: 25-1281    Doc: 37-1       Filed: 06/16/2025    Pg: 393 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 56 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 58 of 152

## MEMORANDUM TO REMIND DEPARTMENT OF EDUCATION GRANTEES OF EXISTING CASH MANAGEMENT REQUIREMENTS CONCERNING PAYMENTS

The Department of Education (Department) requires that its grantees adhere to existing cash management requirements concerning payments and will ensure that their subgrantees are also aware of these policies by providing them relevant information.  A grantee's failure to comply with cash management requirements may result in an improper payment determination by the Department in accordance with the Payment Integrity Information Act (PIIA) of 2019.

There are three categories of payment requirements that apply to the drawdown of funds from grant accounts at the Department.  The first two types of payments are subject to the requirements in the Treasury Department regulations implementing the Cash Management Improvement Act (CMIA) of 1990, 31 U.S.C.6513, and the third is subject to the requirements in the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) at 2 CFR part 200,[1] as follows:

1.    Payments to a State under programs that are covered by a State's Treasury State Agreement (TSA);

2.    Payments to States under programs that are not covered by a TSA; and

3.    Payments to other non-Federal entities, including nonprofit organizations and local governments.

### CMIA Requirements Applicable to Programs included in a TSA

Generally, under the Treasury Department regulations implementing the CMIA, only major assistance programs (large-dollar programs meeting thresholds in 31 CFR § 205.5) are included in a State's written TSA. See 31 CFR § 205, subpart A.  Programs included in a TSA must use approved funding techniques and both States and the Federal government are subject to interest liabilities for late payments. State interest liabilities accrue from the day federal funds are credited to a State account to the day the State pays out the federal funds for federal assistance program purposes. 31 CFR § 205.15.  If a State makes a payment under a Federal assistance program before funds for that payment have been transferred to the State, Federal Government interest liabilities accrue from the date of the State payment until the Federal funds for that payment have been deposited to the State account. 31 CFR § 205.14.

### CMIA Requirements Applicable to Programs Not Included in a TSA

Payments to States under programs not covered by a State's TSA are subject to subpart B of Treasury's regulations in 31 CFR § 205.  These regulations provide that a State must minimize the time between the drawdown of funds from the federal government and their disbursement for approved program activities.  The timing and amount of funds transfers must be kept to a minimum and be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.  31 CFR § 205.33(a).  States should exercise sound cash management in funds transfers to subgrantees.

---

[1] The Department adopted the Uniform Guidance as regulations of the Department at 2 CFR part 3474.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 394 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 57 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 59 of 152

**GAN ENCLOSURE 4**
Revised 03/2021

Under subpart B, neither the States nor the Department owe interest to the other for late payments. 31 CFR § 205.33(b).  However, if a State or a Federal agency is consistently late in making payments, Treasury can require the program to be included in the State's TSA.  31 CFR § 205.35.

**Fund transfer requirements for grantees other than State governments and subgrantees**

The transfer of Federal program funds to grantees other than States and to subgrantees are subject to the payment and interest accrual requirements in the Uniform Guidance at 2 CFR § 200.305(b).  These requirements are like those in subpart B of the Treasury Department regulations in 31 CFR part 205, requiring that "payments methods must minimize the time elapsing between the transfer of funds from the United States Treasury or the pass-through entity and the disbursement by the non-Federal entity." 2 CFR § 200.305(b) introduction.

The Federal Government and pass-through entities must make payments in advance of expenditures by grantees and subgrantees if these non-Federal entities maintain, or demonstrate the willingness to maintain, written procedures "that minimize the time elapsing between the transfer of funds and disbursement by the non-Federal entity, and financial management systems that meet the standards for fund control and accountability.  2 CFR § 200.305(b)(1).  If a grantee or subgrantee cannot meet the criteria for advance payments, a Federal agency or pass-through entity can pay that entity through reimbursement.  See 2 CFR § 200.305(b)(1) and (4) for more detailed description of the payment requirements and the standards for requiring that payments be made by reimbursement.

Non-Federal entities must maintain advance payments in interest bearing accounts unless certain conditions exist.  See 2 CFR § 200.305(b)(8) for those conditions.  The requirements regarding interest accrual and remittance follow:

Grantees and subgrantees must annually remit interest earned on federal advance payments except that interest earned amounts up to $500 per year may be retained for administrative expense. Any additional interest earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services Payment Management System (PMS) through an electronic medium using either Automated Clearing House (ACH) network or a Fedwire Funds Service payment. 2 CFR § 200.305(b)(9)(i) and (ii).

1.  When returning interest through ACH Direct Deposit or Fedwire, grantees must include the following in their return transaction:

    - PMS Account Number (PAN). NOTE: The PAN is the same series of alpha-numeric characters used for payment request purposes (e.g.: C1234G1).
    - PMS document number.
    - The reason for the return (e.g., interest, part interest part other, etc.).
    - An explanation stating that the refund is for interest payable to the Department of Health and Human Services, and the grant number(s) for which the interest was earned.

    a.  U.S. Department of Education grantees are generally located and operate domestically and return interest domestically.  Below is PSC ACH account information for interest returned

JA 392

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 395 of 638    Page 58 of 75
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 58 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 60 of 152

domestically. For international ACH interest returned, account information is available at:
Returning Funds/Interest.

- PSC ACH Routing Number is: 051036706
- PSC DFI Accounting Number: 303000
- Bank Name: Credit Gateway - ACH Receiver
- Location: St. Paul, MN

b. Service charges may be incurred from a grantee's financial institution when a Fedwire to
return interest is initiated. For FedWire returns, Fedwire account information is as follows:

- Fedwire Routing Number: 021030004
- Agency Location Code (ALC): 75010501
- Bank Name: Federal Reserve Bank
- Treas NYC/Funds Transfer Division
- Location: New York, NY

2.   Interest may be returned by check using only the U.S. Postal Service; however, returning
interest via check may take 4-6 weeks for processing before a check payment may be applied to
the appropriate PMS account.

a. Interests returned by check are to be mailed (USPS only) to:

- HHS Program Support Center
PO Box 979132
St. Louis, MO 63197

A brief statement explaining the nature of the return must be included.

b. To return interest on a grant not paid through the PMS, make the check payable to the
Department of Health and Human Services, and include the following with the check:

- An explanation stating that the refund is for interest
- The name of the awarding agency
- The grant number(s) for which the interest was earned
- The return should be made payable to: Department of Health and Human Services.

3.   For detailed information about how to return interest, visit the PSC Retuning Funds/Interest
page at: Returning Funds/Interest

Grantees, including grantees that act as pass-through entities and subgrantees have other
responsibilities regarding the use of Federal funds. For example, all grantees and subgrantees must
have procedures for determining the allowability of costs for their awards. We highlight the following
practices related to the oversight of subgrantee compliance with the financial management
requirements in the Uniform Guidance that will assist State grantees (pass-through entities) in meeting
their monitoring responsibilities. Under 2 CFR § 200.332, pass-through entities must –

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 396 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 59 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 61 of 152

**GAN ENCLOSURE 4**
Revised 03/2021

1.  Evaluate each subrecipient's risk of noncompliance with Federal statutes, regulations, and the terms and conditions of the subaward for purposes of determining the appropriate subrecipient monitoring.

2.  Monitor the performance and fiscal activities of the subrecipient to ensure that the subaward is used for authorized purposes, in compliance with Federal statutes, regulations, and the terms and conditions of the subaward; and that subaward performance goals are achieved.

A small number of Department grant programs have program-specific cash management and payment requirements based on the authorizing legislation or program regulations.  These program-specific requirements may supplement or override general cash management or payment requirements.  If you have any questions about your specific grant, please contact the Education Program Contact listed in Block 3 of your Grant Award Notification.

JA 394

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 397 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 60 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 62 of 152

**GAN ATTACHMENT 5**
Revised 03/2021

### RECIPIENTS OF DEPARTMENT OF EDUCATION GRANTS AND COOPERATIVE AGREEMENTS
### FREQUENTLY ASKED QUESTIONS ON CASH MANAGEMENT

**Q**  **What are the Federal Laws and Regulations Regarding Payments to the States?**

**A**  The *Cash Management Improvement Act of 1990* (*CMIA*) establishes interest liabilities for the Federal and State governments when the Federal Government makes payments to the States. See 31 U.S.C. 3335 and 6503.  The implementing regulations are in Title 31 of the Code of Federal Regulations (CFR), Part 205, https://www.ecfr.gov/cgi-bin/text-idx?tpl=/ecfrbrowse/Title31/31cfr205_main_02.tpl.  Non-Federal entities other than States follow the rules on Federal payments set out in 2 CFR 200.305.

**Q**  **What is a Treasury-State Agreement (TSA)?**

**A**  A TSA documents the accepted funding techniques and methods for calculating interest agreed upon by the U.S. Department of the Treasury (Treasury) and a State.  It identifies the Federal assistance programs that are subject to interest liabilities under the CMIA.  The CMIA regulations specify a number of different funding techniques that may be used by a State but a State can negotiate with the Treasury Department to establish a different funding technique for a particular program. A TSA is effective until terminated and, if a state does not have a TSA, payments to the State are subject to the default techniques in the regulations that Treasury determines are appropriate.

**Q**  **What are the CMIA requirements for a program subject to a Treasury-State Agreement?**

**A**  Payments to a State under a program of the Department are subject to the interest liability requirements of the CMIA if the program is included in the State's Treasury-State Agreement (TSA) with the Department of Treasury.  If the Federal government is late in making a payment to a State, it owes interest to the State from the time the State spent its funds to pay for expenditure until the time the Federal government deposits funds to the State's account to pay for the expenditure.  Conversely, if a State is late in making a payment under a program of the Department, the State owes interest to the Federal government from the time the Federal government deposited the funds to the State's account until the State uses those funds to make a payment.  For more information, GAN Enclosure 4.

**Q**  **What are the CMIA requirements for a program that is not subject to a Treasury-State Agreement?**

**A**  If a program is not included in the State's TSA, neither the State nor the Federal government are liable for interest for making late payments.  However, both the Federal government and the State must minimize the time elapsing between the date the State requests funds and the date that the funds are deposited to the State's accounts.  The State is also required to minimize the time elapsed between the date it receives funds from the Federal government and the date it makes a payment under the program,  Also, the Department must minimize the amount of funds transferred to a State to only that needed to meet the immediate cash needs of the State.  The timing and amount of funds transferred must be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.

**Q**  **What if there is no TSA?**

JA 395

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 398 of 638

Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 61 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 63 of 152

**GAN ATTACHMENT 5**
Revised 03/2021

**A**    When a State does not have a TSA in effect, default procedures in 31 CFR, part 205 that the Treasury Department determines appropriate apply. The default procedures will prescribe efficient funds transfer procedures consistent with State and Federal law and identify the covered Federal assistance programs and designated funding techniques.

**Q**    **Who is responsible for Cash Management?**
**A**    Grantees and subgrantees that receive grant funds under programs of the Department are responsible for maintaining internal controls regarding the management of Federal program funds under the Uniform Guidance in 2 CFR 200.302 and 200.303. In addition, grantees are responsible for ensuring that subgrantees are aware of the cash management and requirements in 2 CFR part 200, subpart D.

**Q**    **Who is responsible for monitoring cash drawdowns to ensure compliance with cash management policies?**
**A**    Recipients must monitor <u>their own</u> cash drawdowns **and** those of their subrecipients to assure substantial compliance to the standards of timing and amount of advances.

**Q**    **How soon may I draw down funds from the G5 grants management system?**
**A**    Grantees are required to minimize the amount of time between the drawdown and the expenditure of funds from their bank accounts. (See 2 CFR 200.305(b).) Funds must be drawn only to meet a grantee's immediate cash needs for each individual grant. The G5 screen displays the following message:

**By submitting this payment request, I certify to the best of my knowledge and belief that the request is based on true, complete, and accurate information. I further certify that the expenditures and disbursements made with these funds are for the purposes and objectives set forth in the applicable Federal award or program participation agreement, and that the organization on behalf of which this submission is being made is and will remain in compliance with the terms and conditions of that award or program participation agreement. I am aware that the provision of any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me, and the organization on behalf of which this submission is being made, to criminal, civil, or administrative penalties for fraud, false statements, false claims, or other violations. (U.S. Code Title 18, Section 1001; Title 20, Section 1097; and Title 31, Sections 3729-3730 and 3801-3812)**

**Q**    **How may I use Federal funds?**
**A**    Federal funds must be used as specified in the Grant Award Notification (GAN) and the approved application or State plan for allowable direct costs of the grant and an allocable portion of indirect costs, if authorized.

**Q**    **What are the consequences to recipients/subrecipients for not complying with terms of the grant award?**
**A**    If a recipient or subrecipient materially fails to comply with any term of an award, whether stated in a Federal statute or regulation, including those in 2 CFR part 200, an assurance, the GAN, or elsewhere, the awarding agency may in accordance with 2 CFR 200.339 take one or more of the following actions:

USCA4 Appeal: 25-1281     Doc: 37-1       Filed: 06/16/2025     Pg: 399 of 638
Case 1:25-cv-10548-MJJ     Document 8-14     Filed 03/06/25     Page 62 of 75
Case 1:25-cv-00702-JRR     Document 25-2     Filed 03/12/25     Page 64 of 152

**GAN ATTACHMENT 5**
**Revised 03/2021**

1. Temporarily withhold cash payments pending correction of the deficiency by the non-Federal entity or more severe enforcement action by the Federal awarding agency or pass-through entity.
2. Disallow (that is, deny both use of funds and any applicable matching credit for) all or part of the cost of the activity not in compliance.
3. Wholly or partly suspend or terminate the Federal award.
4. Initiate suspension or debarment proceedings as authorized under 2 CFR part 180 and Federal award agency regulations (or in the case of a pass-through be initiated by a Federal awarding agency).
5. Withhold further Federal awards for the project or program.
6. Take other remedies that may be legally available.

**Q**  **Who is responsible for determining the amount of interest owed to the Federal government?**
**A**   As set forth in 31 CFR 205.9, the method used to calculate and document interest liabilities is included in the State's TSA.  A non-State entity must maintain advances of Federal funds in interest-bearing accounts unless certain limited circumstance apply and remit interest earned on those funds to the Department of Health and Human Services, Payment Management System annually.  See 2 CFR 200.305.

**Q**  **What information should accompany my interest payment?**
**A**   In accordance with 2 CFR 200.305(b)(9), interest in access of $500.00 earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services Payment Management System (PMS) through an electronic medium using either Automated Clearing House (ACH) network or a Fedwire Funds Service payment.

For returning interest on Federal awards paid through PMS, the refund should:
(a) Provide an explanation stating that the refund is for interest;
(b) List the PMS Payee Account Number(s) (PANs);
(c) List the Federal award number(s) for which the interest was earned; and
(d) Make returns payable to: Department of Health and Human Services.

For returning interest on Federal awards not paid through PMS, the refund should:
(a) Provide an explanation stating that the refund is for interest;
(b) Include the name of the awarding agency;
(c) List the Federal award number(s) for which the interest was earned; and
(d) Make returns payable to: Department of Health and Human Services.

For additional information about returning interest see GAN ATTACHMENT 4.

**Q**  **Are grant recipients/subrecipients automatically permitted to draw funds in advance of the time they need to disburse funds in order to liquidate obligations?**
**A**    The payment requirements in 2 CFR 200.305(b) authorize a grantee or subgrantee to request funds in advance of expenditures if certain conditions are met.  However, if those conditions are not met, the Department and a pass-through agency may place a payee on reimbursement.

JA 397

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 400 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 63 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 65 of 152

**GAN ATTACHMENT 5**
Revised 03/2021

**Q**    **For formula grant programs such as ESEA Title I, for which States distribute funds to LEAs, may States choose to pay LEAs on a reimbursement basis?**

**A**     A subgrantee must be paid in advance if it meets the standards for advance payments in 2 CFR 200.305(b)(1) but if the subgrantee cannot meet those standards, the State may put the subgrantee on reimbursement payment.  See 2 CFR 200.305(b).

**Q**    **Will the Department issue special procedures in advance if G5 plans to shut down for 3 days or more?**

**A**    Yes, before any shutdown of G5 lasting three days or more, the Department issues special guidance for drawing down funds during the shut down.  The guidance will include cash management improvement act procedures for States and certain State institutions of higher education and procedures for grants (including Pell grants) that are not subject to CMIA.

JA 398

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 401 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 64 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 66 of 152

# EXHIBIT B

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 402 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 65 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 67 of 152

S336S240059 - 24A
Laila Richman
Towson University
College of Education
8000 York Road
Towson, MD 21252

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 403 of 638    Page 66 of 75
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 66 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 68 of 152

S336S240059 - 24A

Anne Greene
Towson University
College of Education
8000 York Road
Towson, MD 21252

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 404 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 67 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 69 of 152

S336S240059 - 24A



### US Department of Education
### Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| Towson University<br>College of Education<br>8000 York Road<br>Towson, MD 21252 | PR/AWARD NUMBER   S336S240059 - 24A<br>ACTION NUMBER   2<br>ACTION TYPE   Revision<br>AWARD TYPE   Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>  Laila Richman          (410) 704-3892<br>  lrichman@towson.edu<br>EDUCATION PROGRAM CONTACT<br>  Diana Schneider          (202) 401-1456<br>  diana.schneider@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK      888-336-8930<br>  obssed@servicenowservices.com | 84.336S<br>Towson University (TU) PRIME (Preparing and Retaining Inclusive Maryland Educators) |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Laila Richman | Project Director | 0 % |

**6** AWARD PERIODS

|  |  |
|---|---|
| BUDGET PERIOD | 10/01/2024 - 09/30/2025 |
| PERFORMANCE PERIOD | 10/01/2024 - 09/30/2029 |

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 2 | 10/01/2025 - 09/30/2026 | $811,249.00 |
| 3 | 10/01/2026 - 09/30/2027 | $1,099,920.00 |
| 4 | 10/01/2027 - 09/30/2028 | $1,240,123.00 |
| 5 | 10/01/2028 - 09/30/2029 | $1,152,933.00 |

**7** AUTHORIZED FUNDING

|  |  |
|---|---|
| THIS ACTION | $436,753.00 |
| BUDGET PERIOD | $1,286,412.00 |
| PERFORMANCE PERIOD | $1,286,412.00 |

**8** ADMINISTRATIVE INFORMATION

|  |  |
|---|---|
| UEI | LC3SFMP2L798 |
| REGULATIONS | EDGAR AS APPLICABLE<br>2 CFR AS APPLICABLE |
| ATTACHMENTS | N/A |

**9** LEGISLATIVE AND FISCAL DATA

|  |  |
|---|---|
| AUTHORITY: | PL P.L. 110-315 TITLE II HIGHER EDUCATION ACT, AS AMENDED |
| PROGRAM TITLE: | TEACHER QUALITY ENHANCEMENT GRANTS FOR STATE AND PARTNERSHIPS |
| CFDA/SUBPROGRAM NO: | 84.336S |

JA 402

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 405 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 68 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 70 of 152

S336S240059 - 24A



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| FUND CODE | FUNDING YEAR | AWARD YEAR | ORG. CODE | CATEGORY | LIMITATION | ACTIVITY | CFDA | OBJECT CLASS | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0201A | 2024 | 2024 | ES000000 | B | JDK | 000 | 336 | 4101C | $436,753.00 |

**10**

PR/AWARD NUMBER: S336S240059 - 24A

RECIPIENT NAME: Towson University
College of Education

GRANTEE NAME: TOWSON UNIVERSITY
8000 YORK RD,
TOWSON, MD 21252 - 0002

PROGRAM INDIRECT COST TYPE: Restricted

PROJECT INDIRECT COST RATE: 8%

TERMS AND CONDITIONS

(1)  THIS ACTION INCREASES THE AMOUNT OF FUNDS AUTHORIZED FOR THE CURRENT BUDGET
PERIOD AND PERFORMANCE PERIOD AS SHOWN IN BLOCK 7.

## LAVANNA WEEMS
Digitally signed by LAVANNA WEEMS
Date: 2024.09.06 12:38:04 -04'00'

**AUTHORIZING OFFICIAL**　　　　　　　**DATE**

Ver. 1

JA 403

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 406 of 638
Case 1:25-cv-10548-MJJ    Document 18-14    Filed 03/06/25    Page 69 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 71 of 152

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME –** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION –** Unique items of information that identify this notification.

    **PR/AWARD NUMBER –** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

    **ACTION NUMBER –** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

    **ACTION TYPE –** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

    **AWARD TYPE –** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF –** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

    **\*RECIPIENT PROJECT DIRECTOR –** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

    **EDUCATION PROGRAM CONTACT –** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

    **EDUCATION PAYMENT CONTACT –** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER –** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL –** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS –** Project activities and funding are approved with respect to three different time periods, described below:

    **BUDGET PERIOD –** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

    **PERFORMANCE PERIOD –** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

    **\*FUTURE BUDGET PERIODS –** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING –** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

    **\*THIS ACTION –** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

    **\*BUDGET PERIOD –** The total amount of funds available for use by the grantee during the stated budget period to this date.

    **\*PERFORMANCE PERIOD –** The amount of funds obligated from the start date of the first budget period to this date.

    **RECIPIENT COST SHARE –** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

    **RECIPIENT NON-FEDERAL AMOUNT –** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION –** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

    **UEI –** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

JA 404

**\*REGULATIONS -** Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -**
The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.

**AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -** If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

---

\* This item differs or does not appear on formula and block grants.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 408 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 71 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 73 of 152

# EXHIBIT C

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 409 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 72 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 74 of 152



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF SECONDARY AND ELEMENTARY EDUCATION**
**OFFICE OF ADMINISTRATION**

RE: Grant Award Termination

Dear _____:

This letter provides notice that the United States Department of Education is terminating your federal award, _____. *See* 2 C.F.R. § 200.340-43; *see also* 34 C.F.R. § 75.253.

It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339-43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. _____ in its entirety effective 2/12/25 _____.

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 407

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 410 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 73 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 75 of 152

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice. Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1. a copy of the written notice of termination;
2. the date you received written notice of termination;
3. a brief statement of your argument and the disputed factual, legal, or other issues;
4. the amount of funds or costs in dispute, if any; and
5. any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Respectfully,

cc: Ruth Ryder

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 408

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 411 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 74 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 76 of 152

# EXHIBIT D

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 412 of 638
Case 1:25-cv-10548-MJJ    Document 8-14    Filed 03/06/25    Page 75 of 75
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 77 of 152

| From: | Washington, Mark |
| --- | --- |
| Sent: | Wednesday, February 12, 2025 12:55 PM |
| To: | Richman, Laila |
| Cc: | Ryder, Ruth; Weems, Kia; Williams, Damien |
| **Subject:** | S336S240059_TOWSON_UNIVERSITY_021225_FINAL.pdf |
| **Attachments:** | S336S240059_TOWSON_UNIVERSITY_021225_FINAL.pdf |

You don't often get email from mark.washington@ed.gov. Learn why this is important

[ **CAUTION**: This email is from outside of TU. Use caution before clicking links or opening attachments. If suspicious, report to phishing@towson.edu. ]

Dear Ms. Richman,

Please see the attached letter, informing you of the Department's decision to terminate your federal award S336S240059, because the grant is inconsistent with, and no longer effectuates, Department priorities.  You will also receive an updated GAN notice, confirming this decision and change.  You will also receive notification from the Department's G5 grants administration system.

Please feel free to contact me with any related questions or concerns about this information.  Please also note the basis for challenge or appeal of this decision, as noted in the language of the attached letter.

Respectfully,

Mark Washington

---



**Mark Washington**
**Deputy Assistant Secretary**
United States Department of Education
Office of Elementary and Secondary Education
400 Maryland Avenue, SW | Washington, D.C. 20202
Phone: (202) 205-0167 | Mobile: (202) 549-9956 | Email: mark.washington@ed.gov

Exhibit B

USCA4 Appeal: 25-1281   Doc: 37-1   Filed: 06/16/2025   Pg: 414 of 638   Page 1 of 70
Case 1:25-cv-10548-MJJ   Document 8-15   Filed 03/06/25   Page 1 of 70
Case 1:25-cv-00702-JRR   Document 25-2   Filed 03/12/25   Page 79 of 152

# EXHIBIT 15

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 415 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 2 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 80 of 152

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF NEW
JERSEY; STATE OF COLORADO; STATE
OF ILLINOIS; STATE OF MARYLAND;
STATE OF NEW YORK; and STATE OF
WISCONSIN,

        Plaintiffs,

              v.

U.S. DEPARTMENT OF EDUCATION;
DENISE CARTER, in her official capacity
as former Acting Secretary of Education and
current acting Chief Operating Officer,
Federal Student Aid; LINDA MCMAHON,
in her official capacity as Secretary of
Education,

        Defendants.

Case No. 1:25-cv-10548

JA 413

USCA4 Appeal: 25-1281     Doc: 37-1        Filed: 06/16/2025     Pg: 416 of 638     Page 3 of 70
Case 1:25-cv-10548-MJJ     Document 8-15     Filed 03/06/25     Page 3 of 70
Case 1:25-cv-00702-JRR     Document 25-2     Filed 03/12/25     Page 81 of 152

## DECLARATION OF SEGUN EUBANKS

I, Segun Eubanks, declare as follows:

1.       I am a resident of the State of Maryland. I am over the age of 18 and have personal knowledge of all the facts stated herein, except as to those matters stated upon information and belief; as to those matters, I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2.       I am currently employed by the University of Maryland, College Park (UMCP), as a professor of practice and the Director of UMCP's Center for Educational Innovation and Improvement (CEii).  UMCP is a constituent institution of the University System of Maryland, the State of Maryland's public system of higher education.

3.       As professor of practice and Director of the CEii, I am responsible for leading projects that improve the quality of K-12 schools in Maryland and across the United States.

4.       In 2022, the U.S. Department of Education (ED) invited applications for a Supporting Effective Educator Development Grant (SEED).

5.       SEED Grants were intended to increase the number of highly effective educators through implementation of evidence-based practices. One of the competitive funding priorities listed in the 2022 Request for Proposals was to promote diversity in the administrator and teaching workforce. Another competitive funding priority was to promote equity in student access to educational resources.

1

JA 414

USCA4 Appeal: 25-1281 Doc: 37-1 Filed: 06/16/2025 Pg: 417 of 638
Case 1:25-cv-10548-MJJ Document 8-15 Filed 03/06/25 Page 4 of 70
Case 1:25-cv-00702-JRR Document 25-2 Filed 03/12/25 Page 82 of 152

6. As set out in its grant proposal, the CEii intended to use the SEED grant to provide professional development and coaching based on state-of-the-art research to assistant principals (on track to become principals) and principals at high-need schools, thereby improving their leadership performance in ways that would also improve teacher performance and student outcomes.

7. Grant S423A220062 was approved to begin on October 1, 2022, for a period of three years, in the amount of $4,808,683. The program officer encouraged the project to expend funds promptly, so there were no plans to request a no-cost extension.

8. On September 27, 2022, ED produced a Grant Award Notification (GAN) setting forth the terms and conditions of the grant award. A true and correct copy of the corresponding GAN and its attachments, dated September 27, 2022, is attached as Exhibit A. On October 16, 2024, UMCP received from ED a "Continuation Grant Award Notification." A true and correct copy of this GAN is attached as Exhibit B. As set forth therein, termination of the grant by ED is permitted only if a recipient or subrecipient (1) "materially fails to comply with any term of an award" (GAN Attachment 5); or (2) engages in violations of human trafficking (GAN Attachment 8).

9. Since October 01, 2022, UMCP has used the SEED grant funds in a manner fully consistent with ED's statements regarding the nature of the grant and UMCP's grant application.

10. UMCP has used and expended the funds to provide comprehensive, research-based training and one-on-one mentoring to 120 principals and assistant principals in high-need schools in Maryland and New Jersey. Project activities were designed to improve student learning outcomes, support and retain teachers, and implement school-wide improvement plans.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 418 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 5 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 83 of 152

11.     At the time notification of termination was received (February 10, 2025), the remaining amount of funds committed by ED to UMCP was $877,090. Without these remaining funds the 70 principals participating in the current cohorts were unable to complete the graduate credits offered to them through the program, were unable to earn the micro-credentials aligned with their graduate courses, and stopped receiving mentoring, coaching, and school improvement plan assessments.

12.     Throughout the grant period, project staff participated in all required monitoring calls and submitted required quarterly reports by their due dates, up to and including January 24, 2025. Formal written feedback on the project's performance was not provided, but we received grant award notifications and award continuations annually in October, 2023, and October, 2024.

13.     On February 10, 2025, without any prior notice or indication, ED informed UMCP that its SEED grant was being terminated as of February 10, 2025. A true and correct copy of the ED's grant award termination letter is attached as Exhibit C. A true and correct copy of ED's email from Mark Washington, Deputy Assistant Secretary for Management and Planning to me at UMCP, attaching the grant award termination letter, is attached as Exhibit D.

14.     The grant termination letter stated that SEED Grant S423A220062 was terminated because the project was inconsistent with and no longer effectuated ED priorities by promoting or taking part in DEI initiatives, violating Federal civil rights law, conflicting with ED's policy prioritizing merit, fairness, and excellence in education, not being free from fraud, abuse, or duplication, or otherwise failing to serve the best interests of the United States.

15.     The termination notice was sent at 7:01 p.m., followed by the updated GAN several hours later, both of which were sent outside of normal business hours. The reason provided for the termination in the updated GAN was that "[t]he grant is deemed to be inconsistent with, and no

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 419 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 6 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 84 of 152

longer effectuates, Department priorities. See 2 C.F.R. 200.340(a) (4); see also 34 C.F.R. 75.253."
The termination notice and email were sent from a contact in ED named Mark Washington, who
had never been in contact with me or my project staff before. Metadata indicated the termination
letter was created by another person unfamiliar to me named Brooks Morgan. The termination
letter appeared to be a template with my name and the award number pasted in. My name and
address, as well as the signature line of the letter, were oddly formatted.

16.     UMCP relied and acted upon its expectation and understanding that ED would
fulfill its commitment to provide SEED grant funding it had awarded to UMCP. The project
employed two doctoral students and six staff members who were abruptly terminated from the
project on the stop work date. Program activities were abruptly stopped before the 70 principals
currently participating were able to complete their coursework and design their school
improvement plans. Several events planned for the summer, with deposits placed on venues, have
been cancelled. Contracts with the project's three partner organizations (Learning Forward, Mira
Education, Policy Studies Associates) were terminated abruptly.

17.     The grant termination resulted in harm to the two UMCP graduate students and six
project employees who suffered an inability to complete their work.  UMCP's CEii must now
secure additional funding on short notice or face cuts to its staff and possible closure.  The harm
is not limited to UMCP.  The project's partner organizations suffered harm through loss of income
because their contracts were abruptly cancelled. The project's 70 participating principals/assistant
principals in the current cohort have been harmed because they will not gain vital information and
skills that would have supported the administrator pipeline in these high-need schools.  The 1,204
teachers and nearly 25,000 students from the 70 participating schools in Maryland and New Jersey

USCA4 Appeal: 25-1281   Doc: 37-1      Filed: 06/16/2025   Pg: 420 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25   Page 7 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25   Page 85 of 152

have been harmed because they will not benefit from improvement of their school leadership that would have led to better teacher outcomes and better student outcomes.

18.     Prior to the grant award termination on February 10, 2025, ED had never provided me with notice, written or otherwise, that the grant administered by UMCP engaged in any of the activities described in the termination letter. In particular, ED had never provided notice that UMCP's SEED grant programs "promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic"; "violate either the letter or purpose of Federal civil rights law"; "conflict with the Department's policy of prioritizing merit, fairness, and excellence in education"; "are not free from fraud, abuse, or duplication"; or "otherwise fail to serve the best interests of the United States."

19.     On February 21, 2025, a U.S. district court preliminarily enjoined in part the enforcement of two January 2025 executive orders that directed the federal government to dismantle DEI initiatives. *See* Dkt. 44, *National Association of Diversity Officers in Higher Education v. Trump*, No. 1:25-cv-00333-ABA (D. Md. Feb. 21, 2025). To date, UMCP has not received any guidance from ED about whether its terminated SEED grant awards may be reinstated in view of the court order. UMCP inquired about this issue on March 4, 2025, and awaits ED's response.

20.     The termination caused an abrupt loss of income from the grant, as well as forcing us to ask our project's partner organizations to stop work. The termination forced us to stop efforts to improve principals' performance, increase the administrative and teaching pipeline in high-need schools, and improve student outcomes, thus depriving principals, teachers, and students from the participating schools of these benefits.

USCA4 Appeal: 25-1281    Doc: 37-1       Filed: 06/16/2025    Pg: 421 of 638    Page 8 of 70
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 86 of 152

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed on March 4, 2025, in College Park, Maryland.

/s/ Segun Eubanks

_____

Segun Eubanks

JA 419

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 422 of 638    Page 9 of 70
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 9 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 87 of 152

# E   HIBIT A

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 423 of 638    Page 10 of 70
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 10 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 88 of 152

S423A220062

Segun Eubanks
University of Maryland
VPR
University of Maryland
2115 Benjamin Building 3942 Campus Drive
College Park, MD 20742

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 424 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 11 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 89 of 152

S423A220062

Evan Crierie
University of Maryland
VPR
3112 Lee Building 7809 Regents Drive
College Park, MD 20742

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 425 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 12 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 90 of 152

S423A220062



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| University of Maryland<br>VPR<br>3112 Lee Building 7809 Regents Drive<br>College Park, MD 20742 | PR/AWARD NUMBER  S423A220062<br>ACTION NUMBER  1<br>ACTION TYPE  New<br>AWARD TYPE  Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>Segun Eubanks  (301) 405-2334<br>seubank2@umd.edu<br>EDUCATION PROGRAM CONTACT<br>Mia Howerton  (202) 205-0147<br>Mia.Howerton@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>G5 PAYEE HELPDESK  888-336-8930<br>obssed@servicenowservices.com | 84.423A<br>UMD School Improvement Leadership Academy |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Segun Eubanks | Project Director | 100 % |

**6** AWARD PERIODS

BUDGET PERIOD  10/01/2022 - 09/30/2023
PERFORMANCE PERIOD  10/01/2022 - 09/30/2025

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 2 | 10/01/2023 - 09/30/2024 | $1,833,771.00 |
| 3 | 10/01/2024 - 09/30/2025 | $1,448,595.00 |

**7** AUTHORIZED FUNDING

THIS ACTION  $1,526,317.00
BUDGET PERIOD  $1,526,317.00
PERFORMANCE PERIOD  $1,526,317.00

**8** ADMINISTRATIVE INFORMATION

UEI/SSN  NPU8ULVAAS23
REGULATIONS  CFR PART XXX
EDGAR AS APPLICABLE
2 CFR AS APPLICABLE
ATTACHMENTS  2 , 3 , 6 , 8 , 9 , 11 , 12 , 13 , 14 , GE1 , GE2 , GE3 , GE4 , GE5

**9** LEGISLATIVE AND FISCAL DATA

AUTHORITY:  PL P.L. 114–95 II DEPARTMENT OF DEFENSE AND FULL YEAR
CONTINUING APPROPRIATIONS ACT
PROGRAM TITLE:  SUPPORTING EFFECTIVE EDUCATOR DEVELOPMENT
CFDA/SUBPROGRAM NO:  84.423A

JA 423

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 426 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 13 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 91 of 152

 

S423A220062

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| FUND CODE | FUNDING YEAR | AWARD YEAR | ORG. CODE | CATEGORY | LIMITATION | ACTIVITY | CFDA | OBJECT CLASS | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0204A | 2022 | 2022 | ES000000 | B | UE1 | 000 | 423 | 4101C | $1,526,317.00 |

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S423A220062 |
| RECIPIENT NAME: | University of Maryland VPR |
| GRANTEE NAME: | UNIVERSITY OF MARYLAND, COLLEGE PARK |
| | 3112 LEE BLDG 7809 REGENTS DR, |
| | COLLEGE PARK, MD 20742 - 0001 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

(1)   THE FOLLOWING ITEMS ARE INCORPORATED IN THE GRANT AGREEMENT:

1) THE RECIPIENT'S APPLICATION (BLOCK 2);
2) THE APPLICABLE EDUCATION DEPARTMENT REGULATIONS: 2 CFR PART 180; NONPROCUREMENT DEBARMENT AND SUSPENSION AS ADOPTED AT 2 CFR PART 3485; 2 CFR PART 200 AS ADOPTED AT 2 CFR 3474 (BLOCK 8), AND 34 CFR PARTS 75, 77, 79, 81, 82, 84, 86, 97, 98, 99; AND THE PROGRAM REGULATIONS SPECIFIED IN BLOCK 8; AND
3) THE SPECIAL TERMS AND CONDITIONS SHOWN AS ATTACHMENTS IN BLOCK 8 ON THE INITIAL AWARD APPLY UNTIL CHANGED.

THIS AWARD SUPPORTS ONLY THE BUDGET PERIOD SHOWN IN BLOCK 6. IN ACCORDANCE WITH 34 CFR 75.253, THE SECRETARY CONSIDERS, AMONG OTHER THINGS, CONTINUED FUNDING IF:

1) CONGRESS HAS APPROPRIATED SUFFICIENT FUNDS UNDER THE PROGRAM;
2) THE DEPARTMENT DETERMINES THAT CONTINUING THE PROJECT WOULD BE IN THE BEST INTEREST OF THE GOVERNMENT;
3) THE GRANTEE HAS MADE SUBSTANTIAL PROGRESS TOWARD MEETING THE GOALS AND OBJECTIVES OF THE PROJECT;
4) THE SECRETARY ESTABLISHED PERFORMANCE MEASUREMENT REQUIREMENTS FOR THE GRANT IN THE APPLICATION NOTICE, THE PERFORMANCE TARGETS IN THE GRANTEE'S APPROVED APPLICATION;
5) THE RECIPIENT HAS SUBMITTED REPORTS OF PROJECT PERFORMANCE AND BUDGET EXPENDITURES THAT MEET THE REPORTING REQUIREMENTS FOUND AT 34 CFR 75.118, 2 CFR 200.328 AND 200.329, AND ANY OTHER REPORTING REQUIREMENTS ESTABLISHED BY THE SECRETARY; AND
6) THE GRANTEE HAS MAINTAINED FINANCIAL AND ADMINISTRATIVE MANAGEMENT SYSTEMS THAT MEET THE REQUIREMENTS IN 2 CFR 200.302, FINANCIAL MANAGEMENT, AND 2 CFR 200.303, INTERNAL CONTROLS.

IN ACCORDANCE WITH 2 CFR 200.308(c)(2) CHANGES TO KEY PERSONNEL IDENTIFIED IN BLOCK 5 MUST RECEIVE PRIOR APPROVAL FROM THE DEPARTMENT.

THE SECRETARY ANTICIPATES FUTURE FUNDING FOR THIS AWARD ACCORDING TO THE SCHEDULE IDENTIFIED IN BLOCK 6. THESE FIGURES ARE ESTIMATES ONLY AND DO NOT BIND THE SECRETARY TO FUNDING THE AWARD FOR THESE PERIODS OR FOR THE SPECIFIC AMOUNTS SHOWN. THE RECIPIENT WILL BE NOTIFIED OF SPECIFIC FUTURE FUNDING ACTIONS THAT THE SECRETARY TAKES FOR THIS AWARD.

JA 424

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 427 of 638
Case 1:25-cv-10548-MJJ    Document 25-2    Filed 03/06/25    Page 14 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 92 of 152

S423A220062



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

(2)   The Office of Management and Budget requires all Federal agencies to assign a Federal Award Identifying Number (FAIN) to each of their financial assistance awards. The PR/AWARD NUMBER identified in Block 2 is your FAIN. If subawards are permitted under this grant, and you choose to make subawards, you must document the assigned PR/AWARD NUMBER (FAIN) identified in Block 2 of this Grant Award Notification on each subaward made under this grant. The term subaward means:
1. A legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient. (See 2 CFR 200.331(a))
2. The term does not include your procurement of property and services needed to carry out the project or program (The payments received for goods or services provided as a contractor are not Federal awards, see 2 CFR 200.501(f) of the OMB Uniform Guidance: "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards").
3. A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract. (See 2 CFR 200.1)

(3)   Reimbursement of indirect costs is subject to the availability of funds and statutory and regulatory restrictions. The negotiated indirect cost rate agreement authorizes a non-Federal entity to draw down indirect costs from the grant awards. The following conditions apply to the below entities.

A. All entities (other than institutions of higher education (IHE))

The GAN for this grant award shows the indirect cost rate that applies on the date of the initial grant for this project. However, after the initial grant date, when a new indirect cost rate agreement is negotiated, the newly approved indirect cost rate supersedes the indirect cost rate shown on the GAN for the initial grant. This new indirect cost rate should be applied according to the period specified in the indirect cost rate agreement, unless expressly limited under EDGAR or program regulations. Any grant award with an approved budget can amend the budget to account for a change in the indirect cost rate. However, for a discretionary grant award any material changes to the budget which may impact the scope or objectives of the grant must be discussed with the program officer at the Department. See 34 CFR 75.560 (d)(3) (ii) (part 75 of EDGAR).

B. Institutions of higher education (IHE)

Under 2 CFR part 200, Appendix III, Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), the Department must apply the negotiated indirect cost rate in effect on the date of the initial grant award to every budget period of the project, including all continuation grants made for this project. See 2 CFR Part 200, Appendix III, paragraph C.7. Therefore, the GAN for each continuation grant will show the original indirect cost rate and it applies to the entire period of performance of this project. If the indirect cost rate agreement that is applicable to this grant does not extend to the end of the grant s project period, the indirect cost rate set at the start of the project period must still be applied to the end of project period regardless of the fact that the rate has otherwise expired.

(4)   Revised Budget: The following condition will be imposed on all grantees recommended for funding:
The grantee must submit a revised budget covering Year 1 of the grant award that aligns with the actual amount of funding that the grantee receives from the Department. The revised budget must be within the scope of the approved project and must align with all initial goals and objectives of the approved application. The grantee must submit this revised budget within 30 days of the grant award.
If you wish to request reconsideration of these specific conditions, please send written notification describing why such conditions should not be imposed on this grant to your Department program officer.

Frontload: The following condition will be imposed on the grantees who are proposed to be frontloaded:
This grant is a frontloaded grant, i.e., funds indicated in Block 7 were requested by the grantee, and approved by the Department, for expenditure in more than one budget period. For the current budget period and any subsequent budget period, the grantee may only draw down funds in accordance with its approved budget for that budget period and may not draw down funds in excess of that amount without prior approval.
If you wish to request reconsideration of these specific conditions, please send written notification describing why such conditions should not be imposed on this grant to your Department program officer.

JA 425

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 428 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 15 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 93 of 152

S423A220062

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

_____     _____

**AUTHORIZING OFFICIAL**                              **DATE**

Ver. 1

JA 426

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 429 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 16 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 94 of 152

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**        (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

    **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

    **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

    **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

    **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

    **\*RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

    **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

    **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

    **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

    **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

    **\*FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

    **\*THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

    **\*BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

    **\*PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

    **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

    **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

JA 427

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 430 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 17 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 95 of 152

**UEI/SSN -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes. The SSN, issued by the Social Security Administration to individuals, is a nine character identifier for individuals. The Department assigns the SSN as an identifier to individuals who are recipients of Federal financial assistance for payment purposes.

**\*REGULATIONS -** Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -** The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.

**AMOUNT -** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.
**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -** The total amount of funds awarded under the grant, this action included.

---

\* This item differs or does not appear on formula and block grants.

JA 428

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 431 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 18 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 96 of 152

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF THE CHIEF FINANCIAL OFFICER
### & CHIEF INFORMATION OFFICER

Segun Eubanks
University of Maryland
VPR
3112 Lee Building 7809 Regents Drive

College Park, MD 20742

SUBJECT: Payee Identification for Grant Award S423A220062

This is to inform you that the United States Department of Education does not have a payee and bank account of record designated for the above listed grant award. You will not be able to request funds for this grant award until a payee and bank account of record are established.

1) All SF-1199A, Direct Deposit and Fedwire Sign-Up forms must be mailed to the Department of Education. The SF-1199A must contain original signatures for both the recipient and bank officials.
2) First time recipients establishing a bank account for a new award must include a copy of the grant award document with the cover letter and SF-1199A, Direct Deposit or Fedwire Sign-Up forms.
3) The Grant Administration and Payment System (GAPS) has been enhanced to produce an automated notification when bank account data has been changed or deleted. This automated notification is transmitted via e-mail to Payees having e-mail capacity or mailed to recipients without an e-mail address.
4) All banking information requests, including establishing a new bank account, modifying an existing bank account or deleting a bank account must be accompanied with a cover letter requesting the specific action. The cover letter must be on the letterhead of the requesting payee. The cover letter must contain the following information:

    - UEI

    - e-mail address (if available) for the person to receive automated notification

    - signature and phone number of the person requesting the bank information change

Mail Cover Letters and accompanying forms to:

U.S. Department of Education
400 Maryland Ave, SW, Rm. 4C146
Washington, DC 20202-4110

JA 429

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 432 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 19 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 97 of 152

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF THE CHIEF FINANCIAL OFFICER
## & CHIEF INFORMATION OFFICER

Attn: Financial Management Operations

If you have any questions or require assistance concerning establishing a payee record for a bank account please contact the G5 Hotline at 1-888-336-8930.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 433 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 20 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 98 of 152

Dear G5 Payee:

To obtain your G5 Login ID, you will need to complete the G5 External User Access Request Form and return it notarized to the U.S. Department of Education. Attached are the instructions for accessing and completing the form. Upon receiving the notarized form, the Department will send you an email with your new G5 Login ID.

Please mail the form to:

> U.S. Department of Education
>
> Office of the Chief Information Officer
>
> Mail Stop - 4110
>
> 400 Maryland Avenue S.W.
>
> Washington, DC 20202
>
> Attn: Functional Applications Team

Thank you for your continued support of the U.S. Department of Education's G5 Grant Management System. Please contact the G5 Hotline (888-336-8930) if you have any

> Sincerely,
>
> G5 Administration

JA 431

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025      Pg: 434 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 21 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 99 of 152

## Instructions for Completing the G5 External User Access Request Form

To establish direct access to your U.S. Department of Education G5 Grant Management System account, please complete the G5 External User Access Request Form attached, have it notarized, and mail the completed form to the address below.

Steps for Completing the G5 External User Access Request Form -

1. Go to http://www.g5.gov and click on the link, "Not Registered? Sign up".

2. Compete each data element of the form including the following elements:

   a. User Type (Select Payee unless you are specifically a Servicer)

   b. Unique Entity Identifier (UEI)

   b. Desired Role (Select Full Access to enable you to continue to draw funds, or View Only if you will only need to review account activity).

3. Print the form and then Submit your online registration.

4. You will immediately receive an email asking you to activate your account.

5. Click on the link in the email and select your password and Secret Question and Answer.

6. Congratulations! You now have an active account. Only one more step!!

7. Sign the printed (from step 3) G5 External User Access Request Form as the Authorized Payee in the presence of a Notary Public.

8. Assure the G5 External User Access Request Form is notarized with appropriate seal and signature and expiration date.

9. Mail the completed, notarized G5 External User Access Request Form to the following address:

   **U.S. Department of Education**
   **Office of the Chief Information Officer**
   **Mail Stop - 4110**
   **400 Maryland Avenue S.W.**
   **Washington DC 20202**
   **Attn: Functional Applications Team**

10. Allow two weeks for delivery and account updates.

11. You will receive Email notification that your G5 External User Access Request Form has been processed and your roles have been assigned.

12. Congratulations, You're now able to access G5 directly.

As always, please contact the G5 Hotline (888-336-8930) with any questions.

JA 432

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 435 of 638    Page 22 of 70
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 22 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 100 of 152

**INSTRUCTIONS**
**ACH DIRECT DEPOSIT SIGN-UP FORM**
**SF-1199A**

Recipients can obtain an SF-1199A (Figure D-1) from their financial insitution. The preprinted instructions on the reverse side of the SF-1199A should be disregarded and the following instructions should be followed in completing the SF-1199A.

The recipient is to complete Sections 1 and 2 of the SF-1199A. The recipient's financial institution is to complete Section 3 and mail the completed form to the Department of Education. The financial institution will mail a copy of the completed SF-1199A to the recipient.

## INSTRUCTIONS - SECTION 1

| | | |
|---|---|---|
| ITEM A | Name of Payee | Enter the name and address of payee's organization. |
| | Address | |
| | Telephone Number | Enter telephone number of person authorized to certify the payment request. |
| ITEM B | Name of Person(s) Entitled to Payment | Leave Blank. |
| ITEM C | Claim or Payroll ID Number | Enter the following information<br>    Prefix: 9 digit D-U-N-S Number,<br>    Suffix: 11 character Grant Award nUmber. |
| ITEM D | Type of Depositor | Place an "X" in the Appropriate Box. |
| ITEM E | Depositor Account | Enter the payee's account number at the financial institution in which funds are to be deposited. Include blanks or dashes when entering the account number. |
| ITEM F | Type of Payement | Enter "X" in the "Other" box. |
| ITEM G | Box for Allotment of Payment Only | Leave Blank. |
| Payee/Joint Certification | | Authorized Certifying Official for the payee is to sign the form. |

## INSTRUCTIONS - SECTION 2

| | | |
|---|---|---|
| Government Agency Name | Enter: | U.S. Department of Education |
| Government Agency Address | Enter: | 400 Maryland Avenue, SW<br>Room 4C138<br>Washington, DC 20202 |

## INSTRUCTIONS - SECTION 3

To be completed by financial institution.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 436 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 23 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 101 of 152

Director, Financial Payment Group
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202 - 4331

Ref: PR/Award No. S423A220062

Dear Sir:

Please transfer FEDWIRE payments for University of Maryland to the following financial institution and depositor account beginning on this date: Month_____, Day_____, Year_____.

Information regarding the financial institution to which payments for D-U-N-S_____ are to be transferred is provided below.

Financial Institution                                    Corresponding Bank (if applicable):

Name:_____            Name:_____
Street:_____            Street:_____
City:_____            City:_____
State:_____            State:_____
Zip:_____            Zip:_____

ABA Number:_____            ABA Number:_____
Account Number:_____            Telegraphic Abbrev.:_____
Contact Name:_____
Telephone No:_____

Please update my account with the information as indicated above. If you have any questions, I may be reached at (____) _____.

Sincerely,


Chief Financial Officer

JA 434

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 437 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 24 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 102 of 152

**GAN ATTACHMENT 2**
**Revised 03/2021**

## SPECIFIC GRANT TERMS AND CONDITIONS FOR
## FINANCIAL AND PERFORMANCE REPORTS

**PERFORMANCE REPORTS:**

**(1) FINAL REPORTS - ALL RECIPIENTS** are required to submit a final performance report within 120 days after the expiration or termination of grant support in accordance with submission instructions provided in box 10 of the Grant Award Notification (GAN), or through another notification provided by the Department of Education (Department) (2 CFR § 200.329(c)).

**(2) ANNUAL, QUARTERLY, or SEMIANNUAL REPORTS - ALL RECIPIENTS** of a multi-year discretionary award must submit an annual Grant Performance Report (34 CFR § 75.118). The annual performance report shall provide the most current performance and financial expenditure information that is sufficient to meet the reporting requirements of 2 CFR §§ 200.328, 200.329, and 34 CFR § 75.720.

Your education program contact will provide you with information about your performance report submissions, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification provided by the Department. The grant term or condition in box 10 on the GAN or another notification may reflect any of the following:

1. That a performance report is due before the next budget period begins. The report should contain current performance and financial expenditure information for this grant. It will either identify the date the performance report is due or state that the Department will provide additional information about this report, including due date, at a later time.

2. That an interim performance report is required because of the nature of the award or because of statutory or regulatory provisions governing the program under which this award is made, and that the report is due more frequently than annually as indicated, e.g., due quarterly and submitted within 30 days after the end of each quarter, or due semiannually and submitted within 30 days after the end of each 6-month period (2 CFR § 200.329(c)(1)).

3. That other reports are required, e.g., program specific reports required in a program's statute or regulation.

**(3) FINANCIAL REPORTS – SOME RECIPIENTS:**

If a financial report is required, your education program contact will provide you with information about your financial report submission, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification.

A Standard Form (SF) 425 Federal Financial Report (FFR) is required if:

1. A grant involves cost sharing, and the ED 524B, which collects cost sharing information, is not submitted or a program-specific report approved by U.S. Office of Management and Budget (OMB) does not collect cost sharing information;
2. Program income was earned;

1

JA 435

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 438 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 25 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 103 of 152

**GAN ATTACHMENT 2**
Revised 03/2021

3.  Indirect cost information is to be reported and the ED 524B was not used or a program-specific report approved by OMB does not collect indirect cost information;
4.  Program regulations or statute require the submission of the FFR; or
5.  Specific Award Conditions, or specific grant or subgrant conditions for designation of "high risk," were imposed in accordance with 2 C.F.R. part 200.208 and part 3474.10 and required the submission of the FFR.

If the FFR is required, the notification may indicate one of the following (see the form and its instructions at Standard Form (SF) 425 Federal Financial Report (FFR)):

1.  Quarterly - FFRs are required for reporting periods ending on 12/31, 03/31, 06/30, 09/30, and are due within 30 days after each reporting period.

2.  Semi-annual - FFRs are required for reporting periods ending on 03/31 and 09/30, and are due within 30 days after each reporting period.

3.  Annual - FFRs are required for reporting period ending 09/30, and is due within 30 days after the reporting period.

4.  Final - In coordination with the submission of final performance reports, FFRs are due within 120 days after the project or grant period end date (2 CFR 200.328).

When completing an FFR for submission, the following must be noted:

1.  *Multiple Grant Reporting Using SF 425A Prohibited:* While the FFR is a governmentwide form that is designed for single grant and multiple grant award reporting, the Department's policy is that multiple grant award reporting is not permitted for Department grants. Thus, a Department grantee that is required to submit an FFR in accordance with any of the above referenced selections must complete and submit one FFR for each of its grants. Do not use the FFR attachment (Standard Form 425A), which is available for reporting multiple grants, for reporting on Department grants. As such, references to multiple grant reporting and to the FFR attachment in items 2, 5 and 10 of the FFR are not applicable to Department grantees. With regards to item 1 of the note found in the FFR Instructions, a grantee must complete items 10(a) through 10(o) for each of its grants. The multiple award, multiple grant, and FFR attachment references found in items 2, 5, 6, before 10(a), in item 10(b), before 10(d), before 10(i) and before 10(l) of the Line Item Instructions for the FFR are not applicable to Department grants.

2.  *Program Income*: Unless disallowed by statute or regulation, a grantee will complete item 10(m) or 10(n) in accordance with the options or combination of options as provided in 2 CFR Part 200.307. A grantee is permitted, in accordance with 2 CFR Part 200.307, to add program income to its Federal share to further eligible project or program objectives, use program income to finance the non-Federal share of the project or program; and deduct program income from the Federal share of the total project costs.

3.  *Indirect Costs:* A grantee will complete item 11(a) by listing the indirect cost rate type identified on its indirect cost rate agreement, as approved by its cognizant agency for indirect costs.

2

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 439 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 26 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 104 of 152

**GAN ATTACHMENT 2**
**Revised 03/2021**

A Department grantee that does not have an indirect cost rate agreement approved by its cognizant agency for indirect costs, and that is using the Department approved (beyond the 90-day temporary period) temporary indirect cost rate of 10% of budgeted direct salaries and wages, or the de minimis rate of 10% of modified total direct cost (MTDC) must list its indirect cost rate in 11(a) as a Department Temporary Rate or De Minimis Rate.  The de minimis rate of 10% of MTDC consists of:

> All direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $25,000 of each subaward (i.e., subgrant). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items, including contract costs in excess of $25,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (see definition of MTDC at 2 CFR § 200.1).

A training program grantee whose recovery of indirect cost limits indirect cost recovery to 8% of MTDC or the grantees negotiated indirect cost rate, whichever is less in accordance with EDGAR § 75.562 (c), must list its rate in 11(a) as a Department Training Grant Rate.  The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States[1] as defined in 2 CFR § 200.1

A restricted program grantee must list its rate as a Restricted Indirect Cost Rate in 11(a).  A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant agency for indirect costs, or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR 75.563 and 76.564 – 76.569, is not less than 8% MTDC.  A State or local government[2] that is a restricted program grantee may not elect to utilize the 8% MTDC rate.  Additionally, restricted program grantees may not utilize the de minimis rate, but may utilize the temporary rate until a restricted indirect cost rate is negotiated.  If a restricted program grantee elects to utilize the temporary rate, it must list its rate as a Department Temporary Rate in 11(a).

Grantees with indirect cost rates prescribed in program statute or regulation must list their rate as a Rate Required in Program Statute or Regulation in 11(a).  Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery.

For detailed information including restrictions related to temporary, de minimis, training, restricted, and program prescribed indirect cost rates see GAN ATTACHMENT 4.

4.  *Supplemental Pages:* If grantees need additional space to report financial information, beyond what is available within the FFR, they should provide supplemental pages. These additional pages must indicate the following information at the top of each page: the PR/Award Number

---

[1] Note that a State-funded institution of higher education is not considered a "State government" for these purposes; and a Tribal college or university funded by a federally-recognized Tribe is not considered a Tribe for these purposes.
[2] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.

JA 437

also known as the Federal Identifying Number or FAIN, recipient organization, Unique Entity Identifier, Employer Identification Number (EIN), and period covered by the report.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 441 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 28 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 106 of 152

**GAN ATTACHMENT 3**
**Revised 03/2021**

## AN OVERVIEW OF SINGLE AUDIT REQUIREMENTS OF STATES, LOCAL GOVERNMENTS, AND NONPROFIT ORGANIZATIONS

This GAN ATTACHMENT is **not** applicable to for-profit organizations. For-profit organizations comply with audit requirements specified in block 10 of their Grant Award Notification (GAN).

**Summary of Single Audit Requirements for States, Local Governments and Nonprofit Organizations:**

1. Single Audit. A non-Federal entity (a State, local government, Indian tribe, Institution of Higher Education (IHE)[1], or nonprofit organization) that expends $750,000 or more during the non-Federal entity's fiscal year in Federal awards must have a single audit conducted in accordance with 2 CFR 200.501, "Audit Requirements," except when it elects to have a program specific audit conducted.

2. Program-specific audit election. When an auditee expends Federal awards under only one Federal program (excluding research and development (R&D)), and the Federal program's statutes, regulations, or the terms and conditions of the Federal award do not require a financial statement audit of the auditee, the auditee may elect to have a program–specific audit conducted. A program–specific audit may not be elected for R&D unless all of the Federal awards expended were received from the same Federal agency, or the same Federal agency and the same pass-through entity, and that Federal agency, or pass-through entity in the case of a subrecipient, approves in advance a program-specific audit.

3. Exemption when Federal awards expended are less than $750,000. A non-Federal entity that expends less than $750,000 during the non-Federal entity's fiscal year in Federal awards is exempt from Federal audit requirements for that year, except as noted in 2 CFR 200.503, but records must be available for review or audit by appropriate officials of the Federal agency, pass-through entity, and Government Accountability Office (GAO). Generally, grant records must be maintained for a period of three years after the date of the final expenditure report (2 CFR § 200.334)

4. Federally Funded Research and Development Centers (FFRDC). Management of an auditee that owns or operates a FFRDC may elect to treat the FFRDC as a separate entity.

5. Report Submission. To meet audit requirements of U.S. Office of Management and Budget (OMB) Uniform Guidance: Cost Principles, Audit, and Administrative Requirements for Federal Awards (Uniform Guidance), grantees must submit all audit documents required by Uniform Guidance 2 CFR 200.512, including Form SF-SAC: Data Collection Form electronically to the Federal Audit Clearinghouse at:

---

[1] As defined under the Higher Education Act of 1965, as amended (HEA) section 101.

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 442 of 638    Page 29 of 70
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 29 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 107 of 152

**GAN ATTACHMENT 3**
Revised 03/2021

https://facides.census.gov/Account/Login.aspx.

The audit must be completed, and the data collection form and reporting package must be submitted within the earlier of 30 calendar days after receipt of the auditor's report(s), or nine months after the end of the audit period.  If the due date falls on a Saturday, Sunday, or Federal holiday, the reporting package is due the next business day.  Unless restricted by Federal statutes or regulations, the auditee must make copies available for public inspection.  Auditees and auditors must ensure that their respective parts of the reporting package do not include protected personally identifiable information. (2 CFR 200.512)

Grantees are strongly urged to obtain the "OMB Compliance Supplement" and to contact their cognizant agency for single audit technical assistance.

The designated cognizant agency for single audit purposes is "the Federal awarding agency that provides the predominant amount of direct funding to the recipient."  Grantees should obtain a copy of the OMB Compliance supplement.  This supplement will be instructive to both grantees and their auditors.  Appendix III of the supplement provides a list of Federal Agency Contacts for Single Audits, including addresses, phone numbers, fax numbers, and e-mail addresses for technical assistance.

For single audit-related questions, if the U.S. Department of Education is the cognizant agency, grantees should contact the Non-Federal Audit Team in the Department's Office of Inspector General, at oignon-federalaudit@ed.gov.  Additional resources for single audits are also available on the Non-Federal Audit Team's website at https://www2.ed.gov/about/offices/list/oig/nonfed/index.html.  For programmatic questions, grantees should contact the education program contact shown on the Department's GAN.

Grantees can obtain information on single audits from:

The OMB website at www.omb.gov.  Look under Office of Management and Budget (in right column) then click Office of Federal Financial Management (to obtain OMB Compliance Supplement).  The SF-SAC: Data Collection Form can be found at the Federal Audit Clearinghouse at: https://facides.census.gov/Files/2019-2021%20Checklist%20Instructions%20and%20Form.pdf.

The American Institute of Certified Public Accountants (AICPA) has illustrative OMB Single Audit report examples that might be of interest to accountants, auditors, or financial staff at www.aicpa.org.

JA 440

USCA4 Appeal: 25-1281    Doc: 37-1       Filed: 06/16/2025    Pg: 443 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 30 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 108 of 152

**GAN ATTACHMENT 6**
**Revised 03/2021**

### REQUEST FOR APPROVAL OF PROGRAM INCOME

In projects that generate program income, the recipient calculates the amount of program income according to the guidance given in 2 CFR Part 200.307.

**\*\*\* IF YOU RECEIVED YOUR GRANT AWARD NOTIFICATION ELECTRONICALLY AND YOU ARE SUBJECT TO ANY OF THE RESTRICTIONS IDENTIFIED BELOW, THE RESTRICTION(S) WILL APPEAR IN BOX 10 ON YOUR GRANT AWARD NOTIFICATION AS A GRANT TERM OR CONDITION OF THE AWARD. \*\*\***

Unless checked below as NOT ALLOWED, the recipient may exercise any of the options or combination of options, as provided in 2 CFR Part 200.307, for using program income generated in the course of the recipient's authorized project activities:

_____ Not Allowed  Adding program income to funds committed to the project by the Secretary and recipient and using it to further eligible project or program objectives;

_____ Not Allowed  Using program income to finance the non-Federal share of the project or program; and

_____ Not Allowed  Deducting program income from the total allowable cost to determine the net allowable costs.

1

JA 441

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 444 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 31 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 109 of 152

## TRAFFICKING IN PERSONS

The Department of Education adopts the requirements in the Code of Federal Regulations at 2 CFR 175 and incorporates those requirements into this grant through this condition. The grant condition specified in 2 CFR 175.15(b) is incorporated into this grant with the following changes. Paragraphs a.2.ii.B and b.2. ii. are revised to read as follows:

"a.2.ii.B. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 34 CFR part 85."

"b.2. ii. Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 34 CFR part 85."

Under this condition, the Secretary may terminate this grant without penalty for any violation of these provisions by the grantee, its employees, or its subrecipients.

JA 442

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 445 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 32 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 110 of 152

**FEDERAL FUNDING ACCOUNTABILITY TRANSPARENCY ACT**
**REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION**

The Federal Funding Accountability and Transparency Act (FFATA) is designed to increase transparency and improve the public's access to Federal government information.  To this end, FFATA requires that Department of Education (Department) grant recipients:

1. Report **first-tier subawards** made under Federal grants that are funded at $30,000 or more that meet the reporting conditions as set forth in this grant award term;
2. Report their executives' compensation for all new Federal grants that are funded at $30,000 and that meet the reporting conditions as set forth in this grant award term; and
3. Report executive compensation data for their **first-tier subrecipients** that meet the reporting conditions as set forth in this grant award term.

For FFATA reporting purposes, the Department grant recipient is the entity listed in box 1 of the Grant Award Notification.

Only **first-tier subawards** made by the Department grant recipient to its **first-tier subrecipients** and the **first-tier subrecipients'** executive compensation are required to be reported in accordance with FFATA.

*Subaward, Subrecipient, Recipient, Total Compensation, Executives*, and other key terms, are defined within item 5, Definitions, of this grant award term.

This grant award term is issued in accordance with 2 CFR Part 170—Reporting Subaward And Executive Compensation Information.

1. ***Reporting of First-tier Subawards -***

   a. *Applicability and what to report.*

      Unless you are exempt as provided item 4, Exemptions, of this grant award term, you must report each obligation that **equals or exceeds $30,000** in Federal funds for a first-tier subaward to a non-Federal entity or Federal agency.

      You must report the information about each obligating action that are specified in the submission instructions posted at FSRS.

   b. *Where and when to report.*

      The Department grant recipient must report each obligating action described in paragraph **1.a.** of this award term to FSRS.

      Report subaward information no later than the end of the month following the month in which the subaward obligation was made. For example, if the obligation was made on November 7, 2020, the obligation must be reported by no later than December 31, 2020.

2. ***Reporting Total Compensation of the Department's Grant Recipients' Executives -***

JA 443

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 446 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 33 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 111 of 152

**GAN ATTACHMENT – 9**
**Revised 03/2021**

a.   *Applicability and what to report.*

You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if—

i     The total Federal funding authorized to date under this Federal award **equals or exceeds $30,000**;

ii    In the preceding fiscal year, you received—

    A.   80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**

    B.   $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and,**

    C.   The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at SEC Investor.gov Executive Compensation.)

b.   *Where and when to report.*

You must report executive total compensation described in paragraph **2.a.** of this grant award term:

i.    As part of your registration profile at SAM.gov.

ii.   By the end of the month following the month in which this award is made (for example, if the obligation was made on November 7, 2020 the executive compensation must be reported by no later than December 31, 2020), and annually thereafter.

**3.   *Reporting of Total Compensation of Subrecipient Executives –***

a.   *Applicability and what to report.*

Unless you are exempt as provided in item 4, Exemptions, of this award term, for each first-tier **non-Federal entity** subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if—

i.    In the subrecipient's preceding fiscal year, the subrecipient received—

JA 444

A. 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**

B. $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and**,

C. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at SEC Investor.gov Executive Compensation.)

b. *Where and when to report.*

You must report subrecipient executive total compensation described in paragraph **3.a.** of this grant award term:

i. In FSRS.  You must include a condition on subawards that requires the subrecipients to timely report the information required under paragraph **3.a.** to you the prime awardee, or in the SAM.gov.  Subrecipient executive compensation entered in SAM.gov by the subrecipient will pre-populate in FSRS, so you do not have to report when subrecipients enter this information in SAM.gov. Subrecipient executive compensation not entered in SAM.gov by the subrecipient is reported in FSRS by you the Department grant recipient.

ii. By the end of the month following the month during which you make the subaward.  For example, if the subaward obligation was made on November 7, 2020 the subrecipient's executive compensation must be reported by no later than December 31, 2020.

**4. *Exemptions –***

a. If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

i. Subawards, and

ii. The total compensation of the five most highly compensated executives of any **subrecipient**.

**5. *Definitions -***

a. For purposes of this award term:

i. Federal *Agency* means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).

ii. Non-Federal *Entity* means all of the following, as defined in 2 CFR part 25:

A Governmental organization, which is a State, local government, or Indian tribe;

3

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 448 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 35 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 113 of 152

**GAN ATTACHMENT – 9**
**Revised 03/2021**

A foreign public entity;

A domestic or foreign nonprofit organization; and,

A domestic or foreign for-profit organization

iii.    *Executive* means officers, managing partners, or any other employees in management positions.

iv.    *Obligation*, when used in connection with a non-Federal entity's utilization of funds under a Federal award, means orders placed for property and services, contracts and subawards made, and similar transactions during a given period that require payment by the non-Federal entity during the same or a future period.

v.    *Subaward:*

This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

The term does not include your procurement of property and services (such as payments to a contractor, small purchase agreements, vendor agreements, and consultant agreements) that are needed for the benefit of the prime awardee to carry out the project or program (for further explanation, see 2 CFR 200.331).  For example, the following are not considered subawards:

> *Cleaning Vendors:* Vendors that are hired by a grantee to clean its facility.
> *Payroll Services Vendors:* Vendors that carryout payroll functions for the grantee.
> *Information Technology Vendors:* Vendors that provide IT support to grant staff.

Payments to individuals that are beneficiaries of Federal programs are not considered subawards.

A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

v.    *Subrecipient* means a non-Federal entity or Federal agency that:

Receives a subaward from you (the recipient) under this award; and

Is accountable to you for the use of the Federal funds provided by the subaward.

In accordance with its subaward, uses the Federal funds to carry out a program for a public purpose specified in authorizing statute, as opposed to providing goods or services for the benefit of the Department prime awardee.

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 449 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 36 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 114 of 152

vii.    *Recipient* means a non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program. The term recipient does not include subrecipients.  See also §200.69 Non-Federal entity.

viii.   *Total compensation* means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

Salary and bonus.

Awards of stock, stock options, and stock appreciation rights.  Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

Earnings for services under non-equity incentive plans.  This does not include group life, health, hospitalization, or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

Change in pension value.  This is the change in present value of defined benefit and actuarial pension plans.

Above-market earnings on deferred compensation which is not tax-qualified.

Other compensation, if the aggregate value of all such other compensation (e.g., severance, termination payments, value of life insurance paid on behalf of the employee, perquisites, or property) for the executive exceeds $10,000.

JA 447

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 450 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 37 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 115 of 152

**GAN ATTACHMENT 11**
**Revised 03/2021**

### SPECIFIC CONDITIONS FOR DISCLOSING
### FEDERAL FUNDING IN PUBLIC ANNOUNCEMENTS

When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, U.S. Department of Education grantees shall clearly state:

1) the percentage of the total costs of the program or project which will be financed with Federal money;

2) the dollar amount of Federal funds for the project or program; and

3) the percentage and dollar amount of the total costs of the project or program that will be financed by non-governmental sources.

Recipients must comply with these conditions under Division H, Title V, Section 505 of Public Law 116-260, Consolidated Appropriations Act, 2021.

1

JA 448

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 451 of 638    Page 38 of 70
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 38 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 116 of 152

**PROHIBITION OF TEXT MESSAGING AND EMAILING WHILE DRIVING
DURING OFFICIAL FEDERAL GRANT BUSINESS**

Federal grant recipients, sub recipients and their grant personnel are prohibited from text messaging while driving a government owned vehicle, or while driving their own privately-owned vehicle during official grant business, or from using government supplied electronic equipment to text message or email when driving.

Recipients must comply with these conditions under Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," October 1, 2009.

JA 449

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 452 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 39 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 117 of 152

**GAN ATTACMENT 13**
**Revised 03/2021**

## REGISTRATION OF UNIQUE ENTITY IDENTIFIER (UEI) NUMBER AND TAXPAYER IDENTIFICATION NUMBER (TIN) IN THE SYSTEM FOR AWARD MANAGEMENT (SAM)

The U.S. Department of Education (Department) Grants Management System (G5) disburses payments via the U.S. Department of Treasury (Treasury).  The U.S. Treasury requires that we include your Tax Payer Identification Number (TIN) with each payment.   Therefore, in order to do business with the Department you must have a registered Unique Entity Identifier (UEI) and TIN number with the SAM, the U.S. Federal Government's primary registrant database.  If the payee UEI number is different than your grantee UEI number, both numbers must be registered in the SAM. Failure to do so will delay the receipt of payments from the Department.

A TIN is an identification number used by the Internal Revenue Service (IRS) in the administration of tax laws. It is issued either by the Social Security Administration (SSA) or by the IRS. A Social Security number (SSN) is issued by the SSA whereas all other TINs are issued by the IRS.

The following are all considered TINs according to the IRS.

- Social Security Number "SSN"
- Employer Identification Number "EIN"
- Individual Taxpayer Identification Number "ITIN"
- Taxpayer Identification Number for Pending U.S. Adoptions "ATIN"
- Preparer Taxpayer Identification Number "PTIN"

If your UEI number is not currently registered with the SAM, you can easily register by going to www.sam.gov.  Please allow 3-5 business days to complete the registration process.  If you need a new TIN, please allow 2-5 weeks for your TIN to become active.  If you need assistance during the registration process, you may contact the SAM Federal Service Desk at 866-606-8220.

If you are currently registered with SAM, you may not have to make any changes.  However, please take the time to validate that the TIN associated with your UEI is correct.

If you have any questions or concerns, please contact the G5 Hotline at 888-336-8930.

1

JA 450

USCA4 Appeal: 25-1281    Doc: 37-1       Filed: 06/16/2025    Pg: 453 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 40 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 118 of 152

## SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS

**1.    Requirement for System for Award Management (SAM)**

Unless you are exempted from this requirement under 2 CFR 25.110, you are, in accordance with your grant program's Notice Inviting Applications, required to maintain an active SAM registration with current information about your organization, including information on your immediate and highest level owner and subsidiaries, as well as on all predecessors that have been awarded a Federal contract or grant within the last three years, if applicable, at all times during which you have an active Federal award or an application or plan under consideration by a Federal awarding agency.  To remain registered in the SAM database after your initial registration, you are required to review and update your information in the SAM database on an annual basis from the date of initial registration or subsequent updates to ensure it is current, accurate and complete.

**2.    Requirement for Unique Entity Identifier (UEI) Numbers**

If you are authorized to make subawards under this award, you:

1.    Must notify potential subrecipients that they may not receive a subaward from you unless they provided their UEI  number to you.
2.    May not make a subaward to a subrecipient when the subrecipient fails to provide its UEI number to you.

**3.    Definitions**

For purposes of this award term:

1.    System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient.  Additional information about registration procedures may be found at the SAM internet site (currently at https://www.sam.gov).

2.    Unique Entity Identifier (UEI) means the identifier assigned by SAM registration to uniquely identify business entities.

3.    Recipient means a non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program.  The term recipient does not include subrecipients.  See 2 CFR 200.86.

4.    Subaward means an award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity.  It does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program.  A subaward may be provided through any form of legal agreement, including an agreement that the pass-through entity considers a contract. See 2 CFR 200.92.

1

JA 451

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 454 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 41 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 119 of 152

5.  Subrecipient means a non-Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program.  A subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency. See 2 CFR 200.93.

JA 452

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 455 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 42 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 120 of 152

GAN ENCLOSURE 1
Revised 03/2021

## KEY FINANCIAL MANAGEMENT REQUIREMENTS FOR DISCRETIONARY GRANTS AWARDED BY THE DEPARTMENT OF EDUCATION

The Department expects grantees to administer Department grants in accordance with generally accepted business practices, exercising prudent judgment so as to maintain proper stewardship of taxpayer dollars.  This includes using fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds.  In addition, grantees may use grant funds only for obligations incurred during the funding period.

Title 2 of the Code of Federal Regulations Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," establishes requirements for Federal awards made to non-Federal entities.  The Education Department General Administrative Regulations in 34 CFR (EDGAR) 75, 76, 77, 79, 81, 82, 84, 86, 97, 98, and 99 contain additional requirements for administering discretionary grants made by this Department.  The most recent version of these regulations may be accessed at the following URLs:

The Education Department General Administrative Regulations (EDGAR)

 2 CFR Part 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards

The information on page 2, "Selected Topics in Administering Department Discretionary Grants," highlights major administrative requirements of 2 CFR Part 200.  In addition, a few of the topics discuss requirements that the Department imposes on its discretionary grantees under EDGAR, Part 75 (Direct Grants).  The specific sections of 2 CFR Part 200 and of EDGAR that address the topics discussed are shown in parentheses.  The Department urges grantees to read the full text of these and other topics in EDGAR and in 2 CFR Part 200.

Grantees are reminded that a particular grant might be subject to additional requirements of the authorizing statute for the program that awarded the grant and/or any regulations issued by the program office.  Grantees should become familiar with those requirements as well, because program-specific requirements might differ from those in 2 CFR Part 200 and in EDGAR.

The Department recommends that the project director and the fiscal management staff of a grantee organization communicate frequently with each other about the grant budget.  Doing so will help to assure that you use Federal funds only for those expenditures associated with activities that conform to the goals and objectives approved for the project.

Grantees may direct any questions regarding  the topics discussed on page 2, "Selected Topics in Administering Department Discretionary Grants,"or about any other aspect of administering your grant award to the Department program staff person named in Block 3 of the Grant Award Notification.

1

JA 453

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 456 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 43 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 121 of 152

**GAN ENCLOSURE 1**
**Revised 03/2021**

**SELECTED TOPICS IN ADMINISTERING DEPARTMENT DISCRETIONARY GRANTS**

## I.    Financial Management Systems (2 CFR Part 200.302)

In general, grantees are required to have financial management systems that:

* provide for accurate, current, and complete disclosure of results regarding the use of funds under grant projects;
* provide adequate source documentation for Federal and non-Federal funds used under grant projects;
* contain procedures to determine the allowability, allocability, and reasonableness of obligations and expenditures made by the grantee; and
* enable the grantee to maintain effective internal control and fund accountability procedures, e.g., requiring separation of functions so that the person who makes obligations for the grantee is not the same person who signs the checks to disburse the funds for those obligations.

State systems must account for funds in accordance with State laws and procedures that apply to the expenditure of and the accounting for a State's own funds. A State's procedures, as well as those of its subrecipients and cost-type contractors, must be sufficient to permit the preparation of reports that may be required under the award as well as provide the tracing of expenditures to a level adequate to establish that award funds have not been used in violation of any applicable statutory restrictions or prohibitions.

## II.    Federal Payment (2 CFR Part 200.305)

Under this part --

* the Department pays grantees in advance of their expenditures if the grantee demonstrates a willingness and ability to minimize the time between the transfer of funds to the grantee and the disbursement of the funds by the grantee;
* grantees repay to the Federal government interest earned on advances; and
* grantees, generally, must maintain advance payments of Federal awards in interest bearing accounts.

In general, grantees should make payment requests frequently, only for small amounts sufficient to meet the cash needs of the immediate future.

The Department has recently encountered situations where grantees failed to request funds until long after the grantee actually expended its own funds for the costs of its grant.  Grantees need to be aware that, by law, Federal funds are available for grantees to draw down for only a limited period of time, after which the funds revert to the U.S. Treasury.  In some cases grantees have requested funds too late for the Department to be able to pay the grantees for legitimate costs incurred during their project periods.

JA 454

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 457 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 44 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 122 of 152

**GAN ENCLOSURE 1**
**Revised 03/2021**

The Department urges financial managers to regularly monitor requests for payment under their grants to assure that Federal funds are drawn from the Department G5 Payment System at the time those funds are needed for payments to vendors and employees.

### III.    Personnel (EDGAR §§ 75.511-75.519 and 2 CFR Part 200 Subpart D and E)

The rules governing personnel costs are located in EDGAR Part 75 and 2 CFR Part 200 Subparts D and E.  Part 75 covers issues such as paying consultants with grant funds, prohibiting dual compensation of staff, and waiving the requirement for a full-time project director.  The rules clarifying changes in key project staff are located in 2 CFR Part 200.308 (c)(2).  General rules governing reimbursement of salaries and compensation for staff working on grant projects are addressed in the cost principles in 2 CFR Part 200 Subpart D and E.  In all cases, payments of any type to personnel must be supported by complete and accurate records of employee time and effort.  For those employees that work on multiple functions or separately funded programs or projects, the grantee must also maintain time distribution records to support the allocation of employee salaries among each function and separately funded program or project.

### IV.    Cost Principles (2 CFR Part 200 Subpart E)

All costs incurred under any grant are subject to the cost principles found in 2 CFR Part 200 Subpart E.  The cost principles provide lists of selected items of allowable and unallowable costs, and must be used in determining the allowable costs of work performed under the grant.

### V.    Procurement Standards (2 CFR Part 200.317-327)

Under 2 CFR Part 200.317, States are required to follow the procurement rules the States have established for purchases funded by non-Federal sources.  When procuring goods and services for a grant's purposes, all other grantees may follow their own procurement procedures, but only to the extent that those procedures meet the minimum requirements for procurement specified in the regulations.  These requirements include written competition procedures and codes of conduct for grantee staff, as well as requirements for cost and price analysis, record-keeping and contractor compliance with certain Federal laws and regulations.  These regulations also require grantees to include certain conditions in contracts and subcontracts, as mandated by the regulations and statutes.

### VI.    Indirect Costs (EDGAR §§75.560-564 and 2 CFR Part 200.414)

In addition to the information presented beslow, see GAN ATTACHMENT 4 for addional information including restrictions related to temporary, de minimis, training, restricted, and program prescribed indirect cost rates.

A.   Unrestricted Indirect Cost Rate

To utilize an unrestricted indirect cost rate, a grantee must have an indirect cost agreement with its cognizant agency, submit an indirect cost rate proposal to its cognizant agency for indirect

JA 455

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 458 of 638
Case 1:25-cv-10548-MJJ    Document 25-2    Filed 03/06/25    Page 45 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 123 of 152

**GAN ENCLOSURE 1**
Revised 03/2021

costs (cognizant agency) within 90 days after the award of this grant or elect to utilize the de minimis rate under 2 CFR § 200.414(f) or the temporary indirect cost rate (subject to limitations described below).

The grantee must provide proof of its negotiated indirect cost rate agreement to the Department as soon as it has signed such an agreement with its cognizant agency.

B.    Temporary Indirect Cost Rate

A grantee that does not have a current negotiated indirect cost rate agreement may recover indirect costs at a temporary rate, which is limited to 10% of budgeted direct salaries and wages (See 34 CFR § 75.560(c)); or it may choose not to charge indirect costs to the grant. The temporary rate can only be used for 90 days unless the exceptional circumstances apply under 34 CFR § 75.560(d)(2).

If the grantee has not submitted its indirect cost proposal to its cognizant agency within the 90-day period, it may no longer recover indirect costs utilizing the temporary indirect cost rate until it has negotiated an indirect cost rate agreement with its cognizant agency. Once a grantee obtains a federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

C.    De minimis Indirect Cost Rate

Institutions of Higher Education (IHEs), federally-recognized Indian Tribes, State and Local Governments[1] receiving less than $35 million in direct federal funding, and nonprofit organizations, if they do not have a current negotiated (including provisional) rate, and are not subject to the Department's training rate or restricted rate (supplement-not-supplant provisions) may elect to charge a de minimis  indirect cost rate of 10% of modified total direct costs (MTDC). This rate may be used indefinitely.

MTDC consists of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $25,000 of each subaward (i.e., subgrant). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items, including contract costs in excess of $25,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (see definition of MTDC at 2 CFR § 200.1).

Additionally, the de minimis rate may not be used by grantees that are subject to the Department's training indirect cost rate (34 CFR § 75.562) or restricted indirect cost rate. The de minimis rate may be used indefinitely. However, if a grantee chooses to use the de minimis rate to recover indirect costs, it must do so for all of its Federal awards until such time as the grantee negotiates an indirect cost rate with its cognizant agency. Once a grantee obtains a federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

---

[1] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.

4

JA 456

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 459 of 638    Page 46 of 70
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 46 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 124 of 152

**GAN ENCLOSURE 1**
**Revised 03/2021**

D.  Programs with a Supplement-not-supplant requirement (restricted indirect cost rate)

A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant agency for indirect costs, or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR 75.563 and 76.564 – 76.569, is not less than 8% MTDC.  A State or local government[2] that is a restricted program grantee may not elect to utilize the 8% MTDC rate.  Additionally, restricted program grantees may not utilize the de minimis rate, but may utilize the temporary rate until a restricted indirect cost rate is negotiated.

E.  Training Grant Indirect Cost Rate

If the grantee is a training grant recipient and is not a State, local, or Tribal government[3], the grantee must negotiate a rate under 34 CFR 75.562. This provision limits indirect cost recovery to 8% of modified total direct costs or the grantees negotiated indirect cost rate, whichever is less.

The recovery using the training grant indirect cost rate is subject to the following limitations:

   i.    The lesser of the 8% indirect cost rate or negotiated indirect cost rate also applies to sub-awards that fund training.
   ii.   The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States as defined in 2 CFR § 200.1, respectively.
   iii.  Indirect costs in excess of the 8% limit may not be charged directly, used to satisfy matching or cost-sharing requirements, or charged to another Federal award.
   iv.   A grantee using the training rate of 8% is required to have documentation available for audit that shows that its negotiated indirect cost rate is at least 8%.

F.  Program-Specific Indirect Cost Rate

Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery instead of the general requirements described here.

**VII.    Audit Requirements (2 CFR Part 200 Subpart F)**

2 CFR 200 Subpart F requires that grantees that are non-Federal entities (a State, local government, Indian tribe, IHE, or nonprofit organization that carries out a Federal award as a recipient or subrecipient) obtain a non-Federal audit of their expenditures under their Federal grants if the grantee expends more than $750,000 in Federal funds in one fiscal year.  2 CFR Part 200 Subpart F contains the requirements imposed on grantees for

---

[2] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.
[3] Note that a State-funded institution of higher education is not considered a "State government" for these purposes; and a Tribal college or university funded by a federally-recognized Tribe is not considered a Tribe for these purposes.

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 460 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 47 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 125 of 152

audits done in connection with the law.

The Department recommends hiring auditors who have specific experience in auditing Federal awards under the regulations and the Compliance Supplement.

## VIII.    Other Considerations

Some other topics of financial management covered in 2 CFR Part 200 that might affect particular grants include program income (2 CFR Part 200.307), cost sharing or matching (2 CFR Part 200.306), property management requirements for equipment and other capital expenditures (2 CFR Parts 200.313, 200.439).

JA 458

USCA4 Appeal: 25-1281    Doc: 37-1        Filed: 06/16/2025    Pg: 461 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 48 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 126 of 152

**GAN ENCLOSURE 2**
Revised 03/2021

## MEMORANDUM TO ED DISCRETIONARY GRANTEES

You are receiving this memorandum to remind you of Federal requirements, found in 2 CFR Part 200, *Uniform Administrative Requirements, Cost Principles, and Audit Requirements,* regarding cash drawdowns under your grant account.

For any cash that you draw from your Department of Education (*the* Department) grant account, you must:

- draw down only as much cash as is necessary to meet the immediate needs of the grant project;
- keep to the minimum the time between drawing down the funds and paying them out for grant activities; and
- return to the Government the interest earned on grant funds deposited in interest-bearing bank accounts except for a small amount of interest earned each year that your entity is allowed to keep to reimburse itself for administrative expenses).

In order to meet these requirements, you are urged to:

- take into account the need to coordinate the timing of drawdowns with prior internal clearances (e.g., by boards, directors, or other officials) when projecting immediate cash needs so that funds drawn down from ED do not stay in a bank account for extended periods of time while waiting for approval;
- monitor the fiscal activity (drawdowns and payments) under your grant on a continuous basis;
- plan carefully for cash flow in your grant project during the budget period and review project cash requirements before each drawdown; and
- pay out grant funds for project activities as soon as it is practical to do so after receiving cash from the Department.

Keep in mind that the Department monitors cash drawdown activity for all grants. Department staff will contact grantees who appear to have drawn down excessive amounts of cash under one or more grants during the fiscal quarter to discuss the particular situation. For the purposes of drawdown monitoring, the Department will contact grantees who have drawn down 50% or more of the grant in the first quarter, 80% or more in the second quarter, and/or 100% of the cash in the third quarter of the budget period. However, even amounts less than these thresholds could still represent excessive drawdowns for your particular grant activities in any particular quarter. Grantees determined to have drawn down excessive cash will be required to return the excess funds to the Department, along with any associated earned interest, until such time as the money is legitimately needed to pay for grant activities. If you need assistance with returning funds and interest, please contact the Department's G5 Hotline by calling 1-888-336-8930.

Grantees that do not follow Federal cash management requirements and/or consistently appear on the Department's reports of excessive drawdowns could be:

- subjected to specific award conditions or designated as a "high-risk" grantee [2 CFR Part 200.208 and 2 CFR 3474.10], which could mean being placed on a "cash-reimbursement" payment method (i.e., a grantee would experience the inconvenience of having to pay for grant activities with its own money and waiting to be reimbursed by the Department afterwards);

1

JA 459

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 462 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 49 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 127 of 152

**GAN  ENCLOSURE 2**
Revised 03/2021

- subject to further corrective action;
- denied selection for funding on future ED grant applications [EDGAR 75.217(d)(3)(ii)]; and/or
- debarred or suspended from receiving future Federal awards from any executive agency of the Federal government.

You are urged to read 2 CFR Part 200.305 to learn more about Federal requirements related to grant payments and to determine how to apply these requirements to any subgrantees. You are urged to make copies of this memorandum and share it with all affected individuals within your organization.

2

JA 460

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 463 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 50 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 128 of 152

**GAN ENCLOSURE 3**
**Revised 03/2021**

## THE USE OF GRANT FUNDS FOR CONFERENCES AND MEETINGS

You are receiving this memorandum to remind you that grantees must take into account the following factors when considering the use of grant funds for conferences and meetings:

- Before deciding to use grant funds to attend or host a meeting or conference, a grantee should:
  - Ensure that attending or hosting a conference or meeting is consistent with its approved application and is reasonable and necessary to achieve the goals and objectives of the grant;
  - Ensure that the primary purpose of the meeting or conference is to disseminate technical information, (e.g., provide information on specific programmatic requirements, best practices in a particular field, or theoretical, empirical, or methodological advances made in a particular field; conduct training or professional development; plan/coordinate the work being done under the grant); and
  - Consider whether there are more effective or efficient alternatives that can accomplish the desired results at a lower cost, for example, using webinars or video conferencing.
- Grantees must follow all applicable statutory and regulatory requirements in determining whether costs are reasonable and necessary, especially the Cost Principles for Federal grants set out at 2 CFR Part 200 Subpart E of the, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards."  In particular, remember that:
  - Federal grant funds cannot be used to pay for alcoholic beverages; and
  - Federal grant funds cannot be used to pay for entertainment, which includes costs for amusement, diversion, and social activities.
- Grant funds may be used to pay for the costs of attending a conference.  Specifically, Federal grant funds may be used to pay for conference fees and travel expenses (transportation, per diem, and lodging) of grantee employees, consultants, or experts to attend a conference or meeting if those expenses are reasonable and necessary to achieve the purposes of the grant.
  - When planning to use grant funds for attending a meeting or conference, grantees should consider how many people should attend the meeting or conference on their behalf.  The number of attendees should be reasonable and necessary to accomplish the goals and objectives of the grant.
- A grantee hosting a meeting or conference may not use grant funds to pay for food for conference attendees unless doing so is necessary to accomplish legitimate meeting or conference business.
  - A working lunch is an example of a cost for food that might be allowable under a Federal grant if attendance at the lunch is needed to ensure the full participation by conference attendees in essential discussions and speeches concerning the purpose of the conference and to achieve the goals and objectives of the project.
- A meeting or conference hosted by a grantee and charged to a Department grant must not be promoted as a U.S. Department of Education conference.  This means that the seal of the U.S. Department of Education must not be used on conference materials or signage without Department approval.

JA 461

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 464 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 51 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 129 of 152

**GAN ENCLOSURE 3**
Revised 03/2021

- o All meeting or conference materials paid for with grant funds must include appropriate disclaimers, such as the following:

   The contents of this (insert type of publication; e.g., book, report, film) were developed under a grant from the Department of Education.  However, those contents do not necessarily represent the policy of the Department of Education, and you should not assume endorsement by the Federal Government.

- Grantees are strongly encouraged to contact their project officer with any questions or concerns about whether using grant funds for a meeting or conference is allowable prior to committing grant funds for such purposes.

   - o A short conversation could help avoid a costly and embarrassing mistake.

- Grantees are responsible for the proper use of their grant awards and may have to repay funds to the Department if they violate the rules on the use of grant funds, including the rules for meeting- and conference-related expenses.

JA 462

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 465 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 52 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 130 of 152

GAN ENCLOSURE 4
Revised 03/2021

## MEMORANDUM TO REMIND DEPARTMENT OF EDUCATION GRANTEES OF EXISTING CASH MANAGEMENT REQUIREMENTS CONCERNING PAYMENTS

The Department of Education (Department) requires that its grantees adhere to existing cash management requirements concerning payments and will ensure that their subgrantees are also aware of these policies by providing them relevant information.  A grantee's failure to comply with cash management requirements may result in an improper payment determination by the Department in accordance with the Payment Integrity Information Act (PIIA) of 2019.

There are three categories of payment requirements that apply to the drawdown of funds from grant accounts at the Department.  The first two types of payments are subject to the requirements in the Treasury Department regulations implementing the Cash Management Improvement Act (CMIA) of 1990, 31 U.S.C.6513, and the third is subject to the requirements in the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* (Uniform Guidance) at 2 CFR part 200,[1] as follows:

1.  Payments to a State under programs that are covered by a State's Treasury State Agreement (TSA);

2.  Payments to States under programs that are not covered by a TSA; and

3.  Payments to other non-Federal entities, including nonprofit organizations and local governments.

**CMIA Requirements Applicable to Programs included in a TSA**

Generally, under the Treasury Department regulations implementing the CMIA, only major assistance programs (large-dollar programs meeting thresholds in 31 CFR § 205.5) are included in a State's written TSA. See 31 CFR § 205, subpart A.  Programs included in a TSA must use approved funding techniques and both States and the Federal government are subject to interest liabilities for late payments. State interest liabilities accrue from the day federal funds are credited to a State account to the day the State pays out the federal funds for federal assistance program purposes. 31 CFR § 205.15.  If a State makes a payment under a Federal assistance program before funds for that payment have been transferred to the State, Federal Government interest liabilities accrue from the date of the State payment until the Federal funds for that payment have been deposited to the State account. 31 CFR § 205.14.

**CMIA Requirements Applicable to Programs Not Included in a TSA**

Payments to States under programs not covered by a State's TSA are subject to subpart B of Treasury's regulations in 31 CFR § 205.  These regulations provide that a State must minimize the time between the drawdown of funds from the federal government and their disbursement for approved program activities.  The timing and amount of funds transfers must be kept to a minimum and be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.  31 CFR § 205.33(a).  States should exercise sound cash management in funds transfers to subgrantees.

---

[1] The Department adopted the Uniform Guidance as regulations of the Department at 2 CFR part 3474.

JA 463

USCA4 Appeal: 25-1281    Doc: 37-1      Filed: 06/16/2025    Pg: 466 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 53 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 131 of 152

**GAN ENCLOSURE 4**
Revised 03/2021

Under subpart B, neither the States nor the Department owe interest to the other for late payments. 31 CFR § 205.33(b).  However, if a State or a Federal agency is consistently late in making payments, Treasury can require the program to be included in the State's TSA.  31 CFR § 205.35.

**Fund transfer requirements for grantees other than State governments and subgrantees**

The transfer of Federal program funds to grantees other than States and to subgrantees are subject to the payment and interest accrual requirements in the Uniform Guidance at 2 CFR § 200.305(b).  These requirements are like those in subpart B of the Treasury Department regulations in 31 CFR part 205, requiring that "payments methods must minimize the time elapsing between the transfer of funds from the United States Treasury or the pass-through entity and the disbursement by the non-Federal entity." 2 CFR § 200.305(b) introduction.

The Federal Government and pass-through entities must make payments in advance of expenditures by grantees and subgrantees if these non-Federal entities maintain, or demonstrate the willingness to maintain, written procedures "that minimize the time elapsing between the transfer of funds and disbursement by the non-Federal entity, and financial management systems that meet the standards for fund control and accountability."  2 CFR § 200.305(b)(1).  If a grantee or subgrantee cannot meet the criteria for advance payments, a Federal agency or pass-through entity can pay that entity through reimbursement.  See 2 CFR § 200.305(b)(1) and (4) for more detailed description of the payment requirements and the standards for requiring that payments be made by reimbursement.

Non-Federal entities must maintain advance payments in interest bearing accounts unless certain conditions exist.  See 2 CFR § 200.305(b)(8) for those conditions.  The requirements regarding interest accrual and remittance follow:

Grantees and subgrantees must annually remit interest earned on federal advance payments except that interest earned amounts up to $500 per year may be retained for administrative expense. Any additional interest earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services Payment Management System (PMS) through an electronic medium using either Automated Clearing House (ACH) network or a Fedwire Funds Service payment. 2 CFR § 200.305(b)(9)(i) and (ii).

1.  When returning interest through ACH Direct Deposit or Fedwire, grantees must include the following in their return transaction:

    - PMS Account Number (PAN). NOTE: The PAN is the same series of alpha-numeric characters used for payment request purposes (e.g.: C1234G1).
    - PMS document number.
    - The reason for the return (e.g., interest, part interest part other, etc.).
    - An explanation stating that the refund is for interest payable to the Department of Health and Human Services, and the grant number(s) for which the interest was earned.

    a.  U.S. Department of Education grantees are generally located and operate domestically and return interest domestically.  Below is PSC ACH account information for interest returned

JA 464

**GAN ENCLOSURE 4**
Revised 03/2021

domestically.  For international ACH interest returned, account information is available at: Returning Funds/Interest.

- PSC ACH Routing Number is: 051036706
- PSC DFI Accounting Number: 303000
- Bank Name: Credit Gateway - ACH Receiver
- Location: St. Paul, MN

b.  Service charges may be incurred from a grantee's financial institution when a Fedwire to return interest is initiated.  For FedWire returns, Fedwire account information is as follows:

- Fedwire Routing Number: 021030004
- Agency Location Code (ALC): 75010501
- Bank Name: Federal Reserve Bank
- Treas NYC/Funds Transfer Division
- Location: New York, NY

2.    Interest may be returned by check using only the U.S. Postal Service; however, returning interest via check may take 4-6 weeks for processing before a check payment may be applied to the appropriate PMS account.

a.  Interests returned by check are to be mailed (USPS only) to:

- HHS Program Support Center
  PO Box 979132
  St. Louis, MO 63197

A brief statement explaining the nature of the return must be included.

b.  To return interest on a grant not paid through the PMS, make the check payable to the Department of Health and Human Services, and include the following with the check:

- An explanation stating that the refund is for interest
- The name of the awarding agency
- The grant number(s) for which the interest was earned
- The return should be made payable to: Department of Health and Human Services.

3.    For detailed information about how to return interest, visit the PSC Retuning Funds/Interest page at: Returning Funds/Interest

Grantees, including grantees that act as pass-through entities and subgrantees have other responsibilities regarding the use of Federal funds.  For example, all grantees and subgrantees must have procedures for determining the allowability of costs for their awards.  We highlight the following practices related to the oversight of subgrantee compliance with the financial management requirements in the Uniform Guidance that will assist State grantees (pass-through entities) in meeting their monitoring responsibilities.  Under 2 CFR § 200.332, pass-through entities must –

JA 465

USCA4 Appeal: 25-1281     Doc: 37-1        Filed: 06/16/2025      Pg: 468 of 638
Case 1:25-cv-10548-MJJ     Document 8-15     Filed 03/06/25     Page 55 of 70
Case 1:25-cv-00702-JRR     Document 25-2     Filed 03/12/25     Page 133 of 152

**GAN ENCLOSURE 4**
**Revised 03/2021**

1.    Evaluate each subrecipient's risk of noncompliance with Federal statutes, regulations, and the terms and conditions of the subaward for purposes of determining the appropriate subrecipient monitoring.

2.    Monitor the performance and fiscal activities of the subrecipient to ensure that the subaward is used for authorized purposes, in compliance with Federal statutes, regulations, and the terms and conditions of the subaward; and that subaward performance goals are achieved.

A small number of Department grant programs have program-specific cash management and payment requirements based on the authorizing legislation or program regulations.  These program-specific requirements may supplement or override general cash management or payment requirements.  If you have any questions about your specific grant, please contact the Education Program Contact listed in Block 3 of your Grant Award Notification.

JA 466

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 469 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 56 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 134 of 152

GAN ATTACHMENT 5
Revised 03/2021

# RECIPIENTS OF DEPARTMENT OF EDUCATION GRANTS AND COOPERATIVE AGREEMENTS
# FREQUENTLY ASKED QUESTIONS ON CASH MANAGEMENT

**Q**   **What are the Federal Laws and Regulations Regarding Payments to the States?**

**A**   The *Cash Management Improvement Act of 1990* (*CMIA*) establishes interest liabilities for the Federal and State governments when the Federal Government makes payments to the States. See 31 U.S.C. 3335 and 6503.  The implementing regulations are in Title 31 of the Code of Federal Regulations (CFR), Part 205, https://www.ecfr.gov/cgi-bin/text-idx?tpl=/ecfrbrowse/Title31/31cfr205_main_02.tpl.  Non-Federal entities other than States follow the rules on Federal payments set out in 2 CFR 200.305.

**Q**   **What is a Treasury-State Agreement (TSA)?**

**A**   A TSA documents the accepted funding techniques and methods for calculating interest agreed upon by the U.S. Department of the Treasury (Treasury) and a State.  It identifies the Federal assistance programs that are subject to interest liabilities under the CMIA.  The CMIA regulations specify a number of different funding techniques that may be used by a State but a State can negotiate with the Treasury Department to establish a different funding technique for a particular program. A TSA is effective until terminated and, if a state does not have a TSA, payments to the State are subject to the default techniques in the regulations that Treasury determines are appropriate.

**Q**   **What are the CMIA requirements for a program subject to a Treasury-State Agreement?**

**A**   Payments to a State under a program of the Department are subject to the interest liability requirements of the CMIA if the program is included in the State's Treasury-State Agreement (TSA) with the Department of Treasury.  If the Federal government is late in making a payment to a State, it owes interest to the State from the time the State spent its funds to pay for expenditure until the time the Federal government deposits funds to the State's account to pay for the expenditure.  Conversely, if a State is late in making a payment under a program of the Department, the State owes interest to the Federal government from the time the Federal government deposited the funds to the State's account until the State uses those funds to make a payment.  For more information, GAN Enclosure 4.

**Q**   **What are the CMIA requirements for a program that is not subject to a Treasury-State Agreement?**

**A**   If a program is not included in the State's TSA, neither the State nor the Federal government are liable for interest for making late payments.  However, both the Federal government and the State must minimize the time elapsing between the date the State requests funds and the date that the funds are deposited to the State's accounts.  The State is also required to minimize the time elapsed between the date it receives funds from the Federal government and the date it makes a payment under the program,  Also, the Department must minimize the amount of funds transferred to a State to only that needed to meet the immediate cash needs of the State.  The timing and amount of funds transferred must be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.

**Q**   **What if there is no TSA?**

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 470 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 57 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 135 of 152

A    When a State does not have a TSA in effect, default procedures in 31 CFR, part 205 that the Treasury Department determines appropriate apply.  The default procedures will prescribe efficient funds transfer procedures consistent with State and Federal law and identify the covered Federal assistance programs and designated funding techniques.

Q    **Who is responsible for Cash Management?**
A    Grantees and subgrantees that receive grant funds under programs of the Department are responsible for maintaining internal controls regarding the management of Federal program funds under the Uniform Guidance in 2 CFR 200.302 and 200.303.  In addition, grantees are responsible for ensuring that subgrantees are aware of the cash management and requirements in 2 CFR part 200, subpart D.

Q    **Who is responsible for monitoring cash drawdowns to ensure compliance with cash management policies?**
A    Recipients must monitor <u>their own</u> cash drawdowns **and** those of their subrecipients to assure substantial compliance to the standards of timing and amount of advances.

Q    **How soon may I draw down funds from the G5 grants management system?**
A    Grantees are required to minimize the amount of time between the drawdown and the expenditure of funds from their bank accounts.  (See 2 CFR 200.305(b).)  Funds must be drawn only to meet a grantee's immediate cash needs for each individual grant.  The G5 screen displays the following message:

**By submitting this payment request, I certify to the best of my knowledge and belief that the request is based on true, complete, and accurate information. I further certify that the expenditures and disbursements made with these funds are for the purposes and objectives set forth in the applicable Federal award or program participation agreement, and that the organization on behalf of which this submission is being made is and will remain in compliance with the terms and conditions of that award or program participation agreement. I am aware that the provision of any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me, and the organization on behalf of which this submission is being made, to criminal, civil, or administrative penalties for fraud, false statements, false claims, or other violations. (U.S. Code Title 18, Section 1001; Title 20, Section 1097; and Title 31, Sections 3729-3730 and 3801-3812)**

Q    **How may I use Federal funds?**
A    Federal funds must be used as specified in the Grant Award Notification (GAN) and the approved application or State plan for allowable direct costs of the grant and an allocable portion of indirect costs, if authorized.

Q    **What are the consequences to recipients/subrecipients for not complying with terms of the grant award?**
A    If a recipient or subrecipient materially fails to comply with any term of an award, whether stated in a Federal statute or regulation, including those in 2 CFR part 200, an assurance, the GAN, or elsewhere, the awarding agency may in accordance with 2 CFR 200.339 take one or more of the following actions:

JA 468

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 471 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 58 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 136 of 152

**GAN ATTACHMENT 5**
**Revised 03/2021**

1. Temporarily withhold cash payments pending correction of the deficiency by the non-Federal entity or more severe enforcement action by the Federal awarding agency or pass-through entity.
2. Disallow (that is, deny both use of funds and any applicable matching credit for) all or part of the cost of the activity not in compliance.
3. Wholly or partly suspend or terminate the Federal award.
4. Initiate suspension or debarment proceedings as authorized under 2 CFR part 180 and Federal award agency regulations (or in the case of a pass-through be initiated by a Federal awarding agency).
5. Withhold further Federal awards for the project or program.
6. Take other remedies that may be legally available.

**Q** **Who is responsible for determining the amount of interest owed to the Federal government?**
**A** As set forth in 31 CFR 205.9, the method used to calculate and document interest liabilities is included in the State's TSA. A non-State entity must maintain advances of Federal funds in interest-bearing accounts unless certain limited circumstance apply and remit interest earned on those funds to the Department of Health and Human Services, Payment Management System annually. See 2 CFR 200.305.

**Q** **What information should accompany my interest payment?**
**A** In accordance with 2 CFR 200.305(b)(9), interest in access of $500.00 earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services Payment Management System (PMS) through an electronic medium using either Automated Clearing House (ACH) network or a Fedwire Funds Service payment.

For returning interest on Federal awards paid through PMS, the refund should:
(a) Provide an explanation stating that the refund is for interest;
(b) List the PMS Payee Account Number(s) (PANs);
(c) List the Federal award number(s) for which the interest was earned; and
(d) Make returns payable to: Department of Health and Human Services.

For returning interest on Federal awards not paid through PMS, the refund should:
(a) Provide an explanation stating that the refund is for interest;
(b) Include the name of the awarding agency;
(c) List the Federal award number(s) for which the interest was earned; and
(d) Make returns payable to: Department of Health and Human Services.

For additional information about returning interest see GAN ATTACHMENT 4.

**Q** **Are grant recipients/subrecipients automatically permitted to draw funds in advance of the time they need to disburse funds in order to liquidate obligations?**
**A** The payment requirements in 2 CFR 200.305(b) authorize a grantee or subgrantee to request funds in advance of expenditures if certain conditions are met. However, if those conditions are not met, the Department and a pass-through agency may place a payee on reimbursement.

JA 469

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 472 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 59 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 137 of 152

**GAN ATTACHMENT 5**
Revised 03/2021

**Q**   **For formula grant programs such as ESEA Title I, for which States distribute funds to LEAs, may States choose to pay LEAs on a reimbursement basis?**

**A**    A subgrantee must be paid in advance if it meets the standards for advance payments in 2 CFR 200.305(b)(1) but if the subgrantee cannot meet those standards, the State may put the subgrantee on reimbursement payment.  See 2 CFR 200.305(b).

**Q**   **Will the Department issue special procedures in advance if G5 plans to shut down for 3 days or more?**

**A**   Yes, before any shutdown of G5 lasting three days or more, the Department issues special guidance for drawing down funds during the shut down.  The guidance will include cash management improvement act procedures for States and certain State institutions of higher education and procedures for grants (including Pell grants) that are not subject to CMIA.

JA 470

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 473 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 60 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 138 of 152

# E  HI  IT


**UNIVERSITY OF MARYLAND**

Maura Elford Collinge <mcolling@umd.edu>

## Fwd: G5 Notification - Administrative Action (GAN) S423A220062
1 message

**Christine Kang** <ckang1@umd.edu>                                   Mon, Oct 21, 2024 at 12:50 PM
To: Maura Elford Collinge <mcolling@umd.edu>
Cc: oraera <oraera@umd.edu>

Grant Award Notification incorporating approved change of UMD Administrative Contact / account email from oraa@umd.edu to kpetrone@umd.edu

---------- Forwarded message ---------
From: <Mel.Harper-Butler@ed.gov>
Date: Wed, Oct 16, 2024 at 9:24 AM
Subject: G5 Notification - Administrative Action (GAN) S423A220062
To: <seubank2@umd.edu>, <kpetrone@umd.edu>, <Mel.Harper-Butler@ed.gov>
Cc: <Mel.Harper-Butler@ed.gov>

Dear Grantee:

This e-mail notifies you that your administrative action request has been reviewed and completed.  You may access your electronically signed Grant Award Notification (GAN) documents for this administrative action, S423A220062 & GAN action number 9, at http://www.g5.gov under Grant Maintenance, Award Documents.

You will need to sign in to G5 to access your GAN.  If you don't already have an account in G5, please go to the link on the top left of the home page that says "Not Registered? Sign up" and follow the instructions.  To register, you will need your institution's UEI. You must also use the exact same name (no nicknames) and email address that is listed on this email.  If you are a project director, or state director, select "Project Director" or "State Director" when prompted to choose a role in your profile.  Please note:  Only recipients of this email (the project director and certifying official or state director and authorizing official) can access the GAN in G5. If someone else at your organization requires a copy, you may print out a copy or forward the PDF to them.

If you have questions regarding accessing G5 or your GAN documents, please contact the G5 help desk at 888-336-8930.  For all other questions of a programmatic or fiscal nature, please contact the ED Program Contact listed on your GAN (Box 3).

Please acknowledge receipt of this e-mail by sending a reply to the Education Program Contact listed on your GAN (Box 3).

Christine Kang
Information Systems Manager
University of Maryland
Office of Research Administration
0101 Lee Building
7809 Regents Drive
College Park, MD 20742-5141
Tel:  301-405-5736
http://ora.umd.edu

📄 **GAN_S423A220062-24.9.1.pdf**
271K

USCA4 Appeal: 25-1281 Doc: 37-1 Filed: 06/16/2025 Pg: 475 of 638 Page 62 of 70
Case 1:25-cv-10548-MJJ Document 8-15 Filed 03/06/25
Case 1:25-cv-00702-JRR Document 25-2 Filed 03/12/25 Page 140 of 152



S423A220062 - 24

## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

| **1** RECIPIENT NAME | **2** AWARD INFORMATION |
|---|---|
| University of Maryland<br>VPR<br>3112 Lee Building 7809 Regents Drive<br>College Park, MD 20742 | PR/AWARD NUMBER   S423A220062 - 24<br>ACTION NUMBER   9<br>ACTION TYPE   Administrative<br>AWARD TYPE   Discretionary |

| **3** PROJECT STAFF | **4** PROJECT TITLE |
|---|---|
| RECIPIENT PROJECT DIRECTOR<br>  Segun Eubanks   (301) 405-5401<br>  seubank2@umd.edu<br>EDUCATION PROGRAM CONTACT<br>  Melissa Harper-Butler   (202) 453-5631<br>  Mel.Harper-Butler@ed.gov<br>EDUCATION PAYMENT HOTLINE<br>  G5 PAYEE HELPDESK   888-336-8930<br>  obssed@servicenowservices.com | 84.423A<br>UMD School Improvement Leadership Academy |

**5** KEY PERSONNEL

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Segun Eubanks | Project Director | 42 % |

**6** AWARD PERIODS

| | |
|---|---|
| BUDGET PERIOD | 10/01/2024 - 09/30/2025 |
| PERFORMANCE PERIOD | 10/01/2022 - 09/30/2025 |

FUTURE BUDGET PERIODS

N/A

**7** AUTHORIZED FUNDING

| | |
|---|---|
| THIS ACTION | N/A |
| BUDGET PERIOD | $755,699.00 |
| PERFORMANCE PERIOD | $4,506,218.00 |

**8** ADMINISTRATIVE INFORMATION

| | |
|---|---|
| UEI | NPU8ULVAAS23 |
| REGULATIONS | CFR PART XXX |
| | EDGAR AS APPLICABLE |
| | 2 CFR AS APPLICABLE |
| ATTACHMENTS | N/A |

**9** LEGISLATIVE AND FISCAL DATA

| | |
|---|---|
| AUTHORITY: | PL P.L. 114–95 II DEPARTMENT OF DEFENSE AND FULL YEAR CONTINUING APPROPRIATIONS ACT |
| PROGRAM TITLE: | SUPPORTING EFFECTIVE EDUCATOR DEVELOPMENT |
| CFDA/SUBPROGRAM NO: | 84.423A |

JA 473

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 476 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 63 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 141 of 152

S423A220062 - 24



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

**10**

| | |
|---|---|
| PR/AWARD NUMBER: | S423A220062 - 24 |
| RECIPIENT NAME: | University of Maryland |
| | VPR |
| GRANTEE NAME: | UNIVERSITY OF MARYLAND, COLLEGE PARK |
| | 3112 LEE BUILDING, |
| | COLLEGE PARK, MD 20742 - 5100 |
| PROGRAM INDIRECT COST TYPE: | Restricted |
| PROJECT INDIRECT COST RATE: | 8% |

TERMS AND CONDITIONS

N/A

MELISSA HARPER-BUTLER      Digitally signed by MELISSA HARPER-BUTLER
                            Date: 2024.10.16 09:23:41 -04'00'

_____      _____

**AUTHORIZING OFFICIAL**                              **DATE**

Ver. 1

JA 474

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 477 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 64 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 142 of 152

# EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**    (See Block 2 of the Notification)

**1. RECIPIENT NAME -** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION -** Unique items of information that identify this notification.

  **PR/AWARD NUMBER -** A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

  **ACTION NUMBER -** A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

  **ACTION TYPE -** The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, AMENDMENT).

  **AWARD TYPE -** The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF -** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

  ***RECIPIENT PROJECT DIRECTOR -** The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

  **EDUCATION PROGRAM CONTACT -** The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

  **EDUCATION PAYMENT CONTACT -** The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER -** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.* KEY PERSONNEL -** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS -** Project activities and funding are approved with respect to three different time periods, described below:

  **BUDGET PERIOD -** A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

  **PERFORMANCE PERIOD -** The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

  ***FUTURE BUDGET PERIODS -** The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING -** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

  ***THIS ACTION -** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

  ***BUDGET PERIOD -** The total amount of funds available for use by the grantee during the stated budget period to this date.

  ***PERFORMANCE PERIOD -** The amount of funds obligated from the start date of the first budget period to this date.

  **RECIPIENT COST SHARE -** The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

  **RECIPIENT NON-FEDERAL AMOUNT -** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION -** This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

  **UEI -** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes.

USCA4 Appeal: 25-1281      Doc: 37-1      Filed: 06/16/2025      Pg: 478 of 638
Case 1:25-cv-10548-MJJ      Document 8-15      Filed 03/06/25      Page 65 of 70
Case 1:25-cv-00702-JRR      Document 25-2      Filed 03/12/25      Page 143 of 152

**\*REGULATIONS -**  Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS -**  Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA -**  The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS -** The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.
**AMOUNT -**  The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS -**  Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER -**  The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME -**  The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE -**  The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE -**  The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL -**  The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF -**  The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.

**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT -**  The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT -**  The total amount of funds awarded under the grant, this action included.

**10. AFFILIATE -**  If an affiliate digital signature appears on this GAN, it is the digital signature belonging to the individual delegated the authority to affix the Authorizing Official's signature to the GAN.

\* This item differs or does not appear on formula and block grants.

JA 476

USCA4 Appeal: 25-1281   Doc: 37-1      Filed: 06/16/2025   Pg: 479 of 638
Case 1:25-cv-10548-MJJ   Document 8-15   Filed 03/06/25   Page 66 of 70
Case 1:25-cv-00702-JRR   Document 25-2   Filed 03/12/25   Page 144 of 152

# EXHIBIT C

I'm

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 481 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 68 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 146 of 152

If you wish to object to or challenge this termination decision, you must submit information and documentation supporting your position in writing within 30 calendar days of the date of this termination notice.  Objections and challenges must be sent by email and first-class mail and addressed to the component head that oversees the grantmaking unit, which will typically be the Assistant Secretary of that unit. In this case, please address your objection or challenge to Ruth Ryder, Acting Assistant Secretary; Office of Elementary and Secondary Education; 400 Maryland Ave., SW; Washington, D.C. 20202; ruth.ryder@ed.gov.

Your appeal should contain the following:
1.  a copy of the written notice of termination;
2.  the date you received written notice of termination;
3.  a brief statement of your argument and the disputed factual, legal, or other issues;
4.  the amount of funds or costs in dispute, if any; and
5.  any other relevant documents.

*See id.* § 200.342.

Costs incurred by you after this termination are allowable only if (a) those costs were properly incurred by you before the effective date of this termination, and not in anticipation of it; and (b) those costs would be allowable if your federal award was not suspended or expired normally at the end of the period of performance in which the termination takes effect. *See* 2 C.F.R. § 200.343. You are encouraged to carefully review and discharge your closeout responsibilities set forth in 2 C.F.R. § 200.344-45 and your award agreement. Those responsibilities include, but are not limited to, your obligation to "promptly refund any unobligated funds" that have been paid out but "are not authorized to be retained." *See* 2 C.F.R. § 200.344(g). Failure to do so will result in the Department filing a report documenting your "material failure to comply with the terms and conditions of" this award on SAM.gov and taking any other appropriate enforcement actions. *See id.* § 200.344(i).

Finally, you are reminded of your duties under your agreement and Department of Education guidance regarding retention of grant records for at least three years.

Thank you,



Deputy Assistant Secretary
for Management and Planni
cc: Ruth Ryder

400 MARYLAND AVE., S.W., WASHINGTON, DC  20202
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

JA 479

USCA4 Appeal: 25-1281    Doc: 37-1       Filed: 06/16/2025    Pg: 482 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 69 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 147 of 152

# E  HIBIT D

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 483 of 638
Case 1:25-cv-10548-MJJ    Document 8-15    Filed 03/06/25    Page 70 of 70
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 148 of 152



**Segun Eubanks**

to me ▼

12:24 PM (3 minutes ago)    ☆    ↩    ⋮

Here is the original email sent from Mark Washington.  He is not someone we had interacted with before.

···

Segun

---------- Forwarded message ----------
From: **Washington, Mark** <Mark.Washington@ed.gov>
Date: Mon, Feb 10, 2025 at 7:01 PM
Subject: University of MD_Grant Termination _021025_FINAL.pdf
To: seubank2@umd.edu <seubank2@umd.edu>
Cc: Ryder, Ruth <Ruth.Ryder@ed.gov>, Weems, Kia <Kia.Weems@ed.gov>, Williams, Damien <Damien.Williams@ed.gov>

Dear Mr. Eubanks,

Please see the attached letter, informing you of the Department's decision to terminate your federal award S423A220062, because the grant is inconsistent with, and no longer effectuates, Department priorities.  You will also receive an updated GAN notice, confirming this decision and change.  You will also receive notification from the Department's G5 grants administration system.

Please feel free to contact me with any related questions or concerns about this information.  Please also note the basis for challenge or appeal of this decision, as noted in the language of the attached letter.

Respectfully,

Mark Washington



**Mark Washington**
**Deputy Assistant Secretary**
United States Department of Education
Office of Elementary and Secondary Education
400 Maryland Avenue, SW | Washington, D.C. 20202
Phone: (202) 205-0167 | Mobile: (202) 549-9956  |  Email: mark.washington@ed.gov

--
Segun Eubanks, EdD
Professor of Practice
Director, Center for Education Innovation and Improvement
College of Education
Anacostia Building, Room 3308
1 Physics Ellipse Drive
University of Maryland
College Park, MD 20740

JA 481

Exhibit C

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 485 of 638
Case 1:25-cv-10548-MJJ    Document 8-13    Filed 03/06/25    Page 59 of 61
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 150 of 152



Chicago
Public
Schools                                                  ███████████  █ @cps.edu>

---

## Fwd: Check in

████████████   ████████ @cps.edu>                        Thu, Feb 27, 2025 at 6:48 PM
To ████████████   █████████ @cps.edu>

**Best regards,**

████████████ - **Chicago Public Schools**
**Student Teaching Program Manager**



-------- Forwarded message --------
From ████████   ████████████████ ed.gov>
Date: Fri, Feb 21, 2025 at 1:13 PM
Subject: RE: Check in
T ████████████████  < ████████ @cps.edu>


████,

  A new GAN email was sent out to everyone, some have not received the letter is my understand.  It is not coming from me, or TQP so there isn't much I can help.  I don't know who the letter might had been emailed to if it had.  All the accounts in G6 are closed.


████████████

Education Program Specialist

US Department of Education

OESE, EED

400 Maryland Ave., SW

Room 3E249

Washington, DC 20023

TE ████████████

Ema████████████ ed.gov

USCA4 Appeal: 25-1281    Doc: 37-1    Filed: 06/16/2025    Pg: 486 of 638
Case 1:25-cv-10548-MJJ    Document 8-13    Filed 03/06/25    Page 60 of 61
Case 1:25-cv-00702-JRR    Document 25-2    Filed 03/12/25    Page 151 of 152

**From** ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ @cps.edu>
**Sent:** Friday, February 21, 2025 2:09 PM
**To** ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ @ed.gov>
**Subject:** Re: Check in

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Thank you for your response. Unfortunately, this is news to us. No one on any of our teams has been made aware. We obviously knew that there were impending cuts, but no one has received a letter on our end.

Do you know who it would have gone to? Are current active funds affected or is this actionable For next fiscal year?

▮▮▮▮▮▮▮▮
Student Teaching Manager
Chicago Public Schools

On Fri, Feb 21, 2025 at 1:06 PM ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ @ed.gov> wrote:

▮▮▮▮

I am not sure I can help, I do not have any additional information to share.  All the grants have been terminated and you should of gotten a letter as well as the GAN with the end date.

▮▮▮▮▮▮▮▮▮

Education Program Specialist

US Department of Education

OESE, EED

400 Maryland Ave., SW

Room 3E249

Washington, DC 20023

TEL ▮▮▮▮▮▮▮▮▮▮

Ema ▮▮▮▮▮▮▮▮▮▮ @ed.gov

**From** ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ @cps.edu>
**Sent:** Friday, February 21, 2025 1:18 PM
**To** ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ @ed.gov>
**Subject:** Check in

JA 484

USCA4 Appeal: 25-1281   Doc: 37-1   Filed: 06/16/2025   Pg: 487 of 638
Case 1:25-cv-10548-MJJ   Document 8-13   Filed 03/06/25   Page 61 of 61
Case 1:25-cv-00702-JRR   Document 25-2   Filed 03/12/25   Page 152 of 152

**CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

H ▓▓▓▓▓! I hope you're doing well. I wanted to check in to see if you could provide a status update on our ongoing grant work with the Department of Ed. As I mentioned in our previous communication, I truly empathize with you and your colleagues during this time. At the same time, I also have a responsibility to share any timely updates with our District, partners, and participants as needed.

I appreciate any information you can provide. Thank you!

**Best regards,**

▓▓▓▓▓▓▓▓▓▓▓▓**- Chicago Public Schools**

**Student Teaching Program Manager**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *et al.,* | |
| *Plaintiffs*, | |
| v. | Civil Action No.  1:25-cv-00702-JRR |
| LINDA MCMAHON, AS SECRETARY OF EDUCATION, *et al.,* | |
| *Defendants*. | |

**SUPPLEMENTAL DECLARATION OF KATHLENE CAMPBELL, PH.D., IN FURTHER SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER / PRELIMINARY INJUNCTION**

I, Kathlene Campbell, Ph.D., declare and state under penalty of perjury the following:

1.      I am the Chief Executive Officer of the National Center for Teacher Residencies ("NCTR"), one of the plaintiffs in this case.

2.       I am over the age of 18, and I am competent in all respects to testify to the matters below.  I understand that this Supplemental Declaration is for use in connection with the above-captioned civil action, and I make this Supplemental Declaration based upon my own personal knowledge and my review of the NCTR's business records.

3.      Attached hereto as Exhibit A is a true and correct copy of NCTR's original Grant Award Notification for its Supporting Effective Educator Development program ("SEED") grant, which the Department of Education subsequently terminated on February 10, 2025.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 12 day of March, 2025

By: _Kathlene H. Campbell_____

Kathlene Campbell, Ph.D.

Exhibit A

S423A220008
Tabitha Grossman
National Center for Teacher Residencies
1332 N. Halsted Street
#304
Chicago, IL 60642

S423A220008

Tabitha Grossman
National Center for Teacher Residencies
1332 N. Halsted Street
#304
CHICAGO, IL 60642

S423A220008



## US Department of Education
## Washington, D.C. 20202

## GRANT AWARD NOTIFICATION

**1 RECIPIENT NAME**

National Center for Teacher Residencies
1332 N. Halsted Street
#304
CHICAGO, IL 60642

**2 AWARD INFORMATION**

| | |
|---|---|
| PR/AWARD NUMBER | S423A220008 |
| ACTION NUMBER | 1 |
| ACTION TYPE | New |
| AWARD TYPE | Discretionary |

**3 PROJECT STAFF**

RECIPIENT PROJECT DIRECTOR
Tabitha Grossman        (804) 986-3493
tgrossman@nctresidencies.org
EDUCATION PROGRAM CONTACT
Mia Howerton        (202) 205-0147
Mia.Howerton@ed.gov
EDUCATION PAYMENT HOTLINE
G5 PAYEE HELPDESK        888-336-8930
obssed@servicenowservices.com

**4 PROJECT TITLE**

84.423A
Centering Equity: Building & Scaling Teacher Residencies

**5 KEY PERSONNEL**

| NAME | TITLE | LEVEL OF EFFORT |
|---|---|---|
| Tabitha Grossman | Project Director | 100 % |

**6 AWARD PERIODS**

BUDGET PERIOD        10/01/2022 - 09/30/2023
PERFORMANCE PERIOD        10/01/2022 - 09/30/2025

FUTURE BUDGET PERIODS

| BUDGET PERIOD | DATE | AMOUNT |
|---|---|---|
| 2 | 10/01/2023 - 09/30/2024 | $2,358,005.00 |
| 3 | 10/01/2024 - 09/30/2025 | $2,050,419.00 |

**7 AUTHORIZED FUNDING**

| | |
|---|---|
| THIS ACTION | $1,899,442.00 |
| BUDGET PERIOD | $1,899,442.00 |
| PERFORMANCE PERIOD | $1,899,442.00 |

**8 ADMINISTRATIVE INFORMATION**

| | |
|---|---|
| UEI/SSN | DMKFJA9LJ9J5 |
| REGULATIONS | CFR PART XXX |
| | EDGAR AS APPLICABLE |
| | 2 CFR AS APPLICABLE |
| ATTACHMENTS | 2 , 3 , 6 , 8 , 9 , 11 , 12 , 13 , 14 , GE1 , GE2 , GE3 , GE4 , GE5 |

**9 LEGISLATIVE AND FISCAL DATA**

AUTHORITY:        PL P.L. 114–95 II DEPARTMENT OF DEFENSE AND FULL YEAR
        CONTINUING APPROPRIATIONS ACT
PROGRAM TITLE:        SUPPORTING EFFECTIVE EDUCATOR DEVELOPMENT
CFDA/SUBPROGRAM NO:        84.423A

JA 491

S423A220008



**US Department of Education**
**Washington, D.C. 20202**

# GRANT AWARD NOTIFICATION

| FUND CODE | FUNDING YEAR | AWARD YEAR | ORG. CODE | CATEGORY | LIMITATION | ACTIVITY | CFDA | OBJECT CLASS | AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| 0204A | 2022 | 2022 | ES000000 | B | UE1 | 000 | 423 | 4101C | $1,899,442.00 |

**10**

PR/AWARD NUMBER:                    S423A220008
RECIPIENT NAME:                    National Center for Teacher Residencies
GRANTEE NAME:                    NATIONAL CENTER FOR TEACHER RESIDENCIES, INC.
                                   1332 N HALSTED STE 304,
                                   CHICAGO, IL 60642 - 2694
PROGRAM INDIRECT COST TYPE:        Restricted
PROJECT INDIRECT COST RATE:        8%

TERMS AND CONDITIONS

(1)    THE FOLLOWING ITEMS ARE INCORPORATED IN THE GRANT AGREEMENT:

1) THE RECIPIENT'S APPLICATION (BLOCK 2);
2) THE APPLICABLE EDUCATION DEPARTMENT REGULATIONS: 2 CFR PART 180; NONPROCUREMENT
DEBARMENT AND SUSPENSION AS ADOPTED AT 2 CFR PART 3485; 2 CFR PART 200 AS ADOPTED
AT 2 CFR 3474 (BLOCK 8), AND 34 CFR PARTS 75, 77, 79, 81, 82, 84, 86, 97, 98, 99; AND THE PROGRAM
REGULATIONS SPECIFIED IN BLOCK 8; AND
3) THE SPECIAL TERMS AND CONDITIONS SHOWN AS ATTACHMENTS IN BLOCK 8 ON THE INITIAL
AWARD APPLY UNTIL CHANGED.

THIS AWARD SUPPORTS ONLY THE BUDGET PERIOD SHOWN IN BLOCK 6. IN ACCORDANCE WITH 34
CFR 75.253, THE SECRETARY CONSIDERS, AMONG OTHER THINGS, CONTINUED FUNDING IF:

1) CONGRESS HAS APPROPRIATED SUFFICIENT FUNDS UNDER THE PROGRAM;
2) THE DEPARTMENT DETERMINES THAT CONTINUING THE PROJECT WOULD BE IN THE BEST
INTEREST OF THE GOVERNMENT;
3) THE GRANTEE HAS MADE SUBSTANTIAL PROGRESS TOWARD MEETING THE GOALS AND
OBJECTIVES OF THE PROJECT;
4) THE SECRETARY ESTABLISHED PERFORMANCE MEASUREMENT REQUIREMENTS FOR THE
GRANT IN THE APPLICATION NOTICE, THE PERFORMANCE TARGETS IN THE GRANTEE'S APPROVED
APPLICATION;
5) THE RECIPIENT HAS SUBMITTED REPORTS OF PROJECT PERFORMANCE AND BUDGET
EXPENDITURES THAT MEET THE REPORTING REQUIREMENTS FOUND AT 34 CFR 75.118, 2 CFR 200.328
AND 200.329, AND ANY OTHER REPORTING REQUIREMENTS ESTABLISHED BY THE SECRETARY;
AND
6) THE GRANTEE HAS MAINTAINED FINANCIAL AND ADMINISTRATIVE MANAGEMENT SYSTEMS
THAT MEET THE REQUIREMENTS IN 2 CFR 200.302, FINANCIAL MANAGEMENT, AND 2 CFR 200.303,
INTERNAL CONTROLS.

IN ACCORDANCE WITH 2 CFR 200.308(c)(2) CHANGES TO KEY PERSONNEL IDENTIFIED IN BLOCK 5
MUST RECEIVE PRIOR APPROVAL FROM THE DEPARTMENT.

THE SECRETARY ANTICIPATES FUTURE FUNDING FOR THIS AWARD ACCORDING TO THE SCHEDULE
IDENTIFIED IN BLOCK 6. THESE FIGURES ARE ESTIMATES ONLY AND DO NOT BIND THE SECRETARY
TO FUNDING THE AWARD FOR THESE PERIODS OR FOR THE SPECIFIC AMOUNTS SHOWN. THE
RECIPIENT WILL BE NOTIFIED OF SPECIFIC FUTURE FUNDING ACTIONS THAT THE SECRETARY
TAKES FOR THIS AWARD.

(2)    The Office of Management and Budget requires all Federal agencies to assign a Federal Award Identifying Number
(FAIN) to each of their financial assistance awards. The PR/AWARD NUMBER identified in Block 2 is your FAIN.

S423A220008



## US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

If subawards are permitted under this grant, and you choose to make subawards, you must document the assigned PR/AWARD NUMBER (FAIN) identified in Block 2 of this Grant Award Notification on each subaward made under this grant. The term subaward means:

1. A legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient. (See 2 CFR 200.331(a))

2. The term does not include your procurement of property and services needed to carry out the project or program (The payments received for goods or services provided as a contractor are not Federal awards, see 2 CFR 200.501(f) of the OMB Uniform Guidance: "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards").

3. A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract. (See 2 CFR 200.1)

(3) Reimbursement of indirect costs is subject to the availability of funds and statutory and regulatory restrictions. The negotiated indirect cost rate agreement authorizes a non-Federal entity to draw down indirect costs from the grant awards. The following conditions apply to the below entities.

A. All entities (other than institutions of higher education (IHE))

The GAN for this grant award shows the indirect cost rate that applies on the date of the initial grant for this project. However, after the initial grant date, when a new indirect cost rate agreement is negotiated, the newly approved indirect cost rate supersedes the indirect cost rate shown on the GAN for the initial grant. This new indirect cost rate should be applied according to the period specified in the indirect cost rate agreement, unless expressly limited under EDGAR or program regulations. Any grant award with an approved budget can amend the budget to account for a change in the indirect cost rate. However, for a discretionary grant award any material changes to the budget which may impact the scope or objectives of the grant must be discussed with the program officer at the Department. See 34 CFR 75.560 (d)(3) (ii) (part 75 of EDGAR).

B. Institutions of higher education (IHE)

Under 2 CFR part 200, Appendix III, Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs), the Department must apply the negotiated indirect cost rate in effect on the date of the initial grant award to every budget period of the project, including all continuation grants made for this project. See 2 CFR Part 200, Appendix III, paragraph C.7. Therefore, the GAN for each continuation grant will show the original indirect cost rate and it applies to the entire period of performance of this project. If the indirect cost rate agreement that is applicable to this grant does not extend to the end of the grant s project period, the indirect cost rate set at the start of the project period must still be applied to the end of project period regardless of the fact that the rate has otherwise expired.

(4) Revised Budget: The following condition will be imposed on all grantees recommended for funding:
The grantee must submit a revised budget covering Year 1 of the grant award that aligns with the actual amount of funding that the grantee receives from the Department. The revised budget must be within the scope of the approved project and must align with all initial goals and objectives of the approved application. The grantee must submit this revised budget within 30 days of the grant award.
If you wish to request reconsideration of these specific conditions, please send written notification describing why such conditions should not be imposed on this grant to your Department program officer.

Frontload: The following condition will be imposed on the grantees who are proposed to be frontloaded:
This grant is a frontloaded grant, i.e., funds indicated in Block 7 were requested by the grantee, and approved by the Department, for expenditure in more than one budget period. For the current budget period and any subsequent budget period, the grantee may only draw down funds in accordance with its approved budget for that budget period and may not draw down funds in excess of that amount without prior approval.
If you wish to request reconsideration of these specific conditions, please send written notification describing why such conditions should not be imposed on this grant to your Department program officer.

S423A220008

# US Department of Education
## Washington, D.C. 20202

# GRANT AWARD NOTIFICATION

**AUTHORIZING OFFICIAL**                    **DATE**

Ver. 1

JA 494

## EXPLANATION OF BLOCKS ON THE GRANT AWARD NOTIFICATION

**For Discretionary, Formula and Block Grants**     (See Block 2 of the Notification)

**1. RECIPIENT NAME –** The legal name of the recipient or name of the primary organizational unit that was identified in the application, state plan or other documents required to be submitted for funding by the grant program.

**2. AWARD INFORMATION –**   Unique items of information that identify this notification.

> **PR/AWARD NUMBER –**  A unique, identifying number assigned by the Department to each application. On funded applications, this is commonly known as the "grant number" or "document number." The PR/Award Number is also known as the Federal Award Identifying Number, or FAIN.

> **ACTION NUMBER –**  A numeral that represents the cumulative number of steps taken by the Department to date to establish or modify the award through fiscal or administrative means. Action number "01" will always be "NEW AWARD"

> **ACTION TYPE –**  The nature of this notification (e.g., NEW AWARD, CONTINUATION, REVISION, ADMINISTRATIVE)

> **AWARD TYPE –**  The particular assistance category in which funding for this award is provided, i.e., DISCRETIONARY, FORMULA, or BLOCK. If this award was made under a Research and Development grant program, the terms RESEARCH AND DEVELOPMENT will appear under DISCRETIONARY, FORMULA OR BLOCK.

**3. PROJECT STAFF –** This block contains the names and telephone numbers of the U.S. Department of Education and recipient staff who are responsible for project direction and oversight.

> **\*RECIPIENT PROJECT DIRECTOR –**  The recipient staff person responsible for administering the project. This person represents the recipient to the U.S. Department of Education.

> **EDUCATION PROGRAM CONTACT –**  The U.S. Department of Education staff person responsible for the programmatic, administrative and businessmanagement concerns of the Department.

> **EDUCATION PAYMENT CONTACT –**  The U.S. Department of Education staff person responsible for payments or questions concerning electronic drawdown and financial expenditure reporting.

**4. PROJECT TITLE AND CFDA NUMBER –** Identifies the Catalog of Federal Domestic Assistance (CFDA) subprogram title and the associated subprogram number.

**5.\* KEY PERSONNEL –** Name, title and percentage (%) of effort the key personnel identified devotes to the project.

**6. AWARD PERIODS –**   Project activities and funding are approved with respect to three different time periods, described below:

> **BUDGET PERIOD –**  A specific interval of time for which Federal funds are being provided from a particular fiscal year to fund a recipient's approved activities and budget. The start and end dates of the budget period are shown.

> **PERFORMANCE PERIOD –**  The complete length of time the recipient is proposed to be funded to complete approved activities. A performance period may contain one or more budget periods.

> **\*FUTURE BUDGET PERIODS –**  The estimated remaining budget periods for multi-year projects and estimated funds the Department proposes it will award the recipient provided substantial progress is made by the recipient in completing approved activities, the Department determines that continuing the project would be in the best interest of the Government, Congress appropriates sufficient funds under the program, and the recipient has submitted a performance report that provides the most current performance information and the status of budget expenditures.

**7. AUTHORIZED FUNDING –** The dollar figures in this block refer to the Federal funds provided to a recipient during the award periods.

> **\*THIS ACTION –** The amount of funds obligated (added) or de-obligated (subtracted) by this notification.

> **\*BUDGET PERIOD –** The total amount of funds available for use by the grantee during the stated budget period to this date.

> **\*PERFORMANCE PERIOD –** The amount of funds obligated from the start date of the first budget period to this date.

> **RECIPIENT COST SHARE –**  The funds, expressed as a percentage, that the recipient is required to contribute to the project, as defined by the program legislation or regulations and/or terms and conditions of the award.

> **RECIPIENT NON-FEDERAL AMOUNT –** The amount of non-federal funds the recipient must contribute to the project as identified in the recipient's application. When non-federal funds are identified by the recipient where a cost share is not a legislation requirement, the recipient will be required to provide the non-federal funds.

**8. ADMINISTRATIVE INFORMATION –**  This information is provided to assist the recipient in completing the approved activities and managing the project in accordance with U.S. Department of Education procedures and regulations.

JA 495

**UEI/SSN –** The UEI, issued in SAM.gov, is a unique 12 character organization identifier assigned to each recipient for payment purposes. The SSN, issued by the Social Security Administration to individuals, is a nine character identifier for individuals. The Department assigns the SSN as an identifier to individuals who are recipients of Federal financial assistance for payment purposes.

**\*REGULATIONS –** Title 2 of the Code of Federal Regulations(CFR), Part 200 as adopted at 2 CFR 3474; the applicable parts of the Education Department General Administrative Regulations (EDGAR), specific program regulations (if any), and other titles of the CFR that govern the award and administration of this grant.

**\*ATTACHMENTS –** Additional sections of the Grant Award Notification that discuss payment and reporting requirements, explain Department procedures, and add special terms and conditions in addition to those established, and shown as clauses, in Block 10 of the award. Any attachments provided with a notification continue in effect through the project period until modified or rescinded by the Authorizing Official.

**9. LEGISLATIVE AND FISCAL DATA –** The name of the authorizing legislation for this grant, the CFDA title of the program through which funding is provided, and U.S. Department of Education fiscal information.

**FUND CODE, FUNDING YEAR, AWARD YEAR, ORG.CODE, PROJECT CODE, OBJECT CLASS –** The fiscal information recorded by the U.S. Department of Education's Grants Management System (G5) to track obligations by award.

**AMOUNT –** The amount of funds provided from a particular appropriation and project code. Some notifications authorize more than one amount from separate appropriations and/or project codes. The total of all amounts in this block equals the amount shown on the line, "THIS ACTION" (See "AUTHORIZED FUNDING" above (Block 7)).

**10. TERMS AND CONDITIONS –** Requirements of the award that are binding on the recipient.

**\*PARTICIPANT NUMBER –** The number of eligible participants the grantee is required to serve during the budget year.

**\*GRANTEE NAME –** The entity name and address registered in the System for Award Management (SAM). This name and address is tied to the UEI registered in SAM under the name and address appearing in this field. This name, address and the associated UEI is what is displayed in the SAM Public Search.

**\*PROGRAM INDIRECT COST TYPE –** The type of indirect cost permitted under the program (i.e. Restricted, Unrestricted, or Training).

**\*PROJECT INDIRECT COST RATE –** The indirect cost rate applicable to this grant.

**\*AUTHORIZING OFFICIAL –** The U.S. Department of Education official authorized to award Federal funds to the recipient, establish or change the terms and conditions of the award, and authorize modifications to the award

**FOR FORMULA AND BLOCK GRANTS ONLY:**
**(See also Blocks 1, 2, 4, 6, 8, 9 and 10 above)**
**3. PROJECT STAFF –** The U.S. Department of Education staff persons to be contacted for programmatic and payment questions.
**7. AUTHORIZED FUNDING**

**CURRENT AWARD AMOUNT –** The amount of funds that are obligated (added) or de-obligated (subtracted) by this action.

**PREVIOUS CUMULATIVE AMOUNT –** The total amount of funds awarded under the grant before this action.

**CUMULATIVE AMOUNT –** The total amount of funds awarded under the grant, this action included.

---

\* This item differs or does not appear on formula and block grants.

# UNITED STATES DEPARTMENT OF EDUCATION
## OFFICE OF THE CHIEF FINANCIAL OFFICER
## & CHIEF INFORMATION OFFICER

Tabitha Grossman
National Center for Teacher Residencies
1332 N. Halsted Street
#304

CHICAGO, IL 60642

SUBJECT: Payee Verification for Grant Award S423A220008

This is to inform you of the payee for the above listed grant award issued by the United States
Department of Education

Grantee UEI/SSN: DMKFJA9LJ9J5
Grantee Name: NATIONAL CENTER FOR TEACHER RESIDENCIES, INC.

Payee UEI/SSN: DMKFJA9LJ9J5
Payee Name: NATIONAL CENTER FOR TEACHER RESIDENCIES, INC.

If any of the above information is not correct, please contact a Payee Customer Support
Representative at 1-888-336-8930. Please send all the correspondence relating to the payee or
bank information changes to the following address:

U.S. Department of Education
550 12th Street, SW
Room 6087
Washington, DC 20202

Attn: Stephanie Barnes
Phone: 202-245-8006

JA 497

**GAN ATTACHMENT 2**
**Revised 03/2021**

## SPECIFIC GRANT TERMS AND CONDITIONS FOR
## FINANCIAL AND PERFORMANCE REPORTS

**PERFORMANCE REPORTS**:

**(1) FINAL REPORTS - ALL RECIPIENTS** are required to submit a final performance report within 120 days after the expiration or termination of grant support in accordance with submission instructions provided in box 10 of the Grant Award Notification (GAN), or through another notification provided by the Department of Education (Department) (2 CFR § 200.329(c)).

**(2) ANNUAL, QUARTERLY, or SEMIANNUAL REPORTS - ALL RECIPIENTS** of a multi-year discretionary award must submit an annual Grant Performance Report (34 CFR § 75.118). The annual performance report shall provide the most current performance and financial expenditure information that is sufficient to meet the reporting requirements of 2 CFR §§ 200.328, 200.329, and 34 CFR § 75.720.

Your education program contact will provide you with information about your performance report submissions, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification provided by the Department. The grant term or condition in box 10 on the GAN or another notification may reflect any of the following:

1. That a performance report is due before the next budget period begins. The report should contain current performance and financial expenditure information for this grant. It will either identify the date the performance report is due or state that the Department will provide additional information about this report, including due date, at a later time.

2. That an interim performance report is required because of the nature of the award or because of statutory or regulatory provisions governing the program under which this award is made, and that the report is due more frequently than annually as indicated, e.g., due quarterly and submitted within 30 days after the end of each quarter, or due semiannually and submitted within 30 days after the end of each 6-month period (2 CFR § 200.329(c)(1)).

3. That other reports are required, e.g., program specific reports required in a program's statute or regulation.

**(3) FINANCIAL REPORTS – SOME RECIPIENTS:**

If a financial report is required, your education program contact will provide you with information about your financial report submission, including the due date, as a grant term or condition in box 10 on the GAN, or through another notification.

A Standard Form (SF) 425 Federal Financial Report (FFR) is required if:

1. A grant involves cost sharing, and the ED 524B, which collects cost sharing information, is not submitted or a program-specific report approved by U.S. Office of Management and Budget (OMB) does not collect cost sharing information;
2. Program income was earned;

1

JA 498

**GAN ATTACHMENT 2**
**Revised 03/2021**

3. Indirect cost information is to be reported and the ED 524B was not used or a program-specific report approved by OMB does not collect indirect cost information;
4. Program regulations or statute require the submission of the FFR; or
5. Specific Award Conditions, or specific grant or subgrant conditions for designation of "high risk," were imposed in accordance with 2 C.F.R. part 200.208 and part 3474.10 and required the submission of the FFR.

If the FFR is required, the notification may indicate one of the following (see the form and its instructions at Standard Form (SF) 425 Federal Financial Report (FFR)):

1. Quarterly - FFRs are required for reporting periods ending on 12/31, 03/31, 06/30, 09/30, and are due within 30 days after each reporting period.

2. Semi-annual - FFRs are required for reporting periods ending on 03/31 and 09/30, and are due within 30 days after each reporting period.

3. Annual - FFRs are required for reporting period ending 09/30, and is due within 30 days after the reporting period.

4. Final - In coordination with the submission of final performance reports, FFRs are due within 120 days after the project or grant period end date (2 CFR 200.328).

When completing an FFR for submission, the following must be noted:

1. *Multiple Grant Reporting Using SF 425A Prohibited:* While the FFR is a governmentwide form that is designed for single grant and multiple grant award reporting, the Department's policy is that multiple grant award reporting is not permitted for Department grants. Thus, a Department grantee that is required to submit an FFR in accordance with any of the above referenced selections must complete and submit one FFR for each of its grants. Do not use the FFR attachment (Standard Form 425A), which is available for reporting multiple grants, for reporting on Department grants. As such, references to multiple grant reporting and to the FFR attachment in items 2, 5 and 10 of the FFR are not applicable to Department grantees. With regards to item 1 of the note found in the FFR Instructions, a grantee must complete items 10(a) through 10(o) for each of its grants. The multiple award, multiple grant, and FFR attachment references found in items 2, 5, 6, before 10(a), in item 10(b), before 10(d), before 10(i) and before 10(l) of the Line Item Instructions for the FFR are not applicable to Department grants.

2. *Program Income*: Unless disallowed by statute or regulation, a grantee will complete item 10(m) or 10(n) in accordance with the options or combination of options as provided in 2 CFR Part 200.307. A grantee is permitted, in accordance with 2 CFR Part 200.307, to add program income to its Federal share to further eligible project or program objectives, use program income to finance the non-Federal share of the project or program; and deduct program income from the Federal share of the total project costs.

3. *Indirect Costs:* A grantee will complete item 11(a) by listing the indirect cost rate type identified on its indirect cost rate agreement, as approved by its cognizant agency for indirect costs.

2

JA 499

**GAN ATTACHMENT 2**
Revised 03/2021

A Department grantee that does not have an indirect cost rate agreement approved by its cognizant agency for indirect costs, and that is using the Department approved (beyond the 90-day temporary period) temporary indirect cost rate of 10% of budgeted direct salaries and wages, or the de minimis rate of 10% of modified total direct cost (MTDC) must list its indirect cost rate in 11(a) as a Department Temporary Rate or De Minimis Rate.  The de minimis rate of 10% of MTDC consists of:

> All direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $25,000 of each subaward (i.e., subgrant). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items, including contract costs in excess of $25,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (see definition of MTDC at 2 CFR § 200.1).

A training program grantee whose recovery of indirect cost limits indirect cost recovery to 8% of MTDC or the grantees negotiated indirect cost rate, whichever is less in accordance with EDGAR § 75.562 (c), must list its rate in 11(a) as a Department Training Grant Rate.  The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States[1] as defined in 2 CFR § 200.1

A restricted program grantee must list its rate as a Restricted Indirect Cost Rate in 11(a).  A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant agency for indirect costs, or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR 75.563 and 76.564 – 76.569, is not less than 8% MTDC.  A State or local government[2] that is a restricted program grantee may not elect to utilize the 8% MTDC rate.  Additionally, restricted program grantees may not utilize the de minimis rate, but may utilize the temporary rate until a restricted indirect cost rate is negotiated.  If a restricted program grantee elects to utilize the temporary rate, it must list its rate as a Department Temporary Rate in 11(a).

Grantees with indirect cost rates prescribed in program statute or regulation must list their rate as a Rate Required in Program Statute or Regulation in 11(a).  Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery.

For detailed information including restrictions related to temporary, de minimis, training, restricted, and program prescribed indirect cost rates see GAN ATTACHMENT 4.

4.  *Supplemental Pages:* If grantees need additional space to report financial information, beyond what is available within the FFR, they should provide supplemental pages. These additional pages must indicate the following information at the top of each page: the PR/Award Number

---

[1] Note that a State-funded institution of higher education is not considered a  State government  for these purposes; and a Tribal college or university funded by a federally-recognized Tribe is not considered a Tribe for these purposes.
[2] Note that a State-funded institution of higher education is not considered a  State government  for these purposes.

JA 500

also known as the Federal Identifying Number or FAIN, recipient organization, Unique Entity Identifier, Employer Identification Number (EIN), and period covered by the report.

4

## AN OVERVIEW OF SINGLE AUDIT REQUIREMENTS OF STATES,
## LOCAL GOVERNMENTS, AND NONPROFIT ORGANIZATIONS

This GAN ATTACHMENT is **not** applicable to for-profit organizations.  For-profit organizations comply with audit requirements specified in block 10 of their Grant Award Notification (GAN).

**Summary of Single Audit Requirements for States, Local Governments and Nonprofit Organizations:**

1.  Single Audit.  A non-Federal entity (a State, local government, Indian tribe, Institution of Higher Education (IHE)[1], or nonprofit organization) that expends $750,000 or more during the non-Federal entity's fiscal year in Federal awards must have a single audit conducted in accordance with 2 CFR 200.501, "Audit Requirements," except when it elects to have a program specific audit conducted.

2.  Program-specific audit election.  When an auditee expends Federal awards under only one Federal program (excluding research and development (R D)), and the Federal program's statutes, regulations, or the terms and conditions of the Federal award do not require a financial statement audit of the auditee, the auditee may elect to have a program–specific audit conducted.  A program–specific audit may not be elected for R D unless all of the Federal awards expended were received from the same Federal agency, or the same Federal agency and the same pass-through entity, and that Federal agency, or pass-through entity in the case of a subrecipient, approves in advance a program-specific audit.

3.  Exemption when Federal awards expended are less than $750,000.  A non-Federal entity that expends less than $750,000 during the non-Federal entity's fiscal year in Federal awards is exempt from Federal audit requirements for that year, except as noted in 2 CFR 200.503, but records must be available for review or audit by appropriate officials of the Federal agency, pass-through entity, and Government Accountability Office (GAO). Generally, grant records must be maintained for a period of three years after the date of the final expenditure report (2 CFR § 200.334)

4.  Federally Funded Research and Development Centers (FFRDC).  Management of an auditee that owns or operates a FFRDC may elect to treat the FFRDC as a separate entity.

5.  Report Submission.  To meet audit requirements of U.S. Office of Management and Budget (OMB) Uniform Guidance: Cost Principles, Audit, and Administrative Requirements for Federal Awards (Uniform Guidance), grantees must submit all audit documents required by Uniform Guidance 2 CFR 200.512, including Form SF-SAC: Data Collection Form electronically to the Federal Audit Clearinghouse at:

---

[1] As defined under the Higher Education Act of 1965, as amended (HEA) section 101.

https://facides.census.gov/Account/Login.aspx.

The audit must be completed, and the data collection form and reporting package must be submitted within the earlier of 30 calendar days after receipt of the auditor's report(s), or nine months after the end of the audit period.  If the due date falls on a Saturday, Sunday, or Federal holiday, the reporting package is due the next business day.  Unless restricted by Federal statutes or regulations, the auditee must make copies available for public inspection.  Auditees and auditors must ensure that their respective parts of the reporting package do not include protected personally identifiable information. (2 CFR 200.512)

Grantees are strongly urged to obtain the "OMB Compliance Supplement" and to contact their cognizant agency for single audit technical assistance.

The designated cognizant agency for single audit purposes is "the Federal awarding agency that provides the predominant amount of direct funding to the recipient."  Grantees should obtain a copy of the OMB Compliance supplement.  This supplement will be instructive to both grantees and their auditors. Appendix III of the supplement provides a list of Federal Agency Contacts for Single Audits, including addresses, phone numbers, fax numbers, and e-mail addresses for technical assistance.

For single audit-related questions, if the U.S. Department of Education is the cognizant agency, grantees should contact the Non-Federal Audit Team in the Department's Office of Inspector General, at oignon-federalaudit@ed.gov.  Additional resources for single audits are also available on the Non-Federal Audit Team's website at https://www2.ed.gov/about/offices/list/oig/nonfed/index.html.  For programmatic questions, grantees should contact the education program contact shown on the Department's GAN.

Grantees can obtain information on single audits from:

The OMB website at www.omb.gov.  Look under Office of Management and Budget (in right column) then click Office of Federal Financial Management (to obtain OMB Compliance Supplement).  The SF-SAC: Data Collection Form can be found at the Federal Audit Clearinghouse at: https://facides.census.gov/Files/2019-2021%20Checklist%20Instructions%20and%20Form.pdf.

The American Institute of Certified Public Accountants (AICPA) has illustrative OMB Single Audit report examples that might be of interest to accountants, auditors, or financial staff at www.aicpa.org.

JA 503

**GAN ATTACHMENT 6**
**Revised 03/2021**

## REQUEST FOR APPROVAL OF PROGRAM INCOME

In projects that generate program income, the recipient calculates the amount of program income according to the guidance given in 2 CFR Part 200.307.

**\*\*\* IF YOU RECEIVED YOUR GRANT AWARD NOTIFICATION ELECTRONICALLY AND YOU ARE SUBJECT TO ANY OF THE RESTRICTIONS IDENTIFIED BELOW, THE RESTRICTION(S) WILL APPEAR IN BOX 10 ON YOUR GRANT AWARD NOTIFICATION AS A GRANT TERM OR CONDITION OF THE AWARD. \*\*\***

Unless checked below as NOT ALLOWED, the recipient may exercise any of the options or combination of options, as provided in 2 CFR Part 200.307, for using program income generated in the course of the recipient's authorized project activities:

Not Allowed  Adding program income to funds committed to the project by the Secretary and recipient and using it to further eligible project or program objectives;

Not Allowed  Using program income to finance the non-Federal share of the project or program; and

Not Allowed  Deducting program income from the total allowable cost to determine the net allowable costs.

1

JA 504

## TRAFFICKING IN PERSONS

The Department of Education adopts the requirements in the Code of Federal Regulations at 2 CFR 175 and incorporates those requirements into this grant through this condition. The grant condition specified in 2 CFR 175.15(b) is incorporated into this grant with the following changes. Paragraphs a.2.ii.B and b.2. ii. are revised to read as follows:

> "a.2.ii.B. Imputed to you or the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 34 CFR part 85."

> "b.2. ii. Imputed to the subrecipient using the standards and due process for imputing the conduct of an individual to an organization that are provided in 34 CFR part 85."

Under this condition, the Secretary may terminate this grant without penalty for any violation of these provisions by the grantee, its employees, or its subrecipients.

JA 505

**FEDERAL FUNDING ACCOUNTABILITY TRANSPARENCY ACT**
**REPORTING SUBAWARDS AND EXECUTIVE COMPENSATION**

The Federal Funding Accountability and Transparency Act (FFATA) is designed to increase transparency and improve the public's access to Federal government information.  To this end, FFATA requires that Department of Education (Department) grant recipients:

1. Report **first-tier subawards** made under Federal grants that are funded at $30,000 or more that meet the reporting conditions as set forth in this grant award term;
2. Report their executives' compensation for all new Federal grants that are funded at $30,000 and that meet the reporting conditions as set forth in this grant award term; and
3. Report executive compensation data for their **first-tier subrecipients** that meet the reporting conditions as set forth in this grant award term.

For FFATA reporting purposes, the Department grant recipient is the entity listed in box 1 of the Grant Award Notification.

Only **first-tier subawards** made by the Department grant recipient to its **first-tier subrecipients** and the **first-tier subrecipients'** executive compensation are required to be reported in accordance with FFATA.

*Suba ard Subrecipient Recipient   otal Compensation    ecuti es*, and other key terms, are defined within item 5, Definitions, of this grant award term.

This grant award term is issued in accordance with 2 CFR Part 170   Reporting Subaward And Executive Compensation Information.

1. ***Reporting of First-tier Subawards -***

a. *Applicabilit  and   hat to report*

Unless you are exempt as provided item 4, Exemptions, of this grant award term, you must report each obligation that **equals or exceeds $30,000** in Federal funds for a first-tier subaward to a non-Federal entity or Federal agency.

You must report the information about each obligating action that are specified in the submission instructions posted at FSRS.

b.    *here and   hen to report*

The Department grant recipient must report each obligating action described in paragraph **1.a.** of this award term to FSRS

Report subaward information no later than the end of the month following the month in which the subaward obligation was made. For example, if the obligation was made on November 7, 2020, the obligation must be reported by no later than December 31, 2020.

2. ***Reporting Total Compensation of the Department's Grant Recipients' Executives -***

JA 506

a. *Applicabilit   and   hat to report*

You must report total compensation for each of your five most highly compensated executives for the preceding completed fiscal year, if

i   The total Federal funding authorized to date under this Federal award **equals or exceeds $30,000**;

ii   In the preceding fiscal year, you received

A.   80 percent or more of your annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**

B.   $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and,**

C.   The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986.  (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at SEC Investor.gov Executive Compensation )

b.   *here and   hen to report*

You must report executive total compensation described in paragraph **2.a.** of this grant award term:

i.   As part of your registration profile at SAM.gov

ii.   By the end of the month following the month in which this award is made (for example, if the obligation was made on November 7, 2020 the executive compensation must be reported by no later than December 31, 2020), and annually thereafter.

**3.   *Reporting of Total Compensation of Subrecipient Executives –***

a.   *Applicabilit   and   hat to report*

Unless you are exempt as provided in item 4, Exemptions, of this award term, for each first-tier **non-Federal entity** subrecipient under this award, you shall report the names and total compensation of each of the subrecipient's five most highly compensated executives for the subrecipient's preceding completed fiscal year, if

i.   In the subrecipient's preceding fiscal year, the subrecipient received

JA 507

    A. 80 percent or more of its annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards), **and**

    B. $25,000,000 or more in annual gross revenues from Federal procurement contracts (and subcontracts) and Federal financial assistance subject to the Transparency Act, as defined at 2 CFR 170.320 (and subawards); **and**,

    C. The public does not have access to information about the compensation of the executives through periodic reports filed under section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a), 78o(d)) or section 6104 of the Internal Revenue Code of 1986. (To determine if the public has access to the compensation information, see the U.S. Security and Exchange Commission total compensation filings at SEC Investor.gov Executive Compensation )

b. *here and hen to report*

You must report subrecipient executive total compensation described in paragraph **3.a.** of this grant award term:

i. In FSRS. You must include a condition on subawards that requires the subrecipients to timely report the information required under paragraph **3.a.** to you the prime awardee, or in the SAM.gov. Subrecipient executive compensation entered in SAM.gov by the subrecipient will pre-populate in FSRS, so you do not have to report when subrecipients enter this information in SAM.gov. Subrecipient executive compensation not entered in SAM.gov by the subrecipient is reported in FSRS by you the Department grant recipient.

ii. By the end of the month following the month during which you make the subaward. For example, if the subaward obligation was made on November 7, 2020 the subrecipient's executive compensation must be reported by no later than December 31, 2020.

**4. *Exemptions –***

a. If, in the previous tax year, you had gross income, from all sources, under $300,000, you are exempt from the requirements to report:

i. Subawards, and

ii. The total compensation of the five most highly compensated executives of any **subrecipient**.

**5. *Definitions -***

a. For purposes of this award term:

i. Federal *Agenc* means a Federal agency as defined at 5 U.S.C. 551(1) and further clarified by 5 U.S.C. 552(f).

ii. Non-Federal *ntit* means all of the following, as defined in 2 CFR part 25:

A Governmental organization, which is a State, local government, or Indian tribe;

JA 508

**GAN ATTACHMENT – 9**
**Revised 03/2021**

A foreign public entity;

A domestic or foreign nonprofit organization; and,

A domestic or foreign for-profit organization

iii.    *ecuti e* means officers, managing partners, or any other employees in management positions.

iv.    *bligation*, when used in connection with a non-Federal entity's utilization of funds under a Federal award, means orders placed for property and services, contracts and subawards made, and similar transactions during a given period that require payment by the non-Federal entity during the same or a future period.

v.    *Suba ard:*

This term means a legal instrument to provide support for the performance of any portion of the substantive project or program for which you received this award and that you as the recipient award to an eligible subrecipient.

The term does not include your procurement of property and services (such as payments to a contractor, small purchase agreements, vendor agreements, and consultant agreements) that are needed for the benefit of the prime awardee to carry out the project or program (for further explanation, see 2 CFR 200.331).  For example, the following are not considered subawards:

> *Cleaning   endors:*  endors that are hired by a grantee to clean its facility.
> *Pa roll Ser ices   endors:*  endors that carryout payroll functions for the grantee.
> *In ormation   echnolog   endors:*  endors that provide IT support to grant staff.

Payments to individuals that are beneficiaries of Federal programs are not considered subawards.

A subaward may be provided through any legal agreement, including an agreement that you or a subrecipient considers a contract.

v.    *Subrecipient* means a non-Federal entity or Federal agency that:

Receives a subaward from you (the recipient) under this award; and

Is accountable to you for the use of the Federal funds provided by the subaward.

In accordance with its subaward, uses the Federal funds to carry out a program for a public purpose specified in authorizing statute, as opposed to providing goods or services for the benefit of the Department prime awardee.

4

JA 509

vii.   *Recipient* means a non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program. The term recipient does not include subrecipients.  See also §200.69 Non-Federal entity.

viii.   *otal compensation* means the cash and noncash dollar value earned by the executive during the recipient's or subrecipient's preceding fiscal year and includes the following (for more information see 17 CFR 229.402(c)(2)):

Salary and bonus.

Awards of stock, stock options, and stock appreciation rights.  Use the dollar amount recognized for financial statement reporting purposes with respect to the fiscal year in accordance with the Statement of Financial Accounting Standards No. 123 (Revised 2004) (FAS 123R), Shared Based Payments.

Earnings for services under non-equity incentive plans.  This does not include group life, health, hospitalization, or medical reimbursement plans that do not discriminate in favor of executives and are available generally to all salaried employees.

Change in pension value.  This is the change in present value of defined benefit and actuarial pension plans.

Above-market earnings on deferred compensation which is not tax-qualified.

Other compensation, if the aggregate value of all such other compensation (e.g., severance, termination payments, value of life insurance paid on behalf of the employee, perquisites, or property) for the executive exceeds $10,000.

JA 510

**GAN ATTACHMENT 11**
**Revised 03/2021**

### SPECIFIC CONDITIONS FOR DISCLOSING
### FEDERAL FUNDING IN PUBLIC ANNOUNCEMENTS

When issuing statements, press releases, requests for proposals, bid solicitations and other documents describing projects or programs funded in whole or in part with Federal money, U.S. Department of Education grantees shall clearly state:

1) the percentage of the total costs of the program or project which will be financed with Federal money;

2) the dollar amount of Federal funds for the project or program; and

3) the percentage and dollar amount of the total costs of the project or program that will be financed by non-governmental sources.

Recipients must comply with these conditions under Division H, Title , Section 505 of Public Law 116-260, Consolidated Appropriations Act, 2021.

1

JA 511

**GAN ATTACHMENT 12**
**Revised 03/2021**

### PROHIBITION OF TEXT MESSAGING AND EMAILING WHILE DRIVING
### DURING OFFICIAL FEDERAL GRANT BUSINESS

Federal grant recipients, sub recipients and their grant personnel are prohibited from text messaging while driving a government owned vehicle, or while driving their own privately-owned vehicle during official grant business, or from using government supplied electronic equipment to text message or email when driving.

Recipients must comply with these conditions under Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," October 1, 2009.

JA 512

GAN ATTACMENT 13
Revised 03/2021

**REGISTRATION OF UNIQUE ENTITY IDENTIFIER (UEI) NUMBER AND TAXPAYER
IDENTIFICATION NUMBER (TIN) IN THE SYSTEM FOR AWARD MANAGEMENT (SAM)**

The U.S. Department of Education (Department) Grants Management System (G5) disburses payments
via the U.S. Department of Treasury (Treasury).  The U.S. Treasury requires that we include your Tax
Payer Identification Number (TIN) with each payment.   Therefore, in order to do business with the
Department you must have a registered Unique Entity Identifier (UEI) and TIN number with the SAM,
the U.S. Federal Government's primary registrant database.  If the payee UEI number is different than
your grantee UEI number, both numbers must be registered in the SAM. Failure to do so will delay the
receipt of payments from the Department.

A TIN is an identification number used by the Internal Revenue Service (IRS) in the administration of tax
laws. It is issued either by the Social Security Administration (SSA) or by the IRS. A Social Security
number (SSN) is issued by the SSA whereas all other TINs are issued by the IRS.

The following are all considered TINs according to the IRS.

- Social Security Number "SSN"
- Employer Identification Number "EIN"
- Individual Taxpayer Identification Number "ITIN"
- Taxpayer Identification Number for Pending U.S. Adoptions "ATIN"
- Preparer Taxpayer Identification Number "PTIN"

If your UEI number is not currently registered with the SAM, you can easily register by going to
www.sam.gov.  Please allow 3-5 business days to complete the registration process.  If you need a new
TIN, please allow 2-5 weeks for your TIN to become active.  If you need assistance during the
registration process, you may contact the SAM Federal Service Desk at 866-606-8220.

If you are currently registered with SAM, you may not have to make any changes.  However, please take
the time to validate that the TIN associated with your UEI is correct.

If you have any questions or concerns, please contact the G5 Hotline at 888-336-8930.

JA 513

GAN ATTACHEMENT 14
Revised 03/2021

## SYSTEM FOR AWARD MANAGEMENT AND UNIVERSAL IDENTIFIER REQUIREMENTS

**1.    Requirement for System for Award Management (SAM)**

Unless you are exempted from this requirement under 2 CFR 25.110, you are, in accordance with your grant program's Notice Inviting Applications, required to maintain an active SAM registration with current information about your organization, including information on your immediate and highest level owner and subsidiaries, as well as on all predecessors that have been awarded a Federal contract or grant within the last three years, if applicable, at all times during which you have an active Federal award or an application or plan under consideration by a Federal awarding agency.  To remain registered in the SAM database after your initial registration, you are required to review and update your information in the SAM database on an annual basis from the date of initial registration or subsequent updates to ensure it is current, accurate and complete.

**2.    Requirement for Unique Entity Identifier (UEI) Numbers**

If you are authorized to make subawards under this award, you:

1.    Must notify potential subrecipients that they may not receive a subaward from you unless they provided their UEI  number to you.
2.    May not make a subaward to a subrecipient when the subrecipient fails to provide its UEI number to you.

**3.    Definitions**

For purposes of this award term:

1.    System for Award Management (SAM) means the Federal repository into which a recipient must provide information required for the conduct of business as a recipient.  Additional information about registration procedures may be found at the SAM internet site (currently at https://www.sam.gov).

2.    Unique Entity Identifier (UEI) means the identifier assigned by SAM registration to uniquely identify business entities.

3.    Recipient means a non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program.  The term recipient does not include subrecipients.  See 2 CFR 200.86.

4.    Subaward means an award provided by a pass-through entity to a subrecipient for the subrecipient to carry out part of a Federal award received by the pass-through entity.  It does not include payments to a contractor or payments to an individual that is a beneficiary of a Federal program.  A subaward may be provided through any form of legal agreement, including an agreement that the pass-through entity considers a contract. See 2 CFR 200.92.

1

JA 514

5.  Subrecipient means a non-Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program.  A subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency. See 2 CFR 200.93.

JA 515

GAN ENCLOSURE 1
Revised 03/2021

**KEY FINANCIAL MANAGEMENT REQUIREMENTS FOR DISCRETIONARY GRANTS
AWARDED BY THE DEPARTMENT OF EDUCATION**

The Department expects grantees to administer Department grants in accordance with generally accepted business practices, exercising prudent judgment so as to maintain proper stewardship of taxpayer dollars.  This includes using fiscal control and fund accounting procedures that insure proper disbursement of and accounting for Federal funds.  In addition, grantees may use grant funds only for obligations incurred during the funding period.

Title 2 of the Code of Federal Regulations Part 200, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards," establishes requirements for Federal awards made to non-Federal entities.  The Education Department General Administrative Regulations in 34 CFR (EDGAR) 75, 76, 77, 79, 81, 82, 84, 86, 97, 98, and 99 contain additional requirements for administering discretionary grants made by this Department.  The most recent version of these regulations may be accessed at the following URLs:

The Education Department General Administrative Regulations (EDGAR)

 2 CFR Part 200 Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards

The information on page 2, "Selected Topics in Administering Department Discretionary Grants," highlights major administrative requirements of 2 CFR Part 200.  In addition, a few of the topics discuss requirements that the Department imposes on its discretionary grantees under EDGAR, Part 75 (Direct Grants).  The specific sections of 2 CFR Part 200 and of EDGAR that address the topics discussed are shown in parentheses.  The Department urges grantees to read the full text of these and other topics in EDGAR and in 2 CFR Part 200.

Grantees are reminded that a particular grant might be subject to additional requirements of the authorizing statute for the program that awarded the grant and/or any regulations issued by the program office.  Grantees should become familiar with those requirements as well, because program-specific requirements might differ from those in 2 CFR Part 200 and in EDGAR.

The Department recommends that the project director and the fiscal management staff of a grantee organization communicate frequently with each other about the grant budget.  Doing so will help to assure that you use Federal funds only for those expenditures associated with activities that conform to the goals and objectives approved for the project.

Grantees may direct any questions regarding  the topics discussed on page 2, "Selected Topics in Administering Department Discretionary Grants,"or about any other aspect of administering your grant award to the Department program staff person named in Block 3 of the Grant Award Notification.

JA 516

**SELECTED TOPICS IN ADMINISTERING DEPARTMENT DISCRETIONARY GRANTS**

**I.      Financial Management Systems (2 CFR Part 200.302)**

In general, grantees are required to have financial management systems that:

* provide for accurate, current, and complete disclosure of results regarding the use of funds under grant projects;
* provide adequate source documentation for Federal and non-Federal funds used under grant projects;
* contain procedures to determine the allowability, allocability, and reasonableness of obligations and expenditures made by the grantee; and
* enable the grantee to maintain effective internal control and fund accountability procedures, e.g., requiring separation of functions so that the person who makes obligations for the grantee is not the same person who signs the checks to disburse the funds for those obligations.

State systems must account for funds in accordance with State laws and procedures that apply to the expenditure of and the accounting for a State's own funds. A State's procedures, as well as those of its subrecipients and cost-type contractors, must be sufficient to permit the preparation of reports that may be required under the award as well as provide the tracing of expenditures to a level adequate to establish that award funds have not been used in violation of any applicable statutory restrictions or prohibitions.

**II.      Federal Payment (2 CFR Part 200.305)**

Under this part --

* the Department pays grantees in advance of their expenditures if the grantee demonstrates a willingness and ability to minimize the time between the transfer of funds to the grantee and the disbursement of the funds by the grantee;
* grantees repay to the Federal government interest earned on advances; and
* grantees, generally, must maintain advance payments of Federal awards in interest bearing accounts.

In general, grantees should make payment requests frequently, only for small amounts sufficient to meet the cash needs of the immediate future.

The Department has recently encountered situations where grantees failed to request funds until long after the grantee actually expended its own funds for the costs of its grant. Grantees need to be aware that, by law, Federal funds are available for grantees to draw down for only a limited period of time, after which the funds revert to the U.S. Treasury. In some cases grantees have requested funds too late for the Department to be able to pay the grantees for legitimate costs incurred during their project periods.

JA 517

The Department urges financial managers to regularly monitor requests for payment under their grants to assure that Federal funds are drawn from the Department G5 Payment System at the time those funds are needed for payments to vendors and employees.

## III.    Personnel (EDGAR §§ 75.511-75.519 and 2 CFR Part 200 Subpart D and E)

The rules governing personnel costs are located in EDGAR Part 75 and 2 CFR Part 200 Subparts D and E.  Part 75 covers issues such as paying consultants with grant funds, prohibiting dual compensation of staff, and waiving the requirement for a full-time project director.  The rules clarifying changes in key project staff are located in 2 CFR Part 200.308 (c)(2).  General rules governing reimbursement of salaries and compensation for staff working on grant projects are addressed in the cost principles in 2 CFR Part 200 Subpart D and E.  In all cases, payments of any type to personnel must be supported by complete and accurate records of employee time and effort.  For those employees that work on multiple functions or separately funded programs or projects, the grantee must also maintain time distribution records to support the allocation of employee salaries among each function and separately funded program or project.

## IV.    Cost Principles (2 CFR Part 200 Subpart E)

All costs incurred under any grant are subject to the cost principles found in 2 CFR Part 200 Subpart E.  The cost principles provide lists of selected items of allowable and unallowable costs, and must be used in determining the allowable costs of work performed under the grant.

## V.    Procurement Standards (2 CFR Part 200.317-327)

Under 2 CFR Part 200.317, States are required to follow the procurement rules the States have established for purchases funded by non-Federal sources.  When procuring goods and services for a grant's purposes, all other grantees may follow their own procurement procedures, but only to the extent that those procedures meet the minimum requirements for procurement specified in the regulations.  These requirements include written competition procedures and codes of conduct for grantee staff, as well as requirements for cost and price analysis, record-keeping and contractor compliance with certain Federal laws and regulations.  These regulations also require grantees to include certain conditions in contracts and subcontracts, as mandated by the regulations and statutes.

## VI.    Indirect Costs (EDGAR §§75.560-564 and 2 CFR Part 200.414)

In addition to the information presented beslow, see GAN ATTACHMENT 4 for addional information including restrictions related to temporary, de minimis, training, restricted, and program prescribed indirect cost rates.

A.   Unrestricted Indirect Cost Rate

To utilize an unrestricted indirect cost rate, a grantee must have an indirect cost agreement with its cognizant agency, submit an indirect cost rate proposal to its cognizant agency for indirect

JA 518

costs (cognizant agency) within 90 days after the award of this grant or elect to utilize the de minimis rate under 2 CFR § 200.414(f) or the temporary indirect cost rate (subject to limitations described below).

The grantee must provide proof of its negotiated indirect cost rate agreement to the Department as soon as it has signed such an agreement with its cognizant agency.

B.   Temporary Indirect Cost Rate

A grantee that does not have a current negotiated indirect cost rate agreement may recover indirect costs at a temporary rate, which is limited to 10% of budgeted direct salaries and wages (See 34 CFR § 75.560(c)); or it may choose not to charge indirect costs to the grant. The temporary rate can only be used for 90 days unless the exceptional circumstances apply under 34 CFR § 75.560(d)(2).

If the grantee has not submitted its indirect cost proposal to its cognizant agency within the 90-day period, it may no longer recover indirect costs utilizing the temporary indirect cost rate until it has negotiated an indirect cost rate agreement with its cognizant agency. Once a grantee obtains a federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

C.   De minimis Indirect Cost Rate

Institutions of Higher Education (IHEs), federally-recognized Indian Tribes, State and Local Governments[1] receiving less than $35 million in direct federal funding, and nonprofit organizations, if they do not have a current negotiated (including provisional) rate, and are not subject to the Department's training rate or restricted rate (supplement-not-supplant provisions) may elect to charge a de minimis  indirect cost rate of 10% of modified total direct costs (MTDC). This rate may be used indefinitely.

MTDC consists of all direct salaries and wages, applicable fringe benefits, materials and supplies, services, travel, and subawards and contracts up to the first $25,000 of each subaward (i.e., subgrant). MTDC excludes equipment, capital expenditures, charges for patient care, rental costs, tuition remission, scholarships and fellowships, participant support costs and the portion of each subaward in excess of $25,000. Other items, including contract costs in excess of $25,000, may be excluded when necessary to avoid a serious inequity in the distribution of indirect costs (see definition of MTDC at 2 CFR § 200.1).

Additionally, the de minimis rate may not be used by grantees that are subject to the Department's training indirect cost rate (34 CFR § 75.562) or restricted indirect cost rate. The de minimis rate may be used indefinitely. However, if a grantee chooses to use the de minimis rate to recover indirect costs, it must do so for all of its Federal awards until such time as the grantee negotiates an indirect cost rate with its cognizant agency. Once a grantee obtains a federally recognized indirect cost rate that is applicable to this grant, the grantee may use that indirect cost rate to claim indirect cost reimbursement.

---

[1] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.

JA 519

D.   Programs with a Supplement-not-supplant requirement (restricted indirect cost rate)

A restricted program (i.e., programs with statutory supplement-not-supplant requirements) grantee must utilize a restricted indirect cost rate negotiated with its cognizant agency for indirect costs, or may elect to utilize a restricted indirect cost rate of 8% MTDC if their negotiated restricted indirect cost rate calculated under 34 CFR 75.563 and 76.564 – 76.569, is not less than 8% MTDC.  A State or local government[2] that is a restricted program grantee may not elect to utilize the 8% MTDC rate.  Additionally, restricted program grantees may not utilize the de minimis rate, but may utilize the temporary rate until a restricted indirect cost rate is negotiated.

E.   Training Grant Indirect Cost Rate

If the grantee is a training grant recipient and is not a State, local, or Tribal government[3], the grantee must negotiate a rate under 34 CFR 75.562. This provision limits indirect cost recovery to 8% of modified total direct costs or the grantees negotiated indirect cost rate, whichever is less.

The recovery using the training grant indirect cost rate is subject to the following limitations:

i.    The lesser of the 8% indirect cost rate or negotiated indirect cost rate also applies to sub-awards that fund training.
ii.   The 8% limit does not apply to agencies of Indian tribal governments, local governments, and States as defined in 2 CFR § 200.1, respectively.
iii.  Indirect costs in excess of the 8% limit may not be charged directly, used to satisfy matching or cost-sharing requirements, or charged to another Federal award.
iv.   A grantee using the training rate of 8% is required to have documentation available for audit that shows that its negotiated indirect cost rate is at least 8%.

F.   Program-Specific Indirect Cost Rate

Grantees are required to follow program-specific statutory or regulatory requirements that mandate either indirect cost rate type or maximum administrative costs recovery instead of the general requirements described here.

## VII.   Audit Requirements (2 CFR Part 200 Subpart F)

2 CFR 200 Subpart F requires that grantees that are non-Federal entities (a State, local government, Indian tribe, IHE, or nonprofit organization that carries out a Federal award as a recipient or subrecipient) obtain a non-Federal audit of their expenditures under their Federal grants if the grantee expends more than $750,000 in Federal funds in one fiscal year.  2 CFR Part 200 Subpart F contains the requirements imposed on grantees for

---

[2] Note that a State-funded institution of higher education is not considered a "State government" for these purposes.
[3] Note that a State-funded institution of higher education is not considered a "State government" for these purposes; and a Tribal college or university funded by a federally-recognized Tribe is not considered a Tribe for these purposes.

**GAN ENCLOSURE 1**
**Revised 03/2021**

audits done in connection with the law.

The Department recommends hiring auditors who have specific experience in auditing Federal awards under the regulations and the Compliance Supplement.

**VIII.    Other Considerations**

Some other topics of financial management covered in 2 CFR Part 200 that might affect particular grants include program income (2 CFR Part 200.307), cost sharing or matching (2 CFR Part 200.306), property management requirements for equipment and other capital expenditures (2 CFR Parts 200.313, 200.439).

JA 521

GAN  ENCLOSURE 2
Revised 03/2021

## MEMORANDUM TO ED DISCRETIONARY GRANTEES

You are receiving this memorandum to remind you of Federal requirements, found in 2 CFR Part 200, *Uni orm Administrati e Re uirements  Cost Principles  and Audit Re uirements* regarding cash drawdowns under your grant account.

For any cash that you draw from your Department of Education (*the* Department) grant account, you must:

- draw down only as much cash as is necessary to meet the immediate needs of the grant project;
- keep to the minimum the time between drawing down the funds and paying them out for grant activities; and
- return to the Government the interest earned on grant funds deposited in interest-bearing bank accounts except for a small amount of interest earned each year that your entity is allowed to keep to reimburse itself for administrative expenses).

In order to meet these requirements, you are urged to:

- take into account the need to coordinate the timing of drawdowns with prior internal clearances (e.g., by boards, directors, or other officials) when projecting immediate cash needs so that funds drawn down from ED do not stay in a bank account for extended periods of time while waiting for approval;
- monitor the fiscal activity (drawdowns and payments) under your grant on a continuous basis;
- plan carefully for cash flow in your grant project during the budget period and review project cash requirements before each drawdown; and
- pay out grant funds for project activities as soon as it is practical to do so after receiving cash from the Department.

 eep in mind that the Department monitors cash drawdown activity for all grants. Department staff will contact grantees who appear to have drawn down excessive amounts of cash under one or more grants during the fiscal quarter to discuss the particular situation. For the purposes of drawdown monitoring, the Department will contact grantees who have drawn down 50% or more of the grant in the first quarter, 80% or more in the second quarter, and/or 100% of the cash in the third quarter of the budget period. However, even amounts less than these thresholds could still represent excessive drawdowns for your particular grant activities in any particular quarter. Grantees determined to have drawn down excessive cash will be required to return the excess funds to the Department, along with any associated earned interest, until such time as the money is legitimately needed to pay for grant activities.  If you need assistance with returning funds and interest, please contact the Department's G5 Hotline by calling 1-888-336-8930.

Grantees that do not follow Federal cash management requirements and/or consistently appear on the Department's reports of excessive drawdowns could be:

- subjected to specific award conditions or designated as a "high-risk" grantee [2 CFR Part 200.208 and 2 CFR 3474.10], which could mean being placed on a "cash-reimbursement" payment method (i.e., a grantee would experience the inconvenience of having to pay for grant activities with its own money and waiting to be reimbursed by the Department afterwards);

1

JA 522

**GAN  ENCLOSURE 2**
Revised 03/2021

- subject to further corrective action;
- denied selection for funding on future ED grant applications [EDGAR 75.217(d)(3)(ii)]; and/or
- debarred or suspended from receiving future Federal awards from any executive agency of the Federal government.

You are urged to read 2 CFR Part 200.305 to learn more about Federal requirements related to grant payments and to determine how to apply these requirements to any subgrantees. You are urged to make copies of this memorandum and share it with all affected individuals within your organization.

2

JA 523

**GAN ENCLOSURE 3**
**Revised 03/2021**

## THE USE OF GRANT FUNDS FOR CONFERENCES AND MEETINGS

You are receiving this memorandum to remind you that grantees must take into account the following factors when considering the use of grant funds for conferences and meetings:

- Before deciding to use grant funds to attend or host a meeting or conference, a grantee should:
  - Ensure that attending or hosting a conference or meeting is consistent with its approved application and is reasonable and necessary to achieve the goals and objectives of the grant;
  - Ensure that the primary purpose of the meeting or conference is to disseminate technical information, (e.g., provide information on specific programmatic requirements, best practices in a particular field, or theoretical, empirical, or methodological advances made in a particular field; conduct training or professional development; plan/coordinate the work being done under the grant); and
  - Consider whether there are more effective or efficient alternatives that can accomplish the desired results at a lower cost, for example, using webinars or video conferencing.

- Grantees must follow all applicable statutory and regulatory requirements in determining whether costs are reasonable and necessary, especially the Cost Principles for Federal grants set out at 2 CFR Part 200 Subpart E of the, "Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards."  In particular, remember that:
  - Federal grant funds cannot be used to pay for alcoholic beverages; and
  - Federal grant funds cannot be used to pay for entertainment, which includes costs for amusement, diversion, and social activities.

- Grant funds may be used to pay for the costs of attending a conference.  Specifically, Federal grant funds may be used to pay for conference fees and travel expenses (transportation, per diem, and lodging) of grantee employees, consultants, or experts to attend a conference or meeting if those expenses are reasonable and necessary to achieve the purposes of the grant.
  - When planning to use grant funds for attending a meeting or conference, grantees should consider how many people should attend the meeting or conference on their behalf.  The number of attendees should be reasonable and necessary to accomplish the goals and objectives of the grant.

- A grantee hosting a meeting or conference may not use grant funds to pay for food for conference attendees unless doing so is necessary to accomplish legitimate meeting or conference business.
  - A working lunch is an example of a cost for food that might be allowable under a Federal grant if attendance at the lunch is needed to ensure the full participation by conference attendees in essential discussions and speeches concerning the purpose of the conference and to achieve the goals and objectives of the project.

- A meeting or conference hosted by a grantee and charged to a Department grant must not be promoted as a U.S. Department of Education conference.  This means that the seal of the U.S. Department of Education must not be used on conference materials or signage without Department approval.

JA 524

**GAN ENCLOSURE 3**
Revised 03/2021

All meeting or conference materials paid for with grant funds must include appropriate disclaimers, such as the following:

> The contents of this (insert type of publication; e.g., book, report, film) were developed under a grant from the Department of Education.  However, those contents do not necessarily represent the policy of the Department of Education, and you should not assume endorsement by the Federal Government.

- Grantees are strongly encouraged to contact their project officer with any questions or concerns about whether using grant funds for a meeting or conference is allowable prior to committing grant funds for such purposes.

> A short conversation could help avoid a costly and embarrassing mistake.

- Grantees are responsible for the proper use of their grant awards and may have to repay funds to the Department if they violate the rules on the use of grant funds, including the rules for meeting- and conference-related expenses.

JA 525

## MEMORANDUM TO REMIND DEPARTMENT OF EDUCATION GRANTEES OF EXISTING CASH MANAGEMENT REQUIREMENTS CONCERNING PAYMENTS

The Department of Education (Department) requires that its grantees adhere to existing cash management requirements concerning payments and will ensure that their subgrantees are also aware of these policies by providing them relevant information.  A grantee's failure to comply with cash management requirements may result in an improper payment determination by the Department in accordance with the Payment Integrity Information Act (PIIA) of 2019.

There are three categories of payment requirements that apply to the drawdown of funds from grant accounts at the Department.  The first two types of payments are subject to the requirements in the Treasury Department regulations implementing the Cash Management Improvement Act (CMIA) of 1990, 31 U.S.C.6513, and the third is subject to the requirements in the *Uni orm Administrati e Re uirements Cost Principles  and Audit Re uirements  or Federal A ards* (Uniform Guidance) at 2 CFR part 200,[1] as follows:

1. Payments to a State under programs that are covered by a State's Treasury State Agreement (TSA);

2. Payments to States under programs that are not covered by a TSA; and

3. Payments to other non-Federal entities, including nonprofit organizations and local governments.

**CMIA Requirements Applicable to Programs included in a TSA**

Generally, under the Treasury Department regulations implementing the CMIA, only major assistance programs (large-dollar programs meeting thresholds in 31 CFR § 205.5) are included in a State's written TSA. See 31 CFR § 205, subpart A.  Programs included in a TSA must use approved funding techniques and both States and the Federal government are subject to interest liabilities for late payments. State interest liabilities accrue from the day federal funds are credited to a State account to the day the State pays out the federal funds for federal assistance program purposes. 31 CFR § 205.15.  If a State makes a payment under a Federal assistance program before funds for that payment have been transferred to the State, Federal Government interest liabilities accrue from the date of the State payment until the Federal funds for that payment have been deposited to the State account. 31 CFR § 205.14.

**CMIA Requirements Applicable to Programs Not Included in a TSA**

Payments to States under programs not covered by a State's TSA are subject to subpart B of Treasury's regulations in 31 CFR § 205.  These regulations provide that a State must minimize the time between the drawdown of funds from the federal government and their disbursement for approved program activities.  The timing and amount of funds transfers must be kept to a minimum and be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.  31 CFR § 205.33(a).  States should exercise sound cash management in funds transfers to subgrantees.

---

[1] The Department adopted the Uniform Guidance as regulations of the Department at 2 CFR part 3474.

JA 526

USCA4 Appeal: 25-1281     Doc: 37-1     Filed: 06/16/2025     Pg: 529 of 638
Case 1:25-cv-00702-JRR     Document 25-3     Filed 03/12/25     Page 42 of 48

GAN ENCLOSURE 4
Revised 03/2021

Under subpart B, neither the States nor the Department owe interest to the other for late payments. 31 CFR § 205.33(b). However, if a State or a Federal agency is consistently late in making payments, Treasury can require the program to be included in the State's TSA. 31 CFR § 205.35.

**Fund transfer requirements for grantees other than State governments and subgrantees**

The transfer of Federal program funds to grantees other than States and to subgrantees are subject to the payment and interest accrual requirements in the Uniform Guidance at 2 CFR § 200.305(b). These requirements are like those in subpart B of the Treasury Department regulations in 31 CFR part 205, requiring that "payments methods must minimize the time elapsing between the transfer of funds from the United States Treasury or the pass-through entity and the disbursement by the non-Federal entity." 2 CFR § 200.305(b) introduction.

The Federal Government and pass-through entities must make payments in advance of expenditures by grantees and subgrantees if these non-Federal entities maintain, or demonstrate the willingness to maintain, written procedures "that minimize the time elapsing between the transfer of funds and disbursement by the non-Federal entity, and financial management systems that meet the standards for fund control and accountability." 2 CFR § 200.305(b)(1). If a grantee or subgrantee cannot meet the criteria for advance payments, a Federal agency or pass-through entity can pay that entity through reimbursement. See 2 CFR § 200.305(b)(1) and (4) for more detailed description of the payment requirements and the standards for requiring that payments be made by reimbursement.

Non-Federal entities must maintain advance payments in interest bearing accounts unless certain conditions exist. See 2 CFR § 200.305(b)(8) for those conditions. The requirements regarding interest accrual and remittance follow:

Grantees and subgrantees must annually remit interest earned on federal advance payments except that interest earned amounts up to $500 per year may be retained for administrative expense. Any additional interest earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services Payment Management System (PMS) through an electronic medium using either Automated Clearing House (ACH) network or a Fedwire Funds Service payment. 2 CFR § 200.305(b)(9)(i) and (ii).

1. When returning interest through ACH Direct Deposit or Fedwire, grantees must include the following in their return transaction:

   - PMS Account Number (PAN). NOTE: The PAN is the same series of alpha-numeric characters used for payment request purposes (e.g.: C1234G1).
   - PMS document number.
   - The reason for the return (e.g., interest, part interest part other, etc.).
   - An explanation stating that the refund is for interest payable to the Department of Health and Human Services, and the grant number(s) for which the interest was earned.

   a. U.S. Department of Education grantees are generally located and operate domestically and return interest domestically. Below is PSC ACH account information for interest returned

2

JA 527

domestically.  For international ACH interest returned, account information is available at: Returning Funds/Interest.

- PSC ACH Routing Number is: 051036706
- PSC DFI Accounting Number: 303000
- Bank Name: Credit Gateway - ACH Receiver
- Location: St. Paul, MN

b.  Service charges may be incurred from a grantee's financial institution when a Fedwire to return interest is initiated.  For FedWire returns, Fedwire account information is as follows:

- Fedwire Routing Number: 021030004
- Agency Location Code (ALC): 75010501
- Bank Name: Federal Reserve Bank
- Treas NYC/Funds Transfer Division
- Location: New York, NY

2.  Interest may be returned by check using only the U.S. Postal Service; however, returning interest via check may take 4-6 weeks for processing before a check payment may be applied to the appropriate PMS account.

a.  Interests returned by check are to be mailed (USPS only) to:

- HHS Program Support Center
  PO Box 979132
  St. Louis, MO 63197

A brief statement explaining the nature of the return must be included.

b.  To return interest on a grant not paid through the PMS, make the check payable to the Department of Health and Human Services, and include the following with the check:

- An explanation stating that the refund is for interest
- The name of the awarding agency
- The grant number(s) for which the interest was earned
- The return should be made payable to: Department of Health and Human Services.

3.  For detailed information about how to return interest, visit the PSC Retuning Funds/Interest page at: Returning Funds/Interest

Grantees, including grantees that act as pass-through entities and subgrantees have other responsibilities regarding the use of Federal funds.  For example, all grantees and subgrantees must have procedures for determining the allowability of costs for their awards.  We highlight the following practices related to the oversight of subgrantee compliance with the financial management requirements in the Uniform Guidance that will assist State grantees (pass-through entities) in meeting their monitoring responsibilities.  Under 2 CFR § 200.332, pass-through entities must –

**GAN ENCLOSURE 4**
**Revised 03/2021**

1. Evaluate each subrecipient's risk of noncompliance with Federal statutes, regulations, and the terms and conditions of the subaward for purposes of determining the appropriate subrecipient monitoring.

2. Monitor the performance and fiscal activities of the subrecipient to ensure that the subaward is used for authorized purposes, in compliance with Federal statutes, regulations, and the terms and conditions of the subaward; and that subaward performance goals are achieved.

A small number of Department grant programs have program-specific cash management and payment requirements based on the authorizing legislation or program regulations.  These program-specific requirements may supplement or override general cash management or payment requirements.  If you have any questions about your specific grant, please contact the Education Program Contact listed in Block 3 of your Grant Award Notification.

4

JA 529

**GAN ATTACHMENT 5**
Revised 03/2021

## RECIPIENTS OF DEPARTMENT OF EDUCATION GRANTS AND COOPERATIVE AGREEMENTS
## FREQUENTLY ASKED QUESTIONS ON CASH MANAGEMENT

**Q**    **What are the Federal Laws and Regulations Regarding Payments to the States?**

**A**    The *Cash Management Impro ement Act o*        (*CMIA*) establishes interest liabilities for the Federal and State governments when the Federal Government makes payments to the States. See 31 U.S.C. 3335 and 6503.  The implementing regulations are in Title 31 of the Code of Federal Regulations (CFR), Part 205, https://www.ecfr.gov/cgi-bin/text-idx_tpl_/ecfrbrowse/Title31/31cfr205_main_02.tpl. Non-Federal entities other than States follow the rules on Federal payments set out in 2 CFR 200.305.

**Q**    **What is a Treasury-State Agreement (TSA)?**

**A**    A TSA documents the accepted funding techniques and methods for calculating interest agreed upon by the U.S. Department of the Treasury (Treasury) and a State.  It identifies the Federal assistance programs that are subject to interest liabilities under the CMIA.  The CMIA regulations specify a number of different funding techniques that may be used by a State but a State can negotiate with the Treasury Department to establish a different funding technique for a particular program. A TSA is effective until terminated and, if a state does not have a TSA, payments to the State are subject to the default techniques in the regulations that Treasury determines are appropriate.

**Q**    **What are the CMIA requirements for a program subject to a Treasury-State Agreement?**

**A**    Payments to a State under a program of the Department are subject to the interest liability requirements of the CMIA if the program is included in the State's Treasury-State Agreement (TSA) with the Department of Treasury.  If the Federal government is late in making a payment to a State, it owes interest to the State from the time the State spent its funds to pay for expenditure until the time the Federal government deposits funds to the State's account to pay for the expenditure.  Conversely, if a State is late in making a payment under a program of the Department, the State owes interest to the Federal government from the time the Federal government deposited the funds to the State's account until the State uses those funds to make a payment.  For more information, GAN Enclosure 4.

**Q**    **What are the CMIA requirements for a program that is not subject to a Treasury-State Agreement?**

**A**    If a program is not included in the State's TSA, neither the State nor the Federal government are liable for interest for making late payments.  However, both the Federal government and the State must minimize the time elapsing between the date the State requests funds and the date that the funds are deposited to the State's accounts.  The State is also required to minimize the time elapsed between the date it receives funds from the Federal government and the date it makes a payment under the program,  Also, the Department must minimize the amount of funds transferred to a State to only that needed to meet the immediate cash needs of the State.  The timing and amount of funds transferred must be as close as is administratively feasible to a State's actual cash outlay for direct program costs and the proportionate share of any allowable indirect costs.

**Q**    **What if there is no TSA?**

JA 530

**A**   When a State does not have a TSA in effect, default procedures in 31 CFR, part 205 that the Treasury Department determines appropriate apply.  The default procedures will prescribe efficient funds transfer procedures consistent with State and Federal law and identify the covered Federal assistance programs and designated funding techniques.

**Q**   **Who is responsible for Cash Management?**
**A**   Grantees and subgrantees that receive grant funds under programs of the Department are responsible for maintaining internal controls regarding the management of Federal program funds under the Uniform Guidance in 2 CFR 200.302 and 200.303.  In addition, grantees are responsible for ensuring that subgrantees are aware of the cash management and requirements in 2 CFR part 200, subpart D.

**Q**   **Who is responsible for monitoring cash drawdowns to ensure compliance with cash management policies?**
**A**   Recipients must monitor their own cash drawdowns **and** those of their subrecipients to assure substantial compliance to the standards of timing and amount of advances.

**Q**   **How soon may I draw down funds from the G5 grants management system?**
**A**   Grantees are required to minimize the amount of time between the drawdown and the expenditure of funds from their bank accounts.  (See 2 CFR 200.305(b).)  Funds must be drawn only to meet a grantee's immediate cash needs for each individual grant.  The G5 screen displays the following message:

**By submitting this payment request, I certify to the best of my knowledge and belief that the request is based on true, complete, and accurate information. I further certify that the expenditures and disbursements made with these funds are for the purposes and objectives set forth in the applicable Federal award or program participation agreement, and that the organization on behalf of which this submission is being made is and will remain in compliance with the terms and conditions of that award or program participation agreement. I am aware that the provision of any false, fictitious, or fraudulent information, or the omission of any material fact, may subject me, and the organization on behalf of which this submission is being made, to criminal, civil, or administrative penalties for fraud, false statements, false claims, or other violations. (U.S. Code Title 18, Section 1001; Title 20, Section 1097; and Title 31, Sections 3729-3730 and 3801-3812)**

**Q**   **How may I use Federal funds?**
**A**   Federal funds must be used as specified in the Grant Award Notification (GAN) and the approved application or State plan for allowable direct costs of the grant and an allocable portion of indirect costs, if authorized.

**Q**   **What are the consequences to recipients/subrecipients for not complying with terms of the grant award?**
**A**   If a recipient or subrecipient materially fails to comply with any term of an award, whether stated in a Federal statute or regulation, including those in 2 CFR part 200, an assurance, the GAN, or elsewhere, the awarding agency may in accordance with 2 CFR 200.339 take one or more of the following actions:

JA 531

1. Temporarily withhold cash payments pending correction of the deficiency by the non-Federal entity or more severe enforcement action by the Federal awarding agency or pass-through entity.
2. Disallow (that is, deny both use of funds and any applicable matching credit for) all or part of the cost of the activity not in compliance.
3. Wholly or partly suspend or terminate the Federal award.
4. Initiate suspension or debarment proceedings as authorized under 2 CFR part 180 and Federal award agency regulations (or in the case of a pass-through be initiated by a Federal awarding agency).
5. Withhold further Federal awards for the project or program.
6. Take other remedies that may be legally available.

**Q  Who is responsible for determining the amount of interest owed to the Federal government?**

**A**  As set forth in 31 CFR 205.9, the method used to calculate and document interest liabilities is included in the State's TSA. A non-State entity must maintain advances of Federal funds in interest-bearing accounts unless certain limited circumstance apply and remit interest earned on those funds to the Department of Health and Human Services, Payment Management System annually. See 2 CFR 200.305.

**Q  What information should accompany my interest payment?**

**A**  In accordance with 2 CFR 200.305(b)(9), interest in access of $500.00 earned on Federal advance payments deposited in interest-bearing accounts must be remitted annually to the Department of Health and Human Services Payment Management System (PMS) through an electronic medium using either Automated Clearing House (ACH) network or a Fedwire Funds Service payment.

For returning interest on Federal awards paid through PMS, the refund should:
(a) Provide an explanation stating that the refund is for interest;
(b) List the PMS Payee Account Number(s) (PANs);
(c) List the Federal award number(s) for which the interest was earned; and
(d) Make returns payable to: Department of Health and Human Services.

For returning interest on Federal awards not paid through PMS, the refund should:
(a) Provide an explanation stating that the refund is for interest;
(b) Include the name of the awarding agency;
(c) List the Federal award number(s) for which the interest was earned; and
(d) Make returns payable to: Department of Health and Human Services.

For additional information about returning interest see GAN ATTACHMENT 4.

**Q  Are grant recipients/subrecipients automatically permitted to draw funds in advance of the time they need to disburse funds in order to liquidate obligations?**

**A**  The payment requirements in 2 CFR 200.305(b) authorize a grantee or subgrantee to request funds in advance of expenditures if certain conditions are met. However, if those conditions are not met, the Department and a pass-through agency may place a payee on reimbursement.

JA 532

**GAN ATTACHMENT 5**
Revised 03/2021

**Q**  **For formula grant programs such as ESEA Title I, for which States distribute funds to LEAs, may States choose to pay LEAs on a reimbursement basis?**

**A**   A subgrantee must be paid in advance if it meets the standards for advance payments in 2 CFR 200.305(b)(1) but if the subgrantee cannot meet those standards, the State may put the subgrantee on reimbursement payment.  See 2 CFR 200.305(b).

**Q**  **Will the Department issue special procedures in advance if G5 plans to shut down for 3 days or more?**

**A**  Yes, before any shutdown of G5 lasting three days or more, the Department issues special guidance for drawing down funds during the shut down.  The guidance will include cash management improvement act procedures for States and certain State institutions of higher education and procedures for grants (including Pell grants) that are not subject to CMIA.

JA 533

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

AMERICAN ASSOCIATION OF COLLEGES )
FOR TEACHER EDUCATION, et al.,   )
                                 )
                Plaintiffs,      )
                                 )
        vs.                      )    CIVIL CASE NO.
                                 )    1:25-cv-00702-JRR
LINDA MCMAHON, in her official   )
capacity as Secretary of         )
Education, et al.,               )
                Defendants.      )    Courtroom 3A
_____  )    Baltimore, Maryland

THURSDAY, MARCH 13, 2025

TRANSCRIPT OF PROCEEDINGS - PRELIMINARY INJUNCTION
BEFORE THE HONORABLE JULIE R. RUBIN

For the Plaintiffs:

Joshua W. Richards, Esquire
Carolyn M. Toll, Esquire
 Saul Ewing, LLP
 Centre Square West, 38th Floor
 1500 Market Street
 Philadelphia, PA 19102

Daniel M. Moore, Esquire
 Saul Ewing, LLP
 1001 Fleet Street, 9th Floor
 Baltimore, MD 21202

For the Defendants:

Molissa H. Farber, Esquire
Megan L. Micco, Esquire
 US Attorney's Office - District of Maryland
 36 South Charles Street, 4th Fl.
 Baltimore, MD 21201

(Computer-aided Transcription of Stenotype Notes)

Reported by: Amanda L. Longmore, RPR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland  21201

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (10:06 a.m.) |
| 3 | THE CLERK:  The matter now pending before this Court |
| 4 | is Civil Docket Number JRR-25-cv-0072, American Association of |
| 5 | Colleges for Teacher Education, et al., versus McMahon, et al. |
| 6 | This matter now comes before the Court for the purpose of a |
| 7 | preliminary injunction hearing. |
| 8 | Counsel for the plaintiffs, followed by counsel for the |
| 9 | defendants, will you please introduce yourselves for the |
| 10 | record? |
| 11 | MR. RICHARDS:  Good morning.  Josh Richards, Saul |
| 12 | Ewing, for the plaintiffs. |
| 13 | THE COURT:  Good morning. |
| 14 | MS. TOLL:  Carolyn Toll, Saul Ewing, for the |
| 15 | plaintiffs. |
| 16 | THE COURT:  Good morning. |
| 17 | MR. MOORE:  Good morning, Your Honor.  Daniel Moore |
| 18 | of Saul Ewing. |
| 19 | THE COURT:  Good morning. |
| 20 | MS. FARBER:  Good morning, Your Honor.  Molissa |
| 21 | Farber for the defendants. |
| 22 | THE COURT:  Good morning. |
| 23 | MS. MICCO:  Good morning, Your Honor.  Megan Micco |
| 24 | also for the defendants. |
| 25 | THE COURT:  Good morning to all.  Everyone can be |

1   seated.  I'll just ask for just a few moments so I can organize
2   what I need to have directly in front of me.
3       All right.  Counsel, just because there are so many moving
4   parts in terms of documents that are at issue here that I'm
5   sure we'll talk about during argument, I will ask you to just,
6   if I need to, to have a moment or two to turn to whatever
7   document you're referring to so I can be sure to have them in
8   front of me.
9       And with that, I'm happy to hear from you, Mr. Moore.  Or
10  Mr. Richards, rather.
11          MR. RICHARDS:  Your Honor, would you like me to
12  stand while I'm addressing the Court or --
13          THE COURT:  I will -- whatever makes you comfortable
14  is fine with me.
15          MR. RICHARDS:  Then I'll stay sitting, thank you.
16      I think that the issues before the Court have been
17  narrowed significantly since we filed our motion in light of
18  the Government's response.  And it seems to me that, you know,
19  the Government has not challenged that irreparable harm will
20  result without an injunction.  And so I won't say more about
21  that unless the Court would like me to, except to say that
22  because we're not going to be talking about irreparable harm at
23  length today, I don't want the Court or the public to lose
24  sight of the fact that, you know, this case is really about the
25  potential destruction of the infrastructure to provide teacher

1    preparation in this country.  And the impact of allowing these

2    grants to be terminated is that the programs that support that

3    teacher preparation will be in a position where they're no

4    longer able to operate.  They'll lose staff, they'll lose the

5    things that they've built to allow them to do what they do, and

6    even if those programs are later refunded, they'll have to be

7    rebuilt from the ground up.  And so it's not a small thing that

8    we're here to talk about.

9              THE COURT:  So let me just put a pin in that for a

10   second and say that to the extent there are things that are not

11   challenged, and I know that you're not saying anything to the

12   contrary, but bear in mind that I still need to make a finding

13   in your favor as to each of those elements so I wouldn't, you

14   know, necessarily rest on your papers unless you want to but

15   you're welcome to.

16             MR. RICHARDS:  Thank you, Your Honor.  So I am happy

17   to speak more to that.

18        Before I begin, too, I wanted to just sort of note that

19   final agency action doesn't seem to be challenged here.  Again,

20   we did cover that in our briefs and I can cover that before the

21   Court.  And so it strikes me that the main disputed issues

22   before the Court are the jurisdictional issues that the

23   Government has raised with respect to standing and venue, the

24   Fifth Amendment claim that we've raised, and whether or not the

25   NADOHE order either applies or the same reasoning applies here,

1  and then the agency priorities issue that we've raised as our

2  principal APA claim.

3      I can start anywhere that the Court would prefer, but

4  maybe with the jurisdictional issues?

5          THE COURT:  Yeah, I would like to start with the

6  jurisdictional issues.

7      And, Ms. Farber, I will just -- I'm not asking you to make

8  argument about it now but just to confirm, does -- do

9  defendants concede the issue of final agency action?

10         MS. FARBER:  Yes, for the purposes of this motion we

11  do.

12         THE COURT:  I should say that's sort of, you know,

13  built into every sentence that we're about to say, for purposes

14  of this hearing, as well as the irreparable harm.

15         MS. FARBER:  Yes.

16         THE COURT:  All right.  Very good.  So those issues

17  are sort of in the can, although plaintiff still bears the

18  burden, because, you know, I'm not a potted plant, but go

19  ahead.

20         MR. RICHARDS:  Okay.  So as to the jurisdictional

21  issues, I'll start with standing, even though it's reversed

22  from how the Government raised them.

23      The only plaintiff I believe that standing was challenged

24  as to was MACTE.  I don't believe that there's any dispute that

25  MACTE is a membership organization and it's comprised of

1  principally, entirely, Maryland organizations that provide

2  teacher preparation services.

3      It is a matter of, at this point, public record that at

4  least three of its members, Towson University, College Park,

5  and Frostburg, have had grants cut as part of this program.

6      The Supreme Court ruled in lots of cases but most recently

7  in the Students For Fair Admissions case that an

8  organizational -- membership organization has standing if any

9  of its members suffered concrete harm.  I don't think that

10  there's any dispute that we have alleged concrete harm on

11  behalf of the members, and so I think that we've sort of easily

12  established standing for MACTE, and for the other plaintiffs I

13  don't believe it's been challenged.

14      And if there's no questions about that, I can move on.

15          THE COURT:  So Frostburg, Maryland, and Towson, just

16  to clarify, their grants were subject to -- and I don't know if

17  I'm mispronouncing the judge's name, Judge Joun -- Judge Joun,

18  were they subject to his TRO?

19          MR. RICHARDS:  They were.

20          THE COURT:  And have any of those -- have any of

21  those institutions whose grants were subject to his TRO gotten

22  their money out?

23          MR. RICHARDS:  I don't know.  I don't know whether or

24  not they have been able to draw down on that order yet.

25          THE COURT:  Do they plan to?

1          MR. RICHARDS:  I think that they do, once those

2    grants are turned back on.  But I think our position would be

3    there's no mootness issue there --

4          THE COURT:  Right.

5          MR. RICHARDS:  -- because the order is temporary.

6          THE COURT:  Well, but if they've taken their money

7    out in view of the declaration that it's pretty hard to claw

8    that back, what do I do with that?

9          MR. RICHARDS:  Well, again, our view would be that

10   because that relief is temporary and does not sort of --

11   "guarantee" is the wrong word, but does not even indicate that

12   future money will be able to be drawn down, and we have a clear

13   intent from the Government to terminate the loan, they've

14   appealed the order, that the dispute is still live.

15         THE COURT:  Okay.  Do they -- have they been granted

16   future grants?  In other words, are they -- and I don't know if

17   I'm asking this question the wrong way, but are those three

18   grant recipients, in their multiyear grants, are there any

19   grants that have been granted for future years that have not

20   yet begun in terms of, you know, their financial spending?

21         MR. RICHARDS:  I don't know, Your Honor.

22         THE COURT:  Okay.  And I don't even know if I asked

23   that the right way, but my point is, you know, because, in

24   other words, if there are other grants that are out there, that

25   might be something to know but --

```
 1           MR. RICHARDS:  I agree, Your Honor.  I also think
 2   that part of the reason that we've brought this claim in the
 3   way that we have is because all grant recipients that are
 4   members of the plaintiff organizations are essentially
 5   identically situated with respect to these particular grants,
 6   and they were terminated in exactly the same way, roughly the
 7   exact time, using the exact reason.  I'm not sure whether that
 8   will be true for future grants or not.
 9           THE COURT:  Okay.
10           MR. RICHARDS:  Shall I move on to venue?
11           THE COURT:  That would be great.  Yep.
12           MR. RICHARDS:  Venue we also think is
13   straightforward.  You know, we did allege two different bases
14   for venue in our complaint.  The Government addressed only one
15   in their brief, in its argument that we didn't have venue, but
16   of course we alleged that we've established venue under
17   1391(e)(1)(C) because the Government is a defendant in this
18   case and MACTE, again, is a citizen of the State of Maryland;
19   therefore we have a single plaintiff for whom we have venue and
20   the vast majority of the case law that we were able to locate
21   makes completely clear that one plaintiff is all that's
22   sufficient to establish venue under (e)(1)(C).
23           THE COURT:  If MACTE is gone, does AACTE carry the
24   day on substantial?
25           MR. RICHARDS:  It does.
```

1              THE COURT:  Why?

2              MR. RICHARDS:  Because Towson and College Park and

3     Frostburg are all members of AACTE.

4              THE COURT:  I see.  So they're co-members, AACTE and

5     MACTE.

6              MR. RICHARDS:  Correct.

7              THE COURT:  Okay.  And are there any other Maryland

8     institutions that are members of AACTE that are not MACTE

9     members?

10             MR. RICHARDS:  I don't think so.

11             THE COURT:  That would be at issue here I guess is

12    the question.

13             MR. RICHARDS:  I don't think so, Your Honor.

14             THE COURT:  Okay.

15             MR. RICHARDS:  But I will just turn to one point that

16    the Government raises and that we addressed briefly in our rely

17    but mindful of the Court's suggestion that we flush these

18    things out.

19         You know, the Government's argument on venue appears to be

20    that venue isn't proper in Maryland, which we don't agree with,

21    but that it also would be unwise to transfer the case to D.C.

22    because D.C. is being overwhelmed, and the solution that they

23    propose to that venue challenge is that the case be transferred

24    to every jurisdiction in which a loan -- or rather which a

25    grant was terminated.  That strikes me as an extremely

Preliminary Injunction 3/13/25

1    impractical solution and a poor use of the venue provision,

2    particularly where the Court may exercise some discretion.

3        So to the extent that sort of the counterfactual here is,

4    you know, we have 50 or however many states we have here at

5    issue, different cases all deciding the same issue for

6    identically situated plaintiffs, that strikes me as a poor

7    suggestion.

8            THE COURT:  Okay.  I'm not suggesting that you're

9    finished at this point, but I think before we go headlong into

10    the Winter factors, I'd want to ask the Government and defense

11    in general to respond to the standing mootness venue issues.

12    So are you finished as to those issues?

13            MR. RICHARDS:  Yes, Your Honor.  Thank you.

14            THE COURT:  Okay.  Let's just put those issues in a

15    can and then we'll go onto the meat.

16            MS. FARBER:  Thank you, Your Honor.  I'd prefer to

17    stand.

18            THE COURT:  That's fine.  Everybody has their

19    preference.  I once invited counsel to remove his suit jacket

20    because it was really hot in the courtroom and he said "I just

21    can't."

22        (Laughter.)

23            MS. FARBER:  I might need to take advantage of that

24    later.

25        Your Honor, I -- thank you for the opportunity to jump in

1   before we get to the merits.

2           THE COURT:  Sure.

3           MS. FARBER:  As I'm sure you noticed, the Government

4   made its best efforts to present the most streamlined possible

5   defense to this case as we could.  And so that involved, you

6   know, not contesting irreparable harm in this context given

7   that we have kind of an institutional existential issue alleged

8   and then a final agency action as well.

9       There are significant standing and venue concerns here at

10  the threshold.  At the outset, the allegations that are

11  specific to Maryland that show there were specific Maryland

12  grants that were terminated, how many there were, those all --

13  none of those are in the complaint.  All of those come out in

14  later filings as a way to try to bootstrap the complaint or

15  bolster the complaint.  And the case law in this jurisdiction

16  is clear that you cannot amend the complaint, add allegations

17  to the complaint by responding or replying in support of -- or

18  in opposition to a motion.

19      So where we point out fatal flaws in the complaint,

20  plaintiffs can't salvage those by adding supplemental

21  declarations or additional allegations in a reply as they seek

22  to do here.

23      Now, as Your Honor pointed out, there is a very similar

24  case in Massachusetts that was heard on a TRO hearing on

25  Monday, and relief was granted in that case, not only to MACTE,

1   but to a number of other plaintiffs --

2           THE COURT:  States.

3           MS. FARBER:  -- in other states.  And on the subject

4   of supplemental declarations, I am a little surprised that we

5   don't have supplemental declarations this morning from

6   plaintiff attesting to the fact that that money is back.

7       So we see from the filings in the Massachusetts case that

8   the AUSA on that case worked with ED to get the money released.

9   We have the declaration from someone at ED that all the money

10  is restored, that there are no conditions on that money, that

11  the grantees can withdraw all of the money if they want to, and

12  that grantees have started to do that already.

13      So, frankly, I'm a bit floored that plaintiffs' counsel

14  doesn't know whether -- whether their clients have withdrawn

15  any of the money that, for all intents and purposes, appears to

16  be completely released and fully available to them.

17          THE COURT:  Do you know?

18          MS. FARBER:  I don't know.

19          THE COURT:  Okay.

20          MS. FARBER:  I don't know.

21          THE COURT:  And I'm not suggesting it's your burden

22  to know.  I'm just inquiring.

23          MS. FARBER:  No, Your Honor, I don't know at this

24  point.  And, frankly, the reason that I sent those exhibits as

25  early as I did, almost as soon as I got them yesterday

1    afternoon, was to hopefully give plaintiffs a chance to inquire

2    and submit some kind of additional information to this court.

3         So to hear plaintiffs' counsel say that he doesn't know,

4    did he even ask?  Did he look at those things and even ask his

5    client if they got the money?  Because, as far as we know,

6    there might be zero dollars left to withdraw on that fund.

7    Like, the plaintiffs may have taken all of it out.

8         And to Your Honor's point about future money, it does seem

9    like there are some grants where there are future years to

10   dispute, but that takes us out of preliminary injunction land

11   because the plaintiff has all the money that they're going to

12   get this year on hand.  We no longer have an existential

13   threat.  So I'm surprised since we know plaintiffs know how to

14   file supplemental declarations that we don't have one here with

15   that information.

16        As far as whether the plaintiffs are identically situated,

17   we see from Exhibit 2 -- Defense Exhibit 2 -- so I should have

18   said that the exhibits that I referenced that I sent to the

19   Court last night from the Massachusetts case are Exhibits 1 and

20   2.  Exhibit 1 is a status report in that Massachusetts case;

21   and then Exhibit 2 is a declaration from Rachel Oglesby.

22        The Court has copies of those --

23             THE COURT:  Yes.

24             MS. FARBER:  -- I presume?  Okay.

25        So in Ms. Oglesby's declaration, she provides some

1   examples, I believe, of situations in which grants were
2   terminated.  And they're all different.  They're all different
3   circumstances why grants are terminated.  And so this is not a
4   case where everyone is identically situated.  At least based on
5   this declaration, we have different reasons why different
6   grants were subject to termination, and those are Paragraphs 11
7   through 16.  And we can all certainly disagree about the wisdom
8   of these terminations, but that's an APA challenge and that is
9   something that is going to be individual and fact specific for
10  each terminated grant.
11              THE COURT:  But when you say they're not -- I mean,
12  perhaps these are my words -- "similarly situated," are you
13  taking the position that the Department did not terminate these
14  grants because they were determined or identified, as
15  Ms. Oglesby describes, to involve programs related to DEI?
16              MS. FARBER:  No.  No, I'm not taking that position.
17              THE COURT:  So how are they materially different?
18              MS. FARBER:  Well, I think that --
19              THE COURT:  Materially different.
20              MS. FARBER:  I think that would depend on the facts
21  of the case.
22       So one example might be if there's a program that has a
23  set racial quota, for example, like we need to have a certain
24  percentage of teachers in these minority categories in order to
25  achieve diversity, that, under Students for Fair Admission,

1    might be materially distinct from a grant that just promotes

2    antiracism.

3         And I don't know what position the Department of Education

4    would take about an antiracism grant in light of Students For

5    Fair Admission, but I think Students For Fair Admission at

6    least is pretty clear that when we're thinking about quotas and

7    when we're thinking about admitting some people into a program

8    and not admitting others, according to the Supreme Court case

9    from 2023, that runs afoul of federal civil rights laws.

10         THE COURT:  Yeah, but to some extent the question of

11    being similarly situated is more an inquiry through the lens of

12    what were the criteria that your client used to terminate the

13    grants, not what another court says might also run afoul of the

14    law, right?

15         I mean, the reason they're similarly situated is because

16    the Department of Education has said you all fit in this same

17    basket and therefore we're terminating your grants.  Whether or

18    not that's substantively true or whether or not there might not

19    be other ways in which another onlooker might find the grant

20    programs, you know, to offend the law in some way doesn't

21    really seem to be at issue here in terms of whether they're

22    similarly situated for purposes of the lawsuit.

23         MS. FARBER:  I take that point, Your Honor, and I

24    think, you know, it comes to the level of abstraction that the

25    Court's going to use.

1      THE COURT:  Yeah.

2      MS. FARBER:  So in a bigger picture these grants were

3  terminated for relating to Diversity, Equity, and Inclusion,

4  but then when it comes down to what analysis a court would do

5  for each terminated grant under the APA, that's where they're

6  going to be looking at more fact-specific aspects of each

7  grant.  And so that's where I believe the plaintiffs and the

8  grantees would start to distinguish themselves.  So it's a

9  question of the level of abstraction the Court uses, and I

10  would suggest that finer grain, but the Court is correct that

11  the sort of overarching issue is DEI.

12      THE COURT:  I hear you.  But let me just -- you know,

13  in my preparation on the issue of standing, I went through the

14  complaint apart from the opposition to the motion itself and

15  created the following.  And these truly are in the nature of

16  notes to self.  So, you know, I know we've all kind of hurried

17  up to prepare so forgive me for being sort of abbreviated.

18      But with respect to the organizational standing of MACTE,

19  the complaint at Page 2 avers that MACTE members got grants.

20  The complaint at Page 3 says MACTE members got grants that

21  remained active through mid February 2025.  Page 4, MACTE

22  members' grants were terminated.

23      Paragraph 4, which is different from Page 4, defines GR,

24  Grant Recipients, to include MACTE members.  Paragraph 14

25  implicates MACTE's core mission -- core mission, and TQP and

1    SEED grants support teachers in Maryland, followed by the

2    declaration of Dr. Laurie Mullen.  I think that's at 5-5,

3    Paragraphs 6 and 7 attest that MACTE has ten member

4    organizations, all of which are Maryland residents; three of

5    their members got grants -- which I later learned were

6    Maryland, Towson, and Frostburg -- that were "impacted by the

7    terminations resulting in substantial loss of funds for teacher

8    preparation programs in Maryland."

9         You're taking the position that those things, all of which

10    are in the initial pleading, not in a response or a reply,

11    rather, don't satisfy organizational standing?

12         MS. FARBER:  Your Honor, you included a citation to

13    somewhere that explicitly says MACTE grants were terminated in

14    the complaint.

15         THE COURT:  Yes.

16         MS. FARBER:  Which you said Paragraph 4, but I didn't

17    see it there.

18         THE COURT:  Page 4.  I don't know -- I think it was

19    like publicly in an intro portion.  If I've misstated it, then

20    I'm sure you'll point out my flaw.

21         MS. FARBER:  Okay.  So what I see and the reason why

22    we thought this was confusing, and perhaps the Court reads it

23    differently, was that backing up to Page 3, there's sort of

24    this general allegation that grants were terminated under TQP,

25    SEED, and TSL.  And then Page 4, as Your Honor points out, they

1    say after terminating AACTE and MACTE's member organizations

2    and NCTRs and its member organizations TQP and SEED grants, so

3    they're sort of lumped in there together.  We don't see any

4    specific allegations about what grants were terminated.

5          There are specific allegations about other states and then

6    the -- that declaration that Your Honor referenced, the way I

7    read it described, you know, some impact of terminations

8    somewhere possibly being felt in Maryland, but there wasn't an

9    indication of whether programs in Maryland explicitly were

10   terminated.  At least that's how I read it.

11         And this was, you know, this was plaintiffs' complaint.

12   They chose to file this.  They picked the day that they were

13   going to file this.  They had all the time in the world that

14   they wanted to work on this.  They chose Maryland to file this

15   case.  They have very detailed allegations about grant

16   terminations in other states and not a single -- not a single

17   identification of one single grant that's terminated in

18   Maryland until we pushed them on it.

19         So that's the issue that we take there.

20              THE COURT:  Okay.  Okay.  Anything else about venue?

21              MS. FARBER:  Yes, Your Honor.  As to venue, we do

22   concede that Subsection (e) does allow for bringing a case

23   against the government if a government is a defendant and one

24   of the plaintiffs resides in Maryland, and we concede of course

25   that MACTE is located here.  However, we believe that we have

Preliminary Injunction 3/13/25

1    strong grounds to transfer venue in the lines of the

2    Chakrabardi case.

3              THE COURT:  Yeah, but that's not about improper

4    venue.  I mean, Judge Messitte kind of transitioned into a

5    forum non conveniens evaluation there, didn't he?

6              MS. FARBER:  That was part of it.  That was part of

7    it.  But, Your Honor, I think that the concern here is this

8    idea of --

9              THE COURT:  But what he said there specifically, he

10   expressly acknowledged that they could have properly served as

11   the venue there, but the plaintiffs there, to his point of

12   view, very loudly did not, in fact, file in their resident

13   state.  We don't have that situation here.

14             MS. FARBER:  There were some plaintiffs in

15   Chakrabarti who did -- who were Maryland residents, so that's

16   not exactly correct.

17             THE COURT:  Okay.

18             MS. FARBER:  And so it's similar.

19             THE COURT:  I'm just remember the opinion, but okay.

20             MS. FARBER:  Yeah, we were talking, Your Honor, about

21   whether you were on the bench when Chakrabarti happened.  I

22   think it might have been a year before you.

23             THE COURT:  What year did it come out?

24             MS. FARBER:  I want to say it was 2021 or '22 but I

25   don't remember offhand.

1          THE COURT:  So if it was 2021 it was just before me.

2          MS. FARBER:  Yeah.  It was a mess here.  There were

3     hundreds, hundreds of cases that got filed.

4          THE COURT:  Yeah.

5          MS. FARBER:  It was a complete disaster.  And

6     Chakrabarti gave enormous relief to the bench that was really

7     was doing nothing other than dealing with these cases because

8     USCIS just had the misfortune of moving their office across the

9     state line.

10          THE COURT:  Well, that was the nature of Judge

11     Messitte was to take it for the team.

12          MS. FARBER:  Yeah.  May he rest in peace.

13          Your Honor, we have here a similar posture to Chakrabarti

14     where there's one plaintiff with three grants, and we have no

15     idea how many total grants there are.  The complaint is

16     completely silent about how many grants we're talking about.

17          Exhibit 2 mentions that there were something in the

18     neighborhood of 100 or 104 grants that were, you know, sort of

19     in this chunk of grants terminated.  So three out of how many

20     grants are here in Maryland.  Chakrabarti had a handful of

21     plaintiffs who were in Maryland, but that was not enough to

22     defeat the venue concerns there.  And so we --

23          THE COURT:  But, again, that was on a forum non

24     conveniens sort of analysis.  So, I mean, here we're talking

25     about whether venue is proper, not whether it might make sense

1    to take it somewhere else.  That's a different motion.

2              MS. FARBER:  Yes, Your Honor.  And we would say that

3    the Court should consider not ruling on the preliminary

4    injunction to allow us the opportunity to brief the issue of

5    venue.

6              THE COURT:  Okay.

7         I'm not saying "okay" to your request.

8              MS. FARBER:  I understand.

9              THE COURT:  I understand.

10             MS. FARBER:  You conceded it, Your Honor.  Noted.

11         (Laughter.)

12             THE COURT:  Okay.  All right.  Anything else about

13   that?

14             MS. FARBER:  No, Your Honor.

15             THE COURT:  Okay.  Is there anything else that --

16             MS. FARBER:  Oh, you know, I guess there was one

17   other point about venue that I wanted to raise, which is that,

18   you know, there was a really clear effort to be in Maryland

19   here and specifically to be back in front of Judge Abelson.

20   And I think that that sort of informs the way we look at

21   whether venue is appropriate here.  You know, that might be

22   something that -- that would be something the Government would

23   like the opportunity to brief in a venue transfer motion.

24             THE COURT:  Why?  I mean, so?

25             MS. FARBER:  It relates to forum shopping and the

Preliminary Injunction 3/13/25

1      federal courts discouraging that type of practice.

2              THE COURT:  Okay.  All right.  Mr. Richards, are you

3      forum shopping?

4              MR. RICHARDS:  I am not, Your Honor.  We filed this

5      case in Maryland and specifically filed it as related to the

6      Judge Abelson case specifically because we believe this case

7      should have or was covered by the NADOHE order and therefore we

8      thought judicial economy would be served by doing so.

9          We are -- you know, this case was assigned to Your Honor,

10     and that's certainly within, you know, the scope of the rules

11     and so we're happy to argue it in front of this court but that

12     was the purpose.

13             THE COURT:  I will tell you, I mean, I don't view it

14     as forum shopping, Ms. Farber, and I understand the legal

15     argument that you're making and I'm not making any decisions

16     today at all, so I want to be clear that the things I say today

17     are really in the nature of inviting conversation, but I think

18     it is something that on which reasonable minds can differ as to

19     whether this is, you know, in the parlance of the Court a

20     related case and that has, you know, administrative

21     significance versus just sort of colloquial it's related

22     because the subject matters are so similar or overlap even.

23         So, I mean, I think it made -- I'm not talking about the

24     venue question, but I think it made absolute sense to introduce

25     this action as a case that was connected to or related to Judge

Preliminary Injunction 3/13/25

1    Abelson's order, particularly because if it were determined to

2    be inexorably connected or a determination in this case would

3    necessarily invoke his decision there, that it would make sense

4    really, frankly, out of respect for Judge Abelson to give him

5    the entitlement to determine how, if at all, his case affects

6    his case.  I mean, I hear your complaint but I don't share it.

7         Okay.  Mr. Richards, I'm happy to hear from you as to the

8    factors to consider on a PI.

9              MR. RICHARDS:  And I'm sorry, before I move on to

10   that, Your Honor, may I just reiterate one point for the

11   record, which is -- and this came out very briefly in your

12   exchange with the Government but, you know, our invocation of

13   standing as to MACTE I think is best supported by the injury to

14   MACTE's members but, of course, we did also invoke standing on

15   the basis of the institution's mission.

16             THE COURT:  Yes.

17             MR. RICHARDS:  And that is another basis for standing

18   that has been recognized by the Courts in which I think also,

19   you know, MACTE's clearly demonstrated here, so I think -- I

20   didn't want to be remiss and not mention that.

21             THE COURT:  Are you invoking -- and it may be clear

22   from your complaint so I'm not pretending it's not in there if

23   it is, but I'm just asking in good faith, are you also

24   invoking, from MACTE's standpoint or from Maryland members'

25   standpoint the notion of a certain impending doom, kind of a

```
 1   Clapper theory, or are you basing it on injury already
 2   experienced?
 3              MR. RICHARDS:  For purposes of standing?
 4              THE COURT:  Yeah.  I mean, in other words, is there
 5   both here or are you strictly looking at past injury?
 6              MR. RICHARDS:  There is -- there is both.
 7              THE COURT:  Talk to me about the both.
 8              MR. RICHARDS:  Well, and I'm not sure this is clear
 9   from our complaint and we could amend it after the fact to make
10   that clear, you know, this is purely for purposes of the
11   preliminary injunction, but I think the answer is we don't know
12   what's going to happen here, and the termination --
13              THE COURT:  Well, that doesn't really, then, fall in
14   with Clapper.  I mean, in other words, if you're talking about
15   threatened injury, you know, for a PI's sake, I mean, that
16   needs to be concrete, clear, not theoretical, not hypothetical.
17   So the "we're not sure" probably doesn't get you there.
18              MR. RICHARDS:  I take the Court's point.  I didn't
19   want to make a concession for the case writ large.  I think --
20              THE COURT:  I understand.
21              MR. RICHARDS:  -- we're still working through this
22   from the perspective of what, how many, and which programs will
23   have to be shuttered because of this, but for purposes of the
24   PI, we're relying on the instant harm.
25              THE COURT:  Okay.  That's a clear answer.  I
```

1    appreciate that.  Okay.

2           MR. RICHARDS:  So does the Court have a preference in

3    terms of which order I take the other issues in, the Fifth

4    Amendment versus the APA?

5           THE COURT:  Let's go Fifth Amendment first.  And I

6    will apologize in advance for poking you with questions, as I'm

7    prone to do.  I'm going to try to be a little more hands-offy

8    than I usually am, but no promises.

9           MR. RICHARDS:  And I will not rely on any promises,

10   Your Honor.

11          THE COURT:  Okay.

12          MR. RICHARDS:  You know, I think the principal

13   argument here which we've tried to distill down in our papers

14   is that taking as a given that the NADOHE order prescribes

15   certain conduct by the Government because of the conclusion

16   that the J20 order is unconstitutionally vague, it is difficult

17   to conceive of, difficult to understand the argument that

18   continuing to enforce conduct that, if taken today, would

19   clearly be unlawful under the order, is nevertheless lawful

20   because it happened to have taken place before the order was

21   issued.  And that is in some way a derivative claim based on

22   the order, but it's also ultimately based on the Fifth

23   Amendment vagueness, vagueness principles that underlie the

24   order.

25          THE COURT:  Well, Ms. Farber's going to tell me that

1     that doesn't hold water because Judge Abelson was evaluating it

2     through a First Amendment lens.

3              MR. RICHARDS:  Yeah, and I think that that's -- it's

4     true that Judge Abelson was evaluating that order through both

5     a First Amendment and Fifth Amendment lens, but --

6              THE COURT:  And future harm.  In other words, how do

7     we comport ourselves?  We don't know what's illegal.  It's not

8     clear from J20's termination provision or the enforcement

9     provision.  I don't know what I'm allowed to do, what I'm not

10    allowed to do.  Aren't we talking about harm that's already

11    happened for reasons that we know about because you were

12    targeted as DEI grants?

13             MR. RICHARDS:  Well, I don't think so, Your Honor.  I

14    think the problem here is that the Government took action and,

15    again, it's -- perhaps it's clear to the Court, it continues to

16    be unclear to me whether the Government is saying that the

17    actions were or were not taken on behalf of DEI or were or were

18    not taken on behalf of the J20 -- on account of the J20 order.

19             THE COURT:  Oh, I think they've clearly -- well, you

20    know, I think actually what you've raised is sort of a concern

21    that I have, which is both can be true.

22         In other words, to some extent, and I'll just hone in on

23    this, and you don't have to address it now but we will need to

24    address it, is the Fifth Amendment argument that -- and forget

25    the other case before Judge Abelson for a moment, but, you

1    know, in reading the complaint, you know, it immediately came

2    off the page to me that there's essentially a transitive

3    argument, right, that the terminations came on the heels of the

4    Executive Order, the J20 order.

5             MR. RICHARDS:  Yep.

6             THE COURT:  And it's the timing, right?  It's the

7    timing and the rationale.  DEI's illegal, we're not going to

8    support it, it's discrimination.  Your clients' members and one

9    of your clients' grants were terminated with a termination

10    letter that includes a lot of reasons including discrimination

11    in the sense of DEI being discriminatory, otherwise unlawful,

12    or however you want to term it, press release, right?

13        The press release makes no mention of the Executive Order.

14    It's rather brief, as press releases often are, and your Fifth

15    Amendment claim to some extent necessarily requires that I

16    agree that the termination has its root in the Executive Order.

17    I mean, that's not subject to debate, right?

18             MR. RICHARDS:  No, I agree, Your Honor.

19             THE COURT:  And so that to me is flawed in logic,

20    because it opens up a giant political discussion about

21    President Trump has campaigned on certain things, including why

22    we're here today, President Trump issued his Executive Order,

23    it says what it says, President Trump is entitled to identify

24    people to work for him directly or to work in agencies of the

25    federal government that he feels are best suited to carry out

1    the agendas that he finds to be important, including

2    individuals who, on their own, might be like minded and

3    competent to carry those things out.

4          So to pursue a claim that the terminations violate the

5    Fifth Amendment because they are -- they happened because of,

6    because they obeyed the Executive Order or in furtherance of

7    the Executive Order omits to consider that Secretary McMahon or

8    her predecessor, Ms. Carter, had their own feelings about

9    DEI-related grants.  And, I'm not saying I credit it because I

10   haven't gotten there, but to some extent Ms. Oglesby's

11   declaration says as much.

12         And even if, even if I were to ask Ms. Farber, don't you

13   agree that your clients -- that the Executive Order effectively

14   mandates what happened here, that does not -- that is myopic.

15   It doesn't consider the fact that there might have been other

16   reasons to undertake the action about which your clients

17   complain.

18         So that to me is the biggest problem with your Fifth

19   Amendment claim because I don't know how, without speculating

20   on the record before me now, I am to draw the conclusion that

21   the Executive Order is why we are here.  I don't know how I get

22   there.  It's possible.  But there's no evidence of it.  That

23   press release doesn't say it, that termination letter doesn't

24   say it, Ms. Oglesby's declaration sure as heck doesn't say it.

25   How do I get there?

 1          MR. RICHARDS:  So I think there is evidence of it,

 2   right, because we decide matters on circumstantial evidence all

 3   the time.

 4          THE COURT:  Absolutely.  Absolutely.  And I agree

 5   with you that you are not cabined to proving it by direct

 6   evidence and, you know, for purposes of a clear record I

 7   suppose I should say I'm talking about likelihood of success on

 8   the merits when I talk about this.  And surely you are not

 9   constrained to limit your arguments to direct evidence.

10      But on a clear and convincing PI spectacular relief sort

11   of standard, is it enough here?  I don't mean can

12   circumstantial evidence carry the day, but does it here?

13          MR. RICHARDS:  We believe so, Your Honor, and I

14   think, you know, I'm hoping your presentation of that thought

15   process is for purposes of discussion --

16          THE COURT:  It is.

17          MR. RICHARDS:  -- and not necessarily having

18   decision --

19          THE COURT:  I'm making zero findings.  I mean, and I

20   said to my staff this morning, part of the benefit of the

21   parties' agreement to sort of collapse the TRO into the PI is

22   that I can talk, listen, process without having the task of

23   decisionmaking today.

24      So I want to be crystal clear, all of my thoughts are in

25   process.  I am making no findings.  So when I make affirmative

1    statements, I want to be clear they are really designed to be

2    more in the nature of an inquiry and an invitation to engage.

3              MR. RICHARDS:  Thank you, Your Honor.

4          And so on that basis, I'm afraid I don't have a ton to

5    offer back to the Court besides what the Court has just

6    explained, but I would frame it differently.

7          The way that I would frame it is that the President of the

8    United States issued a clear and unambiguous directive.  He is

9    the direct supervisor of all of the agency heads, and he sets

10   the agenda for those agency heads to follow.  He instructed all

11   of them to review and within 60 days make proposals about how

12   to do very specific things with respect to very specific

13   principles.  They then did them and here we are.  And that

14   doesn't strike me as remotely difficult to conceive of.

15         And even if Linda McMahon or her predecessor also held

16   those views, that's actually immaterial, right, because whether

17   she held those views or different views, she still would have

18   had to follow the order.

19         And with respect to the order itself and the vagueness

20   issue, this isn't a First Amendment problem.  This is a Fifth

21   Amendment problem because these organizations are told, if you

22   have equity-related programs, we're cutting your funding.  What

23   does that mean?  Does it -- and let's talk about conduct.

24         Does it mean if it's in your mission statement but you

25   don't actually take any action that preferences one race over

Preliminary Injunction 3/13/25

1    another but in your mission statement you say we're dedicated

2    to equity, is that what you get your grant canceled over?  Or

3    do you actually have to engage in conduct that would be

4    unlawful under Title VI?  We know that that's not the case

5    because there was no finding here that any of these grant

6    recipients engaged in conduct that would violate Title VI.  How

7    are we to know?  How are we to conform our conduct?  One of

8    the --

9          THE COURT:  Except we're not talking about future,

10   right?  We're talking about as applied.

11         MR. RICHARDS:  I understand, but they took these

12   steps in a posture, and we talk about this in our brief and the

13   Court may or may not accept this, but they took these steps in

14   a posture where there was no ability to challenge the

15   pronouncement.

16         THE COURT:  I hear you, and I don't quarrel with that

17   as a, you know, philosophical principle.  And I want to be

18   clear, I'm not faulting you for this.  I'm just objectively

19   noticing chronology that the action was instituted because the

20   grants were terminated, not because your clients didn't know

21   how, if at all, they should conform to this pronouncement.

22     In other words -- and I know you're saying, you know,

23   there was no time and who could possibly have had time to

24   change a program on a dime.  I get it.  I'm not quarrelling

25   with that.  But that's -- that is background, right?  I mean,

1    that's sort of narrative.  That's not the basis of the claim.

2    The claim is my grant was terminated because we're surmising it

3    was identified as DEI-offensive.

4              MR. RICHARDS:  I think it's more that --

5              THE COURT:  I mean, isn't that what you just told me

6    that, you know, so far, here we are on the complaint because of

7    grants terminated, not imminent threat?

8              MR. RICHARDS:  I think it's we don't know why the

9    grant was terminated.  I mean, how are we to take action to

10   reinstate the grant, right?  It was terminated for this vague

11   reason publicly, privately for no reason at all, and we have a

12   due process right to be able to challenge that but we don't

13   know how to do that because we don't know what the actual

14   reason was.  And it's not capable of definition, as Judge

15   Abelson found.

16        And so we have an ongoing harm here.  Our ability to

17   remedy this is continually sort of frustrated by we can't put a

18   target on it.  we don't know whether to go and say we'd like

19   the grant reinstated because we don't actually do the thing

20   that you say that we're doing.

21             THE COURT:  I know that -- I know that if the answer

22   is no that the reason is because you can't know the basis, but

23   did any of the offended clients file a notice of challenge?

24             MR. RICHARDS:  Yes.

25             THE COURT:  How many?

Preliminary Injunction 3/13/25

```
1          MR. RICHARDS:  I don't know the answer to how many.
2    We communicated that they should all file challenges.
3          THE COURT:  And filing those challenges, do those
4    challenges include a basis?
5          MR. RICHARDS:  Yes, they do.
6          THE COURT:  What does the basis articulate?
7          MR. RICHARDS:  The basis articulates both the Fifth
8    Amendment problem with the vagueness and APA issue with the
9    termination.
10          THE COURT:  The "we don't know why we're here"
11    problem, okay.
12          MR. RICHARDS:  Yep.
13          THE COURT:  Okay.  So there was no appeal on the
14    basis that I was incorrectly terminated on grounds of DEI?  And
15    when I say "incorrectly," I don't mean it's unfair but I mean,
16    in other words --
17          MR. RICHARDS:  Misidentified me as being DEI?
18          THE COURT:  Yes.  None of your clients claims that
19    they were correctly identified as promoting or fostering the
20    principles -- I'm calling them DEI principles.
21          MR. RICHARDS:  So the answer is I don't know the
22    answer to that.
23          THE COURT:  Okay.  Okay.  Anyway, go ahead.
24          MR. RICHARDS:  I think that's it in a nutshell, Your
25    Honor.
```

1    THE COURT:  Okay.

2    MR. RICHARDS:  You know, I think it's the fact that

3 we are unable to restore access because we don't know why it

4 was terminated in the first instance.

5    And again, as I said earlier, the fact that this really

6 reflects conduct by the Government to continue to enforce a

7 decision, right?  I mean, the impact of the decision being made

8 tomorrow versus the impact of the decision being made two weeks

9 ago is the same on the grantee organization.

10    And so there's a temporal difference but not a functional

11 difference, and so we believe that we have the right to

12 challenge the continued enforcement of the termination just as

13 we could challenge the threat of the termination or anything

14 else connected with that.

15    THE COURT:  Okay.

16    MR. RICHARDS:  Would you like me to continue on to

17 the APA?  Okay.

18    THE COURT:  Do you want to talk about -- before you

19 move on to APA, do you want to talk about public interest

20 and --

21    MR. RICHARDS:  Sure.  You know, I think from our

22 perspective this is pretty simple, right?  There's no public

23 interest or equitable interest in the Government violating the

24 Constitution or federal statute.  And so if the Court makes a

25 determination that we are likely to succeed in either the Fifth

1    Amendment or the APA challenge, our view is that a finding that
2    the balance of the equities is required under the case law.
3            THE COURT:  Okay.  And just to be clear, you know, I
4    know we're collapsing balance of equities and public interest
5    given the defendant, but --
6            MR. RICHARDS:  Right.
7            THE COURT:  Okay.  All right.  I'm APA ready.
8            MR. RICHARDS:  All right.  You have been kind enough
9    to sort of give me some forewarning.  I'm going to give you a
10   little bit here.  I am going to resist the attempt to make this
11   more complicated than it needs to be.
12       We have intentionally brought this claim as fairly narrow.
13   There are at least a half a dozen other reasons why under the
14   APA the Government can't do what it did.  We haven't raised
15   those in our complaint.  We may amend to assert them later.
16   But here we're making one very simple argument, and it really
17   only requires the parsing of one regulation and one statute.
18           And so, you know, I anticipate the muddying of the waters
19   there and I, for one, am going resist that as we go and
20   certainly I'll have to answer the Court's questions, but I
21   think that the issue here has to do with one phrase and that is
22   "Agency Priorities" as it appears in § 340 of the Uniform
23   Guidance.  And what § 340 says and what we're all in agreement
24   about is that if an award no longer effectuates the program
25   goals or agency priorities, it can be terminated by the

1   Government.

2       That provision, § 340, is about termination of grants.

3   It's about the termination of the grant based on the whole

4   grant, right?  When a grant is awarded, it's awarded pursuant

5   to terms and conditions.  It's awarded pursuant to agency

6   priorities that had been established at that time.  It's

7   awarded pursuant to program goals that had been established.

8       And when the Department, this particular department

9   creates those agency priorities, it does so through formal

10  comment -- Notice-and-Comment Rulemaking.  And it's unique in

11  that regard.  I don't want to say no other agency has to do

12  that, but I don't think any other agencies have to do that.  I

13  know that the Department of Education has a special statute,

14  which I'm going to call GEPA for short, and under GEPA, the

15  general rule that agencies do not need to rulemake around

16  grants was specifically changed just for the Department of

17  Education.

18      So when we're looking at the whole grant and the granting

19  process, we know that the department has to set priorities for

20  the grants, it has to do so through Notice and Rulemaking, and

21  then if it wants to terminate the grant, we can look at all of

22  the things that went into that grant.  We can look at the terms

23  and conditions of that grant and we can look at whether or not

24  the grant at issue continues to effectuate the agency

25  priorities.

1          It doesn't make any sense to say with respect to this

2    Uniform Guidance those agency priorities are any different from

3    the agency priorities that are talked about with respect to

4    granting elsewhere in the statute and regulatory scheme.  And,

5    you know, you see that because it's hard to even talk about

6    without making up a new word for what the Government thinks

7    that this ought to be instead.

8          What happened here is that the Government came in and it

9    didn't have the same "little p" priorities as the previous

10   administration.  It's to be expected.  And in most other

11   agencies that means that the Government can go in and cancel

12   grants if that's what it wants to do pursuant to agency

13   priorities.

14         Now, I'm not saying that the Government could or couldn't

15   cancel grants for other reasons.  I'm not trying to expand that

16   to this here.  What I'm saying is that the Department of

17   Education is special and if this new administration had new

18   priorities, then they can go past them but they didn't.

19         And so one of two things has to be true.  Either we're

20   talking about the same priorities because we didn't go through

21   Rulemaking, in which case the Government hasn't explained how

22   these grants no longer effectuate those same priorities.  They

23   didn't give any reasons really at all when they terminated the

24   grants.

25         Or the only other option is that this doesn't mean agency

1    priorities.  It means something else even though it's the same

2    two words.  And that strikes me as incredibly implausible and

3    tortured.  And unless you agree with the Government that that's

4    a reasonable interpretation of this, as a matter of law the APA

5    issue is foreclosed to them, right?  There's nothing they can

6    do to change that.

7              THE COURT:  How does 34 C.F.R. § 75.105 apply here?

8              MR. RICHARDS:  That's EDGAR.  That's for the

9    continuation of grants.  It doesn't apply here at all.  I don't

10   know why they cited it.

11             THE COURT:  Okay.  In the terminate -- what I'm

12   calling the termination letters, the termination letters

13   regarding the continuation of the grants, among other portions

14   of the regulations that were cited, the Secretary cites

15   expressly 34 C.F.R. 75.253, and that's related to multiyear

16   grants.  Is that right, Mr. Richards?

17             MR. RICHARDS:  Right.  And that's -- again, that's

18   not what we're talking about here.  We're talking about the

19   continuation -- or we're talking about terminating a grant that

20   is in the middle of its grant period.

21             THE COURT:  So just so that I'm clear, so the

22   letters that -- so, in other words, when your clients' members

23   and when your clients received the notices of termination,

24   these were not on the precipice of being approved for

25   continuation of a multiyear grant?

1          MR. RICHARDS:  Correct.  That's correct.  They were
2    just -- they weren't requesting continuation.  So that's a
3    separate process, you go through a different set of requests.
4    This was mere -- they invoked 200.340, right, the termination
5    provision for grants that are continuing.  And I think I'm
6    using the wrong word on --
7          THE COURT:  But they also cite 75.253 for multiyear
8    grants, I think.
9          MR. RICHARDS:  In the termination letter, Your Honor?
10         THE COURT:  Yeah.  The termination letter says that
11   the termination, you know, otherwise fails to serve the best
12   interests of the United States and cites, among other things,
13   34 C.F.R. 75.253, and that says that in order for a grantee to
14   continue to receive funds in a multiyear project, among other
15   things, the grantee must receive a determination from the
16   Secretary that continuation of the project is in the best
17   interests of the federal government.
18         MR. RICHARDS:  Yeah.  That's a different process,
19   Your Honor.
20         THE COURT:  Okay.  So you're contending that that
21   does not apply at all and --
22         MR. RICHARDS:  Correct.
23         THE COURT:  -- so the citation of that was just
24   piling on.
25         MR. RICHARDS:  Piling on.

Preliminary Injunction 3/13/25

```
 1          THE COURT:  Okay.  So instead, you're directing my
 2    attention to 200.340.
 3          MR. RICHARDS:  Right, which is the same provision the
 4    Government relies on here.
 5          THE COURT:  Yes, yes, yes, yes.  Okay.  And so walk
 6    me through again your logic that "little p" is not in play?
 7          MR. RICHARDS:  Yeah, and that -- so again, I just
 8    want to -- the language issue here illustrates the point,
 9    right?  We're already talking about agency priorities in the
10    context of grants.  We're talking about something -- there is
11    no "little p" I guess is my point in this context.
12       The "little p" is something that the President, I suppose,
13    or the head of the agency has as their personal or political
14    policy agenda.  It has nothing to do with agency priorities.
15    Agency priorities for the Department of Education are set by
16    Notice-and-Comment Rulemaking.  There is no "little p."
17          THE COURT:  And in your complaint, you know, goes
18    headlong into the provision of final rulemaking and all that
19    stuff.  So the priorities are set, the priorities are
20    published, and then your clients go through the competitive
21    process to try to, you know, conform their grant applications
22    to ensure that, you know, they're hopefully satisfying those
23    priorities so that they look like attractive grant recipients,
24    right?  They get the grant.
25          MR. RICHARDS:  Yeah, and I think the Government --
```

1    the Government introduces concepts here that don't belong.  So

2    the Government talks about things like invitational priorities

3    and annual priorities.  These derive from the agency priorities

4    that are set through Rulemaking.  And the Government can invite

5    based on those priorities or based on the statute people to

6    apply for grants, but it still derives from the agency

7    priorities that are set through Notice-and-Comment Rulemaking.

8         And again, just sort of walking you through the big

9    picture again and from a textual perspective why this makes

10   sense versus just from a pure commonsense perspective, right?

11        The prior commonsense perspective it's the same word.

12   We're used to using it to describe a specific thing, and the

13   Uniform Guidance applies to all federal agencies but only the

14   Department of Ed has to go through this Rulemaking, right, so

15   Department of Ed is told specifically you have to go through

16   this Rulemaking.

17        The textual reading is that 340 talks about the whole

18   grant.  I mean, Part 200 is all about grants.  That's all grant

19   stuff, right?  And 340 talks specifically to termination, and

20   it looks at the different parts of the grant.  And when we

21   award grants we award them with terms and conditions and we

22   award them pursuant to agency priorities.  And so when we

23   terminate them it is logical to think, okay, well, we're going

24   to terminate them on the same basis.

25             THE COURT:  Does "program goals" have a term of art?

Preliminary Injunction 3/13/25

```
 1    Is that a term of art?
 2              MR. RICHARDS:  Program goals are also established I
 3    believe by Congress when it's authorized.  I haven't focused on
 4    that piece of it but, you know --
 5              THE COURT:  I guess what I'm asking is "program
 6    goals" has a defined term that we're not saying is at issue
 7    here --
 8              MR. RICHARDS:  Yes.
 9              THE COURT:  -- but that's not just sort of a
10    generalized mealy term, right?
11              MR. RICHARDS:  No, correct.
12              THE COURT:  That means something.  So program goals
13    or agency priorities doesn't weaken your argument --
14              MR. RICHARDS:  No.
15              THE COURT:  -- because program goals is a thing, it's
16    just not the thing here.
17              MR. RICHARDS:  Correct.
18              THE COURT:  Okay.  So walk me through
19    linguistically -- your linguistic argument on 340, walk me
20    through it.  I'm looking at it.
21              MR. RICHARDS:  Okay.  So, A, the award can be
22    terminated or in part or its entirety as follows, right?  The
23    first basis by which it can be terminated is if it fails to
24    comply with the terms and conditions of the federal award.
25          I will note that the terms and conditions of all these
```

1    federal awards which were similarly situated was merely a

2    citation to Part 200, so the terms and conditions were Part

3    200.

4         THE COURT:  Okay.  There's not a -- and you did say

5    this in your recent paper, but so there is not sort of a one,

6    two, three, four list of you got to do this, you got to do

7    that.

8         MR. RICHARDS:  No.  And this is another reason why

9    their argument fails that's beyond sort of the textual piece,

10   and I can get to that in a second, but -- so we have this terms

11   and conditions as the basis for a termination.  We're looking

12   at the grant, we're looking at the GAN, right, the notice that

13   you get when you receive the first grant, and there's a little

14   box and it has terms and conditions it in.  And we say, okay,

15   are they not following any of the terms and conditions.  That's

16   a basis for the termination of the grant, right?

17        THE COURT:  Sure.

18        MR. RICHARDS:  And those terms and conditions are

19   awarded at the -- are assigned at the time that the grant is

20   initially awarded.  So we're looking at does this grant, it

21   starts at (a), and does it continue now to be doing the things

22   that we were thinking that it had to do at (a).  (2) and (3)

23   aren't really applicable here.

24        THE COURT:  Right, yeah.

25        MR. RICHARDS:  And then we get to (4).  And it

Preliminary Injunction 3/13/25

1    says -- and again, there's a textual problem with the
2    Government's argument in (4) as well, but that isn't our
3    principal argument here, right, that pursuant to the terms and
4    conditions of the federal award, so when we're looking at the
5    terms and conditions, if, among those things, are that it no
6    longer effectuates the program goals or agency priorities, then
7    that is a basis for also terminating the grant.  So we look
8    back, what were the agency priorities and we say, okay, does it
9    no longer effectuate those agency priorities?
10        So now we're in this position where the Government I guess
11   could be arguing -- I don't think that they are -- that we've
12   changed the agency priorities and now it doesn't effectuate
13   them anymore, but they're not arguing that, right, because to
14   change agency priorities they know they have to go through
15   Notice-and-Comment.
16        So instead they're just arguing that agency priorities
17   doesn't really mean anything, right?  It means what we had for
18   breakfast.  And so every day that we wake up we can decide the
19   agency priorities are something different, and so every day we
20   can go look at 340(b) -- I'm sorry, 340(a)(4) and say, okay,
21   today we're going to cancel the grant for this reason.  That
22   just doesn't make any sense.  That's not the kind of
23   predicability, notice that we use in grant terminations.  So
24   that's the argument.
25        Now, there's a secondary argument here which I think we

1    really don't need to reach, but in order for their argument to

2    be right, and this is sort of like a spending clause argument

3    sort of the same principal, right, we have to unambiguously put

4    folks on notice of what the terms and conditions are under

5    which we might cancel, terminate your grant.

6            And so they have to not only be right textually, this is

7    what it should mean; they have to also unambiguously have

8    conveyed that to the grantees.  And they didn't do that either,

9    right, because they don't have anything in the box where it

10   says "Terms and Conditions" except for Part 200, so it's sort

11   of cursive in that sense.

12           THE COURT:  But that includes this.

13           MR. RICHARDS:  Yeah.

14           THE COURT:  So which way does that cut?

15           MR. RICHARDS:  Well, I don't think it cuts one way or

16   the other, right?  I mean, I think one could argue that just

17   dropping in a citation to an entire regulatory scheme probably

18   isn't sufficient notice, but we're not making that argument

19   here today.

20           THE COURT:  Thank goodness.

21           MR. RICHARDS:  Trying to keep it easy, Your Honor.

22        But I think it cuts against, right, because if the point

23   of 200.340 is that there's limitless, boundless discretion to

24   change priorities whenever you want, then why bother in the

25   first place to have -- I mean, why don't we just not have

Preliminary Injunction 3/13/25

1   200.340(a), no subparts, right?  Whenever we change our mind.

2           THE COURT:  Okay.

3           MR. RICHARDS:  On --

4           THE COURT:  What about including, though?  In other

5   words, if I'm going with you there that if changing priorities

6   because I feel like it is allowable under the terms and

7   conditions aspect which just sort of wholesale loops in 200 --

8           MR. RICHARDS:  Yeah.

9           THE COURT:  -- what significance does the word

10  "including" have?

11          MR. RICHARDS:  "Including" -- and again, I don't

12  think this is necessary for our argument, but I think the right

13  way to read the word "including" there is that the Government

14  can make a determination that a grant no longer effectuates the

15  purpose, the program goals or the agency --

16          THE COURT:  Priorities.

17          MR. RICHARDS:  -- priorities -- sorry -- if it lists

18  that as a reason that it can terminate grants in the terms and

19  conditions, which cuts against, frankly, the idea that even

20  putting Part 200 here is valid because that really does create

21  a feedback loop, right?

22      It's, you know, Part 200, which means including anything

23  that's in the box which goes back to "including."  It doesn't

24  really make a whole lot of sense as a drafting convention to

25  write it that way if you didn't mean you actually need to

Preliminary Injunction 3/13/25

1    include the specific grounds.  But, again, I'm trying very -- I

2    don't think we need to go there here today.  I just think that

3    that -- that reality of the way that this is drafted makes the

4    Government's argument very difficult.

5              THE COURT:  And what of "to the extent authorized by

6    law"?

7              MR. RICHARDS:  It's just under the APA, Your Honor.

8              THE COURT:  Okay.

9              MR. RICHARDS:  May I make one further point --

10             THE COURT:  Yes, you may.

11             MR. RICHARDS:  -- before we move on?

12        Unrelated to this, we have submitted declarations related

13   to different grant conditions that have been placed on grants.

14   And I didn't check last night but last I checked, the members

15   that were supporting this lawsuit, their grants are on what's

16   called route pay.  Route pay means you need to get advance

17   permission to spend money.  That is a significant burden and

18   it's a burden that the Department is allowed to impose after

19   making certain findings with respect to that specific grant and

20   it being at risk.

21        We are requesting as part of the preliminary injunction in

22   this case that the Government be ordered to follow its own

23   regulations with respect to placing those conditions on grants.

24             THE COURT:  So in the termination letter, I'm looking

25   at the one that was appended to the complaint, Document ECF

1    1-2, Page 11, the ECF pagination, "Costs incurred by you after

2    this termination are allowable only if, A, those costs were

3    properly incurred by you before the effective date of this

4    termination and not in anticipation of it; and B, those costs

5    would be allowable if your federal award was not suspended or

6    expired normally at the end of the period of performance in

7    which the termination takes effect," and they cite 200.343 and

8    then they encourage you to review your responsibilities, et

9    cetera, et cetera.

10         Are you claiming that that --

11              MR. RICHARDS:  No, that's -- so the rules for drawing

12   down grants posttermination are different than the rules when

13   you're on route pay.

14              THE COURT:  Okay.

15              MR. RICHARDS:  Two different --

16              THE COURT:  So I have drawn my attention to something

17   that I need not have.

18              MR. RICHARDS:  Right.

19              THE COURT:  I'm glad that I asked you because I was

20   confused why that was problematic.

21         So I know -- I've read the complaint and the issues of

22   route pay, so -- and I know Ms. Farber asserted that it was

23   unclear whether your requested relief for purposes of the PI

24   involved that.  So help make it clear, I know your rely asserts

25   it as clear, I'm not saying it's not, but help me understand it

Preliminary Injunction 3/13/25

1  better.

2          MR. RICHARDS:  It's in our form order, first of all,

3  that we were requesting that.

4          THE COURT:  I'm not saying you haven't --

5          MR. RICHARDS:  And I understand.  I'm just giving you

6  the reasons.

7          THE COURT:  Yeah.

8          MR. RICHARDS:  It was in our form order, first of

9  all; and second of all, we assert in our primary brief that

10  they've been placed on route pay, that they have not -- that

11  the Government has not gone through the process that it's

12  required to go through on an individualized basis prior to

13  placing them on route pay.

14      Presumably, you know, my friend has access to that

15  information because it's her client that placed that in that

16  status.  And so we're just asking generally that to the extent

17  that the Government has been placing grantees on route pay

18  without cause that it be ordered to cease doing so.

19          THE COURT:  Okay.  Anything else?

20          MR. RICHARDS:  I would love to have some rebuttal

21  time but not now.

22          THE COURT:  You will have rebuttal time.  Thank you.

23      Ms. Farber -- and if anyone needs a recess to use the

24  restroom or just to have a break, now is a good time if you

25  need to.  Would you like a recess?

Preliminary Injunction 3/13/25

1          MS. FARBER:  I'm flexible, Your Honor.

2          THE COURT:  Okay.  All right.  We'll keep going.  I'm

3     always told I don't think about that enough, so I'm trying to

4     think about that.

5          MS. FARBER:  Thank you for the offer.

6          So I'll start with the applicability of NADOHE and due

7     process and then move on to APA and kind of wrap up with the

8     balance of equities, if that works.

9          THE COURT:  Okay.

10          MS. FARBER:  I note plaintiffs' point that they don't

11     have a ton to offer you on the due process and applicability of

12     NADOHE.  We do have a ton to offer the Court on why NADOHE is

13     not applicable here.

14          THE COURT:  Okay.

15          MS. FARBER:  As the Court noted, NADOHE is based on

16     the, in relevant part, January 20th Executive Order signed by

17     President Trump, and there were -- the Court found that that

18     order, the language of that order was vague.  But this case

19     really doesn't properly challenge that order because here we

20     have termination letters.

21          And the phrase that troubled Judge Abelson the most in

22     NADOHE, which plaintiffs' counsel again mentioned in his

23     remarks here, was the phrase "equity related," the opinion in

24     NADOHE said what does that even mean, what is "equity related"?

25          The phrase "equity related" does not appear in any of the

1    actual termination letters that we have here.  We're not

2    dealing with the Executive Order.  We're dealing with a final

3    agency decision terminating these grants.  That's not vague.

4    We're in APA land.  We're not in Fifth Amendment land.

5         And to further that point, you know, although plaintiff

6    can show, you know, offer circumstantial evidence to say, well,

7    the timing is really convenient here, we have an Executive

8    Order and then we have the agency action several weeks later,

9    comparing the agency actions that you have in NADOHE with the

10   one that you have here really leaves very little doubt that we

11   are not talking about the Executive Orders.

12        I have two additional exhibits today to show the Court on

13   that topic, and I've provided copies of these to plaintiffs'

14   counsel already.  May I approach the bench?

15             THE COURT:  Yes, please.

16        Mr. Richards, you do not have any objection to these.  Am

17   I correct?

18             MR. RICHARDS:  I do not, Your Honor.

19             THE COURT:  Thank you.  I mean, I know you can argue

20   against them, but to my looking at them you have no objection.

21             MS. FARBER:  Your Honor, I've handed you what's

22   marked as Exhibit 3 and Exhibit 5.

23        Exhibit 3 is what was filed as an exhibit to the

24   Preliminary Injunction/Temporary Restraining Order Motion in

25   Exhibit 9 there, NADOHE, ECF number -- I'm sorry, I gave you my

Preliminary Injunction 3/13/25

1    comply and don't have the ECF number in front of me.

2              THE COURT:  I have the -- it's 27-13.

3              MS. FARBER:  27-13, correct.

4              THE COURT:  Let me take a moment and read it.

5              MS. FARBER:  Sure.

6         (Pause in Proceedings.)

7              THE COURT:  Okay.

8              MS. FARBER:  And the second is Exhibit 5, which was

9    another NADOHE filing.  This was ECF 39-10 in NADOHE.

10        Now, these are two -- I'll give all moment to look at

11   them.

12             THE COURT:  Yes.  Thank you.

13        (Pause in Proceedings.)

14             THE COURT:  Okay.  I get it.

15             MS. FARBER:  So these are two letters that were part

16   of the record in NADOHE.  These letters were sent to grant

17   recipients about potential threat -- you know, the potential

18   threats to their funding, issues related to the Executive

19   Order.  They're dated, they're both dated before the NADOHE

20   opinion, of course, and they both very explicitly referenced

21   the Executive Order and were trying to comply with the

22   Executive Order.

23        Compare these two, compare Exhibit 3 and Exhibit 5, which

24   very clearly reference the Executive Order in that command,

25   with the termination letter that Your Honor pointed out at ECF

Preliminary Injunction 3/13/25

1    1-2 in this case at Page 10 and 11.

2         THE COURT:  Um-hmm.

3         MS. FARBER:  As you've pointed out, no reference to

4    the Executive Order there.  I didn't see the phrase "equity

5    related" in there.  And this also, this -- some of these are

6    undated but all -- we have no allegation that any of these came

7    after NADOHE.  As far as I can tell they all came before.

8         So there was no reason for the agency to hide the fact

9    that this was -- if this was because of the Executive Order,

10   they didn't have a court decision yet saying they couldn't do

11   that, that they couldn't rely on it.  So if that was the

12   reason, there was no reason for them to hide that at all.  But

13   these letters don't reference the Executive Order.  They

14   reference the department's priorities.

15        And, Your Honor, I think what might be our strongest

16   evidence on that is the leaked communication that we included

17   as an exhibit in our response at ECF 24-2.  That was an

18   internal communication by the -- I believe it was the Acting

19   Secretary at the time.  That was not intended to be seen by the

20   public.

21        THE COURT:  Bear with me for one second.  I want to

22   make sure I see that.

23        MS. FARBER:  ECF 24-2.

24        THE COURT:  Yeah, okay.

25        MS. FARBER:  It's formatted strangely because that

1   was a screenshot from someone's Twitter post leaking this

2   internal memo.

3        So again, this came before the NADOHE opinion.  The agency

4   would have no reason, as far as they know, to hide if they're

5   doing something based on an Executive Order.  This was supposed

6   to be an internal communication not meant for the public, and

7   this doesn't say anything about the Executive Order anywhere.

8   This is about the Department and the Secretary's own goals.

9        So I think, you know, these things all taken together

10  really show the sharp contrast between the case that Judge

11  Abelson had in front of him where no grants had been terminated

12  at all, people were trying to figure out what does this mean,

13  what might be terminated, are we going to get terminated or

14  not, and this case where they know their grants have been

15  terminated, we have a final agency action, and now the question

16  is was that action arbitrary and capricious.  It wasn't vague,

17  but was it arbitrary and capricious.  It's an APA case.  This

18  is not a Fifth Amendment vagueness case.

19       And more to that point why NADOHE doesn't apply here is

20  that the First Amendment component of the plaintiffs' claim in

21  NADOHE colored the entire case.  And that wasn't -- I'm not

22  saying that was incorrect.  I know NADOHE is being appealed so

23  I'm being very careful about what I say about the case.  But

24  Judge Abelson found that there was a likely First Amendment

25  violation in that case, and the law is very clear that when you

1   have a First Amendment -- potential First Amendment

2   infringement, you look at vagueness very differently.  It's a

3   very strict standard for vagueness when you're looking at it

4   through the lens of the First Amendment.  And Judge Abelson

5   mentions that repeatedly in his opinion, and there is -- there

6   is -- I think to put a really fine point on it, one of the

7   cases that plaintiff cites in their brief, in their opening

8   motion is Humanitarian from Central District of California.

9   And in that case, at Page 1062, the Court finds or holds,

10  "Outside the First Amendment context, a statute is

11  unconstitutionally vague on its face only if it is vague in all

12  of its applications."

13       Now, contrast that with what Judge Abelson found, which is

14  exactly the opposite.  So the NADOHE at Page 21, he says just

15  because it's not vague in some contexts doesn't mean it's

16  unconstitutionally vague, and that's because he was applying a

17  First Amendment standard.

18       And that's not what we have here.  We have a specific

19  application to plaintiffs who really should have known and I

20  believe knew why their grants were terminated.  So the way to

21  kind of think about NADOHE, I think, is if these plaintiffs did

22  stand in front of Judge Abelson today and say, okay, here's

23  what happened to us, we got our grants terminated --

24                THE COURT:   I'm moving to enforce your order.

25                MS. FARBER:   Yeah, apply the order to us, Judge.  Do

1   you think that Judge Abelson would be able to do that

2   lickety-split, or would he need to look at additional evidence,

3   would he need to have another hearing?  And I posit that he

4   wouldn't be able to do that.

5            THE COURT:  Apart from the retroactive application.

6            MS. FARBER:  Right, exactly.  It's certainly not

7   retroactive, and Judge Abelson, you know, really was mightily

8   struggling at the NADOHE hearing to try to understand what

9   situations might come under the purview of the Executive Order

10   because he just didn't have the advantage of having definite

11   facts.  There were no terminations in that case.

12     So I don't believe that Judge Abelson would be able to

13   just say, yep, you guys are included in the order, let's just

14   write it up.  It's a different case and a completely different

15   set of facts.

16            THE COURT:  So in other words, even if he decided I

17   am -- I'm going to do the analysis of the factors about whether

18   or not to give retroactive application to something, and let's

19   assume for sake of argument that he found in plaintiffs' favor

20   that retroactive application was appropriate, just generally

21   speaking, you're saying that the same analysis that applied in

22   his case would not answer the plaintiffs' assertions of harm

23   here.

24            MS. FARBER:  Exactly right, Your Honor.  Exactly

25   right.  And you can see how Judge Abelson sort of struggles

1  with the phrase "equity related "in the NADOHE opinion as a
2  main problem -- as a main source of the vagueness, and we don't
3  have -- that phrase doesn't appear here.
4       Here we have a finite termination letter.  It cites to a
5  number of different provisions of Code and Rules, and it cites
6  to sort of the reasons why this decision's being made.  You
7  know, and we can certainly -- you know, the sufficiency of that
8  letter is sort of a different issue and, frankly, not an issue
9  that the plaintiffs here have raised as the substantive
10 sufficiency of that letter, but that's not something Judge
11 Abelson had the benefit of and that doesn't come under the
12 purview of NADOHE.
13      And on the point of, if we set NADOHE aside and the Court
14 does its own vagueness analysis, I think plaintiffs' claims
15 there still fail, and that is because, first of all, we know
16 there is a lot more tolerance for vagueness in context of
17 civil -- civil issues as opposed to criminal issues.
18           THE COURT:  You're saying assuming the EO is the
19 reason.
20           MS. FARBER:  No, I'm saying let's say the EO is not
21 the reason and you're just trying to figure out whether this
22 action is somehow violative of the Fifth Amendment.
23      We believe this is just a straightforward -- I don't know
24 if anything is straightforward in this administration, but it's
25 a straightforward APA case and not a -- it doesn't entangle the

Preliminary Injunction 3/13/25

1    Fifth Amendment.

2              THE COURT:  But you're not making argument -- and I

3    realize it's hypothetical, but you're not making a hypothetical

4    where the Court allows that the termination letters are the

5    thing that is looked at as the Fifth Amendment violator?

6              MS. FARBER:  They shouldn't be.  I think that's what

7    I'm trying to -- that's the point I'm trying to make is that if

8    we take the executive orders out of it, which they should be

9    because here we have a finite termination letter, there's not a

10   vagueness argument as applied to the plaintiffs.

11        And I guess if the only way that we can consider their

12   vagueness claim is are the Executive Orders vague as applied to

13   plaintiffs, we have a termination letter that shows that

14   they're not.  The words in the termination letter were

15   "Diversity, Equity, Inclusion," these are words that have a

16   common meaning and according to Hill, when words have --

17             THE COURT:  There's a lot more words.  There's a lot

18   more words in the termination letter than that but, yes, those

19   words do appear.  But, yes, there's a lot more words.

20             MS. FARBER:  Yes.  And I would argue that the words

21   that are in the termination letter are words that plaintiff

22   likely used in their grant applications that appear in the

23   Federal Register.

24             THE COURT:  I don't know if they used "fraud" and

25   "duplication" and things like that in their grant applications,

Preliminary Injunction 3/13/25

1    but I understand your meaning.

2            MS. FARBER:  Yes.  I'm guessing they didn't use

3    "fraud" and "duplication" but those --

4            THE COURT:  Probably not.

5            MS. FARBER:  But those terms "fraud" and

6    "duplication" also appear in the Federal Register.  They appear

7    as grant conditions.  So those are not new terms to grantees.

8    When they accept grants, they accept the terms and conditions

9    that come with the grants, which I'll get to in a moment.  So,

10   you know, there's not -- there's just not a vagueness issue

11   here.

12           THE COURT:  Okay.

13           MS. FARBER:  I think that's my argument on vagueness.

14           THE COURT:  Okay.

15           MS. FARBER:  Is there anything -- does the Court have

16   any questions on that or should I move on to the APA?

17           THE COURT:  I don't.  Let's move on to the APA.

18           MS. FARBER:  So I took note of something that

19   plaintiffs' counsel said at the very start of our time together

20   today, which is that sort of what's happening here in the

21   agencies and with the presidential administration is going to

22   require these teacher training programs to rebuild from the

23   ground up.

24        And, you know, at the risk of like, you know, hard truth

25   pills, I think that's exactly what the people who voted for

1   this president voted for was rebuilding some of these systems

2   from the ground up, and that to some extent is what's

3   happening.

4           THE COURT:  Well, that may be his prerogative.  I

5   think it's the manner in which it's being done that is at issue

6   here.

7           MS. FARBER:  Yes, and let's get to that, Your Honor.

8   So the only argument is plaintiff admitted the singular

9   argument they're making here on arbitrary and capriciousness is

10  that agency priorities are subject to Rulemaking.

11          THE COURT:  Yes.

12          MS. FARBER:  And because the agency did not go

13  through the Rulemaking and public comment process about this

14  sort of big picture policy shift with this new administration

15  that they've acted arbitrary and capriciously, and there's not

16  a basis for that in the regulations, in the Federal Register,

17  in the appropriate rules.

18      I think the crux of plaintiffs' argument as to why

19  Rulemaking is required for these kind of big picture agency

20  priorities is that, at least what I heard plaintiffs' counsel

21  say just a moment ago, was it's the same word, right?  It

22  includes -- the phrase includes the word "priorities," and so

23  everywhere we see the word "priorities" in any rule or

24  regulation it means agency priorities.  And that's just not

25  consistent with a plain reading of any of these regulations.

1      And I'll point Your Honor to a couple of the citations

2  that I think plaintiffs' counsel said didn't belong before the

3  Court, but I think they do because this shows the fact that

4  just because the word "priority" appears it doesn't mean it's

5  the same thing across the board.

6      So we have funding priorities.  "Funding priorities"

7  appears in Appendix 1 to Part 200.  It is at (b)(3)(i)(B).  So

8  we have funding priorities there.  And then annual Priorities

9  from 75.105.  Annual priorities, those are subject to

10  Rulemaking, that's a different thing than funding priorities.

11  And then we have agency priorities, which we say are neither of

12  these.  We have funding priorities, we have annual priorities,

13  but then you have agency priorities.  It's a different word.

14  Sure, all three of these things includes the word "priorities"

15  but they're not the same.

16      Plaintiffs' argument essentially says that there's nothing

17  that the Department of Education can do that wouldn't be

18  subject to Rulemaking.  So if the Department of Education wants

19  to move someone's office because it doesn't effectuate the

20  interests of the agency, is that now something that is subject

21  to Rulemaking because it relates to an agency priority to move

22  somebody's office.  Where is the end to what the agency can't

23  do without subjecting itself to Notice and Rulemaking?

24      This is inconsistent with the termination provision at

25  200.340 and the changes to that termination provision in the

1   year 2020.  The clear intent there was to make it a bit easier

2   for agencies to terminate grants that didn't align with its

3   sort of big-picture mission.

4       I'd also point the Court to a couple of sections in the

5   Federal Register that announce, call for grants for the TQP,

6   the SEED, and the TSL programs.  So explicitly in the terms of

7   these grants, there is language related to abiding by federal

8   civil rights law and being able to terminate these grants with

9   broad discretion to the fullest extent of the law.

10      And that "fullest extent of the law" caveat is where we

11  get to is this arbitrary and capricious, right?  That's where

12  the APA comes in.  But I'll point to a couple pages of Federal

13  Register for each of these grants.

14      So for the TQP, it is at Page 23587.  That's where you

15  have -- the language is "projects will be awarded and must be

16  operated in a manner consistent with the nondiscrimination

17  requirements contained in federal civil rights laws."

18      And so that's where you kind of -- that's where the change

19  really happened with Students For Fair Admission was this

20  thought that, well, you know, some of these diversity-promoting

21  programs, they're all consistent with federal civil rights law

22  and then we get Students For Fair Admission that just turns

23  that on its head and says no, a lot of these programs that you

24  thought were fine actually violate civil rights law.

25      So we have that provision related to federal civil rights

 1    law in TQP.  And then the termination provision in TQP is
 2    located at Page 23590 of the Federal Register, and that says,
 3    "Terminating agreements in whole or in part to the greatest
 4    extent authorized by law if an award no longer effectuates the
 5    program goals" -- which we all agree is a different thing --
 6    "or agency priorities."  And then it cites to the termination
 7    provision at 340.
 8        And then there is almost identical, like functionally
 9    identical language in the Federal Registers for SEED at Page
10    19492 and 19495, and then again for TSL, both on Page 33600.
11        So when we talk about what were the terms and conditions
12    of these grants, that's right there.  The terms and conditions
13    relate to abiding by federal civil rights law and we can
14    terminate these grants if they don't align with agency
15    priorities to the fullest extent allowed by law.
16        There was a -- plaintiffs made a brief reference to
17    whether the letters conveyed a good reason for the termination.
18    That's not a claim that they are advancing.  They're advancing
19    just this very simple straightforward was Rulemaking required.
20            THE COURT:  Well, not really.  Their count is very
21    broad, if you read the count.  I mean, so the -- I went to that
22    issue my very self and their count allows for all of it, in my
23    opinion.
24            MS. FARBER:  Okay.  Well, then, if that's the Court's
25    reading, which is distinct or is different from what plaintiffs

1    have said that they are advancing here --

2         THE COURT:  Well, I mean, inasmuch as we're relying

3    on pleadings here, which is what of course you correctly noted

4    at the outset, Count 2 which begins at Page 37, Paragraph 157,

5    is extraordinarily broad and asserts as a general proposition

6    that the termination letters and the decision to terminate is

7    unlawful, arbitrary, and capricious for the reasons set forth

8    above.

9         Now, I don't challenge you or quarrel with you about where

10   the arguments have focused mainly, but I read their APA claim

11   to be broader than you do, than you are.

12        MS. FARBER:  Okay.  Well, I'll take a moment, then,

13   to address that issue, but I do want to highlight that the

14   argument that they actually flush out, the argument they

15   advance is the singular Rulemaking issue, and I don't think

16   that that argument has merit.

17        As to sort of this bigger picture question of were these

18   letters adequate, is this sort of change in big picture

19   priorities arbitrary and capricious, you know, there we have --

20   the Government's position is that the reasoning set forth in

21   the letters is sufficient.  That reasoning sets forth the

22   reason why these grants were being terminated.

23        THE COURT:  Does it?  Does it, though?

24        MS. FARBER:  We think it does, but I will put a pin

25   in that because the Massachusetts court that considered this,

1    Judge Joun who considered this same issue whose plaintiffs did

2    advance the argument that these letters were insufficient found

3    that they were insufficient, that it was just kind of

4    boilerplate that was copy-pasted.  So if that's where Your

5    Honor's headed, I do have an argument there.  The Government's

6    position is these letters were sufficient.

7                THE COURT:  Okay.

8                MS. FARBER:  And I'll just briefly address that

9    before moving to what if you don't think the letters were

10    sufficient.

11        So what's required under the APA is just sort of a

12    reasonable, reasonably explained.  And I think the Supreme

13    Court in the FCC case and in I believe the Motor Vehicle case

14    as well talks -- sort of talks about this distinction between,

15    well, you could have done more, you know, you could have done

16    more, you could have explained more, but did you explain

17    enough, and the issue is really did you explain enough.  And a

18    short explanation can still be a reasoned explanation under the

19    APA.  That's from Multicultural at 936.

20        So in this case, we have an identification of, you know,

21    the Administration's position or the Department's position that

22    Diversity, Equity, Inclusion violates federal civil rights

23    laws, that the grants at issue -- let me pull up the language

24    from the letter -- that the grants at issue promote or take

25    part in DEI initiatives or other initiatives that unlawfully

1    discriminate on the basis of race, color, religion, sex,

2    national origin, or another protected characteristic that

3    violate either the letter or purpose of federal civil rights

4    law, which goes to that discrimination and goes to the terms

5    that we just reviewed, and then goes on and cites to a number

6    of the relevant sections from the Code of Federal Regulations.

7         And, you know, I think we can see that that explanation is

8    sufficient from looking at the complaint.  You know, the

9    complaint cites to the aspects of these terminated programs

10   that would arguably come -- that would come under this umbrella

11   of Diversity, Equity, and Inclusion that would have prompted

12   their grants to be canceled, at least in part.

13             THE COURT:  So, in other words, plaintiffs were able

14   to surmise why they were terminated, but you're taking the

15   position that the letter adequately tells them why they were

16   terminated.

17             MS. FARBER:  Yes.  I think that they're one and the

18   same.

19             THE COURT:  Okay.

20             MS. FARBER:  I think the letter provided enough

21   information to the plaintiffs to understand what was happening

22   and why.  And then there is a -- there is an appeal process

23   that's in this letter.  I --

24             THE COURT:  How would someone invoke that appellate

25   process exactly?  What's required?

1          MS. FARBER:  My understanding is just kind of on all

2    fours with what's in the letter.  So as far as process, I only

3    know what's listed in the letter.  The last communication we

4    had with the Department of Education indicated that there were

5    only two appeals filed and none of them were in Maryland.  But

6    I did not see any original documents for myself and that was --

7    the information is several days old so I do not know if that's

8    changed, if the Maryland plaintiffs have appealed.  But, you

9    know, our understanding from over the weekend was that this

10   wasn't a large number of appeals.

11          THE COURT:  Bear with me for one moment.

12          MS. FARBER:  Sure.

13          THE COURT:  And just to be clear before I ask my next

14   question, your position, your clients' position about the

15   § 200.340 is exactly what?

16          MS. FARBER:  Our position as to the termination

17   provision, let me pull that up.  Our position is that

18   Subsection (1), so 200.340(a)(1), when it talks about terms and

19   conditions, that's where we have the terms and conditions

20   related to federal civil rights laws, not violating federal

21   civil rights laws.  We see that same exact language in the

22   termination letter, and that comes from at least in parts

23   Students For Fair Admission saying that these types of programs

24   do violate federal civil rights laws.

25        I think we agree with plaintiffs that (2) and (3) don't

1    apply here, and then (4) is the argument that we went through

2    that just because the phrase "agency priorities" includes the

3    word "priorities" does not mean agency priorities is synonymous

4    with funding priorities is synonymous with annual priorities.

5    Agency priorities, big picture direction of the agency stuff

6    does not require Rulemaking.

7         THE COURT:  And turning back to the termination

8    letter itself which asserts that an appeal of the termination

9    shall include a brief statement of your argument and the

10   disputed factual legal or other issues.  It cites 200.342, and

11   I confess I don't have that in front of me.  I assume that

12   relates to appeals of terminations, but I'm asking you to tell

13   me what it says.

14        MS. FARBER:  I don't have that in front of me either,

15   Your Honor.

16        THE COURT:  Okay.

17        MS. FARBER:  But my esteemed colleague is telling me

18   that it does relate to the appeal process.

19        THE COURT:  Okay.

20        MS. FARBER:  And so, you know, I think the thing

21   that's a bit unprecedented about this APA challenge for this

22   Court is that typically a remedy for plaintiffs in the event

23   that there's not a sufficient agency record to show the

24   agency's process, the remedy typically is let's remand it to

25   the agency, they can develop the factual record, and then we

1    can look again and see did they explain it better.

2        So again, we maintain that the letter in itself is enough.

3    But here now we're in a situation where there are enormous

4    changes happening at the Department of Education.  I have

5    another exhibit, Exhibit 4, which is the publicly released

6    statement by the Department of Education about the Reductions

7    in Force that happened, I think it was just on Tuesday.

8             THE COURT:  Yes.  So how substantively effective

9    given its reduction in numbers would a remand possibly be?

10            MS. FARBER:  That's the issue, Your Honor.  So in my

11   filing, I suggested remand this back to the agency, they can do

12   an expedited review.  People that I was working with on this

13   case are gone.

14            THE COURT:  But my question is -- and I'm not being

15   smart when I say it and I'm not calling myself stupid.  What I

16   mean to say is I'm not trying to be sassy when I ask this.

17            MS. FARBER:  Thank you, Your Honor.

18            THE COURT:  But who's there to do this expedited

19   work?

20            MS. FARBER:  Correct.

21            THE COURT:  I mean, as a matter of practical reality,

22   even if I were to find that to be an attractive option, you

23   know, justice delayed is justice denied.  I mean, what's going

24   to happen?  I mean, you can't make me any promises.

25            MS. FARBER:  I can't.  And that's why I'm flagging

1    this for you is that was something that I put in my brief.

2                THE COURT:  Yeah, I hear you.

3                MS. FARBER:  And hours later, hours later the

4    situation changed and now we have an existential issue at the

5    Department of Education.

6                THE COURT:  No, I understand.  Of course you would be

7    remiss not to suggest that as an alternative outcome here, but

8    you know, as a practical reality --

9                MS. FARBER:  Yes.

10                THE COURT:  I mean -- yeah.

11                MS. FARBER:  I think we're on the same page there.  I

12    can say that the agency is trying to figure out if they can do

13    a remand, and I'd ask them to put the gears in motion there.

14                THE COURT:  To find out.

15                MS. FARBER:  To find out if they can.  And that would

16    be something that if this is something the Court was

17    considering.  And really, I mean, remand, in a normal

18    circumstance where the agency is not being cut in half, a

19    remand would be probably the most appropriate way to deal with,

20    just flush out this letter a little bit more.  We all

21    acknowledge we are in a different universe as far as that's

22    concerned.

23            But if the Court is open to that, I'm -- my understanding

24    is that I should have a -- we can do it or we can't do it

25    within 48 hours.  I'm hesitant to make any representations

Preliminary Injunction 3/13/25

1    because I don't even know if the people that told me that are

2    going to be there in 48 hours.

3         THE COURT:  So I'm not ethically allowed to provide

4    legal advice.

5         MS. FARBER:  Yes.

6         THE COURT:  But were I you, I would stop there.

7         MS. FARBER:  Yes.  So the main point I want to make

8    here is that the situation has definitely changed.

9         THE COURT:  I understand.  I appreciate your candor.

10        MS. FARBER:  In a normal world we'd be looking at a

11   remand, and we have an agency that is facing some existential

12   issues and I just don't know would be the way that I would say

13   that.

14        THE COURT:  Fair.  I have a question for you.  In the

15   termination letter, and I know you know what I'm about to ask

16   you but -- or perhaps you don't, but the first substantive

17   paragraph beginning "It is a priority," it makes -- you know, a

18   lot of largesse there about sort of positions and a sort of

19   framework, foundation for what we're gearing up to tell you.

20        The second full paragraph:

21        "The grant specified above provides funding for programs

22   that promote or take part in DEI initiatives or other

23   initiatives that unlawfully discriminate on protected

24   characteristics that violate either the letter or purpose of

25   federal civil rights law that conflict with the Department's

1    policy of prioritizing merit, fairness, and excellence in

2    education that are not free from fraud, abuse, or duplication,

3    or that otherwise fail to serve the best interests of the

4    United States.  The grant is therefore inconsistent with and no

5    longer effectuates Department priorities," and so it's

6    terminated.

7        The following page is where it talks about a grant

8    recipient's -- or, no, a terminated grant recipient's ability

9    to challenge the termination decision in writing within 30 days

10   and the appeal should contain the following, Number 3, a brief

11   statement of your argument and the disputed factual legal or

12   other issues.

13       And again, transcripts are lousy for tone, so I am not

14   being sarcastic when I ask this.

15       What exactly do you contend they've learned from this

16   termination letter that anybody who's been terminated could

17   effectively challenge in a, quote, brief statement?  What has

18   this advised them about the basis for their termination?

19       Now, because if I have an education grant or a grant from

20   the Department of Education and my program is called

21   "Underserved Youth from Transgender Communities Unite," I might

22   be fully aware that I am promoting and engaging in a program

23   that President Trump has determined is not okay anymore,

24   unlawful, even, and that he wishes and Secretary McMahon or her

25   predecessor on her own or in conjunction or however -- I'm not

1  getting into the Executive Order issue -- but has determined to
2  root out offenders of that principle and to terminate the
3  grant.
4      Now, a plaintiff here might surmise, wow, I really had a
5  target on my back, especially given the name of my program and
6  what I do and what I spend money on, the participants and the
7  teachers I teach, but what about this letter puts anybody on
8  notice about why they were terminated such that their appeal
9  right would actually have substance?  What am I supposed to do
10 with this?
11             MS. FARBER:  There are -- I think I have three points
12 I'd like to make there.
13             THE COURT:  Okay.
14             MS. FARBER:  It's possible the third one will
15 evaporate as I talk so I think it's two to three points I'd
16 like to make.
17             THE COURT:  Then hurry.
18             MS. FARBER:  Yeah.  The first point is that, you
19 know, we can see that the plaintiffs know what aspects of their
20 program were at issue because they include allegations in their
21 complaint that highlight the diversity and the equity and the
22 inclusion aspects of their program that they believe were what
23 prompted this termination.
24             THE COURT:  Yes.
25             MS. FARBER:  So we know that they know and this

1    letter gave them notice of that.  That's why we're here.

2    That's why we have this lawsuit is because they understand why

3    this happened.

4        As to how can their appeal be successful, there are --

5    there's a contact person here that they can contact with

6    questions.  I believe I read an allegation that some of the

7    plaintiffs have contacted that person and not heard back.

8              THE COURT:  And nobody got back.

9              MS. FARBER:  Yes.

10             THE COURT:  And there was more than one.

11             MS. FARBER:  Yes.

12             THE COURT:  And a lot of time had gone by.

13             MS. FARBER:  Yes.  And we take that as true.  I

14   certainly don't have any contrary information.  But, you know,

15   there is a process here that provides for some way to ask

16   questions.

17             THE COURT:  Well, I guess my point, though, is -- and

18   I'm -- that was rude of me to cut you off but I want to draw

19   you into really what is bothering me about this.

20             MS. FARBER:  Yes, please.

21             THE COURT:  A couple of things.  One, yeah, I'm a DEI

22   program so that might be a basis to cut me off, but

23   the "everything in the kitchen sink" list that is in this

24   letter and it's disjunctive, I mean, holy moly, what are we

25   supposed to do with that?  How do I know that I'm not being

1    terminated because of my super-obvious DEI program, but also

2    because I'm considered duplicative, or because they're accusing

3    me of fraud?  How does this tell a person?  It's disjunctive

4    and it's so broad.  The spirit of a law?  I mean, what does

5    that even mean?

6                THE COURT:  What does the spirit of the law mean?

7                THE COURT:  Yeah.  I mean, in other words, my point

8    is that the letter or purpose of a law, I mean, what is this

9    supposed to advise anybody about how to undertake an appeal of

10   this action?

11               MS. FARBER:  And I take your point, Your Honor, and I

12   think that you are -- and it seems that you and Judge Joun are

13   in agreement on that point that these letters are -- they're --

14   as you said, it's disjunctive, what am I supposed to take from

15   this.

16               THE COURT:  Yeah.

17               MS. FARBER:  And I think where I'd point to is, you

18   know, the plaintiffs took from it what happened here, you know,

19   an effective response would address these alternative -- these

20   alternative issues would address the known issues and then the

21   alternative issues.

22        And then I did have a third point and this is what it is,

23   is that when it come to APA challenges, you know, the question

24   is not could the letter have said more, could the letter have

25   been more detailed, because we all agree yes.

Preliminary Injunction 3/13/25

```
 1              THE COURT:  Here it's could the letter have said less
 2      is my issue.
 3              MS. FARBER:  Sure.
 4              THE COURT:  Right?  It's like what's that old saying,
 5      if I had more time I would have written less?
 6              MS. FARBER:  Right.
 7              THE COURT:  Why does this not smack of an absolute
 8      absence of individualized evaluation?  These are form letters,
 9      obviously.
10              MS. FARBER:  So I think that the question there is,
11      you know, according to the law does the letter do enough.
12      Could it have been more narrow?  Yes.  Yes.
13              THE COURT:  Yeah.
14              MS. FARBER:  But does it do enough to put them on
15      notice, does it do enough, and the Government contends that it
16      does.
17              THE COURT:  Okay.
18              MS. FARBER:  And then, you know, yeah, I think I'll
19      leave it there.
20              THE COURT:  Okay.  I appreciate that.
21              MS. FARBER:  And then, Your Honor, I think as to the
22      other preliminary injunction factors, if I could speak to just
23      briefly.
24              THE COURT:  Yes, absolutely.
25              MS. FARBER:  So we have conceded irreparable harm
```

1    here for the purpose of streamlining things, but that's not

2    decisive.  Just the fact of irreparable harm is not enough.

3              THE COURT:  Of course.

4              MS. FARBER:  And importantly, importantly in the

5    Winter case, the Supreme Court even found that, sort of

6    assumed -- I'll back up a little bit.

7         In Winter, the Supreme Court found likelihood of

8    irreparable harm but then did a balancing of the equities and

9    public interest and found it weighed in favor of the Government

10   and against a preliminary injunction and they did not even

11   consider the question of the merits.

12             THE COURT:  Yeah, if you don't meet them all you

13   don't get it.

14             MS. FARBER:  Yeah, right.  So, well, yes.  Or at

15   least, you know, there's some balancing that's involved, right?

16   And so the Supreme Court there is saying that -- effectively is

17   saying it doesn't matter if you win the merits.  If the balance

18   of the equities doesn't go in your favor, then you don't get

19   this absolutely extraordinary remedy of a preliminary

20   injunction even if you're facing irreparable harm, even if this

21   is an existential issue for you.

22             THE COURT:  Yes.  No, I agree, I mean, I think the

23   likelihood of success on the merits and the irreparable harm

24   for obvious reasons get, you know, top billing, but I don't

25   disagree with you that balance of equities and public interest

1    are often sort of given the -- you know, they take a backseat,

2    I think, on a lot of these issues.  But to some extent I think

3    that's because if a movant satisfies those first two, it often

4    is the case.  I'm not saying it is the case --

5                MS. FARBER:  Right.

6                THE COURT:  -- as a matter of definition, but it

7    often is the case that the other two are quite obvious.

8                MS. FARBER:  Yes.  And I think that's where I would

9    just like to touch for a moment --

10               THE COURT:  All right.

11               MS. FARBER:  -- on the interest on the other side,

12   because it does seem like there is a sort of taking for

13   granted, well, there's no public interest on the other side.

14   The entire interest is in, you know, the --

15               THE COURT:  The people.

16               MS. FARBER:  Yeah, like these values that are --

17               THE COURT:  I understand.  You're saying there are

18   other people.

19               MS. FARBER:  Correct.  There are other people and I

20   think what the election showed us was that those other people

21   are here and they feel urgently about this issue and they went

22   out and voted, and that's why we're here.  And we ignore them

23   or don't weigh them or balance them at our peril that it's an

24   injustice to not factor in those interests.

25               THE COURT:  If I were to grant the injunction that

1    plaintiffs seek, what is the -- in other words, talking about

2    the balance of equities, in other words, in the absence of the

3    injunction who is to hurt more, in the presence of the

4    injunction who is to hurt more.  What is your argument that in

5    the presence of the injunction the -- I'll just say the common

6    American, not a plaintiff, would suffer?

7            MS. FARBER:  I think that the injury that the common

8    American feels is likely less immediately existential than what

9    the plaintiffs here feel.  But I think Judge Thomas in his

10   concurrence in Students For Fair Admissions has -- you know,

11   can disagree with him --

12           THE COURT:  Of course.

13           MS. FARBER:  -- on the content, but he has a really

14   interesting perspective on sort of the urgency with which we

15   need to do away or the urgency with which some of these

16   initiatives can be harmful, even to people of color, I found it

17   to be really, really interesting read with a different

18   perspective that I hadn't considered.

19       So, you know, I think that one of the things that Justice

20   Thomas mentions is this idea of, like, this really like kind of

21   hateful phrase that we have now the "DEI Hire," you know,

22   that's a really kind of lightning bolt, like just horrible,

23   kind of horrible thing to say.  The only reason we have that

24   phrase, Justice Thomas points out in the Students For Fair

25   Admission concurrence, is because we have DEI, you know, and I

1    certainly know people who feel as though -- you know, who

2    question whether they belong in places where they do.  They do

3    belong.  They're there on merit, but because there's this

4    specter, you know, that does cause an injury.  You know, not to

5    mention --

6              THE COURT:  Well, some might say that those who come

7    from a viewpoint that individuals who are not typically or

8    historically in power positions have misappropriated that term

9    through a lens of hate.

10             MS. FARBER:  Yes.  Yes.  Absolutely.  And I would

11   also, I'd be remiss --

12             THE COURT:  Or just simply discrimination, which also

13   is another way of saying hate.  But --

14             MS. FARBER:  Yes.  I would be remiss --

15             THE COURT:  -- it's a very interesting perspective

16   and I -- it's a very interesting perspective and I am always

17   endeavoring to be as intellectually honest as one could

18   possibly be, especially in my job.

19             MS. FARBER:  Of course.

20             THE COURT:  Yes.

21             MS. FARBER:  And I would be remiss if I did not point

22   out Justice Jackson and Justice Kagan's dissent which really

23   just shreds Justice Thomas's opinion.  So there is very heated

24   disagreement on all sides here.

25             THE COURT:  Of course.

1    MS. FARBER:  But just trying to zealously advocate

2    for my client on this and present the sort of opposing

3    viewpoint here.

4    THE COURT:  The public interest issue.  I understand.

5    MS. FARBER:  And then as far as the Government's

6    interest and, you know, I think this is where the Massachusetts

7    case is particularly interesting.  I mean, certainly the

8    Government has an interest in ending discrimination.  And what

9    we see in the Massachusetts case, at least according to Exhibit

10   2, the declaration, is that this money that has been released

11   in the Massachusetts case, it might be just flying out the

12   door.  It might be all gone.  And so when we talk about the

13   potential injury to the Government, we are seeing that

14   potentially in the Massachusetts case.

15   THE COURT:  But that assumes for purposes of your

16   argument that the judge was wrong.

17   MS. FARBER:  That the judge was wrong on the

18   constitutional --

19   THE COURT:  In other words, the money flying out the

20   door is a consequence of his determination that your client did

21   something not allowable by law and that's why the TRO was in

22   place.  In other words, the money flying out the door is

23   because the money was released again.  And so the idea that the

24   Government has been harmed necessarily has built into it the

25   fact that the judge was wrong as a matter of law.

Preliminary Injunction 3/13/25

 1          MS. FARBER:  Yes.  And I see your point.  And yes,
 2   the Government's contention is that that was an incorrect
 3   opinion.
 4          THE COURT:  Of course.
 5          MS. FARBER:  And that there is an appeal.  The
 6   Exhibit 1, which is the status report, mentioned that an appeal
 7   is being filed in that case.
 8          THE COURT:  I saw that.  I saw that.  I'm interested
 9   to know what the basis of the TRO appeal would be.
10          MS. FARBER:  Me, too.
11          THE COURT:  Yes, particularly considering that a
12   briefing schedule was ordered, but we'll see.
13          MS. FARBER:  Yes.  Yes, I think we'll -- it will be
14   interesting to follow that one, yes.
15      Okay.  So I think that's the balance of equities point.  I
16   appreciate Your Honor's hearing that out --
17          THE COURT:  Of course.
18          MS. FARBER:  -- as I know you do every issue.
19      And then finally on the scope of relief, you know, we've
20   asked that it be -- we limit ourself to the grants that are at
21   issue here.  The plaintiffs had all the time in the world.  I
22   guess I shouldn't say all the time in the world, but they are
23   the ones who drafted this complaint, that they don't include
24   the grants that they want to have reinstated sort of makes it
25   difficult for us to figure out with which grants they're

1    talking about.  So we would ask that the relief be limited to

2    those grants that are identified and documented in the

3    complaint, and certainly that it be limited to at the very

4    least the plaintiffs who are here before you in this case.

5        THE COURT:  Okay.  And I'm going to ask Mr. Richards,

6    but since you're standing I'll ask you also -- or first.

7        If the Court were to issue a PI -- and again, for all of

8    those listening, this is strictly for purposes of inquiry --

9    what is the Government's position or the Government Defendant's

10   position on bond?

11       MS. FARBER:  In this case, and the Government's

12   not -- the position we take in this case is not meant to bind

13   the Government in any other case.

14       THE COURT:  Of course.

15       MS. FARBER:  But in this case we are not arguing

16   about bond.

17       THE COURT:  For bond.  In other words, you're content

18   with de minimus or no bond?

19       MS. FARBER:  In this case, yes.

20       THE COURT:  In this case, yes.  All right.  Thank

21   you.

22       Mr. Richards, did you want rebuttal?

23       MR. RICHARDS:  Very, very briefly, Your Honor.

24       The Court asked most of the questions that I would have

25   liked to have asked of my friend, and so I appreciate the need

1    to wrap this up.

2         Just one thing that I want to clean up is that the

3    Government argued that the terms and conditions of the grants

4    were set in the Federal Register.  That's not accurate.

5         Grants are issued through notices, and those grant award

6    notices expressly list the terms and conditions of the grant at

7    issue, and that's an obligation that the Government is held to.

8    I don't think it actually impacts this case but I just wanted

9    to make sure that that was clear that we're not talking about

10   terms and conditions, you know, hither and yon.  We're talking

11   about terms and conditions listed in the grant, in the award

12   notice.

13        THE COURT:  So what significance, if any, does the

14   F.R. have here?

15        MR. RICHARDS:  I don't think it has any, Your Honor.

16   I think it refers to the reason that the Government made a

17   change to regulation for a reason that doesn't have any bearing

18   on the outcome of the case.

19        THE COURT:  Okay.

20        MR. RICHARDS:  I don't think it's incredibly

21   significant here but, you know, counsel's example of changing

22   offices I think is sort of afield, right?  We're talking about

23   here a set of priorities that only has to be issued once in an

24   administration.  They can use it for the entire rest of the

25   administration, it doesn't have to be issued on a

1    grant-by-grant basis.  And the obligation to engage in

2    Notice-and-Comment Rulemaking with respect to grants is

3    specific from GEPA.  We're not talking about office changing

4    and that sort of thing, right?  So we think the argument that

5    this is going to have an impact on the minutia of the

6    Department's operation just isn't quite right, and to the

7    extent that's true is because Congress made it that way.

8         On the last point, we had anticipated if an injunction

9    were issued providing a list of the members of each of our

10   organizations to the Government so that they know exactly which

11   grants should be turned back on, which -- actually, a better

12   phrase would be which terminations should be vacated, and I

13   think that would be a practical way of handling that issue.

14             THE COURT:  Okay.  I think that you should file a

15   line, or whatever you want to call it, providing that list to

16   the Government now and including it in a court filing.

17             MR. RICHARDS:  I will do that, Your Honor.  And I

18   will just add, I don't think this affects the merits here, but

19   there is a reason that we didn't put every grantee in the

20   complaint.

21             THE COURT:  Why?

22             MR. RICHARDS:  The reason is that they all fear

23   retribution from the Government, and I think not unreasonably.

24   And for any of them to stick their heads out and be listed here

25   was a significant risk.

1        And so the idea that not exposing yourself to potential

2    retaliation from the Government is a reason to deny relief in a

3    case where all of the affected entities are similarly situated

4    strikes me as problematic.

5            THE COURT:  So the list that we're talking about,

6    this -- well, I'm not going to impose -- I don't mean by name,

7    but the list that you're proposing to provide if the Court were

8    to issue an injunction is all members of your clients or to the

9    extent it is one of the plaintiffs, but all members of your

10   clients whose grants have be terminated through receipt of a

11   termination letter that is identical to that attached to the

12   complaint.

13           MR. RICHARDS:  Correct, substantially identical,

14   right?  They are form letters, as Your Honor pointed out.

15   There are very minor differences.

16           THE COURT:  Well, I mean that the Paragraphs 2, 3 and

17   4 are the same thing.

18           MR. RICHARDS:  Yes.  Correct, Your Honor.

19           THE COURT:  Okay.  Well, then I do not need you to

20   file that list.  It has no bearing on my decision, but when I

21   make that decision, if the order is to be issued, I may require

22   such a list.

23           MR. RICHARDS:  I would anticipate that, Your Honor.

24   Thank you.

25           THE COURT:  Okay.  Mr. Richards, is there anything

Preliminary Injunction 3/13/25

```
1    else?
2              MR. RICHARDS:  No, Your Honor.
3              THE COURT:  Ms. Farber, is there anything else?
4              MS. FARBER:  No, Your Honor.
5              THE COURT:  All right.  I am going to take a five- or
6    ten-minute recess to look at my notes.  I used to give young
7    law firm associates advice that if a partner brings you in for
8    an assignment, make sure you ask all the questions you'll have
9    because you might never get that meeting again.
10        So I'm going to take my owned advice, I'm going to go look
11   at my notes and make sure I don't have anymore questions, and
12   then I'll come back out and if I don't, we'll go, and if I do,
13   we'll talk.  Court's in recess.
14        (A recess was taken from 12:09 p.m. to 12:31 p.m.)
15              THE COURT:  All right.  I have one question,
16   Mr. Richards, with respect to AACTE.
17              MR. RICHARDS:  Yep.
18              THE COURT:  I know its members also include Maryland,
19   Towson, and Frostburg.  There are two others, I believe,
20   Maryland members, two other Maryland members.  I need to know
21   who they are, what kind of grants they have, and what the
22   status of those grants is.
23              MR. RICHARDS:  Can I apprise the Court after the
24   hearing?
25              THE COURT:  Yes.
```

```
 1          MR. RICHARDS:  I don't know off the top of my head.
 2          THE COURT:  So I understood from the declaration at
 3   5-3 that AACTE has five Maryland members, three of which have
 4   been identified as Maryland, Towson, and Frostburg.  So we know
 5   what the status of their grants is, and I want to know, again,
 6   so who they are, what grants -- or grants, what grants they
 7   have, what kind of grants they have, and what is the status of
 8   those grants, in other words, have they been terminated, et
 9   cetera, and whether they were affected by Judge Joun's order.
10      Yes, if I could --
11          MR. RICHARDS:  I'm sorry, just a point of
12   clarification.
13          THE COURT:  Yes.
14          MR. RICHARDS:  I'm not involved in that case.  My
15   understanding of the order is that it would apply to all TQP
16   and SEED grants --
17          THE COURT:  Correct.
18          MR. RICHARDS:  -- in the states where the AGs brought
19   suit, so that would cover everyone in Maryland one way or the
20   other.
21          THE COURT:  Except only for those two kinds of
22   grants.
23          MR. RICHARDS:  Correct.
24          THE COURT:  Right.
25          MR. RICHARDS:  Got it.
```

Preliminary Injunction 3/13/25

1    THE COURT:  Yeah.  So if you can just provide, you

2  know, you can do it on letterhead, it doesn't matter, by ECF

3  just by end of business will be great.

4    MR. RICHARDS:  Will do.

5    THE COURT:  Okay.  All right.  Thank you very much.

6  I appreciate cogent argument and your very well-done papers.

7    Thank you.  Court's adjourned.

8    (The proceedings concluded at 12:33 p.m.)

9    CERTIFICATE OF OFFICIAL REPORTER

10    I, Amanda L. Longmore, Registered Professional Reporter
   and Federal Certified Realtime Reporter, in and for the United
11  States District Court for the District of Maryland, do hereby
   certify, pursuant to 28 U.S.C. § 753, that the foregoing is a
12  true and correct transcript of the stenographically-reported
   proceedings held in the above-entitled matter and that the
13  transcript page format is in conformance with the regulations
   of the Judicial Conference of the United States.

14

15    Dated this 18th day of March 2025
      -S-

16    _____
      AMANDA L. LONGMORE, RPR, FCRR
17    FEDERAL OFFICIAL COURT REPORTER

18

19

20

21

22

23

24

25

**'22** [1] - 19:24
**1** [5] - 13:19; 61:7; 67:18; 82:6
**1-2** [2] - 48:1; 53:1
**10** [1] - 53:1
**100** [1] - 20:18
**104** [1] - 20:18
**1062** [1] - 55:9
**10:06** [1] - 2:2
**11** [3] - 14:6; 48:1; 53:1
**12:09** [1] - 87:14
**12:31** [1] - 87:14
**12:33** [1] - 89:8
**1391(e)(1)(C** [1] - 8:17
**14** [1] - 16:24
**157** [1] - 64:4
**16** [1] - 14:7
**18th** [1] - 89:14
**19492** [1] - 63:10
**19495** [1] - 63:10
**2** [11] - 13:17, 20-21; 16:19; 20:17; 43:22; 64:4; 67:25; 81:10; 86:16
**200** [8] - 41:18; 43:2; 45:10; 46:7, 20, 22; 61:7
**200.340** [5] - 39:4; 40:2; 45:23; 61:25; 67:15
**200.340(a** [1] - 46:1
**200.340(a)(1** [1] - 67:18
**200.342** [1] - 68:10
**200.343** [1] - 48:7
**2020** [1] - 62:1
**2021** [2] - 19:24; 20:1
**2023** [1] - 15:9
**2025** [2] - 16:21; 89:14
**20th** [1] - 50:16
**21** [1] - 55:14
**23587** [1] - 62:14
**23590** [1] - 63:2
**24-2** [2] - 53:17, 23
**27-13** [1] - 52:2
**28** [1] - 89:11
**3** [9] - 16:20; 17:23; 43:22; 51:22; 52:23; 67:25; 72:10; 86:16

**30** [1] - 72:9
**33600** [1] - 63:10
**34** [3] - 38:7, 15; 39:13
**340** [7] - 35:22; 36:2; 41:17, 19; 42:19; 63:7
**340(a)(4** [1] - 44:20
**340(b** [1] - 44:20
**37** [1] - 64:4
**39-10** [1] - 52:9
**4** [10] - 16:21, 23; 17:16, 18, 25; 44:2; 68:1; 69:5; 86:17
**4)** [1] - 43:25
**48** [2] - 70:25; 71:2
**5** [3] - 51:22; 52:8, 23
**5-3** [1] - 88:3
**5-5** [1] - 17:2
**50** [1] - 10:4
**6** [1] - 17:3
**60** [1] - 30:11
**7** [1] - 17:3
**75.105** [2] - 38:7; 61:9
**75.253** [3] - 38:15; 39:7, 13
**753** [1] - 89:11
**9** [1] - 51:25
**936** [1] - 65:19
**a)** [1] - 43:22
**a.m** [1] - 2:2
**AACTE** [7] - 8:23; 9:3, 8; 18:1; 87:16; 88:3
**abbreviated** [1] - 16:17
**Abelson** [18] - 21:19; 22:6; 23:4; 26:1, 4, 25; 32:15; 50:21; 54:11, 24; 55:4, 13, 22; 56:1, 7, 12, 25; 57:11
**Abelson's** [1] - 23:1
**abiding** [2] - 62:7; 63:13
**ability** [3] - 31:14; 32:16; 72:8
**able** [10] - 4:4; 6:24; 7:12; 8:20; 32:12; 56:1, 4, 12; 62:8; 66:13
**above-entitled** [1]

- 89:12
**absence** [2] - 76:8; 79:2
**absolute** [2] - 22:24; 76:7
**absolutely** [5] - 29:4; 76:24; 77:19; 80:10
**abstraction** [2] - 15:24; 16:9
**abuse** [1] - 72:2
**accept** [3] - 31:13; 59:8
**access** [2] - 34:3; 49:14
**according** [4] - 15:8; 58:16; 76:11; 81:9
**account** [1] - 26:18
**accurate** [1] - 84:4
**accusing** [1] - 75:2
**achieve** [1] - 14:25
**acknowledge** [1] - 70:21
**acknowledged** [1] - 19:10
**acted** [1] - 60:15
**acting** [1] - 53:18
**action** [14] - 4:19; 5:9; 11:8; 22:25; 26:14; 28:16; 30:25; 31:19; 32:9; 51:8; 54:15; 57:22; 75:10
**actions** [2] - 26:17; 51:9
**active** [1] - 16:21
**actual** [2] - 32:13; 51:1
**add** [2] - 11:16; 85:18
**adding** [1] - 11:20
**additional** [4] - 11:21; 13:2; 51:12; 56:2
**address** [6] - 26:23; 64:13; 65:8; 75:19
**addressed** [2] - 8:14; 9:16
**addressing** [1] - 3:12
**adequate** [1] - 64:18
**adequately** [1] -

66:15
**adjourned** [1] - 89:7
**administration** [7] - 37:10, 17; 57:24; 59:21; 60:14; 84:24
**Administration's** [1] - 65:21
**administrative** [1] - 22:20
**admission** [1] - 14:25
**Admission** [6] - 15:5; 62:19, 22; 67:23; 79:25
**Admissions** [2] - 6:7; 79:10
**admitted** [1] - 60:8
**admitting** [2] - 15:7
**advance** [4] - 25:6; 47:16; 64:15; 65:2
**advancing** [3] - 63:18; 64:1
**advantage** [2] - 10:23; 56:10
**advice** [3] - 71:4; 87:7, 10
**advise** [1] - 75:9
**advised** [1] - 72:18
**advocate** [1] - 81:1
**affected** [2] - 86:3; 88:9
**affects** [2] - 23:5; 85:18
**afield** [1] - 84:22
**afoul** [2] - 15:9, 13
**afraid** [1] - 30:4
**afternoon** [1] - 13:1
**agencies** [7] - 27:24; 36:12, 15; 37:11; 41:13; 59:21; 62:2
**agency** [59] - 4:19; 5:1, 9; 11:8; 30:9; 35:22, 25; 36:5, 9, 11, 24; 37:2, 12, 25; 40:9, 13-15; 41:3, 6, 22; 42:13; 44:6, 8-9, 12, 14, 16,

19; 46:15; 51:3, 8-9; 53:8; 54:3, 15; 60:10, 12, 19, 24; 61:11, 13, 20-22; 63:6, 14; 68:2, 5, 23, 25; 69:11; 70:12, 18; 71:11
**agency's** [1] - 68:24
**agenda** [2] - 30:10; 40:14
**agendas** [1] - 28:1
**ago** [2] - 34:9; 60:21
**agree** [11] - 8:1; 9:20; 27:16, 18; 28:13; 29:4; 38:3; 63:5; 67:25; 75:25; 77:22
**agreement** [3] - 29:21; 35:23; 75:13
**agreements** [1] - 63:3
**AGs** [1] - 88:18
**ahead** [2] - 5:19; 33:23
**al** [2] - 2:5
**align** [2] - 62:2; 63:14
**allegation** [3] - 17:24; 53:6; 74:6
**allegations** [7] - 11:10, 16, 21; 18:4, 15; 73:20
**allege** [1] - 8:13
**alleged** [3] - 6:10; 8:16; 11:7
**allow** [3] - 4:5; 18:22; 21:4
**allowable** [4] - 46:6; 48:2, 5; 81:21
**allowed** [5] - 26:9; 47:18; 63:15; 71:3
**allowing** [1] - 4:1
**allows** [2] - 58:4; 63:22
**almost** [2] - 12:25; 63:8
**alternative** [4] - 70:7; 75:19
**Amanda** [1] - 89:10
**AMANDA** [1] -

89:16
**amend** [3] - 11:16; 24:9; 35:15
**Amendment** [25] - 4:24; 25:4, 23; 26:2, 5, 24; 27:15; 28:5, 19; 30:20; 35:1; 51:4; 54:18, 20, 24; 55:1, 4, 10, 17; 58:1, 5
**amendment** [2] - 33:8; 57:22
**American** [3] - 2:4; 79:6, 8
**analysis** [5] - 16:4; 20:24; 56:17, 21; 57:14
**announce** [1] - 62:5
**annual** [5] - 41:3; 61:8, 12; 68:4
**answer** [8] - 24:11, 25; 32:21; 33:1, 21-22; 35:20; 56:22
**anticipate** [2] - 35:18; 86:23
**anticipated** [1] - 85:8
**anticipation** [1] - 48:4
**antiracism** [2] - 15:2, 4
**anyway** [1] - 33:23
**APA** [24] - 5:2; 14:8; 16:5; 25:4; 33:8; 34:17, 19; 35:1, 7, 14; 38:4; 47:7; 50:7; 51:4; 54:17; 57:25; 59:16; 62:12; 64:10; 65:11, 19; 68:21; 75:23
**apart** [2] - 16:14; 56:5
**apologize** [1] - 25:6
**appeal** [11] - 33:13; 66:22; 68:8, 18; 72:10; 73:8; 74:4; 75:9; 82:5, 9
**appealed** [3] - 7:14; 54:22; 67:8

**appeals** [3] - 67:5, 10; 68:12
**appear** [6] - 50:25; 57:3; 58:19, 22; 59:6
**appellate** [1] - 66:24
**appended** [1] - 47:25
**Appendix** [1] - 61:7
**applicability** [2] - 50:6, 11
**applicable** [2] - 43:23; 50:13
**application** [4] - 55:19; 56:5, 18, 20
**applications** [4] - 40:21; 55:12; 58:22, 25
**applied** [4] - 31:10; 56:21; 58:10, 12
**applies** [3] - 4:25; 41:13
**apply** [8] - 38:7, 9; 39:21; 41:6; 54:19; 55:25; 68:1; 88:15
**applying** [1] - 55:16
**appreciate** [6] - 25:1; 71:9; 76:20; 82:16; 83:25; 89:6
**apprise** [1] - 87:23
**approach** [1] - 51:14
**appropriate** [4] - 21:21; 56:20; 60:17; 70:19
**approved** [1] - 38:24
**arbitrary** [7] - 54:16; 60:9, 15; 62:11; 64:7, 19
**arguably** [1] - 66:10
**argue** [4] - 22:11; 45:16; 51:19; 58:20
**argued** [1] - 84:3
**arguing** [4] - 44:11, 13, 16; 83:15
**argument** [42] - 3:5; 5:8; 8:15; 9:19; 22:15;

25:13, 17; 26:24; 27:3; 35:16; 42:13, 19; 43:9; 44:2, 24-25; 45:1, 18; 46:12; 47:4; 56:19; 58:2, 10; 59:13; 60:8, 18; 61:16; 64:14, 16; 65:2, 5; 68:1, 9; 72:11; 79:4; 81:16; 85:4; 89:6
**arguments** [2] - 29:9; 64:10
**art** [2] - 41:25; 42:1
**articulate** [1] - 33:6
**articulates** [1] - 33:7
**aside** [1] - 57:13
**aspect** [1] - 46:7
**aspects** [4] - 16:6; 66:9; 73:19, 22
**assert** [2] - 35:15; 49:9
**asserted** [1] - 48:22
**assertions** [1] - 56:22
**asserts** [3] - 48:24; 64:5; 68:8
**assigned** [2] - 22:9; 43:19
**assignment** [1] - 87:8
**associates** [1] - 87:7
**Association** [1] - 2:4
**assume** [2] - 56:19; 68:11
**assumed** [1] - 77:6
**assumes** [1] - 81:15
**assuming** [1] - 57:18
**attached** [1] - 86:11
**attempt** [1] - 35:10
**attention** [2] - 40:2; 48:16
**attest** [1] - 17:3
**attesting** [1] - 12:6
**attractive** [2] -

40:23; 69:22
**AUSA** [1] - 12:8
**authorized** [3] - 42:3; 47:5; 63:4
**available** [1] - 12:16
**avers** [1] - 16:19
**award** [11] - 35:24; 41:21; 42:21, 24; 44:4; 48:5; 63:4; 84:5, 11
**awarded** [7] - 36:4, 7; 43:19; 62:15
**awards** [1] - 43:1
**aware** [1] - 72:22
**b)(3)(i)(B)** [1] - 61:7
**background** [1] - 31:25
**backing** [1] - 17:23
**backseat** [1] - 78:1
**balance** [8] - 35:2, 4; 50:8; 77:17, 25; 78:23; 79:2; 82:15
**balancing** [2] - 77:8, 15
**based** [8] - 14:4; 25:21; 36:3; 41:5; 50:15; 54:5
**bases** [1] - 8:13
**basing** [1] - 24:1
**basis** [21] - 23:15, 17; 30:4; 32:1, 22; 33:4, 6-7, 14; 41:24; 42:23; 43:11, 16; 44:7; 49:12; 60:16; 66:1; 72:18; 74:22; 82:9; 85:1
**basket** [1] - 15:17
**bear** [3] - 4:12; 53:21; 67:11
**bearing** [2] - 84:17; 86:20
**bears** [1] - 5:17
**begin** [1] - 4:18
**beginning** [1] - 71:17
**begins** [1] - 64:4
**begun** [1] - 7:20
**behalf** [3] - 6:11; 26:17
**belong** [4] - 41:1;

61:2; 80:2
**bench** [3] - 19:21; 20:6; 51:14
**benefit** [1] - 29:20; 57:11
**best** [6] - 11:4; 23:13; 27:25; 39:11, 16; 72:3
**better** [3] - 49:1; 69:1; 85:11
**between** [2] - 54:10; 65:14
**beyond** [1] - 43:9
**big** [6] - 41:8; 60:14, 19; 62:3; 64:18; 68:5
**big-picture** [1] - 62:3
**bigger** [2] - 16:2; 64:17
**biggest** [1] - 28:18
**billing** [1] - 77:24
**bind** [1] - 83:12
**bit** [6] - 12:13; 35:10; 62:1; 68:21; 70:20; 77:6
**board** [1] - 61:5
**boilerplate** [1] - 65:4
**bolster** [1] - 11:15
**bolt** [1] - 79:22
**bond** [4] - 83:10, 16
**bootstrap** [1] - 11:14
**bother** [1] - 45:24
**bothering** [1] - 74:19
**boundless** [1] - 45:23
**box** [3] - 43:14; 45:9; 46:23
**break** [1] - 49:24
**breakfast** [1] - 44:18
**brief** [12] - 8:15; 21:4, 23; 27:14; 31:12; 49:9; 55:7; 63:16; 68:9; 70:1; 72:10, 17
**briefing** [1] - 82:12
**briefly** [5] - 9:16; 23:11; 65:8; 76:23; 83:23
**briefs** [1] - 4:20
**bringing** [1] -

18:22
**brings** [1] - 87:7
**broad** [4] - 62:9; 63:21; 64:5; 75:4
**broader** [1] - 64:11
**brought** [3] - 8:2; 35:12; 88:18
**built** [3] - 4:5; 5:13; 81:24
**burden** [5] - 5:18; 12:21; 47:17
**business** [1] - 89:3
**C.F.R** [3] - 38:7, 15; 39:13
**cabined** [1] - 29:5
**California** [1] - 55:8
**campaigned** [1] - 27:21
**cancel** [4] - 37:11, 15; 44:21; 45:5
**canceled** [2] - 31:2; 66:12
**candor** [1] - 71:9
**cannot** [1] - 11:16
**capable** [1] - 32:14
**capricious** [5] - 54:16; 62:11; 64:7, 19
**capriciously** [1] - 60:15
**capriciousness** [1] - 60:9
**careful** [1] - 54:23
**Carolyn** [1] - 2:14
**carry** [4] - 8:23; 27:25; 28:3; 29:12
**Carter** [1] - 28:8
**case** [73] - 3:24; 6:7; 8:18, 20; 9:21, 23; 11:5, 15, 24-25; 12:7; 13:19; 14:4, 21; 15:8; 18:15, 22; 19:2; 22:5, 9, 20, 25; 23:2, 5-6; 24:19; 26:25; 31:4; 35:2; 37:21; 47:22; 50:18; 53:1; 54:10, 14, 17-18, 21, 23, 25; 55:9; 56:11, 14, 22; 57:25; 65:13, 20;

69:13; 77:5; 78:4, 7; 81:7, 9, 11, 14; 82:7; 83:4, 11-13, 15, 19-20; 84:8, 18; 86:3; 88:14
**cases** [5] - 6:6; 10:5; 20:3, 7; 55:7
**categories** [1] - 14:24
**caveat** [1] - 62:10
**cease** [1] - 49:18
**Central** [1] - 55:8
**certain** [5] - 14:23; 23:25; 25:15; 27:21; 47:19
**certainly** [9] - 14:7; 22:10; 35:20; 56:6; 57:7; 74:14; 80:1; 81:7; 83:3
**CERTIFICATE** [1] - 89:9
**Certified** [1] - 89:10
**certify** [1] - 89:11
**cetera** [3] - 48:9; 88:9
**Chakrabardi** [1] - 19:2
**Chakrabarti** [5] - 19:15, 21; 20:6, 13, 20
**challenge** [13] - 9:23; 14:8; 31:14; 32:12, 23; 34:12; 35:1; 50:19; 64:9; 68:21; 72:9, 17
**challenged** [5] - 3:19; 4:11, 19; 5:23; 6:13
**challenges** [4] - 33:2-4; 75:23
**chance** [1] - 13:1
**change** [8] - 31:24; 38:6; 44:14; 45:24; 46:1; 62:18; 64:18; 84:17
**changed** [5] - 36:16; 44:12; 67:8; 70:4; 71:8
**changes** [2] - 61:25; 69:4
**changing** [3] - 46:5; 84:21; 85:3

**characteristic** [1] - 66:2

**characteristics** [1] - 71:24

**check** [1] - 47:14

**checked** [1] - 47:14

**chose** [2] - 18:12, 14

**chronology** [1] - 31:19

**chunk** [1] - 20:19

**circumstance** [1] - 70:18

**circumstances** [1] - 14:3

**circumstantial** [3] - 29:2, 12; 51:6

**citation** [4] - 17:12; 39:23; 43:2; 45:17

**citations** [1] - 61:1

**cite** [2] - 39:7; 48:7

**cited** [2] - 38:10, 14

**cites** [9] - 38:14; 39:12; 55:7; 57:4; 63:6; 66:5, 9; 68:10

**citizen** [1] - 8:18

**civil** [15] - 15:9; 57:17; 62:8, 17, 21, 24-25; 63:13; 65:22; 66:3; 67:20, 24; 71:25

**Civil** [1] - 2:4

**claim** [14] - 4:24; 5:2; 8:2; 25:21; 27:15; 28:4, 19; 32:1; 35:12; 54:20; 58:12; 63:18; 64:10

**claiming** [1] - 48:10

**claims** [2] - 33:18; 57:14

**Clapper** [2] - 24:1, 14

**clarification** [1] - 88:12

**clarify** [1] - 6:16

**clause** [1] - 45:2

**claw** [1] - 7:7

**clean** [1] - 84:2

**clear** [27] - 7:12; 8:21; 11:16; 15:6; 21:18;

22:16; 23:21; 24:8, 10, 16, 25; 26:8, 15; 29:6, 10, 24; 30:1, 8; 31:18; 35:3; 38:21; 48:24; 54:25; 62:1; 67:13; 84:9

**clearly** [4] - 23:19; 25:19; 26:19; 52:24

**CLERK** [1] - 2:3

**client** [5] - 13:5; 15:12; 49:15; 81:2, 20

**clients** [10] - 12:14; 28:13, 16; 31:20; 32:23; 33:18; 38:23; 40:20; 86:8, 10

**clients'** [4] - 27:8; 38:22; 67:14

**co** [1] - 9:4

**co-members** [1] - 9:4

**code** [1] - 57:5

**Code** [1] - 66:6

**cogent** [1] - 89:6

**collapse** [1] - 29:21

**collapsing** [1] - 35:4

**colleague** [1] - 68:17

**College** [2] - 6:4; 9:2

**Colleges** [1] - 2:5

**colloquial** [1] - 22:21

**color** [2] - 66:1; 79:16

**colored** [1] - 54:21

**comfortable** [1] - 3:13

**command** [1] - 52:24

**comment** [2] - 36:10; 60:13

**Comment** [5] - 36:10; 40:16; 41:7; 44:15; 85:2

**common** [3] - 58:16; 79:5, 7

**commonsense** [2] - 41:10

**communicated** [1] - 33:2

**communication** [4] - 53:16, 18; 54:6; 67:3

**communities** [1] - 72:21

**compare** [2] - 52:23

**comparing** [1] - 51:9

**competent** [1] - 28:3

**competitive** [1] - 40:20

**complain** [1] - 28:17

**complaint** [29] - 8:14; 11:13-17, 19; 16:14, 19-20; 17:14; 18:11; 20:15; 23:6, 22; 24:9; 27:1; 32:6; 35:15; 40:17; 47:25; 48:21; 66:8; 73:21; 82:23; 83:3; 85:20; 86:12

**complete** [1] - 20:5

**completely** [4] - 8:21; 12:16; 20:16; 56:14

**complicated** [1] - 35:11

**comply** [3] - 42:24; 52:1, 21

**component** [1] - 54:20

**comport** [1] - 26:7

**comprised** [1] - 5:25

**concede** [3] - 5:9; 18:22, 24

**conceded** [2] - 21:10; 76:25

**conceive** [2] - 25:17; 30:14

**concepts** [1] - 41:1

**concern** [2] - 19:7; 26:20

**concerned** [1] - 70:22

**concerns** [2] - 11:9; 20:22

**concession** [1] - 24:19

**concluded** [1] - 89:8

**conclusion** [2] -

25:15; 28:20

**concrete** [3] - 6:9; 24:16

**concurrence** [2] - 79:10, 25

**conditions** [29] - 12:10; 36:5, 23; 41:21; 42:24; 43:2, 11, 14-15, 18; 44:4; 45:4, 10; 46:7, 19; 47:13, 23; 59:7; 63:11; 67:19; 84:3, 6, 10

**conduct** [7] - 25:15, 18; 30:23; 31:3, 6-7; 34:6

**Conference** [1] - 89:13

**confess** [1] - 68:11

**confirm** [1] - 5:8

**conflict** [1] - 71:25

**conform** [3] - 31:7, 21; 40:21

**conformance** [1] - 89:13

**confused** [1] - 48:20

**confusing** [1] - 17:22

**Congress** [2] - 42:3; 85:7

**conjunction** [1] - 72:25

**connected** [3] - 22:25; 23:2; 34:14

**consequence** [1] - 81:20

**consider** [6] - 21:3; 23:8; 28:7, 15; 58:11; 77:11

**considered** [4] - 64:25; 65:1; 75:2; 79:18

**considering** [2] - 70:17; 82:11

**consistent** [3] - 60:25; 62:16, 21

**Constitution** [1] - 34:24

**constitutional** [1] - 81:18

**constrained** [1] - 29:9

**contact** [2] - 74:5

**contacted** [1] -

74:7

**contain** [1] - 72:10

**contained** [1] - 62:17

**contend** [1] - 72:15

**contending** [1] - 39:20

**contends** [1] - 76:15

**content** [2] - 79:13; 83:17

**contention** [1] - 82:2

**contesting** [1] - 11:6

**context** [5] - 11:6; 40:10; 55:10; 57:16

**contexts** [1] - 55:15

**continually** [1] - 32:17

**continuation** [6] - 38:9, 13, 19, 25; 39:2, 16

**continue** [4] - 34:6, 16; 39:14; 43:21

**continued** [1] - 34:12

**continues** [2] - 26:15; 36:24

**continuing** [2] - 25:18; 39:5

**contrary** [2] - 4:12; 74:14

**contrast** [2] - 54:10; 55:13

**conveniens** [2] - 19:5; 20:24

**convenient** [1] - 51:7

**convention** [1] - 46:24

**conversation** [1] - 22:17

**conveyed** [2] - 45:8; 63:17

**convincing** [1] - 29:10

**copies** [2] - 13:22; 51:13

**copy** [1] - 65:4

**copy-pasted** [1] - 65:4

**core** [2] - 16:25

**correct** [17] - 9:6; 16:10; 19:16;

39:1, 22; 42:11, 17; 51:17; 52:3; 69:20; 78:19; 86:13, 18; 88:17, 23; 89:12

**correctly** [2] - 33:19; 64:3

**Costs** [1] - 48:1

**costs** [2] - 48:2, 4

**counsel** [11] - 2:8; 3:3; 10:19; 12:13; 13:3; 50:22; 51:14; 59:19; 60:20; 61:2

**counsel's** [1] - 84:21

**count** [3] - 63:20

**Count** [1] - 64:4

**counterfactual** [1] - 10:3

**country** [1] - 4:1

**couple** [4] - 61:1; 62:4, 12; 74:21

**course** [13] - 8:16; 18:24; 23:14; 52:20; 64:3; 70:6; 77:3; 79:12; 80:19, 25; 82:4, 17; 83:14

**Court** [47] - 2:3, 6; 3:12, 16, 21, 23; 4:21; 5:3; 6:6; 10:2; 13:19, 22; 15:8; 16:9; 17:22; 21:3; 22:19; 25:2; 26:15; 30:5; 31:13; 34:24; 50:12, 15, 17; 51:12; 55:9; 57:13; 58:4; 59:15; 61:3; 62:4; 65:13; 68:22; 70:16, 23; 77:5, 7, 16; 83:7, 24; 86:7; 87:23; 89:11

**court** [7] - 13:2; 15:13; 16:4; 22:11; 53:10; 64:25; 85:16

**COURT** [242] - 2:13, 16, 19, 22, 25; 3:13; 4:9; 5:5, 12, 16; 6:15, 20, 25; 7:4, 6, 15, 22; 8:9, 11, 23; 9:1,

4, 7, 11, 14;
10:8, 14, 18;
11:2; 12:2, 17,
19, 21; 13:23;
14:11, 17, 19;
15:10; 16:1, 12;
17:15, 18;
18:20; 19:3, 9,
17, 19, 23; 20:1,
4, 10, 23; 21:6,
9, 12, 15, 24;
22:2, 13; 23:16,
21; 24:4, 7, 13,
20, 25; 25:5, 11,
25; 26:6, 19;
27:6, 19; 29:4,
16, 19; 31:9, 16;
32:5, 21, 25;
33:3, 6, 10, 13,
18, 23; 34:1, 15,
18; 35:3, 7;
38:7, 11, 21;
39:7, 10, 20, 23;
40:1, 5, 17;
41:25; 42:5, 9,
12, 15, 18; 43:4,
17, 24; 45:12,
14, 20; 46:2, 4,
9, 16; 47:5, 8,
10, 24; 48:14,
16, 19; 49:4, 7,
19, 22; 50:2, 9,
14; 51:15, 19;
52:2, 4, 7, 12,
14; 53:2, 21, 24;
55:24; 56:5, 16;
57:18; 58:2, 17,
24; 59:4, 12, 14,
17; 60:4, 11;
63:20; 64:2, 23;
65:7; 66:13, 19,
24; 67:11, 13;
68:7, 16, 19;
69:8, 14, 18, 21;
70:2, 6, 10, 14;
71:3, 6, 9, 14;
73:13, 17, 24;
74:8, 10, 12, 17,
21; 75:7, 16;
76:1, 4, 7, 13,
17, 20, 24; 77:3,
12, 22; 78:6, 10,
15, 17, 25;
79:12; 80:6, 12,
15, 20, 25; 81:4,
15, 19; 82:4, 8,
11, 17; 83:5, 14,
17, 20; 84:13,
19; 85:14, 21;
86:5, 16, 19, 25;
87:3, 5, 15, 18,

25; 88:2, 13, 17,
21, 24; 89:1, 5,
16
**Court's** [5] - 9:17;
15:25; 24:18;
35:20; 63:24
**court's** [2] -
87:13; 89:7
**courtroom** [1] -
10:20
**courts** [1] - 22:1
**Courts** [1] - 23:18
**cover** [3] - 4:20;
88:19
**covered** [1] - 22:7
**create** [1] - 46:20
**created** [1] -
16:15
**creates** [1] - 36:9
**credit** [1] - 28:9
**criminal** [1] -
57:17
**criteria** [1] - 15:12
**crux** [1] - 60:18
**crystal** [1] - 29:24
**cursive** [1] - 45:11
**cut** [5] - 6:5;
45:14; 70:18;
74:18, 22
**cuts** [3] - 45:15,
22; 46:19
**cutting** [1] - 30:22
**D.C** [2] - 9:21
**Daniel** [1] - 2:17
**date** [1] - 48:3
**Dated** [1] - 89:14
**dated** [2] - 52:19
**days** [3] - 30:11;
67:7; 72:9
**de** [1] - 83:18
**deal** [1] - 70:19
**dealing** [1] - 20:7;
51:2
**debate** [1] - 27:17
**decide** [2] - 29:2;
44:18
**decided** [1] -
56:16
**deciding** [1] -
10:5
**decision** [11] -
23:3; 29:18;
34:7; 51:3;
53:10; 64:6;
72:9; 86:20
**decision's** [1] -
57:6
**decisionmaking**
[1] - 29:23
**decisions** [1] -

22:15
**decisive** [1] - 77:2
**declaration** [11] -
7:7; 12:9; 13:21,
25; 14:5; 17:2;
18:6; 28:11, 24;
81:10; 88:2
**declarations** [5] -
11:21; 12:4;
13:14; 47:12
**dedicated** [1] -
31:1
**defeat** [1] - 20:22
**defendant** [3] -
8:17; 18:23;
35:5
**Defendant's** [1] -
83:9
**defendants** [4] -
2:9, 21, 24; 5:9
**Defense** [1] -
13:17
**defense** [2] -
10:10; 11:5
**defined** [1] - 42:6
**defines** [1] -
16:23
**definite** [1] -
56:10
**definitely** [1] -
71:8
**definition** [2] -
32:14; 78:6
**DEI** [16] - 14:15;
16:11; 26:12,
17; 27:11; 28:9;
32:3; 33:14, 17,
20; 65:25;
71:22; 74:21;
75:1; 79:21, 25
**DEI's** [1] - 27:7
**DEI-offensive** [1]
- 32:3
**DEI-related** [1] -
28:9
**delayed** [1] -
69:23
**demonstrated** [1]
- 23:19
**denied** [1] - 69:23
**deny** [1] - 86:2
**department** [3] -
36:8, 19; 72:5
**Department** [19] -
14:13; 15:3, 16;
36:8, 13, 16;
37:16; 40:15;
41:14; 47:18;
54:8; 61:17;
67:4; 69:4, 6;

70:5; 72:20
**Department's** [2]
- 65:21; 85:6
**department's** [2] -
53:14; 71:25
**derivative** [1] -
25:21
**derive** [1] - 41:3
**derives** [1] - 41:6
**describe** [1] -
41:12
**described** [1] -
18:7
**describes** [1] -
14:15
**designed** [1] -
30:1
**destruction** [1] -
3:25
**detailed** [2] -
18:15; 75:25
**determination** [5]
- 23:2; 34:25;
39:15; 46:14;
81:20
**determine** [1] -
23:5
**determined** [4] -
14:14; 23:1;
72:23; 73:1
**develop** [1] -
68:25
**differ** [1] - 22:18
**difference** [2] -
34:10
**differences** [1] -
86:15
**different** [29] -
8:13; 10:5; 14:2,
5, 17, 19; 16:23;
21:1; 30:17;
37:2; 39:3, 18;
41:20; 44:19;
47:13; 48:12,
15; 56:14; 57:5,
8; 61:10, 13;
63:5, 25; 70:21;
79:17
**differently** [3] -
17:23; 30:6;
55:2
**difficult** [5] -
25:16; 30:14;
47:4; 82:25
**dime** [1] - 31:24
**direct** [3] - 29:5,
9; 30:9
**directing** [1] -
40:1
**direction** [1] -

68:5
**directive** [1] -
30:8
**directly** [2] - 3:2;
27:24
**disagree** [3] -
14:7; 77:25;
79:11
**disagreement** [1]
- 80:24
**disaster** [1] - 20:5
**discouraging** [1]
- 22:1
**discretion** [3] -
10:2; 45:23;
62:9
**discriminate** [2] -
66:1; 71:23
**discrimination** [5]
- 27:8, 10; 66:4;
80:12; 81:8
**discriminatory** [1]
- 27:11
**discussion** [2] -
27:20; 29:15
**disjunctive** [3] -
74:24; 75:3, 14
**dispute** [4] - 5:24;
6:10; 7:14;
13:10
**disputed** [3] -
4:21; 68:10;
72:11
**dissent** [1] -
80:22
**distill** [1] - 25:13
**distinct** [2] - 15:1;
63:25
**distinction** [1] -
65:14
**distinguish** [1] -
16:8
**District** [3] - 55:8;
89:11
**diversity** [5] -
14:25; 58:15;
62:20; 65:22;
73:21
**Diversity** [2] -
16:3; 66:11
**diversity-
promoting** [1] -
62:20
**Docket** [1] - 2:4
**Document** [1] -
47:25
**document** [1] -
3:7
**documented** [1] -
83:2

**documents** [2] -
3:4; 67:6
**dollars** [1] - 13:6
**done** [4] - 60:5;
65:15; 89:6
**doom** [1] - 23:25
**door** [3] - 81:12,
20, 22
**doubt** [1] - 51:10
**down** [5] - 6:24;
7:12; 16:4;
25:13; 48:12
**dozen** [1] - 35:13
**Dr** [1] - 17:2
**drafted** [2] - 47:3;
82:23
**drafting** [1] -
46:24
**draw** [3] - 6:24;
28:20; 74:18
**drawing** [1] -
48:11
**drawn** [2] - 7:12;
48:16
**dropping** [1] -
45:17
**due** [3] - 32:12;
50:6, 11
**duplication** [4] -
58:25; 59:3, 6;
72:2
**duplicative** [1] -
75:2
**during** [1] - 3:5
**e)(1)(C)** [1] - 8:22
**early** [1] - 12:25
**easier** [1] - 62:1
**easily** [1] - 6:11
**easy** [1] - 45:21
**ECF** [9] - 47:25;
48:1; 51:25;
52:1, 9, 25;
53:17, 23; 89:2
**economy** [1] -
22:8
**ED** [2] - 12:8
**Ed** [2] - 41:14
**EDGAR** [1] - 38:8
**education** [2] -
72:2, 19
**Education** [14] -
2:5; 15:3, 16;
36:13, 17;
37:17; 40:15;
61:17; 67:4;
69:4, 6; 70:5;
72:20
**effect** [1] - 48:7
**effective** [3] -
48:3; 69:8;

75:19

**effectively** [3] - 28:13; 72:17; 77:16

**effectuate** [5] - 36:24; 37:22; 44:9, 12; 61:19

**effectuates** [5] - 35:24; 44:6; 46:14; 63:4; 72:5

**effort** [1] - 21:18

**efforts** [1] - 11:4

**either** [7] - 4:25; 34:25; 37:19; 45:8; 66:3; 68:14; 71:24

**election** [1] - 78:20

**elements** [1] - 4:13

**elsewhere** [1] - 37:4

**encourage** [1] - 48:8

**end** [3] - 48:6; 61:22; 89:3

**endeavoring** [1] - 80:17

**ending** [1] - 81:8

**enforce** [3] - 25:18; 34:6; 55:24

**enforcement** [2] - 26:8; 34:12

**engage** [3] - 30:2; 31:3; 85:1

**engaged** [1] - 31:6

**engaging** [1] - 72:22

**enormous** [2] - 20:6; 69:3

**ensure** [1] - 40:22

**entangle** [1] - 57:25

**entire** [4] - 45:17; 54:21; 78:14; 84:24

**entirely** [1] - 6:1

**entirety** [1] - 42:22

**entities** [1] - 86:3

**entitled** [2] - 27:23; 89:12

**entitlement** [1] - 23:5

**EO** [2] - 57:18, 20

**equitable** [1] - 34:23

**equities** [8] - 35:2, 4; 50:8; 77:8, 18, 25; 79:2; 82:15

**equity** [10] - 30:22; 31:2; 50:23-25; 53:4; 57:1; 58:15; 65:22; 73:21

**Equity** [2] - 16:3; 66:11

**equity-related** [1] - 30:22

**especially** [2] - 73:5; 80:18

**essentially** [3] - 8:4; 27:2; 61:16

**establish** [1] - 8:22

**established** [5] - 6:12; 8:16; 36:6; 42:2

**esteemed** [1] - 68:17

**et** [5] - 2:5; 48:8; 88:8

**ethically** [1] - 71:3

**evaluating** [2] - 26:1, 4

**evaluation** [2] - 19:5; 76:8

**evaporate** [1] - 73:15

**event** [1] - 68:22

**everywhere** [1] - 60:23

**evidence** [9] - 28:22; 29:1, 6, 9, 12; 51:6; 53:16; 56:2

**Ewing** [3] - 2:12, 14, 18

**exact** [3] - 8:7; 67:21

**exactly** [11] - 8:6; 19:16; 55:14; 56:6, 24; 59:25; 66:25; 67:15; 72:15; 85:10

**example** [3] - 14:22; 84:21

**examples** [1] - 14:1

**excellence** [1] - 72:1

**except** [4] - 3:21; 31:9; 45:10; 88:21

**exchange** [1] - 23:12

**Executive** [22] - 27:4, 13, 16, 22; 28:6, 13, 21; 50:16; 51:2, 7; 52:18, 21-22, 24; 53:4, 9, 13; 54:5, 7; 56:9; 73:1

**executive** [3] - 51:11; 58:8, 12

**exercise** [1] - 10:2

**Exhibit** [15] - 13:17, 20-21; 20:17; 51:22, 25; 52:8, 23; 69:5; 81:9; 82:6

**exhibit** [3] - 51:23; 53:17; 69:5

**exhibits** [3] - 12:24; 13:18; 51:12

**Exhibits** [1] - 13:19

**existential** [6] - 11:7; 13:12; 70:4; 71:11; 77:21; 79:8

**expand** [1] - 37:15

**expected** [1] - 37:10

**expedited** [2] - 69:12, 18

**experienced** [1] - 24:2

**expired** [1] - 48:6

**explain** [3] - 65:16; 69:1

**explained** [4] - 30:6; 37:21; 65:12, 16

**explanation** [2] - 65:18; 66:7

**explicitly** [4] - 17:13; 18:9; 52:20; 62:6

**exposing** [1] - 86:1

**expressly** [3] - 19:10; 38:15; 84:6

**extent** [16] - 4:10; 10:3; 15:10; 26:22; 27:15; 28:10; 47:5; 49:16; 60:2; 62:9; 63:4, 15; 78:2; 85:7; 86:9

**extraordinarily**

[1] - 64:5

**extraordinary** [1] - 77:19

**extremely** [1] - 9:25

**F.R** [1] - 84:14

**face** [1] - 55:11

**facing** [2] - 71:11; 77:20

**fact** [13] - 3:24; 12:6; 14:9; 16:6; 19:12; 24:9; 28:15; 34:2, 5; 53:8; 61:3; 77:2; 81:25

**fact-specific** [1] - 16:6

**factor** [1] - 78:24

**factors** [4] - 10:10; 23:8; 56:17; 76:22

**facts** [3] - 14:20; 56:11, 15

**factual** [3] - 68:10, 25; 72:11

**fail** [2] - 57:15; 72:3

**fails** [3] - 39:11; 42:23; 43:9

**Fair** [7] - 6:7; 15:5; 62:19, 22; 79:10, 24

**fair** [3] - 14:25; 67:23; 71:14

**fairly** [1] - 35:12

**fairness** [1] - 72:1

**faith** [1] - 23:23

**fall** [1] - 24:13

**far** [8] - 13:5, 16; 32:6; 53:7; 54:4; 67:2; 70:21; 81:5

**FARBER** [125] - 2:20; 5:10, 15; 10:16, 23; 11:3; 12:3, 18, 20, 23; 13:24; 14:16, 18, 20; 15:23; 16:2; 17:12, 16, 21; 18:21; 19:6, 14, 18, 20, 24; 20:2, 5, 12; 21:2, 8, 10, 14, 16, 25; 50:1, 5, 10, 15; 51:21; 52:3, 5, 8, 15; 53:3, 23, 25; 55:25; 56:6, 24; 57:20; 58:6, 20; 59:2, 5, 13, 15,

18; 60:7, 12; 63:24; 64:12, 24; 65:8; 66:17, 20; 67:1, 12, 16; 68:14, 17, 20; 69:10, 17, 20, 25; 70:3, 9, 11, 15; 71:5, 7, 10; 73:11, 14, 18, 25; 74:9, 11, 13, 20; 75:6, 11, 17; 76:3, 6, 10, 14, 18, 21, 25; 77:4, 14; 78:5, 8, 11, 16, 19; 79:7, 13; 80:10, 14, 19, 21; 81:1, 5, 17; 82:1, 5, 10, 13, 18; 83:11, 15, 19; 87:4

**Farber** [7] - 2:21; 5:7; 22:14; 28:12; 48:22; 49:23; 87:3

**Farber's** [1] - 25:25

**fatal** [1] - 11:19

**faulting** [1] - 31:18

**favor** [4] - 4:13; 56:19; 77:9, 18

**FCC** [1] - 65:13

**FCRR** [1] - 89:16

**fear** [1] - 85:22

**February** [1] - 16:21

**FEDERAL** [1] - 89:16

**federal** [21] - 15:9; 22:1; 27:25; 34:24; 39:17; 41:13; 42:24; 43:1; 44:4; 48:5; 62:7, 17, 21, 25; 63:13; 65:22; 66:3; 67:20, 24; 71:25

**Federal** [10] - 58:23; 59:6; 60:16; 62:5, 12; 63:2, 9; 66:6; 84:4; 89:10

**feedback** [1] - 46:21

**feelings** [1] - 28:8

**felt** [1] - 18:8

**few** [1] - 3:1

**Fifth** [16] - 4:24; 25:3, 5, 22; 26:5, 24; 27:14;

28:5, 18; 30:20; 33:7; 34:25; 51:4; 54:18; 58:1, 5

**fifth** [1] - 57:22

**figure** [4] - 54:12; 57:21; 70:12; 82:25

**file** [9] - 13:14; 18:12-14; 19:12; 32:23; 33:2; 85:14; 86:20

**filed** [7] - 3:17; 20:3; 22:4; 51:23; 67:5; 82:7

**filing** [4] - 33:3; 52:9; 69:11; 85:16

**filings** [2] - 11:14; 12:7

**final** [6] - 4:19; 5:9; 11:8; 40:18; 51:2; 54:15

**finally** [1] - 82:19

**financial** [1] - 7:20

**findings** [3] - 29:19, 25; 47:19

**fine** [3] - 3:14; 10:18; 55:6; 62:24

**finer** [1] - 16:10

**finished** [2] - 10:9, 12

**finite** [2] - 57:4; 58:9

**firm** [1] - 87:7

**first** [12] - 25:5; 34:4; 42:23; 43:13; 45:25; 49:2, 8; 57:15; 71:16; 73:18; 78:3; 83:6

**First** [10] - 26:2, 5; 30:20; 54:20, 24; 55:1, 4, 10, 17

**fit** [1] - 15:16

**five** [2] - 87:5; 88:3

**flagging** [1] - 69:25

**flaw** [1] - 17:20

**flawed** [1] - 27:19

**flaws** [1] - 11:19

**flexible** [1] - 50:1

**floored** [1] - 12:13

**flush** [3] - 9:17; 64:14; 70:20

flying [3] - 81:11, 19, 22
focused [2] - 42:3; 64:10
folks [1] - 45:4
follow [4] - 30:10, 18; 47:22; 82:14
followed [2] - 2:8; 17:1
following [4] - 16:15; 43:15; 72:7, 10
follows [1] - 42:22
Force [1] - 69:7
foreclosed [1] - 38:5
foregoing [1] - 89:11
forewarning [1] - 35:9
forget [1] - 26:24
forgive [1] - 16:17
form [4] - 49:2, 8; 76:8; 86:14
formal [1] - 36:9
format [1] - 89:13
formatted [1] - 53:25
forth [3] - 64:7, 20
forum [5] - 19:5; 20:23; 21:25; 22:3, 14
fostering [1] - 33:19
foundation [1] - 71:19
four [1] - 43:6
fours [1] - 67:2
frame [2] - 30:6
framework [1] - 71:19
frankly [5] - 12:13, 24; 23:4; 46:19; 57:8
fraud [5] - 58:24; 59:3, 5; 72:2; 75:3
free [1] - 72:2
friend [2] - 49:14; 83:25
front [9] - 3:2, 8; 21:19; 22:11; 52:1; 54:11; 55:22; 68:11, 14
Frostburg [6] - 6:5, 15; 9:3; 17:6; 87:19; 88:4
frustrated [1] - 32:17

full [1] - 71:20
fullest [3] - 62:9; 63:15
fully [2] - 12:16; 72:22
functional [1] - 34:10
functionally [1] - 63:8
fund [1] - 13:6
funding [9] - 30:22; 52:18; 61:6, 8, 10, 12; 68:4; 71:21
funds [2] - 17:7; 39:14
furtherance [1] - 28:6
future [8] - 7:12, 16, 19; 8:8; 13:8; 26:6; 31:9
GAN [1] - 43:12
gearing [1] - 71:19
gears [1] - 70:13
general [4] - 10:11; 17:24; 36:15; 64:5
generalized [1] - 42:10
generally [2] - 49:16; 56:20
GEPA [3] - 36:14; 85:3
giant [1] - 27:20
given [6] - 11:6; 25:14; 35:5; 69:9; 73:5; 78:1
glad [1] - 48:19
goals [11] - 35:25; 36:7; 41:25; 42:2, 6, 12, 15; 44:6; 46:15; 54:8; 63:5
goodness [1] - 45:20
Government [48] - 3:19; 4:23; 5:22; 7:13; 8:14, 17; 9:16; 10:10; 11:3; 21:22; 23:12; 25:15; 26:14, 16; 34:6, 23; 35:14; 36:1; 37:6, 8, 11, 14, 21; 38:3; 40:4, 25; 41:1, 4; 44:10; 46:13; 47:22; 49:11, 17; 76:15; 77:9;

81:8, 13, 24; 83:9, 13; 84:3, 7, 16; 85:10, 16, 23; 86:2
government [4] - 18:23; 27:25; 39:17
Government's [10] - 3:18; 9:19; 44:2; 47:4; 64:20; 65:5; 81:5; 82:2; 83:9, 11
GR [1] - 16:23
grain [1] - 16:10
Grant [1] - 16:24
grant [63] - 7:18; 8:3; 9:25; 14:10; 15:1, 4, 19; 16:5, 7; 18:15, 17; 31:2, 5; 32:2, 9-10, 19; 36:3, 18, 21-24; 38:19, 25; 40:21, 23-24; 41:18, 20; 43:12, 16, 19-20; 44:7, 21, 23; 45:5; 46:14; 47:13, 19; 52:16; 58:22, 25; 59:7; 71:21; 72:4, 7-8, 19; 73:3; 78:25; 84:5, 11; 85:1
grant-by-grant [1] - 85:1
granted [4] - 7:15, 19; 11:25; 78:13
grantee [4] - 34:9; 39:13, 15; 85:19
grantees [6] - 12:11; 16:8; 45:8; 49:17; 59:7
granting [2] - 36:18; 37:4
grants [98] - 4:2; 6:5, 16, 21; 7:2, 16, 18-19, 24; 8:5, 8; 11:12; 13:9; 14:1, 3, 6, 14; 15:13, 17; 16:2, 19-20, 22; 17:1, 5, 13, 24; 18:2, 4; 20:14-16, 18-20; 26:12; 27:9; 28:9; 31:20; 32:7;

36:2, 16, 20; 37:12, 15, 22, 24; 38:9, 13, 16; 39:5, 8; 40:10; 41:6, 18, 21; 46:18; 47:13, 15, 23; 48:12; 51:3; 54:11, 14; 55:20, 23; 59:8; 62:2, 5, 7-8, 13; 63:12, 14; 64:22; 65:23; 66:12; 82:20, 24-25; 83:2; 84:3, 5; 85:2, 11; 86:10; 87:21; 88:5-8, 16, 22
great [2] - 8:11; 89:3
greatest [1] - 63:3
ground [3] - 4:7; 59:23; 60:2
grounds [3] - 19:1; 33:14; 47:1
guarantee [1] - 7:11
guess [3] - 9:11; 21:16; 40:11; 42:5; 44:10; 58:11; 74:17; 82:22
guessing [1] - 59:2
guidance [3] - 35:23; 37:2; 41:13
guys [1] - 56:13
half [2] - 35:13; 70:18
hand [1] - 13:12
handed [1] - 51:21
handful [1] - 20:20
handling [1] - 85:13
hands [1] - 25:7
hands-offy [1] - 25:7
happy [4] - 3:9; 4:16; 22:11; 23:7
hard [1] - 7:7; 37:5; 59:24
harm [16] - 3:19, 22; 5:14; 6:9; 11:6; 24:24; 26:6, 10; 32:16;

56:22; 76:25; 77:2, 8, 20, 23
harmed [1] - 81:24
harmful [1] - 79:16
hate [2] - 80:9, 13
hateful [1] - 79:21
head [3] - 40:13; 62:23; 88:1
headed [1] - 65:5
headlong [2] - 10:9; 40:18
heads [3] - 30:9; 85:24
hear [7] - 3:9; 13:3; 16:12; 23:6; 31:16; 70:2
heard [3] - 11:24; 60:20; 74:7
hearing [2] - 7:5; 14; 11:24; 56:3, 8; 82:16; 87:24
heated [1] - 80:23
heck [1] - 28:24
heels [1] - 27:3
held [4] - 30:15, 17; 84:7; 89:12
help [2] - 48:24
hereby [1] - 89:11
hesitant [1] - 70:25
hide [3] - 53:8, 12; 54:4
highlight [2] - 64:13; 73:21
hill [1] - 58:16
hire [1] - 79:21
historically [1] - 80:8
hither [1] - 84:10
hmm [1] - 53:2
hold [1] - 26:1
holds [1] - 55:9
holy [1] - 74:24
hone [1] - 26:22
honest [1] - 80:17
Honor [58] - 2:17, 20, 23; 3:11; 4:16; 7:21; 8:1; 9:13; 10:13, 16, 25; 11:23; 12:23; 15:23; 17:12, 25; 18:6, 21; 19:7, 20; 20:13; 21:2, 10, 14; 22:4, 9; 23:10; 25:10;

26:13; 27:18; 29:13; 30:3; 33:25; 39:9, 19; 45:21; 47:7; 50:1; 51:18, 21; 52:25; 53:15; 56:24; 60:7; 61:1; 68:15; 69:10, 17; 75:11; 76:21; 83:23; 84:15; 85:17; 86:14, 18, 23; 87:2, 4
Honor's [1] - 13:8; 65:5; 82:16
hopefully [2] - 13:1; 40:22
hoping [1] - 29:14
horrible [1] - 79:22
hot [1] - 10:20
hours [4] - 70:3, 25; 71:2
Humanitarian [1] - 55:8
hundreds [2] - 20:3
hurried [1] - 16:16
hurry [1] - 73:17
hurt [2] - 79:3
hypothetical [3] - 24:16; 58:3
idea [6] - 19:8; 20:15; 46:19; 79:20; 81:23; 86:1
identical [4] - 63:8; 86:11, 13
identically [4] - 8:5; 10:6; 13:16; 14:4
identification [2] - 18:17; 65:20
identified [5] - 14:14; 32:3; 33:19; 83:2; 88:4
identify [1] - 27:23
ignore [1] - 78:22
illegal [2] - 26:7; 27:7
illustrates [1] - 40:8
immaterial [1] - 30:16
immediately [2] - 27:1; 79:8
imminent [1] - 32:7

**impact** [5] - 4:1; 18:7; 34:7; 85:5
**impacted** [1] - 17:6
**impacts** [1] - 84:8
**impending** [1] - 23:25
**implausible** [1] - 38:2
**implicates** [1] - 16:25
**important** [1] - 28:1
**importantly** [2] - 77:4
**impose** [2] - 47:18; 86:6
**impractical** [1] - 10:1
**improper** [1] - 19:3
**inasmuch** [1] - 64:2
**include** [7] - 16:24; 33:4; 47:1; 68:9; 73:20; 82:23; 87:18
**included** [3] - 17:12; 53:16; 56:13
**includes** [6] - 27:10; 45:12; 60:22; 61:14; 68:2
**including** [10] - 27:10, 21; 28:1; 46:4, 10-11, 13, 22-23; 85:16
**inclusion** [3] - 58:15; 65:22; 73:22
**Inclusion** [2] - 16:3; 66:11
**inconsistent** [2] - 61:24; 72:4
**incorrect** [2] - 54:22; 82:2
**incorrectly** [2] - 33:14
**incredibly** [2] - 38:2; 84:20
**incurred** [2] - 48:1, 3
**indicate** [1] - 7:11
**indicated** [1] - 67:4
**indication** [1] - 18:9
**individual** [1] -

14:9
**individualized** [2] - 49:12; 76:8
**individuals** [2] - 28:2; 80:7
**inexorably** [1] - 23:2
**information** [6] - 13:2, 15; 49:15; 66:21; 67:7; 74:14
**informs** [1] - 21:20
**infrastructure** [1] - 3:25
**infringement** [1] - 55:2
**initial** [1] - 17:10
**initiatives** [5] - 65:25; 71:22; 79:16
**injunction** [15] - 2:7; 3:20; 13:10; 21:4; 24:11; 47:21; 76:22; 77:10, 20; 78:25; 79:3-5; 85:8; 86:8
**injunction/ temporary** [1] - 51:24
**injury** [7] - 23:13; 24:1, 5, 15; 79:7; 80:4; 81:13
**injustice** [1] - 78:24
**inquire** [1] - 13:1
**inquiring** [1] - 12:22
**inquiry** [3] - 15:11; 30:2; 83:8
**instance** [1] - 34:4
**instant** [1] - 24:24
**instead** [3] - 37:7; 40:1; 44:16
**instituted** [1] - 31:19
**institution's** [1] - 23:15
**institutional** [1] - 11:7
**institutions** [2] - 6:21; 9:8
**instructed** [1] - 30:10
**insufficient** [2] - 65:2

**intellectually** [1] - 80:17
**intended** [1] - 53:19
**intent** [2] - 7:13; 62:1
**intentionally** [1] - 35:12
**intents** [1] - 12:15
**interest** [12] - 34:19, 23; 35:4; 77:9, 25; 78:11, 13-14; 81:4, 6, 8
**interested** [1] - 82:8
**interesting** [6] - 79:14, 17; 80:15; 81:7; 82:14
**interests** [5] - 39:12, 17; 61:20; 72:3; 78:24
**internal** [3] - 53:18; 54:2, 6
**interpretation** [1] - 38:4
**intro** [1] - 17:19
**introduce** [2] - 2:9; 22:24
**introduces** [1] - 41:1
**invitation** [1] - 30:2
**invitational** [1] - 41:2
**invite** [1] - 41:4
**invited** [1] - 10:19
**inviting** [1] - 22:17
**invocation** [1] - 23:12
**invoke** [3] - 23:3, 14; 66:24
**invoked** [1] - 39:4
**invoking** [2] - 23:21, 24
**involve** [1] - 14:15
**involved** [4] - 11:5; 48:24; 77:15; 88:14
**irreparable** [9] - 3:19, 22; 5:14; 11:6; 76:25; 77:2, 8, 20, 23
**issue** [45] - 3:4; 5:1, 9; 7:3; 9:11; 10:5; 11:7; 15:21; 16:11,

13; 18:19; 21:4; 30:20; 33:8; 35:21; 36:24; 38:5; 40:8; 42:6; 57:8; 59:10; 60:5; 63:22; 64:13, 15; 65:1, 17, 23-24; 69:10; 70:4; 73:1, 20; 76:2; 77:21; 78:21; 81:4; 82:18, 21; 83:7; 84:7; 85:13; 86:8
**issued** [8] - 25:21; 27:22; 30:8; 84:5, 23, 25; 85:9; 86:21
**issues** [22] - 3:16; 4:21; 5:4, 6, 16, 21; 10:11, 14; 25:3; 48:21; 52:18; 57:17; 68:10; 71:12; 72:12; 75:20; 78:2
**itself** [5] - 16:14; 30:19; 61:23; 68:8; 69:2
**J20** [4] - 25:16; 26:18; 27:4
**J20's** [1] - 26:8
**jacket** [1] - 10:19
**Jackson** [1] - 80:22
**January** [1] - 50:16
**job** [1] - 80:18
**Josh** [1] - 2:11
**Joun** [4] - 6:17; 65:1; 75:12
**Joun's** [1] - 88:9
**JRR-25-cv-0072 [1]** - 2:4
**judge** [4] - 79:9; 81:16, 25
**Judge** [27] - 6:17; 19:4; 20:10; 21:19; 22:6, 25; 23:4; 26:1, 4, 25; 32:14; 50:21; 54:10, 24; 55:4, 13, 22, 25; 56:1, 7, 12, 25; 57:10; 65:1; 75:12; 88:9
**judge's** [1] - 6:17
**Judicial** [1] - 89:13
**judicial** [1] - 22:8

**jump** [1] - 10:25
**jurisdiction** [2] - 9:24; 11:15
**jurisdictional** [4] - 4:22; 5:4, 6, 20
**justice** [2] - 69:23
**Justice** [5] - 79:19, 24; 80:22
**Kagan's** [1] - 80:22
**keep** [2] - 45:21; 50:2
**kind** [18] - 11:7; 13:2; 16:16; 19:4; 23:25; 35:8; 44:22; 50:7; 55:21; 60:19; 62:18; 65:3; 67:1; 79:20, 22-23; 87:21; 88:7
**kinds** [1] - 88:21
**kitchen** [1] - 74:23
**known** [2] - 55:19; 75:20
**land** [3] - 13:10; 51:4
**language** [7] - 40:8; 50:18; 62:7, 15; 63:9; 65:23; 67:21
**large** [2] - 24:19; 67:10
**largesse** [1] - 71:18
**last** [5] - 13:19; 47:14; 67:3; 85:8
**Laughter** [2] - 10:22; 21:11
**Laurie** [1] - 17:2
**law** [26] - 8:20; 11:15; 15:14, 20; 35:2; 38:4; 47:6; 54:25; 62:8-10, 21, 24; 63:1, 4, 13, 15; 66:4; 71:25; 75:4, 6, 8; 76:11; 81:21, 25; 87:7
**lawful** [1] - 25:19
**laws** [6] - 15:9; 62:17; 65:23; 67:20, 24
**lawsuit** [3] - 15:22; 47:15; 74:2
**leaked** [1] - 53:16

**leaking** [1] - 54:1
**learned** [2] - 17:5; 72:15
**least** [11] - 6:4; 14:4; 15:6; 18:10; 35:13; 60:20; 66:12; 67:22; 77:15; 81:9; 83:4
**leave** [1] - 76:19
**leaves** [1] - 51:10
**left** [1] - 13:6
**legal** [4] - 22:14; 68:10; 71:4; 72:11
**length** [1] - 3:23
**lens** [5] - 15:11; 26:2, 5; 55:4; 80:9
**less** [3] - 76:1, 5; 79:8
**letter** [37] - 27:10; 28:23; 39:9; 47:24; 52:25; 57:4, 8, 10; 58:9, 13-14, 18, 21; 65:24; 66:3, 15, 20, 23; 67:2, 22; 68:8; 69:2; 70:20; 71:15, 24; 72:16; 73:7; 74:1, 24; 75:8, 24; 76:1, 11; 86:11
**letterhead** [1] - 89:2
**letters** [19] - 38:12, 22; 50:20; 51:1; 52:15; 53:13; 58:4; 63:17; 64:6, 18, 21; 65:2, 6, 9; 75:13; 76:8; 86:14
**level** [2] - 15:24; 16:9
**lickety** [1] - 56:2
**lickety-split** [1] - 56:2
**light** [2] - 3:17; 15:4
**lightning** [1] - 79:22
**likelihood** [3] - 29:7; 77:7, 23
**likely** [4] - 34:25; 54:24; 58:22; 79:8
**limit** [2] - 29:9;

82:20
**limited** [2] - 83:1, 3
**limitless** [1] - 45:23
**Linda** [1] - 30:15
**line** [2] - 20:9; 85:15
**lines** [1] - 19:1
**linguistic** [1] - 42:19
**linguistically** [1] - 42:19
**list** [9] - 43:6; 74:23; 84:6; 85:9, 15; 86:5, 7, 20, 22
**listed** [3] - 67:3; 84:11; 85:24
**listen** [1] - 29:22
**listening** [1] - 83:8
**lists** [1] - 46:17
**live** [1] - 7:14
**loan** [2] - 7:13; 9:24
**locate** [1] - 8:20
**located** [2] - 18:25; 63:2
**logic** [2] - 27:19; 40:6
**logical** [1] - 41:23
**Longmore** [1] - 89:10
**LONGMORE** [1] - 89:16
**look** [14] - 13:4; 21:20; 36:21-23; 40:23; 44:7, 20; 52:10; 55:2; 56:2; 69:1; 87:6, 10
**looked** [1] - 58:5
**looking** [13] - 16:6; 24:5; 36:18; 42:20; 43:11, 20; 44:4; 47:24; 51:20; 55:3; 66:8; 71:10
**looks** [1] - 41:20
**loop** [1] - 46:21
**loops** [1] - 46:7
**lose** [3] - 3:23; 4:4
**loss** [1] - 17:7
**loudly** [1] - 19:12
**lousy** [1] - 72:13
**love** [1] - 49:20
**lumped** [1] - 18:3
**MACTE** [17] -

5:24; 6:12; 8:18, 23; 9:5, 8; 11:25; 16:18-21, 24; 17:3, 13; 18:25; 23:13
**MACTE's** [5] - 16:25; 18:1; 23:14, 19, 24
**main** [4] - 4:21; 57:2; 71:7
**maintain** [1] - 69:2
**majority** [1] - 8:20
**mandates** [1] - 28:14
**manner** [2] - 60:5; 62:16
**March** [1] - 89:14
**marked** [1] - 51:22
**Maryland** [31] - 6:1, 15; 8:18; 9:7, 20; 11:11; 17:1, 4, 6, 8; 18:8, 14, 18, 24; 19:15; 20:20; 21:18; 22:5; 23:24; 67:5, 8; 87:18, 20; 88:3, 19; 89:11
**Massachusetts** [9] - 11:24; 12:7; 13:19; 64:25; 81:6, 9, 11, 14
**materially** [3] - 14:17, 19; 15:1
**matter** [10] - 2:3, 6; 6:3; 38:4; 69:21; 77:17; 78:6; 81:25; 89:2, 12
**matters** [2] - 22:22; 29:2
**McMahon** [4] - 2:5; 28:7; 30:15; 72:24
**mealy** [1] - 42:10
**mean** [53] - 14:11; 15:15; 19:4; 20:24; 21:24; 22:13, 23; 23:6; 24:4, 14-15; 27:17; 29:11, 19; 30:23; 31:25; 32:5, 9; 33:15; 34:7; 37:25; 41:18; 44:17; 45:7, 16, 25; 46:25; 50:24; 51:19;

54:12; 55:15; 61:4; 63:21; 64:2; 68:3; 69:16, 21, 23-24; 70:10, 17; 74:24; 75:4-8; 77:22; 81:7; 86:6, 16
**meaning** [2] - 58:16; 59:1
**means** [7] - 37:11; 38:1; 42:12; 44:17; 46:22; 47:16; 60:24
**meant** [2] - 54:6; 83:12
**meat** [1] - 10:15
**meet** [1] - 77:12
**meeting** [1] - 87:9
**Megan** [1] - 2:23
**member** [3] - 17:3; 18:1
**members** [23] - 6:4, 9, 11; 8:4; 9:3, 8-9; 16:19, 24; 17:5; 23:14; 27:8; 38:22; 47:14; 85:9; 86:8; 87:18, 20; 88:3
**members'** [2] - 16:22; 23:24
**membership** [2] - 5:25; 6:8
**memo** [1] - 54:2
**mention** [3] - 23:20; 27:13; 80:5
**mentioned** [2] - 50:22; 82:6
**mentions** [3] - 20:17; 55:5; 79:20
**mere** [1] - 39:4
**merely** [1] - 43:1
**merit** [3] - 64:16; 72:1; 80:3
**merits** [6] - 11:1; 29:8; 77:11, 17, 23; 85:18
**mess** [1] - 20:2
**Messitte** [2] - 19:4; 20:11
**MICCO** [1] - 2:23
**Micco** [1] - 2:23
**mid** [1] - 16:21
**middle** [1] - 38:20
**might** [24] - 7:25; 10:23; 13:6; 14:22; 15:1, 13,

18-19; 19:22; 20:25; 21:21; 28:2, 15; 45:5; 53:15; 54:13; 56:9; 72:21; 73:4; 74:22; 80:6; 81:11; 87:9
**mightily** [1] - 56:7
**mind** [2] - 4:12; 46:1
**minded** [1] - 28:2
**mindful** [1] - 9:17
**minds** [1] - 22:18
**minimus** [1] - 83:18
**minor** [1] - 86:15
**minority** [1] - 14:24
**minute** [1] - 87:6
**minutia** [1] - 85:5
**misappropriated** [1] - 80:8
**misfortune** [1] - 20:8
**misidentified** [1] - 33:17
**mispronouncing** [1] - 6:17
**mission** [6] - 16:25; 23:15; 30:24; 31:1; 62:3
**misstated** [1] - 17:19
**Molissa** [1] - 2:20
**moly** [1] - 74:24
**moment** [9] - 3:6; 26:25; 52:4, 10; 59:9; 60:21; 64:12; 67:11; 78:9
**moments** [1] - 3:1
**Monday** [1] - 11:25
**money** [18] - 6:22; 7:6, 12; 12:6, 8-11, 15; 13:5, 8, 11; 47:17; 73:6; 81:10, 19, 22
**MOORE** [1] - 2:17
**Moore** [2] - 2:17; 3:9
**mootness** [2] - 7:3; 10:11
**morning** [11] - 2:11, 13, 16-17, 19-20, 22-23, 25; 12:5; 29:20

**most** [6] - 6:6; 11:4; 37:10; 50:21; 70:19; 83:24
**motion** [9] - 3:17; 5:10; 11:18; 16:14; 21:1, 23; 51:24; 55:8; 70:13
**motor** [1] - 65:13
**movant** [1] - 78:3
**move** [10] - 6:14; 8:10; 23:9; 34:19; 47:11; 50:7; 59:16; 61:19, 21
**moving** [4] - 3:3; 20:8; 55:24; 65:9
**MR** [112] - 2:11, 17; 3:11, 15; 4:16; 5:20; 6:19, 23; 7:1, 5, 9, 21; 8:1, 10, 12, 25; 9:2, 6, 10, 13, 15; 10:13; 22:4; 23:9, 17; 24:3, 6, 8, 18, 21; 25:2, 9, 12; 26:3, 13; 27:5, 18; 29:1, 13, 17; 30:3; 31:11; 32:4, 8, 24; 33:1, 5, 7, 12, 17, 21, 24; 34:2, 16, 21; 35:6, 8; 38:8, 17; 39:1, 9, 18, 22, 25; 40:3, 7, 25; 42:2, 8, 11, 14, 17, 21; 43:8, 18, 25; 45:13, 15, 21; 46:3, 8, 11, 17; 47:7, 9, 11; 48:11, 15, 18; 49:2, 5, 8, 20; 51:18; 83:23; 84:15, 20; 85:17, 22; 86:13, 18, 23; 87:2, 17, 23; 88:1, 11, 14, 18, 23, 25; 89:4
**MS** [127] - 2:14, 20, 23; 5:10, 15; 10:16, 23; 11:3; 12:3, 18, 20, 23; 13:24; 14:16, 18, 20; 15:23; 16:2; 17:12, 16,

21; 18:21; 19:6, 14, 18, 20, 24; 20:2, 5, 12; 21:2, 8, 10, 14, 16, 25; 50:1, 5, 10, 15; 51:21; 52:3, 5, 8, 15; 53:3, 23, 25; 55:25; 56:6, 24; 57:20; 58:6, 20; 59:2, 5, 13, 15, 18; 60:7, 12; 63:24; 64:12, 24; 65:8; 66:17, 20; 67:1, 12, 16; 68:14, 17, 20; 69:10, 17, 20, 25; 70:3, 9, 11, 15; 71:5, 7, 10; 73:11, 14, 18, 25; 74:9, 11, 13, 20; 75:6, 11, 17; 76:3, 6, 10, 14, 18, 21, 25; 77:4, 14; 78:5, 8, 11, 16, 19; 79:7, 13; 80:10, 14, 19, 21; 81:1, 5, 17; 82:1, 5, 10, 13, 18; 83:11, 15, 19; 87:4
**muddying** [1] - 35:18
**Mullen** [1] - 17:2
**multicultural** [1] - 65:19
**multiyear** [5] - 7:18; 38:15, 25; 39:7, 14
**must** [2] - 39:15; 62:15
**myopic** [1] - 28:14
**NADOHE** [26] - 4:25; 22:7; 25:14; 50:6, 12, 15, 22, 24; 51:9, 25; 52:9, 16, 19; 53:7; 54:3, 19, 21-22; 55:14, 21; 56:8; 57:1, 12
**name** [3] - 6:17; 73:5; 86:6
**narrative** [1] - 32:1
**narrow** [2] - 35:12; 76:12
**narrowed** [1] - 3:17

**national** [1] - 66:2
**nature** [4] - 16:15;
20:10; 22:17;
30:2
**NCTRs** [1] - 18:2
**necessarily** [5] -
4:14; 23:3;
27:15; 29:17;
81:24
**necessary** [1] -
46:12
**need** [19] - 3:2, 6;
4:12; 10:23;
14:23; 26:23;
36:15; 45:1;
46:25; 47:2, 16;
48:17; 49:25;
56:2; 79:15;
83:25; 86:19;
87:20
**needs** [3] - 24:16;
35:11; 49:23
**neighborhood** [1]
- 20:18
**never** [1] - 87:9
**nevertheless** [1] -
25:19
**new** [5] - 37:6, 17;
59:7; 60:14
**next** [1] - 67:13
**night** [2] - 13:19;
47:14
**nobody** [1] - 74:8
**non** [2] - 19:5;
20:23
**nondiscriminati**
**on** [1] - 62:16
**none** [3] - 11:13;
33:18; 67:5
**normal** [2] -
70:17; 71:10
**normally** [1] -
48:6
**note** [4] - 4:18;
42:25; 50:10;
59:18
**noted** [3] - 21:10;
50:15; 64:3
**notes** [3] - 16:16;
87:6, 11
**nothing** [4] - 20:7;
38:5; 40:14;
61:16
**Notice** [1] - 36:10;
40:16; 41:7;
85:2
**notice** [12] -
32:23; 36:20;
43:12; 44:15,
23; 45:4, 18;

61:23; 73:8;
74:1; 76:15;
84:12
**notice-and-**
**Comment** [1] -
44:15
**Notice-and-**
**Comment** [4] -
36:10; 40:16;
41:7; 85:2
**noticed** [1] - 11:3
**notices** [3] -
38:23; 84:5
**noticing** [1] -
31:19
**notion** [1] - 23:25
**number** [6] - 12:1;
51:25; 52:1;
57:5; 66:5;
67:10
**Number** [2] - 2:4;
72:10
**numbers** [1] -
69:9
**nutshell** [1] -
33:24
**obeyed** [1] - 28:6
**objection** [2] -
51:16, 20
**objectively** [1] -
31:18
**obligation** [2] -
84:7; 85:1
**obvious** [3] -
75:1; 77:24;
78:7
**obviously** [1] -
76:9
**OF** [1] - 89:9
**offend** [1] - 15:20
**offended** [1] -
32:23
**offenders** [1] -
73:2
**offensive** [1] -
32:3
**offer** [5] - 30:5;
50:5, 11-12;
51:6
**offhand** [1] -
19:25
**office** [4] - 20:8;
61:19, 22; 85:3
**offices** [1] - 84:22
**OFFICIAL** [2] -
89:9, 16
**offy** [1] - 25:7
**often** [4] - 27:14;
78:1, 3, 7
**Oglesby** [2] -

13:21; 14:15
**Oglesby's** [3] -
13:25; 28:10, 24
**old** [2] - 67:7; 76:4
**omits** [1] - 28:7
**once** [3] - 7:1;
10:19; 84:23
**one** [39] - 8:14,
21; 9:15; 13:14;
14:22; 18:17,
23; 20:14;
21:16; 23:10;
27:8; 30:25;
31:7; 35:16, 19,
21; 37:19; 43:5;
45:15; 47:9, 25;
51:10; 53:21;
55:6; 66:17;
67:11; 73:14;
74:10, 21;
79:19; 80:17;
82:14; 84:2;
86:9; 87:15;
88:19
**ones** [1] - 82:23
**ongoing** [1] -
32:16
**onlooker** [1] -
15:19
**open** [1] - 70:23
**opening** [1] - 55:7
**opens** [1] - 27:20
**operate** [1] - 4:4
**operated** [1] -
62:16
**operation** [1] -
85:6
**opinion** [9] -
19:19; 50:23;
52:20; 54:3;
55:5; 57:1;
63:23; 80:23;
82:3
**opportunity** [3] -
10:25; 21:4, 23
**opposed** [1] -
57:17
**opposing** [1] -
81:2
**opposite** [1] -
55:14
**opposition** [2] -
11:18; 16:14
**option** [2] - 37:25;
69:22
**Order** [22] - 27:4,
13, 16, 22; 28:6,
13, 21; 50:16;
51:2, 8; 52:19,
21-22, 24; 53:4,

9, 13; 54:5, 7;
56:9; 73:1
**order** [33] - 4:25;
6:24; 7:5, 14;
14:24; 22:7;
23:1; 25:3, 14,
16, 19-20, 22,
24; 26:4, 18;
27:4; 30:18;
39:13; 45:1;
49:2, 8; 50:18;
51:24; 55:24;
56:13; 86:21;
88:9, 15
**ordered** [3] -
47:22; 49:18;
82:12
**orders** [3] - 51:11;
58:8, 12
**organization** [3] -
5:25; 6:8; 34:9
**organizational** [3]
- 6:8; 16:18;
17:11
**organizations** [7]
- 6:1; 8:4; 17:4;
18:1; 30:21;
85:10
**organize** [1] - 3:1
**origin** [1] - 66:2
**original** [1] - 67:6
**otherwise** [3] -
27:11; 39:11;
72:3
**ought** [1] - 37:7
**ourself** [1] - 82:20
**ourselves** [1] -
26:7
**outcome** [2] -
70:7; 84:18
**outset** [2] - 11:10;
64:4
**outside** [1] -
55:10
**overarching** [1] -
16:11
**overlap** [1] -
22:22
**overwhelmed** [1]
- 9:22
**own** [6] - 28:2, 8;
47:22; 54:8;
57:14; 72:25
**owned** [1] - 87:10
**p.m** [3] - 87:14;
89:8
**Page** [15] -
16:19-21, 23;
17:18, 23, 25;
48:1; 53:1; 55:9,

14; 62:14; 63:9;
64:4
**page** [5] - 27:2;
63:2; 70:11;
72:7; 89:13
**pages** [1] - 62:12
**pagination** [1] -
48:1
**paper** [1] - 43:5
**papers** [3] - 4:14;
25:13; 89:6
**Paragraph** [3] -
16:23; 17:16;
64:4
**paragraph** [3] -
16:24; 71:17, 20
**Paragraphs** [3] -
14:6; 17:3;
86:16
**Park** [2] - 6:4; 9:2
**parlance** [1] -
22:19
**parsing** [1] -
35:17
**Part** [7] - 41:18;
43:2; 45:10;
46:20, 22; 61:7
**part** [13] - 6:5; 8:2;
19:6; 29:20;
42:22; 47:21;
50:16; 52:15;
63:3; 65:25;
66:12; 71:22
**participants** [1] -
73:6
**particular** [2] -
8:5; 36:8
**particularly** [4] -
10:2; 23:1; 81:7;
82:11
**parties'** [1] -
29:21
**partner** [1] - 87:7
**parts** [3] - 3:4;
41:20; 67:22
**past** [2] - 24:5;
37:18
**pasted** [1] - 65:4
**Pause** [2] - 52:6,
13
**pay** [7] - 47:16;
48:13, 22;
49:10, 13, 17
**peace** [1] - 20:12
**pending** [1] - 2:3
**people** [13] - 15:7;
27:24; 41:5;
54:12; 59:25;
69:12; 71:1;
78:15, 18-20;

79:16; 80:1
**percentage** [1] -
14:24
**performance** [1] -
48:6
**perhaps** [4] -
14:12; 17:22;
26:15; 71:16
**peril** [1] - 78:23
**period** [2] - 38:20;
48:6
**permission** [1] -
47:17
**person** [3] - 74:5,
7; 75:3
**personal** [1] -
40:13
**perspective** [9] -
24:22; 34:22;
41:9-11; 79:14,
18; 80:15
**philosophical** [1]
- 31:17
**phrase** [12] -
35:21; 50:21,
23, 25; 53:4;
57:1, 3; 60:22;
68:2; 79:21, 24;
85:12
**PI** [6] - 23:8;
24:24; 29:10,
21; 48:23; 83:7
**PI's** [1] - 24:15
**picked** [1] - 18:12
**picture** [8] - 16:2;
41:9; 60:14, 19;
62:3; 64:17;
68:5
**piece** [2] - 42:4;
43:9
**piling** [1] - 39:24
**pills** [1] - 59:25
**pin** [2] - 4:9; 64:24
**place** [3] - 25:20;
45:25; 81:22
**placed** [3] - 47:13;
49:10, 15
**places** [1] - 80:2
**placing** [1] -
47:23; 49:13, 17
**plain** [1] - 60:25
**plaintiff** [14] -
5:17, 23; 8:4,
19, 21; 12:6;
13:11; 20:14;
51:5; 55:7;
58:21; 60:8;
73:4; 79:6
**plaintiffs** [37] -
2:8, 12, 15;

6:12; 10:6;
11:20; 12:1;
13:1, 7, 13, 16;
16:7; 18:24;
19:11, 14;
20:21; 55:19,
21; 57:9; 58:10,
13; 63:16, 25;
65:1; 66:13, 21;
67:8, 25; 68:22;
73:19; 74:7;
75:18; 79:1, 9;
82:21; 83:4;
86:9
**plaintiffs'** [15] -
12:13; 13:3;
18:11; 50:10,
22; 51:13;
54:20; 56:19,
22; 57:14;
59:19; 60:18,
20; 61:2, 16
**plan** [1] - 6:25
**plant** [1] - 5:18
**play** [1] - 40:6
**pleading** [1] -
17:10
**pleadings** [1] -
64:3
**point** [39] - 6:3;
7:23; 9:15; 10:9;
11:19; 12:24;
13:8; 15:23;
17:20; 19:11;
21:17; 23:10;
24:18; 40:8, 11;
45:22; 47:9;
50:10; 51:5;
54:19; 55:6;
57:13; 58:7;
61:1; 62:4, 12;
71:7; 73:18;
74:17; 75:7, 11,
13, 17, 22;
80:21; 82:1, 15;
85:8; 88:11
**pointed** [4] -
11:23; 52:25;
53:3; 86:14
**points** [4] - 17:25;
73:11, 15; 79:24
**poking** [1] - 25:6
**policy** [3] - 40:14;
60:14; 72:1
**political** [2] -
27:20; 40:13
**poor** [2] - 10:1, 6
**portion** [1] - 17:19
**portions** [1] -
38:13

**posit** [1] - 56:3
**position** [19] -
4:3; 7:2; 14:13,
16; 15:3; 17:9;
44:10; 64:20;
65:6, 21; 66:15;
67:14, 16-17;
83:9, 12
**positions** [2] -
71:18; 80:8
**possible** [3] -
11:4; 28:22;
73:14
**possibly** [4] -
18:8; 31:23;
69:9; 80:18
**post** [1] - 54:1
**posttermination**
[1] - 48:12
**posture** [3] -
20:13; 31:12, 14
**potential** [6] -
3:25; 52:17;
55:1; 81:13;
86:1
**potentially** [1] -
81:14
**potted** [1] - 5:18
**power** [1] - 80:8
**practical** [3] -
69:21; 70:8;
85:13
**practice** [1] - 22:1
**precipice** [1] -
38:24
**predecessor** [3] -
28:8; 30:15;
72:25
**predicability** [1] -
44:23
**prefer** [2] - 5:3;
10:16
**preference** [2] -
10:19; 25:2
**preferences** [1] -
30:25
**preliminary** [9] -
2:7; 13:10; 21:3;
24:11; 47:21;
51:24; 76:22;
77:10, 19
**preparation** [5] -
4:1, 3; 6:2;
16:13; 17:8
**prepare** [1] -
16:17
**prerogative** [1] -
60:4
**prescribes** [1] -
25:14

**presence** [2] -
79:3, 5
**present** [2] - 11:4;
81:2
**presentation** [1] -
29:14
**president** [2] -
40:12; 60:1
**President** [6] -
27:21-23; 30:7;
50:17; 72:23
**presidential** [1] -
59:21
**press** [4] -
27:12-14; 28:23
**presumably** [1] -
49:14
**presume** [1] -
13:24
**pretending** [1] -
23:22
**pretty** [3] - 7:7;
15:6; 34:22
**previous** [1] -
37:9
**primary** [1] - 49:9
**principal** [4] - 5:2;
25:12; 44:3;
45:3
**principally** [1] -
6:1
**principle** [2] -
31:17; 73:2
**principles** [4] -
25:23; 30:13;
33:20
**priorities** [67] -
5:1; 35:22, 25;
36:6, 9, 19, 25;
37:2, 9, 13, 18,
20, 22; 38:1;
40:9, 14-15, 19,
23; 41:2, 5, 7,
22; 42:13; 44:6,
8-9, 12, 14, 16,
19; 45:24; 46:5,
16-17; 53:14;
60:10, 20,
22-24; 61:6,
8-14; 63:6, 15;
64:19; 68:2-5;
72:5; 84:23
**prioritizing** [1] -
72:1
**priority** [3] - 61:4,
21; 71:17
**privately** [1] -
32:11
**problem** [8] -
26:14; 28:18;

30:20; 33:8, 11;
44:1; 57:2
**problematic** [2] -
48:20; 86:4
**Proceedings** [2] -
52:6, 13
**proceedings** [2] -
89:8, 12
**process** [18] -
29:15, 22, 25;
32:12; 36:19;
39:3, 18; 40:21;
49:11; 50:7, 11;
60:13; 66:22,
25; 67:2; 68:18,
24; 74:15
**Professional** [1] -
89:10
**program** [21] -
6:5; 14:22; 15:7;
31:24; 35:24;
36:7; 41:25;
42:2, 5, 12, 15;
44:6; 46:15;
63:5; 72:20, 22;
73:5, 20, 22;
74:22; 75:1
**programs** [15] -
4:2, 6; 14:15;
15:20; 17:8;
18:9; 24:22;
30:22; 59:22;
62:6, 21, 23;
66:9; 67:23;
71:21
**project** [2] -
39:14, 16
**projects** [1] -
62:15
**promises** [2] -
25:8; 69:24
**promote** [2] -
65:24; 71:22
**promotes** [1] -
15:1
**promoting** [3] -
33:19; 62:20;
72:22
**prompted** [2] -
66:11; 73:23
**prone** [1] - 25:7
**pronouncement**
[2] - 31:15, 21
**proper** [2] - 9:20;
20:25
**properly** [3] -
19:10; 48:3;
50:19
**proposals** [1] -
30:11

**propose** [1] - 9:23
**proposing** [1] -
86:7
**proposition** [1] -
64:5
**protected** [2] -
66:2; 71:23
**provide** [5] - 3:25;
6:1; 71:3; 86:7;
89:1
**provided** [2] -
51:13; 66:20
**provides** [3] -
13:25; 71:21;
74:15
**providing** [2] -
85:9, 15
**proving** [1] - 29:5
**provision** [13] -
10:1; 26:8; 36:2;
39:5; 40:3, 18;
61:24; 62:25;
63:1, 7; 67:17
**provisions** [1] -
57:5
**public** [12] - 3:23;
6:3; 34:19, 22;
35:4; 53:20;
54:6; 60:13;
77:9, 25; 78:13;
81:4
**publicly** [3] -
17:19; 32:11;
69:5
**published** [1] -
40:20
**pull** [2] - 65:23;
67:17
**pure** [1] - 41:10
**purely** [1] - 24:10
**purpose** [7] - 2:6;
22:12; 46:15;
66:3; 71:24;
75:8; 77:1
**purposes** [12] -
5:10, 13; 12:15;
15:22; 24:3, 10,
23; 29:6, 15;
48:23; 81:15;
83:8
**pursuant** [7] -
36:4, 7; 37:12;
41:22; 44:3;
89:11
**pursue** [1] - 28:4
**purview** [2] -
56:9; 57:12
**pushed** [1] -
18:18
**put** [10] - 4:9;

10:14; 32:17;
45:3; 55:6;
64:24; 70:1, 13;
76:14; 85:19
**puts** [1] - 73:7
**putting** [1] - 46:20
**quarrel** [2] -
31:16; 64:9
**quarrelling** [1] -
31:24
**questions** [9] -
6:14; 25:6;
35:20; 59:16;
74:6, 16; 83:24;
87:8, 11
**quite** [2] - 78:7;
85:6
**quota** [1] - 14:23
**quotas** [1] - 15:6
**quote** [2] - 30:25;
66:1
**race** [2] - 30:25;
66:1
**Rachel** [1] - 13:21
**racial** [1] - 14:23
**raise** [1] - 21:17
**raised** [7] - 4:23;
5:1, 22; 26:20;
35:14; 57:9
**raises** [1] - 9:16
**rather** [4] - 3:10;
9:24; 17:11;
27:14
**rationale** [1] -
27:7
**reach** [1] - 45:1
**read** [9] - 18:7,
10; 46:13;
48:21; 52:4;
63:21; 64:10;
74:6; 79:17
**reading** [4] - 27:1;
41:17; 60:25;
63:25
**reads** [1] - 17:22
**ready** [1] - 35:7
**reality** [3] - 47:3;
69:21; 70:8
**realize** [1] - 58:3
**really** [36] - 3:24;
10:20; 15:21;
20:6; 21:18;
22:17; 23:4;
24:13; 30:1;
34:5; 35:16;
37:23; 43:23;
44:17; 45:1;
46:20, 24;
50:19; 51:7, 10;
54:10; 55:6, 19;
56:7; 62:19;

63:20; 65:17;
70:17; 73:4;
74:19; 79:13,
17, 20, 22;
80:22
**Realtime** [1] -
89:10
**reason** [26] - 8:2,
7; 12:24; 15:15;
17:21; 32:11,
14, 22; 43:8;
44:21; 46:18;
53:8, 12; 54:4;
57:19, 21;
63:17; 64:22;
79:23; 84:16;
85:19, 22; 86:2
**reasonable** [3] -
22:18; 38:4;
65:12
**reasonably** [1] -
65:12
**reasoned** [1] -
65:18
**reasoning** [3] -
4:25; 64:20
**reasons** [11] -
14:5; 26:11;
27:10; 28:16;
35:13; 37:15,
23; 49:6; 57:6;
64:7; 77:24
**rebuild** [1] - 59:22
**rebuilding** [1] -
60:1
**rebuilt** [1] - 4:7
**rebuttal** [3] -
49:20, 22; 83:22
**receipt** [1] - 86:10
**receive** [3] -
39:14; 43:13
**received** [1] -
38:23
**recent** [1] - 43:5
**recently** [1] - 6:6
**recess** [5] - 49:23,
25; 87:6, 13
**recipient's** [1] -
72:8
**recipients** [5] -
7:18; 8:3; 31:6;
40:23; 52:17
**Recipients** [1] -
16:24
**recognized** [1] -
23:18
**record** [8] - 2:10;
6:3; 23:11;
28:20; 29:6;
52:16; 68:23, 25

**reduction** [1] -
69:9
**Reductions** [1] -
69:6
**reference** [5] -
52:24; 53:3,
13-14; 63:16
**referenced** [3] -
13:18; 18:6;
52:20
**referring** [1] - 3:7
**refers** [1] - 84:16
**reflects** [1] - 34:6
**refunded** [1] - 4:6
**regard** [1] - 36:11
**regarding** [1] -
38:13
**Register** [7] -
58:23; 59:6;
60:16; 62:5, 13;
63:2; 84:4
**Registered** [1] -
89:10
**Registers** [1] -
63:9
**regulation** [3] -
35:17; 60:24;
84:17
**regulations** [5] -
38:14; 47:23;
60:16, 25; 89:13
**Regulations** [1] -
66:6
**regulatory** [2] -
37:4; 45:17
**reinstate** [1] -
32:10
**reinstated** [2] -
32:19; 82:24
**reiterate** [1] -
23:10
**relate** [2] - 63:13;
68:18
**related** [18] -
14:15; 22:5,
20-21, 25; 28:9;
30:22; 38:15;
47:12; 50:23-25;
52:18; 53:5;
57:1; 62:7, 25;
67:20
**relates** [3] -
21:25; 61:21;
68:12
**relating** [1] - 16:3
**release** [3] -
27:12; 28:23
**released** [5] -
12:8, 16; 69:5;
81:10, 23

**releases** [1] -
27:14
**relevant** [2] -
50:16; 66:6
**relief** [8] - 7:10;
11:25; 20:6;
29:10; 48:23;
82:19; 83:1;
86:2
**relies** [1] - 40:4
**religion** [1] - 66:1
**rely** [4] - 9:16;
25:9; 48:24;
53:11
**relying** [2] -
24:24; 64:2
**remained** [1] -
16:21
**remand** [7] -
68:24; 69:9, 11;
70:13, 17, 19;
71:11
**remarks** [1] -
50:23
**remedy** [4] -
32:17; 68:22,
24; 77:19
**remember** [2] -
19:19, 25
**remiss** [5] -
23:20; 70:7;
80:11, 14, 21
**remotely** [1] -
30:14
**remove** [1] -
10:19
**repeatedly** [1] -
55:5
**reply** [2] - 11:21;
17:10
**replying** [1] -
11:17
**report** [2] - 13:20;
82:6
**reported** [1] -
89:12
**REPORTER** [2] -
89:9, 16
**Reporter** [1] -
89:10
**representations**
[1] - 70:25
**request** [1] - 21:7
**requested** [1] -
48:23
**requesting** [3] -
39:2; 47:21;
49:3
**requests** [1] -
39:3

**require** [3] -
59:22; 68:6;
86:21
**required** [6] -
35:2; 49:12;
60:19; 63:19;
65:11; 66:25
**requirements** [1]
- 62:17
**requires** [2] -
27:15; 35:17
**resident** [1] -
19:12
**residents** [2] -
17:4; 19:15
**resides** [1] -
18:24
**resist** [2] - 35:10,
19
**respect** [12] -
4:23; 8:5; 16:18;
23:4; 30:12, 19;
37:1, 3; 47:19,
23; 85:2; 87:16
**respond** [1] -
10:11
**responding** [1] -
11:17
**response** [4] -
3:18; 17:10;
53:17; 75:19
**responsibilities**
[1] - 48:8
**rest** [3] - 4:14;
20:12; 84:24
**restore** [1] - 34:3
**restored** [1] -
12:10
**restraining** [1] -
51:24
**restroom** [1] -
49:24
**result** [1] - 3:20
**resulting** [1] -
17:7
**retaliation** [1] -
86:2
**retribution** [1] -
85:23
**retroactive** [4] -
56:5, 7, 18, 20
**reversed** [1] -
5:21
**review** [3] - 30:11;
48:8; 69:12
**reviewed** [1] -
66:5
**RICHARDS** [111] -
2:11; 3:11, 15;
4:16; 5:20; 6:19,

23; 7:1, 5, 9, 21;
8:1, 10, 12, 25;
9:2, 6, 10, 13,
15; 10:13; 22:4;
23:9, 17; 24:3,
6, 8, 18, 21;
25:2, 9, 12;
26:3, 13; 27:5,
18; 29:1, 13, 17;
30:3; 31:11;
32:4, 8, 24;
33:1, 5, 7, 12,
17, 21, 24; 34:2,
16, 21; 35:6, 8;
38:8, 17; 39:1,
9, 18, 22, 25;
40:3, 7, 25;
42:2, 8, 11, 14,
17, 21; 43:8, 18,
25; 45:13, 15,
21; 46:3, 8, 11,
17; 47:7, 9, 11;
48:11, 15, 18;
49:2, 5, 8, 20;
51:18; 83:23;
84:15, 20;
85:17, 22;
86:13, 18, 23;
87:2, 17, 23;
88:1, 11, 14, 18,
23, 25; 89:4
**Richards** [10] -
2:11; 3:10; 22:2;
23:7; 38:16;
51:16; 83:5, 22;
86:25; 87:16
**rights** [13] - 15:9;
62:8, 17, 21,
24-25; 63:13;
65:22; 66:3;
67:20, 24; 71:25
**risk** [3] - 47:20;
59:24; 85:25
**root** [2] - 27:16;
73:2
**roughly** [1] - 8:6
**route** [7] - 47:16;
48:13, 22;
49:10, 13, 17
**RPR** [1] - 89:16
**rude** [1] - 74:18
**rule** [2] - 36:15;
60:23
**ruled** [1] - 6:6
**rulemake** [1] -
36:15
**Rulemaking** [16] -
36:10; 40:16;
41:4, 7, 14, 16;
60:13, 19;

61:10, 18, 21,
23; 63:19;
64:15; 68:6;
85:2
**rulemaking** [4] -
36:20; 37:21;
40:18; 60:10
**rules** [5] - 22:10;
48:11; 57:5;
60:17
**ruling** [1] - 21:3
**run** [1] - 15:13
**runs** [1] - 15:9
**sake** [2] - 24:15;
56:19
**salvage** [1] -
11:20
**sarcastic** [1] -
72:14
**sassy** [1] - 69:16
**satisfies** [1] - 78:3
**satisfy** [1] - 17:11
**satisfying** [1] -
40:22
**Saul** [3] - 2:11,
14, 18
**saw** [2] - 82:8
**schedule** [1] -
82:12
**scheme** [2] - 37:4;
45:17
**scope** [2] - 22:10;
82:19
**screenshot** [1] -
54:1
**seated** [1] - 3:1
**second** [6] - 4:10;
43:10; 49:9;
52:8; 53:21;
71:20
**secondary** [1] -
44:25
**secretary** [1] -
53:19
**Secretary** [4] -
28:7; 38:14;
39:16; 72:24
**Secretary's** [1] -
54:8
**sections** [2] -
62:4; 66:6
**see** [19] - 9:4;
12:7; 13:17;
17:17, 21; 18:3;
37:5; 53:4, 22;
56:25; 60:23;
66:7; 67:6, 21;
69:1; 73:19;
81:9; 82:1, 12
**SEED** [6] - 17:1,

25; 18:2; 62:6; 63:9; 88:16
**seeing** [1] - 81:13
**seek** [2] - 11:21; 79:1
**seem** [4] - 4:19; 13:8; 15:21; 78:12
**self** [2] - 16:16; 63:22
**sense** [9] - 20:25; 22:24; 23:3; 27:11; 37:1; 41:10; 44:22; 45:11; 46:24
**sent** [3] - 12:24; 13:18; 52:16
**sentence** [1] - 5:13
**separate** [1] - 39:3
**serve** [2] - 39:11; 72:3
**served** [2] - 19:10; 22:8
**services** [1] - 6:2
**set** [13] - 14:23; 36:19; 39:3; 40:15, 19; 41:4, 7; 56:15; 57:13; 64:7, 20; 84:4, 23
**sets** [2] - 30:9; 64:21
**several** [2] - 51:8; 67:7
**sex** [1] - 66:1
**shall** [2] - 8:10; 68:9
**share** [1] - 23:6
**sharp** [1] - 54:10
**shift** [1] - 60:14
**shopping** [3] - 21:25; 22:3, 14
**short** [2] - 36:14; 65:18
**show** [5] - 11:11; 51:6, 12; 54:10; 68:23
**showed** [1] - 78:20
**shows** [2] - 58:13; 61:3
**shreds** [1] - 80:23
**shuttered** [1] - 24:23
**side** [2] - 78:11, 13
**sides** [1] - 80:24
**sight** [1] - 3:24

**signed** [1] - 50:16
**significance** [3] - 22:21; 46:9; 84:13
**significant** [4] - 11:9; 47:17; 84:21; 85:25
**significantly** [1] - 3:17
**silent** [1] - 20:16
**similar** [4] - 11:23; 19:18; 20:13; 22:22
**similarly** [6] - 14:12; 15:11, 15, 22; 43:1; 86:3
**simple** [3] - 34:22; 35:16; 63:19
**simply** [1] - 80:12
**single** [4] - 8:19; 18:16
**singular** [2] - 60:8; 64:15
**sink** [1] - 74:23
**sitting** [1] - 3:15
**situated** [10] - 8:5; 10:6; 13:16; 14:4, 12; 15:11, 15, 22; 43:1; 86:3
**situation** [4] - 19:13; 69:3; 70:4; 71:8
**situations** [2] - 14:1; 56:9
**smack** [1] - 76:7
**small** [1] - 4:7
**smart** [1] - 69:15
**solution** [2] - 9:22; 10:1
**someone** [2] - 12:9; 66:24
**somewhere** [3] - 17:13; 18:8; 21:1
**soon** [1] - 12:25
**sorry** [5] - 23:9; 44:20; 46:17; 51:25; 88:11
**sort** [48] - 4:18; 5:12, 17; 6:11; 7:10; 10:3; 16:11, 17; 17:23; 18:3; 20:18, 24; 21:20; 22:21; 26:20; 29:10, 21; 32:1, 17; 35:9; 41:8; 42:9;

43:5, 9; 45:2, 10; 46:7; 56:25; 57:6, 8; 59:20; 60:14; 62:3; 64:17; 65:11, 14; 71:18; 77:5; 78:1, 12; 79:14; 81:2; 82:24; 84:22; 85:4
**source** [1] - 57:2
**speaking** [1] - 56:21
**special** [2] - 36:13; 37:17
**specific** [13] - 11:11; 14:9; 16:6; 18:4; 30:12; 41:12; 47:1, 19; 55:18; 85:3
**specifically** [7] - 19:9; 21:19; 22:5; 36:16; 41:15, 19
**specified** [1] - 71:21
**spectacular** [1] - 29:10
**specter** [1] - 80:4
**speculating** [1] - 28:19
**spend** [2] - 47:17; 73:6
**spending** [2] - 7:20; 45:2
**spirit** [2] - 75:4, 6
**split** [1] - 56:2
**staff** [2] - 4:4; 29:20
**stand** [3] - 3:12; 10:17; 55:22
**standard** [3] - 29:11; 55:3, 17
**standing** [15] - 4:23; 5:21, 23; 6:8, 12; 10:11; 11:9; 16:13, 18; 17:11; 23:13, 17; 24:3; 83:6
**standpoint** [2] - 23:24
**start** [6] - 5:3, 5, 21; 16:8; 50:6; 59:19
**started** [1] - 12:12
**starts** [1] - 43:21
**State** [1] - 8:18
**state** [2] - 19:13; 20:9
**statement** [6] -

30:24; 31:1; 68:9; 69:6; 72:11, 17
**statements** [1] - 30:1
**states** [6] - 10:4; 12:2; 18:5, 16; 88:18
**States** [5] - 30:8; 39:12; 72:4; 89:11, 13
**status** [6] - 13:20; 49:16; 82:6; 87:22; 88:5, 7
**statute** [6] - 34:24; 35:17; 36:13; 37:4; 41:5; 55:10
**stay** [1] - 3:15
**stenographically** [1] - 89:12
**stenographically-reported** [1] - 89:12
**steps** [2] - 31:12
**stick** [1] - 85:24
**still** [8] - 4:12; 5:17; 7:14; 24:21; 30:17; 41:6; 57:15; 65:18
**stop** [1] - 71:6
**straightforward** [5] - 8:13; 57:23-25; 63:19
**strangely** [1] - 53:25
**streamlined** [1] - 11:4
**streamlining** [1] - 77:1
**strict** [1] - 55:3
**strictly** [2] - 24:5; 83:8
**strike** [1] - 30:14
**strikes** [5] - 4:21; 9:25; 10:6; 38:2; 86:4
**strong** [1] - 19:1
**strongest** [1] - 53:15
**struggles** [1] - 56:25
**struggling** [1] - 56:8
**Students** [7] - 6:7; 15:4; 62:19, 22; 79:10, 24
**students** [2] - 14:25; 67:23

stuff [3] - 40:19; 41:19; 68:5
**stupid** [1] - 69:15
**subject** [11] - 6:16, 18, 21; 12:3; 14:6; 22:22; 27:17; 60:10; 61:9, 18, 20
**subjecting** [1] - 61:23
**submit** [1] - 13:2
**submitted** [1] - 47:12
**subparts** [1] - 46:1
**Subsection** [2] - 18:22; 67:18
**substance** [1] - 73:9
**substantial** [2] - 8:24; 17:7
**substantially** [1] - 86:13
**substantive** [2] - 57:9; 71:16
**substantively** [2] - 15:18; 69:8
**succeed** [1] - 34:25
**success** [2] - 29:7; 77:23
**successful** [1] - 74:4
**suffer** [1] - 79:6
**suffered** [1] - 6:9
**sufficiency** [2] - 57:7, 10
**sufficient** [7] - 8:22; 45:18; 64:21; 65:6, 10; 66:8; 68:23
**suggest** [2] - 16:10; 70:7
**suggested** [1] - 69:11
**suggesting** [2] - 10:8; 12:21
**suggestion** [2] - 9:17; 10:7
**suit** [2] - 10:19; 88:19
**suited** [1] - 27:25
**super** [1] - 75:1
**super-obvious** [1] - 75:1
**supervisor** [1] - 30:9
**supplemental** [4] - 11:20; 12:4;

13:14
**support** [4] - 4:2; 11:17; 17:1; 27:8
**supported** [1] - 23:13
**supporting** [1] - 47:15
**suppose** [2] - 29:7; 40:12
**supposed** [5] - 54:5; 73:9; 74:25; 75:9, 14
**Supreme** [6] - 6:6; 15:8; 65:12; 77:5, 7, 16
**surely** [1] - 29:8
**surmise** [2] - 66:14; 73:4
**surmising** [1] - 32:2
**surprised** [2] - 12:4; 13:13
**suspended** [1] - 48:5
**synonymous** [2] - 68:3
**systems** [1] - 60:1
**talks** [7] - 41:2, 17, 19; 65:14; 67:18; 72:7
**target** [2] - 32:18; 73:5
**targeted** [1] - 26:12
**task** [1] - 29:22
**teach** [1] - 73:7
**Teacher** [1] - 2:5
**teacher** [5] - 3:25; 4:3; 6:2; 17:7; 59:22
**teachers** [3] - 14:24; 17:1; 73:7
**team** [1] - 20:11
**temporal** [1] - 34:10
**temporary** [2] - 7:5, 10
**ten** [2] - 17:3; 87:6
**ten-minute** [1] - 87:6
**term** [6] - 27:12; 41:25; 42:1, 6, 10; 80:8
**terminate** [14] - 7:13; 14:13; 15:12; 36:21; 38:11; 41:23; 45:5; 46:18;

62:2, 8; 63:14;
64:6; 73:2
**terminated** [45] -
4:2; 8:6; 9:25;
11:12; 14:2, 10;
16:3, 5, 22;
17:13, 24; 18:4,
10, 17; 20:19;
27:9; 31:20;
32:2, 7, 9-10;
33:14; 34:4;
35:25; 37:23;
42:22; 54:11,
13, 15; 55:20,
23; 64:22; 66:9,
14, 16; 72:6, 8,
16; 73:8; 75:1;
86:10; 88:8
**terminating** [6] -
15:17; 18:1;
38:19; 44:7;
51:3; 63:3
**termination** [51] -
14:6; 24:12;
26:8; 27:9, 16;
28:23; 33:9;
34:12; 36:2;
38:12, 23; 39:4,
9-11; 41:19;
43:11, 16;
47:24; 48:2, 4,
7; 50:20; 51:1;
52:25; 57:4;
58:4, 9, 13-14,
18, 21; 61:24;
63:1, 6, 17;
64:6; 67:16, 22;
68:7; 71:15;
72:9, 16, 18;
73:23; 86:11
**terminations** [10]
- 14:8; 17:7;
18:7, 16; 27:3;
28:4; 44:23;
56:11; 68:12;
85:12
**terms** [33] - 3:4;
7:20; 15:21;
25:3; 36:5, 22;
41:21; 42:24;
43:2, 10, 14-15,
18; 44:3, 5;
45:4, 10; 46:6,
18; 59:5, 7-8;
62:6; 63:11;
66:4; 67:18;
84:3, 6, 10
**textual** [4] - 41:9,
17; 43:9; 44:1
**textually** [1] -

45:6
**THE** [242] - 2:3,
13, 16, 19, 22,
25; 3:13; 4:9;
5:5, 12, 16;
6:15, 20, 25;
7:4, 6, 15, 22;
8:9, 11, 23; 9:1,
4, 7, 11, 14;
10:8, 14, 18;
11:2; 12:2, 17,
19, 21; 13:23;
14:11, 17, 19;
15:10; 16:1, 12;
17:15, 18;
18:20; 19:3, 9,
17, 19, 23; 20:1,
4, 10, 23; 21:6,
9, 12, 15, 24;
22:2, 13; 23:16,
21; 24:4, 7, 13,
20, 25; 25:5, 11,
25; 26:6, 19;
27:6, 19; 29:4,
16, 19; 31:9, 16;
32:5, 21, 25;
33:3, 6, 10, 13,
18, 23; 34:1, 15,
18; 35:3, 7;
38:7, 11, 21;
39:7, 10, 20, 23;
40:1, 5, 17;
41:25; 42:5, 9,
12, 15, 18; 43:4,
17, 24; 45:12,
14, 20; 46:2, 4,
9, 16; 47:5, 8,
10, 24; 48:14,
16, 19; 49:4, 7,
19, 22; 50:2, 9,
14; 51:15, 19;
52:2, 4, 7, 12,
14; 53:2, 21, 24;
55:24; 56:5, 16;
57:18; 58:2, 17,
24; 59:4, 12, 14,
17; 60:4, 11;
63:20; 64:2, 23;
65:7; 66:13, 19,
24; 67:11, 13;
68:7, 16, 19;
69:8, 14, 18, 21;
70:2, 6, 10, 14;
71:3, 6, 9, 14;
73:13, 17, 24;
74:8, 10, 12, 17,
21; 75:7, 16;
76:1, 4, 7, 13,
17, 20, 24; 77:3,
12, 22; 78:6, 10,
15, 17, 25;

79:12; 80:6, 12,
15, 20, 25; 81:4,
15, 19; 82:4, 8,
11, 17; 83:5, 14,
17, 20; 84:13,
19; 85:14, 21;
86:5, 16, 19, 25;
87:3, 5, 15, 18,
25; 88:2, 13, 17,
21, 24; 89:1, 5
**themselves** [1] -
16:8
**theoretical** [1] -
24:16
**theory** [1] - 24:1
**therefore** [4] -
8:19; 15:17;
22:7; 72:4
**they've** [7] - 4:5;
7:6, 13; 26:19;
49:10; 60:15;
72:15
**thinking** [3] -
15:6; 43:22
**thinks** [1] - 37:6
**third** [2] - 73:14;
75:22
**Thomas** [3] -
79:9, 20, 24
**Thomas's** [1] -
80:23
**thoughts** [1] -
29:24
**threat** [4] - 13:13;
32:7; 34:13;
52:17
**threatened** [1] -
24:15
**threats** [1] - 52:18
**three** [10] - 6:4;
7:17; 17:4;
20:14, 19; 43:6;
61:14; 73:11,
15; 88:3
**threshold** [1] -
11:10
**timing** [3] - 27:6;
51:7
**Title** [2] - 31:4, 6
**today** [12] - 3:23;
22:16; 25:18;
27:22; 29:23;
44:21; 45:19;
47:2; 51:12;
55:22; 59:20
**together** [3] -
18:3; 54:9;
59:19
**tolerance** [1] -
57:16

**TOLL** [1] - 2:14
**Toll** [1] - 2:14
**tomorrow** [1] -
34:8
**ton** [3] - 30:4;
50:11
**tone** [1] - 72:13
**took** [5] - 26:14;
31:11, 13;
59:18; 75:18
**top** [2] - 77:24;
88:1
**topic** [1] - 51:13
**tortured** [1] - 38:3
**total** [1] - 20:15
**touch** [1] - 78:9
**Towson** [6] - 6:4,
15; 9:2; 17:6;
87:19; 88:4
**TQP** [8] - 16:25;
17:24; 18:2;
62:5, 14; 63:1;
88:15
**training** [1] -
59:22
**transcript** [2] -
89:12
**transcripts** [1] -
72:13
**transfer** [3] - 9:21;
19:1; 21:23
**transferred** [1] -
9:23
**transgender** [1] -
72:21
**transitioned** [1] -
19:4
**transitive** [1] -
27:2
**tried** [1] - 25:13
**TRO** [6] - 6:18,
21; 11:24;
29:21; 81:21;
82:9
**troubled** [1] -
50:21
**true** [8] - 8:8;
15:18; 26:4, 21;
37:19; 74:13;
85:7; 89:12
**truly** [1] - 16:15
**Trump** [5] -
27:21-23; 50:17;
72:23
**truth** [1] - 59:24
**try** [4] - 11:14;
25:7; 40:21;
56:8
**trying** [12] - 37:15;
45:21; 47:1;

50:3; 52:21;
54:12; 57:21;
58:7; 69:16;
70:12; 81:1
**TSL** [3] - 17:25;
62:6; 63:10
**Tuesday** [1] - 69:7
**turn** [2] - 3:6; 9:15
**turned** [2] - 7:2;
85:11
**turning** [1] - 68:7
**turns** [1] - 62:22
**Twitter** [1] - 54:1
**two** [18] - 3:6;
8:13; 34:8;
37:19; 38:2;
43:6; 48:15;
51:12; 52:10,
15, 23; 67:5;
73:15; 78:3, 7;
87:19; 88:21
**type** [1] - 22:1
**types** [1] - 67:23
**typically** [3] -
68:22, 24; 80:7
**U.S.C** [1] - 89:11
**ultimately** [1] -
25:22
**um-hmm** [1] -
53:2
**umbrella** [1] -
66:10
**unable** [1] - 34:3
**unambiguous** [1]
- 30:8
**unambiguously**
[2] - 45:3, 7
**unclear** [2] -
26:16; 48:23
**unconstitutional
ly** [3] - 25:16;
55:11, 16
**undated** [1] - 53:6
**under** [18] - 8:16,
22; 14:25; 16:5;
17:24; 25:19;
31:4; 35:2, 13;
36:14; 45:4;
46:6; 47:7; 56:9;
57:11; 65:11,
18; 66:10
**underlie** [1] -
25:23
**underserved** [1] -
72:21
**understood** [1] -
88:2
**undertake** [2] -
28:16; 75:9
**unfair** [1] - 33:15

**uniform** [3] -
35:22; 37:2;
41:13
**unique** [1] - 36:10
**unite** [1] - 72:21
**United** [5] - 30:8;
39:12; 72:4;
89:10, 13
**universe** [1] -
70:21
**University** [1] -
6:4
**unlawful** [5] -
25:19; 27:11;
31:4; 64:7;
72:24
**unlawfully** [2] -
65:25; 71:23
**unless** [3] - 3:21;
4:14; 38:3
**unprecedented**
[1] - 68:21
**unreasonably** [1]
- 85:23
**unrelated** [1] -
47:12
**unwise** [1] - 9:21
**up** [16] - 4:7;
16:17; 17:23;
27:20; 37:6;
44:18; 50:7;
56:14; 59:23;
60:2; 65:23;
67:17; 71:19;
77:6; 84:1
**urgency** [2] -
79:14
**urgently** [1] -
78:21
**USCIS** [1] - 20:8
**uses** [1] - 16:9
**vacated** [1] -
85:12
**vague** [10] -
25:16; 32:10;
50:18; 51:3;
54:16; 55:11,
15-16; 58:12
**vagueness** [14] -
25:23; 30:19;
33:8; 54:18;
55:2; 57:2, 14,
16; 58:10, 12;
59:10, 13
**valid** [1] - 46:20
**values** [1] - 78:16
**vast** [1] - 8:20
**vehicle** [1] - 65:13
**venue** [26] - 4:23;
8:10, 12, 14-16,

19, 22; 9:19, 23;
10:1, 11; 11:9;
18:20; 19:1, 4,
11; 20:22, 25;
21:5, 17, 21, 23;
22:24
**versus** [5] - 2:5;
22:21; 25:4;
34:8; 41:10
**VI** [2] - 31:4, 6
**view** [5] - 7:7, 9;
19:12; 22:13;
35:1
**viewpoint** [2] -
80:7; 81:3
**views** [3] - 30:16
**violate** [6] - 28:4;
31:6; 62:24;
66:3; 67:24;
71:24
**violates** [1] -
65:22
**violating** [2] -
34:23; 67:20
**violation** [1] -
54:25
**violative** [1] -
57:22
**violator** [1] - 58:5
**voted** [3] - 59:25;
60:1; 78:22
**wake** [1] - 44:18
**walk** [3] - 40:5;
42:18
**walking** [1] - 41:8
**wants** [3] - 36:21;
37:12; 61:18
**water** [1] - 26:1
**waters** [1] - 35:18
**ways** [1] - 15:19
**weaken** [1] -
42:13
**weekend** [1] -
67:9
**weeks** [2] - 34:8;
51:8
**weigh** [1] - 78:23
**weighed** [1] - 77:9
**welcome** [1] -
4:15
**well-done** [1] -
89:6
**whole** [5] - 36:3,
18; 41:17;
46:24; 63:3
**wholesale** [1] -
46:7
**win** [1] - 77:17
**Winter** [1] - 10:10
**winter** [2] - 77:5,

7
**wisdom** [1] - 14:7
**wishes** [1] - 72:24
**withdraw** [2] -
12:11; 13:6
**withdrawn** [1] -
12:14
**word** [13] - 7:11;
37:6; 39:6;
41:11; 46:9, 13;
60:21-23; 61:4,
13-14; 68:3
**words** [30] - 7:16,
24; 14:12; 24:4,
14; 26:6, 22;
31:22; 33:16;
38:2, 22; 46:5;
56:16; 58:14-21;
66:13; 75:7;
79:1; 81:19, 22;
83:17; 88:8
**works** [1] - 50:8
**world** [4] - 18:13;
71:10; 82:21
**wow** [1] - 73:4
**wrap** [2] - 50:7;
84:1
**writ** [1] - 24:19
**write** [2] - 46:25;
56:14
**writing** [1] - 72:9
**written** [1] - 76:5
**year** [4] - 13:12;
19:22; 62:1
**years** [2] - 7:19;
13:9
**yesterday** [1] -
12:25
**yon** [1] - 84:10
**young** [1] - 87:6
**yourself** [1] - 86:1
**yourselves** [1] -
2:9
**youth** [1] - 72:21
**zealously** [1] -
81:1
**zero** [2] - 13:6;
29:19
**§** [6] - 35:22; 36:2;
38:7; 67:15;
89:11