**No. 25-1281**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————

U.S. Department of Education, *et al.*,

Defendants-Appellants,

v.

American Association of Colleges for Teacher Education, *et al.*,

Plaintiffs-Appellees.

———————————

On Appeal from the United States District Court
for the District of Maryland

———————————

## JOINT APPENDIX VOLUME 2

———————————

JOSHUA W.B. RICHARDS
CAROLYN M. TOLL
  *SAUL EWING LLP*
  *1500 Market Street, 38th Floor*
  *Philadelphia, PA 19102*
  *(215) 972-7737*

DANIEL M. MOORE
  *SAUL EWING LLP*
  *1001 Fleet Street, Ninth Floor*
  *Baltimore, MD 21202-4359*
  *(410) 332-8734*

*Counsel for Plaintiffs*

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney*
  *General*

MARK R. FREEMAN
DANIEL TENNY
SEAN R. JANDA
BRIAN J. SPRINGER
BENJAMIN C. WEI
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7235*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 616-2875*

*Counsel for Defendants*

# TABLE OF CONTENTS

District Court Memorandum Opinion on Granting Preliminary
Injunction (Dkt. No. 32) ........................................................ JA 637

District Court Order Granting Preliminary
Injunction (Dkt. No. 33) ........................................................ JA 685

District Court Opinion and Order
on Reconsideration (Dkt. No. 42) ......................................... JA 687

District Court Opinion and Order
on Stay Pending Appeal (Dkt. No. 45) .................................. JA 700

District Court Order Denying Plaintiffs' Rule 60(b) Motion to
Dissolve Preliminary Injunction and Request for Indicative
Ruling Under Rule 62.1 (Dkt. No. 58) .................................. JA 710

Notice of Appeal (Dkt. No. 46) ....................................................... JA 712

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION,** *et al.*,

      *Plaintiffs*,

    **v.**

**LINDA MCMAHON,** in her official capacity as Secretary of Education, *et al.*,

      *Defendants*.

Civil No.: 1:25-cv-00702-JRR

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Plaintiffs American Association of Colleges for Teacher Education, National Center for Teacher Residencies, and the Maryland Association of Colleges for Teacher Education's Motion for Temporary Restraining Order/Preliminary Injunction. (ECF No. 5; the "Motion.") Following expedited briefing by the parties, the court convened a hearing on the Motion on March 13, 2025. For the reasons that follow, by accompanying order, Plaintiffs' Motion will be granted in part and denied in part.

## I.    <u>BACKGROUND</u>

Plaintiffs American Association of Colleges for Teacher Education ("AACTE"), National Center for Teacher Residencies ("NCTR"), and the Maryland Association of Colleges for Teacher Education ("MACTE") initiated this action on March 5, 2025. (ECF No. 1; the "Complaint.") Plaintiffs' claims arise from the Department of Education's (the "Department") termination of grants awarded through its Teacher Quality Partnership Program ("TQP"), Supporting Effective Educator Development Program ("SEED"), and the Teacher and School Leader Incentive Program ("TSL") (collectively, the "Grant Programs").

### A. Plaintiffs

Plaintiffs AACTE, NCTR, and MACTE are composed of members that provide teacher preparation programs throughout the United States.  (ECF No. 1 at p. 2.)

Plaintiff AACTE is the largest membership organization dedicated to educator preparation in the United States.  (ECF No. 1 ¶ 12.)  Its hundreds of members include public and private colleges and universities, as well as nonprofit organizations.  *Id.*  AACTE members work with teachers, counselors, pre-Kindergarten through grade 12 administrators, and college faculty.  *Id.*  AACTE shares its membership organization's research, policy insights, and best practices with professional educators to further its mission of "elevat[ing] education and educator preparation through research, professional practice, advocacy, and collaboration."  *Id.*  Fifty-four AACTE members, including five located in Maryland, were awarded TQP, SEED, and TSL grants.  (ECF No. 5-3 ¶¶ 5, 6.)

NCTR's members include colleges, universities, and nonprofit teaching organizations across the United States.  (ECF No. 1 ¶ 13.)  Its mission is "to transform educator preparation by advancing the teacher residency movement to prepare, support, and retain more effective educators who represent and value the communities they serve."  *Id.*  NCTR "supports the design of new teacher residency programs and provides consulting to strengthen existing programs across the United States."  *Id.*  NCTR's members use grant money, including from the Grant Programs, to "reduce tuition costs for aspiring teachers called teacher residents, pay host K-12 teachers for the work they are doing to support the aspiring teachers, offset the cost for licensure examinations and test prep workshops, and provide a stipend or pay for work the teacher residents are completing through their internships."  *Id.*  Twenty-five NCTR members received SEED, TQP, and/or TSL

grant awards; and in 2022, the Department awarded NCTR a three-year SEED grant.  (NCTR Decl., ECF No. 5-4 ¶¶ 5–6.)

MACTE is a membership organization with a mission "to serve as a distinct statewide voice on matters of importance to educator preparation programs at Maryland's colleges and universities." (ECF No. 1 ¶ 14.)  MACTE's members are "college and universities engaged in the preparation of professional school personnel with state program approval."  *Id.*  All of MACTE's members are located in Maryland.  (ECF No. 5-3 ¶ 6.)  Three of MACTE's 10 members received TQP and SEED grants.  *Id.* ¶ 7.  These TQP and SEED grant recipients use their grant awards to recruit, retain, and support teachers in Maryland.  *Id.* ¶ 5.

## B.  The Grant Programs

The Grant Programs' authorizing statutes reserve funds for the Secretary of the Department (the "Secretary") to award grants on a competitive basis to provide funding for specified purposes. According to the statute, TQP grant funds shall be used for "carry[ing] out a program for the preparation of teachers . . ., a teaching residency . . ., or a combination of such programs" that include certain requirements specified in 20 U.S.C. § 1022a(d) and (e).  20 U.S.C. § 1022a(c)(1).

SEED provides grants for the purposes of:

> (1) providing teachers, principals, or other school leaders from nontraditional preparation and certification routes or pathways to serve in traditionally underserved local educational agencies;
> (2) providing evidence-based professional development activities that address literacy, numeracy, remedial, or other needs of local educational agencies and the students the agencies serve;
> (3) providing teachers, principals, or other school leaders with professional development activities that enhance or enable the provision of postsecondary coursework through dual or concurrent enrollment programs and early college high school settings across a local educational agency;
> (4) making freely available services and learning opportunities to local educational agencies, through partnerships and cooperative

3

> agreements or by making the services or opportunities publicly accessible through electronic means; or
> (5) providing teachers, principals, or other school leaders with evidence-based professional enhancement activities, which may include activities that lead to an advanced credential.

20 U.S.C. § 6672(a).

TSL provides grants to "eligible entities to develop, implement, improve, or expand performance-based compensation systems or human capital management systems, in schools served by the eligible entity." 20 U.S.C. § 6631(a). TSL's authorizing statute describes its purposes as follows:

> (1) to assist States, local educational agencies, and nonprofit organizations to develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders (especially for teachers, principals, or other school leaders in high-need schools) who raise student academic achievement and close the achievement gap between high- and low-performing students; and
> (2) to study and review performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders to evaluate the effectiveness, fairness, quality, consistency, and reliability of the systems.

*Id*. § 6631.

Per their authorizing statutes, SEED and TSL awards provide grants for periods of "not more than 3 years." 20 U.S.C. §§ 6672(b)(1), 6632(b)(1). TQP awards provide grants for periods up to five years. (ECF No. 1 ¶ 4.)

### C. The Application Process

The Grant Programs' authorizing statutes set forth grant application procedures. 20 U.S.C. §§ 1022a(b), 6672(d), 6632(c). The statutory application process for the Grant Programs (set forth in Title 20 of the United States Code, titled "Education") is implemented in accordance with the Code of Federal Regulations, Title 34, which governs the Department specifically. According to

4

JA 640

the regulations adopted to implement the statutory application process for the Grant Programs, the

Secretary is required to publish proposed and final "Annual absolute, competitive preference, and

invitational priorities" in the Federal Register. 34 C.F.R. § 75.105. The applicable regulations

also require that the Secretary's proposed priorities go through public comment rule making except

in the following circumstances:

> (i) The final annual priorities will be implemented only by inviting applications that meet the priorities;
> (ii) The final annual priorities are chosen from a list of priorities already established in the program's regulations;
> (iii) Publishing proposed annual priorities would seriously interfere with an orderly, responsible grant award process or would otherwise be impracticable, unnecessary, or contrary to the public interest;
> (iv) The program statute requires or authorizes the Secretary to establish specified priorities; or
> (v) The annual priorities are chosen from allowable activities specified in the program statute.

34 C.F.R. § 75.105(b)(2). Once the priorities are established through notice and comment, they

must then be published in a notice in the Federal Register, usually in the Notice Inviting

Applications seeking grant applicants. *Id.* § 75.105(a).

The Department is subject to additional rule making requirements under the General

Education Provisions Act ("GEPA") at 20 U.S.C. § 1232. Important here, GEPA carves out

Department priority notice and comment rule making, including as applied to the Grant Programs

statutory application process, from the Administrative Procedure Act's ("APA") more generalized

exemption of grant-related matters from public notice and comment rule making requirements. 5

U.S.C. § 553(a)(2). Under GEPA,

> The exemption for . . . grants and benefits in section 553(a)(2) of Title 5 [of the APA] shall apply only to regulations--
> (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or

(2) where the Secretary determines that the requirements of this subsection will cause extreme hardship to the intended beneficiaries of the program affected by such regulations.

20 U.S.C. § 1232(d).

For purposes of § 1232(d), a "regulation" is "any generally applicable rule, regulation, guideline, interpretation, or other requirement that (1) is prescribed by the Secretary or the Department; and (2) has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program." 20 U.S.C. § 1232(a). "Applicable program" means "any program for which the Secretary or the Department has administrative responsibility as provided by law or by delegation of authority pursuant to law." *Id.* § 1221(c)(1).

Here, Plaintiffs' members that received (now terminated) TQP, TSL, and SEED grants ("Grant Recipients")[1] were selected to receive funding ("Grant Awards") from FY 2020, 2022, and 2024 TQP Grants; FY 2022 SEED Grants; and FY 2023 TSL Grants. (ECF No. 1 ¶¶ 32–34, 38, 42.) All Grant Recipients applied for Grant Program awards pursuant to a Notice Inviting Application published in the Federal Register. For TQP Grant Program awards, Notices Inviting Applications appeared at 85 Fed. Reg. 29691–29704; 87 Fed. Reg. 10906–10923; and 89 Fed. Reg. 23573–23592. For SEED Grant Program awards, Notices Inviting Applications appeared at 87 Fed. Reg. 19487–19496. For TSL Grant Program awards, Notices Inviting Applications appeared at 88 Fed. Reg. 33592–33601. The Notices Inviting Application set forth the Department priorities established through the § 75.105 public notice and comment rule making process, to include the following priorities: "supporting educators and their professional growth," "increasing educator diversity," "high-need schools," "addressing the impact of COVID-19 on Students, Educators, and Faculty," "[p]romoting equity in student access to educational resources and

---

[1] The term "Grant Recipients" includes Plaintiff NCTR. (*See* ECF No. 5-4 ¶ 6.)

opportunities," "supporting a diverse educators workforce and professional growth to strengthen student learning," "meeting student social, emotional, and academic needs," "increasing postsecondary education access, affordability, completion, and post-enrollment success," and "strengthening cross-agency coordination and community engagement to advance systemic change." 85 Fed. Reg. 29691–29704; 87 Fed. Reg. 10906–10923; 89 Fed. Reg 23573–23592; 87 Fed. Reg 19487–19496; 88 Fed. Reg. 33592–33601; *see also* ECF No. 1 ¶¶ 29, 31, 35, 37, 39, 41.

### D. Change of Administration

On January 20, 2025, President Trump was sworn in, for the second time, as President of the United States. That same day, he signed Executive Order 14151 titled "Ending Radical and Wasteful Government DEI Programs and Preferencing." Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025). The "Purpose and Policy" portion of Executive Order 14151 provides:

> The Biden Administration forced illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI), into virtually all aspects of the Federal Government, in areas ranging from airline safety to the military. This was a concerted effort stemming from President Biden's first day in office, when he issued Executive Order 13985, "Advancing Racial Equity and Support for Underserved Communities Through the Federal Government."
>
> Pursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted "Equity Action Plans" to detail the ways that they have furthered DEIs infiltration of the Federal Government. The public release of these plans demonstrated immense public waste and shameful discrimination. That ends today. Americans deserve a government committed to serving every person with equal dignity and respect, and to expending precious taxpayer resources only on making America great.

*Id.* § 1, *Purpose and Policy*.

JA 643

Of import here, Executive Order 14151 mandates the termination of, *inter alia,* certain grants and programs as follows:

> (b) Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:
>
>> (i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

*Id.* § 2(b)(1), *Implementation.*[2]

On February 3, 2025, three membership associations (none a plaintiff here) and the City of Baltimore filed action in this court against President Trump, the Acting Secretary of the Department, and the Acting Secretaries of the Departments of Health and Human Services, Labor, Commerce, Agriculture, and Energy, and the Secretary of the Department of the Interior. *Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 1:25-CV-00333-ABA (D. Md. Feb. 3, 2025) (the "*NADOHE*" case). The *NADOHE* plaintiffs claim, *inter alia,* that the Termination Provision violates the Fifth Amendment to the United States Constitution, as well as the Spending Clause at Article I. Following briefing and oral argument on the *NADOHE* plaintiffs' motion for preliminary injunction, the presiding judge issued a preliminary injunction enjoining the defendants from "paus[ing], freez[ing], imped[ing], block[ing], cancel[ing], or terminat[ing] any awards, contracts or obligations ("Current Obligations") or chang[ing] the terms of any Current Obligation, on the basis of the Termination Provision." *Ass'n of Diversity Officers in Higher Educ. v. Trump*, No.

---

[2] Other courts have referred to this as the "Termination Provision." For continuity, so too shall this court.

1:25-CV-00333-ABA, 2025 WL 573764, *31 (D. Md. Feb. 21, 2025), *opinion clarified,* No. 25-CV-0333-ABA, 2025 WL 750690, *5 (D. Md. Mar. 10, 2025)

Following Executive Order 14151, but before the *NADOHE* preliminary injunction, the Department's Office of Planning, Evaluation and Policy Development issued an internal directive (the "Directive") titled "Eliminating Discrimination and Fraud in Department Grant Awards."[3] (ECF No. 24-2.)  The Directive, dated February 5, 2025, was signed by Acting Secretary of the Department Denise L. Carter.  *Id.*  The Directive begins:

> From the Supreme Court's 1954 landmark opinion in *Brown v. Board of Education* to its 2023 decision in *Students for Fair Admissions, Inc. v. Fellows of Harvard College,* education has played a central role in this Nation's fight against discrimination. It remains a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. This includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

*Id.*

Through the Directive, the Department instructed its personnel as follows:

> For these reasons, pursuant to, among other authorities, 20 U.S.C. § 3411 and 2 C.F.R. § 200.339–341, the Secretary of Education hereby directs as follows:

---

[3] The Directive was offered by Defendants as an exhibit to their opposition to the Motion and was referenced by defense counsel at the hearing over no objection.  At the hearing, defense counsel explained, over no objection by opposing counsel, that the Directive was made public by way of a social media post that was not at the direction, or with the permission, of Acting Secretary Carter. In other words, it was leaked.  Plaintiffs offer no challenge to its authenticity.  (ECF No. 24 at p. 8; ECF No. 24-2.)

