# In the United States Court of Appeals for the Fourth Circuit

U.S. DEPARTMENT OF EDUCATION, ET AL.,

*Defendants-Appellants*,

v.

AMERICAN ASSOCIATION OF COLLEGES FOR TEACHER EDUCATION, *ET AL*.

*Plaintiffs-Appellees*.

On Appeal from the United States District Court
for the District of Maryland
No. 1:25-cv-00702
The Honorable Julie R. Rubin

———————————————

**BRIEF OF APPELLEES**

———————————————

Daniel M. Moore
Saul Ewing LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-3133
Tel: (410) 332-8734
Fax: (410) 332-8862
Daniel.Moore@saul.com

Joshua W.B. Richards
Carolyn M. Toll
Saul Ewing LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 972-7737
Joshua.Richards@saul.com
Carolyn.Toll@saul.com

*Counsel For Plaintiffs-Appellees*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................v

INTRODUCTION ...............................................................................1

COUNTER-STATEMENT OF THE ISSUES ....................................4

STATEMENT OF THE CASE ............................................................4

    I.     FACTUAL BACKGROUND ....................................................4

          A.    Overview of TQP, SEED, and TSL Grants and Department Priorities. .....................................................4

                1.    Congress Created and Funded the TQP, SEED, and TSL Grants. .................................................4

                2.    Regulations Governing Grant Terminations. .................5

                3.    Statute and Department Regulation Requirements for Setting Priorities. .........................................6

                4.    Department of Education Priorities Applicable to Now-Terminated TQP, SEED, and TSL Grants. ...........7

          B.    AACTE's and MACTE's Member Organizations and NCTR and its Member Organizations were Awarded TQP, SEED, and/or TSL Grants. ............................................9

                1.    Notice Inviting Applications for FY 2020, FY 2022, and FY 2024 TQP Grants. ...................................9

                2.    Notice Inviting Applications for FY 2022 SEED Grants. .........................................................10

                3.    Notice Inviting Applications for FY 2023 TSL Grants. .........................................................10

    C.     **The Department's Termination of the TQP, SEED, and TSL Grants in February 2025.**............................11

    D.     **The Effects of Termination on Appellees and Their Member Organizations.**............................12

         *1.*     *Effect of Grant Terminations on Ability to Maintain Programs.*............................12

         *2.*     *Effect of Special Condition on Grants.*............................15

**II.**     **PROCEDURAL BACKGROUND**............................15

**SUMMARY OF THE ARGUMENT**............................16

**STANDARD OF REVIEW**............................17

**ARGUMENT**............................18

**I.**     **THE DISTRICT COURT CORRECTLY DETERMINED THAT APPELLEES ARE ENTITLED TO A PRELIMINARY INJUNCTION.**............................18

    A.     **The District Court Correctly Assured Itself of Jurisdiction.**............................18

         *1.*     *The Grants at Issue are Not Contracts Subject to the Tucker Act.*............................18

         *2.*     *The Source of Rights and Type of Relief Sought Here Favor Jurisdiction Because Appellees' Claims Challenge Agency Overreach.*............................21

         *3.*     *The Court of Federal Claims Lacks Jurisdiction Here.*............................24

         *4.*     *The District Court Cannot be Stripped of Jurisdiction by the Tucker Act Under*

*Circumstances Where There is No Jurisdiction in the Court of Federal Claims.* ...........................................26

5. *The Supreme Court's Order in Department of Education v. California Does Not Change the Fact that Jurisdiction is Proper in the District Court.* ..........27

B. **The Department's Decision to Terminate the Grants was Not Committed to Agency Discretion.** ...........................30

C. **The District Court Correctly Found that Appellees are Likely to Succeed on the Merits of their APA Claim.** .........33

D. **In the Absence of a Preliminary Injunction, Appellees Suffer Irreparable Harm—and the Government Already Conceded As Much.** ...................................38

1. *The Government Cannot Retreat from Its Concession of Irreparable Harm.* ...................................41

2. *Appellees Demonstrated, and the District Court Independently Assured Itself, that Appellees Suffer Irreparable Harm Absent Injunctive Relief.* ...................................................43

E. **The Balance of Equities and Public Interest Favor Injunctive Relief.** ...................................................48

F. **The Preliminary Injunction is Properly Tailored.** ...............51

**CONCLUSION** ...................................................54

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*AIDS Vaccine Advoc. Coal. v. United States Dep't of State*,
No. CV 25-00400 (AHA), 2025 WL 485324 (D.D.C. Feb. 13, 2025)..............39

*Allen v. Zurich Ins. Co.*,
667 F.2d 1162 (4th Cir. 1982) .......................................................41, 42

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*,
703 F. Supp. 3d 126 (D.D.C. 2023)...................................................20

*Ass'n of Am. Publishers v. Frosh*,
586 F. Supp. 3d 379 (D. Md. 2022)...............................................39, 48

*Bennett v. Spear*,
520 U.S. 154 (1997)......................................................................34

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)...............................................................*passim*

*California v. U.S. Dep't of Educ.*,
132 F.4th 92 (1st Cir. 2025)......................................................32, 33

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184 (4th Cir. 2013) ..........................................................39

*Climate United Fund v. Citibank, N.A.*,
No. 25-698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ................................28

*Coal. for Common Sense in Gov't Procurement v. United States*,
576 F. Supp. 2d 162 (2008) ............................................................40

*Coleman v. Kendall*,
74 F.4th 610 (4th Cir. 2023) ...........................................................22

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
38 F.4th 1099 (D.C. Cir. 2022)..................................................*passim*

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ....................................................................*passim*

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  591 U.S. 1 (2020) .................................................................................37

*Dep't of Education v. California*,
  145 S. Ct. 966 (2025) ............................................................27, 28, 29

*Hall v. McLaughlin*,
  864 F.2d 868 (D.C. Cir. 1989) ...........................................................37

*Inova Alexandria Hosp. v. Shalala*,
  244 F.3d 342 (4th Cir. 2001) .............................................................31

*Kansas v. Dep't of Educ.*,
  No. 24-cv-4041-JWB, 2024 WL 3471331 (D. Kansas July 19, 2024) ........53, 54

*Katz v. Cisneros*,
  16 F.3d 1204 (Fed. Cir. 1994) ...........................................................25

*Kidwell v. Dep't of Army*,
  56 F.3d 279 (D.C. Cir. 1995) .......................................................22, 25

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ......................................................................30, 31

*Lummi Tribe of the Lummi Rsrv., Wash. v. United States*,
  870 F.3d 1313 (Fed. Cir. 2017) .........................................................24

*Maine v. United States Dep't of Agric.*,
  No. 25-0131, 2025 WL 1088946 (D. Me. Apr. 11, 2025) ..................28

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
  No. 1:25-cv-01363-DLB, 2025 WL 1585051 (D. Md. June 5, 2025) ....22, 25, 27

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ......................................................................24, 25

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020)........................................................................23

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982)..................................................19, 22

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002).........................................................33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)............................................................................34

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197 (4th Cir. 2019) ........................................18, 39

*Nat'l Ctr. for Mfg. Scis. v. United States*,
114 F.3d 196 (Fed. Cir. 1997) ........................................................24

*National Ass'n of Diversity Officers in Higher Educ. v. Trump*,
767 F. Supp. 3d 243 (D. Md. 2025)................................................40

*New Hampshire v. Maine*,
532 U.S. 742 (2001).................................................................41, 42

*Normandy Apartments, Ltd. v. U.S. Dep't Housing & Urban Dev.*,
554 F.3d 1290 (10th Cir. 2009) .................................................21, 25

*Open Communities All. v. Carson*,
286 F. Supp. 3d 148 (D.D.C. 2017)................................................39

*Packard Elevator v. I.C.C.*,
782 F.2d 112 (8th Cir. 1986) ..........................................................40

*Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*,
313 F. Supp. 3d 62 (D.D.C. 2018)..................................................32

*Randall v. United States*,
95 F.3d 339 (1996)............................................................................22

*Real Time Med. Sys Inc. v. PointClickCare Techs., Inc.*,
    131 F.4th 205 (4th Cir. 2025) ...............................................................49

*Rhea Lana, Inc. v. United States*,
    925 F.3d 521 (D.C. Cir. 2019) ..............................................................37

*Rhode Island v. Trump*,
    No. 25-128, 2025 WL 1303868 (D.R.I. May 6, 2025) ......................28

*Roe v. Dep't of Def.*,
    947 F.3d 207 (4th Cir. 2020) ...............................................................37

*Southern Educ. Found. v. U.S. Dep't of Educ.*,
    No. 25-1079, 2025 WL 1453047 (D.D.C. May 21, 2025) .................28

*Sterling Commercial Credit—Michigan, LLC v. Phoenix Indus. I, LLC*,
    762 F. Supp. 2d 8 (D.D.C. 2011) ........................................................40

*Texas Children's Hosp. v. Burwell*,
    76 F. Supp. 3d 224 (D.D.C. 2014) ......................................................40

*U.S. Dep't of Lab. v. Wolf Run Mining Co.*,
    452 F.3d 275 (4th Cir. 2006) ...............................................................49

*Vitkus v. Blinken*,
    79 F.4th 352 (4th Cir. 2023) ...............................................................39

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..........................................................................39, 48

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
    No. 25-0097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ............28, 30

*WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*,
    553 F.3d 292 (4th Cir. 2009) ...............................................................18

**CONSTITUTIONAL PROVISIONS**

U.S. Const. Article I, § 8, cl. 1 ...............................................45

U.S. Const. Article I, § 9, cl. 7 ...............................................45