> Department personnel shall conduct an internal review of all new grant awards, grants that have not yet been awarded to specific individuals or entities (e.g., notices of funding opportunities), and issued grants. Such review shall be limited to ensuring that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication.

*Id. See also* Oglesby Decl., Hearing Ex. No. 2 ¶ 5. The Directive makes no mention of President Trump, Executive Order 14151, or any other Executive Order.

### E. February 2025 Termination

In early February 2025, the majority of Grant Recipients received a letter from the Department, which reads:

> This letter provides notice that the United States Department of Education is terminating your federal award, [Grant Award number]. *See* 2 C.F.R. § 200.340–43; *see also* 34 C.F.R. § 75.523.
>
> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.
>
> The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict

10

> with the Department's policy of prioritizing merit, fairness, and
> excellence in education; that are not free from fraud, abuse, or
> duplication; or that otherwise fail to serve the best interests of the
> United States. The grant is therefore inconsistent with, and no longer
> effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see
> also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other
> authorities, 2 C.F.R. § 200.339–43, 34 C.F.R. § 75.253, and the
> termination provisions in your grant award, the Department hereby
> terminates grant No. [____] in its entirety effective [February ___,
> 2025].

(ECF No. 1-2; the "Termination Letter.")

In addition to the Termination Letter, Grant Recipients received updated Grant Award

Notifications ("GANs"). (ECF No. 1 ¶ 5.) The GANs contained information regarding the Grant

Recipient, Grant Project award information, project staff and title, key personnel, award periods,

authorized periods, authorized funding, administrative information, legislative and fiscal data, and

terms and conditions. (ECF No. 1-1.) The updated GANs read: "[t]his grant is deemed to be

inconsistent with, and no longer effectuates, Department priorities. See 2 C.F.R. 200.340(a)(4);

see also 34 C.F.R. 75.253." *Id.*

Since the Termination Letters were issued, Plaintiffs and their member organizations have

stopped receiving their Grant Award funds. (ECF No. 5-1 at p. 11.) As a result, Plaintiffs' member

organizations are unable to continue their work, which directly effects thousands of students and

educators, and threatens the existence of Grant Recipients' programs. *Id.*; *see, e.g.* ECF No. 5-6

Declaration of Carolyn Parker, Ph.D., of AACTE member American University ("AU") (attesting

to deleterious impact of TQP grant termination); ECF No. 5-7, Declaration of Amy Smith, Ph.D.,

of AACTE member University of St. Thomas ("UST") (same); ECF No. 5-8, Declaration of

Heather Kirkpatrick, Ph.D., of NCTR and AACTE member Alder Graduate School of Education

(same); ECF No. 5-9, Declaration of Dr. Sarah Johnson, of AACTE member Teaching Lab (same

*re* TSL grant termination); ECF No. 5-4, Declaration of Kathlene Campbell, Ph. D., Chief

JA 647

Executive Officer of Plaintiff NCTR (same *re* SEED grant termination); and ECF No. 5-5, Declaration of Laurie Mullen, Ph.D., President of Plaintiff MACTE (same *re* termination of MACTE members' TQP and SEED grants).

Following issuance of the Termination Letters, on February 17, 2025, the Department issued a press release titled "U.S. Department of Education Cuts Over $600 Million in Divisive Teacher Training Grants."[4] (February 2025 Press Release, ECF No. 1-4.) In full, the February 2025 Press Release reads:

> The U.S. Department of Education today announced it has terminated over $600 million in grants to institutions and nonprofits that were using taxpayer funds to train teachers and education agencies on divisive ideologies. Training materials included inappropriate and unnecessary topics such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; "anti-racism"; and instruction on white privilege and white supremacy. Additionally, many of these grants included teacher and staff recruiting strategies implicitly and explicitly based on race.
>
> The grants are awarded to teacher preparation programs that train future classroom teachers. Examples from the grant applications included:
> - Requiring practitioners to take personal and institutional responsibility for systemic inequities (e.g., racism) and critically reassess their own practices;
> - Receiving professional development workshops and equity training on topics such as "Building Cultural Competence," "Dismantling Racial Bias" and "Centering Equity in the Classroom";
> - Acknowledging and responding to systemic forms of oppression and inequity, including racism, ableism, "gender-based" discrimination, homophobia, and ageism;
> - Providing "targeted practices in culturally relevant and responsive teaching abolitionist pedagogies and issues of diversity in classroom management"; and
> - Providing spaces for critical reflection to help educators confront biases and have transformative conversations about equity.

---

[4] The February 2025 Press Release is available on the Department's website at https://www.ed.gov/about/news/press-release/us-department-of-education-cuts-over-600-million-divisive-teacher-training-grants (last visited Mar. 17, 2025).

JA 648

*Id.*

## F. Resulting Litigation

Following issuance of the Termination Letters, at least two lawsuits were filed to challenge the Department's termination of the Grant Awards. On March 3, 2025, Plaintiffs filed the instant action asserting that the Department's termination of their members' TQP, SEED, and TSL Grant Awards violates the Due Process Clause of the Fifth Amendment (Count I) and the APA (Count II).[5] (ECF No. 1.) That same day, Plaintiffs filed the Motion for temporary restraining order and preliminary injunction to reinstate the terminated Grant Awards and to enjoin Defendants from terminating other Grant Awards under the same rationale. (ECF No. 5.) On March 5, 2025, the court convened a status conference with the parties. The parties agreed to treat the Motion as one for preliminary injunction only (in lieu of first addressing the motion for temporary restraining order) and, with the parties' consent, the court set an expedited briefing schedule and scheduled a hearing. (ECF No. 18.) On March 13, 2025, the parties appeared for a hearing on the Motion.

After the instant case was filed, but before the hearing on the Motion, the states of California, Maryland, New Jersey, Colorado, Illinois, New York, Wisconsin, and the Commonwealth of Massachusetts joined as plaintiffs to file suit in the United States District Court for the District of Massachusetts (Civil Case No. 1:25-cv-10548-MJJ; the "*California* case"). The *California* plaintiffs allege the Department, Secretary McMahon, and former Acting Secretary Carter violated the APA by terminating TQP and SEED Grant Awards. On March 10, 2025, the presiding judge, the Honorable Myong J. Joun, entered a temporary restraining order as follows:

> 1. Defendants shall immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded TQP or SEED grants for recipients in Plaintiff States;

---

[5] Plaintiff NCTR seeks redress of termination of its own grant, as well as of those of its members. (ECF No. 1 ¶¶ 65–76.)

JA 649

2. Defendants are temporarily enjoined from implementing, giving effect to, maintaining, or reinstating under a different name the termination of any previously awarded TQP or SEED grants for recipients in Plaintiff States, including but not limited to through the Termination Letter, Termination GAN, and any other agency actions implementing such terminations, such as suspension or withholding of any funds approved and obligated for the grants;

3. Defendants are temporarily enjoined from terminating any individual TQP and SEED grant for recipients in Plaintiff States, except to the extent the final agency action is consistent with the Congressional authorization and appropriations, relevant federal statute, including the requirements of the APA, the requirements of the relevant implementing regulations, the grant terms and conditions, and this Court's Order;

4. Within 24 hours of entry of this Order, Defendants shall provide notice of the TRO to their employees and anyone acting in concert with them, and to all TQP and SEED grantees in Plaintiff States;

5. Defendants shall file a status report with the Court, within 24 hours of entry of this Order, confirming their compliance with the Court's TRO;

6. This TRO shall become effective immediately upon entry by this Court. The TRO shall remain in effect for 14 days; and

7. By March 11, 2025 at 5 P.M., the parties shall jointly propose a briefing schedule regarding Plaintiff States' request for preliminary injunction.

*California v. U.S. Dep't of Educ.*, — F. Supp. 3d. — , No. CV 25-10548-MJJ, 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025). The *California* defendants filed a notice of appeal of the temporary restraining order the following day.

## II.    **LEGAL STANDARD**

Plaintiffs seek a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. "A preliminary injunction is 'an extraordinary remedy' that 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Pierce v. N. Carolina State Bd. of Elections*,

14

JA 650

97 F.4th 194, 209 (4th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (noting that "a preliminary injunction is 'an extraordinary remedy never awarded as of right'"). As such, preliminary injunctive relief is to be "granted only sparingly and in limited circumstances." *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 351 (D. Md. 2021), *aff'd,* No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd,* No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001)).

A plaintiff seeking preliminary injunctive relief "must establish that 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm absent preliminary relief; 3) the balance of the equities favors the requested injunctive relief; and 4) that relief is in the public interest." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (citing *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170–71 (4th Cir. 2019)). These factors were established by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). "[P]laintiff bears the burden of establishing that each of these factors supports granting the injunction."[6] *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citing cases); *see St. Michael's Media, Inc.*, 566 F. Supp. 3d at 351 (same).

---

[6] "Because preliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *St. Michael's Media, Inc. v. Mayor & City Council of Baltimore*, 566 F. Supp. 3d 327, 352 (D. Md. 2021), *aff'd,* No. 21-2158, 2021 WL 6502219 (4th Cir. Nov. 3, 2021), and *aff'd,* No. 21-2206, 2021 WL 6502220 (4th Cir. Nov. 13, 2021) (quoting *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016)).

III.    **ANALYSIS**

  **A. Jurisdictional Matters**

   *1. Standing*

The Constitution extends the judicial power of Article III courts to "cases" or "controversies."  U.S. CONST. ART. III, § 2, cl. 1.  The doctrine of standing, among others, "implements" this limit.  *Carney v. Adams*, 592 U.S. 53, 58 (2020).  Accordingly, as a threshold matter, the court must determine whether Plaintiffs have standing to bring this action.  To establish standing:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dep't. of Educ v. Brown*, 600 U.S. 551, 561 (2023) (citations omitted) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In *TransUnion LLC v. Ramirez*, the Supreme Court explained that when determining if a plaintiff meets the concrete-harm requirement, "courts should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts."  594 U.S. 413, 424 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)).  Traditional tangible harms include physical and monetary harms or losses.  *Id*. at 425.

Membership organizations, like Plaintiffs, may establish standing based on their own injury or based on their members' injuries; the latter standing basis is known as representational

16

or associational standing.  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023).

As referenced in Section I.E., above, Plaintiffs allege the following facts in their Complaint and through affidavits (or declarations) of relevant persons with knowledge:

In 2022, Plaintiff NCTR received a three-year SEED grant.  (ECF No. 1 ¶¶ 65–76; NCTR Decl., ECF No. 5-4 ¶ 6.)  On February 10, 2025, NCTR received a Termination Letter from the Department informing it that its SEED grant was terminated for no longer effectuating Department priorities.  (ECF No. 1 ¶¶ 6–7; NCTR Decl., ECF No. 5-4 ¶¶ 10, 11.)  That same day, the Department stopped funding NCTR's grant. (NCTR Decl., ECF No. 5-4 ¶ 14, pp. 14–15.)  Without the SEED grant funding, NCTR will be unable to engage in its core activities, including operating teacher residency programs and conducting research regarding best practices for teacher training. (ECF No. 1 ¶¶ 65–71; NCTR Decl., ECF No. 5-4 ¶¶ 12, 17–19.)  Accordingly, as a direct result of the Department's termination decision, NCTR suffered monetary harm, and a decision in Plaintiffs' favor, finding the Department's termination illegal and reinstating NCTR's SEED grant would remedy NCTR's alleged harm.  Plaintiff NCTR has sufficiently demonstrated standing to bring this action.

Plaintiffs AACTE and MACTE assert representational standing through their members. (ECF No. 1 ¶ 4.)[7]  AACTE and MACTE's members "together comprise hundreds of teacher preparation programs throughout the United States."  *Id.* at p. 2.  Their members received TQP, SEED, and TSL grants from the Department that remained active until the February 2025 Termination Letters.  *Id*. at pp. 6–7.  To establish representational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the

_____

[7] Plaintiff NCTR also seeks relief for its members, including without limitation NCTR member and (now terminated) TQP Grant Recipient Alder Graduate School of Education.  (ECF No. 1 ¶ 14; ECF No. 5-8.)

interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Students for Fair Admissions*, 600 U.S. at 181. (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). An organization need only "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (emphasis omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

AACTE member organizations received TQP, SEED, and TSL grants. (ECF No. 1 at p. 2; *see supra re* Declarations at ECF Nos. 5-6, 5-7, 5-8, and 5-9). AACTE's members' grants remained active through early to mid-February 2025 until receipt of the Termination Letter. *Id.* at pp. 3–4. Among those grants terminated was AU's TQP grant. *Id.* ¶ 77; *see also* Section I.E., *supra*. As a result of the termination and corresponding loss of funding, AU is no longer able to recruit participants to its teacher-training residency program and, if the funding is not reinstated, AU will shut down the program. *Id.* ¶¶ 83–86. Accordingly, at least one AACTE member has standing to bring this action in its own right.

AACTE's mission is "to elevate education and educator preparation through research, professional practice, advocacy, and collaboration." (ECF No. 1 ¶ 12.) The Department's termination of the Grant Awards "directly threatens this mission," as "[t]hese grants fund initiatives that benefit PK-12 students and schools nationwide by supporting innovative approaches to educator preparation and professional development." *Id*. AACTE, therefore, satisfies the second prong of representational standing. Finally, the claims presented and relief requested here concern the legality of the Department's termination decision and do not require this court to consider "the individual circumstances of any aggrieved" Plaintiff member

18

JA 654

organization. *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. V. Brock*, 477 U.S. 274, 287 (1986).

According to the Complaint, Plaintiff MACTE's member organizations also received Grant Program awards and Termination Letters. (ECF No. 1 at pp. 2–4.) Further, according to the record before the court, the Department terminated grants awarded to MACTE members Towson University, University of Maryland, and Frostburg State University, causing "a substantial loss of funds for teacher preparation programs in Maryland." (ECF No. 25-1 ¶¶ 5–9.) Defendants contend that Plaintiffs fail adequately to allege MACTE's standing in the Complaint and may not salvage such defect through supplemental declarations or its reply in support of the Motion. The court is satisfied that Plaintiffs sufficiently allege MACTE's standing in the Complaint, and reiterate MACTE's standing in the Motion.