**FEDERAL STATUTES & REGULATIONS**

5 U.S.C. § 701 ..............................................................*passim*

5 U.S.C. § 702 ...........................................................19, 25

5 U.S.C. § 706 ....................................................................33

20 U.S.C. § 1022 ........................................................*passim*

20 U.S.C. § 6632 ......................................................5, 10

20 U.S.C. § 6672 ...................................................4, 5, 10

20 U.S.C. § 1232 ........................................................*passim*

28 U.S.C. § 1331 ......................................................4, 19

28 U.S.C. § 1491 ...............................................................20

31 U.S.C. § 6303 ..............................................................20

31 U.S.C. § 6304 ..............................................................20

2 C.F.R. § 200 ....................................................................20

2 C.F.R. § 200.208 ...................................................15, 48

2 C.F.R. § 200.302 ..............................................................50

2 C.F.R. § 200.305 ..............................................................50

2 C.F.R. § 200.337 ..............................................................50

2 C.F.R. § 200.340 .....................................................*passim*

2 C.F.R. § 200.343 ..............................................................47

2 C.F.R. § 200.344 ..............................................................47

2 C.F.R. § 200.345 .................................................................................. 50

2 C.F.R. § 200.410 .................................................................................. 50

2 C.F.R. § 200.472 .................................................................................. 47

34 C.F.R. § 75.105 ..........................................................................*passim*

**OTHER AUTHORITIES**

Matthew H. Solomson, COURT OF FEDERAL CLAIMS: JURISDICTION, PRACTICE, AND PROCEDURE (2016) ............................................................................... 25

# INTRODUCTION

Appellees filed this case seeking a declaratory judgment that the Department of Education's (the "Department") mass and indiscriminate termination of grants for teacher preparation programs was unlawful and an injunction pursuant to the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the "APA") ordering the Department to reinstate the grants. All of the grants at issue were terminated for the same stated reasons and by means of a misuse of the same statutory provision, 2 C.F.R. § 200.340(a)(4) ("Section 340(a)(4)"), which permits termination of grants that "no longer effectuate agency priorities." The Department's misuse of Section 340(a)(4) is the basis for this action.

The terminated grants arose under three programs that Congress authorized to prepare educators in the United States and help mitigate dramatic teacher shortages, especially in high-need communities. While the grants were in the midst of approved budget periods, the Department sent form termination letters (the "Termination Letters") lacking any individualized consideration to Grant Recipients[1] informing them that the grants are "inconsistent with, and no longer effectuate[], Department priorities." The remainder of the boilerplate letters recited a disjunctive list of five nonspecific ways in which the specific grant might be "inconsistent" with

---

[1] NCTR and the member organizations of NCTR, ACTE, and MACTE with terminated grants are referred to herein as the "Grant Recipients."

Department Priorities.

The district court issued a preliminary injunction having concluded that the Department's actions likely violate the APA for multiple reasons. First, Priorities for any Education Department grant program must be set by Congress or through notice and comment rulemaking, which the Department did not do here. Because the Department Priorities have not changed, and there is nothing in the record to support a conclusion by the Department that the grants fail to effectuate the still-current Priorities, the district court appropriately found that the Department's termination was likely arbitrary and capricious. The district court also properly found a likely APA violation because the boilerplate reasons, such as they were, that the Department provided for the terminations were not reasonably explained and failed to reflect individualized consideration.

As the district court correctly found when the Government raised it for the first time on reconsideration, the Tucker Act is no jurisdictional bar to relief. This is not a contract dispute; it is, as the Government earlier conceded, a straightforward APA case. *See* J.A. 590 ("I don't know if anything is straightforward in this administration, but it's a straightforward APA case[.]"). The Government's "agency discretion" argument also fails because there are numerous statutory and regulatory provisions that cabin the Department's authority in ways that provide "meaningful standards" for judicial review.

The district court likewise correctly concluded that the Government's concession of irreparable harm to the Grant Recipients was correct, and that Appellees had made a clear showing that their members will suffer irreparable harm in the absence of an injunction. It also correctly concluded that the balance of the equities and public interest tips in Appellees' favor here where the injunction would restore the status quo had the grants not been unlawfully terminated. The potential harm to Appellees is existential—threatening the very existence of members' services or work; the purported harm to the Government pales in comparison. Even still, the Grant Recipients' ability to draw down funds and the ability of the Government to recover funds are subject to federal regulatory safeguards, and, during the pendency of the preliminary injunction, the Government did not provide any evidence of any improper attempt to draw down by any Grant Recipient.

Finally, the district court appropriately tailored its order to apply to the grant awards of NCTR and Appellees' member grant recipients. In doing so, the district court carefully considered the scope of its injunction to be no more burdensome than necessary.

This Court should affirm the district court's entry of a preliminary injunction and vacate its stay order.

## COUNTER-STATEMENT OF THE ISSUES

1.    Whether the district court correctly determined that it possessed jurisdiction under 28 U.S.C. § 1331.

2.    Whether, upon finding that Appellees are likely to succeed on the merits of their APA claim, the district court properly issued a preliminary injunction.

## STATEMENT OF THE CASE

### I.   FACTUAL BACKGROUND

#### A.   Overview of TQP, SEED, and TSL Grants and Department Priorities.

##### 1.   *Congress Created and Funded the TQP, SEED, and TSL Grants.*

Congress authorized three programs to prepare and develop educators in the United States: the Teacher Quality Partnership Program ("TQP"), the Supporting Effective Educator Development Program ("SEED"), and the Teacher and School Leader Incentive Program ("TSL"). The Teacher Quality Partnership Grant Program provides funding to eligible partnerships to improve student achievement and the quality of prospective and new teachers by improving the preparation of prospective teachers and enhancing professional development activities for new teachers. *See* 20 U.S.C. § 1022. The Supporting Effective Educator Development Program provides funding to increase the number of highly effective educators in the United States by supporting the implementation of evidence-based practices that prepare, develop, or enhance the skills of educators. *See* 20 U.S.C. § 6672. The Teacher and School

Leader Incentive Program provides funding to serve educators in high-need schools who raise student academic achievement and close the achievement gap between high- and low-performing students. TSL helps develop, implement, improve, or expand comprehensive performance-based compensation systems or human capital management systems for teachers, principals, or other school leaders. *See* 20 U.S.C. § 6632.

Congress directed the Secretary of the Department of Education (the "Secretary") to award grants, on a competitive basis, to eligible entities to provide funding consistent with the goals of TQP (20 U.S.C. § 1022a(a)), SEED (20 U.S.C. § 6672(a)), and TSL (20 U.S.C. § 6632(a)).

### 2.    *Regulations Governing Grant Terminations.*

Federal regulation permits the Department of Education to terminate grants if they no longer effectuate Department of Education Priorities. *See* 2 C.F.R. § 200.340(a)(2) (2020); 2 C.F.R. § 200.340(a)(4) (2024).[2] "Department Priorities," however, is a term of art; in order to establish its Priorities, the Department must, by statute and regulation, go through a notice and comment rulemaking process. *See* 20 U.S.C. § 1232(d); 34 C.F.R. § 75.105(b)(2).

---

[2] While the parties dispute the particular provision applicable here, it is immaterial to the disposition of this appeal.

### 3. Statute and Department Regulation Requirements for Setting Priorities.

To set Department Priorities, the Secretary is required to publish agency Priorities in the *Federal Register*, which must be used to select the Priorities for a competition, and must have gone through public comment (there are five exceptions to this rule, but none are implicated here). The Secretary is likewise required to establish the specific Priorities that are included in the application for each competitive federal grant program, such as TQP, SEED, and TSL, by publishing the Priorities in the Notice Inviting Application for the grant in the *Federal Register*. 34 C.F.R. § 75.105(b)(1).

As a federal agency, the Department is unique in the statutory requirement it has to follow for setting agency Priorities for discretionary grants. While the Administrative Procedures Act (5 U.S.C. § 553) generally exempts federal agency grants from the rulemaking process, the General Education Provisions Act ("GEPA") (20 U.S.C. § 1232(d)) alters that rule for the Department of Education; for the Department, the grants exemption for rulemaking only applies to regulations (1) that govern the first grant competition under a new or substantially revised program authority as determined by the Secretary; or (2) where the Secretary determines rulemaking will cause extreme hardship to the intended beneficiaries of the program. 20 U.S.C. § 1232(d).

In sum, the Priorities for grant programs administered by the Department must go through the notice and comment rulemaking process.[3]

Germane here, the Department held competitions for TQP grants in 2020, 2022, and 2024. It also held competitions for SEED grants in 2022, and a competition for TSL grants in 2023. For each of these competitions, and in compliance with statute and Department regulation, the Priorities were set either by Congress in the program's authorizing statute or through notice and comment rulemaking. 85 F.R. 29691-29704; 87 F.R. 10906-10923; 89 F.R. 23573-23592; 87 F.R. 19487-19496; 88 F.R. 33592-33601.

### 4. *Department of Education Priorities Applicable to Now-Terminated TQP, SEED, and TSL Grants.*

In 2019-2021, the Department established a set of allowable Department Priorities through the proper notice and comment rulemaking process. First, after going through the proper notice and comment rulemaking process, the Department published its Notice of Final Priority for discretionary grant programs in the *Federal Register* on November 27, 2019. 84 F.R. 65300-65303.[4] Second, also after the notice and comment rulemaking process, the Department published a Notice of Final

---

[3] While there are limited exceptions to this rule, none of the exceptions are applicable to the analysis here. *See* 34 C.F.R. 75.105(b)(2).

[4] The Department of Education published a Notice of Proposed Priorities for public comment on July 29, 2019. 84 F.R. 36504-36507.

Priorities for all discretionary grant programs in the *Federal Register* on March 9, 2020.[5] 85 F.R. 13640-13644. Then the Department went through the proper notice and comment rulemaking process once again and published its Notice of Final Priorities for TQP, SEED, and TSL grant competitions in the *Federal Register* on July 9, 2021.[6] 86 F.R. 36217-36220. That same day, again after the proper notice and comment rulemaking process, the Department published a Notice of Final Priority specific for TSL.[7]

Finally, the Department went through the required notice and comment rulemaking process and published a Notice of Final Priorities for the Secretary's Supplemental Priorities for all discretionary grant programs in the *Federal Register* on December 10, 2021.[8] 86 F.R. 70612-70641.