Specifically, the Complaint (ECF No. 1) at page 2 avers that MACTE members received Grant Awards; at pages 3 and 4, the Complaint alleges that these grants remained active through mid-February 2025 until they were terminated by the Department through the Termination Letters; the Complaint at paragraph 4 defines "Grant Recipients" to include MACTE members; and the Complaint at paragraph 14 alleges that the Department's grant terminations impact MACTE's core mission, and that TQP and SEED Grant Awards support teachers in Maryland. These allegations are supported by MACTE President Dr. Laurie Mullen's attestation that three of MACTE's 10 members received TQP and SEED grants; the Department terminated the grants; and the grant terminations caused a substantial loss of funds for teacher preparation programs in Maryland. (MACTE Decl., ECF No. 5-5 ¶¶ 6–7.) Further, Plaintiffs allege that the Department's Grant Program terminations "implicated MACTE's core mission," as MACTE "serves the institutions of higher education in Maryland for both the recruitment and retention of future teachers as well as

the support and advancement of current classroom teachers."  (ECF No. 1 ¶ 14.)  Finally, for the same reasons identified in relation to AACTE, the court discerns no cause for it to consider the individual circumstances of MACTE's members.   Accordingly, MACTE satisfies all the requirements of organizational standing.

As a separate but related issue, Defendants also argue Plaintiff MACTE lacks standing because Judge Joun's temporary restraining order in the *California* case (issued March 10, 2025, seven days after the instant action was filed) ordered the Department to restore terminated TQP and SEED grants to recipients in Maryland, which effectively covers MACTE's allegedly aggrieved members.  *California v. U.S. Dep't of Educ.*, No. CV 25-10548, — F. Supp. 3d. — , 2025 WL 760825, at *5 (D. Mass. Mar. 10, 2025).  This is wrong-headed.  Standing "is concerned with the presence of injury, causation, and redressability at the time a complaint is filed," whereas mootness "scrutinizes the presence of these elements after filing—*i.e.*, at the time of a court's decision."  *Garcia v. U.S. Citizenship & Immgr. Servs.*, 168 F. Supp. 3d 50, 65 (D.D.C. 2016).  As mentioned, the Complaint here was filed March 3, 2025, a week before the *California* case TRO.  (ECF No. 1.)  Judge Joun's order does not impair MACTE's standing here.

Moreover, the *California* TRO does not render MACTE's (or any Plaintiff's) claims moot.  "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'"  *Already, LLC v. Nike, Inc.,* 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)).  A "case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'"  *Id*. (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009)).  This is not the situation at hand.

Temporary restraining orders exist to prevent immediate and irreparable injury, loss, or damage by preserving the *status quo* until the court considers whether to order preliminary injunctive relief (or terminate the TRO).  FED. R. CIV. P. 65(b)(1)(A).  As its name suggests, a temporary restraining order is temporary; unless extended, the order expires within 14 days of entry.  FED. R. CIV. P. 65(b)(2).  Rule 65 contemplates the importance of proceeding expeditiously from entry of a TRO to a preliminary injunction hearing.  FED. R. CIV. P. 65(b)(3).  Indeed, courts are instructed to prioritize a preliminary injunction hearing following a TRO granted without notice above all other matters.  *Id*.  A preliminary injunction provides more lasting relief than a TRO; it serves to prevent irreparable harm during the pendency of litigation, and to preserve the court's ability to render meaningful judgment and relief on the merits.  *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).  While Plaintiffs here, and those in the *California* case, pursued emergency relief, Judge Joun's TRO does not, indeed cannot, resolve the parties' disputes.  Against this backdrop, the question of the legality of the Department's termination of MACTE members' TQP and SEED grants remains very much alive and appropriate for this court to consider pursuant to Article III.

### 2. *Judicial Review*

The APA waives the federal government's sovereign immunity to permit judicial review of agency action in limited circumstances.  5 U.S.C. § 705.  Such review is available in suits brought by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" who seeks "relief other than money damages."  *Id*.  Importantly, judicial review is limited to "final agency action for which there is no other adequate remedy in a court."  *Id*. § 704.  "Because 'sovereign immunity is jurisdictional in nature,' finality under the APA is a jurisdictional requirement."  *Jake's Fireworks Inc. v. United States Consumer Prod.*

*Safety Comm'n*, 105 F.4th 627, 631 (4th Cir. 2024) (quoting *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019)).

Agency action is "final" when two conditions are met: (1) "the action must mark the 'consummation' of the agency's decision making process—it must not be of a merely tentative or interlocutory nature," and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948), and *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatl.*, 400 U.S. 62, 71 (1970)); *see Biden v. Texas*, 597 U.S. 785, 808 (2022) (quoting *Bennett*, 520 U.S. at 178).

The parties agree, as does the court, that the Department's termination of the subject TQP, SEED, and TSL Grant Awards constituted final agency action. Each Termination Letter represented that the Department had concluded its review of the grant in question. (ECF No. 1-2). The Department's Termination Letters immediately produced legal consequences for the Grant Recipients; the Grant Recipients could no longer access the funds allotted to them by the Grant Awards. *See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), — F. Supp. 3d — , 2025 WL 368852, at *10 (D.D.C. Feb. 3, 2025) (finding Office of Management and Budget memorandum directing federal agencies to temporarily pause disbursement of federal financial assistance and to freeze all such funds "immediately produced legal consequences across the entire federal funding system").

**B. Venue**

Where, as here, a defendant is an officer or employee of the United States, a plaintiff may bring its claims in any judicial district in which:

(A) a defendant in the action resides,

JA 658

(B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or

(C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e)(1).

Although they need only establish one of the above recited circumstances, Plaintiffs aver venue is proper in this district because "a substantial part of the events or omissions giving rise to the claims occurred in the District of Maryland, and Plaintiff MACTE resides in this district." (ECF No. 1 ¶ 11.) Further, under § 1391(e)(1)(C), venue in the District of Maryland is proper because no real property is involved, Plaintiff MACTE resides in this district, and Defendant McMahon, as the Department Secretary, is an officer of the United States.

Even if Defendant MACTE lacked standing or was not a party to this action, per § 1391(e)(1)(B), Plaintiffs ably demonstrate that "a substantial part of the events . . . giving rise to the claim occurred" in Maryland. "[I]t is possible for venue to be proper in more than one judicial district;" the question for the court under § 1391(e)(1)(B) is not whether a given district is the best venue, but whether the events or omissions that occurred there are "sufficiently substantial." *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004). In considering "whether events or omissions are sufficiently substantial to support venue . . . , a court should not focus only on those matters that are in dispute or that directly led to the filing of the action." *Id.* at 406 (citation omitted). Instead, the court "should review 'the entire sequence of events underlying the claim.'" *Id.*; *accord Brito v. Major Energy Elec. Servs., LLC,* 526 F. Supp. 3d 95, 109 (D. Md. 2021) (same); *Taylor v. Shreeji Swami*, PWG-16-3787, 2017 WL 1832206, at *1 (D. Md. May 8, 2017) (same); *Convergence Mgmt. Assocs., Inc. v. Callender*, TDC-15-4015, 2016 WL 6662253, at *2 (D. Md. Nov. 10, 2016) (same). A substantial part of the events "does not mean 'a majority of the events.'"

JA 659

*Coastal Lab's, Inc. v. Jolly,* 502 F. Supp. 3d 1003, 1023 (D. Md. 2020) (quoting *Seidel v. Kirby*, 296 F. Supp. 3d 745, 751–52 (D. Md. 2017)).

Here, the facts alleged make clear there is more than one relevant "event that occurred in Maryland;" further, the Maryland events do not "appear[] to be unsubstantial." *Tusha v. Greenfield*, No. CV GLR-20-2143, 2021 WL 1530211, at *5 (D. Md. Apr. 19, 2021). Many AACTE members applied for, received, and utilized grants in Maryland. (ECF No. 5-3 ¶ 6.) The terminations, it is competently alleged, will produce a substantial loss of funds and related programming for teacher preparation programs in Maryland. *Id.*

## C. Request for Preliminary Injunction

### 1. Likelihood of Success on the Merits

"A plaintiff seeking a preliminary injunction must make a clear showing that he is likely to succeed at trial and to suffer irreparable harm in the absence of preliminary relief." *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 210 (4th Cir. 2024) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008)). Plaintiffs contend they are likely to succeed on the merits of both their Fifth Amendment and APA claims. The court addresses each in turn.

a. Fifth Amendment Due Process Claim – Vagueness

Among its many protections, the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V. The requirement of clarity is "essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly

defined."[8] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Where a law is impermissibly

vague, it must be invalidated. *Fox Television*, 567 U.S. at 253.

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 588 U.S.

445, 447 (2019). As the Supreme Court has explained:

> Our doctrine prohibiting the enforcement of vague laws rests on the
> twin constitutional pillars of due process and separation of powers.
> . . . Vague laws contravene the "first essential of due process of law"
> that statutes must give people "of common intelligence" fair notice
> of what the law demands of them. . . . Vague laws also undermine
> the Constitution's separation of powers and the democratic self-
> governance it aims to protect.

*Id.* at 451 (first citing *Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring in

part and concurring in judgment); then quoting *Connally v. General Constr. Co.*, 269 U.S. 385,

391 (1926); then citing *Collins v. Kentucky*, 234 U.S. 634, 638 (1914)). The void-for-vagueness

doctrine thus addresses these "two connected but discrete due process concerns"—that "regulated

parties should know what is required of them so they may act accordingly," and that "precision

and guidance are necessary so that those enforcing the law do not act in an arbitrary or

discriminatory way." *Fox Television*, 567 U.S. at 253; *see Just Puppies, Inc. v. Frosh*, 565 F.

Supp. 3d 665, 734 (D. Md. 2021), *aff'd sub nom.* 123 F.4th 652 (4th Cir. 2024) (same).

"Fair notice of the law's demands . . . is 'the first essential of due process.'" *Dimaya*, 584

U.S. at 183 (Gorsuch, J., concurring in part and concurring in judgment) (quoting *Connally*, 269

U.S. at 391). It is a "fundamental principle in our legal system . . . that laws which regulate persons

or entities must give fair notice of conduct that is forbidden or required." *Fox Television*, 567 U.S.

---

[8] As Plaintiffs assert, and this court has previously explained, while challenges to vagueness are often analyzed in the statutory context, the same principles guide consideration of executive orders. *See, e.g., Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, — F. Supp. 3d — , No. 1:25-CV-00333-ABA, 2025 WL 573764, at *19 (D. Md. Feb. 21, 2025) (discussing principles of statutory vagueness in analyzing a vagueness challenge to an executive order); *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146–47 (9th Cir. 2009) (same); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 536 (N.D. Cal. 2017) (same).

at 253; *see Edgar v. Haines*, 2 F.4th 298, 316 (4th Cir. 2021) (same).  "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."  *Grayned*, 408 U.S. at 108.  "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Id.* at 108–109.

While "perfect clarity and precise guidance have never been required," *see United States v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989)), "a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement."  *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272–73 (4th Cir. 2019); *see Fox Television*, 567 U.S. at 253 (same).

Plaintiffs' Fifth Amendment claim rests on allegations that the Termination Provision of Executive Order 14151 is unconstitutionally vague.[9]  In order to show they are likely to succeed on their Fifth Amendment claim, Plaintiffs concede that they must produce evidence that the Department terminated their members' Grant Awards pursuant to the Termination Provision of Executive Order 14151.  As will be explained below, Plaintiffs fail to adduce, at this stage, sufficient evidence in support of same; as such, they have not met their burden to show a clear likelihood of success on the merits of their Fifth Amendment claim.  The court, therefore, does not reach the question of unconstitutional vagueness.

---

[9] Plaintiffs ask the court to extend to them the benefit of the *NADOHE* preliminary injunction through retroactive application.  (ECF No. 5-1 at pp. 17–18; *see* ECF No. 1 ¶¶ 45-52.)  Their arguments are unavailing for the reasons set forth in this opinion and because they fail to overcome the material procedural and substantive differences between the case at bar and *NADOHE*.  Further, on March 14, 2025, the Fourth Circuit granted the *NADOHE* defendants' request to stay the preliminary injunction pending appeal.

Plaintiffs allege: "Plaintiffs and their member organizations were subjected to the Termination Provision when the Department terminated the grants at issue in this lawsuit under the instructions provided in Executive Order 14151." (ECF No. 1 ¶ 155.) Plaintiffs acknowledge that the Termination Letters did not expressly reference or mention Executive Order 14151, and argue that "the Department's publicly-articulated reason for termination," as described in the February 17, 2025 Press Release, offers competent circumstantial evidence to support the conclusion that the Department terminated the Grant Awards in obeyance of Executive Order 14151. (ECF No. 5-1 at pp. 15, 17–18 .)

As discussed *supra*, the full February 2025 Press Release reads:

> The U.S. Department of Education today announced it has terminated over $600 million in grants to institutions and nonprofits that were using taxpayer funds to train teachers and education agencies on divisive ideologies. Training materials included inappropriate and unnecessary topics such as Critical Race Theory; Diversity, Equity, and Inclusion (DEI); social justice activism; "anti-racism"; and instruction on white privilege and white supremacy. Additionally, many of these grants included teacher and staff recruiting strategies implicitly and explicitly based on race.
>
> The grants are awarded to teacher preparation programs that train future classroom teachers. Examples from the grant applications included:
> - Requiring practitioners to take personal and institutional responsibility for systemic inequities (e.g., racism) and critically reassess their own practices;
> - Receiving professional development workshops and equity training on topics such as "Building Cultural Competence," "Dismantling Racial Bias" and "Centering Equity in the Classroom";
> - Acknowledging and responding to systemic forms of oppression and inequity, including racism, ableism, "gender-based" discrimination, homophobia, and ageism;
> - Providing "targeted practices in culturally relevant and responsive teaching abolitionist pedagogies and issues of diversity in classroom management"; and

- Providing spaces for critical reflection to help educators confront biases and have transformative conversations about equity.

(ECF No. 1-4.)

For comparison, the Termination Provision of Executive Order 14151 provides:

> Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM, as appropriate, shall take the following actions within sixty days of this order:
>
> (i) terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025).

Beyond referencing "DEI," the court does not discern substantially similar language, which is to say, it is not in fact "clear," as Plaintiffs allege, that the Department terminated the Grant Awards at issue pursuant to the Termination Provision of Executive Order 14151. (ECF No. 1 ¶ 48.) Plaintiffs' papers otherwise offer no other argument or evidence in support of its allegation. At the hearing, Plaintiffs confirmed that the circumstantial evidence upon which they rely in support of this allegation is that of timing and presidential authority—the Termination Letters were issued within the required timeframe under the Termination Provision (60 days) ordered by President Trump.