---

[5] The Department of Education published a Notice of Proposed Priorities for public comment on November 29, 2019. 84 F.R. 65734-65739.

[6] The Department of Education published a Notice of Proposed Priorities for public comment on April 20, 2021. 86 F.R. 20471-20475.

[7] The Department of Education published a Notice of Proposed Priority for public comment on April 9, 2021. 86 F.R. 18519-18523.

[8] The Department of Education published a Notice of Proposed Priorities for public comment on June 30, 2021. 86 F.R. 34664-34674.

**B.** **AACTE's and MACTE's Member Organizations and NCTR and its Member Organizations were Awarded TQP, SEED, and/or TSL Grants.**

    *1.* *Notice Inviting Applications for FY 2020, FY 2022, and FY 2024 TQP Grants.*

Three TQP competitions are relevant to this civil action. First, on May 18, 2020, the Department published a Notice Inviting Applications for the FY 2020 TQP competition inviting applicants to apply for the grant funds. 85 F.R. 29691-29704. Second, on February 25, 2022, the Department published a Notice Inviting Applications for the FY 2022 TQP competition inviting applicants to apply for the grant funds. 87 F.R. 10906-10923. Third, the Department published a Notice Inviting Applications for the FY 2024 TQP competition on April 4, 2024 inviting applicants to apply for the grant funds. 89 F.R. 23573-23592.

The project period for the FY 2020, FY 2022, and FY 2024 TQP competitions (the maximum amount of time for which the grants can be awarded) was up to five years. 85 F.R. 29699, 87 F.R. 10918, 89 F.R. 23587. All three TQP grant competitions included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TQP's authorizing statute (20 U.S.C. § 1022).

Grant Recipients were selected to receive funding from the FY 2020 TQP, FY 2022 TQP, and FY 2024 TQP competitions for up to a five-year period for each competition.

### 2.    *Notice Inviting Applications for FY 2022 SEED Grants.*

On April 4, 2022, the Department published a Notice Inviting Applications for the FY 2022 SEED competition, inviting applicants to apply for the grant funds. 87 F.R. 19487-19496. The project period for the FY 2022 SEED competition was up to three years. 87 F.R. 19492. Just like the TQP grant competitions, the SEED grant competition included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in SEED's authorizing statute (20 U.S.C. § 6672). Grant Recipients were selected to receive funding from the FY 2022 SEED competition for up to a three-year period.

### 3.    *Notice Inviting Applications for FY 2023 TSL Grants.*

Finally, one TSL grant competition is relevant to this action. On May 24, 2023, the Department published a Notice Inviting Applications for the FY 2023 TSL competition, inviting applicants to apply for the grant funds. 88 F.R. 33592-33601. The project period for the FY 2023 TSL competition was up to three years. 88 F.R. 33598. As with the TQP and SEED grant competitions, the TSL grant competition also included Priorities that were established through the required notice and comment rulemaking process or chosen from allowable activities specified in TSL's authorizing statute 20 U.S.C. § 6632. Grant Recipients were selected to receive funding from the FY 2023 TSL competition for up to a three-year period.

The five-year TQP grants, three-year SEED grants, and/or three-year TSL grants all remained active through early to mid-February 2025.

### C.   The Department's Termination of the TQP, SEED, and TSL Grants in February 2025.

With no notice, and without lawful reason, the Department sent Termination Letters and updated Grant Award Notifications ("GANs") to the majority of the Grant Recipients in February 2025, informing them that their TQP, SEED, and TSL grants were terminated, effective immediately on the date of the letter.[9] The substance of every one of the Termination Letters sent to the Grant Recipients are identical, indicating the same reasons with the same terminology for the grant terminations. *See, e.g.*, J.A. 135-48.

While the Termination Letters provide that the Grant Recipients may challenge the termination decision by submitting information documenting their position in writing to the Department within thirty days, the termination of funding was effective on the date of notification in February 2025.

In both the GANs and the Termination Letters, the purported basis provided by the Department for termination was that the grants are "inconsistent with, and no

---

[9] While the Department terminated the majority of the Grant Recipients' grants, some of Appellees' member organizations did not have their TQP grants terminated.

longer effectuate[], Department priorities." In the Termination Letters, the Department went on to explain that:

> It is a priority of the Department of Education to eliminate discrimination in all forms of education throughout the United States. The Acting Secretary of Education has determined that, per the Department's obligations to the constitutional and statutory law of the United States, this priority includes ensuring that the Department's grants do not support programs or organizations that promote or take part in diversity, equity, and inclusion ("DEI") initiatives or any other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic. Illegal DEI policies and practices can violate both the letter and purpose of Federal civil rights law and conflict with the Department's policy of prioritizing merit, fairness, and excellence in education….the grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The grant is therefore inconsistent with, and no longer effectuates, Department priorities.

### D. The Effects of Termination on Appellees and Their Member Organizations.

#### 1. Effect of Grant Terminations on Ability to Maintain Programs.

As of the date of the Termination Letters, the Department terminated funding, thereby cutting off the Grant Recipients' funding[10] from the Department that they

---

[10] Grant funding was briefly reinstated during the pendency of the preliminary injunction until this Court granted the Government's motion to stay pending appeal. Dkt. No. 30.

were awarded pursuant to the TQP, SEED, and TSL grants. J.A. 162-66 (Declaration of Kathlene Campbell on behalf of NCTR ("NCTR Declaration") at ¶ 12); J.A. 179-82 (Declaration of Carolyn Parker on behalf of American University ("AU Declaration") at ¶ 12); J.A. 193-96 (Declaration of Amy Smith on behalf of the University of St. Thomas ("UST Declaration") at ¶ 12); J.A. 215-20 (Declaration of Heather Kirkpatrick on behalf of Alder Graduate School of Education ("Alder GSE Declaration") at ¶ 11); J.A. 239-45 (Declaration of Sarah Johnson on behalf of Teaching Lab ("Teaching Lab Declaration") at ¶ 12). Without the TQP, SEED, and TSL grants, Grant Recipients are unable to continue funding their work, which in turn imperils the programs of the Grant Recipients' very existence. The harm to Appellees and their member organizations has been severe, and a continuation of the harm is certain and irreparable in the absence of continued injunctive relief. *See e.g.*, J.A. 165 (NCTR Declaration at ¶¶ 13-18); J.A. 181-82 (AU Declaration at ¶¶ 13-16); J.A. 196 (UST Declaration at ¶¶ 13-14); J.A. 217-19 (Alder GSE Declaration at ¶¶ 12-20); J.A. 242-44 (Teaching Lab Declaration at ¶¶ 17-26).

For example, the termination of Appellee NCTR's SEED grant deprives it the ability to serve K-12 school districts where there is high turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages. J.A. 165-66 (NCTR Declaration at ¶ 18). In addition, absent Court intervention to reinstate American University's TQP grant, it will be forced to shut down its teacher

preparation program for special education and early childhood education, impacting up to 1,500 Washington D.C. children and 48 future educators. J.A. 181-82 (AU Declaration at ¶¶ 13-14). Similarly, the University of St. Thomas is at risk of losing its student pipeline in areas of high-need, such as special education, as a result of the loss of funding for its teacher preparation program, *see* J.A. 196 (UST Declaration at ¶ 13), and the termination of TQP grant funds for Alder Graduate School of Education has had and will continue to have immense impacts for more than 100 aspiring teacher candidates and mentor teachers, and hundreds of K-12 students at partner school systems. J.A. 217-28 (Alder GSE Declaration at ¶¶ 13-16). In addition, the termination of TSL grant funds will result in a loss of curriculum-based professional learning and coaching services by a non-profit organization, Teaching Lab, impacting more than 40 public schools and more than 150 teachers, whose instruction in turn reaches well over 6,000 K-12 students. J.A. 240 (Teaching Lab Declaration at ¶¶ 8-9).

As a direct result of the termination of the grants, Appellees' member organizations will see a decline in enrollment. This will exacerbate the on-going teacher shortages nationwide and thwart their efforts to prepare future educators for success.

Finally, the termination of the Grant Recipients' grants imperils their ability to perform their primary missions as nonprofit membership organizations that

depend on grants to fulfill their primary purposes for existence. *See e.g.*, J.A. 165-66 (NCTR Declaration at ¶¶ 17-19); J.A. 182 (AU Declaration at ¶ 17); J.A. 196 (UST Declaration at ¶ 15); J.A. 219 (Alder GSE Declaration at ¶ 20); J.A. 245 (Teaching Lab Declaration at ¶¶ 30).

### *2.  Effect of Special Condition on Grants.*

In addition to the immediate and irreparable effects of terminating the grants, the Department added a special condition to impacted grants requiring prior approval for them to draw down funds, referred to as "route pay." In violation of Federal regulations, the Department did not provide any notice or explanation for this blanket condition imposed on terminated grants. *See* 2 C.F.R. § 200.208. This new, unlawfully-imposed condition caused delays in the Grant Recipients receiving their grant funds and added subjectivity to already approved costs. Based on this past conduct, the Grant Recipients reasonably fear that the Government will impose such a condition again if the Court reinstates the injunction, which will provide further opportunities for the Department to unlawfully deprive them of funding.

## II.  PROCEDURAL BACKGROUND

Appellees filed suit on March 3, 2025, J.A. 9-47, and requested injunctive relief to reinstate the unlawfully terminated grants. J.A. 48-88. The Government responded on March 11, J.A. 260-91, and the Court heard argument two days later. J.A. 534-622. On March 17, the district court granted Appellees' motion in part and

ordered the Department to reinstate the grants at issue on the "terms and conditions in place immediately prior to issuance of Termination Letters[.]" J.A. 637-86.