Defendants also argue that the record before the court demonstrates that the Department did not terminate the Grant Awards as a means to comply with Executive Order 14151, or, alternatively, the record sufficiently undermines Plaintiffs' theory and conclusion that Executive

28

Order 14141 and the Termination Letters (and the February 2025 Press Release) are plainly and obviously connected. The court agrees with Defendants on this point. The Department's Directive cites as authority 28 U.S.C. § 3411 and 2 C.F.R. §§ 200.339–341, and directs Department personnel to "conduct an internal review of all . . . grants" to "ensur[e] that Department grants do not fund discriminatory practices—including in the form of DEI—that are either contrary to law or to the Department's policy objectives, as well as to ensure that all grants are free from fraud, abuse, and duplication." (February 2025 Directive, ECF No. 24-2.) The Directive, as Defendants note, makes no reference to Executive Order 14151 or President Trump. Further, importantly, the Directive preceded the *NADOHE* preliminary injunction enjoining enforcement of the Termination Provision, which is to say, at the time of the Directive, the Department had no incentive or motive to omit reference to Executive Order 14151, because the Termination Provision had not yet been enjoined in *NADOHE*. *See NADOHE*, 2025 WL 573764, *supra*.[10]

The circumstantial evidence offered by Plaintiffs does not demonstrate a clear likelihood of success on their Fifth Amendment claim where that claim necessarily requires that the Termination Provision was the source of the Grant Award terminations. Said another way, the record before the court at this time fails to demonstrate that the Department likely terminated the Grant Awards at the directive of Executive Order 14151. The evidence Plaintiffs rely upon to rest that conclusion is simply too tenuous to serve as the cornerstone for the extraordinary relief of a

---

[10] Defendants also point to correspondence offered in the *NADOHE* case from the FCC Chair stating that the FCC was ending the FCC's "promotion" of DEI pursuant to the policies expressed in President Trump's Executive Order. *NADOHE*, 2025 WL 573764, at *7.

JA 665

preliminary injunction.[11]    As such, Plaintiffs fail to meet their burden to show they are likely to succeed on their Fifth Amendment challenge.[12]

 b. <u>Administrative Procedure Act Claim</u>

 The APA instructs a reviewing court to hold unlawful and set aside final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  "A disputed action also may be set aside as arbitrary and capricious if the agency has acted 'without observance of procedure required by law.'"  *Safari Club Int'l v. Zinke*, 878 F.3d 316, 325 (D.C. Cir. 2017) (first quoting 5 U.S.C. § 706(2)(D); then citing *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 371 (6th Cir. 2010) (noting that "even in cases arising under § 706(2)(D), the arbitrary-and-capricious standard frequently governs.")); *see also Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 557 (D. Md. 2020) (same).  As discussed above, judicial review is appropriate here, as the parties agree, as does the court, that the Termination Letters constituted final agency action.

 In deciding whether a final agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the reviewing court determines "only whether the [agency] examined 'the relevant data' and articulated 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'"  5 U.S.C. §

---

[11] Further, as the court expressed at the hearing on the Motion, Plaintiffs neglect to consider that Acting Secretary Carter and Secretary McMahon may well share President Trump's views and opinions regarding DEI and equity-based programs and grants as expressed in Executive Order 14151.  Indeed, one might expect that to be the case.  That Executive Order 14151 may have, by its terms mandated precisely the action taken by the Department in terminating the Grant Awards does not mean the Department terminated the Grant Awards because it was ordered to do so – as opposed to because the Department head devised her own action items for the Department going forward; or based on some combination of same.

[12] Because the court concludes Plaintiffs fail to demonstrate a clear showing of likelihood of success on the merits on their Fifth Amendment claim for failure to relate adequately the Termination Letters to the Termination Provision of Executive Order 14151, it does not address Defendants' arguments related to the principle that "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement— depends in part on the nature of the enactment."  *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982).

706(2)(A); *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983)). The court may not substitute its own policy judgment for that of the agency. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

An agency action qualifies as "arbitrary" or "capricious" if it is not "reasonable and reasonably explained." *Id.* "Generally, an agency decision is arbitrary and capricious if 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43).

"Deciding whether agency action was adequately explained requires, first, knowing where to look for the agency's explanation." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020). "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Id.* (quoting *Michigan v. EPA*, 576 U. S. 743, 758 (2015)); *see also State Farm*, 463 U.S. at 50 (noting "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself").

To remind the reader, the Termination Letters state as follows:

> This letter provides notice that the United States Department of Education is terminating your federal award, [Grant Award number]. *See* 2 C.F.R. § 200.340–43; *see also* 34 C.F.R. § 75.523.
>
> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law

of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education. In addition to complying with the civil rights laws, it is vital that the Department assess whether all grant payments are free from fraud, abuse, and duplication, as well as to assess whether current grants are in the best interests of the United States.

The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities. *See* 2 C.F.R. § 200.340(a)(4); *see also* 34 C.F.R. § 75.253. Therefore, pursuant to, among other authorities, 2 C.F.R. § 200.339–43, 34 C.F.R. § 75.253, and the termination provisions in your grant award, the Department hereby terminates grant No. [___] in its entirety effective [February ___, 2025].

(ECF No. 1-2.)

   i. Rule Making Requirements

  The Department primarily relies upon two sections of the Code of Federal Regulations: § 200.340 and § 75.253. Sections 200.339 and 341–43, also cited, provide additional notification requirements for terminations described in § 200.340. At oral argument, Plaintiffs stated, and the Defendants did not dispute, that § 75.253 has no application here, because § 75.253 prescribes the procedure for "Continuation of a Multiyear Project after the First Budget Period" – and no Grant Recipient was in such a position relative to the Termination Letter.

JA 668

Section 200.340 provides:

> (a) The Federal award may be terminated in part or its entirety as follows:
>
> > (1) By the Federal agency or pass-through entity if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award;
> >
> > (2) By the Federal agency or pass-through entity with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated;
> >
> > (3) By the recipient or subrecipient upon sending the Federal agency or pass-through entity a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated. However, if the Federal agency or pass-through entity determines that the remaining portion of the Federal award will not accomplish the purposes for which the Federal award was made, the Federal agency or pass-through entity may terminate the Federal award in its entirety; or
> >
> > (4) By the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities.
>
> (b) The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.

2 C.F.R. § 200.340(a)–(b) (2025).

The Grant Recipients' GANs incorporate § 200.340 in their terms and conditions.[13] (ECF

No. 25-2.)   Accordingly, in compliance with § 200.340(b), the Department included the

---

[13] In relevant part, the GANs read: "2 CFR Part 200 as adopted at 2 CFR 3474." (ECF No. 25-2 at pp. 17, 91.) Section 3474.1 is titled "Adoption of 2 CFR part 200" and reads: "(a) The Department of Education adopts the Office of Management and Budget (OMB) Guidance in 2 CFR part 200, except for 200.102(a) and 2 CFR 200.207(a). Thus, this part gives regulatory effect to the OMB guidance and supplements the guidance as needed for the Department. (b) The authority for all of the provisions in 2 CFR part 200 as adopted in this part is listed as follows. (Authority: 20 U.S.C. 1221e-3, 3474, and 2 CFR part 200)." 2 C.F.R. § 3474.1.

termination provisions set forth in § 200.340(a) in the GANs provided to the Grant Recipients. The parties' dispute, therefore, concerns whether the February 2025 Grant Terminations complied with § 200.340(a)(4).

Plaintiffs argue that "agency priorities" as used in § 200.340(a)(4) and the Termination Letters is a term of art. (ECF No. 5-1 at p. 5.)[14] As relates to the Department, Plaintiffs insist, "agency priorities" cannot be changed without going through public notice and comment rule making. *Id.* at p. 10. Defendants dispute this contention and instead suggest "agency priorities" refers to broader ("big-picture") agency policy aims, set by each administration or Secretary, and are not required to go through public notice and comment processes. (ECF No. 24 at pp. 24–25.) Defendants may be correct as it relates to other agencies, but, as discussed below, Plaintiffs persuade the court for purposes of the Motion that Department "agency priorities" may change only pursuant to APA notice and comment processes.

In 2020, § 200.340 was amended to allow, for the first time, an agency to terminate a federal award for failure to "effectuate agency priorities." Previously, a federal agency was entitled to terminate a federal award for the reasons currently listed at § 200.340(a)(1)–(3) or for cause. 2 C.F.R. 200.399 (2019). The comments to this change acknowledge:

> The intent of this change is to ensure that Federal awarding agencies prioritize ongoing support to Federal awards that meet program goals. For instance, following the issuance of a Federal award, if additional evidence reveals that a specific award objective is ineffective at achieving program goals, it may be in the government's interest to terminate the Federal award.

Guidance for Grants and Agreements, Published Doc. No. 2020-17468, 85 FR 49506 (Aug. 13, 2020). In at least two other instances since President Trump's 2025 inauguration, courts addressed

---

[14] Plaintiffs assert "program goals" are also a term of art and refer to program goals established by Congress. At the hearing, Defendants agreed that "program goals" are not relevant or at issue here.

terminations of federal awards by the United States Department of State pursuant to §

200.340(a)(4). *See Aids Vaccine Advoc. Coal. V. United States Dep't of State*, No. CV 25-00400

(AHA), — F. Supp. 3d — , 2025 WL 752378, at *12, n.10 (D.D.C. Mar. 10, 2025) (describing

"waves of suspension and termination notices with boilerplate language" advising programs were

suspended "because the award 'no longer effectuates agency priorities and is terminated in

accordance with the U.S. Department of State Standard Terms and Conditions and 2 C.F.R.

200.340'"); *United States Conf. of Catholic Bishops v. U.S. Dept. of State,* No.1:25-CV-00465

(TNM), — F. Supp. 3d — , 2025 WL 763738, at *3 (D.D.C. Mar. 11, 2025) (noting "the

justification behind the termination was simple: the agreements 'no longer effectuate[d] agency

priorities.' [] PRM thus terminated the awards 'in accordance with the U.S. Department of State

Standard Terms and Conditions, 2 C.F.R. 200.340'"). No party cites, and the court is unaware of,

another instance of the Department terminating federal awards under § 200.340(a)(4). *See* ECF

No. 24 at p. 26 (noting the "relatively untested" nature of and "paucity of caselaw interpreting" §

200.340).

Under § 200.340(a)(4), an award termination for failure to effectuate (program goals or)

agency priorities is limited to "the extent authorized by law." With important exceptions the court

will shortly address, the APA's rule making requirements do not apply to "a matter relating to . . .

grants." 5 U.S.C. 553(a)(2). Critically, this exemption does not apply to the Department.

The General Education Provisions Act ("GEPA")—(applicable to the Department under

Title 20 of the United States Code)—provides:

> The exemption for . . . grants . . . in section 553(a)(2) of Title 5 shall
> apply only to regulations—
>
> (1) that govern the first grant competition under a new or
> substantially revised program authority as determined by the
> Secretary; or

JA 671

> (2) where the Secretary determines that the requirements of this subsection will cause extreme hardship to the intended beneficiaries of the program affected by such regulations.

20 U.S.C. § 1232(d).  Neither of these exceptions is present here.

A "regulation," as used in the above section, is "any generally applicable rule, regulation, guideline, interpretation, or other requirement that – (1) is prescribed by the Secretary or the Department; and (2) has legally binding effect in connection with, or affecting, the provision of financial assistance under any applicable program."  20 U.S.C. 1232(a).  GEPA thereby limits the APA's rule making exemption for grants to two circumstances—neither of which applies to the Grant Recipients' awards    .  All other Department regulations, including its "agency priorities," are subject to 5 U.S.C. § 553 notice and comment rule making.[15]

Defendants' argument that "Plaintiff's interpretation of federal regulation renders every federal agency powerless to shift its activities with new Presidential administrations absent a lengthy public rulemaking process" ignores GEPA's specific application to the Department's purported change of "priorities" at issue here.  (ECF No. 24 at p. 26.)  Defendants' assertion that the "priorities" referred to in the Termination Letters are "general and issued at the discretion of the Agency or the Administration" and "can be changed at any time without a vote or notice and comment from the public" is utterly at odds with GEPA.  (ECF No. 24 at p. 26.)  Under GEPA,

---

[15] Plaintiffs persuasively explain: "[i]n sum, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process;" "while there are limited exceptions to this rule, none of the exceptions are applicable to the analysis here."  (ECF No. 5-1 at p. 5 (citing 20 U.S.C. § 1232(d) and 34 C.F.R. § 75.105(b)(2)); *see* ECF No. 1 ¶ 24 ("In other words, the Priorities for grant programs administered by the Department must go through notice and comment rulemaking process, unless one of the [§ 1232(d)] exceptions applies.")  Defendants do not argue that any exception to the APA rule making process applies here; instead, they argue generally that neither cited authority applies.  (ECF No. 24 at p. 25 ("These provisions do not support Plaintiffs' argument. § 1232(d) governs regulations and § 75.105(b)(2) governs annual priorities.")) Section 75.105 provides instruction for priorities used in the selection of grant recipients; it falls under subparts "How To Apply for a Grant" and "The Application Notice."  Section 1232(d) applies to "regulations," but Defendants offer no argument why § 200.340(a)(4) "agency priorities" are not "regulations" as defined in § 1232(a).

'department priorities' are established by the Secretary or Department and grant recipients must abide them to avoid award cancellation – which is to say, they are legally binding on the federal award recipient.  As a matter of law, therefore, such "priorities" – including those on which the Termination Letters were based – must go through public notice and comment rule making.

The Grant Recipients' Grant Awards were terminated upon the Department's supposed finding that "[t]he grant is . . . inconsistent with, and no longer effectuates, Department priorities." (ECF No. 1-2.)  Nothing in the administrative record before the court supports, or tends to support, this conclusion or the veracity of the statement itself – which is to say, nothing in the record supports, or tends to support, a conclusion that, in fact, any Grant Program award was inconsistent with, or no longer effectuated, Department priorities as had been previously established through the statutorily mandated public notice and comment rule making process.  Nothing before the court supports, or tends to support, a conclusion that in fact the Department reviewed the grant award of each Grant Recipient and, on such review, in fact, found it to run afoul of previously lawfully established "agency priorities."  Defendants present no evidence of public notice and comment rule making through which its priorities (on which the Grant Recipients received their Grant Awards) underwent amendment or change.  (*See* ECF No. 1 ¶¶ 25–28 and Federal Register authorities cited therein regarding Notices of Final Priorities establishing agency priorities used in selection of the Grant Recipients.)  Instead, Defendants urge that the Department, embarking on a new presidential administration, is entitled to make "big-picture" priority changes free from the constraints of GEPA and the APA, and was therefore free to terminate the Grant Recipients' awards on the basis that the Department essentially changed its mind.

Plaintiffs have made a clear showing that the Department's termination of the Grant Recipients' Grant Program awards violates the APA.  Specifically, Plaintiffs make a clear showing

JA 673

that the Department did not change, modify, or alter the agency priorities (which are regulatory in nature and effect) on which the Department based the Grant Recipients' Grant Awards. Plaintiffs also make a clear showing that the Department did not notify Grant Recipients that their programs were inconsistent with, or violated, agency policies, as required by 2 C.F.R. § 200.341, and which the Department cites in the Termination Letter. (*See, e.g.*, MACTE Decl., ECF No. 25-2, attesting that prior to the Termination Letter, no MACTE Grant Recipient had received "notice, written or otherwise, that the grant administered by [the Grant Recipient] engaged in any of the activities described in the termination letter.") Defendants do not assert that, prior to issuance of the Termination Letters, any Grant Recipient was notified of such policy violation or non-compliance (despite the Termination Letter's citation to C.F.R. § 200.341 as supportive authority for its action).