On March 18, the Government filed an Emergency Motion for Reconsideration that the district court denied, concluding that the Tucker Act does not divest it of jurisdiction and that the grants' terminations were not committed to agency discretion. J.A. 687-99. On March 20, the Government filed a motion to stay the injunction pending appeal that the district court denied. J.A. 700-09. The Government noted this appeal on March 21. J.A. 712.

Before this Court, the Government moved for a stay pending appeal, Appellees opposed, and this Court granted the motion to stay. Dkt. Nos. 12, 19, 26, 30.

## SUMMARY OF THE ARGUMENT

This Court should affirm the district court's entry of a preliminary injunction. First, the district court correctly determined that the Tucker Act does not divest it of jurisdiction. This "straightforward APA case," J.A. 590, belongs in the district court because Appellees seek forward-looking equitable relief for straightforward violations of the APA, and any incidental monetary relief Appellees will receive as a result of its claims is not "money damages," it is equitable relief, as the Supreme Court explained in *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Precisely

*because* Appellees seek a declaration and injunction under the APA, the Court of Federal Claims cannot grant relief within the bounds of its own jurisdiction.

Second, the Government's "agency discretion" argument fails because there are numerous statutory and regulatory provisions that cabin the Department's authority in ways that provide "meaningful standards" for judicial review.

Third, the Government twists the balance of equities analysis and is wrong twice over. Not only did the Government concede below that Appellees suffer irreparable harm in the absence of a preliminary injunction—a concession they cannot abandon now—the Government's argument misapprehends the key issue before the Court: whether *Appellees* are *likely* to suffer irreparable harm. Appellees persuasively established, and the district court correctly found, irreparable harm to be the result of the Department's wrongful grant terminations.

Fourth, the district court's preliminary injunction is properly tailored. The preliminary injunction issued by the district court is "no more burdensome than necessary" to provide relief to Appellees and those similarly situated and provides relief to only the parties that appeared before it.

For these reasons explained more fully below, this Court should affirm the issuance of the preliminary injunction.

## <u>STANDARD OF REVIEW</u>

This Court reviews a district court's grant of a preliminary injunction for

abuse of discretion. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 213 (4th Cir. 2019). Because this is a "deferential standard, . . . so long as 'the district court's account of the evidence is plausible in light of the record viewed in its entirety, [this Court] may not reverse,' even if [it is] 'convinced that . . . [it] would have weighed the evidence differently.'" *Id.* (quotation omitted). Accordingly, this Court reviews "factual findings for clear error and legal conclusions *de novo*." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY DETERMINED THAT APPELLEES ARE ENTITLED TO A PRELIMINARY INJUNCTION.

### A. The District Court Correctly Assured Itself of Jurisdiction.

#### 1. The Grants at Issue are Not Contracts Subject to the Tucker Act.

District courts have jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Congress authorized judicial review by district courts under the APA in suits challenging agency actions that seek "relief other than money damages." 5 U.S.C. § 702.

The mere fact "that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). The Supreme Court has "long

recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief[.]" *Id.*

The grants at issue here are not contracts—express or implied—subject to the Tucker Act. 28 U.S.C. § 1491(a)(1). The Tucker Act's implied exception is narrow; courts routinely reject the "'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act[.]'" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). A more capacious approach would improperly "deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982).

As an initial matter, the plain language of the Tucker Act encompasses "contracts"—not "grants." Grants are used to carry out a public purpose of support or stimulation. *See* 31 U.S.C. § 6304 (recognizing the appropriateness of grant agreements where the principal purpose "is to transfer a thing of value . . . to carry out a public purpose of support or stimulation[.]"). In contrast, contracts are used for the principal purpose of acquiring property or services for the direct benefit of the United States government. *See* 31 U.S.C. § 6303 (recognizing the appropriateness of procurement contract where the principal purpose "is to acquire . . . property or

services for the direct benefit or use of the United States[.]"). The statute here should be given its plain meaning. Where Congress expressly used the term "contract"— and is presumed to say what it means and mean what it says—this Court should not expand the scope of the statute without a textual basis to do so.

In the Uniform Grants Guidance, 2 C.F.R. § 200, the source of the provision being used by the government to terminate the grants, contracts are expressly defined. A contract is "a legal instrument by which a recipient or subrecipient conducts procurement transactions under a Federal award." Grants are also expressly defined. A grant is "a legal instrument of financial assistance . . . used to enter into a relationship, the principal purpose of which is to transfer anything of value to carry out a public purpose authorized by a law of the United States and not to acquire property or services for the Federal agency or pass-through entity's direct benefit or use." The Tucker Act says nothing of grants, and the awards issued under the TQP, SEED and TSL programs are not "contracts" under the definition of that term, either. There is, as a result, no basis to conclude that "grants" are "contracts," under either the Uniform Grants Guidance or the Tucker Act.

Grants are unlike contracts in other ways, too. They lack consideration; that is, they do not provide a "tangible" and "direct" benefit to the government. *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023). The advancement of "policy interests" or "generalized benefit[s]" is not a

"benefit" to the United States that would amount to consideration. *Id.* at 133-34. Even the existence of an actual contract in the background (which the grants here are not) does not insulate the Government from challenges to illegal agency action, which the action at issue here patently *is*. *See, e.g.*, *Crowley*, 38 F.4th at 1102 (holding that APA claim challenging agency's authority belonged in district court because plaintiff "d[id] not seek to enforce or recover on [a] contract" and did not "seek monetary relief"); *see also Normandy Apartments, Ltd. v. U.S. Dep't Housing & Urban Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009).

### 2. The Source of Rights and Type of Relief Sought Here Favor Jurisdiction Because Appellees' Claims Challenge Agency Overreach.

*First*, this action challenges broad agency overreach—the heart of the APA. *See Bowen,* 487 U.S. at 904-05. The same would be true if Appellees challenged only a single grant termination, but it is even more evident in the case here of an official agency policy that violates the APA and GEPA, federal statutes whose application to this case the Court of Federal Claims has no jurisdiction to address. GEPA specifically—and uniquely—requires that the Department set its grant Priorities using notice and comment rulemaking. 20 U.S.C. § 1232(d). Put differently, unlike other federal agencies, GEPA is clear with regard to the Department of Education alone: the ordinary APA exemption for grant rulemaking does not apply to the Department. *Id.* Congress' unequivocal determination

resoundingly undermines the Government's argument to the contrary. Because the source of Appellees' rights is derived from federal statute—namely, the APA—such claims favor jurisdiction in the district court.

*Second*, the relief sought in this case differs from the relief available from a Tucker Act claim. *Accord Megapulse*, 672 F.2d at 968. The analysis turns on whether Appellees seek monetary damages. *See Crowley*, 38 F.4th at 1107. They do not. Appellees seek neither a money judgment nor an injunction directing the Government to pay a specific sum; instead, Appellees seek declaratory and injunctive relief returning the parties to the pre-existing *status quo*; that is, before the Department violated the APA. To determine if a plaintiff seeks injunctive relief sufficient to establish jurisdiction, the Court must consider the "essence" of the complaint and whether the relief requested is "not . . . incident of, or collateral to, a monetary award." *Coleman v. Kendall*, 74 F.4th 610, 615–16 (4th Cir. 2023) (quoting *Randall v. United States*, 95 F.3d 339, 347 (1996)). Hinting at a monetary award, or where a prevailing plaintiff may obligate the United States to satisfy a monetary award does not reduce the essence of a complaint to "seek[ing] monetary relief." *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995).[11]

---

[11] Faced with a similar issue in *Maryland v. Corp. for Nat'l & Cmty. Serv.*, the U.S. District Court for the District of Maryland found this framework persuasive. No. 1:25-cv-01363-DLB, 2025 WL 1585051, at *24-25 (D. Md. June 5, 2025) ("*AmeriCorps*"). This Court should too.

The Supreme Court has made clear that this type of suit may proceed in district court because it "is not a suit seeking money in compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory [and regulatory] mandate itself[.]" *Bowen*, 487 U.S. at 900. The "essence" of what Appellees seek is prospective and equitable in nature—a declaration that the Department's terminations are not permitted by law. Appellees do not seek money to remedy a loss, *see Bowen*, 487 U.S. at 895, or "specific sums already calculated, past due, and designed to compensate for completed labors." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020).

Instead, the relief sought consists of the ability to continue programmatic work under the federal grants. Given that certain of the grants awarded to Appellees' members that were terminated had a performance period that lasts beyond this fiscal year, prospective relief would include the opportunity to apply for a non-competing continuation of such grants as well, which the Grant Recipients cannot do under terminated grants. As a result, the only meaningful and appropriate remedy for the Department's violation of the notice-and-comment requirement is enjoin the grants' improper termination. *Id.* at 27. The Court of Federal Claims cannot grant that relief.