For these reasons, the court concludes that Plaintiffs have made a clear showing of likelihood of success on the merits of their APA claim. Specifically, the court finds that the Department's Termination Letter, and the Department's termination of the Grant Recipients' Grant Awards are likely to be proven arbitrary and capricious, because the Department's action was unreasonable, not reasonably explained, based on factors Congress had not intended the Department to consider (*i.e.*, not agency priorities), and otherwise not in accordance with law.[16] 5 U.S.C. § 706(2)(A); *Dep't of Commerce v. New York*, 588 U.S. 752, 773 (2019); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *Sierra Club v. United States Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018).

---

[16] The record before the court also supports a finding of likelihood of success on the basis that the Department's action was "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

JA 674

ii.  Termination Letter Grounds

Even crediting Defendants' assertions that the "agency priorities" referenced in the Termination Letters are not subject to notice and comment rule making, and that the Department followed procedure required by law in issuing the Termination Letters, Plaintiffs still make a clear showing of likelihood of success on their APA claim because the Termination Letters fail to provide Grant Recipients any workable, sensible, or meaningful reason or basis for the termination of their awards.  Plaintiffs correctly observe: "the form letters failed to provide basic notice by omitting any specificity about the reason that the Department found any individual grant 'inconsistent with . . . Department priorities.' The letters merely list, disjunctively, five vague ways in which the specific grants at issue might be 'inconsistent.'"[17]  (ECF No. 5-1 n.10.)  The court agrees.

The Department has not provided the "reasonable explanation" of its final agency action the APA requires.  *Prometheus*, 592 U.S. at 423.  The Termination Letter's list of ways in which a Grant Recipient's program is "inconsistent" with Department priorities is so broad and vague as to be limitless; devoid of import, even.  Coupled with the disjunctive nature of the list (". . . or that otherwise fail to serve the best interests of the United States"), the Termination Letter effectively and practically renders meaningless the right to appeal, which, as described in the Termination Letter, requires a written appeal to be submitted within 30 days containing a "brief statement of your argument and the disputed factual, legal, or other issues."  (ECF No. 1-2.)  Inasmuch as the Termination Letter at once accuses a Grant Recipient of nothing and everything, it is utterly unclear

---

[17] The Termination Letters provide in pertinent part: "The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States." (ECF No. 1-2.)

to the court how a terminated Grant Recipient might mount such an appeal. How does one draft a "brief statement" of a "disputed" fact when one has no earthly idea what has been asserted, if anything?

A reasonable explanation considers relevant data and articulates a satisfactory explanation for the agency's decision, "including a rational connection between the facts found and the choice made." *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43). The Department has not provided a satisfactory explanation of the facts found or the choice made, much less a rational connection between the two. The Termination Letter fails to mention or refer to data or information the Department considered, if any, in deciding that the Grant Programs no longer effectuate Department priorities. Further, the Department's use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiffs' argument that the Department did not consider individual, or any, data or information. *California v. U.S. Dep't of Educ.*, — F. Supp. 3d. — , No. CV 25-10548-MJJ, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025) (finding the same Termination Letter "does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all").

### iii. Oglesby *California* Case Declaration

On the eve of the hearing, Defendants, with Plaintiffs' consent, offered for the court's consideration a declaration of Rachel Oglesby, Chief of Staff of the Department, which bears the caption of, and was offered in, the *California* case. (Hearing Ex. No. 2.) In the declaration, Ms. Oglesby attests to the Department's "individualized review process" of "every grant issued under the [TQP] Program and the [SEED] Program." *Id.* ¶¶ 6, 7. At the hearing here, Defendants did not rely on Ms. Oglesby's declaration to oppose Plaintiffs' arbitrary and capricious argument. Nonetheless, inasmuch as the declaration is before the court, the court addresses its significance.

In reviewing a final agency action, the court "'consider[s] the record made before the agency at the time the agency acted,' so 'post-hoc rationalizations . . . have traditionally been found to be an inadequate basis for review.'" *Roe v. Dep't of Defense*, 947 F.3d 207, 220 (4th Cir. 2020) (quoting *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 467–68 (4th Cir. 2013)).  Courts may consider "affidavits not contained in the agency record . . . where 'there was such failure to explain administrative action as to frustrate effective judicial review.'" *Dow AgroSciences*, 707 F.3d at 468 (quoting *Camp v. Pitts*, 411 U.S. 138, 142–43 (1973)).  Such post-hoc materials, however, must only provide "background information or evidence of whether all relevant factors were examined by an agency," or be "merely explanatory of the original record and . . . contain no new rationalizations." *AT&T Info. Sys., Inc. v. Gen. Servs. Admin.*, 810 F.2d 1233, 1236 (D.C. Cir. 1987) (citations omitted).

Even if credited as "background information" or "merely explanatory of the original record," Ms. Oglesby's declaration, regarding plaintiffs in another case, fails to rescue Defendants from the unavoidable conclusion that Plaintiffs are likely to succeed on the merits of their APA claim.  Ms. Oglesby's declaration fails to remedy that the Termination Letter evinces no individualized consideration of Grant Recipient awards and does not shed light on which of the possible grounds for termination set forth in the disjunctive list applies to a Termination Letter recipient.  Further, nothing in Ms. Oglesby's declaration suggests that any of the unnamed grants Ms. Oglesby describes are at issue in this action.  *See* Hearing Ex. No. 2 ¶¶ 11–16 (offering reasons why five unnamed grants were terminated); *id.* ¶ 24 ("The [Termination] letters reasoned that the funded programs 'promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; . . . violate either the letter or purpose of Federal civil rights law; that conflict with

41

the Department's policy of prioritizing merit, fairness, and excellence in education; . . . are not free from fraud, abuse, or duplication; or … otherwise fail to serve the best interest of the United States." (ellipses in original)).

### 2. Irreparable Harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (citing cases). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Irreparable harm is harm that "cannot be fully rectified by the final judgment after trial." *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

While "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough," *see Roe v. Dep't of Def.*, 947 F.3d 207, 228 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017)), "irreparable harm may still occur in extraordinary circumstances, such as when monetary damages are unavailable or unquantifiable." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263 (4th Cir. 2017). For instance, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). Similarly, harm that "threaten[s] a party's very existence" can qualify as irreparable. *Mountain Valley Pipeline*, 915 F.3d at 218.

JA 678

Plaintiffs contend they will suffer irreparable harm in the absence of a preliminary injunction because Grant Recipients are – in this moment – deprived of "essential funding required to continue their teacher preparation programs and the deprivation "complete eviscerates[] Plaintiffs' missions."[18]  (ECF No. 5-1 at pp. 25–28.)  For purposes of the Motion, Defendants do not dispute Plaintiffs will suffer irreparable harm in the absence of an injunction.  (ECF No. 24 at p. 27.)

Plaintiffs have made a clear showing that their members will suffer irreparable harm in the absence of an injunction.  According to the supporting declarations, the loss of funding will cause some Grant Recipients to shutter their programs entirely.  (NCTR Decl., ECF No. 5-4 ¶ 14; AU Decl., ECF No. 5-6 ¶ 13.)  Others will be forced to terminate staff that work on teacher preparation programs and will be unable to provide funding to teachers set to start in their respective training programs—teachers who often rely on such funding for their livelihoods.  (NCTR Decl., ECF No. 5-4 ¶¶ 14–15; AU Decl., ECF No. 5-6 ¶ 13; UST Decl., ECF No. 5-7 ¶¶ 13–14; Alder GSE Decl., ECF No. 5-8 ¶ 13; Teaching Lab Decl., ECF No. 5-9 ¶ 19.)  Plaintiffs ably demonstrate that they will suffer irreparable harm that is both actual and imminent absent a preliminary injunction— harm that will affect the existence of Grant Recipients' programs as well as the livelihoods of individuals within the affected teacher preparation programs.

---

[18]  As to Plaintiffs' claims regarding the impact on their missions, the Fourth Circuit has indicated that where an organizational plaintiff's standing is based on a representation theory (as is the case with respect to AACTE and MACTE, but not as to NCTR), district courts should look at the irreparable harm to its members.  *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 n.9 (4th Cir. 2020).

Plaintiffs also assert irreparable harm in the form of a likely constitutional violation, *see* ECF No. 5-1 at p. 24; this argument is unavailing in view of the court's conclusion that Plaintiffs have not made a clear showing that they are likely to succeed on the merits of their Fifth Amendment claim.

### 3. *Balance of Equities and the Public Interest*

Finally, "Plaintiffs must show 'that the balance of equities tips in [their] favor' and 'that an injunction is in the public interest.'" *Pierce v. N. Carolina State Bd. of Elections*, 97 F.4th 194, 225 (4th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). When, as here, the Government is the party opposing a motion for preliminary injunction, the balance of equities and public interest factors merge. *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief," with "particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)); *see Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 397 (D. Md. 2022) (same). The court considers "the 'harm to the plaintiff if the injunction is erroneously denied versus harm to the defendant if the injunction is erroneously granted.'" *Students for Fair Admissions v. United States Naval Acad.*, 707 F. Supp. 3d 486, 509 (D. Md. 2023) (quoting *Planned Parenthood of Ind. & Ky., Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019)).

Plaintiffs argue that the balance of equities favors them – where a preliminary injunction would restore "the *status quo* . . . had the Department not unlawfully terminated" the Grant Awards. (ECF No. 5-1 at p. 30.) Absent an injunction, Plaintiffs assert, the Grant Recipients' teaching preparation programs risk closure. *Id.* at pp. 30–31. Defendants, in turn, argue that "several compelling interests" weigh against an injunction, referring to the Government's and some citizens' interest in "ending discrimination" in the form of DEI policies, a cornerstone of President Trump's reelection. (ECF No. 24 at pp. 27–29.)

Defendants' arguments miss the mark insofar as the *Winter* factors are concerned. The inquiry the court is obliged to undertake requires the balancing of harm if the injunction is erroneously granted as opposed to denied. *See Students for Fair Admissions*, 707 F. Supp. 3d at 509, *supra*. In that vein, a member of the public who is opposed to government funding of Grant Programs that relate to DEI does not outweigh the asserted concrete, irreparable harm in the form of programmatic closures, staff terminations, and loss of funding of teacher preparation programs Plaintiffs and Plaintiffs' members will experience should the injunction not issue.[19] The harms Plaintiffs identify also implicate grave effect on the public: fewer teachers for students in high-need neighborhoods, early childhood education, and special education programs. (AU Decl., ECF No. 5-6 ¶ 13; UST Decl., ECF No. 5-7 ¶¶ 6, 14–15.) Moreover, even to the extent Defendants assert such an interest in ending DEI-based programs, they have sought to effect change by means the court finds likely violate the law. "[T]he public 'undoubtedly has an interest in seeing its governmental institutions follow the law.'" *Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (quoting *Roe*, 947 F.3d at 230–31).

The balance of equities and public interest favor issuance of a preliminary injunction.

## D. Appropriate Scope of the Preliminary Injunction

Having determined that Plaintiffs are entitled to a preliminary injunction, the court turns now to the proper scope of the injunction.[20] "Crafting a preliminary injunction is an exercise of

---

[19] At the hearing, Defendants asserted that individual participants in these teacher preparation programs may be harmed by "believing their success . . . [to be] unearned." *See* ECF No. 24 at p. 28 (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 275–76 (2023) (Thomas, J., concurring)). Inasmuch as individuals are free to participate in such programs, or not, this is unpersuasive with respect to the Motion.

[20] Defendants request that, if the court is inclined to grant a preliminary injunction, it should instead remand the matter to the Department, so that it may provide a more detailed explanation for the terminations on an expedited schedule. (ECF No. 24 at p. 29.) In the time since Defendants' filing, there have been significant reductions in force at the Department, which defense counsel acknowledged at the hearing consistent with her duties of candor to the court. In accordance with her duties as an officer of the court, defense counsel expressed that she did not know whether expedited review remained possible. Regardless, Defendants' request for remand is not compelling here, where they

discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017). Federal district courts possess "wide discretion to fashion appropriate injunctive relief in a particular case." *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (quoting *Richmond Tenants Org., Inc. v. Kemp*, 956 F.2d 1300, 1308 (4th Cir. 1992)). At the same time, courts also "must ensure that 'a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *HIAS, Inc. v. Trump*, 985 F.3d 309, 326 (4th Cir. 2021) (quoting *Roe*, 947 F.3d at 231). The court "may issue a nationwide injunction so long as [it] 'mold[s] its decree to meet the exigencies of the particular case.'" *Id.* (quoting *Roe*, 947 F.3d at 231). "[A] nationwide injunction may be appropriate when the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs." *Id.* (quoting *Roe*, 947 F.3d at 232–33).

With the aforementioned principles in mind, the court concludes the following scope is no more burdensome than necessary to provide complete relief to Plaintiffs and those similarly situated, and subject to the Termination Letter, or substantially the same Grant Program termination letters, pursuant to the Department's apparent categorical policy. *See HIAS*, 985 F.3d at 326, *supra*. By separate order, issued herewith, Defendants are ordered to reinstate the Grant Awards for Plaintiffs' members who are Grant Recipients (including NCTR), in accordance with the GAN Terms and Conditions in place immediately prior to the Termination Letters. The court will further order that Defendants shall not undertake to terminate, or terminate, any TQP, SEED, and TSL awards in a manner this court has determined is likely unlawful as violative of the APA as described herein.

---

fail to state or to propose a time frame within which Plaintiffs' members complaints addressed herein could be evaluated.

### E. Security

Pursuant to Federal Rule of Civil Procedure 65(c), this court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). "This rule is mandatory and unambiguous." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999) (citing *District 17, UMWA v. A & M Trucking, Inc.,* 991 F.2d 108, 110 (4th Cir. 1993)).

In determining the amount of an injunction bond, courts "should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order"; the inquiry thus "ordinarily depends on the gravity of the potential harm to the enjoined party." *Hoechst Diafoil*, 174 F.3d at 421 n.3. While bond is mandatory, the court has discretion "to set the bond amount 'in such sum as the court deems proper,'" including a bond in a nominal amount or in the amount of zero. *See id.* at 421 n.3 (citations omitted) (discussing a nominal bond); *Maryland Dep't of Hum. Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1483 n.23 (4th Cir. 1992) (discussing a nominal bond amount of zero). Indeed, a nominal bond approach "has long been followed in public-interest litigation cases." *State of Maryland, et al., v. U.S. Dep't of Agriculture, et al.*, — F. Supp. 3d — , No. CV JKB-25-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025) (citing cases).

Plaintiffs here request that no bond, or alternatively a nominal bond, be required. (ECF No. 5-1 at p. 31.) At the hearing on the Motion, defense counsel stated that Defendants did not oppose Plaintiffs' request for no bond. Defendants subsequently filed a notice advising of their change of position and requesting bond amount "equal to the Federal Government's potential costs

and damages from a wrongly issued injunction," per President Trump's March 11, 2025 Executive Order titled "Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)." (ECF Nos. 30, 30-1.) Defendants now seek a bond, because injunctive relief "would potentially mandate that the Executive spend money that may not be recouped once distributed." (ECF No. 30.) Defendants do not request a specific amount in bond; and this and other courts have imposed a nominal bond upon such unsupported speculations. *See, e.g.*, *PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 685124, at *32 (D. Md. Mar. 4, 2025); *Washington v. Trump*, No. 2:25-CV-00244-LK, 2025 WL 659057, at *28 n.29 (W.D. Wash. Feb. 28, 2025). *Cf. Hoechst Diafoil Co.*, 174 F.3d at 421 n.3 (explaining that where the risk of harm to an enjoined party is "remote," "a nominal bond may suffice").