### 3. *The Court of Federal Claims Lacks Jurisdiction Here.*

The Federal Circuit has correspondingly made clear that in a case like this, no jurisdiction would arise in the Claims Court. *See Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1318 (Fed. Cir. 2017) (holding that Court of Federal Claims lacks subject matter jurisdiction to order relief providing access to grant funds and remarking that "[t]o label the disbursement of [strings-attached grant] funds so thoroughly scrutinized and cabined as a remedy for 'damages' would strain the meaning of the term to its breaking point."); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) (concluding that sovereign immunity does not bar federal district courts' APA review of the government's refusal to release funding and likening entitlement to funds under a statute to the *Bowen* grant-in-aid applicants, not monetary compensation for losses that plaintiffs "will suffer as the result of the withholding of those funds")).[12]

---

[12] Moreover, the "carve-out" to the APA's waiver of sovereign immunity—that it "does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought' by the plaintiff," *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702)—is inapplicable here. This case does not fall within the three categories of cases encompassed by the Tucker Act. *See* Matthew H. Solomson, COURT OF FEDERAL CLAIMS: JURISDICTION, PRACTICE, AND PROCEDURE, at 3-2 (2016) (internal quotation marks and footnotes omitted) (explaining that the Tucker Act "vests the [Court of Federal Claims] with jurisdiction over three distinct causes of action against the U.S. government: (1) actions brought pursuant to money-mandating statutes, regulations, executive orders, or constitutional provisions; (2) actions to recover illegal exactions of money by the United States; and (3) actions pursuant to contracts with the United States."). As a result, "the Tucker Act is not

That an injunction may later cause the Government to honor an obligation to make payments does not strip the district court of jurisdiction. *See Crowley*, 38 F.4th at 1108 ("[E]ven if the plaintiff filed the complaint with an eye to future monetary awards, a district court with otherwise appropriate jurisdiction may hear the claim and grant the proper equitable relief." (quotation omitted)). This encompasses a future disbursement of grant funds. *Accord AmeriCorps*, 2025 WL 1585051, at *25 ("That the relief requires AmeriCorps to ultimately disburse grant funds does not mean monetary damages are the essence of the relief.") (citing *Kidwell*, 56 F.3d at 284). Appellees seek declaratory and injunctive relief declaring the Government's termination of the grants—and their placement on route pay—unlawful. J.A. 46. That is nothing like an injunction to pay a specific sum. *See Crowley*, 38 F.4th at 1110-12; *Normandy Apartments*, 554 F.3d at 1296-97. And, even if the Government were to pay money to Appellees, that does not strip the district court of jurisdiction. *See Bowen*, 487 U.S. at 893 (noting that where "requested relief will 'require one

---

applicable and cannot forbid the requested relief, either expressly or impliedly." *Katz v. Cisneros*, 16 F.3d 1204, 1210 (Fed. Cir. 1994).

"When a statute is not addressed to the type of grievance which the plaintiff seeks to assert, then the statute cannot prevent an APA suit." *Match-E-Be-Nash-She-Wish*, 567 U.S. at 216 (citation and internal quotation marks omitted). The Tucker Act (which in relevant part is addressed to contract claims) is not addressed to Appellees' grievances here (that the Termination Letters violated the APA and other federal laws), and therefore the Tucker Act cannot prevent suit under the APA.

party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'").

The Government's view appears to be that each affected Grant Recipient should file individual Tucker Act claims. But separate and apart from the lack of jurisdiction in the Claims Court, because Tucker Act relief is retrospective and monetary in nature, the Government seems to be suggesting that each affected Grant Recipient file a separate lawsuit *each time* the Department refuses to reimburse any allowable cost. But the staggering inefficiency of this procedure is the least of it because it also does not get at the harm that Appellees seek to remedy and would effectively preclude any remedy under the APA for facially unlawful acts. Simply put, Appellees' claims are not for the failure to reimburse individual, liquidated costs, but rather the Department of Education's wholesale policy of indiscriminate and unlawful grant terminations in violation of federal statute.

### 4. The District Court Cannot be Stripped of Jurisdiction by the Tucker Act Under Circumstances Where There is No Jurisdiction in the Court of Federal Claims.

"There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006) (holding that where the complaint is not subject to the jurisdiction of the Court of Federal Claims, a federal district court cannot be stripped of jurisdiction by the Tucker Act). As recently articulated by the Ninth Circuit in *Community Legal*

*Services in East Palo Alto v. United States Department of Health & Human Services*,
the argument that the Tucker Act forbids an APA claim where no jurisdiction lies in
the Court of Federal Claims "lacks merit" and is "contrary to common sense." 137
F.4th 932, 939 (9th Cir. 2025) (concluding that divesting district court of jurisdiction
of APA claim "conflicts with the 'strong presumption favoring judicial review of
administrative action' that is embodied in the APA."). Because there is no adequate
remedy in the Court of Claims, and divesting the district court of jurisdiction over a
"straightforward APA claim," J.A. 590, would create a jurisdictional void providing
no remedy for the deprivation of rights under the APA, the Tucker Act does not strip
the district court of jurisdiction.

### 5. The Supreme Court's Order in Department of Education v. California Does Not Change the Fact that Jurisdiction is Proper in the District Court.

The Government clings to the Supreme Court's disposition of an emergency
application for stay pending appeal in *Department of Education v. California*, 145
S. Ct. 966 (2025) (per curiam) ("*California*"), with "barebones briefing, no
argument," and two pages of analysis. 145 S. Ct. at 969 (Kagan, J., dissenting).
*California* is of limited precedential value and is not binding on this Court. Various

federal district courts to have considered this question reached this same conclusion.[13]

The Supreme Court's disposition in *California* is distinguishable for other reasons, too. First, the Supreme Court's order in *California* substantially relies on the per curiam conclusion that the Government in that case "compellingly argues that respondents would not suffer irreparable harm while the TRO is stayed" because the respondents represented that they have the "financial wherewithal to keep their programs running." 145 S. Ct. 966, 969. That conclusion is categorically at odds with this case, in which irreparable harm has been conceded by the Department, J.A. 272; J.A. 679, and the evidence in the record here amply reflects that Appellees will suffer substantial harm absent an injunction – including forcing many of Appellees'

---

[13] *See, e.g.*, *AmeriCorps*, 2025 WL 1585051, at *27 (observing that the Tucker Act analysis in *California* "does not compel the conclusion that [the district court] lacks jurisdiction," that a stay order "is not a ruling on the merits," and that *California* "did not overturn *Bowen*"); *Southern Educ. Found. v. U.S. Dep't of Educ.*, No. 25-1079, 2025 WL 1453047, at *9 n.3 (D.D.C. May 21, 2025) (collecting cases); *Climate United Fund v. Citibank, N.A.*, No. 25-698, 2025 WL 1131412, at *9-12 (D.D.C. Apr. 16, 2025) (concluding that *California* does not strip the court of jurisdiction over plaintiffs' grant termination claims); *Rhode Island v. Trump*, No. 25-128, 2025 WL 1303868, at *6 (D.R.I. May 6, 2025) (concluding that *California*'s "precedential value is limited," and "does not render this Court an improper forum for [plaintiffs'] claims under the APA."); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-0097, 2025 WL 1116157, at *15 (D.R.I. Apr. 15, 2025) (retaining jurisdiction over plaintiffs' APA claims challenging the government's federal funding freeze, and determining *California* "is not to the contrary"); *Maine v. United States Dep't of Agric.*, No. 25-0131, 2025 WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) ("[*California*] does not change the Court's determination that it is a proper forum for this dispute under the APA.").

member organizations to shutter their programs entirely. J.A. 13, 28-43, 679, 707-08.

Second, unlike in *California*, Appellees seek an injunctive remedy ensuring that the Government's unlawful placement of Grant Recipients' grants on "route pay" conditions does not occur again, in contravention of federal regulations, which impede the Grant Recipients from obtaining allowable funds in a timely manner. That is paradigmatic APA-based equitable relief not contemplated by the Supreme Court's analysis. J.A. 46. Appellees likewise seek injunctive relief in the form of a prohibition on likely additional terminations.

What is more, the Government suggests that this Court need not resolve the impact of *Bowen* because the "Supreme Court found nothing in *Bowen* inconsistent." App. Br. at 26. Not so. To the extent that the Supreme Court's per curiam order suggests a premature determination that requiring federal agencies to comply with federal regulations in mass-terminating grants equates to an order for "money damages," such a holding would *sub silentio* overrule *Bowen*, but the Court cited *Bowen* as good law. 145 S. Ct. at 968. Unless *Bowen* is actually overruled, it remains binding on this Court notwithstanding any hints about what the Supreme Court's future precedents may hold. The consequences of erroneously treating the Supreme Court's order on a preliminary record as binding in this case would cause devastating and irreparable harm. *Bowen* remains binding on this Court and is outcome

determinative. *See Woonasquatucket River Watershed Council*, 2025 WL 1116157, at *15 (noting that the court "cannot disregard *Bowen* . . . [e]ven if it looks like [*California*] has 'implicitly overruled'" it).

In sum, and as the district court explained, Appellees "do not seek money damages for past wrongs," J.A. 695; Appellees seek a declaration and "forward-looking equitable relief," the essence of which is to prevent further grant termination, (*id*.); the Court of Federal Claims lacks authority to grant the declaratory and injunctive relief Appellees seek, (*id*.); Appellees' request for the removal of "route pay grant conditions" is necessarily "forward-looking equitable relief" unavailable in the Claims Court, (*id*. at 695-96); and the Complaint invokes a "constellation of sources," including the grants' authorizing statutes, federal regulations implementing same, and GEPA. (*id*. at 696). Jurisdiction is proper.

## B. The Department's Decision to Terminate the Grants was Not Committed to Agency Discretion.

Seeking to avoid review, the Government also attempts to invoke 5 U.S.C. § 701(a)(2), which excludes from the APA's judicial review provisions agency actions "committed to agency discretion by law." App. Br. at 16, 30. However, that exclusion applies only in "rare circumstances" in which a court would have "no meaningful standard against which to" review an agency's discretionary action. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). "[E]ven if the underlying statute does not include meaningful (or manageable) standards, 'regulations

promulgated by an administrative agency in carrying out its statutory mandate can provide standards for judicial review.'" *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 346 (4th Cir. 2001). The operative question, therefore, is whether a statute or regulation provides a "meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com.*, 588 U.S. at 772. The answer here is yes.