In view of the facts here, and where Defendants present no non-speculative assertion of potential costs and damages, the court finds a nominal bond is appropriate. As far as the court can discern, and Defendants do not argue to the contrary, any financial cost Defendants may incur existed prior to terminations of Grant Program awards at issue here. The court will, therefore, set a nominal bond in the amount of $100.00.

## IV.    CONCLUSION

For the reasons set forth herein, the Motion (ECF No. 5) shall be granted in part and denied in part.

March 17, 2025                                    /S/
                                    _____
                                    Julie R. Rubin
                                    United States District Judge

JA 684

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER
EDUCATION,** *et al.*,

*Plaintiffs*,

v.                                                      Civil No.: 1:25-cv-00702-JRR

**LINDA MCMAHON, in her official
capacity as Secretary of Education,** *et al.*,

*Defendants*.

## ORDER

The court has before it Plaintiffs American Association of Colleges for Teacher Education, National Center for Teacher Residencies, and Maryland Association of Colleges for Teacher Education's Motion for Preliminary Injunction. (ECF No. 5; the "Motion.") The court has considered the parties' motions papers, as well as arguments made and exhibits offered at oral argument held March 13, 2025. For the reasons set forth in the accompanying memorandum opinion[1] and in accordance with Federal Rule of Civil Procedure 65, it is this 17th day of March 2025:

**ORDERED** that Plaintiffs' Motion shall be, and is hereby, **GRANTED IN PART AND DENIED IN PART** as follows:

It is **ORDERED** that Defendants United States Department of Education and Linda McMahon, in her official capacity as Secretary of Education, **SHALL**, within five (5) business days of entry of this order, **REINSTATE** the TQP, SEED, and TSL Grant Awards of Plaintiff NCTR and Plaintiffs' Grant Recipient members in accordance with the Grant Award Notification

---

[1] All terms defined in the court's accompanying memorandum opinion shall have the same meanings here.

JA 685

terms and conditions in place immediately prior to issuance of Termination Letters by the Department; and further it is

**ORDERED** that Defendants United States Department of Education and Linda McMahon, in her official capacity as Secretary of Education, **SHALL NOT TERMINATE**, and are **ENJOINED** from terminating, any TQP, SEED, or TSL Grant Program award in a manner this court has determined is likely unlawful as violative of the Administrative Procedure Act as described in the accompanying memorandum opinion; and further it is

**ORDERED** that the Motion shall be, and is hereby, **DENIED** in all other respects; and further it is

**ORDERED** that Plaintiffs shall, within two (2) business days of entry of this order, provide Defendants a list to include Plaintiff NCTR and Plaintiffs' Grant Recipient members whose TQP, SEED, and TSL Grant Awards were terminated by the Department Termination Letter; and further it is

**ORDERED** that the parties shall file a joint status report within seven (7) business days of entry of this order, apprising the court of the status of the parties' compliance with this order; and further it is

**ORDERED** that this preliminary injunction shall remain in effect subject to further order of court; and further it is

**ORDERED**, pursuant to Federal Rule of Civil Procedure 65(c), Plaintiffs collectively **SHALL POST A BOND** of **ONE HUNDRED DOLLARS ($100.00)** with the Clerk of Court within three (3) business days of entry of this order.

/S/

_____
Julie R. Rubin
United States District Judge

2

JA 686

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER
EDUCATION**, *et al.*,

     *Plaintiffs*,

    **v.**

**LINDA MCMAHON, in her official
capacity as Secretary of Education**, *et al.*,

     *Defendants*.

Civil No.: 1:25-cv-00702-JRR

---

**MEMORANDUM OPINION AND ORDER[1]**

This matter comes before the court on Defendants Linda McMahon, in her official capacity as Secretary of Education, U.S. Department of Education, and Donald J. Trump's, in his official capacity as President of the United States, Emergency Motion for Reconsideration. (ECF No. 36; the "Motion.") The court has reviewed all papers. No hearing is necessary and none has been requested. Local Rule 105.6 (D. Md. 2023).

**I.    BACKGROUND**

As discussed at length in its memorandum opinion issued Monday, March 17, 2025, Plaintiffs AACTE, NCTR, and MACTE initiated this action on March 5, 2025, asserting two claims: violation of the Due Process Clause of the Fifth Amendment (Count I) and violation of the APA (Count II). (ECF No. 1.) Plaintiffs' claims arise from the Department's termination of grants awarded through the TQP, SEED, and TSL Grant Programs. Following briefing and a hearing on Plaintiffs' motion for preliminary injunction, the court granted in part and denied in part Plaintiffs' motion. (ECF Nos. 32, 33.) Specifically, the court held that Plaintiffs demonstrated a clear

---

[1] All terms defined in the court's memorandum opinion at ECF No. 32 shall have the same meanings here.

likelihood of success on the APA claim and issued a preliminary injunction that, *inter alia*, requires Defendants to reinstate TQP, SEED, and TSL Grant Awards of Plaintiff NCTR and Plaintiffs' members, and enjoins Defendants from terminating TQP, SEED, or TSL awards in a manner the court found likely in violation of the APA.   *Id.*   Defendants are required to reinstate the aforementioned TQP, SEED, and TSL awards within five business days of the court's order.  (ECF No. 33.)

At 7:53 p.m. on March 18, 2025, Defendants filed their emergency Motion, requesting the court rule on the Motion within 24 hours.  (ECF No. 36.)  That same evening, the court ordered Plaintiff to respond by 12:00 p.m. today, March 19, 2025.  (ECF No. 37.)  Plaintiffs met that deadline with 8 minutes to spare (ECF No. 38), following which Defendants filed a reply at 2:11 p.m. today (ECF No. 40).

## II.   LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 54(b)

Defendants bring this Motion pursuant to Federal Rule of Civil Procedure 54(b).  (ECF No. 26-1 at p. 2.)  Rule 54(b) "governs reconsideration of orders that do not constitute final judgments in a case (*i.e.,* interlocutory orders)."  *Carrero v. Farrelly*, 310 F. Supp. 3d 581, 583–84 (D. Md. 2018).  Rule 54(b) provides that "any order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of a judgment adjudicating all the claims."  FED. R. CIV. P. 54(b).  "Compared to motions to reconsider *final* judgments pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Rule 54(b)'s approach involves broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops and new facts or arguments come to light."  *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 257 (4th Cir. 2018) (emphasis in original) (citing *Carlson v. Boston Sci. Corp.*, 856

F.3d 320, 325 (4th Cir. 2017)). Resolution of a motion for reconsideration of an interlocutory order "is committed to the discretion of the district court." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003). Importantly, "the discretion afforded by Rule 54(b) is not limitless;" the Fourth Circuit has "cabined revision pursuant to Rule 54(b) by treating interlocutory rulings as law of the case." *U.S. Tobacco Coop. Inc.*, 899 F.3d at 256–57. Accordingly, a court may revise an interlocutory order to account for "(1) a subsequent trial producing substantially different evidence; (2) a change in applicable law; or (3) clear error causing manifest injustice." *Id.* at 257 (quoting *Carlson*, 856 F.3d at 325).

### B. Federal Rule of Civil Procedure 12(b)(1)[2]

"Rule 12(b)(1) of the Federal Rules of Civil Procedure authorizes dismissal for lack of subject matter jurisdiction." *Barnett v. United States*, 193 F. Supp. 3d 515, 518 (D. Md. 2016). "The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." *United States ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 176 (D. Md. 2019) (citing *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999)). "In determining whether jurisdiction exists, 'the court may look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue.'" *Id.* at 176 (quoting *Khoury v. Meserve*, 268 F. Supp. 2d 600, 606 (D. Md. 2003)).

Subject matter jurisdiction challenges may proceed in two ways: "either a facial challenge, asserting that the allegations pleaded in the complaint are insufficient to establish subject matter jurisdiction, or a factual challenge, asserting 'that the jurisdictional allegations of the complaint [are] not true.'" *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 479 (D. Md. 2019) (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). Defendants here mount

---

[2] Defendants at once title their Motion as one "for Reconsideration" per Federal Rule of Civil Procedure 54(b) and seek dismissal of the Complaint per Rule 12(b)(1).

a facial challenge to this court's exercise of jurisdiction. In a facial challenge, "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at 192; *see Ministry of Defence of State of Kuwait v. Naffa*, 105 F.4th 154, 159 (4th Cir. 2024) (same).

Inasmuch as subject matter jurisdiction is unwaivable and may be raised at any time by any party, including by the court *sua sponte*, the court dispenses with discussion of Rule 54 and moves to the heart of the matter.

## III.   <u>ANALYSIS</u>

Defendants now advance two arguments, both jurisdictional in nature, and neither of which was raised in their briefing or oral argument on Plaintiffs' motion for preliminary injunction.

First, Defendants argue the court lacks subject matter jurisdiction because the United States Court of Federal Claims has exclusive jurisdiction over this action in accordance with the Tucker Act. Second, Defendants contend that Plaintiffs' challenge to the Department's final agency action—termination of the Grant Program Awards by the Termination Letter—was a matter committed to agency discretion and, as such, is beyond the grasp of judicial review.

### A. Tucker Act – 28 U.S.C. § 1491

"The Tucker Act grants jurisdiction to the United States Court of Federal Claims 'to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, . . . or for liquidated or unliquidated damages in cases not sounding in tort.'" *Randall v. United States*, 95 F.3d 339, 346 (4th Cir. 1996) (quoting 28 U.S.C. § 1491). "Jurisdiction is exclusive in the Court of Federal Claims for claims over $10,000, while district courts have concurrent jurisdiction with the Court of Federal Claims

for claims at or under $10,000." *Coleman v. Kendall*, 74 F.4th 610, 615 (4th Cir. 2023), *cert. denied,* 144 S. Ct. 818 (2024) (citing *Randall*, 95 F.3d at 347).

While not novel, *Massachusetts v. Nat'l Institutes of Health*, 25-cv-10338, 2025 WL 702163, at *5 (D. Mass. Mar. 5, 2025), "[t]he interplay between the Tucker Act and the APA is somewhat complicated and raises some significant issues of federal court jurisdiction." *Randall*, 95 F.3d at 346. "The APA allows private parties to sue the federal government in district court over final agency actions, so long as they seek relief other than monetary damages 'for which there is no other adequate remedy in a court.'" *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346). "Claims for money, by contrast, proceed under the Tucker Act and in the Court of Federal Claims." *Williams v. Roth*, No. 8:21-CV-02135-PX, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022) (citing 28 U.S.C. §§ 1346(a)(2), 1491). To that end, "where 'a plaintiff has an adequate remedy by suit under the Tucker Act,' they are precluded from review under the APA." *Coleman*, 74 F.4th at 615 (quoting *Randall*, 95 F.3d at 346); *see also Maine Cmty. Health Options v. United States*, 590 U.S. 296, 324 (2020) (noting the flip side of the same coin: "[t]he Tucker Act yields when the . . . Administrative Procedure Act [] provides an avenue for relief").

"There is a 'distinction between an action at law for damages,' which provides monetary compensation, and 'an equitable action for specific relief,' which might nonetheless require monetary relief." *Massachusetts,* 2025 WL 702163, at *7 (first quoting *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); and then citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (explaining "whether [restitution] is legal or equitable depends 'on the basis for [the plaintiff's] claim' and the nature of the underlying remedies sought" (citations omitted)). "To determine whether a plaintiff seeks primarily injunctive relief such that a district court has jurisdiction over his claim, courts must look to the 'essence' of the complaint and whether

5

JA 691

the relief requested is 'not . . . an incident of, or collateral to, a monetary award.'" *Coleman*, 74

F.4th at 615–16 (quoting *Randall*, 95 F.3d at 346).

"The classification of a particular action as one which is or is not 'at its essence' a contract

action depends both on the source of the rights upon which the plaintiff bases its claims, and upon

the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir.

1982). "Courts must read the Complaint with an eye toward 'the true nature of the action' to

ascertain whether it is, in fact, seeking money damages or some other relief." *Williams v. Roth*,

No. 8:21-CV-02135-PX, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022) (quoting *James v.

Caldera*, 159 F.3d 573, 579 (Fed. Cir. 1998)). Importantly, "a suit which does not seek monetary

damages does not arise under the Tucker Act simply because the plaintiff's success will result in

eventual monetary gain from the government." *Harrison v. Kendall*, 670 F. Supp. 3d 280, 297

(E.D. Va. 2023) (quoting *Powe v. Sec'y of Navy*, 35 F.3d 556, at *2 (4th Cir. 1994) (unpublished

table decision)); *see Roetenberg v. Sec'y of Air Force*, 73 F. Supp. 2d 631, 636 (E.D. Va. 1999)

(explaining that "[i]t is settled that where . . . the essence of a claim is the equitable relief sought,

and any financial ramifications of a favorable decision are subordinate to the equitable relief, the

Court of Federal Claims does *not* have exclusive jurisdiction over that claim" (emphasis in

original)). "The fact that a judicial remedy may require one party to pay money to another is not a

sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893.

"A hallmark of such equitable actions is the existence of prospective relief in ongoing

relationships." *Massachusetts*, 2025 WL 702163, at *7 (citing *Bowen*, 487 U.S. at 905). "An

adjudication of the lawfulness of [an agency's] regulatory interpretation will have future impact

on the ongoing relationship between the parties. The Court of Federal Claims cannot provide this

relief." *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994). In contrast, a suit properly proceeds

in the Court of Federal Claims under the Tucker Act where plaintiffs "seek not prospective, nonmonetary relief to clarify future obligations but specific sums already calculated, past due, and designed to compensate for completed labors." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020). Indeed, it is generally understood that the Court of Federal Claims "has no power to grant equitable relief." *Richardson v. Morris*, 409 U.S. 464, 465 (1973). The Tucker Act, however, allows for narrow exception to empower the Court of Federal Claims to provide injunctive relief only when such relief is necessary to provide an entire remedy and when the injunction is "an incident of and collateral to" an award of monetary relief. 28 U.S.C. § 1491(a)(2).

In *Bowen*, the Supreme Court considered whether a district court had subject matter jurisdiction over the Commonwealth of Massachusetts' request for judicial review of the Secretary of Health and Human Services' Medicaid disallowance decision; and to order the Secretary to pay the state the monies it asserted had been wrongfully disallowed (not reimbursed). *Bowen v. Massachusetts,* 487 U.S. at 882. The Court concluded: "since the orders are for specific relief (they undo the Secretary's refusal to reimburse the State) rather than for money damages (they do not provide relief that substitutes for that which ought to have been done) they are within the District Court's jurisdiction under § 702's waiver of sovereign immunity." *Id*. at 910.