"Meaningful standards" lie within GEPA and the notice and comment rulemaking to set Priorities for selecting Grant Recipients. J.A. 704 (reasoning that the Government's argument that the "authorizing statutes confer different levels of discretion for awarding funds and for terminating them, the former subject to the APA and the latter exempt from same" lacks any authority and "does not pass muster."). The Government's reliance on *Lincoln v. Vigil*, 508 U.S. 182 (1993) is unpersuasive. The district court accurately highlighted the materially distinguishable facts as follows:

> [T]he Indian Health Service's termination of the Indian Children's Program was exempt from § 533 notice and comment rule making based on § 553(b)(A)'s exemption of "rules of agency rulemaking" from same. *Id*. at 197. Here, per the intersection of GEPA and the APA, . . . the Department's "agency priorities" vis-à-vis the Grant Programs (and [Appellees'] members' Grant Awards) are squarely within the APA's notice and comment rule making requirement and, therefore, are not correctly categorized as items within "agency discretion" not subject to judicial review.

J.A. 699. The Government's fleeting attempt to analogize with *Lincoln* fails to contend with its statutory responsibility to use notice and comment rulemaking to set agency Priorities under GEPA, among other obligations under the APA.

The text of 2 C.F.R. § 200.340(a) also cabins the Department's authority in ways that provide a "meaningful standard" for this Court's review. *See California v. U.S. Dep't of Educ.,* 132 F.4th 92, 97 (1st Cir. 2025)at *3 ("applicable regulations cabin the Department's discretion as to when it can terminate existing grants"). While the Government asserts that it has "significant discretion in determining how best to allocate appropriated funds across grant applicants" App. Br. at 32-33, this case concerns the termination of grants *already awarded* to specific recipients. Whatever discretion the Department may have when awarding *new* grants, the Government has not shown that it has unreviewable agency discretion to *terminate existing* grants. To the contrary, the text of the termination regulation specifically enumerates the four ways federal awards may be terminated. *See also Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 75-78 (D.D.C. 2018) (holding that federal agency's otherwise-presumptively unreviewable decision to halt funding to an agency program was reviewable under the APA

because applicable regulations cabined its termination authority and therefore provided a standard by which the court could review the agency's decision.[14]

Finally, Congress' instructions in the grants' statutes provides another avenue of meaningful standards. Congress has instructed recipients to provide assurances to the Secretary that the grant recipients are spending money consistent with the purpose of the grant statutes. *See California*, 132 F. at 98 ("Congress instructed recipients to 'provide assurances to the Secretary,' including, for example, that participants 'receive training in providing instruction to diverse populations.'") (quoting 20 U.S.C. § 1022e(b)). This limits the Department's discretion and creates "meaningful standard[s] by which to judge the [agency]'s action." *Dep't of Comm.*, 588 U.S. at 772.

## C. The District Court Correctly Found that Appellees are Likely to Succeed on the Merits of their APA Claim.

The Department's termination of the grants because they were allegedly "inconsistent with, and no longer effectuate[], Department priorities" is unlawful because it is contrary to statute and regulation the Department is obliged to follow, and thus violates the APA. 5 U.S.C. § 706(2)(A) (courts must "hold unlawful and

---

[14] The Government's reliance on *Milk Train, Inc. v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002) is inapposite. *Milk Train* involved plaintiffs who failed to point to any applicable legal standards.

set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

As an initial matter, the Department's grant terminations constitute final agency action, reviewable under the APA.[15] The Government conceded as much

---

[15] There are two hallmarks of final agency action: first, the action "mark[s] the 'consummation' of the agency's decisionmaking process;" and second, it is an action by which "rights or obligations have been determined" or "from which "legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

Here, the Department's termination of the Grant Recipients' grants constitutes final agency action. The Termination Letters each provide that the "Department hereby terminates grant No. [] in its entirety effective 2/[]/25." This demand for immediate compliance with the Department's position marks the consummation of the Department's decision-making process. As of the date of the Termination Letters, the Department stopped providing funding approved by the grants, unequivocally terminating the Grant Recipients rights to funding. J.A. 164 (NCTR Declaration at ¶ 12); J.A. 181 (AU Declaration at ¶ 12); J.A. 196 (UST Declaration at ¶ 12); J.A. 217 (Alder GSE Declaration at ¶ 11); J.A. 241 (Teaching Lab Declaration at ¶ 12). Instantly following the halted funding, there was a direct and immediate effect on Appellees and their member organizations – without the funding from the grants, Grant Recipients cannot continue to operate their teacher preparation programs.

below, J.A. 316; 538, and does not argue to the contrary in its principal brief to this Court.

The district court appropriately identified two ways in which the Government violated that standard. *First*, the Department's termination of the grants for being "inconsistent with, and no longer effectuat[ing], Department priorities" is contrary to the law.[16] Statute and regulation require the Secretary to publish Department Priorities for program grants in the *Federal Register*, subject to a notice and comment period. 20 U.S.C. § 1232(d), 34 C.F.R. § 75.105(b)(2). The Secretary then selects allowable Priorities to include in the applications for the grant competitions which are published in the *Federal Register*. 34 C.F.R. § 75.105(c). The Department cannot, by law, change Department Priorities unless and until the Department

---

[16] The Government misrepresents that § 200.340(a)(4) is a "well-established" provision and it provides "broad, indeed, largely unreviewable authority for various Executive Branch agencies to terminate funding agreements that no longer serve the government's interests." App. Br. at 30. That is not so. Under both the 2020 and 2024 versions of the provision, Appellees are not aware of a *single* instance prior to January 20, 2025 in which the provision was invoked to terminate an award to on the grounds that the award does not effectuate new "agency priorities" identified after the time of the award. In fact, in 2020, § 200.340 was amended to allow, for the first time, an agency to terminate federal award for failure to "effectuate agency priorities." The legislative history of the rule also does not align with the Government's interpretation of broad, unreviewable authority. In fact, responding to commenters who raised concerns that the proposed termination language in § 200.340 would provide Federal agencies too much leverage to arbitrarily terminate awards without sufficient cause, the Office of Management and Budget responded that it "deliberated upon these requests and decided as written agencies are not able to terminate grants arbitrarily." 85 F.R. 49509.

engages in rulemaking to propose and issue new Priorities. J.A. 673. The current administration has not done that, so the current Priorities remain Department Priorities. *Id.* As a result, the grants at issue remain consistent with the current Department Priorities, as they were at the time they were awarded. *Id.* (nothing in the record supports a conclusion that "the Department reviewed the grant award of each Grant Recipient and, on such review, in fact, found it to run afoul of previously lawfully established 'agency priorities.'").[17]

*Second*, even if the Government's assertion that the "agency priorities" referenced in the Termination Letters are not subject to notice and comment rulemaking were correct (it isn't), the district court appropriately held that Appellees "still make a clear showing of likelihood of success on their APA claim because the Termination Letters fail to provide Grant Recipients any workable, sensible, or meaningful reason or basis for the termination of their awards. . . . The Department has not provided the 'reasonable explanation' of its final agency action the APA requires" J.A. 675. The Termination Letters simply list disjunctive, potential ways in which a Grant Recipient's program is "inconsistent" with Department Priorities, which "is so broad and vague as to be limitless; devoid of import, even." *Id.* A

---

[17] The language in Section 200.340(a)(4) regarding "no longer effectuates" agency priorities does not authorize an agency to change agency Priorities in the middle of an existing grant term. While the Department may set new policy Priorities for future grant cycles, it has no authority to do so midstream for existing grants.

"reasonable explanation" as mandated by the APA, "considers relevant data and articulates a satisfactory explanation for the agency's decision, 'including a rational connection between the facts found and the choice made.'" J.A. 676 (citing *Dep't of Commerce*, 588 U.S. at 773).

"When an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency . . . may not provide new [reasons]." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 21 (2020). The Department belatedly asserts that it terminated the grants at issue because they shared a "common characteristic (finding DEI)" and points to the declaration of the Chief of Staff of the Department to attempt to argue that the Department engaged in an individualized review. App. Br. at 39. But the district court properly considered this argument below and concluded that even if the declaration, which was indisputably not contained in the agency record, was credited as "merely explanatory of the original record,"[18] "it fails to remedy that the Termination Letters evinces no individualized consideration of Grant Recipient awards and does not shed light on

---

[18] The Government's citations to *Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020) and *Rhea Lana, Inc. v. United States*, 925 F.3d 521 (D.C. Cir. 2019), App. Br. 38, do nothing to advance its argument, as the district court *did* consider the post-hac declaration in its finding. J.A. 677-78. Likewise, the Government's citation to *Hall v. McLaughlin*, 864 F.2d 868 (D.C. Cir. 1989) is unpersuasive. *Hall* concerned whether the agency ignored its own past decisions and diverged from precedent, not whether similarly situated grants sweepingly terminated contemporaneously "is required by the APA" as the Government misstates. App. Br. at 39.

which of the possible grounds for termination set forth in the disjunctive list applies to a termination Letter recipient." J.A. 677. Because the Termination Letters do not provide any "reasonable explanation" for the Department's actions, the Government is unlikely to succeed.

### D. In the Absence of a Preliminary Injunction, Appellees Suffer Irreparable Harm—and the Government Already Conceded As Much.

The grant terminations have caused Appellees to suffer irreparable harm. Below, the Government expressly conceded as much. J.A. 272; 538. Still, Appellees carried their burden and demonstrated the existence of irreparable harm. And, while the district court accepted that concession, it nevertheless independently found that Appellees "made a clear showing that their members will suffer irreparable harm in the absence of an injunction." J.A. 679. On appeal, the Government sings a completely different tune—now arguing that it is the *Government* that would suffer irreparable harm. App. Br. at 39-41. That is wrong twice over. Judicial estoppel prevents the Government from taking a position diametrically opposed to that it asserted below. Even if this Court considers such a misguided argument—it is unavailing where the analysis turns on the likelihood of irreparable harm to Appellees, not the Government.