*Bowen* sets forth a thorough explication – relying with favor on Judge Bork's analysis in *Maryland Dept. of Health Resources v. Dept. of Health and Human Svc.,* 763 F.2d 1441 (D.C. Cir. 1985) – of the critical distinction between "money damages" and "monetary relief." 487 U.S. at 894–96. In sum, the Court explains that while money damages is always a form of monetary relief, not all monetary relief is money damages. And an action to enforce a statute (there, the Medicaid Act), "which happens to be one for the payment of money" does not render it subject to the Tucker Act. *Bowen*, 487 U.S. at 900. "The fact that the mandate is one for the payment of money must

7

JA 693

not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief." *Id.* at 900-901.

In *California v. U.S. Department of Education*, Judge Joun concluded in favor of the district court's subject matter jurisdiction on a Tucker Act challenge. He concluded that the plaintiffs (several states) "seek equitable relief in the form of reinstatement of the TQP and SEED grants. Plaintiff States also seek to enjoin Defendants from implementing, giving effect to, maintaining or reinstating under a different name the termination of any previous awarded TQP and SEED grants. In other words, Plaintiff States seek to preserve the previous status quo to alleviate corresponding harm; they are not alleging claims for past pecuniary harms." *California v. U.S. Dep't of Educ.*, — F. Supp. 3d. — , No. CV 25-10548-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025) (citing *Massachusetts,* 2025 WL 702163, where Judge Angel Kelley found the essence of the plaintiffs' claims was not contractual in nature because "Plaintiffs do not bring claims for past pecuniary harms. Rather, like petitioners in *Bowen*, their claims are to preserve their ongoing and prospective agreements with [the agency]")); *see also Aids Vaccine Advoc. Coal. v. United States Dep't of State*, — F. Supp. 3d. — , No. CV 25-00400 (AHA), 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025) (finding that "Plaintiffs do not seek money damages and, . . . do not seek the contractual remedy of 'money in compensation for [their losses], whatever they may be,' in relation to any breach of their agreements . . . . Indeed, it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach").

On review of the caselaw, controlling and persuasive alike, whether the Tucker Act controls (*i.e.*, divests a district court of jurisdiction) is fact-specific and requires analysis tailored

to the particular facets of the claims before the court. The court must consider: 1) the beating heart of the plaintiff's complaint; and 2) what relief will render the plaintiff whole if the complaint has merit.

Here, the court concludes that the Tucker Act does not apply and this court has subject matter jurisdiction over Plaintiffs' claims for the following chief reasons:

1.      Plaintiffs do not seek money damages for past wrongs. Plaintiffs come to court seeking redress for alleged statutory and regulatory violations that, if left unchecked, will have immediate, lasting and irreparable harm of an existential nature to their programs, and resultant grave harm to the communities they serve. Plaintiffs' seek reinstatement of their status as Grant Program awardees so they can resume and sustain the capacity to run their education-related programming across the nation; that the court's order for reinstatement effects the Department's purse does not render this a contract claim for money damages. That is not its essence;

2.      In addition to reinstatement, Plaintiffs seek forward-looking equitable relief to prevent Defendants from terminating other Grant Program awards in the manner about which they complain and for which they requested preliminary injunctive relief. The Court of Federal Claims lacks the authority to afford the complete equitable relief Plaintiffs seek;

3.      The narrow circumstances in which the Court of Federal Claims may issue injunctive relief per the Tucker Act do not exist here, which is to say, equitable relief is not incident of, or collateral to, an award of money damages. 28 U.S.C. § 1491(a)(2);

4.      In addition to restoration of their Grant Program status, Plaintiffs demand the court order Defendants to remove "route pay grant conditions" (requiring pre-approval to access grant funds), which Plaintiffs allege Defendants unlawfully put in place. Here, again, Plaintiffs seek

forward-looking equitable relief to remove what they allege are unlawful roadblocks to their programming. The Court of Federal Claims lacks the authority to provide this relief; and

5.      Plaintiffs' Complaint requires the court to review and make findings regarding the parties' relationship pursuant to a constellation of sources: the Grant Programs' respective authorizing statutes, the Departments regulations to implement those statutes; and GEPA. This, alone, removes this action from the Tucker Act's grant of exclusive jurisdiction to the Court of Federal Claims.

The cases Defendants cite in their reply are unavailing. *Spectrum Leasing Corp. v. United States*, for example, involves a private government contractor who contracted to provide data processing services and equipment to the General Services Administration. 764 F.2d 891 (1985). When the plaintiff failed to provide deliverables, GSA invoked the liquidated damages provision of the contract and withheld payment on outstanding invoices. The contractor sued, claiming GSA violated the Debt Collection Act (31 U.S.C. §§ 3701, *et seq.*); the district court dismissed the action on the basis that (per the Tucker Act), it lacked subject matter jurisdiction, and the Court of Federal Claims had exclusive jurisdiction. *Id.* Nothing about that case resembles the instant action.

In *Thermalon Indus. v. United States*, 34 Fed. Cl. 411 (1995), the plaintiff sued the United States in the Court of Federal Claims for breach of contract claiming the government (the National Science Foundation) wrongfully withheld payment for work done under a research grant. The government argued the district court had exclusive jurisdiction because the grant was "an agreement intended to effectuate the sovereign obligations of the United States and that all such agreements necessarily fall outside the scope of . . . the Tucker Act." *Id.* at 413. The Court of Federal Claims rejected that argument because the authorizing statute (the National Science Foundation Act of 1950, 42 U.S.C. §§ 1861, *et seq.*) specifically empowered the National Science

JA 696

Foundation to enter "contracts or other arrangements" to promote the sciences.  There, the plaintiff sought money damages for unpaid invoices for work completed per the grant contract.  Nothing about that the court's determination, as Defendants note in their reply, that a grant can fill the essential elements of a contract is remarkable; nor is the court's ruling that Thermalon brought a standard issue breach of contract action against the United States for non-payment of services. Again, as said above, Plaintiffs here do not seek an award of money damages for work performed or to compensate for a wrong.

### B.  Judicial Review

Defendants also seek reconsideration of the court's preliminary injunction on the basis that the challenged agency action at issue here—termination of the Grant Awards on the basis of agency priorities—is "committed to agency discretion by law" and falls outside the scope of permissible judicial review under the APA.  (ECF No. 36-2 at p. 7.)  *See* 5 U.S.C. § 702(a)(2).

The APA provides "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  "That language sets up a 'basic presumption of judicial review' of agency action."  *Holbrook v. Tennessee Valley Auth.*, 48 F.4th 282, 287 (4th Cir. 2022) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967)).  The text carves out two exceptions to that "basic principle."  *Id.*  First, where "statutes preclude judicial review" per § 701(a)(1); and second, where "agency action is committed to agency discretion by law" per § 701(a)(2). *Holbrook,* 48 F.4th at 287. With regard to the second, "[a]gency action is committed to the agency's discretion when no judicially manageable standards are available to assess how and when an agency should exercise its discretion such that a court would have 'no law to apply.'"  *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 964 (4th Cir. 2025) (quoting *Heckler v.*

JA 697

*Chaney*, 470 U.S. 821, 830–31 (1985)).  Of import here, the APA's prohibition of judicial review of actions committed to agency discretion by law, and a defect related thereto, "goes to subject matter jurisdiction."  *Id.* (citing *Angelex Ltd. v. United States*, 723 F.3d 500, 505–506 (4th Cir. 2013)).

Defendants' argument relies exclusively on the Supreme Court's opinion in *Lincoln v. Vigil*, 508 U.S. 182 (1993).  (ECF No. 36-1 at p. 7–8.)  *Lincoln* is materially distinguishable from the facts here.  In *Lincoln,* the Court's decision concerned the Indian Health Service's decision to reallocate resources from the Indian Children's Program to a "nationwide effort to assist" children previously served by the Indian Children's Program.  508 U.S. at 184.  The Court held that the Indian Health Service's "decision to discontinue the Program was 'committed to agency discretion by law' and therefore not subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701(a)(2), and that the Service's exercise of that discretion was not subject to the notice-and-comment rulemaking requirements imposed by § 553."  *Id.*

Relevant here, the Indian Health Service, per the Snyder Act, 25 U.S.C. § 13, and the Indian Health Care Improvement Act, 25 U.S.C. §§ 1601, *et seq.*, received an annual appropriation from Congress.  Neither the Snyder Act nor the Indian Health Care Improvement Act expressly referenced the Indian Children's Program or any other potential recipient/beneficiary other than general reference to "Indian health."  508 U.S. at 194.  By virtue of that omission, Congress, the Court held, left it to the sound discretion of the Indian Health Service how to spend or use the appropriated funds.  *Id.* at 185.  The Indian Children's Program, thus, had no continuing legal entitlement to same, and "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion."  *Id.* at 192.

Importantly, the Indian Health Service's termination of the Indian Children's Program was exempt from § 533 notice and comment rule making based on § 553(b)(A)'s exemption of "rules of agency rulemaking" from same. *Id.* at 197. Here, per the intersection of GEPA and the APA, assessed at length in the court's memorandum opinion issued earlier this week, the Department's "agency priorities" vis-à-vis the Grant Programs (and Plaintiffs' members' Grant Awards) are squarely within the APA's notice and comment rule making requirement and, therefore, are not correctly categorized as items within "agency discretion" not subject to judicial review.

Outside of *Lincoln*, Defendants offer no substantive argument or authority to support their assertion that the Department's termination of the Grant Awards at issue here was "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2). The court will not undertake a prolix analysis where virtually none has been offered by movants, especially as Defendants request a ruling within 24 hours of their emergency Motion. The court is satisfied based upon the record before it that the APA's "basic presumption of judicial review" has been neither rebutted nor overcome. *See Holbrook*, 48 F.4th at 287 and *Abbott Lab'ys*, 387 U.S. at 140.

## IV.    <u>CONCLUSION</u>

Accordingly, it is this 19th day of March 2025:

**ORDERED** that the Motion (ECF No. 36) shall be, and is hereby, **DENIED**.


/S/

_____
Julie R. Rubin
United States District Judge

13

JA 699

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMERICAN ASSOCIATION OF
COLLEGES FOR TEACHER
EDUCATION, *et al.*,

      *Plaintiffs*,

  v.                           Civil No.: 1:25-cv-00702-JRR

LINDA MCMAHON, in her official
capacity as Secretary of Education, *et al.*,

      *Defendants*.

<u>**MEMORANDUM OPINION AND ORDER**</u>[1]

    This matter comes before the court on Defendants Linda McMahon, in her official capacity as Secretary of Education, U.S. Department of Education, and Donald J. Trump's, in his official capacity as President of the United States, Motion to Stay and Suspend Injunction Pending Appeal. (ECF No. 44; the "Motion.")  The court has reviewed all papers.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2023).

**I.    <u>BACKGROUND</u>**

    As discussed at length in its memorandum opinion issued March 17, 2025 (ECF No. 32), Plaintiffs AACTE, NCTR, and MACTE initiated this action on March 5, 2025, asserting two claims: violation of the Due Process Clause of the Fifth Amendment (Count I) and violation of the APA (Count II).  (ECF No. 1.)  Plaintiffs' claims arise from the Department's termination of grants awarded through the TQP, SEED, and TSL Grant Programs.  Following briefing and a hearing on Plaintiffs' Motion for Temporary Restraining Order/Preliminary Injunction (ECF No. 5), the court granted in part and denied in part Plaintiffs' motion (construed, by agreement of the parties, as one

---

[1] All terms defined in the court's memorandum opinion at ECF No. 32 shall have the same meanings here.

for preliminary injunction only).  (ECF Nos. 32, 33.)  Specifically, the court held that Plaintiffs demonstrated a clear likelihood of success on their APA claim and issued a preliminary injunction that, *inter alia*, requires Defendants to reinstate TQP, SEED, and TSL Grant Awards of Plaintiff NCTR and Plaintiffs' members, and enjoins Defendants from terminating TQP, SEED, or TSL awards in a manner the court found likely violative of the APA.  *Id.*  Defendants are required to reinstate the aforementioned TQP, SEED, and TSL Grant Awards within five business days of the court's order.  (ECF No. 33.)

## II.  <u>LEGAL STANDARD</u>

Pursuant to Federal Rule of Civil Procedure 62(c), a preliminary injunction is not stayed following a notice of appeal "[u]nless the court orders otherwise."  FED. R. CIV. P. 62(c); *see also* FED. R. APP. 8(a)(1) (providing that "[a] party must ordinarily move first in the district court for . . . an order suspending . . . an injunction while an appeal is pending").  The Supreme Court has set forth four factors to consider in determining whether to stay the order of preliminary injunction pending Defendants' appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).[2]

The first two factors are "the most critical."  *Nken v. Holder,* 556 U.S. 418, 434 (2009).  The last two factors "merge when the Government is the opposing party."  *Id.* at 435.  Here,

---

[2] The *Hilton* factors are similar to the *Winter* factors a plaintiff bears on a motion for preliminary injunction.  *See* ECF No. 32 at pp. 14–15; *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."); *Nken v. Holder,* 556 U.S. 418, 434 (2009) (observing that "[t]here is substantial overlap between" the factors governing issuance of a stay pending appeal and "the factors governing preliminary injunctions.").

because Defendants are the parties seeking a stay, they bear the burden to demonstrate the factors

weigh in favor of a stay. *Dep't of Educ. v. Louisiana*, 603 U.S. 866, 868 (2024) (providing that

"the burden is on the Government as applicant to show, among other things, a likelihood of success

. . . and that the equities favor a stay").

III.    **ANALYSIS**

    *A.  Whether Defendants Make a Strong Showing They Are Likely to Succeed on Merits*

       As set forth at length in the memoranda opinions on Plaintiffs' Motion for Preliminary

Injunction and on Defendants' Emergency Motion for Reconsideration (ECF Nos. 32 and 42),

Plaintiffs ably met their burden to demonstrate a clear showing of likelihood of success on the

merits of their APA claim (Count II) in two primary ways:

> . . . Plaintiffs have made a clear showing of likelihood of success on
> the merits of their APA claim. Specifically, the court finds that the
> Department's Termination Letter, and the Department's termination
> of the Grant Recipients' Grant Awards are likely to be proven
> arbitrary and capricious, because the Department's action was
> unreasonable, not reasonably explained, based on factors Congress
> had not intended the Department to consider (*i.e.*, not agency
> priorities), and otherwise not in accordance with law. 16 5 U.S.C. §
> 706(2)(A); *Dep't of Commerce v. New York*, 588 U.S. 752, 773
> (2019); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423
> (2021); *Sierra Club v. United States Dep't of the Interior*, 899 F.3d
> 260, 293 (4th Cir. 2018).

and

> . . . Plaintiffs . . . make a clear showing of likelihood of success on
> their APA claim because the Termination Letters fail to provide
> Grant Recipients any workable, sensible, or meaningful reason or
> basis for the termination of their awards. . . .  The Department has
> not provided the "reasonable explanation" of its final agency action
> the APA requires. *Prometheus,* 592 U.S. at 423.  The Termination
> Letter's list of ways in which a Grant Recipient's program is
> "inconsistent" with Department priorities is so broad and vague as
> to be limitless; devoid of import, even.  Coupled with the disjunctive
> nature of the list (". . . or that otherwise fail to serve the best interests

JA 702

of the United States"), the Termination Letter effectively and practically renders meaningless the right to appeal, which, as described in the Termination Letter, requires a written appeal to be submitted within 30 days containing a "brief statement of your argument and the disputed factual, legal, or other issues." (ECF No. 1-2.) . . . .  A reasonable explanation considers relevant data and articulates a satisfactory explanation for the agency's decision, "including a rational connection between the facts found and the choice made." *Dep't of Commerce*, 588 U.S. at 773 (quoting *State Farm*, 463 U.S. at 43).  The Department has not provided a satisfactory explanation of the facts found or the choice made, much less a rational connection between the two.  The Termination Letter fails to mention or refer to data or information the Department considered, if any, in deciding that the Grant Programs no longer effectuate Department priorities.  Further, the Department's use of a template or boilerplate letter issued to all Grant Recipients further strengthens Plaintiffs' argument that the Department did not consider individual, or any, data or information. *California v. U.S. Dep't of Educ.*, — F. Supp. 3d. — , No. CV 25-10548-MJJ, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025) (finding the same Termination Letter "does not reach the level of a reasoned explanation; indeed it amounts to no explanation at all").