To obtain a preliminary injunction, a plaintiff must "demonstrate irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 22 (2008), (emphasis in original, collecting cases); *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quotation omitted). Harm is irreparable if the injury "cannot be fully rectified by the final judgment after trial." *Ass'n of Am. Publishers v. Frosh,* 586 F. Supp. 3d 379, 388 (D. Md. 2022) (quoting *Mountain Valley Pipeline, LLC*, 915 F.3d at 216; *Vitkus v. Blinken*, 79 F.4th 352, 367 (4th Cir. 2023) (finding existence of irreparable harm where no adequate relief could be recovered at the conclusion of trial).

A mission-oriented organization also has a likelihood of irreparable injury where "the 'actions taken by the defendant have perceptively impaired the organization's program'" and "make it more difficult for [organizations] to accomplish [their] primary mission[s]." *Open Communities All. v. Carson*, 286 F. Supp. 3d 148, 177 (D.D.C. 2017); *AIDS Vaccine Advoc. Coal. v. United States Dep't of Stat*e, No. CV 25-00400 (AHA), 2025 WL 485324, at *4 (D.D.C. Feb. 13, 2025), *enforced*, No. CV 25-00400 (AHA), 2025 WL 569381 (D.D.C. Feb. 20, 2025) (finding irreparable injury where loss of funding would make it more difficult to accomplish organization's primary mission).

In addition, economic harm may also prove irreparable if it is severe enough to threaten an organization's existence. *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986) ("Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the [plaintiff]'s business."); *see also National Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 288 (D. Md. 2025) (same); *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (2008) ("To successfully shoehorn potential economic loss into a showing of irreparable harm, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence.") (citations omitted); *see also Texas Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 243-44 (D.D.C. 2014) (finding irreparable harm that is economic in nature where non-profit completely "shut out" of hospital funding program). "The critical consideration under this exception is the effect that the purported economic harm will have on a movant's business or its very existence—not any monetary amount per se." *Sterling Commercial Credit—Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 15 (D.D.C. 2011).

### *1. The Government Cannot Retreat from Its Concession of Irreparable Harm.*

The Government unequivocally conceded below that Appellees suffer irreparable harm absent injunctive relief. J.A. 272; 538. Judicial estoppel—and notions of fundamental fairness—prevents it from reversing course.[19]

"[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, [it] may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted); *see also id.* ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.") (internal quotation omitted).

Several factors inform the applicability of judicial estoppel: (1) "a party's later position must be 'clearly inconsistent' with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position,[20]

---

[19] The Government's arguments in this regard are misguided. The analysis for whether injunctive relief will issue pertains to whether or not *the party seeking the injunction* is likely to experience irreparable harm.

[20] The doctrine of judicial estoppel is "not necessarily confined to situations where the party asserting the earlier contrary position there prevailed." *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1167 (4th Cir. 1982).

so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750-51 (citations omitted).

Each factor is easily satisfied here. First, the Government takes a position completely opposite of that it endorsed below. J.A. 272; 286; 538; 609-10. Second, the Government clearly persuaded the district court to accept that representation. J.A. 679 ("Defendants do not dispute Plaintiffs will suffer irreparable harm in the absence of an injunction."). Third, the Government would derive an unfair advantage if not estopped. That is, the Government deprived the district court of the ability to consider the issue and Appellees of the ability to make a more fulsome record.

In moving to stay the district court's opinion, the Government attempted to retreat from its concession of irreparable harm; however, the district court rebuffed that attempt. J.A. 707 (rejecting the Government's "inappropriate effort to generate a dispute on this point for the first time[.]"). To prevent the Government from "'playing fast and loose' with the courts, and to protect the essential integrity of the judicial process," this Court should similarly reject the Government's attempt to create an issue of the irreparable harm suffered by Appellees in the absence of a preliminary injunction. *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982).

### 2. Appellees Demonstrated, and the District Court Independently Assured Itself, that Appellees Suffer Irreparable Harm Absent Injunctive Relief.

Even if this Court considers the Government's about-face, which it should not, Appellees easily demonstrated the *likelihood* of irreparable injury below. The Grant Recipients are being deprived of essential funding required to continue their teacher preparation programs. Without injunctive relief, the Government's actions unlawfully depriving them of funding will:

– Force many Grant Recipients to shutter their programs, including teacher preparation programs designed to support educators in critical areas of need, including special education and early childhood education. *See e.g.*, J.A. 181-82 (AU Declaration at ¶ 13).

– Significantly reduce the Grant Recipients' ability to address the on-going teacher shortage and cause an exacerbation of the teacher shortage, especially in rural and urban communities, across the country. *See e.g.*, J.A. 165-66 (NCTR Declaration at ¶ 18); J.A. 218 (Alder GSE Declaration at ¶ 16).

– Result in termination of employment for the dedicated staff members, coaches, and grant managers who work to make the teacher preparation programs run. *See e.g.*, J.A. 165 (NCTR Declaration at ¶ 14); J.A. 182 (AU Declaration at ¶ 16); J.A. 219 (Alder GSE Declaration at ¶ 17); J.A. 242-43 (Teaching Lab Declaration at ¶¶ 19-20).

– Result in a widespread cut and/or reduction of scholarships and living wage stipends for future educators to pursue degrees in education in underserved rural, urban, suburban, and exurban communities. *See e.g.*, J.A. 194 (UST Declaration at ¶¶ 7-8); J.A. 217-18 (Alder GSE Declaration at ¶¶ 13-15).

– Result in a widespread cut and/or reduction of mentor teacher stipends for teachers in K-12 schools who work to train and develop new teachers in areas of high-need. *See e.g.*, J.A. 217-18 (Alder GSE Declaration at ¶¶ 13-15).

- Cut curriculum-based professional learning and coaching services designed to improve teacher practice and student learning at over 40 K-12 schools and result in a loss of a rigorous study to help school districts evaluate how best to spend their limited funds and limited teacher development time and resources. J.A. 240-43 (Teaching Lab Declaration at ¶¶ 9, 17-18, 21-22).

- Lead to a decline in enrollment at many of Appellees' member organizations. This includes a decline in current enrollment for students participating in teacher preparation programs who will no longer be able to afford to attend Appellees' member organizations due to the termination of funding supplied for stipends, support for licensure examinations and tutoring, and tuition assistance. The termination of grants also impairs the ability of Appellees' member organizations to recruit future students. *See e.g.*, J.A. 181-82 (AU Declaration at ¶ 13); J.A. 218 (Alder GSE Declaration at ¶¶ 14-15); J.A. 165 NCTR Declaration at ¶ 14).

For the Grant Recipients, the harm is actual, not theoretical, as the funding was terminated in February 2025, immediately resulting in many of the Grant Recipients' inability to continue their programs. The harm to the participants was even more impactful given that the terminations occurred in the middle of the school year. Similarly, for any Grant Recipients whose grants have not yet been terminated, but whose termination is forthcoming, and similarly situated to the grants at issue here, the imminence of their injuries is evident from the Department's publicly-articulated desire to cut these grants used to train teachers and the plain language of the directive from Executive Order 14151 to take immediate action with *at most* 60 days from the date of the January 20, 2025 order. It is clear that the Department swiftly moved to eliminate funding for teacher preparation grants. The harm that this

loss of funding will cause nationally is likewise immense, strangling the viability of the teacher preparation programs that schools and communities desperately need.[21]

The termination of the grants also completely eviscerates Appellees' missions to "elevate education and educator preparation through research, professional practice, advocacy, and collaboration," to "transform educator preparation by advancing the teacher residency movement to prepare, support, and retain more effective educators who represent and value the communities they serve" and to "serve as a distinct statewide voice on matters of importance to educator preparation programs at [] colleges and universities."[22] Without the TQP, SEED, and TSL grants to fund the teacher preparation programs, Appellees and their member organizations will no longer be able to prepare/support and retain educators, which not only thwarts their missions, but also has a devastating impact on the communities they serve. With the loss of funding and slashed programs, Appellees' member

---

[21] Were the Court to agree with the Government, it would pose serious separation of powers and appropriations concerns. Congress has the exclusive power of the federal purse and the Executive Branch is constitutionally constrained from overriding or disregarding Congressional appropriations. *See* U.S. Const. art. I, § 9, cl. 7; U.S. Const. art. I, § 8, cl. 1. In FY 2024, Congress appropriated $90 million for SEED, $70 million for TQP, and $60 million for TSL. Public Law No: 118-42. If these grants remain terminated, and the funds will not be used in the way that Congress appropriated them, such a course may run afoul of the Appropriations Clause and the separation of powers doctrine.

[22] *See* https://aacte.org/about/; https://nctresidencies.org/about-nctr/, https://mactemaryland.wixsite.com/maryland-association.

organizations will no longer be able to support and train teaching candidates to work in partner K-12 schools. Many pre-K through year 12 schools rely on the teacher preparation programs funded by the TQP, SEED, and TSL grants to support their students. For example, without their TQP grant funding, American University will no longer be able to fund additional cohorts of its teacher residency program. As a result, the Washington D.C. Friendship Public Charter Schools will lose the support of the teacher candidates working in their early childhood and special education classrooms. J.A. 181-82 (AU Declaration at ¶ 13). The University of St. Thomas will no longer be able to fund a majority of scholarships for undergraduate and graduate students who are pursuing teacher licensure and degrees in special education and elementary education. J.A. 194 (UST Declaration at ¶¶ 6, 7). The stipends for Alder Graduate School of Education's aspiring teachers and mentor teachers at its partner K-12 school systems will lose the majority of their funding, resulting in expected harm of over $2 million for the partner K-12 school systems. J.A. 217-18 (Alder GSE Declaration at ¶¶ 13-16). Teaching Lab will no longer be able to provide professional learning and coaching services to over 40 K-12 schools. J.A. 240-42 (Teaching Lab Declaration at ¶¶ 9, 17-18). NCTR's thirteen teacher residency programs that were funded by a terminated grant are all in jeopardy, depriving Appellee NCTR of its ability to serve K-12 school districts where there is a high

turnover and shortages of teachers and prepare educators for careers to help mitigate these teacher shortages. J.A. 165-66 (NCTR Declaration at ¶ 18).