(ECF No. 32 at pp. 37–40.)

Defendants continue to ignore or misapprehend the court's analysis and resultant conclusion that, by application of GEPA, with two exceptions not relevant here, the APA's rulemaking carve-out for grant-related matters does not apply to the Department's asserted agency priorities on which it based its termination of the Grant Awards through its Termination Letter. The court did not find, as Defendants say, that "all priorities are identical in the regulations just because they include the word 'priorities.'"  (ECF No. 44 at p. 3.)  Defendants' watered-down misdescription of the court's reasoned discussion and findings regarding the interplay between the Grant Programs' authorizing statutes, Department regulations (within the Code of Federal Regulations) to implement those statutes, GEPA, and the APA, does not serve its aim to persuade the court that they are likely to succeed on appeal.

In the same vein, the court has never purported to cabin the Secretary's entitlement or ability to change her priorities regarding broader "policy objectives." (ECF No. 44 at p. 4.) Where such broader "policy objective" priorities are used as the premise to terminate Grant Awards, the court is (as it is here) tasked with redressing such termination if it runs afoul (as the court concluded it likely does here) of governing statutes and regulations. *See* 2 C.F.R. § 200.340(a)(4) (2025) ("The Federal award may be terminated in . . . its entirety . . . to the extent authorized by law, if an award no longer effectuates the . . . agency priorities."). Nothing in the court's order at ECF No. 33 prohibits, impairs, or limits Defendants' ability, right, or entitlement to terminate Plaintiffs' members' Grant Awards provided any such termination is not undertaken or effected in a manner the court determined is likely a violation of the APA.

In the Motion, Defendants assert the Grant Programs' authorizing statutes confer on the Secretary "significant discretion to allocate funds across grant applicants to best advance the purposes of the programs" and "[n]othing about those statutory discretions constrains the Secretary's discretion to determine how best to allocate funding for each program among many different potential grant recipients." (ECF No. 44 at pp. 5–6.) Defendants' argument that the Grant Programs' authorizing statutes commit allocating Grant Awards to the Secretary's discretion ignores not only GEPA, but also the undisputed fact that the Department uses notice and comment rulemaking to set priorities for selecting Grant Recipients. *See, e.g.* ECF No. 24 at p. 26. Defendants seem to argue that the authorizing statutes confer different levels of discretion for awarding funds and for terminating them, the former subject to the APA and the latter exempt from same. Defendants identify no authority to support this contradiction; and it does not pass muster. Further, as the court previously explained, Defendants' reliance on *Lincoln v. Vigil*, 508 U.S. 182 (1993), is unpersuasive as *Lincoln* is materially distinguishable from this case.

Regarding Defendants' assertion that Plaintiffs' Complaint is essentially a contract dispute, the court incorporates its discussion of the non-application of the Tucker Act from its order of two days ago. (ECF No. 42 at pp. 4–11.) It bears more than a passing mention that, at the hearing on the preliminary injunction, Defendants' counsel asserted her clients' position as follows: "We believe this is a straightforward – I don't know if anything is straightforward in this administration, but it's a straightforward APA case," and "we have a final agency action, and now the question is was that action arbitrary and capricious . . . . It's an APA case." (Preliminary Injunction Hearing Tr. 58:23–25, 54:15–17.) The court agreed then and agrees now. The essence of Plaintiffs' claim is the equitable relief sought; Plaintiffs ask this court to review the lawfulness of the Department's termination decision, a decision that will have an immediate and ongoing impact on the relationship between the parties, namely the Plaintiffs' and their members' Grant Award status. *See* ECF No. 42 at p. 6.

Further, the court was wholly unpersuaded by Defendants' Emergency Motion for Reconsideration (ECF No. 36) in which Defendants sought dismissal of the action on the basis of two arguments that the court lacks subject matter jurisdiction over this action. (ECF No. 42, Memorandum Opinion and Order on Defendants' Emergency Motion for Reconsideration.) Nothing Defendants present in the instant Motion, or elsewhere, gives the court pause as to its proper subject matter jurisdiction over this action or as to the correctness of its determination on the Motion for Preliminary Injunction, including the strength of Plaintiffs' *Winter* factors showing. Indeed, the court found that Plaintiffs plainly and without question met their burden on likelihood of success, as well as irreparable harm, the balance of equities, and public interest. (ECF No. 32 at pp. 42–45.) Therefore, Defendants do not meet their burden to persuade the court they are likely

to succeed on the merits of their appeal of the court's order at ECF No. 33 granting preliminary injunctive relief (or the court's denial of Defendants' Emergency Motion for Reconsideration).

### B. Whether Defendants Will Be Irreparably Injured Absent a Stay

The preliminary injunction requires the Department (and others subject to the order) essentially to do what the court finds the law otherwise (already) requires of it and to return the parties to their respective status immediately prior to the likely unlawful termination of the Grant Awards by the Department's Termination Letter. The injunction requires nothing of the Department (or any Defendant) that the Department had not already committed to do in accordance with its own regulations.

Defendants' purported concerns over the Executive Branch's authority are not compelling; they mistake the point. Defendants, in essence, purport to tee up a separation of powers question. But, no. In fact, none exists. The court's order does not impair Defendants' exercise of lawful authority; and to the extent the Department wishes to terminate the Grant Awards, it may do so by lawful means as delineated by GEPA, the APA, and the Grant Award GANs.[3] The Executive Branch's authority does not carry with it the right to bypass statutory obligations set by Congress. For all such reasons, the court discerns no irreparable injury to Defendants absent a stay pending appeal.

---

[3] For the same reasons, this court's order does not, as a matter of fact or law, impair the Department or the Secretary's compliance with President Trump's newest Executive Order titled *Improving Education Outcomes by Empowering Parents, States, and Communities* (available online at https://perma.cc/22QL-8HVT) (last accessed March 21, 2025). President Trump's Executive Order requires that any action undertaken in compliance with, or to give life to, its stated *Purpose and Policy* (Section 1) be done "to the maximum extent appropriate and permitted by law," and "[c]onsistent with the Department of Education's authorities;" and the President mandates that "this order shall be implemented consistent with applicable law." Nothing about, or within, the Executive Order (expressly or by implication) conflicts with, directs, encourages, or supports non-compliance with the court's order at ECF No. 33.

C.  *Whether a Stay Will Substantially Injure Plaintiffs and Public Interest*

As the court recognized above, these factors "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Entry of a stay will produce immediate, irreparable harm to Plaintiffs in precisely the ways the court identified in its memorandum opinion at ECF No. 33, because, here, a stay is the functional equivalent of denial of preliminary injunctive relief, which the court found is necessary to avoid certain doom for Grant Recipient programs, and resultant/related harms to their affiliated teachers and administrators, and the communities they serve.

Until this point, Defendants expressly conceded (in their papers and at oral argument) that Plaintiffs would experience irreparable harm in the absence of a preliminary injunction.  They now appear to retract that concession, arguing that "there is little to no evidence in the record regarding how many months it would take before Plaintiffs begin to feel the impact of the lack of funding." (ECF No. 44 at p. 7.)  Apart from their inappropriate effort to generate a dispute on this point for the first time in their Motion to stay the court's order, Defendants' position ignores the numerous undisputed attestations Plaintiffs offered in support of their preliminary injunction motion that detail the many concrete harms their members will experience from the loss of their Grant Award funding.  *See, e.g.*, NCTR Decl., ECF No. 5-4 ¶¶ 14–15; AU Decl., ECF No. 5-6 ¶ 13; UST Decl., ECF No. 5-7 ¶¶ 13–14; Alder GSE Decl., ECF No. 5-8 ¶ 13; Teaching Lab Decl., ECF No. 5-9 ¶ 19.

Moreover, Defendants' present assertion is undermined by their own subsequent assertion (also in the Motion) that Plaintiffs' members use their Grant Award funding for "purposes like salaries and living wage stipends," and they "would likely begin withdrawing immediately upon grant reinstatement."  (ECF No. 44 at p. 7.)  Defendants' concession on irreparable harm just days

8

JA 707

ago; followed by their current retraction of the concession; followed by, in the same breath, an assertion that undermines their retraction exposes the untenable nature of their argument.

Further, as set forth at pages 44 and 45 of the court's memorandum opinion at ECF No. 32:

> The harms Plaintiffs identify also implicate grave effect on the public: fewer teachers for students in high-need neighborhoods, early childhood education, and special education programs. (AU Decl., ECF No. 5-6 ¶ 13; UST Decl., ECF No. 5-7 ¶¶ 6, 14–15.) Moreover, even to the extent Defendants assert such an interest in ending DEI-based programs, they have sought to effect change by means the court finds likely violate the law. "[T]he public 'undoubtedly has an interest in seeing its governmental institutions follow the law.'" *Vitkus v. Blinken*, 79 F.4th 352, 368 (4th Cir. 2023) (quoting *Roe*, 947 F.3d at 230–31).

The court reiterates that here.

For the same reasons discussed at length in the court's memorandum opinion at ECF No. 32, Defendants' arguments fail to persuade the court that the risk of substantial injury to Plaintiffs and the public interest favor a stay pending appeal.

### D. Bond

Defendants also assert that the court's imposition of a nominal bond was error. (ECF No. 44 at p. 8.) As the court has previously addressed, at the hearing, defense counsel did not oppose Plaintiffs' request that the court require no bond. Then, Defendants retracted that concession too – by later filing a notice advising of their change of position and requesting bond in an amount "equal to the Federal Government's potential costs and damages from a wrongly issued injunction," per President Trump's March 11, 2025, Executive Order titled "Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)." (ECF Nos. 30, 30-1.) The court examined the issue as it is required to do, and determined that a nominal bond was warranted here based on the cited authorities – authorities Defendants do not address in their Motion. The court is not persuaded that the court's issuance of a nominal bond was error, and Defendants offer no

9

JA 708

substantive legal argument for the court to change its mind now.  This similarly does not favor entry of a stay pending appeal.

IV.    <u>**CONCLUSION**</u>

Accordingly, it is this 21st day of March 2025:

**ORDERED** that the Motion (ECF No. 44) shall be, and is hereby, **DENIED**.


/S/

_____
Julie R. Rubin
United States District Judge

JA 709

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION**, *et al.*, | |
| *Plaintiffs*, | |
| **v.** | Civil No.: 1:25-cv-00702-JRR |
| **LINDA MCMAHON, in her official capacity as Secretary of Education**, *et al.*, | |
| *Defendants*. | |

**ORDER**

The court has before it Plaintiffs' Rule 60(b) Motion to Dissolve Preliminary Injunction and Request for Indicative Ruling Under Rule 62.1 (ECF No. 52; the "Motion") and the parties' Joint Notice at ECF No. 55 in which the parties advise that Defendants "do not oppose" Plaintiffs' requested relief.  The court convened an on-record conference on May 5, 2025, to discuss generally the Motion and how dissolution of the preliminary injunction entered at ECF No. 33 (the "PI") would affect the case.

As shared with the parties at the conference, the court struggles to see a substantive or procedural advantage to the progress of this action, judicial economy, or the respective (or shared) interests of the parties if the court were to dissolve the PI.  By way of background, on April 10, 2025, the Fourth Circuit granted Defendants' motion to stay the PI pending appeal (ECF No. 50) in view of *Department of Education v. California*, 604 U.S. --- , 145 S. Ct. 996 (2025), in which the Supreme Court – on consideration of the Government's request for immediate administrative stay of a similar injunction entered by the District of Massachusetts – found the "Government is likely to succeed in showing the District Court lacked jurisdiction . . . under the APA" based on

JA 710

application of the Tucker Act.  145 S. Ct. at 968.  Before the Supreme Court considered the requested stay in *California*, this court had already issued an opinion (ECF No. 42) that the Tucker Act does not divest this court of subject matter jurisdiction – based on long-standing Supreme Court and other precedent.

Defendants are candid that they will file a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction should this court grant the Motion and the action be remanded for dissolution of the PI.  Regardless, even if Defendants did not file such a motion, the court would be obliged to raise the issue *sua sponte* in view of the Supreme Court's evaluation of the "likelihood" that the Tucker Act applies in *California* – this case's doppelganger.  Given that the Fourth Circuit already has before it this precise issue, the court concludes there is simply no gain to be had by issuing the requested indicative ruling (and subsequently dissolving the PI on remand).

Therefore, the Motion (ECF No. 52) shall be, and is hereby, **DENIED**.


/S/

_____

May 6, 2025                                Julie R. Rubin
                                          United States District Judge

2

JA 711

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

AACTE, *et. al.*,　　　　　　　*
　　　　　　　　　　　　　　　*
　　　　PLAINTIFFS,　　　　　*
　　　　　　　　　　　　　　　*
v.　　　　　　　　　　　　　　*　　　　No. 25-cv-702 (JRR)
　　　　　　　　　　　　　　　*
McMAHON, *et al.*,　　　　　　*
　　　　　　　　　　　　　　　*
　　　　DEFENDANTS.　　　　　*
　　　　　　　　　　　　**＊＊＊＊＊＊**

**<u>NOTICE OF APPEAL</u>**

　　　　Notice is hereby given that Defendants in the above captioned case hereby appeal to the

United States Court of Appeals for the Fourth Circuit the Order Granting in Part Plaintiffs'

Motion for Preliminary Injunction, entered in this case on March 17, 2025.



　　　　<u>　　　March 21, 2025　　　</u>
Date

　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　Kelly O. Hayes
　　　　　　　　　　　　　　　　　United States Attorney

　　　　　　　　　　　　By:　　<u>　　　/s/　　　　　　　</u>
　　　　　　　　　　　　　　　　　Molissa H. Farber (802255)
　　　　　　　　　　　　　　　　　Assistant United States Attorney
　　　　　　　　　　　　　　　　　36 S. Charles St., 4th Floor
　　　　　　　　　　　　　　　　　Baltimore, Maryland 21201
　　　　　　　　　　　　　　　　　(410) 209-4862
　　　　　　　　　　　　　　　　　Molissa.Farber@usdoj.gov
　　　　　　　　　　　　　　　　　*Counsel for Defendants*

1

JA 712