The Grant Recipients were harmed, and are likely to be harmed again, by the Department's special condition put on the grants during their period for drawing down the funds. Generally, unless a grantee poses a specific risk, they can draw down funds from their grant award based on the allowable, allocable and reasonable costs approved in their grant budget without prior approval. Here, the Department added a special condition to impacted grants after they were terminated requiring prior approval for them to draw down funds. The grantees are eligible for costs that were properly incurred before their termination date and costs that would not have occurred if the grant was not terminated.[23]

The regulations that govern federal grants set the reasons that the Department can put conditions on grants and the requirements for notice prior to doing so. Imposing a special condition, such as establishing additional prior approvals, on a grant can only be done if the grantee is determined to pose a risk. Factors that may be considered are financial stability, quality of management systems and standards, history of performance, audit reports and filings, ability to effectively implement

---

[23] Grantees have 120 days to draw down the funds after the termination date. 2 C.F.R. §§ 200.472, 200.343, 200.344(b).

requirements, history of compliance with conditions of a federal award, or a responsibility determination. 2 C.F.R. § 200.208.

Before conditions are placed on a grant, the agency must notify the grantee as to: (1) the nature of the additional requirements; (2) the reason why the additional requirements are being imposed; (3) the nature of the action needed to remove the additional requirement, if applicable; (4) the time allowed for completing the actions if applicable; and (5) the method for requesting reconsideration of the additional requirements imposed. *Id.*

Without notice or any finding of individual grantee risk, the Department put a blanket condition on the terminated grants to require prior approval for all remaining drawdowns. This new, unlawfully-imposed condition has caused, and likely will cause again, delays in the Grant Recipients receiving their grant funds and potential subjectivity added to disturbing already approved costs.

**E.**     **The Balance of Equities and Public Interest Favor Injunctive Relief.**

With regard to the final two factors, which merge for purposes of this analysis, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Ass'n of Am. Publishers*, 586 F. Supp. 3d at 388 (quoting *Winter*, 555 U.S. at 23).

The Government's "public fisc" argument is newfound on appeal.[24] Before the district court, the Government's argument with regard to these factors turned on the Government's interest in ending discrimination, the "public interest in ending DEI," and the "interest of more than seventy-seven million people who voted for President Trump in the 2024 Presidential election."[25] J.A. 286-88. Indeed, at oral argument below, the Government described the harm to the "common American" as "less existential than what [Appellees] feel here." J.A. 612. Rejecting these arguments, the district court explained that "a member of the public who is opposed to government funding of Grant Programs that relate to DEI does not outweigh the asserted concrete, irreparable harm in the form of programmatic closures, staff terminations, and loss of funding of teacher preparation programs [Appellees] and

---

[24] As such, the Government's arguments on this point are neither supported by the record nor properly before this Court. *See, e.g.*, *Real Time Med. Sys Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 223-24 (4th Cir. 2025) ("[A]rguments that a defendant might make on appeal from an order granting a preliminary injunction are subject to the same rules as with any appellant: **we may deem an argument not properly before us if the defendant fails to sufficiently raise it before the district court** or in its opening brief.") (emphasis added); *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 283 (4th Cir. 2006) (failure to raise argument against grant of preliminary injunction before district court equated to failure to preserve same on appeal).

[25] The Government's argument with regard to those individuals who cast a vote for President Trump all did so because of his "DEI agenda," J.A. 287, is seemingly impossible to prove.

[Appellees'] members will experience should the injunction not issue." J.A 681. That assessment is correct and should be affirmed.

The Government's argument, which is purely speculative, ignores the many regulatory safeguards designed to protect the Government from the very harms it asserts are irreparable. TQP, SEED and TSL grants are obligated for one fiscal year at a time. Various regulatory provisions prevent illegal drawdown of grant funds— the sort which the Government apparently contends might occur in the absence of a stay. *See* 2 C.F.R. § 200.305(b) (limiting advanced payments to minimum amounts needed and aligning timing with actual, immediate cash requirements of grant recipient); 2 C.F.R. § 200.302(b)(3) (requiring that costs incurred be supported by "source documentation" such as invoices or receipts); 2 C.F.R. § 200.337(a) (requiring that grant recipients keep records demonstrating their compliance with these financial management requirements and must provide access to these records to the authorized representatives of the Agency for any official use).

Moreover, Federal regulations permit the Government to recover funds that were drawn down for unallowable costs. 2 C.F.R. § 200.410 (allowing federal agencies' recovery of unallowable costs with interest); 2 C.F.R. § 200.345(a)(1) (permitting agency "to disallow costs and recover funds on the basis of a later audit or review"). In compliance with the preliminary injunction, the Department restored the grants as of March 24. The Government points to no "immediate outflow of

significant amounts of money" between March 24 and April 10 when the grants were terminated again, which, were the Government's argument not entirely speculative, would be expected to have happened already if it were likely to happen at all. The Government has not established irreparable injury.

Requiring the Department to continue the Grant Recipients' grants would continue the status quo that would have resulted had the Department not unlawfully terminated the grants. The Government suffers no harm if the preliminary injunction remains, just as it suffered no harm from the status quo before the grants were terminated. Even if the Government were right that it *too* would suffer "irreparable harm" by fulfilling its obligations under the law, that harm, in the context of federal spending as a whole, is miniscule; for Appellees members, it is existential. When the Court balances the equities, it does not find the complete collapse of the federal government's operations on one side of the ledger, but that is precisely what Appellees' members are facing. The Grant Recipients' teaching preparation programs provide an essential service furthering important public interest in education that will be destroyed absent Court intervention. Accordingly, the balance of equities and public interest favor injunctive relief.

### F.     The Preliminary Injunction is Properly Tailored.

In issuing a preliminary injunction, the district court appropriately tailored its order to apply to the TQP, SEED, and TSL grant awards of NCTR and Appellees'

member grant recipients. J.A. 686. The district court gave careful consideration to the scope of its injunction, J.A. 681-82, and there is no reason for this Court to constrain it.

Appellees initiated this litigation in their own right and on behalf of their individual members. The preliminary injunction properly encompasses the terminated grants of Appellees' members, the precise equitable and prospective relief sought in the Complaint. J.A. 46 (requesting relief on behalf of all individual Grant Recipients).

The Government's passing attempt to suggest that there can be no irreparable harm to individual Grant Recipients rings hollow where, below, the Government conceded the existence of irreparable harm in the absence of an injunction and it belies the district court's sound finding to the contrary. J.A. 679 ("Plaintiffs have made a clear showing that *their members* will suffer irreparable harm[.]") (emphasis added). The preliminary injunction is not overbroad.

The Government's suggestion that the preliminary injunction should be limited in scope fails for an additional reason: it does not acknowledge that Appellees alleged that all of the grant recipients are similarly situated. J.A. 15 at ¶ 6 ("All of the Grant Recipients are similarly situated because the substance of each Termination Letter and added terms and conditions in the [GANs] from the Department are identical, indicating the same reasons with the same terminology for

the grant terminations.").

Simply providing equitable and prospective relief to the member organizations which submitted Declarations in conjunction with the Complaint would deprive all of the similarly situated member organizations the relief to which they are similarly entitled and subject them to harm that the Government has already conceded is irreparable. Accordingly, it would be inequitable for relief to be limited in the manner suggested by the Government.

After thorough consideration of the scope of the preliminary injunction, the district court limited its order in a manner "no more burdensome than necessary to provide complete relief to [Appellees] and those similarly situated, and subject to the Termination Letter, or substantially the same Grant Program termination letters, pursuant to the Department's apparent categorical policy." J.A. 682. It ordered the Government to

> reinstate the Grant Awards for [Appellees'] members who are Grant Recipients (including NCTR), in accordance with the GAN Terms and Conditions in place immediately prior to the Termination Letters. The court will further order that [the Government] shall not undertake to terminate, or terminate, any TQP, SEED, and TSL awards in a manner this court has determined is likely unlawful as violative of the APA[.]

J.A. 682.

The district court's preliminary injunction is consistent with the approach of other federal district courts that have granted injunctive relief to prospective members. *See Kansas v. Dep't of Educ.*, No. 24-cv-4041-JWB, 2024 WL 3471331,

at *3 (D. Kansas July 19, 2024) (collecting cases); *see also id.* (noting where an organization obtains "something of value through litigation, nothing prohibits members of the general public from trying to benefit from that by . . . joining the organization").

The Government has not pointed to any contrary authority. The scope of the preliminary injunction is appropriately tailored.

## <u>CONCLUSION</u>

This Court should affirm the decision of the district court.


\*    \*    \*

[signatures follow on next page]

Date: July 16, 2025

Respectfully submitted,

*/s/ Joshua W.B. Richards*
Joshua W.B. Richards
Carolyn M. Toll
SAUL EWING LLP
1500 Market Street, 38th Floor
Philadelphia, Pennsylvania 19102
Tel: (215) 972-7737
Joshua.Richards@saul.com
Carolyn.Toll@saul.com

Daniel M. Moore
SAUL EWING LLP
1001 Fleet Street, 9th Floor
Baltimore, MD 21202-3133
Tel: (410) 332-8734
Fax: (410) 332-8862
Daniel.Moore@saul.com

*Counsel for Appellees American Association of Colleges for Teacher Education, National Center for Teacher Residencies, and Maryland Association of Colleges for Teacher Education*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the word limit of Federal Rule of Appellate Procedure 32(g), because excluding the parts of the document exempted by Rule 32(f), this document contains 12,986 words as calculated by Microsoft Word.

*/s/ Daniel M. Moore*
Daniel M. Moore

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of July, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the Court's CM/ECF system upon all persons entitled to service.

*/s/ Daniel M. Moore*
Daniel M. Moore